SHIRLI FABBRI WEISS (Bar No. 079225)
DAVID PRIEBE (Bar No. 148679)
JEFFREY B. COOPERSMITH (Bar No. 252819)
STAN PANIKOWSKI III (Bar No. 224232)
**DLA PIPER US LLP**
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000
Fax: (650) 833-2001
Email: shirli.weiss@dlapiper.com
Email: david.priebe@dlapiper.com
Email: jeff.coopersmith@dlapiper.com
Email: stanley.panikowski@dlapiper.com

ELLIOT R. PETERS (Bar No. 158708)
STUART L. GASNER (Bar No. 164675)
**KEKER & VAN NEST LLP**
710 Sansome Street
San Francisco, CA 94111
Tel: (415) 391-5400
Fax: (415) 397-7188
E-mail: EPeters@KVN.com
E-mail: SGasner@KVN.com

Attorneys for Defendant
KENNETH L. SCHROEDER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       *Plaintiff*,<br><br>   v.<br><br>KENNETH L. SCHROEDER,<br><br>       *Defendant*. | No. C 07 3798 JW<br><br>**DEFENDANT KENNETH L. SCHROEDER'S MOTION TO DISMISS THE COMPLAINT**<br><br>Date:        March 24, 2008<br>Time:       9:00 a.m.<br>Courtroom:  8<br>Judge:     Hon. James Ware |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ........................................................................ 1

STATEMENT OF ISSUE TO BE DECIDED............................................................. 1

RELIEF SOUGHT ...................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 2

I.      INTRODUCTION AND SUMMARY ................................................. 2

II.      PERTINENT FACTS ......................................................................... 4

         A.      A *Wall Street Journal* Article Leads To Government Probes Of KLA ...... 4

         B.      Kenneth L. Schroeder's Career At KLA...................................... 4

         C.      The SEC Relied On The Special Committee Investigation ....................... 5

         D.      The SEC Used Privileged Communications Supplied By KLA
                 As The Cornerstone Of Its Complaint Against Mr. Schroeder ................. 7

         E.      KLA Has Broadly Asserted Privilege Objections  To Thwart
                 Mr. Schroeder's Ability To Mount A Defense ........................................... 9

         F.      The Confidentiality Agreement Signed By The SEC With
                 KLA Precludes The SEC From Contending KLA Has
                 Waived Privileges .................................................................................... 15

         G.      KLA's Broad Privilege Assertions Have Made It Impossible For
                 Mr. Schroeder To Effectively Defend This Case...................................... 16

III.      FUNDAMENTAL PRINCIPLES OF FAIRNESS REQUIRE DISMISSAL
         OF THE COMPLAINT ....................................................................... 19

         A.      Dismissal is Required Where A Privilege Claim Prevents A Party
                 From Preparing Its Defense ..................................................................... 19

         B.      The SEC Has Put Allegedly Privileged KLA Communications
                 At Issue While KLA Has Deprived Mr. Schroeder of Information
                 Vital to His Defense ................................................................................ 21

         C.      The Complaint Must Be Dismissed Regardless That the SEC Is
                 Not the Holder of the Privilege ............................................................... 22

         D.      Prosecution Of The Complaint in The Face of KLA's Assertions
                 Of Privilege Preventing Schroeder From Effectively Defending
                 Himself, Is a Violation Of Schroeder's Due Process Rights Under
                 The Fifth Amendment.............................................................................. 23

CONCLUSION ......................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

## CASES

American Surety Co. v. Baldwin,
    287 U.S. 156 (1932)..................................................................................... 24

Beverly v. United States,
    No. 2:05-cv-735, 2005 U.S. Dist. LEXIS 30586 (S.D. Ohio Dec. 1, 2005).................... 20

Bittaker v. Woodford,
    331 F.3d 715 (9th Cir. 2003)................................................................... 19, 20

Chevron Corp. v. Pennzoil Co.,
    974 F.2d 1156 (9th Cir. 1992).......................................................................... 19

Cleveland Bd. of Educ. v. Loudermill,
    470 U.S. 532 (1985)............................................................................... 23, 24

Fitzgerald v. Penthouse Int'l, Ltd.,
    776 F.2d 1236 (4th Cir. 1985).......................................................................... 21

Home Indem. Co. v. Lane Powell Moss & Miller,
    43 F.3d 1322 (9th Cir. 1995)........................................................................... 21

Kasza v. Browner,
    133 F.3d 1159 (9th Cir. 1998)......................................................................... 21

McDermott, Will & Emery v. Superior Court,
    83 Cal. App. 4th 378 (2000) ..................................................................... 20, 21

Mullane v. Cent. Hanover Bank & Trust Co.,
    339 U.S. 306 (1950)..................................................................................... 23

Nelson v. Adams USA, Inc.,
    529 U.S. 460 (2000)..................................................................................... 24

Rambus Inc. v. Samsung Elecs. Co.,
    No. C-05-02298 RMW, 2007 WL 3444376 (N.D. Cal. Nov. 13, 2007) ......................... 20

Solin v. O'Melveny & Myers, LLP,
    89 Cal. App. 4th 451 (2001) ............................................................................ 20

United States v. Amlani,
    169 F.3d 1189 (9th Cir. 1999)......................................................................... 21

United States v. Higa,
    55 F.3d 448 (9th Cir. 1995)............................................................................. 14

United States v. Reyes,
    239 F.R.D. 591 (N.D. Cal. 2006)...................................................................... 23

- ii -

1

## TABLE OF AUTHORITIES
### (continued)

2
Page

3

*United States v. W.R. Grace,*
    439 F. Supp. 2d 1125 (D. Mont. 2006) ............................................................... 24

4

5

## RULES

6
Fed. R. Evid. 613(b) ................................................................................................... 14

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- iii -

1    **NOTICE OF MOTION AND MOTION**

2    PLEASE TAKE NOTICE that on March 24, 2008, at 9:00 a.m., or at such other date and

3    time as the Court may order, in Courtroom 8 of the above-entitled court, located at 280 South

4    First Street, San Jose, California, Defendant Kenneth L. Schroeder will and hereby does move,

5    pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution and

6    principles of fundamental fairness, for an order dismissing this case in its entirety.  The grounds

7    for this motion are that the prosecution of the Complaint offends principles of Due Process and

8    fundamental fairness for the following reasons:  attorney-client communications are both at the

9    heart of the Complaint and the defense of this case, and the holder of the attorney-client privilege,

10    KLA-Tencor Corporation ("KLA" or "the Company"), while working closely with plaintiff

11    Securities and Exchange Commission ("SEC") to help  prepare and bring the case against Mr.

12    Schroeder, has asserted the attorney-client privilege (1) to prevent witnesses from testifying to

13    communications critical to Mr. Schroeder's defense and (2) to justify its refusal to produce

14    documents critical to the defense.  This motion is based on this Notice, the Memorandum of

15    Points and Authorities in Support, *infra,* the Declaration of Shirli Fabbri Weiss, and any argument

16    of counsel entertained by the Court at the hearing.

17    **STATEMENT OF ISSUE TO BE DECIDED**

18    Should the SEC's Complaint against Mr. Schroeder (the "Complaint") be dismissed

19    because it violates Constitutional Due Process and principles of fundamental fairness where

20    attorney-client communications form the very core of the SEC's Complaint and are also at the

21    heart of Mr. Schroeder's defense (such that  Mr. Schroeder cannot defend himself without

22    testimony and documents concerning those communications), and where: (1) the holder of the

23    privilege, KLA, has stated it will continue to assert the attorney-client privilege to preclude both

24    attorneys and non-attorneys from testifying to information crucial to the defense and to refuse to

25    produce documents; and (2) the SEC, as a result of its agreement with KLA, does not

26    and cannot challenge KLA's assertion of the privilege.

27    **RELIEF SOUGHT**

28    Mr. Schroeder seeks an order dismissing the Complaint with prejudice.

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION AND SUMMARY**

3

On May 22, 2006, a *Wall Street Journal* article suggested, based on statistical analysis,

4

that KLA and other public companies had granted employee stock options at relative low points in

5

their stock's history by selecting grant dates and exercise prices with hindsight.  While not

6

improper, this practice required special accounting treatment.  The implication of the article was

7

that KLA and other public companies had improperly accounted for stock option grants in their

8

financial statements.  The next day, the Department of Justice and the SEC commenced

9

investigations of KLA's stock option granting practices.  The day after, KLA announced that its

10

Board of Directors had formed a "Special Committee" of the Board to investigate as well.

11

Facing possible criminal and civil penalties, KLA hastened to volunteer cooperation to

12

the government in a prayer for leniency.[1]  As part of its strategy, and to assist the SEC in

13

preparing the Complaint, KLA compiled and produced to the SEC: (1) documents reflecting

14

communications between KLA personnel and two lawyers, Stuart J. Nichols ("Nichols") and Lisa

15

C. Berry ("Berry"), who at different times served as General Counsel to KLA; (2)

16

communications between KLA personnel and KLA's outside counsel at the firm of Wilson

17

Sonsini Goodrich & Rosati ("WSGR"), regarding stock option grants; (3) at least 55 witness

18

interview memoranda (the "Witness Interview Memoranda"), including memoranda based on

19

Special Committee interviews of Mr. Nichols and WSGR lawyers Brett DiMarco and Roger

20

Stern, as well as interviews of KLA personnel who made statements about their communications

21

with inside and outside lawyers regarding the Company's option practices.  Indeed, KLA

22

specifically instructed Mr. Nichols to meet with the SEC and DOJ and provide information to

23

these agencies that would otherwise be covered by the attorney-client privilege.

24

On October 12, 2006, the SEC signed an agreement with KLA allowing the SEC to use

25

---

26

[1]  *See, e.g.*, Katheryn Hayes Tucker, *Ex-Prosecutor Dishes Up Advice to GCs on Government Probes*, Fulton County Daily Report, Oct. 19, 2007 (attached as Exhibit 1 to the Declaration of

27

Shirli Fabbri Weiss, dated February 1, 2008 ("Weiss Decl. Ex. 1") ("Get friendly with the investigators. . . . Find out what they're looking for, whom they suspect, and when they think it

28

happened.  'Your goal is to find out those individuals, separate them and if necessary toss them under the bus.'").

communications that are the subject of KLA's claims of privilege, so as to facilitate the SEC in making very serious fraud allegations against Mr. Schroeder.  In it, the SEC agreed not to challenge KLA's assertion of privilege based on KLA's production of privileged materials to the SEC.  The SEC then used the communications produced to it to bring its action against Mr. Schroeder.  In fact, Mr. Schroeder's alleged communications with former General Counsel Nichols are at the heart of the scienter allegations in the SEC's Complaint.[2]  The SEC also used the communications subject to KLA's privilege claims to publicly tarnish Mr. Schroeder.  The SEC  issued a press release to tout its filing of this lawsuit, which specifically stated that "Schroeder received a legal memorandum in March 2001 cautioning" about retroactive pricing.  Press Release, Securities and Exchange Commission, SEC Charges Former KLA-Tencor CEO With Fraud For Improper Stock Options Backdating: Commission Also Settles Claims Against KLA-Tencor (July 25, 2007) (Weiss Decl. Ex. 3).  A *Wall Street Journal* article from the same day quoted an SEC assistant regional director, referencing the same legal memorandum, as stating: "[a]t least here, the CEO was correctly advised not to back date, and how to properly disclose the company's stock options practices.  He chose to ignore that advice."  Siobhan Hughes, *3rd UPDATE:  SEC Charges Former KLA-Tencor CEO In Backdating*, Wall Street Journal Online, July 25, 2007.  (Weiss Decl. Ex. 4).

KLA cooperated with the SEC by essentially preparing the SEC's case for it over an investigation period lasting more than a year while Mr. Schroeder was precluded from cross-examining witnesses or obtaining documents key to his defense.  However, as soon as Mr. Schroeder was permitted to conduct discovery,  KLA and its Special Committee attorneys broadly and pervasively asserted privileges to prevent Mr. Schroeder from obtaining testimony and documents to defend himself.  Specifically, KLA:  (1) instructed former General Counsel Nichols not to testify about communications with any KLA personnel, including Mr. Schroeder;  (2) advised counsel for Mr. Schroeder that it will broadly assert the attorney-client privilege to

---

[2]  In a separate, later-filed complaint, the SEC also sued Ms. Berry, the former General Counsel of KLA, quoting from and relying on her communications with KLA personnel.  *See* Complaint, *SEC v. Berry*, No. C 07-4431 RMW (N.D. Cal. Aug. 28, 2007) (the "Berry Complaint") (Weiss Decl. Ex. 2).

1   prevent KLA personnel from testifying regarding any interactions with inside or outside counsel,

2   including the interactions referenced in the Schroeder and Berry Complaints; and (3) refused to

3   produce the original notes taken by the Special Committee's attorneys, upon which are based the

4   Witness Interview Memoranda that KLA turned over to the SEC.

5       This case represents the ultimate in gamesmanship by the government and a third party

6   which has worked to violate defendant's Constitutional right to Due Process.  KLA's assertion of

7   privilege in this case has impermissibly and fundamentally prevented Mr. Schroeder from

8   preparing and conducting a defense to the allegations that KLA has helped the SEC to make, and

9   in effect urged the SEC to make.  The SEC is complicit, having specifically agreed not to

10  challenge KLA's assertion of privilege; but even if it were not complicit, the assertion of

11  privilege in this context and the resulting substantial impairment of the defense requires, on

12  grounds of fundamental fairness and Due Process, that the case be dismissed with prejudice.

13  **II.    PERTINENT FACTS**

14      **A.    *Wall Street Journal* Article Leads To Government Probes Of KLA**

15      As noted, a May 2006 *Wall Street Journal* article suggested that KLA and other public

16  companies had selected employee option grant dates and exercise prices with hindsight.  While

17  not improper or uncommon, this practice required specific accounting treatment.  Companies were

18  required to account for such option grants by taking a non-cash compensation charge calculated

19  by subtracting the option's exercise price from the fair market value (price) of the underlying

20  stock on the actual grant date.  KLA's accounting and finance department had not been taking

21  compensation charges for its employee option grants for many years.

22      **B.    Kenneth L. Schroeder's Career At KLA**

23      Defendant Schroeder served KLA in non-accounting leadership positions for

24  approximately 22 years.  He was a member of KLA's Board of Directors from 1991 to January

25  2006.  He was KLA's President and Chief Operating Officer from 1991 to mid-1999, and its

26  Chief Executive Officer from mid-1999 to January 2006.  The company grew and thrived under

27  his leadership, and it remains a thriving company to this day.  Mr. Schroeder is not an accountant

28  and never served KLA as its Chief Financial Officer or worked in its accounting department.

1  KLA never looked to him to do its accounting for options or any other accounting, nor was he
2  ever on any company's audit committee. Mr. Schroeder has no legal training.

3    Nevertheless, Mr. Schroeder is a defendant in this SEC action, as well as in shareholder
4  class action and derivative litigation. *See In re KLA-Tencor Corp. Sec. Litig.,* No. C-06-04065-
5  MJJ (N.D. Cal.); *In re KLA-Tencor Corp. Shareholder Derivative Litig.,* No. C-06-3445 (JW)
6  (N.D. Cal.). Notwithstanding Mr. Schroeder's long and distinguished service to KLA, the
7  Company terminated him by e-mail in the Fall of 2006 after completing its "Special Committee"
8  investigation, which purported to exonerate all then-current officers and directors while
9  conveniently finding that Mr. Schroeder, who at the time was no longer serving as an officer or
10 director, was almost entirely to blame for KLA's mis-accounting of options. *See* KLA-Tencor
11 Corp., Annual Report (Form 10-K) (Jan. 29, 2007), at 23-27 (Weiss Decl. Ex. 6). KLA then
12 rushed to "cooperate" with the SEC against Mr. Schroeder in exchange for a sweetheart deal with
13 the SEC involving no financial penalty to KLA, and no allegation or judgment of securities fraud.[3]

14     **C.**  **The SEC Relied On The Special Committee Investigation**

15   The day after the *WSJ* article appeared, the SEC and the DOJ began investigating KLA's
16 option grant practices. The next day, KLA announced that it had formed its own "Special
17 Committee" to investigate. The same disclosure also announced that KLA had received
18 subpoenas from the DOJ, and publicly promised that the Company "will cooperate fully with any
19 government or regulatory investigation into these matters." *See* KLA-Tencor Corp., Current
20 Report (Form 8-K) (May 24, 2006) (Weiss Decl. Ex 7).

21   As shown by documents produced by the SEC in this litigation, from early on in its
22 investigation, facing possible criminal and civil penalties, KLA hastened to exchange cooperation
23 for leniency.[4] This would allow KLA to curry favor with the government and shape its perception
24 of current and former management. Thereafter, the Special Committee counsel, the law firm of
25 Skadden, Arps, Slate, Meagher & Flom ("Skadden"), interviewed approximately 55 witnesses

26 ─────────────────────
27 [3] *See* Consent of Defendant KLA-Tencor Corporation to Entry of Final Judgment, *SEC v. KLA-Tencor Corp.*, No. C 07-3799 (N.D. Cal. July 25, 2007) (Weiss Decl. Ex. 5).
28 [4] *See* Letter from KLA counsel, John Hemann, Morgan Lewis & Bockius LLP ("MLB"), to the SEC, dated June 29, 2007, and excerpts from enclosure (Weiss Decl. Ex 8).

1    (principally current and former directors, officers and other employees), and produced to the SEC

2    lawyer-revised memoranda based on the notes of the witnesses interviews.  KLA also compiled

3    millions of pages of documents for the SEC, including documents evidencing communications

4    between KLA personnel and two lawyers who served as General Counsel, Mr. Nichols and Ms.

5    Berry; as well as from and to outside lawyers at WSGR.  Among the witness interviews that KLA

6    produced to the SEC were memoranda based on Special Committee interviews of Mr. Nichols and

7    Messrs. DiMarco and Stern of WSGR.  KLA placed no restrictions on the interviews of these

8    lawyers, to the contrary,  KLA specifically instructed Mr. Nichols to provide information to the

9    SEC and the DOJ that would otherwise be covered by the attorney-client privilege.[5]

10   _____

11   [5]  *See* Transcript of the Deposition of Stuart J. Nichols ("Nichols Tr."), at 24-26 (Weiss Decl. Ex.
     9):

12
13        Q.   While you were questioned about your communications with KLA personnel,
          did you assert the attorney-client privilege on behalf of the company in response
          to those questions or did your attorney assert them on your behalf?

14
15        MR. BELNICK [counsel to Mr. Nichols]:  Maybe I can help with this.  Before
          Mr. Nichols answered any questions I obtained a representation from Mr. Wong
16        [Assistant United States Attorney Michael Wang] and I believe SEC counsel that
          KLA was cooperating with their inquiries.  This was prior, as you know, to this
17        lawsuit.  And that Mr. Nichols was therefore free to answer questions that
          otherwise would be privileged.  I left the room and I called KLA's then general
18        counsel, Mr. Gross I believe his name was, and either he or someone from his
          office confirmed to me over the telephone that the government's representation to
19        me was accurate and that with respect to the Justice Department and the SEC, Mr.
          Nichols was free to answer any inquiry even though it might otherwise be
20        considered subject to the attorney-client privilege or work product immunity.
          And on that basis, thereafter I made no objections on privilege grounds.

21
22        MS. WEISS:  And so your understanding as a result of your conversation with
          Mr. Gross was that you were not obliged or even requested to assert the attorney-
          client privilege in response to questions about Mr. Nichols' communications with
23        KLA personnel; is that correct?

24        MR. BELNICK:  That's correct.  Not only that I was not obliged to and that I
          should not.
25
26        MS. WEISS:  And the same question with respect to the work product doctrine,
          that you were not either requested or required to assert that privilege, and that
27        indeed you were being requested by the company to respond -- to have Mr.
          Nichols respond to the questions of both the SEC and the U.S. Attorneys Office;
28        is that correct?

1    The SEC relied heavily, if not entirely, on KLA's Special Committee investigation, and

2   filed an action against Mr. Schroeder, but, as noted above, settled with the Company for no

3   monetary penalties and no finding of fraud.  In this litigation, the SEC has produced no sworn

4   testimony of witnesses against Mr. Schroeder.  Presumably, the SEC relied on the lawyer-revised

5   Witness Interview Memoranda and reports of the Special Committee—the documents that KLA

6   contends remain privileged—as well as some informal interviews arranged by KLA.

7       **D.    The SEC Used Privileged Communications Supplied By KLA As The
             Cornerstone Of Its Complaint Against Mr. Schroeder**

8           As noted above, the SEC received privileged communications from KLA, which it used to

9   prepare its case against Mr. Schroeder.  The SEC made privileged communications the

10  cornerstone of its Complaint against Mr. Schroeder.  Its  core allegations, designed to show the

11  crucial element of scienter to support its securities fraud claims, are based largely on the SEC's

12  interpretation of communications as to which KLA claims privilege.  This is illustrated in the

13  following text and (argumentative) headings from the Complaint—all of which are based on

14  communications subject to KLA's claims of privilege and refusals to allow testimony:

15

16       In June 1999, <u>a KLA executive</u>[6] <u>instructed</u> the Company's Human Resources
         ("HR") department about procedures <u>on how to backdate new hire grants</u>: (1)
17       create a list of newly hired employees; (2) wait several weeks; (3) obtain a list of
         KLA's daily closing stock price for the past. several weeks; (4) highlight the three
18       or four lowest prices; and (5) forward the new hire list and the highlighted stock
         price list to KLA's Stock Option Committee.  Complaint ¶ 23 (emphasis added).
19
     _____

20       MR. BELNICK:  Essentially, yes.

21  [6]  The "KLA executive" which the SEC references in paragraph 18 of the Complaint against Mr.
     Schroeder, is, in fact, Ms. Berry, the General Counsel of KLA from 1997 through mid-1999.  This
22   is clear from the allegations in paragraph 34 of the Berry Complaint, which are almost identical to
     the allegations in paragraph 18 of the Complaint against Mr. Schroeder.  Paragraph 34 of the
23   Berry Complaint alleges:

24       In June 1999, shortly before her departure from KLA, Berry instructed employees
25       in KLA's HR department how to backdate stock option grants so that they could
         carry on with the scheme after she departed.  Berry advised the HR personnel to:
26       (1) create a list of newly hired employees; (2) wait several weeks; (3) obtain a list
         of KLA's daily closing stock prices for the past several weeks; (4) highlight the
27       three or four lowest prices; and (5) forward the new hire list and the highlighted
         stock price list to KLA's Stock Option Committee.  As a consequence, KLA
28       continued to backdate certain stock option grants in this manner following Berry's
         departure from the company.

1

* * *

2

**In a March 2001 Memorandum, <u>Schroeder Receives Legal Advice</u> that he Cannot  Retroactively Set Stock Prices**

3

4

Schroeder understood the accounting implications of awarding an in-the-money options grant.  Soon after he became CEO in July 1999, Schroeder received communications that made him aware of the basic accounting rules for stock options.  <u>For example, in September 1999, Schroeder received an email reflecting outside counsel's opinion</u> that certain options granted with an exercise price equal to the fair market value on the date of grant would not result in a compensation expense.  During the period of the fraud, Schroeder kept abreast of proposed requirements that all employee stock options (rather than just in-the-money options) be expensed by companies, as well as pronouncements and deliberations by the Financial Accounting Standards Board on stock option accounting. Complaint ¶ 29 (emphasis added).

5

6

7

8

9

10

Schroeder therefore knew or was reckless in not knowing that KLA would have to record an accounting expense for any options that were granted below fair market value on the date of the grant.  He also knew or was reckless in not knowing the requirements for the determination of a grant date, *i.e.,* when the key terms of the option grant were known.  Complaint ¶ 30.

11

12

13

<u>In March 2001, KLA's then-General Counsel communicated to Schroeder</u> that selecting grant prices with hindsight required the Company to take a compensation charge, and that doing so without disclosing the fact could run afoul of the law.  <u>On or around March 19, 2001, the GC sent a "Stock Options Pricing" Memorandum to Schroeder.</u>  The first sentence in the Summary section stated: "the date at which the price of option grants is determined must be the fair market value of the underlying shares as of the date upon which options are granted."  Complaint ¶ 31 (emphasis added).

14

15

16

17

18

The Memorandum further described the accounting rules for stock options and stated: "[a]ny attempt to set a price before such a grant is made raises substantial risks under securities and tax laws [and] accounting rules and gives rise to disclosure obligations."  The Memorandum stated that "the Board and its committees are limited in their ability to grant options at a retroactive price without exposing the company to risk of an accounting charge."  Complaint ¶ 32

19

20

21

22

<u>In a March 22, 2001 email back to the General Counsel, Schroeder acknowledged</u> reading the memorandum and responded: "The Compensation Committee has given the Stock Option Committee (Gary, Ken and I) power to set the price of stock options. . .  Please don't take away some of my best tools for attracting and retaining people.  We need those people to win the battle.  Help me, don't just tell me how to follow a strict interpretation of rules.  I need a 'war time counselor,' not someone who can recite page and verse."  Complaint ¶ 33 (emphasis added).

23

24

25

26

27

**Schroeder Continued Approving Backdated Options Grants <u>Despite Having Read The March 2001 Memorandum</u>**

28

1
2
3
4
5

Although Schroeder understood the accounting implications of awarding in-the-money grants before March 2001, and although he received a further warning in March 2001 that backdating options grants without proper disclosure and accounting ran afoul of securities laws, Schroeder nonetheless continued backdating options grants. After March 2001, Schroeder had the Stock Option Committee approve eight additional new hire grants and two additional peak performance grants, all of which were backdated. Complaint ¶ 34 (emphasis added.)

6

7

8

9

10

These allegations, all of which are based on alleged communications that are the subject of privilege claims being asserted vigorously by KLA, are the central allegations against Mr. Schroeder. The SEC interprets the alleged communications between Mr. Nichols and Mr. Schroeder to mean that Mr. Schroeder ignored the advice of the General Counsel not to backdate option grants. As noted above, the SEC said the same thing to the press. *See* p. 3, *supra.*

11

12

### E.    KLA Has Broadly Asserted Privilege Objections To Thwart Mr. Schroeder's Ability To Mount A Defense

13

14

15

16

17

18

19

20

21

22

23

As shown above, KLA assisted the SEC in the preparation of this case. KLA-Tencor has a strong financial stake in seeing the SEC succeed in this litigation for three reasons. First, in October 2006, to curry favor with the government and save itself from penalties, the Company blamed Mr. Schroeder for its option process failures, unilaterally and without judicial scrutiny terminating all of his contracts, cancelling millions of dollars of his contract benefits. KLA has admitted in its SEC filings that Mr. Schroeder's asserted claims of KLA misconduct against him could involve "a material amount." Second, KLA is the real party in interest in a pending derivative complaint against Mr. Schroeder and others. *See In re KLA-Tencor Corp. Shareholder Derivative Litig.*, No. C-06-3445 (JW) (N.D. Cal.). Third, KLA stands to be a direct beneficiary of a portion of the SEC's recovery in this case, as permitted by law. A victory by the SEC in this case would greatly aid KLA's position in all three of these areas.

24

25

On January 24, 2008, in response to Mr. Schroeder's effort to meet and confer regarding a subpoena issued to KLA seeking documents critical to the defense, counsel for KLA wrote that:

26

27

28

With regard to materials protected by the work product doctrine and/or attorney-client privileges, as you know and as we have discussed with you on numerous occasions, KLA provided protected material to the SEC under an express confidentiality agreement that production did not waive applicable privileges.

1

> Based on the circumstances of the SEC investigation, under the common-interest exception to waiver doctrine and case law recognizing a "selective waiver," including *In re McKesson HBOC, Inc. Sec. Litig.*, 2005 WL 934331 (N.D.Cal. Mar. 31, 2005), KLA has not intended to waive any privileges and has vigorously intended to preserve the privilege as to Mr. Schroeder and others who are adverse to the Company.  Mr. Schroeder's claim that those privileges have been waived is incorrect.

2

3

4

5

Letter from Joseph E. Floren, MLB, to Shirli Fabbri Weiss (Jan. 24, 2008) (Weiss Decl. Ex. 10).

6

       Mr. Schroeder's counsel was not aware of just how broadly KLA intended to assert the

7

privileges until January 27, 2008, the day that she took (or, more accurately, attempted to take)

8

Mr. Nichols' deposition.  Nichols served as the General Counsel of KLA from the Fall of 1999

9

through the Fall of 2006, and, as noted, his alleged communications with Mr. Schroeder are

10

quoted in the Complaint and were used by the SEC with the press.  During this deposition, KLA's

11

lawyers prevented Mr. Schroeder from getting any substantive information about the SEC's

12

cornerstone allegations against him.

13

       Counsel for KLA (Mr. Hemann) summarized the Company's position as follows:

14

15

> MR. HEMANN:   Shirli, I think this is probably a good time for me to interject that as a general matter, we have advised Mr. Nichols through his attorney that KLA-Tencor, which would include any committees or members of the board of director -- the directors of KLA-Tencor or their counsel, do not waive any privilege that might be applicable, including the attorney-client or the attorney work product privilege.  And we have requested Mr. Nichols through his counsel, Mr. Belnick, that he adhere to his ethical statutory and fiduciary duties, such as they are, and take all necessary steps to protect both the attorney-client privilege and the attorney work product privilege doctrine as he answers questions today.  And I don't know where exactly this particular set of questions is going, but I wanted to make it clear that the company has made that request.  To the extent that a question that you ask would reveal in Mr. Nichols' answer privileged information; privileged under either the work product doctrine, the attorney-client privilege, we've asked Mr. Nichols to decline to answer the question.  And Mr. Belnick will make an observation if he feels that Mr. Nichols' answer will reveal such information, and on that basis of Mr. Belnick's observation, we would ask Mr. Nichols not to answer the question.

16

17

18

19

20

21

22

23

Nichols Tr., at 32-33 (Weiss Decl. Ex. 9).

24

       Mr. Schroeder's counsel's subsequent attempt to inquire about the allegations of the SEC

25

Complaint, and the circumstances surrounding the March 2001 memorandum sent by Mr. Nichols

26

as alleged in the Complaint, was met with objections and instructions not to answer from KLA's

27

counsel (Ms. Heintz):

28

BY MS. WEISS:

Q.  Mr. Nichols, Exhibit 83 is a copy of the complaint filed in the United States District Court for the Northern District of California, San Jose Division, by the Securities and Exchange Commission as plaintiff against my client, Kenneth L. Schroeder, on July -- I think it's 25th, 2007.  Please review as much of the complaint as you need to respond to my questions.  But I'm going to direct your attention to paragraph 29 under the heading "C., in a March 2001 memorandum Schroeder receives legal advice that he cannot retroactively set stock prices," paragraphs 29, 30, 31, 32 and 33.

* * *

Q.  All right.  Can you tell me, Mr. Nichols, if you believe that the reference to paragraph 31 and 32 in this complaint is a reference to Exhibit 77?

A.  It appears to be a reference to that exhibit, yes.

Q.  All right.  Thank you.  Take a look at Exhibit 78.  The lower part of Exhibit 78 is an email from Mr. Schroeder to you dated March 22nd, 2001, which appears to be responding to Exhibit 77.  Do you see that, sir?

A.  Uh-huh.  Yes.

Q.  Take a moment and tell me, if you can, if you believe that the allegations in paragraph 33 are a reference to Exhibit 78.

A.  Yes, it would appear so.

MS. WEISS:  Miss Heintz, is it the company's position that it will instruct Mr. Nichols not to testify with respect to Exhibit 78 on the grounds of the attorney-client privilege?

MS. HEINTZ:  Yes.

MS. WEISS:  Is that the company's position with respect to the individuals identified on Exhibit 77?

MS. HEINTZ:  Well, they are not identified as recipients of No. 78.

MS. WEISS:  Yes.  But to the extent that I ask them questions about Mr. Schroeder's response, would the company's position be the same?  That is  to say --

MS. HEINTZ:  To the extent they would reveal attorney-client communications, yes.

MS. WEISS:  Would you permit them to respond to questions that did not involve reference to Mr. Nichols' memo?

MS. HEINTZ:  We would have to determine that on a case-by-case basis.

1    MS. WEISS:  But as to communications that in any way touched  upon Mr.
2    Nichols' communication, you would instruct them not to answer.  Is that your
     position?

3    MS. HEINTZ:  If they are communications with Mr. Nichols, yes.

4    MS. WEISS:  Only if they are communications with Mr. Nichols?

5    MS. HEINTZ:  Or to the extent they are about communications of Mr. Nichols.

6    MS. WEISS:  So if Mr. Kispert and Mr. Schroeder had a conversation about Mr.
7    Nichols' memorandum, would you instruct both of those individuals not to
     respond -- not to answer my questions based on the attorney-client privilege?

8    MS. HEINTZ:  We'd have to determine that based on the question and the
9    context.

10   MS. WEISS:  So it depends on how the question is asked whether or not they
     could respond to the question about Mr. Nichols --

11   MS. HEINTZ:  Or what the subject matter of the question is.

12   MS. WEISS:  I'm assuming that the subject matter of the question is Mr. Nichols'
13   memo.  Take that as the assumption.  I'm just trying to shortcut a bunch of
     depositions here.

14
     MS. HEINTZ:  I understand.
15
     MS. WEISS:  Would you instruct Mr. Schroeder and Mr. Kispert not to respond if
16   the questions were posed about Mr. Nichols' communications to Mr. Schroeder?

17   MS. HEINTZ:  Yes.

18   MS. WEISS:  And would that be your position with respect to questions posed by
19   the SEC as well as Mr. Schroeder's counsel or only Mr. Schroeder's counsel?

     MS. HEINTZ:  No with respect to both.
20
21   MS. WEISS:  Okay.  So if the SEC asks questions of Mr. Nichols about Exhibit
     77 and 78, you would instruct him not to answer.  Same thing with all these other
22   people that are cc'd on the memorandum that is Exhibit 77; correct?

     MS. HEINTZ:  Yes.
23

24   Nichols Tr., at 202-06 (Weiss Decl. Ex. 9).

25        Mr. Schroeder's attempt to ask specifically about the communications alleged in

26   paragraphs 31 through 33 of the Complaint—the key allegations giving rise to the SEC's theory

27   that Mr. Schroeder possessed the requisite scienter—was also met with objections and

28   instructions not to answer.  KLA even claimed that communications among non-lawyer officers

1  of the Company about the subject of Mr. Nichols' communications are privileged and non-

2  discoverable:

3      BY MS. WEISS:

4      Q.  Okay.  So, Mr. Nichols, the court reporter had handed you what's been
    marked as Exhibits 68 through 82.  Take a look at Exhibit 77.  Can you identify

5      that exhibit?

6                                     * * *

7      A.  This is a memo that I prepared directed -- that I gave to Ken Schroeder.

8      Q.  The date on it is March 19th, 2001.  The Bates stamp is KT ACWP-
    PRIV00002391 to 2394 – I'm sorry -- 95.  It's a memorandum marked

9      "Privileged and Confidential," addressed to Ken Schroeder from Stu Nichols with
    copies to Maureen Lamb, John Kispert and Joy Nyberg, "Re:  Stock Option

10     Pricing."  Do you see that, sir?

11     A.  Yes.

12     Q.  You sent that to Mr. Schroeder on March 19th, 2001?

13     A.  Yes.

14                                       * * *

15     Q.  All right.  Now, as I understand your instruction from counsel, you're going

16     to refuse to testify with respect to this memorandum on the grounds of attorney-
    client privilege.  Is that correct?

17     MS. HEINTZ:  That's correct.

18     BY MS. WEISS:

19     Q.  Okay.  And I think you've already testified that you did not prepare the

20     memorandum in anticipation of litigation; correct?

21     A.  Correct.

22     Q.  And is it the company's position that it will instruct Ms. Lamb, Mr. Kispert,
    Joy Nyberg and Mr. Schroeder not to testify with respect to this communication

23     from the general counsel Stu Nichols?

24     MS. HEINTZ:  We're prepared to instruct with respect to Mr. Nichols at this

25     time.  We can discuss other applications of the privilege after the deposition.

26     MS. WEISS:  And so is it your statement that you will not commit on the record
    at this time as to whether or not you will instruct the people that I mentioned that

27     are addressees of this memorandum not to testify?

28

1    MS. HEINTZ:  With respect to this memorandum, we would instruct them not to
2    testify.

3    MS. WEISS:  Okay.  So it is the company's position that none of these people
     will be permitted to testify with respect to Exhibit 77 should they be called as
4    witnesses, including Mr. Schroeder?

5    MS. HEINTZ:  Yes.

6    Nichols Tr., at 199-202 (Weiss Decl. Ex. 9).[7]

7          As shown by these exchanges on the record, KLA's broad assertions of privilege have

8    resulted in a situation where the SEC is relying on privileged communications to make its case in

9    court (and in the press), while KLA is preventing Mr. Schroeder from inquiring about those

10   communications with the obvious acquiescence of the SEC.  Mr. Schroeder is not only unable to

11   inquire as to communications between KLA's attorneys and its directors, officers, and employees,

12   but also as to communications among non-lawyers about the key communications from KLA

13   lawyers.  It is impossible for Mr. Schroeder to defend this case, and consequently grossly unfair

14   for the SEC to maintain this action, because he is prevented from inquiring into these matters.

15         Similarly, KLA's Special Committee has blocked Mr. Schroeder from obtaining other

16   essential information crucial to his defense.  As noted, the SEC relied on approximately 55

17   Witness Interview Memoranda volunteered to it by the Special Committee.  These are second or

18   third generation, lawyer-revised memoranda prepared by Skadden, subsequently produced to Mr.

19   Schroeder in the SEC's Rule 26 disclosures.  However, it is essential to Mr. Schroeder's defense

20   that he obtain the underlying *original interview notes* taken by the Skadden attorneys and earlier

21   drafts of the Witness Interview Memoranda.  These notes are likely the closest to what the

22   witnesses actually said during their interviews, which, in turn, is essential to effective cross-

23   examination of the witnesses, as well as to the possible calling of Skadden lawyers as

24   impeachment witnesses in the event that the witnesses testify contrary to their Special Committee

25   interviews.  *See* Fed. R. Evid. 613(b); and *United States v. Higa*, 55 F.3d 448, 451-53 (9th Cir.

26   1995).  But when Mr. Schroeder subpoenaed those notes, and other essential materials from

27

28   ─────────────
     [7]  The transcript is replete with numerous other instances of KLA's counsel instructing Mr.
     Nichols not to answer.

Skadden, it objected and refused to produce the notes citing attorney-client privilege and attorney work product as a shield against discovery.[8]  After meeting and conferring, Skadden stated its position on the original notes and earlier drafts of the Interview Memoranda as follows:

> ". . . .we will not produce any of Ms. Harlan's handwritten notes about the interviews, or any "drafts" or revisions of the interview memoranda, and we will not allow her to answer any questions on such handwritten notes or drafts, as such information is squarely protected by the attorney work product doctrine.  *See Hickman v. Taylor*, 329 U.S. 495, 508."[9]

### F.    The Confidentiality Agreement Signed By The SEC With KLA Precludes The SEC From Contending KLA Has Waived Privileges

On October 12, 2006, the SEC signed a "Confidentiality Agreement" with KLA, permitting the SEC to use privileged documents and information against Mr. Schroeder in any way it wished.  The Confidentiality Agreement provides, in pertinent part:

> KLA-Tencor and the Special Committee will voluntarily provide to the [SEC] Staff copies of documents that may be protected by the attorney-client privilege and work-product doctrine ("Confidential Materials") . . . .

> Please be advised that by producing the Confidential Materials pursuant to this agreement, KLA-Tencor and the Special Committee do not intend to waive the protection of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties.  The Company believes that the Confidential Materials warrant protection from disclosure.

> The Staff will maintain the confidentiality of the Confidential Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities.

> The Staff will not assert that the production of the Confidential Materials to the Commission constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party.  The Staff agrees that production of the Confidential Materials

---

[8] *See* Notice of Subpoena for Records to Skadden, Arps, Slate, Meagher & Flow LLP (Nov. 12, 2007) (Weiss Decl. Ex. 11); Non-Party Skadden, Arps, Slate, Meagher & Flom LLP's Responses and Objections to Defendant Kenneth L. Schroeder's Subpoena for Records (Dec. 10, 2007), at 10-12 (Weiss Decl. Ex. 12) ("Skadden also refuses to produce any of the Interview Memoranda, or any of the privileged documents or exhibits attached thereto, on the additional grounds that such documents are protected from discovery by the attorney client privilege, the work product doctrine, or other application privileges.").

[9] Letter from Matthew Sloan, Skadden, to Shirli F. Weiss (Dec. 27, 2007), at 2 (Weiss Decl. Ex. 13).

provides the Staff with no additional grounds to subpoena testimony, documents
or other privileged materials from the Company or the Special Committee,
although any such grounds that may exist apart from such production shall remain
unaffected by this Agreement.

*See* Letter from John H. Hemann, MLB, to Marc J. Fagel, SEC (Oct. 12, 2006) (emphasis added)

(Weiss Decl. Ex. 14).

The net effect of the Confidentiality Agreement has been to allow the SEC to selectively

use privileged communications *against* Mr. Schroeder while at the same time to allow KLA's

broad assertion of privilege to *block* Schroeder from defending the case.   KLA and the SEC's

strategy is fairly transparent.  In order to enable the SEC to prosecute its case against Mr.

Schroeder through the use of privileged communications, KLA undoubtedly will, at a time of its

choosing most advantageous to itself and the SEC, and disadvantageous to Mr. Schroeder, waive

privilege or selectively waive privilege to allow the SEC to present privileged testimony and

documents against Schroeder at trial.  The Court should not countenance such gamesmanship on

the part of KLA, and much less so on the part of the government, the purpose of which is solely

to place the defendant at a crippling disadvantage in fairly defending the case.

## G.    KLA's Broad Privilege Assertions Have Made It Impossible For Mr. Schroeder To Effectively Defend This Case

With respect to the communications to and from Mr. Nichols alleged in the Complaint, the

SEC wrongly interprets these as "smoking guns" which it imagines show that Mr. Schroeder was

warned by KLA's then-General Counsel not to backdate options, but disregarded this advice.  If

permitted to inquire into the circumstances of these communications, however, Mr. Schroeder's

counsel would show that Mr. Nichols' memorandum of March 2001 (*see* Complaint ¶ 31) was

meant to deal with the narrow issue of whether the Company's Stock Option Committee (of

which Mr. Schroeder was one of the three members) could select a price (not a backdated price)

for stock options to be issued to the Company's officers, with ratification of this selection

retrospectively by the Board of Directors at a meeting set for about a month later.  Mr. Schroeder

also believes that, if permitted to inquire, the record would show that he sought out and spoke

with the CFO about the memorandum, who promised Mr. Schroeder he would speak with the

1    General Counsel and address the issues raised in the memorandum; and that the CFO and the

2    Vice President of Finance at KLA, as well as Mr. Nichols and outside counsel (which Mr.

3    Schroeder asked to become involved), received and in fact were heavily involved in dealing with

4    the issues raised in the March 2001 memorandum and led Mr. Schroeder to believe that they had

5    arrived at an appropriate solution for issues raised by Mr. Nichols.  The record would further

6    show that Mr. Schroeder dealt with these issues appropriately by involving the CFO, and that the

7    CFO, together with the VP-Finance and Mr. Nichols, were able to resolve the issues to their

8    satisfaction.  KLA's broad privilege assertions make it impossible for Mr. Schroeder to develop

9    these facts, however.

10        Similarly, the communications between former General Counsel Berry and KLA personnel

11   are crucial to Mr. Schroeder's defense.  As the SEC alleges, Ms. Berry instructed the Human

12   Resources Department on how to backdate options as she was leaving KLA.  Indeed, even while

13   alleging that Mr. Schroeder "engineered" a backdating scheme at KLA (Complaint ¶ 18), the SEC

14   alleges in the *first paragraph* of its separately filed complaint against Ms. Berry that she "devised

15   the improper backdating scheme while serving as General Counsel of KLA-Tencor Corporation."

16   Berry Complaint ¶ 1.  Among other things, KLA's privilege assertions preclude Mr. Schroeder

17   from inquiring into the basis of a statement by Ms. Berry about retroactive pricing that appears in a

18   memorandum she sent on November 14, 1998, to KLA's outside counsel at WSGR.  (Weiss Decl.

19   Ex. 15).[10]

---

20   [10] Exhibit 15 to the Weiss Declaration, as well as Exhibit 16 to that declaration, discussed *infra*,
     contain communications among KLA personnel and counsel for KLA that are subject to KLA's

21   privilege claims.  As noted in paragraphs 16 and 17 of the Weiss Declaration, Mr. Schroeder
     received these and many other documents similarly subject to KLA's privilege claims from the

22   SEC as part of the SEC's initial disclosures pursuant to Federal Rule of Civil Procedure 26(a).
     KLA knows that the SEC produced these documents to Mr. Schroeder, but has never asked for

23   their return or otherwise tried to protect them from disclosure.  *See* Letter from Joseph E. Floren,
     MLB, to Shirli Fabbri Weiss (Jan. 24, 2008), at 4 (Weiss Decl. Ex. 10) ("Mr. Schroeder . . . now

24   has copies of all of [the privileged documents produced by KLA to the SEC] because the SEC
     provided them to him."); Letter from Matthew Sloan, Skadden, to Shirli F. Weiss (Dec. 27,

25   2007), at 3 (Weiss Decl. Ex. 13) ("Based on the SEC's initial disclosures, the SEC has already
     produced to you every responsive document that the Special Committee or the Company

26   produced to the SEC pursuant to the Company's confidentiality agreement with the government .
     . . .").  The prejudice to Mr. Schroeder addressed by this motion is not that he does not have these

27   documents, but rather that the Company, with the SEC's agreement, is preventing Mr. Schroeder

28   from making <u>any</u> inquiry of witnesses with respect to the documents, including the circumstances
     under which they were created and their meaning in context and is withholding additional

1       The circumstances surrounding what, if anything, outside counsel did in response to Ms.

2   Berry's outline of her backdating process, which she apparently and perhaps mistakenly believed

3   had been approved by KLA's auditors, is obviously essential to Mr. Schroeder's defense, but

4   again, he has been precluded from making this inquiry. Also regarding communications to and

5   from outside counsel, WSGR lawyers were in fact the primary authors of the March 2001

6   memorandum sent by Mr. Nichols, as alleged in the SEC complaint. Inquiry into the WSGR

7   attorneys' recollections of the circumstances surrounding the March 2001 memorandum is thus

8   crucial to Mr. Schroeder's defense, but KLA has made it clear that any attempt to make such

9   inquiry will be met with objections and instructions not to answer.

10      Mr. Schroeder also will be precluded from inquiring as to a key communication on

11  September 20, 1999 between former Human Resources manager Leslie Wilson and Mr. Stern of

12  WSGR, again concerning retroactive pricing. (Weiss Decl. Ex. 16). It is difficult to conceive

13  how Mr. Schroeder could defend this case without being able to inquire into the meaning of this

14  exchange between Ms. Wilson and Mr. Stern. Did Mr. Stern approve retroactive price selection,

15  or did Ms. Wilson at least perceive that he was doing so? Could this explain why the Human

16  Resources department backdated stock options? What are the implications of the fact that Human

17  Resources forwarded Ms. Wilson's email exchange with Mr. Stern to the Company's Finance

18  department (which had responsibility for correctly accounting for stock option grants)? (Weiss

19  Decl. Ex. 16).

20      These are but a few examples of the types of information that Mr. Schroeder is being

21  precluded from obtaining, communications on which KLA claims attorney-client privilege which

22  are so central to the Complaint and to Schroeder's defense. KLA's privilege claims are so broad

23  that Mr. Schroeder simply cannot defend this case. One would think that the SEC, as a

24  government agency, would have equal if not more interest in getting to the bottom of these and

25  many other questions, but it has instead decided to selectively use communications subject to

26  privilege claims against Mr. Schroeder while creating the opportunity through the Confidentiality

27  documents that KLA decided not to produce to the SEC. But because KLA has never tried to

28  protect or prevent disclosure of the documents it produced to the SEC, Mr. Schroeder sees no
    need to file Exhibits 15 and 16, or any other documents accompanying this motion, under seal.

1    Agreement for the Company to preclude Mr. Schroeder from exploring these facts.

2    **III.    FUNDAMENTAL PRINCIPLES OF FAIRNESS REQUIRE DISMISSAL OF THE COMPLAINT**

3

4    The SEC has made the attorney-client privileged communications of KLA the cornerstone

5    of its Complaint against Mr. Schroeder, but KLA has blocked him from making any inquiry about

6    these communications. This situation, largely made possible by what is effectively an agency

7    relationship between KLA and the SEC, is furthered by the Confidentiality Agreement the SEC

8    signed with KLA.  Basic, longstanding principles of fairness and due process flatly prohibit such

9    one-sided use of the privilege.  Because KLA's privilege claims substantially preclude Mr.

10   Schroeder's ability to defend himself, the SEC's Complaint must be dismissed with prejudice.[11]

11   **A.    Dismissal is Required Where A Privilege Claim Prevents A Party From Preparing Its Defense**

12

13   It is well established that a plaintiff cannot base its claims on information protected by the

14   attorney-client privilege while at the same time using the privilege to deny its opponent access to

15   the very information necessary to challenge or defend against those claims.  *Bittaker v. Woodford*,

16   331 F.3d 715, 719 (9th Cir. 2003) (en banc) ("[P]arties in litigation may not abuse the privilege

17   by asserting claims the opposing party cannot adequately dispute unless it has access to the

18   privileged materials.").  The well-worn maxim associated with this basic precept of fundamental

19   fairness is that a party cannot use the attorney-client privilege as both "a sword" and "a shield."

20   *Id.* ("The principle is often expressed in terms of preventing a party from using the privilege as

21   both a shield and a sword."); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)

22   ("The privilege which protects attorney-client communications may not be used both as a sword

23   and a shield.").  In furtherance of this principle, the Ninth Circuit has explained that a party who

24   asserts claims that put purportedly privileged information at issue must make the choice between

25   abandoning its claims (and thereby preserving whatever privilege may exist) and waiving the

---

[11] The harm to Mr. Schroeder cannot be remedied by merely striking the allegations of privileged
26   communications from the complaint because Berry's involvement in creating KLA's backdating
     of options is crucial to Mr. Schroeder's defense, and Mr. Schroeder must be able to probe all
27   privileged communications germane to his defense. Similarly, rather than showing scienter on the
     part of Mr. Schroeder, probing of Mr. Schroeder's communications with Messrs. Nichols and
28   Kispert will show his lack of scienter.

1    privilege to the extent necessary to permit its opponent a fair opportunity to defend against the

2    claims. *See Bittaker*, 331 F.3d at 720 ("The court thus gives the holder of the privilege a choice:

3    If you want to litigate this claim, then you must waive your privilege to the extent necessary to

4    give your opponent a fair opportunity to defend against it."); *see also Rambus Inc. v. Samsung*

5    *Elecs. Co.*, No. C-05-02298 RMW, 2007 WL 3444376, ** 6-7 (N.D. Cal. Nov. 13, 2007)

6    (holding that party that put privileged information in issue was required to either withdraw claims

7    or waive privilege).

8          Where the plaintiff will not, or as is the case here, cannot, waive the privilege to allow a

9    defendant to discover and present information that is necessary to defend against its claims,

10   fairness and due process require dismissal of the claims. *See, e.g.*, *Beverly v. United States*, No.

11   2:05-cv-735, 2005 U.S. Dist. LEXIS 30586, **1-2 (S.D. Ohio Dec. 1, 2005) (recommending

12   dismissal of ineffective assistance of counsel claim where petitioner would not submit written

13   waiver of attorney-client privilege).  Moreover, and importantly, <u>dismissal is required even if the</u>

14   <u>plaintiff is not the privilege holder and cannot compel a waiver of the privilege</u>, because the

15   relevant consideration is not the conduct of the plaintiff, but the manifest unfairness inherent

16   when a claim of privilege (whether from the plaintiff or a third party) prevents a defendant from

17   having a full and fair opportunity to defend itself against the plaintiff's claims.

18         Thus, in *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451 (2001), the court

19   affirmed the dismissal of a malpractice claim brought by an attorney against another law firm

20   where the defendant law firm's planned defense would have required it to disclose privileged

21   communications between the plaintiff and his clients (which the plaintiff had disclosed to the

22   defendant law firm in the course of securing legal advice).  There, as here, the privilege was held

23   not by the plaintiff, but by a non-party to the action.  In dismissing the complaint, the court

24   emphasized that a defendant "is entitled to present to the jury all relevant information consistent

25   with whatever strategy best serves its interests," and that it would be "fundamentally unfair" to

26   prevent the defendant from presenting all "competent, relevant evidence to defend the malpractice

27   claim," even though that evidence was subject to a privilege held by a non-party. *Id.* at 463-64.

28        Similarly, in *McDermott, Will & Emery v. Superior Court*, 83 Cal. App. 4th 378 (2000),

the court held that corporate shareholders could not maintain a derivative malpractice action against the company's outside law firm because the law firm could not adequately defend against the shareholders' claims without a waiver of the attorney-client privilege by the corporation: "We simply cannot conceive how an attorney is to mount a defense in a shareholder derivative action alleging a breach of duty to the corporate client, where . . . the attorney is foreclosed, in the absence of any waiver by the corporation, from disclosing the very communications which are alleged to constitute a breach of that duty."  *Id.* at 385; *see also id.* at 384 ("[B]ecause a derivative action does not result in the corporation's waiver of the privilege, such a lawsuit against the corporation's outside counsel has the dangerous potential for robbing the attorney defendant of the only means he or she may have to mount a meaningful defense."); *Kasza v. Browner*, 133 F.3d 1159, 1166-67, 1170 (9th Cir. 1998) (affirming grant of summary judgment against private plaintiff based on government's assertion of state secrets privilege; stating that "if the privilege deprives the *defendant* of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant") (quotation omitted); *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1243 & n.11 (4th Cir. 1985) (affirming dismissal of action between private parties on basis of state secrets privilege where "proof required by the parties to establish or refute the claim" encompassed privileged information, so merits of controversy were "inextricably intertwined with privileged matters").

## B.   The SEC Has Put Allegedly Privileged KLA Communications At Issue While KLA Has Deprived Mr. Schroeder of Information Vital to His Defense

To determine whether a party's claims are so intertwined with privileged information that fairness requires dismissal in the absence of a waiver by the holder of the privilege, the Ninth Circuit applies a three-part test that considers:  (1) whether the privilege assertion arises out of an affirmative act, such as the filing of a lawsuit; (2) whether the party has put privileged information at issue; and (3) whether the privilege assertion "'would deny the opposing party access to information vital to its defense.'"  *United States v. Amlani*, 169 F.3d 1189, 1195 (9th Cir. 1999), *quoting Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995).

1    There can be no doubt that the SEC affirmatively put KLA's purported attorney-client-

2    privileged information at issue when it filed its Complaint against Mr. Schroeder.  The very core

3    of the SEC's Complaint is based on allegedly privileged communications of KLA, including

4    allegations based on March 2001 communications between Mr. Schroeder and KLA's then-

5    General Counsel.  *See* Section II(D), *supra*.  Indeed, the section heading of the SEC's Complaint

6    that references those communications expressly notes that the SEC's allegations are based on

7    alleged *legal* advice provided by a KLA attorney to Mr. Schroeder.   The Complaint also proffers

8    and relies on allegations concerning communications made by former KLA General Counsel

9    Berry, Complaint ¶ 23, and concerning communications from KLA's outside attorneys. *Id.* ¶ 29.

10    In addition, it is beyond dispute that, in light of the SEC's allegations, KLA's broad

11    assertion of privilege with respect to the March 2001 communications and surrounding

12    circumstances (and with respect to Berry) denies Mr. Schroeder access to information that is truly

13    vital to Mr. Schroeder's ability to defend himself in this case.  Fairness requires that Mr.

14    Schroeder be permitted access to not only the specific communications referenced in the SEC's

15    complaint, but also the broader context of events and communications surrounding those

16    specifically referenced in the Complaint.  *See Amlani*, 169 F.3d at 1195 (stating that, to mount

17    proper defense, government needed access to communications surrounding events at issue;

18    "Simply put, Amlani cannot assert that certain factors caused him to discharge his attorney and

19    then invoke the attorney-client privilege to prevent the government from examining the situation

20    further.").  Because KLA has made it clear that it will refuse, on privilege grounds, to permit Mr.

21    Schroeder to conduct the discovery necessary to prepare his defense against the SEC's claims and

22    allegations, basic principles of fairness require that the Court dismiss the SEC's Complaint.

23    **C.    The Complaint Must Be Dismissed Regardless That the SEC Is Not the
         Holder of the Privilege**

24

25    The SEC cannot avoid dismissal by asserting that non-party KLA, not the SEC, is the only

26    party capable of waiving the privilege in this case to permit Mr. Schroeder access to the discovery

27    necessary to prepare his defense.  The SEC knowingly created this situation through its own

28    voluntary actions, and it cannot avoid the consequences of its actions by requiring Mr. Schroeder

1  to litigate privilege issues with a non-party.   Mr. Schroeder's counsel has found no rule of law or

2  case that requires him to attack the privilege by moving to compel discovery from KLA instead of

3  moving to dismiss the Complaint.  Mr. Schroeder is entitled to pursue the remedy of dismissal.

4          Nor can the SEC be heard to complain that it is not responsible for KLA's refusal to

5  provide Mr. Schroeder with the discovery necessary to prepare his defense to the SEC's

6  complaint.  Although KLA, and not the SEC, is the holder of any privilege that may apply to the

7  documents and/or communications about which Mr. Schroeder requires discovery, the present

8  situation is of the SEC's own making.  The SEC created the perverse state of affairs that currently

9  prevails in this case, where the SEC relies on privileged documents, and KLA asserts the

10  attorney-client privilege to block Mr. Schroeder's attempts to conduct discovery into the

11  circumstances surrounding the central allegations of the SEC's Complaint against him while SEC

12  counsel sits by complacently, contending it has "no dog in this fight."  KLA, which is highly

13  adverse to Mr. Schroeder, has worked closely with the SEC to deflect blame away from itself and

14  its current officers and directors and now has taken advantage of the situation to block Mr.

15  Schroeder from mounting a defense to the dilemma the SEC and KLA have worked to create for

16  Mr. Schroeder.[12]

17      **D.**     **Prosecution Of The Complaint in The Face of KLA's Assertions Of Privilege**
18              **Preventing Schroeder From Effectively Defending Himself, Is a Violation Of**
                **Schroeder's Due Process Rights Under The Fifth Amendment**

19          The Due Process Clause of the Fifth Amendment provides, at its essence, that a person

20  cannot be deprived of life, liberty, or property in the absence of "'notice and opportunity for

21  hearing appropriate to the nature of the case.'"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S.

22  532, 543 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313

23

24  _____
    [12]  While it is true that in some cases a party in a similar position to Mr. Schroeder elects the
25  remedy of compelling disclosure (*cf. United States v. Reyes*, 239 F.R.D. 591 (N.D.Cal. 2006)), the
    defendant is not required to choose pursuit of that remedy.  In *Reyes*, the defendant moved to
26  compel documents that two law firms had created in the context of an internal investigation and
    shared with the SEC.  *See id.* at 599.  That case did not involve a situation where the SEC was
27  affirmatively using privileged communications as the centerpiece of the case against the defendant,
    while the company holding the privilege, empowered by a confidentiality agreement, blocked the
28  defendant from exploring the nature of those same communications.

1   (1950)).  In a civil enforcement action such as this, Due Process requires that Mr. Schroeder be

2   given a full and fair opportunity to defend himself against the SEC's claims.  *See, e.g., Nelson v.*

3   *Adams USA, Inc.*, 529 U.S. 460, 466 (2000) (reversing judgment against defendant on basis of

4   Due Process Clause where district court proceedings "did not provide an adequate opportunity to

5   defend against the imposition of liability") (citing *American Surety Co. v. Baldwin*, 287 U.S. 156

6   (1932)); *see also American Surety Co.*, 287 U.S. at 168 ("Due process requires that there be an

7   opportunity to present every available defense[.]"); *cf. United States v. W.R. Grace*, 439 F. Supp.

8   2d 1125, 1137-45 (D. Mont. 2006) (Sixth Amendment right to present defense required that

9   defendants be permitted to introduce evidence notwithstanding claim of attorney-client privilege).

10          The process due Mr. Schroeder in this case must be commensurate to the significance of

11   the private interests that the SEC seeks to deprive Mr. Schroeder of through this lawsuit.  The

12   SEC seeks not only potentially millions of dollars in penalties from Mr. Schroeder, but also to bar

13   him from serving as an officer or director of any public company.  *See* Complaint at 19; *cf.*

14   *Loudermill*, 470 U.S. at 543 ("We have frequently recognized the severity of depriving a person

15   of the means of livelihood.").  The SEC has put privileged communications at the very heart of its

16   claims against Mr. Schroeder in this case while being complicit in the Company's attempts to

17   continue to claim privilege over those same and related communications.  By doing so, the SEC

18   has deprived Mr. Schroeder of a meaningful opportunity to challenge its allegations against him.

19   This contravenes basic principles of fairness and Due Process, and Mr. Schroeder therefore

20   respectfully requests that the Court dismiss the Complaint in its entirety.

21                                    **<u>CONCLUSION</u>**

22          For the foregoing reasons, the Complaint should be dismissed with prejudice.

1

2

3

Dated:  February 1, 2008                    DLA PIPER US LLP

Respectfully submitted,

4

By: /s/ Shirli Fabbri Weiss

5

6

7

8

9

SHIRLI FABBRI WEISS (Bar No. 079225)
DAVID PRIEBE (Bar No. 148679)
JEFFREY B. COOPERSMITH (Bar No. 252819)
STAN PANIKOWSKI III (Bar No. 224232)
**DLA PIPER US LLP**

Attorneys for Defendant
KENNETH L. SCHROEDER

10          I hereby attest that I have on file all holographic signatures for any signatures indicated by

11     a "conformed" signature (/S/) within this e-filed document.

12

13

SE\9107070.4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28