Exhibit 2

MARC J. FAGEL (Cal. Bar No. 154425)
SUSAN F. LA MARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
JUDITH L. ANDERSON (Cal. Bar No. 124281)
  andersonju@sec.gov
JEREMY E. PENDREY (Cal. Bar No. 187075)
  pendreyj@sec.gov
ELENA RO (Cal. Bar No. 197308)
  roe@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

ORIGINAL FILED

07 AUG 28 AM 9: 21

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

C 07 44311

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. _____ |
| Plaintiff, | |
| vs. | COMPLAINT   RMW   HRL |
| LISA C. BERRY, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.     From 1997 through 2003, the in-house corporate attorney for two different public companies caused each of those companies to report false financial information to the investing public by repeatedly backdating stock option grants and falsifying related paperwork. Defendant Lisa C. Berry devised the improper backdating scheme while serving as General Counsel of KLA-Tencor Corporation ("KLA"), and then implemented similar practices after assuming the position of General Counsel for Juniper Networks, Inc. ("Juniper"). By facilitating the selection of fabricated

1   option grant dates, Berry caused KLA, and then Juniper, to conceal hundreds of millions of dollars

2   of employee and executive compensation from investors.

3        2.     Under well-settled accounting principles in effect throughout the relevant period, KLA

4   and Juniper were not required to record an expense in their financial statements for options granted to

5   employees at the then-current market price of the company's stock ("at-the-money"), but *were*

6   required to record expenses for any options granted below the current market price ("in-the-money").

7   To help KLA and Juniper attract and retain executives and employees with more valuable "in-the-

8   money" options, without disclosing to shareholders the hundreds of millions of dollars in

9   compensation expenses associated with those grants, Berry, working with others, established

10   procedures to falsify the options grant records to make it appear that the options had been granted at-

11   the-money.

12        3.     On repeated occasions from 1997 until she left KLA in 1999, Berry and others caused

13   KLA to backdate stock option grants to dates when KLA's stock price closed much lower. Just prior

14   to her departure from KLA, Berry provided "how to" instructions to other employees so that KLA

15   could continue the improper backdating procedures. In 1999, when Berry moved to Juniper just

16   before it became a public company, she immediately instituted similar backdating procedures. From

17   mid-1999 through mid-2003, for dozens of different grants to groups of employees, Berry similarly

18   caused Juniper to issue backdated options.

19        4.     By selecting option grant dates and prices with hindsight, Berry and others at the

20   respective companies caused KLA, and then Juniper, to issue to executives and employees valuable

21   in-the-money options without disclosing them, and further caused each company to materially

22   misrepresent their publicly-reported income (or losses), and to falsely represent in public filings with

23   the Commission that each company had no expenses related to their stock option grants.

24        5.     By engaging in the acts alleged in this Complaint, Berry, among other things, violated

25   the antifraud provisions of the federal securities laws, falsified public companies' books and records,

26   and caused both KLA and Juniper to falsely report their financial results. The Commission seeks an

27   order enjoining Berry from future violations of the securities laws, requiring her to disgorge ill-gotten

28

COMPLAINT                     2

1  gains with prejudgment interest and to pay civil monetary penalties, barring Berry from serving as an

2  officer or director of a public company, and providing other appropriate relief.

3  <center>**JURISDICTION AND VENUE**</center>

4      6.    The Commission brings this action pursuant to Section 20(b) and 20(d) of the

5  Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and 77t(d)] and Sections 21(d) and

6  21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

7      7.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the

8  Securities Act [15 U.S.C. § 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act

9  [15 U.S.C. § 78u(d), 78u(e) and 78aa].

10      8.    Berry, directly or indirectly, made use of the means or instrumentalities of interstate

11  commerce, or of the mails, or of the facilities of a national securities exchange in connection with the

12  transactions, acts, practices, and courses of business alleged herein.

13      9.    This Court is a proper venue for this action pursuant to Section 22 of the Securities

14  Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because acts,

15  transactions, practices, and courses of business constituting the violations alleged in this Complaint

16  occurred within this District and Berry resides in the Northern District of California.

17  <center>**INTRADISTRICT ASSIGNMENT**</center>

18      10.    Intradistrict assignment to the San Jose Division is proper pursuant to Civil Local Rule

19  3-2(e) because acts or omissions giving rise to the Commission's claims occurred, among other

20  places, in Santa Clara County, California.

21  <center>**DEFENDANT**</center>

22      11.    Berry, age 49, resides in Los Gatos, California. From September 1996 through June

23  1999, Berry was Vice President and General Counsel of KLA. From June 1999 to January 2004,

24  Berry was General Counsel of Juniper, and beginning in July 1999, also served as Vice President and

25  Secretary. Berry majored in accounting in college, received her juris doctorate and then obtained a

26  masters of law in taxation. Berry is licensed to practice law in California, Arizona and Florida.

27

28

1
## RELEVANT ENTITIES

2      12.    KLA is a Delaware corporation headquartered in San Jose, California that makes and

3  sells systems for the semiconductor industry.  At all relevant times, KLA's common stock was

4  registered with the Commission pursuant to Section 12 of the Exchange Act and traded on the

5  NASDAQ National Market.  At all times relevant to this action, KLA used a fiscal year ending on

6  June 30.

7      13.    Juniper is a Delaware corporation headquartered in Sunnyvale, California that makes

8  and sells internet-related networking products.  From June 1999 through 2004, Juniper's common

9  stock was registered under Section 12 of the Exchange Act and was traded on the NASDAQ National

10  Market.  At all times relevant to this action, Juniper used a fiscal year ending on December 31.

11
## FACTUAL ALLEGATIONS

12  **A.    Berry and Others Backdated Options at KLA**

13       **a.  KLA's Stock Option Disclosures**

14      14.    Throughout Berry's tenure as KLA's General Counsel, KLA regularly used employee

15  stock options as a form of compensation to recruit, retain, and incentivize key employees.  Each

16  option gave the grantee the right to buy KLA common stock from the company at a set price, called

17  the "exercise" or "strike" price, on and after a future date.  The option was "in-the-money" when

18  granted if the market price of KLA's common stock exceeded the option's exercise price.  The option

19  was "at-the-money" when granted if the market price of KLA's common stock and the exercise price

20  were the same.

21      15.    From approximately July 1997 through June 1999, KLA's primary stock option plan

22  specifically prohibited the grant of in-the-money options to employees and executives.  The plan

23  required that the board of directors set the exercise price of the company's stock options, and that the

24  price on the date of grant could not be less than fair market value – that is, the closing price of KLA's

25  common stock on the date when granted.

26      16.    On August 7, 1998, KLA filed with the Commission a registration statement on Form

27  S-8 which attached the Company's primary stock option plan, and incorporated each of these key

28  terms.  Berry reviewed this statement and signed it as the company's General Counsel.

1    17.    KLA also publicly represented, in audited financial statements and other filings with

2  the Commission made from 1997 through 1999, that its option grants were made at fair market value.

3  In other words, KLA purported to issue options at-the-money, not in-the-money.

4    18.    KLA also stated in public filings that its audited financial statements conformed with

5  generally accepted accounting principles (known as "GAAP"). In particular, KLA disclosed that it

6  followed Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to

7  Employees" ("APB 25") in accounting for employee stock options. Under APB 25, public companies

8  recorded an expense on their financial statements for the in-the-money portion of any options granted.

9  Consequently, granting in-the-money options to employees could have a significant impact on the

10  company's expenses and income (or loss) reported to the shareholders. APB 25 also allowed

11  companies to grant employee stock options without recording any compensation expense, so long as

12  the option exercise price was not below the closing market price for the company's stock on the date

13  of the grant.

14    19.    KLA made the statements about its accounting for stock options in accordance with

15  APB 25 in the notes to its audited financial statements, including in its annual reports to shareholders,

16  filed with the Commission on Forms 10-K for its fiscal years 1998 and 1999.

17    20.    KLA also filed proxy statements that were sent to shareholders announcing the annual

18  meeting of shareholders. In the proxy statements dated September 28, 1998 and October 15, 1999,

19  KLA provided information on executive compensation and executive option grants in the last fiscal

20  year from the date of filing. The discussion on executive compensation in each proxy statement

21  represented that stock options were granted at the market price on the date of the grant. In addition,

22  KLA's proxy statements filed on September 28, 1998 and October 15, 1999 stated that one of the

23  material terms of certain grants to certain executives was that the exercise price of the options was the

24  fair market value of the company's common stock as of the date of grant. These statements also were

25  incorporated by reference into KLA's Forms 10-K.

26    21.    Berry reviewed, discussed, and finalized the company's annual reports filed with the

27  Commission on Forms 10-K and its proxy statements filed with the Commission on September 28,

28  1998 and October 15, 1999, as KLA's General Counsel.

COMPLAINT                                        5

**b.  Berry Participated in the Scheme to Backdate KLA Option Grants**

22.     In 1997, KLA's board of directors delegated to a Stock Option Committee consisting of three directors the authority to grant stock options to non-officer employees.  The board's delegation required that at least two members of the committee approve each options grant.

23.     From mid-1997 through mid-1999, Berry worked with KLA's Stock Option Committee, which consisted of board members with such delegated authority.  Berry oversaw the administration of the stock option grant process.

24.     Under procedures put in place by Berry and the Stock Option Committee, the option grant approvals did not reflect the date the Stock Option Committee met to approve them.  Instead, grants to employees by the Stock Option Committee were deliberately delayed to allow the selection of historically low stock prices with the benefit of hindsight.

25.     Berry directed Human Resources ("HR") and stock administration department employees to prepare the grant approval paperwork.  Berry then directed the process for selecting the exercise price by using historical information regarding low KLA stock prices of the preceding weeks.  One or more members of the Stock Option Committee then executed the grant paperwork prepared at Berry's direction, bearing false grant dates that had been selected using hindsight.

26.     The grant approvals were then provided to HR and stock administration personnel who entered the grant information, including the backdated exercise prices, into KLA's options tracking database system.

27.     In this manner, Berry and others at KLA repeatedly backdated grants to newly hired and recently promoted employees ("new hire" grants), as well as to current employees eligible for options at the end of KLA's annual review process (known as "peak performance" or "focal" grants), among others.  These backdated grants reflected historically low prices for KLA stock for the weeks prior to the date on which the price was selected.

28.     For example, KLA awarded several grants to employees bearing a purported grant date of August 31, 1998, at an exercise price equal to that day's closing stock price of $10.63.  The grants included peak performance grants to officers and non-officers, as well as a new hire grant.  However, these grants were actually made over a span of a couple weeks during October 1998, when KLA's

1    stock was trading between $10.75 and $13.81, and were backdated to August 31, 1998. The August

2    31 stock price of $10.63 was the lowest closing price for KLA's common stock for at least three

3    months prior to October 1998.

4         29.     Berry personally benefited from the grant backdated to August 31, 1998, as she

5    received options to purchase 22,000 shares at the lower $10.63 exercise price.

6         30.     In another example in late 1998, Berry and others at KLA backdated a one-time

7    hundred-share grant made to thousands of KLA employees. The backdated grant used the date of

8    October 19, 1998, and the closing stock price on that date of $27.6250 as the options' exercise price.

9    However, Berry and others actually selected the price and prepared the grant during December 1998,

10   by which time KLA's stock price had risen above $40.

11        31.     A KLA HR employee specifically questioned Berry about the propriety of backdating

12   the grant to October 19, 1998. The employee pointed out to Berry that using the date in the past when

13   the price was lower raised the question of "whether we would be able to pass the 'audit' test of not

14   setting a date in the past in order to get a better price." Berry responded, acknowledging she

15   understood, but nevertheless allowed KLA to use a backdated grant date and corresponding low price

16   without appropriately accounting for the in-the-money option grant.

17        32.     On approximately ten occasions for grants backdated to July 31, 1997 through grants

18   backdated to June 15, 1999, Berry and others thus used hindsight to choose option exercise prices for

19   new hire, peak performance/focal and other grants made to KLA employees and executives.

20        33.     Berry was involved in most facets of KLA's options granting process. Berry

21   participated in conference calls and communications discussing accounting rules related to stock

22   options. She also wrote a memorandum in November 1998 in which she acknowledged that repricing

23   executive stock options by using an earlier grant date with a lower price would result in KLA having

24   to take "a charge to its P&L."

25        34.     In June 1999, shortly before her departure from KLA, Berry instructed employees in

26   KLA's HR department how to backdate stock option grants so that they could carry on with the

27   scheme after she had departed. Berry advised the HR personnel to: (1) create a list of newly hired

28   employees; (2) wait several weeks; (3) obtain a list of KLA's daily closing stock prices for the past

COMPLAINT                          7

1  several weeks; (4) highlight the three or four lowest prices; and (5) forward the new hire list and the

2  highlighted stock price list to KLA's Stock Option Committee. As a consequence, KLA continued to

3  backdate certain stock option grants in this manner following Berry's departure from the company.

4      35.    Berry knew, or was reckless in not knowing, that the grant documentation that she

5  helped prepare falsely represented the date on which stock options were actually granted to

6  employees. Berry further knew, or was reckless in not knowing, that the stock option grant

7  documentation that reflected the false information about the dates of the grants and exercise prices for

8  the grants, resulted in KLA's failure to properly record expenses for these in-the-money grants and

9  rendered KLA's public statements about its stock options grants false and misleading.

10      c.  **KLA's Publicly Reported Financial Results**

11      36.    As a public company, KLA filed with the Commission annual reports that included

12  audited financial statements, certified by the companies' outside auditors. KLA's failure to record a

13  compensation expense in connection with the backdated, in-the-money option grants resulted in

14  materially overstated net income in KLA's financial statements throughout Berry's tenure at KLA,

15  and even after she had left. Because the in-the-money options continued to affect the financial

16  statements as employees became eligible to exercise their stock options, those misstatements

17  continued through 2003.

18      37.    In particular, KLA's failure to record expenses related to stock options granted in-the-

19  money resulted in a 4 percent overstatement of KLA's net income in 1998, and a 46 percent

20  overstatement of net income in 1999. KLA included those materially false representations about its

21  financial results in its annual reports to shareholders filed with the Commission on Forms 10-K for its

22  fiscal years 1998 and 1999. Berry reviewed and discussed KLA's false and misleading annual reports

23  (and drafts of those reports) filed with the Commission on Forms 10-K for the fiscal years 1998 and

24  1999, as General Counsel of KLA.

25      38.    KLA also filed quarterly reports with the Commission on Forms 10-Q that included

26  financial statements for each of its first three fiscal quarters. KLA's quarterly reports filed on Forms

27  10-Q for each of the company's first three fiscal quarters of 1997 and 1998, and for the quarterly

28  period ended March 31, 1999, contained materially false and misleading financial statements due to

1  the company's failure to record compensation expenses associated with granting undisclosed in-the-

2  money options.  Berry also reviewed, discussed, and helped finalize, each of these false and

3  misleading Forms 10-Q, as General Counsel of KLA.

4      39.    KLA also sold securities pursuant to offering documents, including registration

5  statements on Forms S-8 filed with the Commission on January 30, 1998, August 7, 1998 and

6  December 4, 1998, which incorporated the false financial statements.  Berry reviewed and prepared

7  each of these false and misleading Forms S-8, as General Counsel of KLA.  In addition, Berry signed

8  the Forms S-8 filed with the Commission on January 30, 1998 and August 7, 1998.

9      40.    The representations to KLA's shareholders in its public reports about the company's

10  stock option program, including how KLA priced options and accounted for them and its financial

11  results, were untrue.  Berry knew, or was reckless in not knowing, that those statements and financial

12  results were untrue, because she engineered with others and participated in the scheme to create

13  option grant approvals that falsely represented the date of the grant to make it appear as though KLA

14  was not required to record an expense for its backdated options.

15  **B.    Berry Similarly Caused Juniper to Backdate Stock Option Grants**

16      41.    On June 18, 1999, Berry became Juniper's General Counsel.  In applying for the

17  position, Berry held herself out as having experience in stock administration and the review of

18  financial statements.

19      **a.  Juniper's Stock Option Disclosures**

20      42.    On June 24, 1999, Juniper became a public company through an initial public offering

21  of its stock (an "IPO").  Juniper grew rapidly following its IPO, hiring hundreds of employees

22  through early June 2003.  To support this rapid growth and to achieve its recruiting and compensation

23  objectives, Juniper relied heavily on stock options as a recruiting and retention incentive.  By

24  compensating employees with stock options, Juniper avoided paying greater salaries or other forms of

25  compensation that would have been necessary to attract and retain employees.  Juniper granted stock

26  options to nearly all new full-time employees.  Juniper also granted options to existing Juniper

27  employees (called "ongoing" options), based on performance or other factors.

28

COMPLAINT              9

1    43.    Juniper publicly represented, in audited financial statements and other filings with the
2    Commission made for or during its fiscal years 1999 through 2003, that its stock option grants were
3    made at fair market value.  In particular, Juniper stated in its annual reports to shareholders filed with
4    the Commission on Forms 10-K for its fiscal years 1999 through 2002:  "Incentive stock options are
5    granted at an exercise price of not less than the fair value per share of the common stock on the date
6    of grant."  Juniper further stated in each of those reports on Forms 10-K that, although the company's
7    plans allowed for the granting of so-called "nonstatutory" stock options at an exercise price of not
8    less than 85 percent of the then-market value, "no nonstatutory stock options have been granted for
9    less than fair market value on the date of the grant."

10    44.    Juniper's public filings also affirmatively stated that the company accounted for its
11    employee stock option plans in accordance with GAAP, and particularly, that the company followed
12    APB 25.  Thus, in each of its Forms 10-K filed with the Commission for fiscal years 1999 through
13    2002, Juniper represented that it had "elected to follow APB 25," and that "[b]ecause the exercise
14    price of the Company's stock options equals the market price of the underlying stock on the date of
15    grant, no compensation expense is recognized."

16    45.    Juniper also sent to shareholders proxy statements announcing its annual meetings of
17    shareholders for 2000 through 2003, filed with the Commission on April 13, 2000, March 28, 2001,
18    April 11, 2002 and March 28, 2003.  The proxy statements for 2000, 2001 and 2003, in describing
19    executive compensation and particularly options granted to officers, represented that "options are
20    granted at fair market value on the date of grant."  Similarly, the 2002 proxy statement, in responding
21    to a shareholder proposal regarding the company's repricing (or regranting) of stock options,
22    represented that employees at Juniper who have been awarded stock options "have a right to purchase
23    stock in the future at a price which is the fair market value on the date of the stock option grant."

24    46.    Berry reviewed Juniper's annual reports filed on Forms 10-K, and other periodic
25    reports filed with the Commission, while she was Juniper's General Counsel.  Berry was also
26    responsible for drafting Juniper's proxy statements announcing annual meetings of shareholder,
27    which she signed as Juniper's General Counsel.

28

COMPLAINT                                        10

### b. Berry's Scheme to Backdate Juniper Option Grants

47.    On July 21, 1999, based on Berry's recommendation, Juniper's Board of Directors created a three-member Stock Option Committee, to which it delegated authority to grant stock options to Juniper's non-executive employees.  Throughout her tenure with Juniper, Berry served as a member of the Stock Option Committee, along with two other persons, Juniper's chief executive officer and chief financial officer.

48.    Berry was responsible for overseeing Juniper's stock option granting process, including supervising Juniper's stock administrator.  From mid-1999 through mid-2003, Berry used the procedures she put in place for most Juniper stock option grants by backdating the grants to a date in the past when Juniper's closing stock price was lower.  Berry then routinely created backdated "minutes" for purported Stock Option Committee meetings that never occurred.

### i. Berry Backdated New Hire Stock Option Grants

49.    Beginning in the second half of 1999, Berry routinely prepared backdated stock option grants to issue options to recently hired employees of Juniper.  For these new hire grants, Berry collected the names of recently hired employees and had lists prepared.  She then selected as the exercise price of the new hire grants the closing price of Juniper's stock on a date in the past, reflecting the low closing price during a particular period around the time the employees were hired.  For each backdated grant from 1999 through 2003, Berry then created Stock Option Committee meeting "minutes" that falsely represented that the Stock Option Committee had met on the date of the low closing price and granted options on that date.

50.    Berry signed the backdated committee "minutes" as a Stock Option Committee member.  In addition, for each backdated grant she either presented the minutes to the other Stock Option Committee members for signature or stamped the minutes with a signature stamp she maintained bearing the other Stock Option Committee members' signatures.

51.    Once Berry selected a backdated grant date and a corresponding exercise price, she informed Juniper's stock administrator, who then entered the grants into Juniper's stock option tracking software using the backdated date as the grant date.  Juniper did not reflect in its books an expense related to the in-the-money portion of the options.

52.    For example, Juniper granted options to six new Juniper employees on the purported, but false, grant date of October 27, 1999.  The six employees were hired on Monday, October 25, 1999, at which time Juniper's stock traded at $257.75.  Juniper's stock price dipped to a low of $249.94 on Wednesday, October 27, then rose to $275.63 by the end of the week.  Berry actually selected the grant date in mid-November 1999, when Juniper's stock was trading around $283.50, using information about Juniper's historical closing prices for its stock during the week the employees were hired.

53.    Similarly, Juniper granted stock options to employees hired between October 8, 2002 through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 as the purported "fair market value" of the stock on the grant date.  The Stock Option Committee never met on January 2, 2003.  Instead, Berry selected that date during mid-February, when Juniper's stock was trading around $9 per share.  The January 2, 2003 closing price for Juniper's stock, $7.36, used as the exercise price, was Juniper's lowest closing price of the year up to the time Berry selected the grant date.

54.    Using dates selected with hindsight between mid-June 1999 through the end of May 2003, Berry backdated more than 50 grants to groups of new employees.  More than $300 million in expenses associated with the in-the-money portion of those grants were not disclosed by Juniper as a consequence of Berry's scheme.

### ii. Berry Backdated Juniper's "Ongoing" Stock Option Grants

55.    From her arrival in 1999 through mid-2003, Berry also backdated performance-related grants to existing employees and officers, which Juniper called "ongoing" grants.  Berry thus backdated large grants to officers and employees that were made to create retention and performance incentives (and which at times included new hires), on approximately nine occasions throughout her tenure.

56.    For instance, Juniper granted options to a large group of existing employees and officers (and to certain new hires), which it called an "evergreen" grant, using the backdated grant date of October 4, 1999.  The Stock Option Committee did not meet on October 4, 1999, and no one determined to grant the employees and officers options that day.  Instead, on November 5, 1999,

1    when Juniper's stock price traded at $273.13, Berry created Stock Option Committee meeting

2    minutes dated October 4, 1999, when Juniper's stock priced closed at $182.13 – the lowest price of

3    that quarter to date. Berry subsequently caused Juniper's board of directors to be falsely informed

4    that the grant had been made on October 4, 1999. More than $100 million in expenses associated

5    with the in-the-money portion of this "evergreen" grant were not disclosed by Juniper as a

6    consequence of Berry's actions.

7          57.    On occasion, Juniper granted "pools" of stock options to certain business units to be

8    awarded to employees based on the discretion of the business unit manager. Berry backdated "pool"

9    grants Juniper made seven times between 2000 and 2003 (which also included certain grants to new

10   hires). More than $200 million in expenses associated with the in-the-money portion of these "pool"

11   grants were not disclosed by Juniper due to Berry's actions.

12         58.    For example, Juniper granted options to existing employees and senior executives (as

13   well as some new hires) in one such "pool" grant, using the backdated grant date of December 21,

14   2000. Juniper's stock price closed at $93.94 on December 21, 2000, which was the lowest stock price

15   of the six months up to that date. No Stock Option Committee meeting occurred on that date; in fact,

16   Berry left the country early in the morning of December 21, 2000. The grant was actually made in or

17   around early January 2001, when Juniper's stock price was trading over $100 per share.

18         59.    In the spring of 2001, Juniper's stock price had declined substantially from the levels

19   experienced during 1999 and 2000. Consequently, many options awarded during those earlier years

20   had strike prices well above the then-current stock price (known as "underwater" options).

21         60.    In approximately April 2001, Juniper instituted a program to award additional options

22   to existing employees using a formula based on the number of underwater options each employee

23   then had, and the length of time each had been employed by Juniper. As part of the program, Juniper

24   granted one block of this "formula" grant using as the grant date April 4, 2001, when Juniper's stock

25   price closed at $29.19. Berry caused the grant to be backdated to April 4, selecting that date with

26   hindsight on or around April 19, 2001, when Juniper's stock price had more than doubled to $65.58.

27         61.    Berry knew, or was reckless in not knowing, that the grant documentation that she

28   helped prepare falsely represented the date on which stock options were actually granted to

COMPLAINT                                           13

1  employees.  Berry further knew, or was reckless in not knowing, that using the stock option grant

2  documentation that reflected the false information about the dates of the grants and exercise prices for

3  the grants caused Juniper to fail to properly record expenses for these in-the-money grants.  Berry

4  further knew, or was reckless in not knowing, that the scheme rendered Juniper's public statements

5  made in proxy statements dated April 13, 2000, March 28, 2001, April 11, 2002 and March 28, 2003,

6  and in Forms 10-K filed with the Commission for fiscal years 1999 through 2002, that Juniper

7  granted stock options at the fair market value on the date of the grant and that the company did not

8  grant stock options for less than fair market value, materially false and misleading.

9               c.  **Berry Caused Juniper to Falsely Report Its Financial Results**

10     62.     As a public company, Juniper filed with the Commission annual reports on Form 10-K

11  that included the audited financial statements, certified by the companies' outside auditors, which

12  falsely represented Juniper's financial results.  Due to Juniper's failure to record an expense for in-

13  the-money options, Juniper's financial statements were materially misstated in each fiscal year from

14  1999 through 2002, and Berry reviewed and discussed those Forms 10-K that contained these false

15  representations, as Juniper's General Counsel.  Berry's fraud continued to affect the company's

16  financial statements through 2005.

17     63.     For example, for its fiscal year 2001, Juniper originally reported a loss of $13.4

18  million.  However, after the company ultimately recorded a compensation expense for previously

19  undisclosed in-the-money option grants in restated financials for this period, the company reported an

20  additional expense of $513.1 million, which (after adjusting for taxes) brought Juniper's loss for the

21  year to $501.5 million.

22     64.     Similarly, for its fiscal year 2003, Juniper originally reported net income of $39.2

23  million, representing the company's first profitable year ever.  As a result of Juniper's failure to

24  record a compensation expense for backdated, in-the-money option grants, Juniper's pre-tax income

25  was reduced by $19.3 million, which, after adjusting for taxes, reduced its net income to $30.7

26  million for the year, a profit reduction of 21.68%.

27     65.     Juniper also publicly announced quarterly financial results, which were described in

28  financial statements included in quarterly reports filed with the Commission on Forms 10-Q, that

COMPLAINT                                      14

1  were materially false and misleading due to Juniper's failure to record compensation expenses

2  associated with in-the-money options. Thus, Juniper's quarterly reports filed on Forms 10-Q

3  beginning with the quarter ended September 30, 1999, and for each of the company's first three

4  quarters in fiscal years 2000 through 2002, and the first two quarters of fiscal year 2003, contained

5  materially false and misleading financial statements. Berry reviewed and discussed, as Juniper's

6  General Counsel, each of Juniper's Forms 10-Q that contained these false representations.

7       66.    Juniper filed with the Commission current reports on Forms 8-K on April 10, 2003,

8  July 10, 2003 and October 9, 2003, each of which included announcements about the company's

9  financial results for prior quarters that were materially false and misleading due to Juniper's failure to

10 record compensation expenses associated with undisclosed grants of in-the-money stock options.

11 Berry reviewed, as Juniper's General Counsel, each of Juniper's Forms 8-K that contained these false

12 representations.

13      67.    During Berry's tenure as Juniper's General Counsel, Juniper filed with the

14 Commission registration statements on Form S-8 on March 14, 2000, August 18, 2000, December 12,

15 2000, March 29, 2001, December 21, 2001 and July 9, 2002, each of which incorporated by reference

16 false and misleading periodic reports. Berry reviewed each of these registration statements filed on

17 Form S-8.

18      68.    In May 2006, the audit committee of Juniper's board of director's began to investigate

19 the Company's historical options granting practices. As a result of the audit committee investigation,

20 Juniper announced in March 2007 restated financial results to record expenses for options granted to

21 employees. Juniper announced the recording of additional pre-tax, non-cash, stock-based

22 compensation expense of $894.7 million for fiscal years 1999 through 2005 under APB 25, $879.1

23 million of which was for fiscal years 1999 through 2003.

24

25

26

27

28

COMPLAINT                                        15

1    **C.    Berry Received Backdated KLA and Juniper Options and Sold Shares**

2    69.    While at KLA, Berry herself received backdated options purportedly granted on

3    August 31, 1998 that were in-the-money when granted. As a result, she personally benefited from the

4    backdating and received unreported compensation from backdated KLA options.

5    70.    Similarly, while at Juniper, Berry also received backdated options purportedly granted

6    on May 11, 2000, December 21, 2000, April 11, 2001, July 1, 2002 and March 12, 2003 that were in-

7    the-money when granted. As a result, she personally benefited from the backdating and received

8    unreported compensation from backdated Juniper options.

9    71.    In addition, Berry exercised certain stock options she received. Berry further sold

10   shares in each company's stock, including shares she received based on her exercise of stock options.

11   Berry knew that she and other officers of KLA and Juniper similarly received options backdated as of

12   the same dates as the backdated employee options. She thus was motivated to continue backdating

13   options, in part, to enrich herself and her fellow officers at each company.

14   **FIRST CLAIM FOR RELIEF**

15   **Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

16   72.    The Commission realleges and incorporates by reference paragraphs 1 through 71

17   above.

18   73.    By engaging in the conduct described above, Berry, directly or indirectly, in

19   connection with the purchase or sale of securities, by the use of means or instrumentalities of

20   interstate commerce, or the mails, with scienter:

21         a.    Employed devices, schemes, or artifices to defraud;

22         b.    Made untrue statements of material facts or omitted to state material facts

23             necessary in order to make the statements made, in the light of the circumstances

24             under which they were made, not misleading; and

25         c.    Engaged in acts, practices, or courses of business which operated or would operate

26             as a fraud or deceit upon other persons, including purchasers and sellers of

27             securities.

28

COMPLAINT                                16

1    74.    By reason of the foregoing, Berry has violated, and unless restrained and enjoined, will

2   continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.

3   § 240.10b-5].

4                            **SECOND CLAIM FOR RELIEF**

5    **Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

6    75.    The Commission realleges and incorporates by reference paragraphs 1 through 71

7   above.

8    76.    By engaging in the conduct described above, KLA, Juniper and/or other persons,

9   directly or indirectly, in connection with the purchase or sale of securities, by the use of means or

10  instrumentalities of interstate commerce, or the mails, with scienter:

11          a.   Employed devices, schemes, or artifices to defraud;

12          b.   Made untrue statements of material facts or omitted to state material facts

13               necessary in order to make the statements made, in light of the circumstances

14               under which they were made, not misleading; and

15          c.   Engaged in acts, practices, or courses of business which operated or would operate

16               as a fraud or deceit upon other persons, including purchasers and sellers of

17               securities.

18    77.    Berry knowingly provided substantial assistance to KLA's, Juniper's and/or other

19  persons' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17

20  C.F.R. § 240.10b-5], and therefore is liable as an aider and abettor pursuant to Section 20(e) of the

21  Exchange Act [15 U.S.C. §78t(e)].

22    78.    Unless restrained and enjoined, Berry will continue to violate and aid and abet

23  violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §

24  240.10b-5].

25                            **THIRD CLAIM FOR RELIEF**

26                    **Violations of Securities Act Section 17(a)(1)**

27    79.    The Commission realleges and incorporates by reference Paragraphs 1 through 71

28  above.

COMPLAINT                                    17

80.    By engaging in the conduct described above, Berry, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails with scienter employed devices, schemes or artifices to defraud.

81.    By reason of the foregoing, Berry violated, and unless restrained and enjoined, will continue to commit violations of, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(2) and (3)

82.    The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

83.    By engaging in the conduct described above, Berry, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.    Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b.    Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

84.    By reason of the foregoing, Berry has violated, and unless restrained and enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

### FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

85.    The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

86.    Based on the conduct alleged above, KLA and Juniper each violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], which obligate issuers of securities

COMPLAINT                                     18

1 registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission

2 accurate annual, current and quarterly reports.

3       87.    By engaging in the conduct alleged above, Berry knowingly provided substantial

4 assistance to KLA's and to Juniper's respective filing of materially false and misleading reports with

5 the Commission.

6       88.    By reason of the foregoing, Berry aided and abetted violations by KLA and by Juniper

7 of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-

8 13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]. Unless restrained

9 and enjoined, Berry will continue to aid and abet such violations.

10                    **SIXTH CLAIM FOR RELIEF**

11          **Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)**

12       89.    The Commission realleges and incorporates by reference Paragraphs 1 through 71

13 above.

14       90.    Based on the conduct alleged above, KLA and Juniper each violated Section

15 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities

16 registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books,

17 records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and

18 dispositions of the assets of the issuer.

19       91.    By engaging in the conduct alleged above, Berry knowingly provided substantial

20 assistance to KLA's and Juniper's respective failures to make and keep books, records and accounts

21 which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

22       92.    By reason of the foregoing, Berry has aided and abetted violations by KLA and by

23 Juniper of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Unless restrained

24 and enjoined, Berry will continue to aid and abet such violations.

25                   **SEVENTH CLAIM FOR RELIEF**

26          **Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(B)**

27       93.    The Commission realleges and incorporates by reference Paragraphs 1 through 71

28 above.

COMPLAINT                        19

94.    Based on the conduct alleged above, KLA and Juniper violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to devise and maintain a sufficient system of internal accounting controls.

95.    By engaging in the conduct alleged above, Berry knowingly provided substantial assistance to KLA's and Juniper's respective failures to devise and maintain a sufficient system of internal accounting controls.

96.    By reason of the foregoing, Berry has aided and abetted violations by KLA and by Juniper of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].  Unless restrained and enjoined, Berry will continue to aid and abet such violations.

## EIGHTH CLAIM FOR RELIEF

### Violations of Exchange Act Section 13(b)(5)

97.    The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

98.    By the conduct alleged above, Berry violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], which prohibits anyone from knowingly circumventing a system of internal accounting, or knowingly falsifying certain books, records, and accounts.

99.    Unless restrained and enjoined, Berry will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## NINTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-1

100.    The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

101.    By engaging in the conduct described above, Berry falsified or caused to be falsified KLA's and Juniper's respective books, records and accounts in violation of Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

102.    Berry has violated and, unless restrained and enjoined, will continue to violate, Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b201].

1

**TENTH CLAIM FOR RELIEF**

2

**Violations of Exchange Act Section 14(a) and Rule 14a-9 thereunder**

3        103.    The Commission realleges and incorporates by reference Paragraphs 1 through 71

4    above.

5        104.    Based on the conduct alleged above, KLA and Juniper each violated Section 14(a) of

6    the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which

7    prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other

8    communication, written or oral, that contain a statement which, at the time and in the light of the

9    circumstances under which it was made, was false or misleading with respect to any material fact, or

10   which omit to state any material fact necessary in order to make the statements therein not false or

11   misleading or necessary to correct any statement in any earlier communication with respect to the

12   solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

13       105.    By engaging in the conduct alleged above, Berry knowingly provided substantial

14   assistance to KLA's and Juniper's respective solicitations by means of false or misleading proxy

15   statements.

16       106.    By reason of the foregoing, Berry has aided and abetted violations by KLA and by

17   Juniper of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17

18   C.F.R. § 240.14a-9] thereunder.  Unless restrained and enjoined, Berry will continue to aid and abet

19   such violations.

20

**PRAYER FOR RELIEF**

21       WHEREFORE, the Commission respectfully requests that this Court:

22

**I.**

23       Permanently enjoin Berry from directly or indirectly violating Section 17(a) of the Securities

24   Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b)

25   and 78m(b)(5)], and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1],

26   and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the

27   Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)] and Rules 12b-

28

COMPLAINT                                                          21

1  20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13

2  and 240.14a-9] thereunder;

## II.

4      Order Berry to disgorge ill-gotten gains from conduct alleged herein, plus prejudgment

5  interest;

## III.

7      Order Berry to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §

8  77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

10     Prohibit Berry, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]

11  from serving as an officer or director of any entity having a class of securities registered with the

12  Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file

13  reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d);

## V.

15     Retain jurisdiction of this action in accordance with the principles of equity and the Federal

16  Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

17  may be entered, or to entertain any suitable application or motion for additional relief within the

18  jurisdiction of this Court; and

## VI.

20     Grant such other relief as this Court may deem just and appropriate.

Respectfully submitted,

26  Dated: August 28, 2007

Jeremy E. Pendrey
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

COMPLAINT                                    22