# Exhibit 15

<u>Via Facsimile</u>

To:  Larry W. Sonsini, Esq.   cc: Judith Mayer O'Brien
    Wilson Sonsini Goodrich & Rosati

From: Lisa C. Berry
    Vice President, General Counsel

Date:  November 14, 1998

Re:  November 17, 1998 Board Meeting

---

As discussed on November 6, the following is a summary of what has occurred at the last couple of board meetings. As you know, the outside directors will be meeting from 8:00 am until 10:00 am on Tuesday, November 17 and they would like for you to be present during that discussion. I expect to be in Milpitas during that time in case there are any questions that arise but do not expect to participate in the meeting of the outside directors.

1. **August and October Board Meetings and Subsequent Actions Regarding Repricing of Options**

The Compensation Committee and Board approved repricing for regular employees and excluded those Section 16 employees that would be likely to be included in the "top five" for the current fiscal year. Those excluded employees were to be granted additional options that approximated the "value" lost by not being able to reprice. I refer to these additional options as the "in-lieu" options.

In order to avoid certain adverse accounting consequences, those employees repricing options had to turn in the requisite paperwork by a set date (August 31). We got approval from PricewaterhouseCoopers to have the Stock Option Committee meet at some time during the 30 days following August 31 and set the price for repricing at that time in order to maximize the value to employees. The repricing date ended up being August 31 but it was not determined until September 30 that the August 31 date was the correct date. The repricing date was also to be the date for the grant of "in-lieu" options.

Between the August 7 Board meeting and September 30, a decision was made to approach the Compensation Committee and Board with the question of letting the excluded executives reprice their options as well. Apparently, Ken Levy has been under the mistaken impression (probably left by Gray Cary) that if executive officers reprice then

Larry W. Sonsini, Esq.
November 14, 1998
Page 2

the proxy disclosure is required for ten years running (as opposed to a one-time disclosure with ten years worth of data). That misunderstanding came to light during the 30-day period associated with repricing the other employees. In addition, the FASB has indicated that it will require a charge in the event of repricing in the future and as a result, there was a feeling that this is the last time that repricing would even be feasible.

I prepared a ten year repricing chart and provided it to Ken Levy showing him what the disclosure would look like along with a memo explaining the proxy requirements and a copy of a survey from Roger Stern showing what other companies had done. That information along with some additional alternatives (providing for an increase in the number of in-lieu options based on different models) was presented to both the Compensation Committee and the Board at the October 19 meeting. The Compensation Committee approved a repricing (primarily because the number of shares which would be granted to make up for the lost "value" was close to being the equivalent of a double grant of existing options). The potential fallout from a repricing seemed less problematic than such significant additional grants to executive officers. We also already have an evergreen in our stock option plan so the chance of having a problem with increases to the plan was not an issue.

The question was raised about the impact of repricing on the existing Retention Agreements between the Company and each of Ken Levy, Ken Schroeder and Jon Tompkins. Ken Levy told the Compensation Committee that he did not think that a windfall should result from the repricing. He also wanted to address the issue of part time employment and the rate at which options vest under these agreements under those circumstances. The Compensation Committee agreed that if the terms of the agreement are invoked then the repriced options would only vest at a rate of 50%. The Committee further determined that beginning July 1, 1999 if the person were to work less than full time then the options repriced would only vest at that same rate (which would result in an additional reduction in the vesting schedule). The Compensation Committee recognized that there would need to be some adjustment in the section of the agreement which provides that only options granted more than 12 months prior to invoking the agreement will continue to vest.

At the Board meeting itself, Jon argued that the part-time requirements were directed only at him and that he had an agreement as to retirement and this was contrary to that agreement. Ken Levy indicated that he was not thinking about Jon when the discussions were raised regarding the impact of the repricing on the retention agreements; in fact he said his concern was what actions Ken Schroeder might take in a year if he is not happy with the succession plan. Ken Schroeder was also unhappy with the proposed arrangement. He wanted the repricing date to be the August 31 ($21.25 closing price). At that point in the meeting, Art Schnitzer (VP of HR) and I were excused from the meeting. Later Ken explained to me that the Board determined that Jon's agreement would remain

F.O.I.A. Confidential Treatment Requested
Morgan, Lewis & Bockius LLP
(415) 442-1000

MLB/KLA-SEC00011612

Larry W. Sonsini, Esq.
November 14, 1998
Page 3

unchanged and the terms otherwise proposed by the Compensation Committee would be applicable to him and Ken Schroeder. The Board agreed that if Jon repriced his options then the repriced options would be deemed to have been granted more than 12 months prior to the October 23 date. The reason for this particular requirement is that the agreements provide that only those options granted more than 12 months prior to the end of the Full-Time Employment Period will vest over the 36 months of the payout under the Agreement. Since Jon's arrangement has been to retire effective July 1, 1999 (succession plan) these repriced options would not have continued to vest and it would impact the previously agreed upon retirement arrangement. As part of the discussion relating to retirement, the Board asked that management look into some kind of retirement arrangement in general.

In order to address the potential accounting problems, the Board agreed that the officers would have to return the required paperwork by the October 23 which would be the date of repricing. As fate would have it, the stock price rose from $27.63 to $33.94 between October 19 and October 23. There was significant complaining by certain officers about the repricing date being October 23 rather than October 19. As a result, Ken Levy presented to each of the Board members a compromise that would not cost the company a charge to its P&L (if we were to have used the October 19 date, the charge would have been approximately $3.5 million). The Board subsequently approved the following arrangement - the previously granted "in-lieu" options would be granted as previously approved and the repricing of options would be at a less than one for one arrangement such that the total options before and after the repricing would be the same. I have attached to this summary the information for each of the officers that have repriced options.

2. **October Board Meeting Summary of Events Leading to the Outside Directors Meeting on November 17**

At the October meeting, I provided a memo (requested by Sam Rubinovitz, the unofficial "chairman of the outside directors") to each of the outside members which asked when they would like to meet as a group of outside directors, if at all, and any agenda items. I also provided a memo to Dean Morton and Ned Barnholt (nominating committee outside members) indicating that our guidelines provide that the nominating committee is supposed to assess the Board's performance.

At the end of the October meeting, the outside directors met separately briefly and asked me to set aside time at the next meeting for the outside directors to meet independently. The agenda items are described in the memo I sent out (a copy of which is attached to this summary). These items include the matters which both the outside directors as a group want to discuss and the board performance assessment by the nominating committee.

Larry W. Sonsini, Esq.
November 14, 1998
Page 4

I don't think the outside directors have any particular "agenda" in having this meeting other than performing their obligations as outside directors. I am not sure how the directors feel about the substance and timing of the succession plan, although I think they have given Ken Levy and Jon Tompkins the benefit of the doubt when it comes to the arrangement that was presented to the Board in April.

As a separate matter, Sam Rubinovitz asked that you provide the Board comfort that its decision with respect to the changes to the retention agreements is "ok." The retention agreements were amended in January to provide a three year package when exercised. The deal is for the executive to be a "part-time employee" for a total period of three years during which time any options granted at any time more than 12 months before invoking the agreement will continue to vest. For the first 24 months of the three year period, full salary and bonus will be paid. The bonus is determined assuming that the executive met 100% of his objectives and the only adjustment to be made is to be based on the Company's performance for the applicable year. The salary for that 24-month period is based on the executive's last full-time salary prior to invoking the agreement. During the last 12 months of the three year period a nominal amount is paid. The changes associated with the actions at the October meeting are rather minimal. With respect to Jon, repriced options are deemed to have been granted more than 12 months prior to invocation of the agreement. With respect to Ken and Ken, if either should decide to go part-time then the repriced options will vest in a pro-rated manner. The remainder of the terms are unchanged. I told Sam that I did not believe that the Board's liability was increased by the changes to the agreements but that I would ask you. I assume that if Sam wants to ask you about this issue, he will do so at the meeting. The Board did ask that you participate in the closed session.

I think Ken, Jon and Ken would like to have the outside directors report on their meeting but such a report is obviously at the outside directors' discretion. I suggested to Sam that someone might want to take notes. If the outside directors would like to report to the full Board, that can be done at the end of the outside director session on Tuesday or at the January meeting (or any time that the outside directors think appropriate). I would be happy to prepare a report from any notes that may be taken.

If you have any questions, please give me a call at (408) 875-2423. I plan to be at the Board meeting but will not attend the outside directors' session. I look forward to seeing you on Tuesday.

MLB/KLA-SEC00011614

F.O.I.A. Confidential Treatment Requested
Morgan, Lewis & Bockius LLP
(415) 442-1000