# Exhibit 3

1   SHIRLI FABBRI WEISS (Bar No. 079225)
    DAVID PRIEBE (Bar No. 148679)
2   JEFFREY B. COOPERSMITH (Bar No. 252819)
    STAN PANIKOWSKI III (Bar No. 224232)
3   **DLA PIPER US LLP**
    2000 University Avenue
4   East Palo Alto, CA 94303-2248
    Tel: (650) 833-2000
5   Fax: (650) 833-2001
    Email: shirli.weiss@dlapiper.com
6   Email: david.priebe@dlapiper.com
    Email: jeff.coopersmith@dlapiper.com
7   Email: stanley.panikowski@dlapiper.com

8   ELLIOT R. PETERS (Bar No. 158708)
    STUART L. GASNER (Bar No. 164675)
9   **KEKER & VAN NEST LLP**
    710 Sansome Street
10  San Francisco, CA  94111
    Tel: (415) 391-5400
11  Fax: (415) 397-7188
    E-mail: EPeters@KVN.com
12  E-mail: SGasner@KVN.com

13  Attorneys for Defendant
    KENNETH L. SCHROEDER

14

15                  UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                      SAN JOSE DIVISION

18  SECURITIES AND EXCHANGE          No. C 07 3798 JW
    COMMISSION,
19                                   **DEFENDANT KENNETH L.
            *Plaintiff*,             SCHROEDER'S MOTION TO DISMISS
20                                   THE COMPLAINT**

21          v.                       Date:        March 24, 2008
                                     Time:        9:00 a.m.
22  KENNETH L. SCHROEDER,            Courtroom:   8
                                     Judge:       Hon. James Ware
            *Defendant.*
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................. 1

STATEMENT OF ISSUE TO BE DECIDED.......................................................... 1

RELIEF SOUGHT ................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 2

I.    INTRODUCTION AND SUMMARY ......................................................... 2

II.   PERTINENT FACTS .................................................................................. 4

    A.    A *Wall Street Journal* Article Leads To Government Probes Of KLA ...... 4

    B.    Kenneth L. Schroeder's Career At KLA ...................................................... 4

    C.    The SEC Relied On The Special Committee Investigation ........................ 5

    D.    The SEC Used Privileged Communications Supplied By KLA
        As The Cornerstone Of Its Complaint Against Mr. Schroeder ................. 7

    E.    KLA Has Broadly Asserted Privilege Objections To Thwart
        Mr. Schroeder's Ability To Mount A Defense ............................................ 9

    F.    The Confidentiality Agreement Signed By The SEC With
        KLA Precludes The SEC From Contending KLA Has
        Waived Privileges ..................................................................................... 15

    G.    KLA's Broad Privilege Assertions Have Made It Impossible For
        Mr. Schroeder To Effectively Defend This Case....................................... 16

III.  FUNDAMENTAL PRINCIPLES OF FAIRNESS REQUIRE DISMISSAL
     OF THE COMPLAINT .............................................................................. 19

    A.    Dismissal is Required Where A Privilege Claim Prevents A Party
        From Preparing Its Defense ...................................................................... 19

    B.    The SEC Has Put Allegedly Privileged KLA Communications
        At Issue While KLA Has Deprived Mr. Schroeder of Information
        Vital to His Defense ................................................................................. 21

    C.    The Complaint Must Be Dismissed Regardless That the SEC Is
        Not the Holder of the Privilege ................................................................ 22

    D.    Prosecution Of The Complaint in The Face of KLA's Assertions
        Of Privilege Preventing Schroeder From Effectively Defending
        Himself, Is a Violation Of Schroeder's Due Process Rights Under
        The Fifth Amendment ............................................................................... 23

CONCLUSION ................................................................................................... 24

## TABLE OF AUTHORITIES

**Page**

### CASES

*American Surety Co. v. Baldwin,*
  287 U.S. 156 (1932) .................................................................. 24

*Beverly v. United States,*
  No. 2:05-cv-735, 2005 U.S. Dist. LEXIS 30586 (S.D. Ohio Dec. 1, 2005) ...... 20

*Bittaker v. Woodford,*
  331 F.3d 715 (9th Cir. 2003) ............................................. 19, 20

*Chevron Corp. v. Pennzoil Co.,*
  974 F.2d 1156 (9th Cir. 1992) .................................................. 19

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985) .......................................................... 23, 24

*Fitzgerald v. Penthouse Int'l, Ltd.,*
  776 F.2d 1236 (4th Cir. 1985) ................................................. 21

*Home Indem. Co. v. Lane Powell Moss & Miller,*
  43 F.3d 1322 (9th Cir. 1995) .................................................. 21

*Kasza v. Browner,*
  133 F.3d 1159 (9th Cir. 1998) ................................................. 21

*McDermott, Will & Emery v. Superior Court,*
  83 Cal. App. 4th 378 (2000) .............................................. 20, 21

*Mullane v. Cent. Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) ........................................................... 23

*Nelson v. Adams USA, Inc.,*
  529 U.S. 460 (2000) ........................................................... 24

*Rambus Inc. v. Samsung Elecs. Co.,*
  No. C-05-02298 RMW, 2007 WL 3444376 (N.D. Cal. Nov. 13, 2007) ........... 20

*Solin v. O'Melveny & Myers, LLP,*
  89 Cal. App. 4th 451 (2001) ................................................... 20

*United States v. Amlani,*
  169 F.3d 1189 (9th Cir. 1999) ................................................. 21

*United States v. Higa,*
  55 F.3d 448 (9th Cir. 1995) ................................................... 14

*United States v. Reyes,*
  239 F.R.D. 591 (N.D. Cal. 2006) .............................................. 23

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. W.R. Grace,*
439 F. Supp. 2d 1125 (D. Mont. 2006) .......................................................... 24

## RULES

Fed. R. Evid. 613(b) .......................................................................................... 14

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 24, 2008, at 9:00 a.m., or at such other date and time as the Court may order, in Courtroom 8 of the above-entitled court, located at 280 South First Street, San Jose, California, Defendant Kenneth L. Schroeder will and hereby does move, pursuant to the Due Process Clause of the Fifth Amendment to the United States Constitution and principles of fundamental fairness, for an order dismissing this case in its entirety. The grounds for this motion are that the prosecution of the Complaint offends principles of Due Process and fundamental fairness for the following reasons: attorney-client communications are both at the heart of the Complaint and the defense of this case, and the holder of the attorney-client privilege, KLA-Tencor Corporation ("KLA" or "the Company"), while working closely with plaintiff Securities and Exchange Commission ("SEC") to help prepare and bring the case against Mr. Schroeder, has asserted the attorney-client privilege (1) to prevent witnesses from testifying to communications critical to Mr. Schroeder's defense and (2) to justify its refusal to produce documents critical to the defense. This motion is based on this Notice, the Memorandum of Points and Authorities in Support, *infra,* the Declaration of Shirli Fabbri Weiss, and any argument of counsel entertained by the Court at the hearing.

## STATEMENT OF ISSUE TO BE DECIDED

Should the SEC's Complaint against Mr. Schroeder (the "Complaint") be dismissed because it violates Constitutional Due Process and principles of fundamental fairness where attorney-client communications form the very core of the SEC's Complaint and are also at the heart of Mr. Schroeder's defense (such that Mr. Schroeder cannot defend himself without testimony and documents concerning those communications), and where: (1) the holder of the privilege, KLA, has stated it will continue to assert the attorney-client privilege to preclude both attorneys and non-attorneys from testifying to information crucial to the defense and to refuse to produce documents; and (2) the SEC, as a result of its agreement with KLA, does not and cannot challenge KLA's assertion of the privilege.

## RELIEF SOUGHT

Mr. Schroeder seeks an order dismissing the Complaint with prejudice.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION AND SUMMARY**

On May 22, 2006, a *Wall Street Journal* article suggested, based on statistical analysis, that KLA and other public companies had granted employee stock options at relative low points in their stock's history by selecting grant dates and exercise prices with hindsight. While not improper, this practice required special accounting treatment. The implication of the article was that KLA and other public companies had improperly accounted for stock option grants in their financial statements. The next day, the Department of Justice and the SEC commenced investigations of KLA's stock option granting practices. The day after, KLA announced that its Board of Directors had formed a "Special Committee" of the Board to investigate as well.

Facing possible criminal and civil penalties, KLA hastened to volunteer cooperation to the government in a prayer for leniency.[1] As part of its strategy, and to assist the SEC in preparing the Complaint, KLA compiled and produced to the SEC: (1) documents reflecting communications between KLA personnel and two lawyers, Stuart J. Nichols ("Nichols") and Lisa C. Berry ("Berry"), who at different times served as General Counsel to KLA; (2) communications between KLA personnel and KLA's outside counsel at the firm of Wilson Sonsini Goodrich & Rosati ("WSGR"), regarding stock option grants; (3) at least 55 witness interview memoranda (the "Witness Interview Memoranda"), including memoranda based on Special Committee interviews of Mr. Nichols and WSGR lawyers Brett DiMarco and Roger Stern, as well as interviews of KLA personnel who made statements about their communications with inside and outside lawyers regarding the Company's option practices. Indeed, KLA specifically instructed Mr. Nichols to meet with the SEC and DOJ and provide information to these agencies that would otherwise be covered by the attorney-client privilege.

On October 12, 2006, the SEC signed an agreement with KLA allowing the SEC to use

---

[1] *See, e.g.,* Katheryn Hayes Tucker, *Ex-Prosecutor Dishes Up Advice to GCs on Government Probes,* Fulton County Daily Report, Oct. 19, 2007 (attached as Exhibit 1 to the Declaration of Shirli Fabbri Weiss, dated February 1, 2008 ("Weiss Decl. Ex. 1") ("Get friendly with the investigators. . . . Find out what they're looking for, whom they suspect, and when they think it happened. 'Your goal is to find out those individuals, separate them and if necessary toss them under the bus.'").

- 2 -

1  communications that are the subject of KLA's claims of privilege, so as to facilitate the SEC in

2  making very serious fraud allegations against Mr. Schroeder. In it, the SEC agreed not to

3  challenge KLA's assertion of privilege based on KLA's production of privileged materials to the

4  SEC. The SEC then used the communications produced to it to bring its action against Mr.

5  Schroeder. In fact, Mr. Schroeder's alleged communications with former General Counsel

6  Nichols are at the heart of the scienter allegations in the SEC's Complaint.[2] The SEC also used

7  the communications subject to KLA's privilege claims to publicly tarnish Mr. Schroeder. The

8  SEC issued a press release to tout its filing of this lawsuit, which specifically stated that

9  "Schroeder received a legal memorandum in March 2001 cautioning" about retroactive pricing.

10  Press Release, Securities and Exchange Commission, SEC Charges Former KLA-Tencor CEO

11  With Fraud For Improper Stock Options Backdating: Commission Also Settles Claims Against

12  KLA-Tencor (July 25, 2007) (Weiss Decl. Ex. 3). A *Wall Street Journal* article from the same

13  day quoted an SEC assistant regional director, referencing the same legal memorandum, as

14  stating: "[a]t least here, the CEO was correctly advised not to back date, and how to properly

15  disclose the company's stock options practices. He chose to ignore that advice." Siobhan

16  Hughes, *3rd UPDATE: SEC Charges Former KLA-Tencor CEO In Backdating*, Wall Street

17  Journal Online, July 25, 2007. (Weiss Decl. Ex. 4).

18      KLA cooperated with the SEC by essentially preparing the SEC's case for it over an

19  investigation period lasting more than a year while Mr. Schroeder was precluded from cross-

20  examining witnesses or obtaining documents key to his defense. However, as soon as

21  Mr. Schroeder was permitted to conduct discovery, KLA and its Special Committee attorneys

22  broadly and pervasively asserted privileges to prevent Mr. Schroeder from obtaining testimony

23  and documents to defend himself. Specifically, KLA: (1) instructed former General Counsel

24  Nichols not to testify about communications with any KLA personnel, including Mr. Schroeder;

25  (2) advised counsel for Mr. Schroeder that it will broadly assert the attorney-client privilege to

26  _____

27  [2] In a separate, later-filed complaint, the SEC also sued Ms. Berry, the former General Counsel of KLA, quoting from and relying on her communications with KLA personnel. *See* Complaint, *SEC v. Berry*, No. C 07-4431 RMW (N.D. Cal. Aug. 28, 2007) (the "Berry Complaint") (Weiss Decl. Ex. 2).

28

DLA Piper US LLP        - 3 -                                    KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                                NO. C 07 3798 JW

1  prevent KLA personnel from testifying regarding any interactions with inside or outside counsel,

2  including the interactions referenced in the Schroeder and Berry Complaints; and (3) refused to

3  produce the original notes taken by the Special Committee's attorneys, upon which are based the

4  Witness Interview Memoranda that KLA turned over to the SEC.

5       This case represents the ultimate in gamesmanship by the government and a third party

6  which has worked to violate defendant's Constitutional right to Due Process. KLA's assertion of

7  privilege in this case has impermissibly and fundamentally prevented Mr. Schroeder from

8  preparing and conducting a defense to the allegations that KLA has helped the SEC to make, and

9  in effect urged the SEC to make. The SEC is complicit, having specifically agreed not to

10  challenge KLA's assertion of privilege; but even if it were not complicit, the assertion of

11  privilege in this context and the resulting substantial impairment of the defense requires, on

12  grounds of fundamental fairness and Due Process, that the case be dismissed with prejudice.

13  **II.**    **PERTINENT FACTS**

14       **A.**    *Wall Street Journal* **Article Leads To Government Probes Of KLA**

15       As noted, a May 2006 *Wall Street Journal* article suggested that KLA and other public

16  companies had selected employee option grant dates and exercise prices with hindsight. While

17  not improper or uncommon, this practice required specific accounting treatment. Companies were

18  required to account for such option grants by taking a non-cash compensation charge calculated

19  by subtracting the option's exercise price from the fair market value (price) of the underlying

20  stock on the actual grant date. KLA's accounting and finance department had not been taking

21  compensation charges for its employee option grants for many years.

22       **B.**    **Kenneth L. Schroeder's Career At KLA**

23       Defendant Schroeder served KLA in non-accounting leadership positions for

24  approximately 22 years. He was a member of KLA's Board of Directors from 1991 to January

25  2006. He was KLA's President and Chief Operating Officer from 1991 to mid-1999, and its

26  Chief Executive Officer from mid-1999 to January 2006. The company grew and thrived under

27  his leadership, and it remains a thriving company to this day. Mr. Schroeder is not an accountant

28  and never served KLA as its Chief Financial Officer or worked in its accounting department.

                        KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                 NO. C 07 3798 JW

1    KLA never looked to him to do its accounting for options or any other accounting, nor was he

2    ever on any company's audit committee. Mr. Schroeder has no legal training.

3        Nevertheless, Mr. Schroeder is a defendant in this SEC action, as well as in shareholder

4    class action and derivative litigation. *See In re KLA-Tencor Corp. Sec. Litig.*, No. C-06-04065-

5    MJJ (N.D. Cal.); *In re KLA-Tencor Corp. Shareholder Derivative Litig.*, No. C-06-3445 (JW)

6    (N.D. Cal.). Notwithstanding Mr. Schroeder's long and distinguished service to KLA, the

7    Company terminated him by e-mail in the Fall of 2006 after completing its "Special Committee"

8    investigation, which purported to exonerate all then-current officers and directors while

9    conveniently finding that Mr. Schroeder, who at the time was no longer serving as an officer or

10   director, was almost entirely to blame for KLA's mis-accounting of options. *See KLA-Tencor*

11   *Corp.*, Annual Report (Form 10-K) (Jan. 29, 2007), at 23-27 (Weiss Decl. Ex. 6). KLA then

12   rushed to "cooperate" with the SEC against Mr. Schroeder in exchange for a sweetheart deal with

13   the SEC involving no financial penalty to KLA, and no allegation or judgment of securities fraud.[3]

14       **C.    The SEC Relied On The Special Committee Investigation**

15       The day after the *WSJ* article appeared, the SEC and the DOJ began investigating KLA's

16   option grant practices. The next day, KLA announced that it had formed its own "Special

17   Committee" to investigate. The same disclosure also announced that KLA had received

18   subpoenas from the DOJ, and publicly promised that the Company "will cooperate fully with any

19   government or regulatory investigation into these matters." *See KLA-Tencor Corp.*, Current

20   Report (Form 8-K) (May 24, 2006) (Weiss Decl. Ex 7).

21       As shown by documents produced by the SEC in this litigation, from early on in its

22   investigation, facing possible criminal and civil penalties, KLA hastened to exchange cooperation

23   for leniency.[4] This would allow KLA to curry favor with the government and shape its perception

24   of current and former management. Thereafter, the Special Committee counsel, the law firm of

25   Skadden, Arps, Slate, Meagher & Flom ("Skadden"), interviewed approximately 55 witnesses

26   _____

27   [3] *See* Consent of Defendant KLA-Tencor Corporation to Entry of Final Judgment, *SEC v. KLA-Tencor Corp.*, No. C 07-3799 (N.D. Cal. July 25, 2007) (Weiss Decl. Ex. 5).

28   [4] *See* Letter from KLA counsel, John Hemann, Morgan Lewis & Bockius LLP ("MLB"), to the SEC, dated June 29, 2007, and excerpts from enclosure (Weiss Decl. Ex 8).

1   (principally current and former directors, officers and other employees), and produced to the SEC

2   lawyer-revised memoranda based on the notes of the witnesses interviews.  KLA also compiled

3   millions of pages of documents for the SEC, including documents evidencing communications

4   between KLA personnel and two lawyers who served as General Counsel, Mr. Nichols and Ms.

5   Berry; as well as from and to outside lawyers at WSGR.  Among the witness interviews that KLA

6   produced to the SEC were memoranda based on Special Committee interviews of Mr. Nichols and

7   Messrs. DiMarco and Stern of WSGR.  KLA placed no restrictions on the interviews of these

8   lawyers, to the contrary,  KLA specifically instructed Mr. Nichols to provide information to the

9   SEC and the DOJ that would otherwise be covered by the attorney-client privilege.[5]

10

11   [5] *See* Transcript of the Deposition of Stuart J. Nichols ("Nichols Tr."), at 24-26 (Weiss Decl. Ex.
      9):

12

13        Q.  While you were questioned about your communications with KLA personnel,
          did you assert the attorney-client privilege on behalf of the company in response
14        to those questions or did your attorney assert them on your behalf?

15        MR. BELNICK [counsel to Mr. Nichols]:  Maybe I can help with this.  Before
          Mr. Nichols answered any questions I obtained a representation from Mr. Wong
16        [Assistant United States Attorney Michael Wang] and I believe SEC counsel that
          KLA was cooperating with their inquiries.  This was prior, as you know, to this
17        lawsuit.  And that Mr. Nichols was therefore free to answer questions that
          otherwise would be privileged.  I left the room and I called KLA's then general
18        counsel, Mr. Gross I believe his name was, and either he or someone from his
          office confirmed to me over the telephone that the government's representation to
19        me was accurate and that with respect to the Justice Department and the SEC, Mr.
          Nichols was free to answer any inquiry even though it might otherwise be
20        considered subject to the attorney-client privilege or work product immunity.
          And on that basis, thereafter I made no objections on privilege grounds.

21
          MS. WEISS:  And so your understanding as a result of your conversation with
22        Mr. Gross was that you were not obliged or even requested to assert the attorney-
          client privilege in response to questions about Mr. Nichols' communications with
23        KLA personnel; is that correct?

24        MR. BELNICK:  That's correct.  Not only that I was not obliged to and that I
          should not.
25
          MS. WEISS:  And the same question with respect to the work product doctrine,
26        that you were not either requested or required to assert that privilege, and that
          indeed you were being requested by the company to respond -- to have Mr.
27        Nichols respond to the questions of both the SEC and the U.S. Attorneys Office;
          is that correct?
28

KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                          NO. C 07 3798 JW

1    The SEC relied heavily, if not entirely, on KLA's Special Committee investigation, and

2    filed an action against Mr. Schroeder, but, as noted above, settled with the Company for no

3    monetary penalties and no finding of fraud. In this litigation, the SEC has produced no sworn

4    testimony of witnesses against Mr. Schroeder. Presumably, the SEC relied on the lawyer-revised

5    Witness Interview Memoranda and reports of the Special Committee—the documents that KLA

6    contends remain privileged—as well as some informal interviews arranged by KLA.

7    **D.    The SEC Used Privileged Communications Supplied By KLA As The Cornerstone Of Its Complaint Against Mr. Schroeder**

8

9    As noted above, the SEC received privileged communications from KLA, which it used to

10   prepare its case against Mr. Schroeder. The SEC made privileged communications the

11   cornerstone of its Complaint against Mr. Schroeder. Its core allegations, designed to show the

12   crucial element of scienter to support its securities fraud claims, are based largely on the SEC's

13   interpretation of communications as to which KLA claims privilege. This is illustrated in the

14   following text and (argumentative) headings from the Complaint—all of which are based on

15   communications subject to KLA's claims of privilege and refusals to allow testimony:

16       In June 1999, a KLA executive[6] instructed the Company's Human Resources
         ("HR") department about procedures on how to backdate new hire grants: (1)
17       create a list of newly hired employees; (2) wait several weeks; (3) obtain a list of
         KLA's daily closing stock price for the past. several weeks; (4) highlight the three
18       or four lowest prices; and (5) forward the new hire list and the highlighted stock
         price list to KLA's Stock Option Committee. Complaint ¶ 23 (emphasis added).
19

20       MR. BELNICK: Essentially, yes.

21   [6] The "KLA executive" which the SEC references in paragraph 18 of the Complaint against Mr.
     Schroeder, is, in fact, Ms. Berry, the General Counsel of KLA from 1997 through mid-1999. This
22   is clear from the allegations in paragraph 34 of the Berry Complaint, which are almost identical to
     the allegations in paragraph 18 of the Complaint against Mr. Schroeder. Paragraph 34 of the
23   Berry Complaint alleges:

24       In June 1999, shortly before her departure from KLA, Berry instructed employees
         in KLA's HR department how to backdate stock option grants so that they could
25       carry on with the scheme after she departed. Berry advised the HR personnel to:
         (1) create a list of newly hired employees; (2) wait several weeks; (3) obtain a list
26       of KLA's daily closing stock prices for the past several weeks; (4) highlight the
         three or four lowest prices; and (5) forward the new hire list and the highlighted
27       stock price list to KLA's Stock Option Committee. As a consequence, KLA
         continued to backdate certain stock option grants in this manner following Berry's
28       departure from the company.

KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                                                        NO. C 07 3798 JW

1

\* \* \*

2  **In a March 2001 Memorandum, <u>Schroeder Receives Legal Advice</u> that he**
   **Cannot  Retroactively Set Stock Prices**

3

4  Schroeder understood the accounting implications of awarding an in-the-money
   options grant.  Soon after he became CEO in July 1999, Schroeder received
5  communications that made him aware of the basic accounting rules for stock
   options.  <u>For example, in September 1999, Schroeder received an email reflecting</u>
6  <u>outside counsel's opinion</u> that certain options granted with an exercise price equal
   to the fair market value on the date of grant would not result in a compensation
7  expense.  During the period of the fraud, Schroeder kept abreast of proposed
   requirements that all employee stock options (rather than just in-the-money
8  options) be expensed by companies, as well as pronouncements and deliberations
   by the Financial Accounting Standards Board on stock option accounting.
9  Complaint ¶ 29 (emphasis added).

10
   Schroeder therefore knew or was reckless in not knowing that KLA would have to
11 record an accounting expense for any options that were granted below fair market
   value on the date of the grant.  He also knew or was reckless in not knowing the
12 requirements for the determination of a grant date, *i.e.,* when the key terms of the
   option grant were known.  Complaint ¶ 30.
13

14 <u>In March 2001, KLA's then-General Counsel communicated to Schroeder</u> that
   selecting grant prices with hindsight required the Company to take a
15 compensation charge, and that doing so without disclosing the fact could run
   afoul of the law.  <u>On or around March 19, 2001, the GC sent a "Stock Options</u>
16 <u>Pricing" Memorandum to Schroeder.</u>  The first sentence in the Summary section
   stated: "the date at which the price of option grants is determined must be the fair
17 market value of the underlying shares as of the date upon which options are
   granted."  Complaint ¶ 31 (emphasis added).
18

19 The Memorandum further described the accounting rules for stock options and
   stated: "[a]ny attempt to set a price before such a grant is made raises substantial
20 risks under securities and tax laws [and] accounting rules and gives rise to
   disclosure obligations."  The Memorandum stated that "the Board and its
21 committees are limited in their ability to grant options at a retroactive price
   without exposing the company to risk of an accounting charge."  Complaint ¶ 32
22

23 <u>In a March 22, 2001 email back to the General Counsel, Schroeder acknowledged</u>
   reading the memorandum and responded: "The Compensation Committee has
24 given the Stock Option Committee (Gary, Ken and I) power to set the price of
   stock options. . .  Please don't take away some of my best tools for attracting and
25 retaining people.  We need those people to win the battle.  Help me, don't just tell
   me how to follow a strict interpretation of rules.  I need a 'war time counselor,'
26 not someone who can recite page and verse."  Complaint ¶ 33 (emphasis added).

27 **Schroeder Continued Approving Backdated Options Grants <u>Despite Having</u>**
   **<u>Read The March 2001 Memorandum</u>**
28

1    Although Schroeder understood the accounting implications of awarding in-the-
money grants before March 2001, and although he received a further warning in
2    March 2001 that backdating options grants without proper disclosure and
accounting ran afoul of securities laws, Schroeder nonetheless continued
3    backdating options grants. After March 2001, Schroeder had the Stock Option
Committee approve eight additional new hire grants and two additional peak
4    performance grants, all of which were backdated. Complaint ¶ 34 (emphasis
added.)
5

6        These allegations, all of which are based on alleged communications that are the subject

7    of privilege claims being asserted vigorously by KLA, are the central allegations against

8    Mr. Schroeder. The SEC interprets the alleged communications between Mr. Nichols and Mr.

9    Schroeder to mean that Mr. Schroeder ignored the advice of the General Counsel not to backdate

10   option grants. As noted above, the SEC said the same thing to the press. *See* p. 3, *supra*.

11       **E.    KLA Has Broadly Asserted Privilege Objections To Thwart Mr. Schroeder's
12            Ability To Mount A Defense**

13       As shown above, KLA assisted the SEC in the preparation of this case. KLA-Tencor has

14   a strong financial stake in seeing the SEC succeed in this litigation for three reasons. First, in

15   October 2006, to curry favor with the government and save itself from penalties, the Company

16   blamed Mr. Schroeder for its option process failures, unilaterally and without judicial scrutiny

17   terminating all of his contracts, cancelling millions of dollars of his contract benefits. KLA has

18   admitted in its SEC filings that Mr. Schroeder's asserted claims of KLA misconduct against him

19   could involve "a material amount." Second, KLA is the real party in interest in a pending

20   derivative complaint against Mr. Schroeder and others. *See In re KLA-Tencor Corp. Shareholder*

21   *Derivative Litig.*, No. C-06-3445 (JW) (N.D. Cal.). Third, KLA stands to be a direct beneficiary

22   of a portion of the SEC's recovery in this case, as permitted by law. A victory by the SEC in this

23   case would greatly aid KLA's position in all three of these areas.

24       On January 24, 2008, in response to Mr. Schroeder's effort to meet and confer regarding a

25   subpoena issued to KLA seeking documents critical to the defense, counsel for KLA wrote that:

26       With regard to materials protected by the work product doctrine and/or attorney-
client privileges, as you know and as we have discussed with you on numerous
27       occasions, KLA provided protected material to the SEC under an express
confidentiality agreement that production did not waive applicable privileges.
28

DLA PIPER US LLP        - 9 -                           KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                        NO. C 07 3798 JW

> Based on the circumstances of the SEC investigation, under the common-interest
> exception to waiver doctrine and case law recognizing a "selective waiver,"
> including *In re McKesson HBOC, Inc. Sec. Litig.*, 2005 WL 934331 (N.D.Cal.
> Mar. 31, 2005), KLA has not intended to waive any privileges and has vigorously
> intended to preserve the privilege as to Mr. Schroeder and others who are adverse
> to the Company. Mr. Schroeder's claim that those privileges have been waived is
> incorrect.

Letter from Joseph E. Floren, MLB, to Shirli Fabbri Weiss (Jan. 24, 2008) (Weiss Decl. Ex. 10).

Mr. Schroeder's counsel was not aware of just how broadly KLA intended to assert the

privileges until January 27, 2008, the day that she took (or, more accurately, attempted to take)

Mr. Nichols' deposition. Nichols served as the General Counsel of KLA from the Fall of 1999

through the Fall of 2006, and, as noted, his alleged communications with Mr. Schroeder are

quoted in the Complaint and were used by the SEC with the press. During this deposition, KLA's

lawyers prevented Mr. Schroeder from getting any substantive information about the SEC's

cornerstone allegations against him.

Counsel for KLA (Mr. Hemann) summarized the Company's position as follows:

> MR. HEMANN:  Shirli, I think this is probably a good time for me to interject
> that as a general matter, we have advised Mr. Nichols through his attorney that
> KLA-Tencor, which would include any committees or members of the board of
> director -- the directors of KLA-Tencor or their counsel, do not waive any
> privilege that might be applicable, including the attorney-client or the attorney
> work product privilege. And we have requested Mr. Nichols through his counsel,
> Mr. Belnick, that he adhere to his ethical statutory and fiduciary duties, such as
> they are, and take all necessary steps to protect both the attorney-client privilege
> and the attorney work product privilege doctrine as he answers questions today.
> And I don't know where exactly this particular set of questions is going, but I
> wanted to make it clear that the company has made that request. To the extent
> that a question that you ask would reveal in Mr. Nichols' answer privileged
> information; privileged under either the work product doctrine, the attorney-client
> privilege, we've asked Mr. Nichols to decline to answer the question. And Mr.
> Belnick will make an observation if he feels that Mr. Nichols' answer will reveal
> such information, and on that basis of Mr. Belnick's observation, we would ask
> Mr. Nichols not to answer the question.

Nichols Tr., at 32-33 (Weiss Decl. Ex. 9).

Mr. Schroeder's counsel's subsequent attempt to inquire about the allegations of the SEC

Complaint, and the circumstances surrounding the March 2001 memorandum sent by Mr. Nichols

as alleged in the Complaint, was met with objections and instructions not to answer from KLA's

counsel (Ms. Heintz):

1    BY MS. WEISS:

2    Q.   Mr. Nichols, Exhibit 83 is a copy of the complaint filed in the United States
     District Court for the Northern District of California, San Jose Division, by the
3    Securities and Exchange Commission as plaintiff against my client, Kenneth L.
     Schroeder, on July -- I think it's 25th, 2007.  Please review as much of the
4    complaint as you need to respond to my questions.  But I'm going to direct your
     attention to paragraph 29 under the heading "C., in a March 2001 memorandum
5    Schroeder receives legal advice that he cannot retroactively set stock prices,"
6    paragraphs 29, 30, 31, 32 and 33.

7                                    *  *  *

8    Q.   All right.  Can you tell me, Mr. Nichols, if you believe that the reference to
     paragraph 31 and 32 in this complaint is a reference to Exhibit 77?
9
10   A.   It appears to be a reference to that exhibit, yes.

11   Q.   All right.  Thank you.  Take a look at Exhibit 78.  The lower part of Exhibit
     78 is an email from Mr. Schroeder to you dated March 22nd, 2001, which appears
12   to be responding to Exhibit 77.  Do you see that, sir?

13   A.   Uh-huh.  Yes.

14   Q.   Take a moment and tell me, if you can, if you believe that the allegations in
     paragraph 33 are a reference to Exhibit 78.
15
     A.   Yes, it would appear so.
16
     MS. WEISS:  Miss Heintz, is it the company's position that it will instruct Mr.
17   Nichols not to testify with respect to Exhibit 78 on the grounds of the attorney-
     client privilege?
18
     MS. HEINTZ:  Yes.
19
     MS. WEISS:  Is that the company's position with respect to the individuals
20   identified on Exhibit 77?

21   MS. HEINTZ:  Well, they are not identified as recipients of No. 78.

22   MS. WEISS:  Yes.  But to the extent that I ask them questions about Mr.
     Schroeder's response, would the company's position be the same?  That is  to say
23   --

24   MS. HEINTZ:  To the extent they would reveal attorney-client communications,
     yes.
25
     MS. WEISS:  Would you permit them to respond to questions that did not involve
26   reference to Mr. Nichols' memo?

27   MS. HEINTZ:  We would have to determine that on a case-by-case basis.

28

1    MS. WEISS: But as to communications that in any way touched upon Mr.
2    Nichols' communication, you would instruct them not to answer. Is that your
     position?

3    MS. HEINTZ: If they are communications with Mr. Nichols, yes.

4    MS. WEISS: Only if they are communications with Mr. Nichols?

5    MS. HEINTZ: Or to the extent they are about communications of Mr. Nichols.

6    MS. WEISS: So if Mr. Kispert and Mr. Schroeder had a conversation about Mr.
7    Nichols' memorandum, would you instruct both of those individuals not to
     respond -- not to answer my questions based on the attorney-client privilege?

8    MS. HEINTZ: We'd have to determine that based on the question and the
9    context.

10   MS. WEISS: So it depends on how the question is asked whether or not they
     could respond to the question about Mr. Nichols --
11
     MS. HEINTZ: Or what the subject matter of the question is.
12
     MS. WEISS: I'm assuming that the subject matter of the question is Mr. Nichols'
13   memo. Take that as the assumption. I'm just trying to shortcut a bunch of
     depositions here.
14
     MS. HEINTZ: I understand.
15
     MS. WEISS: Would you instruct Mr. Schroeder and Mr. Kispert not to respond if
16   the questions were posed about Mr. Nichols' communications to Mr. Schroeder?

17   MS. HEINTZ: Yes.

18   MS. WEISS: And would that be your position with respect to questions posed by
     the SEC as well as Mr. Schroeder's counsel or only Mr. Schroeder's counsel?
19
     MS. HEINTZ: No with respect to both.
20
     MS. WEISS: Okay. So if the SEC asks questions of Mr. Nichols about Exhibit
21   77 and 78, you would instruct him not to answer. Same thing with all these other
22   people that are cc'd on the memorandum that is Exhibit 77; correct?

23   MS. HEINTZ: Yes.

24   Nichols Tr., at 202-06 (Weiss Decl. Ex. 9).

25        Mr. Schroeder's attempt to ask specifically about the communications alleged in

26   paragraphs 31 through 33 of the Complaint—the key allegations giving rise to the SEC's theory

27   that Mr. Schroeder possessed the requisite scienter—was also met with objections and

28   instructions not to answer. KLA even claimed that communications among non-lawyer officers

1    of the Company about the subject of Mr. Nichols' communications are privileged and non-

2    discoverable:

3    BY MS. WEISS:

4    Q.    Okay.  So, Mr. Nichols, the court reporter had handed you what's been
     marked as Exhibits 68 through 82.  Take a look at Exhibit 77.  Can you identify
5    that exhibit?

6                                        * * *

7    A.    This is a memo that I prepared directed -- that I gave to Ken Schroeder.

8    Q.    The date on it is March 19th, 2001.  The Bates stamp is KT ACWP-
     PRIV00002391 to 2394 – I'm sorry -- 95.  It's a memorandum marked
9    "Privileged and Confidential," addressed to Ken Schroeder from Stu Nichols with
     copies to Maureen Lamb, John Kispert and Joy Nyberg, "Re:  Stock Option
10   Pricing."  Do you see that, sir?

11   A.    Yes.

12   Q.    You sent that to Mr. Schroeder on March 19th, 2001?

13   A.    Yes.

14                                       * * *

15   Q.    All right.  Now, as I understand your instruction from counsel, you're going
     to refuse to testify with respect to this memorandum on the grounds of attorney-
16   client privilege.  Is that correct?

17   MS. HEINTZ:  That's correct.

18   BY MS. WEISS:

19   Q.    Okay.  And I think you've already testified that you did not prepare the
     memorandum in anticipation of litigation; correct?
20

21   A.    Correct.

22   Q.    And is it the company's position that it will instruct Ms. Lamb, Mr. Kispert,
     Joy Nyberg and Mr. Schroeder not to testify with respect to this communication
23   from the general counsel Stu Nichols?

24   MS. HEINTZ:  We're prepared to instruct with respect to Mr. Nichols at this
     time.  We can discuss other applications of the privilege after the deposition.
25

26   MS. WEISS:  And so is it your statement that you will not commit on the record
     at this time as to whether or not you will instruct the people that I mentioned that
27   are addressees of this memorandum not to testify?

28

1    MS. HEINTZ:  With respect to this memorandum, we would instruct them not to
2    testify.

3    MS. WEISS:  Okay.  So it is the company's position that none of these people
     will be permitted to testify with respect to Exhibit 77 should they be called as
4    witnesses, including Mr. Schroeder?

5    MS. HEINTZ:  Yes.

6    Nichols Tr., at 199-202 (Weiss Decl. Ex. 9).[7]

7        As shown by these exchanges on the record, KLA's broad assertions of privilege have

8    resulted in a situation where the SEC is relying on privileged communications to make its case in

9    court (and in the press), while KLA is preventing Mr. Schroeder from inquiring about those

10   communications with the obvious acquiescence of the SEC.  Mr. Schroeder is not only unable to

11   inquire as to communications between KLA's attorneys and its directors, officers, and employees,

12   but also as to communications among non-lawyers about the key communications from KLA

13   lawyers.  It is impossible for Mr. Schroeder to defend this case, and consequently grossly unfair

14   for the SEC to maintain this action, because he is prevented from inquiring into these matters.

15       Similarly, KLA's Special Committee has blocked Mr. Schroeder from obtaining other

16   essential information crucial to his defense.  As noted, the SEC relied on approximately 55

17   Witness Interview Memoranda volunteered to it by the Special Committee.  These are second or

18   third generation, lawyer-revised memoranda prepared by Skadden, subsequently produced to Mr.

19   Schroeder in the SEC's Rule 26 disclosures.  However, it is essential to Mr. Schroeder's defense

20   that he obtain the underlying *original interview notes* taken by the Skadden attorneys and earlier

21   drafts of the Witness Interview Memoranda.  These notes are likely the closest to what the

22   witnesses actually said during their interviews, which, in turn, is essential to effective cross-

23   examination of the witnesses, as well as to the possible calling of Skadden lawyers as

24   impeachment witnesses in the event that the witnesses testify contrary to their Special Committee

25   interviews.  *See* Fed. R. Evid. 613(b); and *United States v. Higa*, 55 F.3d 448, 451-53 (9th Cir.

26   1995).  But when Mr. Schroeder subpoenaed those notes, and other essential materials from

27

28   _____
     [7]  The transcript is replete with numerous other instances of KLA's counsel instructing Mr.
     Nichols not to answer.

1    Skadden, it objected and refused to produce the notes citing attorney-client privilege and attorney

2    work product as a shield against discovery.[8] After meeting and conferring, Skadden stated its

3    position on the original notes and earlier drafts of the Interview Memoranda as follows:

4
        ". . . .we will not produce any of Ms. Harlan's handwritten notes about the
5        interviews, or any "drafts" or revisions of the interview memoranda, and we will
        not allow her to answer any questions on such handwritten notes or drafts, as such
6        information is squarely protected by the attorney work product doctrine. *See*
        *Hickman v. Taylor*, 329 U.S. 495, 508."[9]
7

8    **F.    The Confidentiality Agreement Signed By The SEC With KLA Precludes The**
        **SEC From Contending KLA Has Waived Privileges**
9

10       On October 12, 2006, the SEC signed a "Confidentiality Agreement" with KLA,

11   permitting the SEC to use privileged documents and information against Mr. Schroeder in any

12   way it wished. The Confidentiality Agreement provides, in pertinent part:

13       KLA-Tencor and the Special Committee will voluntarily provide to the [SEC]
        Staff copies of documents that may be protected by the attorney-client privilege
14       and work-product doctrine ("Confidential Materials") . . . .

15       Please be advised that by producing the Confidential Materials pursuant to this
        agreement, KLA-Tencor and the Special Committee do not intend to waive the
16       protection of the attorney work product doctrine, attorney-client privilege, or any
        other privilege applicable as to third parties. The Company believes that the
17       Confidential Materials warrant protection from disclosure.

18       The Staff will maintain the confidentiality of the Confidential Materials pursuant
        to this agreement and will not disclose them to any third party, except to the
19       extent that the Staff determines that disclosure is otherwise required by law or
        would be in furtherance of the Commission's discharge of its duties and
20       responsibilities.

21       The Staff will not assert that the production of the Confidential Materials to the
        Commission constitutes a waiver of the protection of the attorney work product
22       doctrine, the attorney-client privilege, or any other privilege applicable as to any
        third party. The Staff agrees that production of the Confidential Materials
23

24   _____
     [8] *See* Notice of Subpoena for Records to Skadden, Arps, Slate, Meagher & Flow LLP (Nov. 12,
25   2007) (Weiss Decl. Ex. 11); Non-Party Skadden, Arps, Slate, Meagher & Flom LLP's Responses
     and Objections to Defendant Kenneth L. Schroeder's Subpoena for Records (Dec. 10, 2007), at
26   10-12 (Weiss Decl. Ex. 12) ("Skadden also refuses to produce any of the Interview Memoranda,
     or any of the privileged documents or exhibits attached thereto, on the additional grounds that
27   such documents are protected from discovery by the attorney client privilege, the work product
     doctrine, or other application privileges.").
28   [9] Letter from Matthew Sloan, Skadden, to Shirli F. Weiss (Dec. 27, 2007), at 2 (Weiss Decl. Ex.
     13).

KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                                        NO. C 07 3798 JW

1    provides the Staff with no additional grounds to subpoena testimony, documents
     or other privileged materials from the Company or the Special Committee,
2    although any such grounds that may exist apart from such production shall remain
     unaffected by this Agreement.
3

4    *See* Letter from John H. Hemann, MLB, to Marc J. Fagel, SEC (Oct. 12, 2006) (emphasis added)

5    (Weiss Decl. Ex. 14).

6        The net effect of the Confidentiality Agreement has been to allow the SEC to selectively

7    use privileged communications *against* Mr. Schroeder while at the same time to allow KLA's

8    broad assertion of privilege to *block* Schroeder from defending the case.  KLA and the SEC's

9    strategy is fairly transparent.  In order to enable the SEC to prosecute its case against Mr.

10   Schroeder through the use of privileged communications, KLA undoubtedly will, at a time of its

11   choosing most advantageous to itself and the SEC, and disadvantageous to Mr. Schroeder, waive

12   privilege or selectively waive privilege to allow the SEC to present privileged testimony and

13   documents against Schroeder at trial.  The Court should not countenance such gamesmanship on

14   the part of KLA, and much less so on the part of the government, the purpose of which is solely

15   to place the defendant at a crippling disadvantage in fairly defending the case.

16       **G.    KLA's Broad Privilege Assertions Have Made It Impossible For
17               Mr. Schroeder To Effectively Defend This Case**

18       With respect to the communications to and from Mr. Nichols alleged in the Complaint, the

19   SEC wrongly interprets these as "smoking guns" which it imagines show that Mr. Schroeder was

20   warned by KLA's then-General Counsel not to backdate options, but disregarded this advice.  If

21   permitted to inquire into the circumstances of these communications, however, Mr. Schroeder's

22   counsel would show that Mr. Nichols' memorandum of March 2001 (*see* Complaint ¶ 31) was

23   meant to deal with the narrow issue of whether the Company's Stock Option Committee (of

24   which Mr. Schroeder was one of the three members) could select a price (not a backdated price)

25   for stock options to be issued to the Company's officers, with ratification of this selection

26   retrospectively by the Board of Directors at a meeting set for about a month later.  Mr. Schroeder

27   also believes that, if permitted to inquire, the record would show that he sought out and spoke

28   with the CFO about the memorandum, who promised Mr. Schroeder he would speak with the

1    General Counsel and address the issues raised in the memorandum; and that the CFO and the

2    Vice President of Finance at KLA, as well as Mr. Nichols and outside counsel (which Mr.

3    Schroeder asked to become involved), received and in fact were heavily involved in dealing with

4    the issues raised in the March 2001 memorandum and led Mr. Schroeder to believe that they had

5    arrived at an appropriate solution for issues raised by Mr. Nichols. The record would further

6    show that Mr. Schroeder dealt with these issues appropriately by involving the CFO, and that the

7    CFO, together with the VP-Finance and Mr. Nichols, were able to resolve the issues to their

8    satisfaction. KLA's broad privilege assertions make it impossible for Mr. Schroeder to develop

9    these facts, however.

10        Similarly, the communications between former General Counsel Berry and KLA personnel

11   are crucial to Mr. Schroeder's defense. As the SEC alleges, Ms. Berry instructed the Human

12   Resources Department on how to backdate options as she was leaving KLA. Indeed, even while

13   alleging that Mr. Schroeder "engineered" a backdating scheme at KLA (Complaint ¶ 18), the SEC

14   alleges in the *first paragraph* of its separately filed complaint against Ms. Berry that she "devised

15   the improper backdating scheme while serving as General Counsel of KLA-Tencor Corporation."

16   Berry Complaint ¶ 1. Among other things, KLA's privilege assertions preclude Mr. Schroeder

17   from inquiring into the basis of a statement by Ms. Berry about retroactive pricing that appears in a

18   memorandum she sent on November 14, 1998, to KLA's outside counsel at WSGR. (Weiss Decl.

19   Ex. 15).[10]

20   [10] Exhibit 15 to the Weiss Declaration, as well as Exhibit 16 to that declaration, discussed *infra*,
21   contain communications among KLA personnel and counsel for KLA that are subject to KLA's
     privilege claims. As noted in paragraphs 16 and 17 of the Weiss Declaration, Mr. Schroeder
22   received these and many other documents similarly subject to KLA's privilege claims from the
     SEC as part of the SEC's initial disclosures pursuant to Federal Rule of Civil Procedure 26(a).
23   KLA knows that the SEC produced these documents to Mr. Schroeder, but has never asked for
     their return or otherwise tried to protect them from disclosure. *See* Letter from Joseph E. Floren,
24   MLB, to Shirli Fabbri Weiss (Jan. 24, 2008), at 4 (Weiss Decl. Ex. 10) ("Mr. Schroeder . . . now
     has copies of all of [the privileged documents produced by KLA to the SEC] because the SEC
25   provided them to him."); Letter from Matthew Sloan, Skadden, to Shirli F. Weiss (Dec. 27,
     2007), at 3 (Weiss Decl. Ex. 13) ("Based on the SEC's initial disclosures, the SEC has already
26   produced to you every responsive document that the Special Committee or the Company
     produced to the SEC pursuant to the Company's confidentiality agreement with the government .
27   . . ."). The prejudice to Mr. Schroeder addressed by this motion is not that he does not have these
     documents, but rather that the Company, with the SEC's agreement, is preventing Mr. Schroeder
·28  from making any inquiry of witnesses with respect to the documents, including the circumstances
     under which they were created and their meaning in context and is withholding additional

1    The circumstances surrounding what, if anything, outside counsel did in response to Ms.

2    Berry's outline of her backdating process, which she apparently and perhaps mistakenly believed

3    had been approved by KLA's auditors, is obviously essential to Mr. Schroeder's defense, but

4    again, he has been precluded from making this inquiry. Also regarding communications to and

5    from outside counsel,  WSGR lawyers were in fact the primary authors of the March 2001

6    memorandum sent by Mr. Nichols, as alleged in the SEC complaint.  Inquiry into the WSGR

7    attorneys' recollections of the circumstances surrounding the March 2001 memorandum is thus

8    crucial to Mr. Schroeder's defense, but KLA has made it clear that any attempt to make such

9    inquiry will be met with objections and instructions not to answer.

10    Mr. Schroeder also will be precluded from inquiring as to a key communication on

11    September 20, 1999 between former Human Resources manager Leslie Wilson and Mr. Stern of

12    WSGR, again concerning retroactive pricing. (Weiss Decl. Ex. 16).  It is difficult to conceive

13    how Mr. Schroeder could defend this case without being able to inquire into the meaning of this

14    exchange between Ms. Wilson and Mr. Stern.  Did Mr. Stern approve retroactive price selection,

15    or did Ms. Wilson at least perceive that he was doing so?  Could this explain why the Human

16    Resources department backdated stock options?  What are the implications of the fact that Human

17    Resources forwarded Ms. Wilson's email exchange with Mr. Stern to the Company's Finance

18    department (which had responsibility for correctly accounting for stock option grants)? (Weiss

19    Decl. Ex. 16).

20    These are but a few examples of the types of information that Mr. Schroeder is being

21    precluded from obtaining, communications on which KLA claims attorney-client privilege which

22    are so central to the Complaint and to Schroeder's defense.  KLA's privilege claims are so broad

23    that Mr. Schroeder simply cannot defend this case.  One would think that the SEC, as a

24    government agency, would have equal if not more interest in getting to the bottom of these and

25    many other questions, but it has instead decided to selectively use communications subject to

26    privilege claims against Mr. Schroeder while creating the opportunity through the Confidentiality

27    documents that KLA decided not to produce to the SEC. But because KLA has never tried to

28    protect or prevent disclosure of the documents it produced to the SEC, Mr. Schroeder sees no
need to file Exhibits 15 and 16, or any other documents accompanying this motion, under seal.

KENNETH L. SCHROEDER'S MOTION TO DISMISS
NO. C 07 3798 JW

1    Agreement for the Company to preclude Mr. Schroeder from exploring these facts.

2    **III.    FUNDAMENTAL PRINCIPLES OF FAIRNESS REQUIRE DISMISSAL OF THE**
          **COMPLAINT**
3

4            The SEC has made the attorney-client privileged communications of KLA the cornerstone

5    of its Complaint against Mr. Schroeder, but KLA has blocked him from making any inquiry about

6    these communications. This situation, largely made possible by what is effectively an agency

7    relationship between KLA and the SEC, is furthered by the Confidentiality Agreement the SEC

8    signed with KLA.  Basic, longstanding principles of fairness and due process flatly prohibit such

9    one-sided use of the privilege.  Because KLA's privilege claims substantially preclude Mr.

10   Schroeder's ability to defend himself, the SEC's Complaint must be dismissed with prejudice.[11]

11           **A.    Dismissal is Required Where A Privilege Claim Prevents A Party From**
                 **Preparing Its Defense**
12

13           It is well established that a plaintiff cannot base its claims on information protected by the

14   attorney-client privilege while at the same time using the privilege to deny its opponent access to

15   the very information necessary to challenge or defend against those claims. *Bittaker v. Woodford*,

16   331 F.3d 715, 719 (9th Cir. 2003) (en banc) ("[P]arties in litigation may not abuse the privilege

17   by asserting claims the opposing party cannot adequately dispute unless it has access to the

18   privileged materials.").  The well-worn maxim associated with this basic precept of fundamental

19   fairness is that a party cannot use the attorney-client privilege as both "a sword" and "a shield."

20   *Id.* ("The principle is often expressed in terms of preventing a party from using the privilege as

21   both a shield and a sword."); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)

22   ("The privilege which protects attorney-client communications may not be used both as a sword

23   and a shield.").  In furtherance of this principle, the Ninth Circuit has explained that a party who

24   asserts claims that put purportedly privileged information at issue must make the choice between

25   abandoning its claims (and thereby preserving whatever privilege may exist) and waiving the

26   [11] The harm to Mr. Schroeder cannot be remedied by merely striking the allegations of privileged
     communications from the complaint because Berry's involvement in creating KLA's backdating
27   of options is crucial to Mr. Schroeder's defense, and Mr. Schroeder must be able to probe all
     privileged communications germane to his defense. Similarly, rather than showing scienter on the
28   part of Mr. Schroeder, probing of Mr. Schroeder's communications with Messrs. Nichols and
     Kispert will show his lack of scienter.

1   privilege to the extent necessary to permit its opponent a fair opportunity to defend against the

2   claims. *See Bittaker*, 331 F.3d at 720 ("The court thus gives the holder of the privilege a choice:

3   If you want to litigate this claim, then you must waive your privilege to the extent necessary to

4   give your opponent a fair opportunity to defend against it."); *see also Rambus Inc. v. Samsung*

5   *Elecs. Co.*, No. C-05-02298 RMW, 2007 WL 3444376, ** 6-7 (N.D. Cal. Nov. 13, 2007)

6   (holding that party that put privileged information in issue was required to either withdraw claims

7   or waive privilege).

8          Where the plaintiff will not, or as is the case here, cannot, waive the privilege to allow a

9   defendant to discover and present information that is necessary to defend against its claims,

10  fairness and due process require dismissal of the claims. *See, e.g., Beverly v. United States*, No.

11  2:05-cv-735, 2005 U.S. Dist. LEXIS 30586, **1-2 (S.D. Ohio Dec. 1, 2005) (recommending

12  dismissal of ineffective assistance of counsel claim where petitioner would not submit written

13  waiver of attorney-client privilege). Moreover, and importantly, <u>dismissal is required even if the</u>

14  <u>plaintiff is not the privilege holder and cannot compel a waiver of the privilege</u>, because the

15  relevant consideration is not the conduct of the plaintiff, but the manifest unfairness inherent

16  when a claim of privilege (whether from the plaintiff or a third party) prevents a defendant from

17  having a full and fair opportunity to defend itself against the plaintiff's claims.

18         Thus, in *Solin v. O'Melveny & Myers, LLP*, 89 Cal. App. 4th 451 (2001), the court

19  affirmed the dismissal of a malpractice claim brought by an attorney against another law firm

20  where the defendant law firm's planned defense would have required it to disclose privileged

21  communications between the plaintiff and his clients (which the plaintiff had disclosed to the

22  defendant law firm in the course of securing legal advice). There, as here, the privilege was held

23  not by the plaintiff, but by a non-party to the action. In dismissing the complaint, the court

24  emphasized that a defendant "is entitled to present to the jury all relevant information consistent

25  with whatever strategy best serves its interests," and that it would be "fundamentally unfair" to

26  prevent the defendant from presenting all "competent, relevant evidence to defend the malpractice

27  claim," even though that evidence was subject to a privilege held by a non-party. *Id.* at 463-64.

28         Similarly, in *McDermott, Will & Emery v. Superior Court*, 83 Cal. App. 4th 378 (2000),

1   the court held that corporate shareholders could not maintain a derivative malpractice action

2   against the company's outside law firm because the law firm could not adequately defend against

3   the shareholders' claims without a waiver of the attorney-client privilege by the corporation:

4   "We simply cannot conceive how an attorney is to mount a defense in a shareholder derivative

5   action alleging a breach of duty to the corporate client, where . . . the attorney is foreclosed, in the

6   absence of any waiver by the corporation, from disclosing the very communications which are

7   alleged to constitute a breach of that duty." *Id.* at 385; *see also id.* at 384 ("[B]ecause a derivative

8   action does not result in the corporation's waiver of the privilege, such a lawsuit against the

9   corporation's outside counsel has the dangerous potential for robbing the attorney defendant of

10  the only means he or she may have to mount a meaningful defense."); *Kasza v. Browner*, 133

11  F.3d 1159, 1166-67, 1170 (9th Cir. 1998) (affirming grant of summary judgment against private

12  plaintiff based on government's assertion of state secrets privilege; stating that "if the privilege

13  deprives the *defendant* of information that would otherwise give the defendant a valid defense to

14  the claim, then the court may grant summary judgment to the defendant") (quotation omitted);

15  *Fitzgerald v. Penthouse Int'l, Ltd.*, 776 F.2d 1236, 1243 & n.11 (4th Cir. 1985) (affirming

16  dismissal of action between private parties on basis of state secrets privilege where "proof

17  required by the parties to establish or refute the claim" encompassed privileged information, so

18  merits of controversy were "inextricably intertwined with privileged matters").

19  **B.    The SEC Has Put Allegedly Privileged KLA Communications At Issue While**
20  **KLA Has Deprived Mr. Schroeder of Information Vital to His Defense**

21          To determine whether a party's claims are so intertwined with privileged information that

22  fairness requires dismissal in the absence of a waiver by the holder of the privilege, the Ninth

23  Circuit applies a three-part test that considers: (1) whether the privilege assertion arises out of an

24  affirmative act, such as the filing of a lawsuit; (2) whether the party has put privileged

25  information at issue; and (3) whether the privilege assertion "'would deny the opposing party

26  access to information vital to its defense.'" *United States v. Amlani*, 169 F.3d 1189, 1195 (9th

27  Cir. 1999), *quoting Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir.

28  1995).

1    There can be no doubt that the SEC affirmatively put KLA's purported attorney-client-

2    privileged information at issue when it filed its Complaint against Mr. Schroeder. The very core

3    of the SEC's Complaint is based on allegedly privileged communications of KLA, including

4    allegations based on March 2001 communications between Mr. Schroeder and KLA's then-

5    General Counsel. *See* Section II(D), *supra*. Indeed, the section heading of the SEC's Complaint

6    that references those communications expressly notes that the SEC's allegations are based on

7    alleged *legal* advice provided by a KLA attorney to Mr. Schroeder. The Complaint also proffers

8    and relies on allegations concerning communications made by former KLA General Counsel

9    Berry, Complaint ¶ 23, and concerning communications from KLA's outside attorneys. *Id.* ¶ 29.

10    In addition, it is beyond dispute that, in light of the SEC's allegations, KLA's broad

11    assertion of privilege with respect to the March 2001 communications and surrounding

12    circumstances (and with respect to Berry) denies Mr. Schroeder access to information that is truly

13    vital to Mr. Schroeder's ability to defend himself in this case. Fairness requires that Mr.

14    Schroeder be permitted access to not only the specific communications referenced in the SEC's

15    complaint, but also the broader context of events and communications surrounding those

16    specifically referenced in the Complaint. *See Amlani*, 169 F.3d at 1195 (stating that, to mount

17    proper defense, government needed access to communications surrounding events at issue;

18    "Simply put, Amlani cannot assert that certain factors caused him to discharge his attorney and

19    then invoke the attorney-client privilege to prevent the government from examining the situation

20    further."). Because KLA has made it clear that it will refuse, on privilege grounds, to permit Mr.

21    Schroeder to conduct the discovery necessary to prepare his defense against the SEC's claims and

22    allegations, basic principles of fairness require that the Court dismiss the SEC's Complaint.

23    **C.    The Complaint Must Be Dismissed Regardless That the SEC Is Not the
24         Holder of the Privilege**

25    The SEC cannot avoid dismissal by asserting that non-party KLA, not the SEC, is the only

26    party capable of waiving the privilege in this case to permit Mr. Schroeder access to the discovery

27    necessary to prepare his defense. The SEC knowingly created this situation through its own

28    voluntary actions, and it cannot avoid the consequences of its actions by requiring Mr. Schroeder

1    to litigate privilege issues with a non-party.   Mr. Schroeder's counsel has found no rule of law or

2    case that requires him to attack the privilege by moving to compel discovery from KLA instead of

3    moving to dismiss the Complaint.  Mr. Schroeder is entitled to pursue the remedy of dismissal.

4         Nor can the SEC be heard to complain that it is not responsible for KLA's refusal to

5    provide Mr. Schroeder with the discovery necessary to prepare his defense to the SEC's

6    complaint.  Although KLA, and not the SEC, is the holder of any privilege that may apply to the

7    documents and/or communications about which Mr. Schroeder requires discovery, the present

8    situation is of the SEC's own making.  The SEC created the perverse state of affairs that currently

9    prevails in this case, where the SEC relies on privileged documents, and KLA asserts the

10   attorney-client privilege to block Mr. Schroeder's attempts to conduct discovery into the

11   circumstances surrounding the central allegations of the SEC's Complaint against him while SEC

12   counsel sits by complacently, contending it has "no dog in this fight."  KLA, which is highly

13   adverse to Mr. Schroeder, has worked closely with the SEC to deflect blame away from itself and

14   its current officers and directors and now has taken advantage of the situation to block Mr.

15   Schroeder from mounting a defense to the dilemma the SEC and KLA have worked to create for

16   Mr. Schroeder.[12]

17       **D.**    **Prosecution Of The Complaint in The Face of KLA's Assertions Of Privilege
18                 Preventing Schroeder From Effectively Defending Himself, Is a Violation Of
                   Schroeder's Due Process Rights Under The Fifth Amendment**

19       The Due Process Clause of the Fifth Amendment provides, at its essence, that a person

20   cannot be deprived of life, liberty, or property in the absence of "'notice and opportunity for

21   hearing appropriate to the nature of the case.'"  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S.

22   532, 543 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313

23

---

24   [12]  While it is true that in some cases a party in a similar position to Mr. Schroeder elects the
     remedy of compelling disclosure (*cf. United States v. Reyes*, 239 F.R.D. 591 (N.D.Cal. 2006)), the
25   defendant is not required to choose pursuit of that remedy.  In *Reyes*, the defendant moved to
     compel documents that two law firms had created in the context of an internal investigation and
26   shared with the SEC.  *See id.* at 599.  That case did not involve a situation where the SEC was
     affirmatively using privileged communications as the centerpiece of the case against the defendant,
27   while the company holding the privilege, empowered by a confidentiality agreement, blocked the
     defendant from exploring the nature of those same communications.
28

   - 23 -                  KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                          NO. C 07 3798 JW

1   (1950)). In a civil enforcement action such as this, Due Process requires that Mr. Schroeder be

2   given a full and fair opportunity to defend himself against the SEC's claims. *See, e.g., Nelson v.*

3   *Adams USA, Inc.*, 529 U.S. 460, 466 (2000) (reversing judgment against defendant on basis of

4   Due Process Clause where district court proceedings "did not provide an adequate opportunity to

5   defend against the imposition of liability") (citing *American Surety Co. v. Baldwin*, 287 U.S. 156

6   (1932)); *see also American Surety Co.*, 287 U.S. at 168 ("Due process requires that there be an

7   opportunity to present every available defense[.]"); *cf. United States v. W.R. Grace*, 439 F. Supp.

8   2d 1125, 1137-45 (D. Mont. 2006) (Sixth Amendment right to present defense required that

9   defendants be permitted to introduce evidence notwithstanding claim of attorney-client privilege).

10      The process due Mr. Schroeder in this case must be commensurate to the significance of

11  the private interests that the SEC seeks to deprive Mr. Schroeder of through this lawsuit. The

12  SEC seeks not only potentially millions of dollars in penalties from Mr. Schroeder, but also to bar

13  him from serving as an officer or director of any public company. *See* Complaint at 19; *cf.*

14  *Loudermill*, 470 U.S. at 543 ("We have frequently recognized the severity of depriving a person

15  of the means of livelihood."). The SEC has put privileged communications at the very heart of its

16  claims against Mr. Schroeder in this case while being complicit in the Company's attempts to

17  continue to claim privilege over those same and related communications. By doing so, the SEC

18  has deprived Mr. Schroeder of a meaningful opportunity to challenge its allegations against him.

19  This contravenes basic principles of fairness and Due Process, and Mr. Schroeder therefore

20  respectfully requests that the Court dismiss the Complaint in its entirety.

21                              **CONCLUSION**

22      For the foregoing reasons, the Complaint should be dismissed with prejudice.

23

24

25

26

27

28

DLA PIPER US LLP       - 24 -                        KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                     NO. C 07 3798 JW

1

2  Dated: February 1, 2008                    DLA PIPER US LLP

3                                             Respectfully submitted,

4                                             By: /s/ Shirli Fabbri Weiss

5                                             SHIRLI FABBRI WEISS (Bar No. 079225)
6                                             DAVID PRIEBE (Bar No. 148679)
                                              JEFFREY B. COOPERSMITH (Bar No.
7                                             252819)
                                              STAN PANIKOWSKI III (Bar No. 224232)
8                                             DLA PIPER US LLP

9                                             Attorneys for Defendant
                                              KENNETH L. SCHROEDER

10        I hereby attest that I have on file all holographic signatures for any signatures indicated by

11  a "conformed" signature (/S/) within this e-filed document.

12
    SE\9107070.4
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHIRLI FABBRI WEISS (Bar No. 079225)
DAVID PRIEBE (Bar No. 148679)
JEFFREY B. COOPERSMITH (Bar No. 252819)
STAN PANIKOWSKI III (Bar No. 224232)
DLA PIPER US LLP
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000
Fax: (650) 833-2001
Email: shirli.weiss@dlapiper.com
Email: david.priebe@dlapiper.com
Email: jeff.coopersmith@dlapiper.com
Email: stanley.panikowski@dlapiper.com

ELLIOT R. PETERS (Bar No. 158708)
STUART L. GASNER (Bar No. 164675)
**KEKER & VAN NEST LLP**
710 Sansome Street
San Francisco, CA 94111
Tel: (415) 391-5400
Fax: (415) 397-7188
E-mail: EPeters@KVN.com
E-mail: SGasner@KVN.com

Attorneys for Defendant
KENNETH L. SCHROEDER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | No. C 07 3798 JW |
| *Plaintiff,* | **[PROPOSED] ORDER GRANTING KENNETH L. SCHROEDER'S MOTION TO DISMISS** |
| v. | |
| KENNETH L. SCHROEDER, | |
| *Defendant.* | |

1    On March 24, 2008, the Court heard Defendant Kenneth L. Schroeder's Motion To

2    Dismiss ("Motion").  Having considered the papers submitted by the parties, and the arguments

3    of counsel, the Motion is GRANTED.  This case is dismissed with prejudice, and judgment shall

4    be entered in Mr. Schroeder's favor.

5

6    IT IS SO ORDERED.

7

8    DATED: _____, 2008.

9                                                    _____
                                                     The Honorable James Ware
10                                                   United States District Judge

11   Presented By:

12   DLA PIPER US LLP

13

14   By:___/s/ Jeffrey B. Coopersmith_____
        SHIRLI FABBRI WEISS (Bar No. 079225)
15      DAVID PRIEBE (Bar No. 148679)
        JEFFREY B. COOPERSMITH (Bar No. 252819)
16      STAN PANIKOWSKI III (Bar. No. 224232)
        DLA PIPER US LLP
17      2000 University Avenue
        East Palo Alto, CA 94303-2248
18      Tel: (650) 833-2000
        Fax: (650) 833-2001
19      Email: shirli.weiss@dlapiper.com
        Email: david.priebe@dlapiper.com
20      Email: jeff.coopersmith@dlapiper.com
        Email: stanley.panikowski@dlapiper.com
21
        ELLIOT R. PETERS (Bar No. 158708)
22      STUART L. GASNER (Bar No. 164675)
        KEKER & VAN NEST LLP
23      710 Sansome Street
        San Francisco, CA  94111
24      Tel: (415) 391-5400
        Fax: (415) 397-7188
25      E-mail: EPeters@KVN.com
        E-mail: SGasner@KVN.com
26
        Attorneys for Defendant
27      KENNETH L. SCHROEDER

28

DLA PIPER US LLP                    [PROPOSED] ORDER GRANTING KENNETH L. SCHROEDER'S MOTION TO DISMISS
                                                                         NO. C 07 3798 JW

SHIRLI FABBRI WEISS (Bar No. 079225)
DAVID PRIEBE (Bar No. 148679)
JEFFREY B. COOPERSMITH (Bar. No. 252819)
STAN PANIKOWSKI III (Bar No. 224232)
**DLA PIPER US LLP**
2000 University Avenue
East Palo Alto, CA 94303-2248
Tel: (650) 833-2000
Fax: (650) 833-2001
Email: shirli.weiss@dlapiper.com
Email: david.priebe@dlapiper.com
Email: jeff.coopersmith@dlapiper.com
Email: stanley.panikowski@dlapiper.com

ELLIOT R. PETERS (Bar No. 158708)
STUART L. GASNER (Bar No. 164675)
**KEKER & VAN NEST LLP**
710 Sansome Street
San Francisco, CA 94111
Tel: (415) 391-5400
Fax: (415) 397-7188
E-mail: EPeters@KVN.com
E-mail: SGasner@KVN.com

Attorneys for Defendant
KENNETH L. SCHROEDER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> *Plaintiff,* <br><br> v. <br><br> KENNETH L. SCHROEDER, <br><br> *Defendant.* | No. C 07 3798 JW <br><br> **DECLARATION OF SHIRLI FABBRI WEISS** <br><br> Date:  March 24, 2008 <br> Time:  9:00 a.m. <br> Courtroom:  8 <br> Judge:  Hon. James Ware |

1    I, Shirli Fabbri Weiss, declare as follows:

2    1.    I am an attorney licensed to practice law in the State of California and am admitted

3    to practice before this honorable Court. I am one of the attorneys representing Defendant

4    Kenneth L. Schroeder in this case.

5    2.    Attached as Exhibit 1 hereto is a true and correct copy of Katheryn Hayes Tucker,

6    *Ex-Prosecutor Dishes Up Advice to GCs on Government Probes*, Fulton County Daily Report,

7    Oct. 19, 2007.

8    3.    Attached as Exhibit 2 hereto is a true and correct copy of the Complaint filed in

9    *SEC v. Berry*, No. C 07-4431 (N.D. Cal. Aug. 28, 2007).

10    4.    Attached as Exhibit 3 hereto is a true and correct copy of a press release issued by

11    the Securities and Exchange Commission: SEC Charges Former KLA-Tencor CEO With Fraud

12    For Improper Stock Options Backdating: Commission Also Settles Claims Against KLA-Tencor

13    (July 25, 2007), obtained from the SEC's website.

14    5.    Attached as Exhibit 4 hereto is a true and correct copy of Siobhan Hughes, *3rd*

15    *UPDATE: SEC Charges Former KLA-Tencor CEO In Backdating*, Wall Street Journal Online,

16    July 25, 2007.

17    6.    Attached as Exhibit 5 hereto is a true and correct copy of the Consent of Defendant

18    KLA-Tencor Corporation to Entry of Final Judgment, *SEC v. KLA-Tencor Corp.*, No. C 07-3799

19    (N.D. Cal. July 25, 2007).

20    7.    Attached as Exhibit 6 hereto are true and correct excerpts of KLA-Tencor

21    Corporation's Annual Report (Form 10-K) (Jan. 29, 2007), obtained from the 10-K Wizard

22    website.

23    8.    Attached as Exhibit 7 hereto is a true and correct copy of KLA-Tencor

24    Corporation's Current Report (Form 8-K) (May 24, 2006), obtained from the 10-K Wizard

25    website.

26    9.    Attached as Exhibit 8 hereto is a true and correct copy of a letter from John

27    Hemann, Morgan Lewis & Bockius LLP ("MLB"), to the SEC, dated June 29, 2007, and true and

28    correct excerpts of a power point presentation on the stationary of MLB, which I selected from

1   the power point presentation enclosed with the letter. This exhibit was produced by the SEC as

2   part of its initial disclosures under Federal Rule of Civil Procedure 26(a) on October 3, 2007, and

3   I selected excerpts of the power point presentation to illustrate points that MLB made about the

4   nature and extent of KLA's cooperation with the SEC in its investigation of KLA's stock option

5   grant practices.

6          10.      Attached as Exhibit 9 hereto is a true and correct copy of the transcript of the

7   deposition of Stuart J. Nichols, taken January 27, 2008.

8          11.      Attached as Exhibit 10 hereto is a true and correct copy of a letter from Joseph E.

9   Floren, MLB, to Shirli Fabbri Weiss, dated January 24, 2008.

10         12.      Attached as Exhibit 11 hereto is a true and correct copy of the Notice of Subpoena

11  for Records to Skadden, Arps, Slate, Meagher & Flom LLP, dated November 12, 2007.

12         13.      Attached as Exhibit 12 hereto is a true and correct copy of Non-Party Skadden,

13  Arps, Slate, Meagher & Flom LLP's Responses and Objections to Defendant Kenneth L.

14  Schroeder's Subpoena for Records, dated December 10, 2007.

15         14.      Attached as Exhibit 13 hereto is a true and correct copy of a letter from Matthew

16  E. Sloan, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), to Shirli F. Weiss, dated

17  December 27, 2007, as part of the "meet and confer" process to attempt to resolve differences

18  over Mr. Schroeder's subpoena to Skadden attorney Elizabeth Harlan requesting that she produce

19  her original notes of KLA's Board's Special Committee's interview of defendant Kenneth

20  Schroeder, as well as drafts of the interview memoranda created by Skadden based on the notes,

21  the final version of which was volunteered to the SEC by the Special Committee. As to those

22  notes, of importance, Mr. Sloan states on page 2:

23              "….we will not produce any of Ms. Harlan's handwritten notes
                about the interviews, or any "drafts" or revisions of the interview
24              memoranda, and we will not allow her to answer any questions on
                such handwritten notes or drafts, as such information is squarely
25              protected by the attorney work product doctrine. *See Hickman v.
                Taylor*, 329 U.S. 495, 508."
26

27  Ms. Harlan's deposition was the first deposition noticed by the SEC in this case (and cross-

28  noticed by Mr. Schroeder's counsel), and we sought the documents to prepare to cross-examine

1   Ms. Harlan.  Skadden refused to produce the original interview notes of Mr. Schroeder's

2   interview, as well as the original interview notes underlying the Interview Memoranda that KLA

3   produced to the SEC, on grounds of privilege and work product protection.

4          15.    Attached as Exhibit 14 hereto is a true and correct copy of a Confidentiality

5   Agreement between KLA and the SEC, dated October 12, 2006, which was provided to me by the

6   SEC.

7          16.    Attached as Exhibit 15 hereto is a true and correct copy of a memorandum from

8   Lisa Berry of KLA to Larry Sonsini and Judith Mayer O'Brien of the law firm of Wilson Sonsini

9   Goodrich & Rosati ("WSGR"), dated November 14, 1998.  This document was produced by the

10  SEC as part of its initial disclosures under Federal Rule of Civil Procedure 26(a) on October 3,

11  2007.  It is my understanding that KLA provided this document to the SEC.  Of particular

12  importance to the defense of this case, Ms. Berry stated in her memorandum that:

13              We got approval from Pricewaterhouse Coopers to have the stock
                option committee meet at some time during the 30 days following
14              August 31 and set the price for re-pricing at that time in order to
                maximize the value to employees.  The re-pricing date ended up
15              being August 31, but it was not determined until September 30 that
                the August 31 date was the correct date.  The re-pricing date was
16              also to be the date for the grant of "in lieu" options.

17         17.    Attached as Exhibit 16 hereto is a true and correct copy of emails among Leslie

18  Wilson of KLA, Roger Stern of WSGR and others, dated September 20-23, 1999.  This document

19  was provided by the SEC as part of its initial disclosures under Federal Rule of Civil Procedure

20  26(a) on October 3, 2007.  It is my understanding that KLA provided this document to the SEC.

21  The following exchange, excerpted from those emails, is very significant to this case.  On

22  September 20, 1999, Ms. Wilson asked Mr. Stern a question concerning retroactive pricing:

23              If we choose to communicate that grants will be made between
                now and the end of the year, and that the price will be
24              communicated after the Board (or compensation committee)
                action, does that mean that we will lose the opportunity to capture
25              stock prices from August 31st to date of new employee
                communication?
26

27  Mr. Stern responded that:

28

1
2
3
4

      I'm not quite sure what is meant by "capture stock prices from August 31 to date of new employee communication." The price will be set on the date of the comp committee meeting, and will be 100% of the trading value on that day. So I think the communication sent out already captures that. I apologize if I am being obtuse, please feel free to clarify.

5   Ms. Wilson replied on September 21, 1999 that:

6
7
8
9

      In the past, the Compensation Committee meets on a day following the determination of the individual employee stock option allocations. For FY00, this means that they could have met or are yet to meet on any day following August 27th to set the stock price. [Note the use of the hypothetical.] I agree that the communication already clearly states this.

10

      * * *

11
12
13

      I am concerned that sending additional communication may imply that the Compensation Committee has not yet met and is yet to meet between now (e.g. September 21) and the end of the year, thereby not allowing us to price the stock grant between August 27 and today even if the committee met during that period.

14   Mr. Stern replied:

15
16
17

      I see the point. No, it is not necessary to send out an additional employee communication in this situation. The original communication seems to capture the situation appropriately. Hope this helps!

18

19      I declare under penalty of perjury that the foregoing is true and correct.

20   Executed on February 1, 2008.

21

22

23                 /s/Shirli Fabbri Weiss
                     Shirli Fabbri Weiss

24

25      I hereby attest that I have on file all holographic signatures for any signatures indicated by

26 a "conformed" signature (/S/) within this e-filed document.

27

28  SE\9107185.1

DECLARATION OF SHIRLI FABBRI WEISS
NO. C 07 3798 JW

# Exhibit 1

## The Power of One

One Application. One Process. One Platform.

META

**Law.com's In-House Counsel**

Select **'Print'** in your browser menu to print this document.

©2007 *In-House Counsel* Online

Page printed from: http://www.inhousecounsel.com

Back to Article

---

### Ex-Prosecutor Dishes Up Advice to GCs on Government Probes

Katheryn Hayes Tucker
Fulton County Daily Report
October 19, 2007

The red flag that triggers a government investigation of a company is sometimes a whistleblower or some other complaint. But more often than not, it's just a little something in the news that doesn't add up right.

A prosecutor reads a story in the newspaper and says, "We'll just see what the heck is going on at Acme Co."

That is what Roscoe C. Howard Jr., a Washington-based partner with Troutman Sanders and former federal prosecutor, told members of the Georgia chapter of the Association of Corporate Counsel in a continuing legal education program Oct. 10 at Maggiano's Little Italy in Buckhead.



Run smarter, not harder.
**Download our Proactive Guide to Comprehensive Discovery Management.**



Howard's 30-year legal career includes stints as a professor at the University of Kansas School of Law and as U.S. Attorney for the District of Columbia.

He invited questions both during and after the lecture, and he got plenty. He didn't eat a bite of the nine-dish lunch served, and the audience didn't seem particularly interested in it either. They were eating up every spicy word from the speaker.

Those in attendance now have a thick book detailing Howard's presentation in PowerPoint. What they don't have is a copy of his speech, because it was extemporaneous. Here are some of the highlights of what he dished out:

1. Look closely at compliance. "They will give you a break if you have an effective compliance program. But it has to be effective. Enron had a compliance program. Arthur Andersen had a compliance program. You've got to have one that works. ... They are looking for what you are doing to keep your house in order."

2. Divide the duties. "For larger companies, try not to have the compliance officer be your in-house counsel. If you ask

me about my kids, I'm going to tell you they are beautiful and they are great people, but I'm invested in them. [One is a sophomore at the University of Chicago. One is a high school senior.] If your in-house counsel is also your compliance officer, he may say, 'Hell yeah, it's legal. I've looked at it.' You want somebody who isn't invested."

3. Watch the tone at the top. "People at the top of an organization tell what's important. What are you telling people about what's important? Make sure your employees are prepared."

4. Know the rules before you need to know them, including the U.S. Department of Justice policies. [He included copies of the Thompson memo and the McNulty memo in the handout book. Written by former deputy attorney general Larry Thompson and his successor, Paul J. McNulty, these memos explain the government's practice and principles in business prosecutions.] "Nobody calls and tells you they are coming," Howard said. "If you're trying to get your act together during the investigation, it is too late. They want to catch you off guard."

5. Don't panic. "When they knock, don't panic." Having worked on both sides of investigations, Howard offered plenty of observations, namely this: "It's all about pressure." He said he has seen investigators send in a uniformed SWAT team just for effect. "None of us think as well when we are under pressure," Howard said. "One of the ways to handle the pressure is to prepare for it now."

6. Don't consent. Don't give up right to counsel. Don't answer questions without a legal requirement. But think carefully about resistance. "You can resist, but the resistance is going to be held against you. You know that. But you've got shareholders. You've got responsibilities to them."

7. Send everyone home. "Send your folks home -- the ones you don't need." As a prosecutor, Howard said he would invade a company at dawn, send the team in when the gates opened and by the time most employees arrived, have investigators in every office waiting. The investigators' idea is to get as many people talking as possible -- without benefit of counsel.

8. Find out who is running the investigation. If it's the U.S. Justice Department, it's probably a criminal complaint. "Those are bet-the-company cases," Howard said. "They will put you out of business." Investigators could be from other federal agencies, such as the Treasury Department or the I.R.S. Or, they could be from the state government, although Howard said states will typically let federal agencies take the lead and expense of an investigation if possible.

9. Get friendly with the investigators. Follow up. Keep in touch. Find out what they're looking for, whom they suspect and when they think it happened. "Your goal is to find out those individuals, separate them and if necessary toss them under the bus," Howard said. "The goal is to protect the company."

10. The company is always the client. The board of directors is not the client. As outside counsel representing a corporation, Howard said he encountered a situation in which a board chairman was informing executives involved of his every move on an internal investigation. Howard learned that by cross referencing their cell phone records. After that, he refused to give information about the investigation to the board of directors.

11. Never lie: "Lie during an investigation, get indicted."

12. Trust documents. Get them. Keep them. "Witnesses change their story. It's human nature. But the one witness that will never change is a document. The documents will set you free, because you will find the truth in them."

13. Always do your own internal investigation. Put someone in charge of it. Make a report. Stamp the report "attorney work product." Then it belongs to the attorney, not the company, and it is the attorney's to keep and to hand over at the strategic moment. The goal of the internal investigation is to "make you smarter."

14. Never do solo interviews. Have two interviewers in internal investigations -- one to ask questions, one to take notes and be a witness. But interview people one at a time to avoid collaborations.

15. Remember that a lot of times, the government is "dead wrong." Sometimes prosecutors are young and inexperienced. They have tremendous power. But they are not infallible. "Sometimes these kids are just out of their league." Sometimes a corporate counsel has to fight back. "It may not seem cooperative, but it is representing someone."

# Exhibit 2

1  MARC J. FAGEL (Cal. Bar No. 154425)
   SUSAN F. LA MARCA (Cal. Bar No. 215231)
2    lamarcas@sec.gov
   JUDITH L. ANDERSON (Cal. Bar No. 124281)
3    andersonju@sec.gov
   JEREMY E. PENDREY (Cal. Bar No. 187075)
4    pendreyj@sec.gov
   ELENA RO (Cal. Bar No. 197308)
5    roe@sec.gov

6  Attorneys for Plaintiff
   SECURITIES AND EXCHANGE COMMISSION
7  44 Montgomery Street, Suite 2600
   San Francisco, California 94104
8  Telephone: (415) 705-2500
   Facsimile: (415) 705-2501

9

10

11                 UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13                     SAN JOSE DIVISION

14

15  SECURITIES AND EXCHANGE COMMISSION,    Civil Action No. _____

16              Plaintiff,
                                           COMPLAINT
17       vs.

18  LISA C. BERRY,

19              Defendant.

20

21      Plaintiff Securities and Exchange Commission (the "Commission") alleges:

22                     SUMMARY OF THE ACTION

23      1.      From 1997 through 2003, the in-house corporate attorney for two different public

24  companies caused each of those companies to report false financial information to the investing

25  public by repeatedly backdating stock option grants and falsifying related paperwork. Defendant

26  Lisa C. Berry devised the improper backdating scheme while serving as General Counsel of KLA-

27  Tencor Corporation ("KLA"), and then implemented similar practices after assuming the position of

28  General Counsel for Juniper Networks, Inc. ("Juniper"). By facilitating the selection of fabricated

COMPLAINT                                    1

1  option grant dates, Berry caused KLA, and then Juniper, to conceal hundreds of millions of dollars

2  of employee and executive compensation from investors.

3       2.    Under well-settled accounting principles in effect throughout the relevant period, KLA

4  and Juniper were not required to record an expense in their financial statements for options granted to

5  employees at the then-current market price of the company's stock ("at-the-money"), but *were*

6  required to record expenses for any options granted below the current market price ("in-the-money").

7  To help KLA and Juniper attract and retain executives and employees with more valuable "in-the-

8  money" options, without disclosing to shareholders the hundreds of millions of dollars in

9  compensation expenses associated with those grants, Berry, working with others, established

10  procedures to falsify the options grant records to make it appear that the options had been granted at-

11  the-money.

12       3.    On repeated occasions from 1997 until she left KLA in 1999, Berry and others caused

13  KLA to backdate stock option grants to dates when KLA's stock price closed much lower.  Just prior

14  to her departure from KLA, Berry provided "how to" instructions to other employees so that KLA

15  could continue the improper backdating procedures.  In 1999, when Berry moved to Juniper just

16  before it became a public company, she immediately instituted similar backdating procedures.  From

17  mid-1999 through mid-2003, for dozens of different grants to groups of employees, Berry similarly

18  caused Juniper to issue backdated options.

19       4.    By selecting option grant dates and prices with hindsight, Berry and others at the

20  respective companies caused KLA, and then Juniper, to issue to executives and employees valuable

21  in-the-money options without disclosing them, and further caused each company to materially

22  misrepresent their publicly-reported income (or losses), and to falsely represent in public filings with

23  the Commission that each company had no expenses related to their stock option grants.

24       5.    By engaging in the acts alleged in this Complaint, Berry, among other things, violated

25  the antifraud provisions of the federal securities laws, falsified public companies' books and records,

26  and caused both KLA and Juniper to falsely report their financial results.  The Commission seeks an

27  order enjoining Berry from future violations of the securities laws, requiring her to disgorge ill-gotten

28

COMPLAINT                                    2

1  gains with prejudgment interest and to pay civil monetary penalties, barring Berry from serving as an

2  officer or director of a public company, and providing other appropriate relief.

3                          **JURISDICTION AND VENUE**

4       6.    The Commission brings this action pursuant to Section 20(b) and 20(d) of the

5  Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b) and 77t(d)] and Sections 21(d) and

6  21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

7       7.    This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the

8  Securities Act [15 U.S.C. § 77t(b) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act

9  [15 U.S.C. § 78u(d), 78u(e) and 78aa].

10      8.    Berry, directly or indirectly, made use of the means or instrumentalities of interstate

11  commerce, or of the mails, or of the facilities of a national securities exchange in connection with the

12  transactions, acts, practices, and courses of business alleged herein.

13      9.    This Court is a proper venue for this action pursuant to Section 22 of the Securities

14  Act [15 U.S.C. § 77v], and Section 27 of the Exchange Act [15 U.S.C. § 77aa] because acts,

15  transactions, practices, and courses of business constituting the violations alleged in this Complaint

16  occurred within this District and Berry resides in the Northern District of California.

17                          **INTRADISTRICT ASSIGNMENT**

18      10.    Intradistrict assignment to the San Jose Division is proper pursuant to Civil Local Rule

19  3-2(e) because acts or omissions giving rise to the Commission's claims occurred, among other

20  places, in Santa Clara County, California.

21                                **DEFENDANT**

22      11.    Berry, age 49, resides in Los Gatos, California. From September 1996 through June

23  1999, Berry was Vice President and General Counsel of KLA. From June 1999 to January 2004,

24  Berry was General Counsel of Juniper, and beginning in July 1999, also served as Vice President and

25  Secretary. Berry majored in accounting in college, received her juris doctorate and then obtained a

26  masters of law in taxation. Berry is licensed to practice law in California, Arizona and Florida.

27

28

**RELEVANT ENTITIES**

1

2      12.    KLA is a Delaware corporation headquartered in San Jose, California that makes and

3 sells systems for the semiconductor industry. At all relevant times, KLA's common stock was

4 registered with the Commission pursuant to Section 12 of the Exchange Act and traded on the

5 NASDAQ National Market. At all times relevant to this action, KLA used a fiscal year ending on

6 June 30.

7      13.    Juniper is a Delaware corporation headquartered in Sunnyvale, California that makes

8 and sells internet-related networking products. From June 1999 through 2004, Juniper's common

9 stock was registered under Section 12 of the Exchange Act and was traded on the NASDAQ National

10 Market. At all times relevant to this action, Juniper used a fiscal year ending on December 31.

**FACTUAL ALLEGATIONS**

11

12    **A.**    **Berry and Others Backdated Options at KLA**

13      **a. KLA's Stock Option Disclosures**

14      14.    Throughout Berry's tenure as KLA's General Counsel, KLA regularly used employee

15 stock options as a form of compensation to recruit, retain, and incentivize key employees. Each

16 option gave the grantee the right to buy KLA common stock from the company at a set price, called

17 the "exercise" or "strike" price, on and after a future date. The option was "in-the-money" when

18 granted if the market price of KLA's common stock exceeded the option's exercise price. The option

19 was "at-the-money" when granted if the market price of KLA's common stock and the exercise price

20 were the same.

21      15.    From approximately July 1997 through June 1999, KLA's primary stock option plan

22 specifically prohibited the grant of in-the-money options to employees and executives. The plan

23 required that the board of directors set the exercise price of the company's stock options, and that the

24 price on the date of grant could not be less than fair market value – that is, the closing price of KLA's

25 common stock on the date when granted.

26      16.    On August 7, 1998, KLA filed with the Commission a registration statement on Form

27 S-8 which attached the Company's primary stock option plan, and incorporated each of these key

28 terms. Berry reviewed this statement and signed it as the company's General Counsel.

COMPLAINT

4

17.    KLA also publicly represented, in audited financial statements and other filings with the Commission made from 1997 through 1999, that its option grants were made at fair market value. In other words, KLA purported to issue options at-the-money, not in-the-money.

18.    KLA also stated in public filings that its audited financial statements conformed with generally accepted accounting principles (known as "GAAP"). In particular, KLA disclosed that it followed Accounting Principles Board's Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") in accounting for employee stock options. Under APB 25, public companies recorded an expense on their financial statements for the in-the-money portion of any options granted. Consequently, granting in-the-money options to employees could have a significant impact on the company's expenses and income (or loss) reported to the shareholders. APB 25 also allowed companies to grant employee stock options without recording any compensation expense, so long as the option exercise price was not below the closing market price for the company's stock on the date of the grant.

19.    KLA made the statements about its accounting for stock options in accordance with APB 25 in the notes to its audited financial statements, including in its annual reports to shareholders, filed with the Commission on Forms 10-K for its fiscal years 1998 and 1999.

20.    KLA also filed proxy statements that were sent to shareholders announcing the annual meeting of shareholders. In the proxy statements dated September 28, 1998 and October 15, 1999, KLA provided information on executive compensation and executive option grants in the last fiscal year from the date of filing. The discussion on executive compensation in each proxy statement represented that stock options were granted at the market price on the date of the grant. In addition, KLA's proxy statements filed on September 28, 1998 and October 15, 1999 stated that one of the material terms of certain grants to certain executives was that the exercise price of the options was the fair market value of the company's common stock as of the date of grant. These statements also were incorporated by reference into KLA's Forms 10-K.

21.    Berry reviewed, discussed, and finalized the company's annual reports filed with the Commission on Forms 10-K and its proxy statements filed with the Commission on September 28, 1998 and October 15, 1999, as KLA's General Counsel.

COMPLAINT                                         5

### b. Berry Participated in the Scheme to Backdate KLA Option Grants

22.   In 1997, KLA's board of directors delegated to a Stock Option Committee consisting of three directors the authority to grant stock options to non-officer employees. The board's delegation required that at least two members of the committee approve each options grant.

23.   From mid-1997 through mid-1999, Berry worked with KLA's Stock Option Committee, which consisted of board members with such delegated authority. Berry oversaw the administration of the stock option grant process.

24.   Under procedures put in place by Berry and the Stock Option Committee, the option grant approvals did not reflect the date the Stock Option Committee met to approve them. Instead, grants to employees by the Stock Option Committee were deliberately delayed to allow the selection of historically low stock prices with the benefit of hindsight.

25.   Berry directed Human Resources ("HR") and stock administration department employees to prepare the grant approval paperwork. Berry then directed the process for selecting the exercise price by using historical information regarding low KLA stock prices of the preceding weeks. One or more members of the Stock Option Committee then executed the grant paperwork prepared at Berry's direction, bearing false grant dates that had been selected using hindsight.

26.   The grant approvals were then provided to HR and stock administration personnel who entered the grant information, including the backdated exercise prices, into KLA's options tracking database system.

27.   In this manner, Berry and others at KLA repeatedly backdated grants to newly hired and recently promoted employees ("new hire" grants), as well as to current employees eligible for options at the end of KLA's annual review process (known as "peak performance" or "focal" grants), among others. These backdated grants reflected historically low prices for KLA stock for the weeks prior to the date on which the price was selected.

28.   For example, KLA awarded several grants to employees bearing a purported grant date of August 31, 1998, at an exercise price equal to that day's closing stock price of $10.63. The grants included peak performance grants to officers and non-officers, as well as a new hire grant. However, these grants were actually made over a span of a couple weeks during October 1998, when KLA's

1  stock was trading between $10.75 and $13.81, and were backdated to August 31, 1998. The August

2  31 stock price of $10.63 was the lowest closing price for KLA's common stock for at least three

3  months prior to October 1998.

4        29.    Berry personally benefited from the grant backdated to August 31, 1998, as she

5  received options to purchase 22,000 shares at the lower $10.63 exercise price.

6        30.    In another example in late 1998, Berry and others at KLA backdated a one-time

7  hundred-share grant made to thousands of KLA employees. The backdated grant used the date of

8  October 19, 1998, and the closing stock price on that date of $27.6250 as the options' exercise price.

9  However, Berry and others actually selected the price and prepared the grant during December 1998,

10  by which time KLA's stock price had risen above $40.

11        31.    A KLA HR employee specifically questioned Berry about the propriety of backdating

12  the grant to October 19, 1998. The employee pointed out to Berry that using the date in the past when

13  the price was lower raised the question of "whether we would be able to pass the 'audit' test of not

14  setting a date in the past in order to get a better price." Berry responded, acknowledging she

15  understood, but nevertheless allowed KLA to use a backdated grant date and corresponding low price

16  without appropriately accounting for the in-the-money option grant.

17        32.    On approximately ten occasions for grants backdated to July 31, 1997 through grants

18  backdated to June 15, 1999, Berry and others thus used hindsight to choose option exercise prices for

19  new hire, peak performance/focal and other grants made to KLA employees and executives.

20        33.    Berry was involved in most facets of KLA's options granting process. Berry

21  participated in conference calls and communications discussing accounting rules related to stock

22  options. She also wrote a memorandum in November 1998 in which she acknowledged that repricing

23  executive stock options by using an earlier grant date with a lower price would result in KLA having

24  to take "a charge to its P&L."

25        34.    In June 1999, shortly before her departure from KLA, Berry instructed employees in

26  KLA's HR department how to backdate stock option grants so that they could carry on with the

27  scheme after she had departed. Berry advised the HR personnel to: (1) create a list of newly hired

28  employees; (2) wait several weeks; (3) obtain a list of KLA's daily closing stock prices for the past

COMPLAINT                                   7

1   several weeks; (4) highlight the three or four lowest prices; and (5) forward the new hire list and the

2   highlighted stock price list to KLA's Stock Option Committee. As a consequence, KLA continued to

3   backdate certain stock option grants in this manner following Berry's departure from the company.

4      35.    Berry knew, or was reckless in not knowing, that the grant documentation that she

5   helped prepare falsely represented the date on which stock options were actually granted to

6   employees. Berry further knew, or was reckless in not knowing, that the stock option grant

7   documentation that reflected the false information about the dates of the grants and exercise prices for

8   the grants, resulted in KLA's failure to properly record expenses for these in-the-money grants and

9   rendered KLA's public statements about its stock options grants false and misleading.

10      **c.   KLA's Publicly Reported Financial Results**

11      36.    As a public company, KLA filed with the Commission annual reports that included

12   audited financial statements, certified by the companies' outside auditors. KLA's failure to record a

13   compensation expense in connection with the backdated, in-the-money option grants resulted in

14   materially overstated net income in KLA's financial statements throughout Berry's tenure at KLA,

15   and even after she had left. Because the in-the-money options continued to affect the financial

16   statements as employees became eligible to exercise their stock options, those misstatements

17   continued through 2003.

18      37.    In particular, KLA's failure to record expenses related to stock options granted in-the-

19   money resulted in a 4 percent overstatement of KLA's net income in 1998, and a 46 percent

20   overstatement of net income in 1999. KLA included those materially false representations about its

21   financial results in its annual reports to shareholders filed with the Commission on Forms 10-K for its

22   fiscal years 1998 and 1999. Berry reviewed and discussed KLA's false and misleading annual reports

23   (and drafts of those reports) filed with the Commission on Forms 10-K for the fiscal years 1998 and

24   1999, as General Counsel of KLA.

25      38.    KLA also filed quarterly reports with the Commission on Forms 10-Q that included

26   financial statements for each of its first three fiscal quarters. KLA's quarterly reports filed on Forms

27   10-Q for each of the company's first three fiscal quarters of 1997 and 1998, and for the quarterly

28   period ended March 31, 1999, contained materially false and misleading financial statements due to

COMPLAINT                                8

1  the company's failure to record compensation expenses associated with granting undisclosed in-the-

2  money options. Berry also reviewed, discussed, and helped finalize, each of these false and

3  misleading Forms 10-Q, as General Counsel of KLA.

4      39.    KLA also sold securities pursuant to offering documents, including registration

5  statements on Forms S-8 filed with the Commission on January 30, 1998, August 7, 1998 and

6  December 4, 1998, which incorporated the false financial statements. Berry reviewed and prepared

7  each of these false and misleading Forms S-8, as General Counsel of KLA. In addition, Berry signed

8  the Forms S-8 filed with the Commission on January 30, 1998 and August 7, 1998.

9      40.    The representations to KLA's shareholders in its public reports about the company's

10  stock option program, including how KLA priced options and accounted for them and its financial

11  results, were untrue. Berry knew, or was reckless in not knowing, that those statements and financial

12  results were untrue, because she engineered with others and participated in the scheme to create

13  option grant approvals that falsely represented the date of the grant to make it appear as though KLA

14  was not required to record an expense for its backdated options.

15  **B.**    **Berry Similarly Caused Juniper to Backdate Stock Option Grants**

16      41.    On June 18, 1999, Berry became Juniper's General Counsel. In applying for the

17  position, Berry held herself out as having experience in stock administration and the review of

18  financial statements.

19      **a.**    **Juniper's Stock Option Disclosures**

20      42.    On June 24, 1999, Juniper became a public company through an initial public offering

21  of its stock (an "IPO"). Juniper grew rapidly following its IPO, hiring hundreds of employees

22  through early June 2003. To support this rapid growth and to achieve its recruiting and compensation

23  objectives, Juniper relied heavily on stock options as a recruiting and retention incentive. By

24  compensating employees with stock options, Juniper avoided paying greater salaries or other forms of

25  compensation that would have been necessary to attract and retain employees. Juniper granted stock

26  options to nearly all new full-time employees. Juniper also granted options to existing Juniper

27  employees (called "ongoing" options), based on performance or other factors.

28

1        43.     Juniper publicly represented, in audited financial statements and other filings with the

2    Commission made for or during its fiscal years 1999 through 2003, that its stock option grants were

3    made at fair market value. In particular, Juniper stated in its annual reports to shareholders filed with

4    the Commission on Forms 10-K for its fiscal years 1999 through 2002: "Incentive stock options are

5    granted at an exercise price of not less than the fair value per share of the common stock on the date

6    of grant." Juniper further stated in each of those reports on Forms 10-K that, although the company's

7    plans allowed for the granting of so-called "nonstatutory" stock options at an exercise price of not

8    less than 85 percent of the then-market value, "no nonstatutory stock options have been granted for

9    less than fair market value on the date of the grant."

10       44.     Juniper's public filings also affirmatively stated that the company accounted for its

11    employee stock option plans in accordance with GAAP, and particularly, that the company followed

12    APB 25. Thus, in each of its Forms 10-K filed with the Commission for fiscal years 1999 through

13    2002, Juniper represented that it had "elected to follow APB 25," and that "[b]ecause the exercise

14    price of the Company's stock options equals the market price of the underlying stock on the date of

15    grant, no compensation expense is recognized."

16       45.     Juniper also sent to shareholders proxy statements announcing its annual meetings of

17    shareholders for 2000 through 2003, filed with the Commission on April 13, 2000, March 28, 2001,

18    April 11, 2002 and March 28, 2003. The proxy statements for 2000, 2001 and 2003, in describing

19    executive compensation and particularly options granted to officers, represented that "options are

20    granted at fair market value on the date of grant." Similarly, the 2002 proxy statement, in responding

21    to a shareholder proposal regarding the company's repricing (or regranting) of stock options,

22    represented that employees at Juniper who have been awarded stock options "have a right to purchase

23    stock in the future at a price which is the fair market value on the date of the stock option grant."

24       46.     Berry reviewed Juniper's annual reports filed on Forms 10-K, and other periodic

25    reports filed with the Commission, while she was Juniper's General Counsel. Berry was also

26    responsible for drafting Juniper's proxy statements announcing annual meetings of shareholder,

27    which she signed as Juniper's General Counsel.

28

COMPLAINT

1    **b. Berry's Scheme to Backdate Juniper Option Grants**

2    47.    On July 21, 1999, based on Berry's recommendation, Juniper's Board of Directors

3    created a three-member Stock Option Committee, to which it delegated authority to grant stock

4    options to Juniper's non-executive employees. Throughout her tenure with Juniper, Berry served as a

5    member of the Stock Option Committee, along with two other persons, Juniper's chief executive

6    officer and chief financial officer.

7    48.    Berry was responsible for overseeing Juniper's stock option granting process,

8    including supervising Juniper's stock administrator. From mid-1999 through mid-2003, Berry used

9    the procedures she put in place for most Juniper stock option grants by backdating the grants to a date

10   in the past when Juniper's closing stock price was lower. Berry then routinely created backdated

11   "minutes" for purported Stock Option Committee meetings that never occurred.

12   **i. Berry Backdated New Hire Stock Option Grants**

13   49.    Beginning in the second half of 1999, Berry routinely prepared backdated stock option

14   grants to issue options to recently hired employees of Juniper. For these new hire grants, Berry

15   collected the names of recently hired employees and had lists prepared. She then selected as the

16   exercise price of the new hire grants the closing price of Juniper's stock on a date in the past,

17   reflecting the low closing price during a particular period around the time the employees were hired.

18   For each backdated grant from 1999 through 2003, Berry then created Stock Option Committee

19   meeting "minutes" that falsely represented that the Stock Option Committee had met on the date of

20   the low closing price and granted options on that date.

21   50.    Berry signed the backdated committee "minutes" as a Stock Option Committee

22   member. In addition, for each backdated grant she either presented the minutes to the other Stock

23   Option Committee members for signature or stamped the minutes with a signature stamp she

24   maintained bearing the other Stock Option Committee members' signatures.

25   51.    Once Berry selected a backdated grant date and a corresponding exercise price, she

26   informed Juniper's stock administrator, who then entered the grants into Juniper's stock option

27   tracking software using the backdated date as the grant date. Juniper did not reflect in its books an

28   expense related to the in-the-money portion of the options.

COMPLAINT                                    11

52.    For example, Juniper granted options to six new Juniper employees on the purported, but false, grant date of October 27, 1999.  The six employees were hired on Monday, October 25, 1999, at which time Juniper's stock traded at $257.75.  Juniper's stock price dipped to a low of $249.94 on Wednesday, October 27, then rose to $275.63 by the end of the week.  Berry actually selected the grant date in mid-November 1999, when Juniper's stock was trading around $283.50, using information about Juniper's historical closing prices for its stock during the week the employees were hired.

53.    Similarly, Juniper granted stock options to employees hired between October 8, 2002 through January 2, 2003, using the backdated January 2, 2003 closing price of $7.36 as the purported "fair market value" of the stock on the grant date.  The Stock Option Committee never met on January 2, 2003.  Instead, Berry selected that date during mid-February, when Juniper's stock was trading around $9 per share.  The January 2, 2003 closing price for Juniper's stock, $7.36, used as the exercise price, was Juniper's lowest closing price of the year up to the time Berry selected the grant date.

54.    Using dates selected with hindsight between mid-June 1999 through the end of May 2003, Berry backdated more than 50 grants to groups of new employees.  More than $300 million in expenses associated with the in-the-money portion of those grants were not disclosed by Juniper as a consequence of Berry's scheme.

**ii. Berry Backdated Juniper's "Ongoing" Stock Option Grants**

55.    From her arrival in 1999 through mid-2003, Berry also backdated performance-related grants to existing employees and officers, which Juniper called "ongoing" grants.  Berry thus backdated large grants to officers and employees that were made to create retention and performance incentives (and which at times included new hires), on approximately nine occasions throughout her tenure.

56.    For instance, Juniper granted options to a large group of existing employees and officers (and to certain new hires), which it called an "evergreen" grant, using the backdated grant date of October 4, 1999.  The Stock Option Committee did not meet on October 4, 1999, and no one determined to grant the employees and officers options that day.  Instead, on November 5, 1999,

COMPLAINT                                                12

1   when Juniper's stock price traded at $273.13, Berry created Stock Option Committee meeting

2   minutes dated October 4, 1999, when Juniper's stock priced closed at $182.13 – the lowest price of

3   that quarter to date. Berry subsequently caused Juniper's board of directors to be falsely informed

4   that the grant had been made on October 4, 1999. More than $100 million in expenses associated

5   with the in-the-money portion of this "evergreen" grant were not disclosed by Juniper as a

6   consequence of Berry's actions.

7        57.   On occasion, Juniper granted "pools" of stock options to certain business units to be

8   awarded to employees based on the discretion of the business unit manager. Berry backdated "pool"

9   grants Juniper made seven times between 2000 and 2003 (which also included certain grants to new

10   hires). More than $200 million in expenses associated with the in-the-money portion of these "pool"

11   grants were not disclosed by Juniper due to Berry's actions.

12        58.   For example, Juniper granted options to existing employees and senior executives (as

13   well as some new hires) in one such "pool" grant, using the backdated grant date of December 21,

14   2000. Juniper's stock price closed at $93.94 on December 21, 2000, which was the lowest stock price

15   of the six months up to that date. No Stock Option Committee meeting occurred on that date; in fact,

16   Berry left the country early in the morning of December 21, 2000. The grant was actually made in or

17   around early January 2001, when Juniper's stock price was trading over $100 per share.

18        59.   In the spring of 2001, Juniper's stock price had declined substantially from the levels

19   experienced during 1999 and 2000. Consequently, many options awarded during those earlier years

20   had strike prices well above the then-current stock price (known as "underwater" options).

21        60.   In approximately April 2001, Juniper instituted a program to award additional options

22   to existing employees using a formula based on the number of underwater options each employee

23   then had, and the length of time each had been employed by Juniper. As part of the program, Juniper

24   granted one block of this "formula" grant using as the grant date April 4, 2001, when Juniper's stock

25   price closed at $29.19. Berry caused the grant to be backdated to April 4, selecting that date with

26   hindsight on or around April 19, 2001, when Juniper's stock price had more than doubled to $65.58.

27        61.   Berry knew, or was reckless in not knowing, that the grant documentation that she

28   helped prepare falsely represented the date on which stock options were actually granted to

COMPLAINT                       13

1   employees. Berry further knew, or was reckless in not knowing, that using the stock option grant

2   documentation that reflected the false information about the dates of the grants and exercise prices for

3   the grants caused Juniper to fail to properly record expenses for these in-the-money grants. Berry

4   further knew, or was reckless in not knowing, that the scheme rendered Juniper's public statements

5   made in proxy statements dated April 13, 2000, March 28, 2001, April 11, 2002 and March 28, 2003,

6   and in Forms 10-K filed with the Commission for fiscal years 1999 through 2002, that Juniper

7   granted stock options at the fair market value on the date of the grant and that the company did not

8   grant stock options for less than fair market value, materially false and misleading.

9                   **c. Berry Caused Juniper to Falsely Report Its Financial Results**

10          62.     As a public company, Juniper filed with the Commission annual reports on Form 10-K

11   that included the audited financial statements, certified by the companies' outside auditors, which

12   falsely represented Juniper's financial results. Due to Juniper's failure to record an expense for in-

13   the-money options, Juniper's financial statements were materially misstated in each fiscal year from

14   1999 through 2002, and Berry reviewed and discussed those Forms 10-K that contained these false

15   representations, as Juniper's General Counsel. Berry's fraud continued to affect the company's

16   financial statements through 2005.

17          63.     For example, for its fiscal year 2001, Juniper originally reported a loss of $13.4

18   million. However, after the company ultimately recorded a compensation expense for previously

19   undisclosed in-the-money option grants in restated financials for this period, the company reported an

20   additional expense of $513.1 million, which (after adjusting for taxes) brought Juniper's loss for the

21   year to $501.5 million.

22          64.     Similarly, for its fiscal year 2003, Juniper originally reported net income of $39.2

23   million, representing the company's first profitable year ever. As a result of Juniper's failure to

24   record a compensation expense for backdated, in-the-money option grants, Juniper's pre-tax income

25   was reduced by $19.3 million, which, after adjusting for taxes, reduced its net income to $30.7

26   million for the year, a profit reduction of 21.68%.

27          65.     Juniper also publicly announced quarterly financial results, which were described in

28   financial statements included in quarterly reports filed with the Commission on Forms 10-Q, that

COMPLAINT                                          14

1  were materially false and misleading due to Juniper's failure to record compensation expenses

2  associated with in-the-money options. Thus, Juniper's quarterly reports filed on Forms 10-Q

3  beginning with the quarter ended September 30, 1999, and for each of the company's first three

4  quarters in fiscal years 2000 through 2002, and the first two quarters of fiscal year 2003, contained

5  materially false and misleading financial statements. Berry reviewed and discussed, as Juniper's

6  General Counsel, each of Juniper's Forms 10-Q that contained these false representations.

7      66.    Juniper filed with the Commission current reports on Forms 8-K on April 10, 2003,

8  July 10, 2003 and October 9, 2003, each of which included announcements about the company's

9  financial results for prior quarters that were materially false and misleading due to Juniper's failure to

10  record compensation expenses associated with undisclosed grants of in-the-money stock options.

11  Berry reviewed, as Juniper's General Counsel, each of Juniper's Forms 8-K that contained these false

12  representations.

13      67.    During Berry's tenure as Juniper's General Counsel, Juniper filed with the

14  Commission registration statements on Form S-8 on March 14, 2000, August 18, 2000, December 12,

15  2000, March 29, 2001, December 21, 2001 and July 9, 2002, each of which incorporated by reference

16  false and misleading periodic reports. Berry reviewed each of these registration statements filed on

17  Form S-8.

18      68.    In May 2006, the audit committee of Juniper's board of director's began to investigate

19  the Company's historical options granting practices. As a result of the audit committee investigation,

20  Juniper announced in March 2007 restated financial results to record expenses for options granted to

21  employees. Juniper announced the recording of additional pre-tax, non-cash, stock-based

22  compensation expense of $894.7 million for fiscal years 1999 through 2005 under APB 25, $879.1

23  million of which was for fiscal years 1999 through 2003.

24

25

26

27

28

COMPLAINT                                         15

1    **C.    Berry Received Backdated KLA and Juniper Options and Sold Shares**

2        69.    While at KLA, Berry herself received backdated options purportedly granted on

3    August 31, 1998 that were in-the-money when granted.    As a result, she personally benefited from the

4    backdating and received unreported compensation from backdated KLA options.

5        70.    Similarly, while at Juniper, Berry also received backdated options purportedly granted

6    on May 11, 2000, December 21, 2000, April 11, 2001, July 1, 2002 and March 12, 2003 that were in-

7    the-money when granted.    As a result, she personally benefited from the backdating and received

8    unreported compensation from backdated Juniper options.

9        71.    In addition, Berry exercised certain stock options she received.    Berry further sold

10    shares in each company's stock, including shares she received based on her exercise of stock options.

11    Berry knew that she and other officers of KLA and Juniper similarly received options backdated as of

12    the same dates as the backdated employee options.    She thus was motivated to continue backdating

13    options, in part, to enrich herself and her fellow officers at each company.

14                              **FIRST CLAIM FOR RELIEF**

15            **Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

16        72.    The Commission realleges and incorporates by reference paragraphs 1 through 71

17    above.

18        73.    By engaging in the conduct described above, Berry, directly or indirectly, in

19    connection with the purchase or sale of securities, by the use of means or instrumentalities of

20    interstate commerce, or the mails, with scienter:

21            a.    Employed devices, schemes, or artifices to defraud;

22            b.    Made untrue statements of material facts or omitted to state material facts

23                necessary in order to make the statements made, in the light of the circumstances

24                under which they were made, not misleading; and

25            c.    Engaged in acts, practices, or courses of business which operated or would operate

26                as a fraud or deceit upon other persons, including purchasers and sellers of

27                securities.

28

COMPLAINT                                16

74.     By reason of the foregoing, Berry has violated, and unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

75.     The Commission realleges and incorporates by reference paragraphs 1 through 71 above.

76.     By engaging in the conduct described above, KLA, Juniper and/or other persons, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    a.  Employed devices, schemes, or artifices to defraud;

    b.  Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.  Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

77.     Berry knowingly provided substantial assistance to KLA's, Juniper's and/or other persons' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)].

78.     Unless restrained and enjoined, Berry will continue to violate and aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)(1)

79.     The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

COMPLAINT

80. By engaging in the conduct described above, Berry, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails with scienter employed devices, schemes or artifices to defraud.

81. By reason of the foregoing, Berry violated, and unless restrained and enjoined, will continue to commit violations of, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Violations of Securities Act Sections 17(a)(2) and (3)

82. The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

83. By engaging in the conduct described above, Berry, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b. Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

84. By reason of the foregoing, Berry has violated, and unless restrained and enjoined, will continue to violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder

85. The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

86. Based on the conduct alleged above, KLA and Juniper each violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13], which obligate issuers of securities

COMPLAINT

18

1  registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to file with the Commission

2  accurate annual, current and quarterly reports.

3       87.    By engaging in the conduct alleged above, Berry knowingly provided substantial

4  assistance to KLA's and to Juniper's respective filing of materially false and misleading reports with

5  the Commission.

6       88.    By reason of the foregoing, Berry aided and abetted violations by KLA and by Juniper

7  of Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1, 13a-11 and 13a-

8  13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13]. Unless restrained

9  and enjoined, Berry will continue to aid and abet such violations.

10                        **SIXTH CLAIM FOR RELIEF**

11            **Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(A)**

12       89.    The Commission realleges and incorporates by reference Paragraphs 1 through 71

13  above.

14       90.    Based on the conduct alleged above, KLA and Juniper each violated Section

15  13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities

16  registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books,

17  records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and

18  dispositions of the assets of the issuer.

19       91.    By engaging in the conduct alleged above, Berry knowingly provided substantial

20  assistance to KLA's and Juniper's respective failures to make and keep books, records and accounts

21  which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

22       92.    By reason of the foregoing, Berry has aided and abetted violations by KLA and by

23  Juniper of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)]. Unless restrained

24  and enjoined, Berry will continue to aid and abet such violations.

25                      **SEVENTH CLAIM FOR RELIEF**

26            **Aiding and Abetting Violations of Exchange Act Section 13(b)(2)(B)**

27       93.    The Commission realleges and incorporates by reference Paragraphs 1 through 71

28  above.

COMPLAINT                                    19

1 94. Based on the conduct alleged above, KLA and Juniper violated Section 13(b)(2)(B) of

2 the Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered

3 pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78I] to devise and maintain a sufficient

4 system of internal accounting controls.

5 95. By engaging in the conduct alleged above, Berry knowingly provided substantial

6 assistance to KLA's and Juniper's respective failures to devise and maintain a sufficient system of

7 internal accounting controls.

8 96. By reason of the foregoing, Berry has aided and abetted violations by KLA and by

9 Juniper of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)]. Unless restrained

10 and enjoined, Berry will continue to aid and abet such violations.

11
## EIGHTH CLAIM FOR RELIEF

12
### Violations of Exchange Act Section 13(b)(5)

13 97. The Commission realleges and incorporates by reference Paragraphs 1 through 71

14 above.

15 98. By the conduct alleged above, Berry violated Section 13(b)(5) of the Exchange Act [15

16 U.S.C. § 78m(b)(5)], which prohibits anyone from knowingly circumventing a system of internal

17 accounting, or knowingly falsifying certain books, records, and accounts.

18 99. Unless restrained and enjoined, Berry will continue to violate Section 13(b)(5) of the

19 Exchange Act [15 U.S.C. § 78m(b)(5)].

20
## NINTH CLAIM FOR RELIEF

21
### Violations of Exchange Act Rule 13b2-1

22 100. The Commission realleges and incorporates by reference Paragraphs 1 through 71

23 above.

24 101. By engaging in the conduct described above, Berry falsified or caused to be falsified

25 KLA's and Juniper's respective books, records and accounts in violation of Rule 13b2-1 under the

26 Exchange Act [17 C.F.R. § 240.13b2-1].

27 102. Berry has violated and, unless restrained and enjoined, will continue to violate, Rule

28 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b201].

COMPLAINT       20

### TENTH CLAIM FOR RELIEF

#### Violations of Exchange Act Section 14(a) and Rule 14a-9 thereunder

103. The Commission realleges and incorporates by reference Paragraphs 1 through 71 above.

104. Based on the conduct alleged above, KLA and Juniper each violated Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9], which prohibits solicitations by means of a proxy statement, form of proxy, notice of meeting or other communication, written or oral, that contain a statement which, at the time and in the light of the circumstances under which it was made, was false or misleading with respect to any material fact, or which omit to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which had become false or misleading.

105. By engaging in the conduct alleged above, Berry knowingly provided substantial assistance to KLA's and Juniper's respective solicitations by means of false or misleading proxy statements.

106. By reason of the foregoing, Berry has aided and abetted violations by KLA and by Juniper of Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9] thereunder.  Unless restrained and enjoined, Berry will continue to aid and abet such violations.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

#### I.

Permanently enjoin Berry from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5 and 240.13b2-1], and from aiding and abetting violations of Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and 14(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B) and 78n(a)] and Rules 12b-

COMPLAINT

21

1  20, 13a-1, 13a-11, 13a-13, and 14a-9 [17 C.F.R. §§.240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13

2  and 240.14a-9] thereunder;

3                                                  II.

4        Order Berry to disgorge ill-gotten gains from conduct alleged herein, plus prejudgment

5  interest;

6                                                  III.

7        Order Berry to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §

8  77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

9                                                  IV.

10       Prohibit Berry, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]

11  from serving as an officer or director of any entity having a class of securities registered with the

12  Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file

13  reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d);

14                                                  V.

15       Retain jurisdiction of this action in accordance with the principles of equity and the Federal

16  Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

17  may be entered, or to entertain any suitable application or motion for additional relief within the

18  jurisdiction of this Court; and

19                                                  VI.

20       Grant such other relief as this Court may deem just and appropriate.

21

22

23                                         Respectfully submitted,

24

25

26  Dated: August 28 2007

27                                         Jeremy E. Pendrey
                                           Attorney for Plaintiff
28                                         SECURITIES AND EXCHANGE COMMISSION

COMPLAINT

22

# Exhibit 3



U.S. Securities and Exchange Commission

## SEC Charges Former KLA-Tencor CEO With Fraud For Improper Stock Options Backdating

### Commission Also Settles Claims Against KLA-Tencor

**FOR IMMEDIATE RELEASE**
**2007-143**

*Washington, D.C., July 25, 2007* - The Securities and Exchange Commission today filed charges against Silicon Valley semiconductor company KLA-Tencor Corporation (KLA) and its former Chief Executive Officer, Kenneth L. Schroeder, alleging that they engaged in an illicit scheme to backdate stock option grants.

The Commission alleges that, since 1997, KLA concealed more than $200 million in stock option compensation by providing employees and executives with potentially lucrative "in-the-money" options while secretly backdating the grants to avoid reporting the expenses to investors. The Commission further alleges that Schroeder, of Los Altos Hills, Calif., repeatedly backdated options between 1999 and 2002, and once in 2005 - even after he received advice from company counsel that retroactively selecting grant dates without adequate disclosure was improper.

Linda Chatman Thomsen, the SEC's Director of Enforcement, stated, "KLA dramatically overstated its reported financial results, depriving investors of accurate information about the company's compensation costs and financial performance. It is especially troubling for a public company to engage in such misconduct even after being cautioned that these practices were impermissible."

The Commission's complaint against KLA, filed in federal district court in San Jose, Calif., alleges that former company executives routinely used hindsight to issue options to employees priced at or near KLA's lowest stock price of the preceding weeks. Although pricing the options below current prices required the company to report a compensation charge under well-settled accounting principles, former KLA officials avoided reporting the charges by falsely documenting that the options had been granted on an earlier date. The backdated grants resulted in materially misleading disclosures, with the Company overstating its net income in fiscal years 1998 through 2005 by as much as 156 percent.

In a separate complaint filed against Schroeder, the Commission charges that he repeatedly engaged in backdating after becoming CEO in 1999, including pricing large awards of options to himself that were "in the money" by millions of dollars - a potential windfall never disclosed to KLA-Tencor's shareholders. According to the complaint, Schroeder received a legal memorandum in March 2001 cautioning that "the Board and its committees are limited in their ability to grant options at a retroactive price without exposing the company to risk of an accounting charge." The memo

further warned that "[a]ny attempt to set a price before such a grant is made raises substantial risks under securities and tax laws [and] accounting rules and gives rise to disclosure obligations." The Commission alleges that Schroeder nonetheless continued to backdate options.

KLA-Tencor, without admitting or denying the allegations in the Commission's complaint, agreed to settle the matter by consenting to a permanent injunction against violations of the reporting, books and records, and internal controls provisions of federal securities laws. The Commission declined to charge the company with fraud or seek a monetary penalty, based in part on the company's swift, extensive, and extraordinary cooperation in the Commission's investigation, as well as its far-reaching remedial measures. KLA-Tencor's cooperation included an independent internal investigation and the sharing of the results of that investigation with the government. The company also took significant remedial actions in response to the findings of its internal investigation, including the implementation of new controls designed to prevent the recurrence of fraudulent conduct, removal of certain senior executives and board members, and the re-pricing and cancellation of retroactively-priced options held by several individuals.

Marc J. Fagel, Associate Regional Director of the SEC's San Francisco Regional Office, stated, "KLA-Tencor went to great lengths to clean house after discovering the fraud, and their cooperation greatly facilitated the government's investigation."

The complaint against Schroeder alleges that he violated, or aided and abetted, violations of the antifraud, record-keeping, financial reporting, internal controls, lying to auditors, equity transaction reporting and proxy provisions of the federal securities laws. The complaint also alleges Schroeder signed false certifications required by Section 302 of the Sarbanes-Oxley Act of 2002. The Commission is seeking injunctive relief, disgorgement of ill-gotten gains, and monetary penalties against Schroeder, in addition to an order barring him from serving as an officer or director of a public company. In addition, the complaint seeks reimbursement of bonuses and profits from stock sales pursuant to Section 304 of the Sarbanes-Oxley Act.

The Commission's investigation is continuing.

# # #

For more information, contact:

Marc J. Fagel
Associate Regional Director
(415) 705-2449

Michael S. Dicke
Assistant Regional Director
(415) 705-2458

United States Securities and Exchange Commission
San Francisco Regional Office

➤ Additional materials: Litigation Release No. 20207

*http://www.sec.gov/news/press/2007/2007-143.htm*

Home | Previous Page                    Modified: 07/25/2007