# Exhibit 4



**THE WALL STREET JOURNAL.**
*ONLINE*

July 25, 2007 7:18 p.m. EDT

# 3rd UPDATE: SEC Charges Former KLA-Tencor CEO In Backdating

**DOW JONES NEWSWIRES**
*July 25, 2007 7:18 p.m.*

(Adds comment from Schroeder lawyer in fifth, 10th and 11th paragraphs; background on executive departures in 12th paragraph.)

By Siobhan Hughes
Of DOW JONES NEWSWIRES

WASHINGTON (Dow Jones)--The U.S. Securities and Exchange Commission on Wednesday charged the former chief executive of KLA-Tencor Corp. (KLAC) with engaging in a scheme to backdate stock option grants even after he was told by the company's top lawyer that it was improper to do so without telling investors.

The SEC filed civil-fraud charges against Kenneth Schroeder, 61 years old, of Los Altos Hills, Calif., accusing him of repeatedly backdating options between 1999 and 2002. The SEC also said he backdated in 2005, after passage of the Sarbanes-Oxley Act limited backdating opportunities by requiring companies to disclose stock-options awards within two days.

""We've all heard executives say that they didn't know how to properly account for stock options pre-Sarbanes-Oxley," said Michael Dicke, assistant regional director in the SEC's San Francisco office. "At least here, the CEO was correctly advised not to backdate, and how to properly disclose the company's stock options practices. He chose to ignore that advice."

Stock options give the holder the right to buy stock at a price determined on the date of the grant. Backdating involves pretending the options were granted on an earlier date when the price was lower. The practice can land executives and companies in hot water with the SEC, the Internal Revenue Service and the Justice Department if it isn't

disclosed.

Schroeder plans to fight the SEC charges. "When Mr. Schroeder became CEO in mid-1999, he inherited a process that appeared to him to be working properly," his lawyer, Shirli Weiss, said in a statement. "The company's failure to properly account for its option grants is the proper responsibility of those at the company charged with implementing its internal accounting controls. For his part, Mr. Schroeder has always been clear about his understanding of the matter."

The SEC separately accused KLA-Tencor of concealing more than $200 million in stock option compensation over eight years starting in 1998 by backdating the grants to avoid reporting expenses to investors. The San Jose semiconductor company wasn't fined, and settled without admitting or denying wrongdoing. KLA-Tencor said in a statement that the settlement resolves the SEC's investigation into its options-granting practices.

From July 1999 until mid-2002, KLA-Tencor's human-resources department was instructed to create a list of newly hired employees, wait several weeks, obtain a list of the company's closing stock price for the past several weeks, highlight the three or four lowest prices, and forward the list to the stock option committee, the SEC said. It was "a recipe for backdating that was followed for years," Dicks said.

Schroeder sat on the stock-option committee, and month after month routinely signed backdated option grant approvals without ever ensuring the grants were accounted for appropriately, the SEC said. He made the approvals even after receiving a March 2001 memo from KLA-Tencor's general counsel saying that selecting options-grant dates after the fact would require the company to take a compensation charge and that doing so without disclosure could violate the law, the SEC said. Stuart Nichols was general counsel of KLA-Tencor at the time.

In an email back to the general counsel cited by the SEC, Schroeder wrote: "the compensation committee has given the stock option committee (Gary, Ken and I) power to set the price of stock options... Please don't take away some of my best tools for attracting and retaining people. We need those people to win the battle. Help me, don't just tell me how to follow a strict interpretation of the rules. I need a 'war time counselor,' not someone who can recite page and verse."

The SEC alleged that Schroeder, besides wanting to attract and retain workers, was motivated in part by personal gain because he knew that he and other officers received options backdated to the same dates that the employees' options were. Schroeder's lawyer claims that his client didn't exercise the options granted while he was CEO, and made only $26,000 from the backdated portion of one option granted to him while he was CEO.

"Other KLA-Tencor executives, some of whom are still with the company, made hundreds of thousands of dollars from the backdated portion of their options," Weiss said in a statement. "What the SEC is attempting to do is to recover gain from non-backdated

options granted to Mr. Schroeder in the 1990s when he was COO."

Schroeder; Nichols; and KLA-Tencor's chairman and founder, Kenneth Levy, resigned last year as the company acknowledged that some of its options were backdated. The SEC said in a release that its investigation is continuing.

KLA-Tencor shares rose 20 cents to $59.51 on Wednesday.

-By Siobhan Hughes, Dow Jones Newswires; 202-862-6654; siobhan.hughes@dowjones.com

# Exhibit 5

ORIGINAL

07 JUL 25 AM 9: 18
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  MARC J. FAGEL (State Bar No. 154425)
   JUDITH L. ANDERSON (State Bar No. 124281)
2  MICHAEL S. DICKE (State Bar No. 158187)
   ELENA RO (State Bar No. 197308)
3
   Attorneys for Plaintiff
4  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2600
5  San Francisco, California 94104
   Telephone: (415) 705-2500
6  Facsimile: (415) 705-2501

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

                                                         HRL
11
                       C 07 3799
12  SECURITIES AND EXCHANGE COMMISSION,   Case No. _____

13                 Plaintiff,

14       v.                              CONSENT OF DEFENDANT KLA-TENCOR
                                         CORPORATION TO ENTRY OF FINAL
15  KLA-TENCOR CORPORATION,              JUDGMENT

16                 Defendant.

17

18

19       1.       Defendant KLA-Tencor Corporation ("Defendant") waives service of a summons and

20  the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over

21  Defendant and over the subject matter of this action.

22       2.       Without admitting or denying the allegations of the complaint (except as to personal

23  and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of

24  the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference

25  herein, which, among other things:

26            (a)       permanently restrains and enjoins Defendant from violation of Sections 13(a),

27                      13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934

28                      ("Exchange Act") [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), 78m(b)(2)(B)] and

                                          1
                                                       SEC v. KLA-TENCOR CORP.
                                              CONSENT TO ENTRY OF FINAL JUDGMENT

1        Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,

2        240.13a-11 and 240.13a-13] thereunder.

3        3.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule

4    52 of the Federal Rules of Civil Procedure.

5        4.    Defendant waives the right, if any, to a jury trial and to appeal from the entry of the

6    Final Judgment.

7        5.    Defendant enters into this Consent voluntarily and represents that no threats, offers,

8    promises, or inducements of any kind have been made by the Commission or any member, officer,

9    employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

10       6.    Defendant agrees that this Consent shall be incorporated into the Final Judgment with

11    the same force and effect as if fully set forth therein.

12       7.    Defendant will not oppose the enforcement of the Final Judgment on the ground, if

13    any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby

14    waives any objection based thereon.

15       8.    Defendant waives service of the Final Judgment and agrees that entry of the Final

16    Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its

17    terms and conditions.  Defendant further agrees to provide counsel for the Commission, within thirty

18    days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration

19    stating that Defendant has received and read a copy of the Final Judgment.

20       9.    Consistent with 17 C.F.R. § 202.5(f), this Consent resolves only the claims asserted

21    against Defendant in this civil proceeding.  Defendant acknowledges that no promise or

22    representation has been made by the Commission or any member, officer, employee, agent, or

23    representative of the Commission with regard to any criminal liability that may have arisen or may

24    arise from the facts underlying this action or immunity from any such criminal liability.  Defendant

25    waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the

26    imposition of any remedy or civil penalty herein.  Defendant further acknowledges that the Court's

27    entry of a permanent injunction may have collateral consequences under federal or state law and the

28    rules and regulations of self-regulatory organizations, licensing boards, and other regulatory

2

SEC v. KLA-TENCOR CORP.
CONSENT TO ENTRY OF FINAL JUDGMENT

1    organizations. Such collateral consequences include, but are not limited to, a statutory
2    disqualification with respect to membership or participation in, or association with a member of, a
3    self-regulatory organization. This statutory disqualification has consequences that are separate from
4    any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding
5    before the Commission based on the entry of the injunction in this action, Defendant understands that
6    it shall not be permitted to contest the factual allegations of the complaint in this action.

7        10.    Defendant understands and agrees to comply with the Commission's policy "not to
8    permit a defendant or respondent to consent to a judgment or order that imposes a sanction while
9    denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance
10   with this policy, Defendant agrees: (i) not to take any action or to make or permit to be made any
11   public statement denying, directly or indirectly, any allegation in the complaint or creating the
12   impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent,
13   Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation
14   in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to
15   vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph
16   affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in
17   litigation or other legal proceedings in which the Commission is not a party.

18       11.    Defendant hereby waives any rights under the Equal Access to Justice Act, the Small
19   Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from
20   the United States, or any agency, or any official of the United States acting in his or her official
21   capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs
22   expended by Defendant to defend against this action. For these purposes, Defendant agrees that
23   Defendant is not the prevailing party in this action since the parties have reached a good faith
24   settlement.

25       12.    Defendant agrees that the Commission may present the Final Judgment to the Court
26   for signature and entry without further notice.

27       13.    In connection with this action and any related judicial or administrative proceeding or
28   investigation commenced by the Commission or to which the Commission is a party, Defendant

3

1  (i) agrees to take all possible steps to make available its employees and agents to appear and be

2  interviewed by Commission staff at such times and places as the staff requests upon reasonable

3  notice; (ii) will accept service by mail or facsimile transmission of notices or subpoenas issued by the

4  Commission for documents or testimony at depositions, hearings, or trials, or in connection with any

5  related investigation by Commission staff; (iii) appoints Defendant's undersigned attorney as agent to

6  receive service of such notices and subpoenas; (iv) with respect to such notices and subpoenas,

7  waives the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure

8  and any applicable local rules, provided that the party requesting the testimony reimburses

9  Defendant's travel, lodging, and subsistence expenses at the then-prevailing U.S. Government per

10  diem rates; and (v) consents to personal jurisdiction over Defendant in any United States District

11  Court for purposes of enforcing any such subpoena.

12      14.    Defendant agrees that this Court shall retain jurisdiction over this matter for the

13  purpose of enforcing the terms of the Final Judgment.

14

15  Dated:  7/23/07  , 2007

16                                    [Name] Brian Martin
                                      [Title] General Counsel
17                                    For KLA-Tencor Corporation

18

19  On  July 23  , 2007,  Brian Martin  , a person known to me, personally

20  appeared before me and acknowledged executing the foregoing Consent.

21

22                                    Notary Public  Odette H. Devera
                                      Commission expires:  Jan 21, 2010
23

24  Approved as to form:

25

26  John H. Hemann, Esq.
    William H. Kimball, Esq.
27  Morgan, Lewis & Bockius LLP
    One Market, Spear Street Tower

28

ODETTE H. DEVERA
Commission # 1633812
Notary Public - California
Santa Clara County
My Comm. Expires Jan 21, 2010

4

1   San Francisco, California 94105
    Telephone: (415) 442-1000
2   Facsimile: (415) 442-1001

3   Attorneys for Defendant
    KLA-TENCOR CORPORATION
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

1 | MARC J. FAGEL (State Bar No. 154425)
JUDITH L. ANDERSON (State Bar No. 124281)
2 | MICHAEL S. DICKE (State Bar No. 158187)
ELENA RO (State Bar No. 197308)
3
Attorneys for Plaintiff
4 | SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2600
5 | San Francisco, California 94104
Telephone: (415) 705-2500
6 | Facsimile: (415) 705-2501

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN JOSE DIVISION

11

12 | SECURITIES AND EXCHANGE COMMISSION,        Case No. _____

13 |                          Plaintiff,

14 |          v.                                [PROPOSED] FINAL JUDGMENT

15 | KLA-TENCOR CORPORATION,

16 |                          Defendant.

17

18

19 |        The Securities and Exchange Commission having filed a Complaint and Defendant KLA-

20 | Tencor Corporation having entered a general appearance; consented to the Court's jurisdiction over

21 | Defendant and the subject matter of this action; consented to entry of this Final Judgment without

22 | admitting or denying the allegations of the Complaint (except as to jurisdiction); waived findings of

23 | fact and conclusions of law; and waived any right to appeal from this Final Judgment:

24

25 |                                        I.

26 |        IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant and its agents,

27 | servants, employees, attorneys, and all persons in active concert or participation with any of them

28 | who receive actual notice of this Final Judgment, by personal service or otherwise, are permanently

1

SEC v. KLA-TENCOR CORP.
[PROPOSED] FINAL JUDGMENT

1   restrained and enjoined from violating Section 13(a) of the Exchange Act [15 U.S.C. § 18m(a)] and

2   Rules 12b-20, 13a-1, 13a-11, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and

3   240.13a-13], thereunder, by failing to file annual, quarterly and current reports in conformity with the

4   Commission's integrated reporting and disclosure regulations, Regulations S-K and S-X, or by failing

5   to include such further material information as may be necessary to make the required statements, in

6   light of the circumstances under which they were made, not misleading.

7

8                                                    II.

9           IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant and its agents,

10  servants, employees, attorneys, and all persons in active concert or participation with any of them

11  who receive actual notice of this Final Judgment, by personal service or otherwise, are permanently

12  restrained and enjoined from any violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange

13  Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] by failing, with respect to any issuer which has a

14  class of securities registered pursuant to Section 12 of the Exchange Act or which is required to file

15  reports pursuant to Section 15(d) of the Exchange Act, (A) to make and keep books, records, and

16  accounts, which, in reasonable detail, accurately reflect the transactions and dispositions of the assets

17  of the issuer; and (B) to devise and maintain a system of internal accounting controls sufficient to

18  provide reasonable assurances that:

19          (a)         transactions are executed in accordance with management's general or specific

20  authorization;

21          (b)         transactions are recorded as necessary (1) to permit preparation of financial

22  statements in conformity with generally accepted accounting principles or any other criteria

23  applicable to such statements, and (2) to maintain accountability for assets;

24          (c)         access to assets is permitted only in accordance with management's general or

25  specific authorization; and

26          (d)         the recorded accountability for assets is compared with the existing assets at

27  reasonable intervals and appropriate action is taken with respect to any differences.

28

SEC v. KLA-TENCOR CORP.
[PROPOSED] FINAL JUDGMENT

III.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

V.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: _____, 2007

_____

UNITED STATES DISTRICT JUDGE

Approved as to form:

_____

John H. Hemann, Esq.
William H. Kimball, Esq.
Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, California 94105
Telephone: (415) 442-1000
Facsimile: (415) 442-1001

Attorneys for Defendant
KLA-TENCOR CORPORATION

3

# Exhibit 6

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Fiscal Year Ended June 30, 2006

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the Transition Period from            To

Commission File No. 0-9992

---

# KLA-TENCOR CORPORATION
(Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **04-2564110** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |
| **160 Rio Robles, San Jose, California** | **95134** |
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's Telephone Number, Including Area Code: (408) 875-3000

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.001 Par Value | The Nasdaq |
| Common Stock Purchase Rights | Stock Market, Inc. |

Securities Registered Pursuant to Section 12(g) of the Act:
None
(Title of Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by checkmark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

The aggregate market value of the voting and non-voting common stock held by non-affiliates of the registrant based upon the closing price of the registrant's stock, as of December 31, 2005, was $5,554,245,988. Shares of common stock held by each officer and director and by each person or group who owns 5% or more of the outstanding common stock have been excluded in that such persons or groups may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The registrant had 199,725,957 shares of common stock outstanding as of December 31, 2006.

## DOCUMENTS INCORPORATED BY REFERENCE

None

---

Source: KLA TENCOR CORP, 10-K, January 29, 2007

Table of Contents

# INDEX

|  |  | Page |
|---|---|---|
| | Special Note Regarding Forward-Looking Statements | ii |
| | Explanatory Note Regarding Restatements | ii |

## PART I

| Item 1. | Business | 1 |
| Item 1A. | Risk Factors | 13 |
| Item 1B | Unresolved Staff Comments | 21 |
| Item 2. | Properties | 22 |
| Item 3. | Legal Proceedings | 23 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 28 |

## PART II

| Item 5. | Market for the Registrant's Common Stock, Related Stockholder Matters and Issuer Purchases of Equity Securities | 29 |
| Item 6. | Selected Financial Data | 30 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 33 |
| Item 7A. | Quantitative and Qualitative Disclosure About Market Risk | 50 |
| Item 8. | Financial Statements and Supplementary Data | 51 |
| | Consolidated Balance Sheets at June 30, 2006 and June 30, 2005 | 52 |
| | Consolidated Statements of Operations for each of the three years in the period ended June 30, 2006 | 53 |
| | Consolidated Statements of Stockholders' Equity for each of the three years in the period ended June 30, 2006 | 54 |
| | Consolidated Statements of Cash Flows for each of the three years in the period ended June 30, 2006 | 55 |
| | Notes to Consolidated Financial Statements | 56 |
| | Report of Independent Registered Public Accounting Firm | 101 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 103 |
| Item 9A. | Controls and Procedures | 103 |
| Item 9B. | Other Information | 109 |

## PART III

| Item 10. | Directors and Executive Officers of the Registrant | 110 |
| Item 11. | Executive Compensation | 117 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 122 |
| Item 13. | Certain Relationships and Related Transactions | 124 |
| Item 14. | Principal Independent Registered Public Accounting Firm Fees and Services | 127 |

## PART IV

| Item 15. | Exhibits and Financial Statement Schedule | 128 |
| | Signatures | 131 |
| | Schedule II Valuation and Qualifying Accounts | 132 |
| | Exhibit Index | 133 |

i

Source: KLA TENCOR CORP, 10-K, January 29, 2007

Table of Contents

| Location | Type | Principal Use | Square Footage | Ownership |
|---|---|---|---|---|
| Bundang, South Korea | Office | Sales and Service | 7,508 | Leased |
| Hsinchu, Taiwan | Office | Sales and Service | 95,601 | Leased |
| Tainan, Taiwan | Office | Sales and Service | 7,294 | Leased |
| Taipei, Taiwan | Office | Sales and Service | 6,914 | Leased |
| Shanghai, China | Office and R&D | Sales, Service, Engineering and Warehouse | 58,886 | Leased |
| Beijing, China | Office | Sales and Service | 5,716 | Leased |
| Chennai, India | Office | Engineering | 149,121 | Owned |

(1)    Certain properties in San Jose, California and Livermore, California have been placed for sale in the quarter ended December 31, 2006.

We also lease office space for other, smaller sales and service offices in several locations throughout the world. Our operating leases expire at various times through June 30, 2015 with renewal options at the fair market value for additional periods up to five years. Additional information regarding these leases is incorporated by reference from Note 12 to Consolidated Financial Statements found under Item 8, "Financial Statements and Supplementary Data" in this Annual Report on Form 10-K. We believe our properties are adequately maintained and suitable for their intended use and that our production facilities have capacity adequate for our current needs.

## ITEM 3.    LEGAL PROCEEDINGS

### Special Committee Investigation of Historical Stock Option Practices

On May 22, 2006, the Wall Street Journal published an article about stock option backdating that questioned the stock option practices at several companies, including KLA-Tencor. On May 23, 2006, we received a subpoena from the United States Attorney's Office for the Northern District of California ("USAO") and a letter of inquiry from the United States Securities and Exchange Commission ("SEC") regarding our stock option practices. Later on May 23, 2006, our Board of Directors appointed a Special Committee composed solely of independent directors to conduct a comprehensive investigation of our historical stock option practices. The Special Committee promptly engaged independent legal counsel and accounting experts to assist with the investigation. The investigation included an extensive review of our historical stock option practices, accounting policies, accounting records, supporting documentation, email communications and other documentation, as well as interviews of a number of current and former directors, officers and employees. On September 27, 2006, the Special Committee reported the bulk of its findings and recommendations to our Board of Directors.

### Findings and Remedial Actions

On September 28, 2006, we announced that we would have to restate our previously issued financial statements to correct our past accounting for stock options. As a result of the Special Committee investigation, we discovered that certain of our stock options, primarily those granted from July 1, 1997 to June 30, 2002, had been retroactively priced for all employees who received these grants. This means that the option exercise price was not the market price of the option shares on the actual grant date of the option, but instead was a lower market price on an earlier date. The actual grant date—when the essential actions necessary to grant the option were completed, including the final determination of the number of shares to be granted to each employee and the exercise price—is the correct measurement date to determine the market price of the option shares under the accounting rules in effect at the time. More than 95% of the total in-the-money value (market price on the actual grant date minus exercise price) of all of our retroactively priced options was attributable to those granted from July 1, 1997 to June 30, 2002.

We previously applied Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," and its related Interpretations and provided the required pro forma disclosures under Statement of

23

Table of Contents

Financial Accounting Standards ("SFAS") No. 123, "Accounting for Stock-Based Compensation," through our fiscal year ended June 30, 2005. Under APB Opinion No. 25, a non-cash, stock-based compensation expense was required to be recognized for any option for which the exercise price was below the market price on the actual grant date. Because each of our retroactively priced options had an exercise price below the market price on the actual grant date, there should have been a non-cash charge for each of these options under APB Opinion No. 25 equal to the number of option shares, multiplied by the difference between the exercise price and the market price on the actual grant date. That expense should have been amortized over the vesting period of the option. Starting in our fiscal year ended June 30, 2006, we adopted SFAS No. 123(R), "Share-Based Payment." As a result, beginning in fiscal year 2006, the additional stock-based compensation expense required to be recorded for each retroactively priced option is equal to the incremental fair value of the option on the actual grant date, amortized over the remaining vesting period of the option. We did not record these stock-based compensation expenses under APB Opinion No. 25 or SFAS No. 123(R) related to our retroactively priced options in our previously issued financial statements, and that is why we are restating them in this filing. To correct our past accounting for stock options, we recorded additional pre-tax, non-cash, stock-based compensation expense of (a) $348 million for the periods July 1, 1994 to June 30, 2005 under APB Opinion No. 25 and (b) $22 million for the year ended June 30, 2006 under SFAS No. 123(R). We expect to amortize an additional $6 million of such pre-tax charges under SFAS No. 123(R) in future periods to properly account for past retroactively priced stock options.

By October 16, 2006, the Special Committee had substantially completed its investigation. The Special Committee concluded that (1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 (less than 15% of these options were granted to executive officers), (2) the retroactively priced options were not accounted for correctly in our previously issued financial statements, (3) the retroactive pricing of options was intentional, not inadvertent or through administrative error, (4) the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct, (5) the retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm, and (6) in most instances, the retroactive pricing of options violated the terms of our stock option plans. Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.

The Special Committee concluded that, with a few immaterial exceptions, the retroactive pricing of stock options stopped after June 30, 2002. After that time, there were procedures in place designed to provide reasonable assurance that stock options were priced on the grant date. The Special Committee also concluded that none of our independent Directors was involved in or aware of the retroactive pricing of stock options. Based on the Special Committee's report, our Board of Directors concluded that no current members of management were involved in the retroactive pricing of stock options. During its investigation of our historical stock option practices, the Special Committee did not find evidence of any other financial reporting or accounting issues.

As a result of the Special Committee investigation, on October 16, 2006, we terminated our employment relationship and agreement with Kenneth L. Schroeder, and we announced our intent to cancel all outstanding stock options held by Mr. Schroeder that were retroactively priced or otherwise improperly granted. Those options were canceled in December 2006. Mr. Schroeder was the Company's Chief Executive Officer and a member of its Board of Directors from mid-1999 until January 1, 2006, and was a member of the Company's stock option committee from 1994 until December 31, 2005. From January 1, 2006 to October 16, 2006, Mr. Schroeder was employed as a Senior Advisor to the Company. On November 10, 2006, Mr. Schroeder's counsel informed us that Mr. Schroeder contests our right to terminate his employment relationship and agreement and to cancel any of his options. We intend to vigorously defend any claims that may be made by Mr. Schroeder regarding these matters, which could involve a material amount.

24

Source: KLA TENCOR CORP, 10-K, January 29, 2007

Table of Contents

Also on October 16, 2006, Stuart J. Nichols, Vice President and General Counsel, resigned. Mr. Nichols and we entered into a Separation Agreement and General Release under which Mr. Nichols' outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006.

On October 16, 2006, Kenneth Levy, Founder and Chairman of the Board of Directors of the Company, retired as a director and employee, and was named Chairman Emeritus by our Board of Directors. Mr. Levy and we entered into a Separation Agreement and General Release under which Mr. Levy's outstanding retroactively priced stock options have been re-priced by increasing the exercise price to the market price of the option shares on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006. Mr. Levy was the Company's Chief Executive Officer from 1975 until mid-1999 (with the exception of mid-1997 to mid-1998), was a member of the Company's Board of Directors from 1975 until his retirement, was Chairman of the Board of Directors from 1999 until his retirement, and was a member of the Company's stock option committee from 1994 until use of that committee was suspended in the fall of 2006.

On December 21, 2006, Jon D. Tompkins resigned as a director of the Company, and we agreed to modify the outstanding options held by Mr. Tompkins (all of which were fully vested) to extend the post-termination exercisability period to December 31, 2007, which is the last day of the calendar year in which those options would have terminated in the absence of such extension. Mr. Tompkins, the Chief Executive Officer of Tencor Instruments before its merger into the Company in mid-1997, was the Company's Chief Executive Officer from mid-1997 to mid-1998, was a member of the Company's stock option committee from mid-1997 until mid-1999, and was a member of the Company's Board of Directors from mid-1997 until his resignation.

Although the Board of Directors concluded that John H. Kispert, our President and Chief Operating Officer, was not involved in and was not aware of the improper stock option practices, based on the Special Committee's recommendation, his outstanding retroactively priced options have been re-priced because he served as Chief Financial Officer during part of the period in question. This re-pricing involved increasing the exercise price to the market price of the option shares on the actual grant date. Under SFAS No. 123(R), no incremental charge will be recognized in the financial statements for the quarter ended December 31, 2006.

After the Special Committee substantially completed its investigation, a number of follow-up activities continued, especially in connection with the preparation of this Annual Report on Form 10-K and our Quarterly Report on Form 10-Q for the quarter ended September 30, 2006. The Special Committee also continues to assist the Company in connection with the government inquiries described below. Additional follow-up activities may be required.

*Government Inquiries Relating to Historical Stock Option Practices*

On May 23, 2006, we received a subpoena from the USAO requesting information relating to our past stock option grants and related accounting matters. Also on May 23, 2006, we received a letter from the SEC making an informal inquiry and request for information on the same subject matters. We are cooperating fully with the USAO and SEC inquiries and intend to continue to do so. These inquiries likely will require us to expend significant management time and incur significant legal and other expenses, and could result in civil and criminal actions seeking, among other things, injunctions against the Company and the payment of significant fines and penalties by the Company, which may adversely affect our results of operations and cash flow.

We have also responded to inquiries from the U.S. Department of Labor, which is conducting an examination of our 401(k) Savings Plan. We are cooperating fully with this examination and intend to continue to do so.

We cannot predict how long it will take to or how much more time and resources we will have to expend to resolve these government inquiries, nor can we predict the outcome of these inquiries. Also, there can be no assurance that other inquiries, investigations or actions will not be started by other United States federal or state regulatory agencies or by foreign governmental agencies.

25

Table of Contents
*Late SEC Filings and Nasdaq Delisting Proceedings*

Due to the Special Committee investigation and the resulting restatements, we did not file on time this Annual Report on Form 10-K and our Quarterly Report on Form 10-Q for the quarter ended September 30, 2006. As a result, we received two Nasdaq Staff Determination letters, dated September 14, 2006 and November 14, 2006, respectively, stating that we were not in compliance with the filing requirements of Marketplace Rule 4310(c)(14) and, therefore, that our stock was subject to delisting from the Nasdaq Global Select Market. We appealed this determination and requested a hearing before a Nasdaq Listing Qualifications Panel. On October 26, 2006, we attended a hearing, at which we sought appropriate exceptions to the filing requirements from the Panel pending completion and filing of our delinquent reports. On January 3, 2007, the Panel granted our request for continued listing of our stock on the Nasdaq Global Select Market, subject to the condition that we file this Report and our Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 on or before January 31, 2007.

With the filing of this Report and our Quarterly Report on Form 10-Q for the quarter ended September 30, 2006, we believe we have returned to full compliance with SEC reporting requirements and Nasdaq listing requirements, and, therefore, that the Nasdaq delisting matter is now closed. However, we cannot predict whether the SEC will review these Reports and, if so, whether the SEC will have comments on these Reports (or other reports that we previously filed) that may require us to file amended reports with the SEC. In addition, we cannot predict whether the Nasdaq Listing Qualifications Panel will concur that we are in compliance with all relevant listing requirements. If either of those events occurs, we might be unable to remain in compliance with SEC reporting requirements and Nasdaq listing requirements, and, therefore, we might be unable to maintain an effective listing of our common stock on the Nasdaq Global Select Market or any other national securities exchange.

*Shareholder Derivative Litigation Relating to Historical Stock Option Practices*

Beginning on May 22, 2006, several persons and entities identifying themselves as shareholders of KLA-Tencor filed derivative actions purporting to assert claims on behalf of and in the name of the Company against various of our current and former directors and officers relating to our accounting for stock options issued from 1994 to the present. The complaints in these actions allege that the individual defendants breached their fiduciary duties and other obligations to the Company and violated state and federal securities laws in connection with our historical stock option granting process, our accounting for past stock options, and historical sales of stock by the individual defendants. Three substantially similar actions are pending, one in the U.S. District Court for the Northern District of California (which consists of three separate lawsuits consolidated in one action); one in the California Superior Court for Santa Clara County; and one in the Delaware Chancery Court.

The plaintiffs in the derivative actions have asserted claims for violations of Sections 10(b) (including Rule 10b-5 thereunder), 14(a), and 20(a) of the Securities Exchange Act of 1934, unjust enrichment, breach of fiduciary duty and aiding and abetting such breach, negligence, misappropriation of information, abuse of control, gross mismanagement, waste of corporate assets, breach of contract, constructive fraud, rescission, and violations of California Corporations Code section 25402, as well as a claim for an accounting of all stock option grants made to the named defendants. KLA-Tencor is named as a nominal defendant in these actions. On behalf of KLA-Tencor, the plaintiffs seek unspecified monetary and other relief against the named defendants. The plaintiffs are James Ziolkowski, Mark Ziering, Alaska Electrical Pension Fund, Jeffrey Rabin, and Benjamin Langford. The individual named defendants are current directors and officers; Edward W. Barnholt, H. Raymond Bingham, Robert T. Bond, Jeffrey L. Hall, Stephen P. Kaufman, John H. Kispert, Lida Urbanek and Richard P. Wallace; and former directors and officers; Robert J. Boehlke, Leo Chamberlain, Gary E. Dickerson, Richard J. Elkus, Jr., Dennis J. Fortino, Kenneth Levy, Michael E. Marks, Stuart J. Nichols, Arthur P. Schnitzer, Kenneth L. Schroeder and Jon D. Tompkins. Current director David C. Wang and former director Dean O. Morton were originally named as defendants in one of the derivative actions filed in the U.S. District Court for the Northern District of California, but were dropped as named defendants as of December 22, 2006 upon the filing of a consolidated complaint in that action.

26

Table of Contents

The derivative actions are at an early stage. Discovery has not commenced, and the defendants are not yet required to respond to the complaints. Our Board of Directors has appointed a Special Litigation Committee ("SLC") composed solely of independent directors to conduct an independent investigation of the claims asserted in the derivative actions and to determine the Company's position with respect to those claims. The SLC's investigation is in progress. We cannot predict whether these actions are likely to result in any material recovery by or expense to KLA-Tencor.

*Shareholder Class Action Litigation Relating to Historical Stock Option Practices*

KLA-Tencor and various of our current and former directors and officers were named as defendants in a putative securities class action filed on June 29, 2006 in the U.S. District Court for the Northern District of California. Two similar actions were filed later in the same court, and all three cases have been consolidated into one action. The complaints allege claims under the Securities Exchange Act of 1934 as a result of our past stock option grants and related accounting and reporting, and seek unspecified monetary damages and other relief. The plaintiffs seek to represent a class consisting of purchasers of KLA-Tencor stock between February 13, 2001 and May 22, 2006 who allegedly suffered losses as a result of material misrepresentations in KLA-Tencor's SEC filings during that period. The lead plaintiffs, who seek to represent the class, are the Police and Fire Retirement System of the City of Detroit, the Louisiana Municipal Police Employees' Retirement System, and the City of Philadelphia Board of Pensions and Retirement. The defendants are KLA-Tencor, Edward W. Barnholt, H. Raymond Bingham, Robert J. Boehlke, Robert T. Bond, Gary E. Dickerson, Richard J. Elkus, Jr., Jeffrey L. Hall, Stephen P. Kaufman, John H. Kispert, Kenneth Levy, Michael E. Marks, Kenneth L. Schroeder, Jon D. Tompkins, Lida Urbanek and Richard P. Wallace.

This litigation is at an early stage. Discovery has not commenced, the court has not yet determined whether the plaintiffs may sue on behalf of any class of purchasers, and the defendants are not yet required to respond to the complaints. The Company intends to vigorously defend this litigation.

As part of a derivative lawsuit filed in the Delaware Chancery Court on July 21, 2006 (described above), a plaintiff claiming to be a KLA-Tencor shareholder also asserted a separate putative class action claim against KLA-Tencor and certain of our current and former directors and officers alleging that shareholders incurred damage due to purported dilution of KLA-Tencor common stock resulting from historical stock option granting practices. The Company intends to vigorously defend this litigation.

We cannot predict the outcome of the shareholder class action cases (described above), and we cannot estimate the likelihood or potential dollar amount of any adverse results. However, an unfavorable outcome in this litigation could have a material adverse impact upon our financial position, results of operations or cash flows for the period in which the outcome occurs and in future periods.

*Indemnification Obligations*

Subject to certain limitations, we are obligated to indemnify our current and former directors, officers and employees in connection with the investigation of our historical stock option practices and related government inquiries and litigation. These obligations arise under the terms of our certificate of incorporation, our bylaws, applicable contracts, and Delaware and California law. The obligation to indemnify generally means that we are required to pay or reimburse the individuals' reasonable legal expenses and possibly damages and other liabilities incurred in connection with these matters. We are currently paying or reimbursing legal expenses being incurred in connection with these matters by a number of our current and former directors, officers and employees. Although the maximum potential amount of future payments KLA-Tencor could be required to make under these agreements is theoretically unlimited, the Company believes the fair value of this liability is adequately covered within the reserves it has established for currently pending legal proceedings.

27

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

KLA-Tencor Corporation

January 26, 2007
(Date)

By: _____/s/    RICHARD P. WALLACE_____
                  Richard P. Wallace
                  Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/   RICHARD P. WALLACE<br>Richard P. Wallace | Chief Executive Officer and Director (principal executive officer) | January 26, 2007 |
| /s/   JEFFREY L. HALL<br>Jeffrey L. Hall | Senior Vice President and Chief Financial Officer (principal financial officer and principal accounting officer) | January 26, 2007 |
| /s/   EDWARD W. BARNHOLT<br>Edward W. Barnholt | Chairman of the Board and Director | January 26, 2007 |
| /s/   H. RAYMOND BINGHAM<br>H. Raymond Bingham | Director | January 26, 2007 |
| /s/   ROBERT T. BOND<br>Robert T. Bond | Director | January 26, 2007 |
| /s/   STEPHEN P. KAUFMAN<br>Stephen P. Kaufman | Director | January 26, 2007 |
| /s/   LIDA URBANEK<br>Lida Urbanek | Director | January 26, 2007 |
| /s/   DAVID C. WANG<br>David C. Wang | Director | January 26, 2007 |

131

Source: KLA TENCOR CORP, 10-K, January 29, 2007

# Exhibit 7

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant To Section 13 or 15(d) of**
**The Securities Exchange Act of 1934**

Date of report (Date of earliest event reported): May 22, 2006

# KLA-TENCOR CORPORATION
(Exact Name of Registrant as Specified in Charter)

Delaware
(State or Other Jurisdiction of
Incorporation)

000-09992
(Commission File Number)

04-2564110
(IRS Employer Identification No.)

160 Rio Robles
San Jose, California 95134
(Address of Principal Executive Offices)
Registrant's telephone number, including area code: (408) 875-3000

N/A
(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Source: KLA TENCOR CORP, 8-K, May 24, 2006

**Item 8.01 Other Events.**

KLA-Tencor Corporation announced today that its Board of Directors has appointed a Special Committee of independent directors to conduct an internal investigation relating to past stock option grants, the timing of such grants and related accounting and documentation. The Special Committee will be assisted by outside legal counsel and accounting experts. KLA-Tencor also said that it has received subpoenas from the U.S. Attorney's Offices for the Eastern District of New York and Northern District of California requesting information relating to its past stock option grants. KLA-Tencor said that it will cooperate fully with any government or regulatory investigation into these matters. KLA-Tencor further disclosed that on May 22, 2006, it was served with a complaint relating to a lawsuit filed in the United States District Court for the Northern District of California filed by the Theodore R. Kornreich Revocable Trust, derivatively on behalf of KLA-Tencor.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**KLA-TENCOR CORPORATION**

Date:   May 24, 2006

By:   /s/Stuart J. Nichols

Name:   Stuart J. Nichols
Title:   Vice President and General Counsel

Created by 10K Wizard   www.10KWizard.com

# Exhibit 8

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: 415.442.1000
Fax: 415.442.1001
www.morganlewis.com

# Morgan Lewis
### COUNSELORS AT LAW

Matthew Michael Haut
Paralegal
415.442.1426
matthew.haut@morganlewis.com

June 29, 2007

**FOIA CONFIDENTIAL TREATMENT REQUESTED
BY KLA-TENCOR CORPORATION
PURSUANT TO 17 C.F.R. 200.83**

Office of Freedom of Information
and Privacy Act Operations
U.S. Securities and Exchange Commission
Operations Center
100 F Street, N.E.
Washington, DC 20549

Re:    *In the Matter of KLA-Tencor Corp. (SF-3120)*

Dear Sir or Madam:

On behalf of our client, KLA-Tencor Corporation, we made a presentation to the Staff of the San Francisco, California Offices of the U.S. Securities and Exchange Commission (the "Commission") which consisted of PowerPoint slides [copy of slides attached] and certain supporting materials (the "Materials") on June 8, 2007. The Materials, and the information contained therein, represent information that is privileged and confidential within the contemplation of the applicable provisions of the Freedom of Information Act ("FOIA"), and the rules of the Commission implementing that Act, 17 C.F.R. Sections 200.80 & .83, and is furnished solely for the use of the Commission. Accordingly, we request that the Materials and the information contained therein be afforded confidential treatment pursuant to FOIA and the rules of the Commission implementing the Act.

We also request confidential treatment of the letters transmitting the Materials because they relate to information that is itself privileged and confidential.

1-SF/7570089.1

Morgan Lewis
COUNSELORS AT LAW

June 29, 2007

FOIA CONFIDENTIAL TREATMENT REQUESTED
BY KLA-TENCOR CORPORATION
PURSUANT TO 17 C.F.R. 200.83
Page 2

Please acknowledge receipt of this letter by signing in the space provided on the enclosed
duplicate copy of this letter and returning it to me in the enclosed self-addressed, postage pre-
paid envelope.

Sincerely,

Matthew Michael Haut

Enclosures
cc:  Ms. Elena Ro
     John H. Hemann (w/o encl.)
     William H. Kimball (w/o encl.)

RECEIPT ACKNOWLEDGED:

_____
FOIA Officer

1-SF/7570089 1





- Cooperation has been exemplary by all accounts and was designed to expedite SEC investigation

  - Immediately shared attorney-client privileged information pursuant to confidentiality agreement

  - Immediately shared results of Special Committee investigation with SEC staff

  - Immediately provided critical documents in manner designed to assist SEC staff

  - Promptly responded to every request for documents or information

Morgan Lewis

F.O.I.A. Confidential Treatment Requested

- Critical information voluntarily provided to SEC that would not otherwise have been uncovered and available

  - Privileged Special Committee documents

  - Privileged Company documents

  - Privileged witness interviews

Morgan Lewis

F.O.I.A. Confidential Treatment Requested



- Privileged Special Committee Documents
  - Interview memoranda of over 60 witnesses
  - Presentations to SEC and DOJ
  - PowerPoint presentations
    - To Board of Directors
    - To Auditors

Morgan Lewis

F.O.I.A. Confidential Treatment Requested



- Privileged Company Documents

  - Stu Nichols memorandum and related e-mail

  - Lisa Berry memoranda and related e-mail

  - E-mail and other documents prepared by outside counsel

Morgan Lewis

F.O.I.A. Confidential Treatment Requested



## KLA-Tencor

## Privileged and Confidential

**Date:** March 19, 2001
**To:** Ken Schroeder
**From:** Stu Nichols
**cc:** Maureen Lamb, John Kispert, Joy Nyberg
**Re:** Stock Option Pricing

Recently, several questions have been raised regarding the mechanics behind stock option pricing, both generally and specifically with respect to officer option grants. The purpose of this memo is to clarify and set forth the basis for the rules regarding stock option pricing of option grants to company officers.

F.O.I.A. Confidential Treatment Requested



*Morgan Lewis*

**Via Facsimile**

**To:**       Larry W. Sonsini, Esq.
             Wilson Sonsini Goodrich & Rosati

**cc:**    Judith Mayer O'Brien

**From:** Lisa C. Berry
             Vice President, General Counsel

**Date:**    November 14, 1998

**Re:**      November 17, 1998 Board Meeting

\* \* \*

In order to avoid certain adverse accounting consequences, those employees repricing options had to turn in the requisite paperwork by a set date (August 31). We got approval from PricewaterhouseCoopers to have the Stock Option Committee meet at some time during the 30 days following August 31 and set the price for repricing at that time in order to maximize the value to employees. The repricing date ended up being August 31 but it was not determined until September 30 that the August 31 date was the correct date. The repricing date was also to be the date for the grant of "in-lieu" options.

F.O.I.A. Confidential Treatment Requested

**Morgan Lewis**

From:     Stern, Roger
Sent:     Sunday, March 7, 2004 1:26 PM
To:       DiMarco, Bret
Subject:  Old KLA Option timing e-mail

REDACTED

Bret:

I thought it would be handy if I could track down that old e-mail/memo that you ghost-wrote for Stu on the option grant cherrypicking issues (when they were using the time machine to pick low strike prices).

Roger Stern
Employee Benefits & Compensation Group
Wilson, Sonsini, Goodrich & Rosati
Ph. 650-320-4618 (direct)
Fax: 650-493-6811

F.O.I.A. Confidential Treatment Requested

Morgan Lewis



- Company Document Productions Designed to Assist and Expedite SEC Investigation
  - Witness binders highlighting relevant documents
  - Productions made on timely basis as requested
- Witness Availability
  - All requested witnesses made available on timely basis, including current and former employees
- Privileged Witness Interviews

Morgan Lewis

F.O.I.A. Confidential Treatment Requested

# Exhibit 9

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN JOSE DIVISION
 4   SECURITIES AND EXCHANGE
     COMMISSION,
 5
             Plaintiff,
 6
     vs.                              No. C 07-3798-JW
 7
     KENNETH L. SCHROEDER,
 8
             Defendant.
 9
10
11
12
13
14
15          DEPOSITION OF STUART J. NICHOLS, Esq.
16               Sunday, January 27, 2008
17                VOLUME I (Pages 1-230)
18
19
20             SHEILA CHASE & ASSOCIATES
                    REPORTING FOR:
21               LiveNote World Service
                221 Main Street, Suite 1250
22             San Francisco, California  94105
                  Phone:  (415) 321-2300
23                 Fax:  (415) 618-0743
24
     Reported by:
25   JANIS JENNINGS, CSR, CRP
```

Nichols, Stuart J. Esq.                                                    1/27/2008

---

**Page 2**

```
 1
 2
 3
 4
 5
 6              Deposition of STUART NICHOLS, taken on
 7       behalf of the Defendant, at DLA PIPER, 2000
 8       University Avenue, East Palo Alto, California,
 9       beginning at 9:48 A.M. on Sunday, January 27,
10       2008, before JANIS L. JENNINGS, Certified
11       Shorthand Reporter No. 3942, CRP
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1          A P P E A R A N C E S (Continued)
 2
 3    For KLA-Tencor Corporation:
 4
 5          JOHN H. HEMANN, ESQ.
            TERA M. HEINTZ, ESQ.
            MORGAN, LEWIS & BOCKIUS LLP
 6          One Market, Spear Street Tower
            San Francisco, California 94105
 7          Phone: 415.442.1000
 8          Fax: 415.442.1001
            jhemann@morganlewis.com
 9          theintz@morganlewis.com
10
11    For the Deponent:
12
13          MARK A. BELNICK, ESQ.
14          LAW OFFICES OF MARK A. BELNICK, LLC
15          120 West 45th Street, Suite 1700B
16          New York, New York 10036
17          Phone: 646.453.2900
18          Fax: 646.453.2908
19          mbelnick@belnicklaw.com
20
21
22    Also Present:
23          Margaret Austin, Paralegal
24          Gary Brewer, Videographer
25
```

---

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3    For the United States Securities and Exchange
      Commission:
 4
 5          MARK P. FICKES, ESQ.
            ELENA RO, ESQ.
 6          UNITED STATES SECURITIES
            AND EXCHANGE COMMISSION
 7          44 Montgomery Street, Suite 2600
            San Francisco, California 94104
 8          Phone: 415.705.2338
 9          fickesm@sec.gov
            roe@sec.gov
10
11    For the Defendant Kenneth L. Schroeder:
12          SHERLI FABBRI WEISS, ESQ.
            DLA PIPER US LLP
13          401 B Street, Suite 1700
            San Diego, California 92101-4297
14          Phone: 619.699.2700
15          Fax: 619.699.2701
            shirli.weiss@dlapiper.com
16
17          JEFFREY B. COOPERSMITH, ESQ.
            DLA PIPER US LLP
18          701 Fifth Avenue, Suite 7000
            Seattle, Washington 98104-7044
19          Phone: 206.839.4800
            Fax: 206.839.4801
20          jeff.coopersmith@dlapiper.com
21
22
23
24
25
```

---

**Page 5**

```
 1               I N D E X
 2    DEPOSITION OF
      STUART NICHOLS
 3
 4                              Page
      Examination by Ms. Weiss       12
 5
 6
 7
 8               EXHIBITS
 9    No.         Description     Page
10    Exhibit 41  Comp Book: Nos. KT ACWP-PRIV00002541-
                  2696            10
11
      Exhibit 42  Comp Book; Nos. KT ACWP-PRIV00002697-
12                2893            10
13    Exhibit 43  Computation Book: Nos.
                  KT ACWP-PRIV00002894-3047      10
14
      Exhibit 44  Computation Book: Nos.
15                KT ACWP-PRIV00003048-3201      10
16    Exhibit 45  Computation Book: Nos.
                  KT ACWP-PRIV00003202-3357      10
17
      Exhibit 46  Computation Book: Nos.
18                KT ACWP-PRIV00003358-3512      10
19    Exhibit 47  Computation Book: Nos.
                  KT ACWP-PRIV00003513-3665      10
20
      Exhibit 48  Computation Book: Nos.
21                KT ACWP-PRIV00003666-3818      10
22    Exhibit 49  Computation Book: Nos.
                  KT ACWP-PRIV00003819-3855      10
23
      Exhibit 50  Email thread dated 10/12/99; Nos.
24                MK-PRIV000046 through 47       65
25
```

2 (Pages 2 to 5)

Nichols, Stuart J. Esq.

1/27/2008

---

**Page 6**

I N D E X (Continued)

EXHIBITS

No.      Description      Page

Exhibit 51  Letter dated 10 18 99 to Stuart
Nichols; Nos. MLB KLA-SEC00016923
through 16924          65

Exhibit 52  Letter dated 10 7 99 to Stuart
Nichols; Nos. MK00033403-11          65

Exhibit 53  Nols. Hire Form; No. MLB KLA-SEC00016903  65

Exhibit 54  Minutes of the Meeting of the Board of
Directors of KLA-Tencor Corporation
November 16, 1999; Nos. KLA-SEC002735
through 2759          81

Exhibit 55  Memo dated 1 5 00 from Stuart Nichols;
Nos. KT ACWP-PRIV00004298 through 4304   114

Exhibit 56  Email thread from Stuart Nichols dated
1 6 2000; Nos. KTACWP-PRIV00004938
through 4940          124

Exhibit 57  Minutes of the Meeting of the Board of
Directors KLA-Tencor Corporation January
25, 2000; Nos. MLB KLA-SEC00021958
through 21961          132

Exhibit 58  Email thread from Leslie Wilson dated
1 22 00; Nos. MLB KLA-SEC00051399
through 51400          133

Exhibit 59  Minutes of the Meeting of the Board of
Directors of KLA-Tencor Corporation
April 25, 2000; Nos. MLB KLA-SEC00021983
through 21984          176

Exhibit 60  KLA-Tencor Historical Stock Prices;
20 pages          153

Exhibit 61  Email thread of Stuart Nichols dated
10 9 00; Nos. MLB KLA-SEC00022983
through 22982          155

---

**Page 7**

I N D E X (Continued)

EXHIBITS

No.      Description      Page

Exhibit 62  Minutes of the Meeting of the Board of
Directors of KLA-Tencor Corporation Oct.
15, 2000; Nos. MLB KLA-SEC00022086
through 22089          159

Exhibit 63  Employee Retention Stock Option Issue
Oct. 30, 2000; Nos. KT ACWP-PRIV00002401
through 2415          160

Exhibit 64  Employee Retention Stock Option Program
Proposal for the Compensation Committee;
Nos. MLB KLA-SEC00004879 through 4898  163

Exhibit 65  Minutes of the Meeting of the Board of
Directors of KLA-Tencor Corporation
Nov. 10, 2000; Nos. MLB KLA-SEC00004903
through 4907          164

Exhibit 66  Minutes of the Meeting of the
Compensation Committee of KLA-Tencor
Corp.; Nos. MLB KLA-SEC00004872 through
4876          164

Exhibit 67  Minutes of the Meeting of the Board of
Directors of KLA Instruments Corp. Apr
26, 1997; Nos. MLB KLA-SEC00054051
through 50458          193

Exhibit 68  Email thread from Joy Ng berg dated
3 12 01; Nos. MLB KLA-SEC00052175   198

Exhibit 69  Email thread from Stuart Nichols dated
3 13 01; Nos. KT ACWP-PRIV00001921
through 1925          198

Exhibit 70  Email thread from Stuart Nichols dated
3 13 01; Nos. KT ACWP-PRIV00001903
through 1904          198

Exhibit 71  Email thread from Bret DiMarco dated
3 13 01; Nos. KLA-SEC00042 through 45  198

---

**Page 8**

I N D E X (Continued)

EXHIBITS

No.      Description      Page

Exhibit 72  Email with attachment from Stuart
Nichols dated 3 14 01; Nos.
KT ACWP-PRIV00001905 through 1909   198

Exhibit 73  Email with attachment from Roger
Stern dated 3 14 01; Nos.
KT ACWP-PRIV00002365 through 2370   198

Exhibit 74  Email thread with attachment from
Bret DiMarco dated 3 14 01; Nos.
KT ACWP-PRIV00001328 through 2381   198

Exhibit 75  Email thread from Bret DiMarco dated
3 14 01; Nos. KT ACWP-PRIV00001327
through 2370.          198

Exhibit 76  Email thread with attachment from
Selina Leper dated 3 14 01; Nos.
KT ACWP-PRIV00002371 through 2372   198

Exhibit 77  Memo from Stu Nichols dated 3 19 01;
Nos. KT ACWP-PRIV00002391 through 2395  198

Exhibit 78  Email thread from Stuart Nichols dated
3 22 01; No. MLB KLA-SEC00050838   198

Exhibit 79  Email thread from Stuart Nichols dated
3 22 01; No. KT ACWP-PRIV00001317   198

Exhibit 80  Email thread from Roger Stern dated
3 22 01; No. KLA-SEC000007          198

Exhibit 81  Email thread from Stuart Nichols dated
3 22 01; No. KT ACWP-PRIV00002389   198

Exhibit 82  Email thread from Stuart Nichols dated
3 22 01; Nos. KT ACWP-PRIV00002397
through 2399          199

Exhibit 83  Complaint          202

---

**Page 9**

I N D E X (Continued)

EXHIBITS

No.      Description      Page

Exhibit 84  Stock Option Committee Procedures;
No. MLB KLA-SEC00022989          220

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

| Page | Line |
| --- | --- |
| 43 | 11 |
| 109 | 21 |
| 112 | 24 |
| 118 | 1 |
| 119 | 9 |
| 120 | 4 |
| 122 | 11 |
| 127 | 5 |
| 128 | 4 |
| 128 | 13 |
| 131 | 18 |
| 135 | 23 |
| 140 | 3 |
| 142 | 6 |
| 155 | 7 |
| 164 | 8 |
| 167 | 15 |

---

3 (Pages 6 to 9)

Page 10

1    EAST PALO ALTO, CALIFORNIA;
2    SUNDAY, JANUARY 27, 2008; 9:48 A.M.
3    --oOo--
4    (Whereupon, Exhibits 41 through 49
5    were marked for identification off
6    the record)
7    THE VIDEOGRAPHER: Good morning. We're
8    going on the record.
9    Here marks the beginning of videotape
10   No. 1, Volume I, in the deposition of Stuart J.
11   Nichols in the matter of Securities and Exchange
12   Commission versus Kenneth L. Schroeder, in the
13   United States District Court, Northern District
14   of California, case No. C 07-3798-JW.
15   Today's date is January 27th, 2008, and
16   the time is 9:48 a.m.
17   The video operator today is Gary Brewer
18   representing LiveNote World Service, located at
19   221 Main Street, Suite 1250, San Francisco,
20   California, 94105. The phone number is
21   415-321-2300.
22   The court reporter is Janis Jennings of
23   LiveNote.
24   Would counsel please identify themselves
25   and state whom they represent.

Page 11

1    MS. WEISS: Good morning. My name is
2    Shirli Weiss. I'm from DLA Piper and I represent
3    the Defendant Kenneth L. Schroeder
4    MR. COOPERSMITH: I'm Jeff Coopersmith
5    also with DLA Piper and I also represent Kenneth
6    Schroeder.
7    MR. BELNICK: I'm Mark Belnick and I
8    represent the witness Stuart Nichols.
9    MR. HEMANN: John Hemann of Morgan Lewis
10   on behalf of KLA-Tencor.
11   MS. HEINTZ: Tera Heintz from Morgan Lewis
12   on behalf of KLA-Tencor.
13   MR. FICKES: Mark Fickes on behalf of the
14   Securities and Exchange Commission.
15   MS. RO: Elena Ro on behalf of the
16   Securities and Exchange Commission.
17   THE VIDEOGRAPHER: Okay. If there are no
18   stipulations, the reporter may administer the oath.
19
20   STUART NICHOLS,
21   The deponent herein, was sworn and
22   testified as follows:
23   / / /
24   / / /
25   / / /

Page 12

1    EXAMINATION
2    BY MS. WEISS:
3    Q.  Good morning, sir. Would you please state
4    your full name and spell your last name for the
5    record.
6    A.  Stuart John Nichols. My last name is
7    spelled N-i-c-h-o-l-s.
8    Q.  Mr. Nichols, my name is Shirli Weiss. I
9    represent Kenneth Schroeder who is the defendant in
10   this action. You are here pursuant to a subpoena
11   served on your counsel with agreements from him to
12   accept it on your behalf.
13   I'm going to be asking you some questions
14   about the action and my questions and your answers
15   will be taken down by the court reporter.
16   So that we have a clear record, I'll ask
17   that you wait until I finish my question before you
18   commence your answer, and I'll wait until you finish
19   your answer before I commence my next question.
20   Can we have that agreement?
21   A.  Yes.
22   Q.  You are a member of the California Bar,
23   are you, sir?
24   A.  Yes.
25   Q.  Can you tell me if you are a member of any

Page 13

1    other bar in the United States?
2    A.  Yes.
3    Q.  Which bar?
4    A.  No, I can tell you. The answer is no, but
5    you asked me whether I can tell you. And the answer
6    is: No, I'm not a member of another bar.
7    Q.  Okay. When did you become a member of the
8    California Bar?
9    A.  1987.
10   Q.  Were there any interruptions to that
11   membership?
12   A.  No.
13   Q.  You remain a member today; is that
14   correct?
15   A.  Yes.
16   Q.  And that means that you're a lawyer;
17   correct?
18   A.  Correct.
19   Q.  And you understand that you're under oath
20   to tell the truth?
21   A.  Yes.
22   Q.  And do you understand that if you lie, you
23   could be subject to penalty of perjury?
24   A.  Yes.
25   Q.  And you understand that if you respond "I

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 14

1   do not remember" when in fact you do remember, that
2   that is a lie?
3       A.  Yes.
4       Q.  And you understand that if you respond
5   that you do not know the answer to the question when
6   in fact you do know the answer to the question; that
7   that also is a lie?
8       A.  Yes.
9       Q.  Sir, you can take a break at any time.
10  Just indicate to your counsel and we'll go off the
11  record by agreement.  However, we will not go off
12  the record until all of the parties to the
13  deposition agree that we can go off the record.
14          Could you tell me what your current
15  address is, please.
16      A.  704 Vera Cruz Avenue, Los Altos,
17  California.
18      Q.  Are you currently employed?
19      A.  Yes.
20      Q.  What is the name and address of your
21  employer?
22      A.  MIPS Technologies, Inc.  The address --
23  the headquarters address is 1225 Charleston Avenue,
24  Mountain View, California.
25      Q.  Is "MIPS" short for anything?

Page 15

1       A.  No.
2       Q.  When did you become employed by MIPS?
3       A.  November of 2007.
4       Q.  What is the nature of your employment at
5   MIPS?
6       A.  I'm the general counsel of the company.
7       Q.  I forgot to ask you, Mr. Nichols:  Have
8   you taken any medication that you believe might
9   impair your ability to testify truthfully today?
10      A.  No.
11      Q.  Have you been deposed before?
12      A.  Yes.
13      Q.  When was the last time you were deposed?
14      A.  It has been at least a year and a half.  I
15  don't know exactly.
16      Q.  Was the deposition in the context of --
17  was it related to KLA's option dating practices?
18      A.  No.
19      Q.  What was the context of that deposition?
20      A.  I don't specifically remember, but it was
21  not an uncommon thing for me to be deposed in the
22  context of subpoenas of records.  They would need
23  someone to testify regarding the effort that was
24  made; in the context of litigation, of course.
25  There were requests for production and I would give

Page 16

1   custodian of records-type depositions.  I've done
2   that several times.
3       Q.  And were you testifying as a custodian of
4   records at that deposition?
5       A.  Yes.
6       Q.  And was that for MIPS?
7       A.  No.  As I said, I haven't had my
8   deposition taken for a year and a half.
9       Q.  I see.  Was that for KLA-Tencor?
10      A.  Yes.
11      Q.  Who brought that litigation?
12      A.  Well, your question assumes that there
13  was only one instance, but I think I said there
14  were several, and there were.  I don't remember
15  specifically whether it was -- these were cases that
16  we brought or whether they were cases that were
17  brought by -- against us where we were a defendant,
18  or where we were simply a third party that was
19  producing documents in a litigation matter to which
20  we were not a party.
21      Q.  Did you testify at all in the litigation
22  that you most recently testified in as a percipient
23  witness at all?
24      A.  I do not believe so.
25      Q.  All right.  Prior to that deposition, had

Page 17

1   you been deposed before?
2       A.  Yes.
3       Q.  And what was the context of the most
4   recent deposition prior to that one?
5       A.  Well, again, there were several instances
6   where I was deposed as in the capacity of a
7   custodian of record -- of records.  But I can't
8   distinguish, you know, when they happened or --
9   they were fairly trivial types of depositions.
10      Q.  All right.  Let's put those aside.
11          Can you call to mind any depositions
12  that you gave where you testified as a percipient
13  witness?
14          And do you know what I mean when I say
15  "percipient"?
16      A.  Yes.  I can remember one instance where I
17  testified as a 30(b)(6) witness.
18      Q.  Was that also on behalf of KLA-Tencor?
19      A.  No.
20      Q.  What company was that on behalf of?
21      A.  This was when I was employed by Varian
22  Associates, Inc.
23      Q.  All right.  Putting that aside, can you
24  think of any circumstances where you've testified as
25  a percipient witness?

Page 18

1   A.  There may have been an instance where I
2   testified while at KLA as a 30(b)(6) witness on some
3   sort of issue about our subsidiary structure.  I
4   don't distinctly remember it, but I have a vague
5   memory that I did do that at one point.
6       Q.  Any other circumstances that you can
7   recall where you testified as a percipient witness?
8       A.  Yes.
9       Q.  Okay.  Please identify the first that
10  comes to mind.
11      A.  The first that comes to mind was a
12  deposition in connection with a wrongful termination
13  and trade secret matter.
14      Q.  Were you a party in that matter or a
15  witness: a nonparty witness?
16      A.  I was a nonparty witness.
17      Q.  Just identify who the litigants were in
18  that matter.
19      A.  I no longer remember the name of the
20  plaintiff.  The defendant was Varian Associates,
21  Inc.
22      Q.  I'm sorry.  Did you say "Varian"?
23      A.  Varian.
24      Q.  Okay.  And you said that was a wrongful
25  termination?

Page 19

1       A.  Yes.
2       Q.  Were you general counsel when you were at
3   Varian?
4       A.  No.
5       Q.  How long ago was that deposition given?
6       A.  At least six years ago.
7       Q.  All right.  Putting aside that instance,
8   can you recall any other circumstances where you
9   testified as a percipient witness?
10      A.  No.
11      Q.  And have you ever been a party to a
12  litigation?
13      A.  Yes.
14      Q.  Let's put aside for the moment litigations
15  arising out of KLA-Tencor's option practices.  Other
16  than litigation arising out of that subject matter,
17  have you been a party to a litigation?
18      A.  No.
19      Q.  Did you review documents in preparation
20  for your deposition today?
21      A.  No.
22      Q.  Have you had an opportunity to speak with
23  your counsel?
24      A.  Yes.
25      Q.  And would you identify is that Mr. Belnick

Page 20

1   who sits to your right?
2       A.  Yes.
3       Q.  All right.  Mr. John Hemann has asked to
4   attend today's deposition.  Mr. Hemann is outside
5   counsel, as I understand it, for KLA-Tencor.
6           Have you met with Mr. Hemann in connection
7   with your deposition today?
8       A.  No.
9       Q.  If I refer to "KLA option practices," I'm
10  referring to the broad spectrum of KLA's option
11  practices during the entire time period of your
12  tenure with the company and thereafter just as a
13  broad shorthand.
14          Have you met with the agents of the SEC
15  prior to today in connection with KLA's option
16  practices?
17      A.  Yes.
18      Q.  How many times can you recall meeting with
19  agents of the SEC?
20      A.  Once.
21      Q.  The approximate time period, do you
22  recall?
23      A.  I believe it was late 2006.
24      Q.  Do you keep a calendar that would tell you
25  the day that you met with the SEC?

Page 21

1       A.  No.
2       Q.  If you needed to remember the date, how
3   would you track down that date?
4       A.  How would I?  I would probably go back to
5   some old email.
6       Q.  What is your email address?
7       A.  Stu, S-t-u, .nichols@gmail.com.
8       Q.  I believe you said you met with the SEC
9   one time; is that correct?
10      A.  Correct.
11      Q.  And who do you recall was present at that
12  meeting?
13      A.  Let's see, my counsel, Mark Belnick.
14  There was at least one representative of the Office
15  of the U.S. Attorney; his name was I believe Michael
16  Wong.  There were two representatives of the FBI
17  whose names I don't recall.  And there was at least
18  one representative of the SEC, and her name is
19  Elena Ro.
20      Q.  And that's Miss Ro who is in attendance
21  today?
22      A.  That's correct.
23      Q.  Do you know who called for that meeting?
24      A.  No, I don't.
25      Q.  When you attended that meeting, were you

6 (Pages 18 to 21)

Page 22

1  questioned with respect to KLA's option practices?
2      A.  Yes.
3      Q.  Were you questioned concerning
4  communications that you had while you were general
5  counsel at KLA-Tencor?
6      A.  Yes.
7      Q.  Were you general counsel at KLA-Tencor?
8      A.  I believe at that point I was no longer,
9  though I don't have the date fixed in my head.
10      Q.  What was the approximate time period that
11  you were general counsel at KLA-Tencor?
12      A.  My start date was I believe October 25th
13  of 1999, and my resignation date was October 16th
14  of 2006.
15      Q.  I believe you stated that you made
16  statements during the meeting concerning your
17  communications with -- well, let me ask you.
18          You were asked at the meeting about
19  communications that you had as general counsel with
20  KLA-Tencor with personnel at KLA-Tencor; is that
21  correct?
22      A.  That's correct.
23      Q.  And you were also asked questions with
24  respect to communications that you had as general
25  counsel of KLA-Tencor with KLA-Tencor's outside

Page 23

1  counsel; is that correct?
2      A.  Yes, that's correct.
3      Q.  Can you recall any other general
4  categories of communications that you were
5  questioned about by either the SEC or the
6  representatives of the U.S. Attorneys Office?
7      A.  I'm not sure what you mean by "general
8  categories of communication." Can you be more
9  specific?
10      Q.  Yes. I think we identified communications
11  that you had with KLA personnel. We also identified
12  communications that you had with outside counsel for
13  KLA. Were you questioned about any other categories
14  of communications, such as communications with
15  persons outside of KLA who were not outside counsel
16  and who were not KLA personnel?
17      A.  So I guess it depends. I may have
18  been asked about communications with KLA's board
19  members. And I don't know whether when you use
20  the phrase "KLA personnel" you're including board
21  members.
22      Q.  Thank you for that clarification. For
23  purposes of my questions I will include KLA's board
24  of directors or former members of the board in the
25  category of "KLA personnel,"

Page 24

1          Shall we have that understanding?
2      A.  Yup.
3      Q.  You may have been asked questions about
4  your communications with board members; is that
5  correct?
6      A.  I may have, yes.
7      Q.  While you answered questions, did you make
8  a record of your interview?
9      A.  No.
10      Q.  And did you observe anyone else in the
11  room making a record of your interview?
12      A.  The other attorneys who were observing the
13  deposition may well have taken notes. I don't have
14  a specific memory about whether they did or didn't.
15      Q.  While you were questioned about your
16  communications with KLA personnel, did you assert
17  the attorney-client privilege on behalf of the
18  company in response to those questions or did your
19  attorney assert them on your behalf?
20      MR. BELNICK:  Maybe I can help with this.
21  Before Mr. Nichols answered any questions I obtained
22  a representation from Mr. Wong and I believe SEC
23  counsel that KLA was cooperating with their
24  inquiries. This was prior, as you know, to this
25  lawsuit. And that Mr. Nichols was therefore free to

Page 25

1  answer questions that otherwise would be privileged.
2          I left the room and I called KLA's then
3  general counsel, Mr. Gross I believe his name was,
4  and either he or someone from his office confirmed
5  to me over the telephone that the government's
6  representation to me was accurate and that with
7  respect to the Justice Department and the SEC,
8  Mr. Nichols was free to answer any inquiry even
9  though it might otherwise be considered subject
10  to the attorney-client privilege or work product
11  immunity. And on that basis, thereafter I made no
12  objections on privilege grounds.
13      MS. WEISS:  And so your understanding as a
14  result of your conversation with Mr. Gross was that
15  you were not obliged or even requested to assert the
16  attorney-client privilege in response to questions
17  about Mr. Nichols' communications with KLA
18  personnel; is that correct?
19      MR. BELNICK:  That's correct. Not only
20  that I was not obliged to and that I should not.
21      MS. WEISS:  And the same question with
22  respect to the work product doctrine, that you were
23  not either requested or required to assert that
24  privilege, and that indeed you were being requested
25  by the company to respond -- to have Mr. Nichols

Nichols, Stuart J. Esq.                                                          1/27/2008

Page 26

1   respond to the questions of both the SEC and the
2   U.S. Attorneys Office; is that correct?
3        MR. BELNICK: Essentially, yes.
4   BY MS. WEISS:
5        Q. Mr. Nichols, are you aware of any
6   confidentiality agreements between KLA-Tencor
7   and the U.S. Attorneys Office?
8        A. No.
9        Q. Are you aware of any confidentiality
10  agreements between KLA-Tencor and the Securities
11  and Exchange Commission?
12       A. No.
13       Q. Was anyone else present other than the
14  people that you identified that you can think of?
15       A. No.
16       Q. Were you there pursuant to subpoena or
17  voluntarily?
18       A. I believe I was there voluntarily.
19       Q. During the time that you answered
20  questions posed to you, were you shown documents?
21       A. Yes.
22       Q. Were any of the documents -- did any of
23  the documents reflect what you would have believed
24  were attorney-client privileged communications
25  between yourself and other people?

Page 27

1        A. Yes.
2        Q. Generally what other categories of
3   documents were you shown at that meeting?
4        A. Meaning documents that would not be
5   privileged, that I did not think were subject to
6   the privilege?
7        Q. Or not subject to the attorney-client
8   privilege. In other words, research, PowerPoint,
9   memoranda, anything like that.
10       A. I don't remember any PowerPoints. I don't
11  know what you mean by "research." But I don't --
12  if you mean legal research, or for that matter
13  technical research, I don't remember anything along
14  those lines. I do remember SEC filings. And there
15  may have been, for instance, email that was not --
16  that I would not have deemed to be subject to the
17  privilege that I talked about.
18       Q. How long did the interview last?
19       A. I believe we started at 9:00 or 10:00 and
20  we concluded at 4:00 or 4:30, something like that.
21  Maybe it was 5:00. I don't remember exactly.
22       Q. I take it that the interview was not
23  transcribed?
24       A. Correct.
25       Q. And it was not recorded, to your

Page 28

1   knowledge?
2        A. Not that I know of.
3        Q. Following that interview, were you
4   contacted by any representatives of the SEC to give
5   any follow-up statements, either through a meeting
6   or in writing or by telephone?
7        A. Was I personally contacted?
8        Q. Were you contacted either directly or
9   through your counsel.
10       A. Yeah. I believe that my counsel was
11  contacted.
12       Q. Did you turn over additional statements
13  following that interview which you understood would
14  be turned over to the government?
15       A. When you say "turn over," what do you
16  mean?
17       Q. Did you write anything down that you
18  understood would be turned over to the government?
19       A. Did I personally write anything down?
20       Q. Yes. Or participate in a writing that was
21  turned over to the government.
22       A. Well, a written submission was made after
23  the interview on my behalf.
24       Q. Okay. This is a Wells submission?
25       MR. BELNICK: Let me answer it was not.

Page 29

1        MS. WEISS: You did not make a Wells
2   submission?
3        MR. BELNICK: Correct. It was a
4   submission made by counsel; mainly me and my
5   co-counsel, Akin Gump. And it was confidential
6   and subject to FOIA, and still is as far as I'm
7   concerned. And we made the appropriate requests at
8   the time for FOIA treatment and confidentiality, and
9   those are still in effect, those requests.
10       MS. WEISS: Was the submission that was
11  made made solely to the SEC?
12       MR. BELNICK: Yes.
13  BY MS. WEISS:
14       Q. Mr. Nichols, do you know if a submission
15  was made to the U.S. Attorneys Office?
16       A. I'm not aware of any submission made to
17  the U.S. Attorneys Office.
18       MR. BELNICK: The answer is no.
19  BY MS. WEISS:
20       Q. Other than the submission that your
21  counsel identified, did you make any other
22  submissions to either the SEC or the U.S. Attorneys
23  Office?
24       A. No, not that I'm aware of.
25       Q. Were you contacted for any follow-up

8 (Pages 26 to 29)

Nichols, Stuart J. Esq.                                          1/27/2008

Page 30

1  questioning up until today by either of those
2  agencies?
3      A.  No.
4      Q.  Since -- do you recall generally press
5  about potential option dates being retrospectively
6  selected in about May of 2006?  Do you recall
7  generally that time period?  Wall Street Journal
8  articles or other articles?
9      A.  Yes.
10      Q.  Since that time period, Mr. Nichols, have
11  you had any communications with the press?
12      A.  Regarding stock option matters?
13      Q.  Yes.
14      A.  No.
15      Q.  Communications involving yourself appeared
16  in the press before the complaint was filed against
17  my client, Mr. Schroeder, which was filed in July of
18  2007.  Do you know who gave those communications to
19  the press?
20      A.  You'll have to be clearer on what
21  communications you're talking about.  I'm not
22  sure what you're referring to.
23      Q.  Do you recall any -- reading any press
24  about KLA-Tencor and your communications with
25  Mr. Schroeder that were discussed in the press?

Page 31

1      A.  There were a number of different articles,
2  different press items; so, yeah, I remember a number
3  of different things in the press.
4      Q.  Do you know of anyone who delivered or
5  gave information about your communications with
6  Mr. Schroeder to any member of the press or media?
7      A.  No.
8      Q.  Do you have any facts on which you can
9  base a suspicion that any particular person gave
10  copies of your communications to the press that
11  involved your communications with Mr. Schroeder?
12      MR. BELNICK:  Just for the record, I
13  object to him being asked for suspicions.
14  But you may answer.
15      THE WITNESS:  No.
16      MR. FICKES:  I also object the question
17  calls for speculation.
18  BY MS. WEISS:
19      Q.  Sir, you were aware that the board of
20  directors of KLA-Tencor at some point after May 1st,
21  2006, formed what they called the Special Committee
22  of the board to investigate KLA-Tencor's option
23  practices?
24      A.  Yes, I'm aware of that.
25      Q.  All right.  So I'll refer to that maybe as

Page 32

1  the "Special Committee" in my questioning.
2      I understand that you met with the Special
3  Committee after May of 2006; is that correct?
4      MR. BELNICK:  Could you clarify if you
5  mean the board members on the committee itself or
6  their counsel?
7  BY MS. WEISS:
8      Q.  I was going to ask you about the
9  attendees, but --
10      MR. BELNICK:  I think it will be faster if
11  you divide it.
12      MS. WEISS:  All right.
13      MR. HEMANN:  Shirli, I think this is
14  probably a good time for me to interject that as a
15  general matter, we have advised Mr. Nichols through
16  his attorney that KLA-Tencor, which would include
17  any committees or members of the board of
18  director -- the directors of KLA-Tencor or their
19  counsel, do not waive any privilege that might be
20  applicable, including the attorney-client or the
21  attorney work product privilege.
22      And we have requested Mr. Nichols through
23  his counsel, Mr. Belnick, that he adhere to his
24  ethical statutory and fiduciary duties, such as they
25  are, and take all necessary steps to protect both

Page 33

1  the attorney-client privilege and the attorney work
2  product privilege doctrine as he answers questions
3  today.
4      And I don't know where exactly this
5  particular set of questions is going, but I wanted
6  to make it clear that the company has made that
7  request.  To the extent that a question that you ask
8  would reveal in Mr. Nichols' answer privileged
9  information; privileged under either the work
10  product doctrine, the attorney-client privilege,
11  we've asked Mr. Nichols to decline to answer the
12  question.
13      And Mr. Belnick will make an observation
14  if he feels that Mr. Nichols' answer will
15  reveal such information, and on that basis of
16  Mr. Belnick's observation, we would ask Mr. Nichols
17  not to answer the question.
18      MS. WEISS:  All right.  As I understand
19  your comments, Mr. Hemann, on behalf of KLA-Tencor
20  you would instruct Mr. Nichols not to respond to
21  questions concerning the content of communications
22  between Mr. Nichols and KLA-Tencor's Special
23  Committee --
24      MR. HEMANN:  Correct.
25      MS. WEISS:  -- including the members of

9 (Pages 30 to 33)

Page 34

1  the Special Committee or the counsel acting for
2  their members; is that correct?
3      MR. HEMANN: That's correct.
4      MS. WEISS: Is that the same instruction
5  that you would make with respect to all of
6  KLA-Tencor's current and former personnel?
7      MR. HEMANN: Yes.
8      MS. WEISS: Would that also be true
9  with respect to the assertion of the work product
10 doctrine with respect to all current and former
11 inside attorneys for KLA-Tencor?
12     MR. HEMANN: Yes.
13     MS. WEISS: That is to say that to the
14 extent that they met with the Special Committee,
15 you would instruct them not to respond to my
16 questions --
17     MR. HEMANN: Oh, I'm sorry. I'm sorry.
18 I thought you were talking about Mr. Nichols'
19 communications with attorneys for KLA-Tencor.
20     I would instruct Mr. Nichols not to -- I
21 would advise Mr. Nichols that the company is taking
22 the position that his communications with attorneys
23 for KLA-Tencor, whether inside attorneys or outside
24 attorneys, are protected by some combination of
25 the attorney-client privilege and the attorney work

Page 35

1  product doctrine.
2      MS. WEISS: Okay. Right now I'm just on
3  the Special Committee.
4      THE VIDEOGRAPHER: I'm sorry. Is your
5  BlackBerry on?
6      MR. HEMANN: Yes. I can turn it off.
7      THE VIDEOGRAPHER: Somebody is starting to
8  interfere with the audio.
9      MS. WEISS: You may actually have to put
10 it remotely. I've had trouble with Blackberrys that
11 are even off.
12     THE VIDEOGRAPHER: Thank you.
13     MS. WEISS: Okay. Mr. Hemann, what I'd
14 like to do is, first of all, segregate the Special
15 Committee. And I think you were clear about your
16 instruction with respect to the attorney-client
17 privilege.
18     I'm moving now to the work product
19 protection. As to Mr. Nichols' communications with
20 the Special Committee or the Special Committee's
21 counsel, is it your instruction to him not to
22 respond to questions on the grounds that asks for
23 his communications to those personnel; the Special
24 Committee or their counsel, on the grounds of the
25 work product doctrine?

Page 36

1      MR. HEMANN: Yes.
2      MS. WEISS: And would it be your
3  instruction to each of KLA-Tencor's current and
4  former in-house counsel that they are not to respond
5  to questions that I pose to them as witnesses
6  regarding their communications with the Special
7  Committee or its counsel on the basis of the work
8  product doctrine?
9      MR. HEMANN: I think my comments and
10 positions today are directed solely to Mr. Nichols.
11 I'd be happy to talk to you after the deposition
12 about other potential witnesses.
13     MS. WEISS: Well, Counsel, we'd like to
14 make a clear record today of KLA's intentions with
15 respect to instructions to witnesses so that we
16 don't have to take more witness' depositions before
17 we approach the court with these issues.
18     So these issues have been vetted over many
19 weeks now. Are you not prepared to tell me what
20 the company's position is with respect to other
21 attorneys that I call as witnesses as far as the
22 assertion of the attorney-client privilege and
23 the work product doctrine is concerned?
24     MR. HEMANN: I'm prepared to meet and
25 confer with you about other witnesses outside

Page 37

1  the context of Mr. Nichols' deposition.
2      MS. WEISS: Mr. Nichols --
3      MR. BELNICK: Can I just make a brief
4  statement?
5      MS. WEISS: Please.
6      MR. BELNICK: Just to make clear, as
7  I indicated both to you and Mr. Hemann and our
8  communication before deposition when Mr. Hemann gave
9  the instructions he described, Mr. Nichols, as a
10 lawyer, former general counsel for KLA, obviously
11 has fiduciary ethical and legal obligations and so
12 he has no choice.
13     And I'm neither criticizing or applauding,
14 but he obviously has no choice but to follow the
15 instructions of KLA and its counsel, and therefore
16 he will follow the instruction that Mr. Hemann just
17 put on the record.
18     And if all or part -- or the substantial
19 part of an answer would involve privileged or work
20 product, I have no choice but to say "privilege":
21 meaning he can't answer it. Not because he doesn't
22 want to answer or I don't want him to answer, but
23 because he has no choice as a lawyer other than to
24 follow his former clients' request and direction.
25     MS. WEISS: I understand, Mr. Belnick.

10 (Pages 34 to 37)

Page 38

1   And to the extent that I continue to ask questions
2   that call for communications which you deem
3   privileged, my purpose is going to be to elicit your
4   objection and make a record from which a court can
5   infer your intentions specifically and generally.
6   And Mr. Hemann's intentions.
7       So that will be my purpose in pursuing
8   lines of questioning as to which you've already made
9   your position.
10      MR. BELNICK: I understand. And just
11  two quick points on that so we can get back to
12  the record. First, just so it's clear, when you
13  say "your"; meaning looking at me, they're not my
14  objections. They're KLA's objections and we are
15  adhering to them.
16      Second, I would hope, but it's entirely
17  up to you, that given the statement Mr. Hemann has
18  made, it's fairly clear that there's not going to be
19  very much that Mr. Hemann can answer so I would
20  request that you -- we try to limit the record
21  building for the sake of saving everyone's time.
22  But I'm certainly not going to stop you or try to
23  stop you.
24      MS. WEISS: Okay. Thank you, sir.
25  BY MS. WEISS:

Page 39

1       Q.  Mr. Nichols, the notes, the final
2   memoranda that the Special Committee counsel
3   prepared of your interviews with the Special
4   Committee, were turned over, as I understand
5   it, to Mr. Schroeder by the SEC in compliance with
6   Rule 26 in this litigation.
7       I am going to read to you the dates of the
8   interviews that I have and ask you whether or not
9   you generally recall that those were the dates that
10  you met with the committee. So the dates that I
11  have are July 28th, 2006; August 4th, 2006; and
12  September 18th, 2006.
13      Is that generally your recollection as to
14  when you met with the Special Committee?
15      A.  That sounds generally right.
16      MR. BELNICK: On all three of those
17  occasions?
18      Because I think the witness' recollection
19  was -- and I think he was correct -- that he met
20  only once with them.
21      THE WITNESS: No, no.
22      MR. BELNICK: I'm misunderstanding then.
23      THE WITNESS: She's referring to the
24  Special Committee, not to the SEC.
25      MR. BELNICK: Oh, I apologize.  I

Page 40

1   apologize.
2   BY MS. WEISS:
3       Q.  Mr. Nichols, if you met on more than three
4   occasions, do you think you would remember that?
5       A.  Yes.
6       Q.  Did you make calendar entries as to when
7   you met with the Special Committee?
8       A.  I may have.
9       Q.  Did you meet with the SEC before or after
10  you met with the Special Committee? And if it was
11  in between, you can tell me that, too.
12      A.  I really don't remember the timing.
13      Q.  Okay.  The memoranda turned over to us
14  with respect to July 28th. 2006. states that the
15  people who were in attendance at your interview
16  were the following:  Richard Marmaro, Jack Dicanio,
17  Elizabeth Harlan, all from the Skadden Arps Law
18  Firm; Steven Daughters from LECG, which I understand
19  was their forensic consultant; Mr. Belnick by
20  telephone; yourself.
21      Do you recall anyone else being present at
22  that interview?
23      A.  I have a memory that there was a second
24  representative of LECG. Other than that -- and I
25  wouldn't have been able to come up with a name of

Page 41

1   Mr. Daughters, but I just remember that there were
2   two -- I thought I remember there being two LECG
3   people there.
4       Q.  All right. Other than that person, do
5   you recall anyone else being in attendance at that
6   meeting?
7       A.  No.
8       Q.  Who, as you understood it at that time,
9   were the members of the Special Committee itself?
10      A.  The members of the Special Committee
11  itself were Ray Bingham and -- I'm blanking on his
12  name.
13      Q.  Steven Kaufman?
14      A.  Thank you. Steven Kaufman.
15      Q.  Did you meet with either Mr. Bingham or
16  Mr. Kaufman, or both, at any time in connection
17  with KLA-Tencor's investigation of its stock option
18  practices?
19      A.  Yes.
20      Q.  How many times did you meet with
21  Mr. Bingham?
22      A.  You're referring now to in-person meetings
23  as opposed to telephone meetings?
24      Q.  Let's start with the in-person meetings.
25      A.  I recall only one in-person meeting with

Page 42

1  Ray Bingham in connection with his responsibilities
2  relative to the Special Committee.
3     Q.  And at the time that you met with
4  Mr. Bingham, was he questioning you with respect
5  to your past communications at KLA-Tencor?
6     A.  No.
7     Q.  Was it a meeting in connection with
8  his responsibilities as a member of the Special
9  Committee?
10    A.  Yes.
11    Q.  Was there a second meeting with
12 Mr. Bingham?
13    A.  Not that I recall.
14    Q.  Was there any time that Mr. Bingham
15 participated personally in an interview of you
16 with respect to the investigation?
17    A.  No.
18    Q.  Okay.  Moving to Mr. Kaufman.  How many
19 times did you meet with him either in person or by
20 telephone?
21    A.  I don't believe I ever met with him in
22 person in connection with his responsibilities on
23 the Special Committee.
24    Q.  Okay.  Or by telephone?
25    A.  I remember at least one meeting that he --

Page 43

1  in which he participated by phone.
2     Q.  Was the purpose of that meeting, as you
3  understood it, to provide your advice to him as to
4  his responsibilities as a member of that committee?
5     A.  No.
6     Q.  What was the purpose of the meeting with
7  Mr. Kaufman?
8     A.  Well, it was a phone meeting that he
9  participated in by phone that included a number
10 of other people, including Ray Bingham in person.
11    Q.  And what was the purpose of that meeting,
12 as you understood it?
13    MR. BELNICK:  One second, please.  I'm
14 trying to ascertain if we have a privilege issue
15 here.
16    MS. WEISS:  Sure.
17    (Discussion off the record between
18       Deponent and Counsel.)
19    MR. BELNICK:  I believe that the answer
20 will implicate the privilege, at least work product
21 and perhaps attorney-client as well, so we'll have
22 to follow KLA's instruction and respectfully
23 decline.
24    MS. WEISS:  Okay.  And your instruction is
25 to the witness not to answer the question; correct?

Page 44

1     MR. BELNICK:  It is my instruction to
2  the witness -- just so it's clear, Shirli, I'm not
3  trying to mince words -- is he needs to follow KLA's
4  direction, and the direction, as I understand it
5  and as you understand it, is that KLA has directed
6  him not to answer questions that we believe would
7  implicate attorney-client privilege or work product,
8  and we're following that direction.
9     MS. WEISS:  Okay.  And just so that
10 we don't have to keep repeating that every time,
11 let's have an agreement that when I say, "Are you
12 instructing him not to answer" and you say "Yes,"
13 that will mean that you are instructing him not to
14 answer based on the instruction of KLA which in turn
15 is based on the attorney-client privilege and the
16 work product doctrine.
17    MR. BELNICK:  Correct.  Just so long as
18 it's clear that it's not Mr. Nichols or his counsel
19 who made decisions on whether the privilege exists
20 or doesn't exist.  We have no position on that.
21    MS. WEISS:  Very good.
22    MR. BELNICK:  I mean, the privilege
23 exists and we don't take any position.  I understand
24 there's a waiver issue pending.  We're not taking
25 any positions on whether anything has been waived

Page 45

1  or not.
2     MS. WEISS:  I understand.
3     MR. BELNICK:  We're following KLA's
4  direction.
5     MS. WEISS:  I understand.
6     THE WITNESS:  And just to be clear, if you
7  instruct me not to answer relative to a privilege
8  issue that exists within -- between you and me, you
9  need to make that clear; right?
10    MR. BELNICK:  Thanks.
11    THE WITNESS:  I mean, I don't want every
12 instruction to be construed as an instruction
13 based --
14    MR. BELNICK:  I know.  Don't worry.  If
15 Shirli goes after our top secret confidential
16 discussions, I'll make it clear.
17 BY MS. WEISS:
18    Q.  Okay.  So I think we were questioning you
19 about Mr. Kaufman and I think you declined to answer
20 a question.
21    A.  Well, your question was what was the
22 purpose of this meeting.
23    Q.  And you're instructed not to answer --
24    A.  Correct.
25    Q.  -- based on the attorney-client privilege

LiveNote World Service          800.548.3668 Ext. 1

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 46

1    and the work product doctrine.
2        All right. So I have notes from an
3    interview of you that occurred August 4th, 2006.
4    The notes record that Mr. Marmaro, Mr. Dicanio,
5    Miss Harlan, Mr. Daughters, and Mr. Belnick were at
6    that interview, as well as yourself. Mr. Belnick I
7    don't think made it clear whether he was there by
8    phone or in person.
9        MR. BELNICK: I was in person.
10   BY MS. WEISS:
11       Q.  In person.
12       And in addition, on August 4th a gentleman
13   named Joe Anastosi also joined.
14       A.  Okay. So it may have been in the second
15   meeting that there were two LECG people present.
16   Because Mr. Anastosi is LECG?
17       Q.  Yes.
18       A.  Yeah.
19       Q.  And does that comport with your
20   recollection?
21       A.  Yes.
22       Q.  All right. And then there was a third
23   interview that occurred on September 18th, 2006, and
24   at that interview only Mr. Dicanio and Miss Harlan
25   attended as well as your counsel and yourself and no

Page 47

1    one else.
2        Does that comport with your recollection?
3        A.  Correct. Although I believe Mr. Belnick
4    participated by phone.
5        Q.  All right. Now, of those meetings, is
6    there any person that you have a recollection that
7    attended that I didn't mention?
8        A.  No.
9        Q.  And at those meetings would it be correct
10   to say that the attorney who questioned you said
11   that KLA was the holder of the attorney-client
12   privilege and the work product privilege with
13   respect to that -- the Special Committee's interview
14   of you and could turn the results of that interview
15   as they chose over to third parties?
16       Do you recall that instruction?
17       MR. BELNICK: I'll object to the extent
18   that it calls for him to make legal conclusions --
19   oh, was it an instruction?
20   BY MS. WEISS:
21       Q.  Do you recall that instruction?
22       MR. BELNICK: I strike the objection.
23   BY MS. WEISS:
24       Q.  Do you have in mind the question?
25       A.  I have in mind the question.

Page 48

1        MR. BELNICK: I'm sorry.
2        THE WITNESS: I do generally recall the
3    instruction.
4    BY MS. WEISS:
5        Q.  All right. Now, in addition to the
6    Special Committee, were you also interviewed in
7    connection with your service as general counsel
8    at KLA by something called the Special Litigation
9    Committee of KLA-Tencor at any time?
10       A.  Yes.
11       Q.  And can you identify approximately when
12   that interview occurred.
13       A.  Well, it would have been after the third
14   of the Special Litigation Committee meetings which
15   you have --
16       MR. BELNICK: The third of the Special
17   Committee?
18       THE WITNESS: Yeah, I'm sorry. The third
19   of the Special Committee meetings which you have
20   reminded me occurred in September of '06.
21   BY MS. WEISS:
22       Q.  How many meetings did you attend with the
23   Special Litigation Committee?
24       A.  I believe there were two.
25       Q.  And whom did you understand the Special

Page 49

1    Litigation Committee to be comprised of?
2        A.  Do you mean in terms of the board
3    committee itself who was on that committee?
4        Q.  Yes.
5        A.  I have a memory that it was Mr. Kaufman
6    and Mr. Wong, but I'm not certain about that.
7        Q.  This would be a different Mr. Wong than
8    the Mr. Wong that you identified earlier?
9        A.  Correct.
10       Q.  And you said you believed that there were
11   two meetings. Can you tell me who attended those
12   meetings to the best of your recollection.
13       A.  I believe that Tim Miller from the Skadden
14   firm attended both of them and Jim Lyons attended
15   the first one, and perhaps both.
16       Q.  Anyone else?
17       A.  I don't believe so.
18       Q.  Who took notes?
19       A.  Oh, and Mr. Belnick. Pardon me.
20       Mr. Miller and Mr. Lyons may have taken
21   notes.
22       Q.  You did not?
23       A.  I did not.
24       Q.  Backing up to the Special Committee
25   interviews. Would it be correct to say that one of

13 (Pages 46 to 49)

Nichols, Stuart J. Esq.                                        1/27/2008

Page 50

1  the attorneys took notes during that interview?
2     A. Yes.
3     Q. And was that a Skadden attorney that took
4  notes?
5     A. I don't have a specific memory. I have a
6  general memory that Miss Harlan was taking notes.
7  Mr. Dicanio may have taken notes. I don't remember
8  one way or another.
9     Q. Those notes were not submitted to you at
10  any time --
11    A. No.
12    Q. -- would that be correct?
13       Would it be correct that they were not
14  submitted?
15    A. That would be correct.
16    Q. Okay. All right. Following your
17  meeting with the Special Committee and the Special
18  Litigation Committee, have you entered into any
19  agreements with the company?
20    A. Yes.
21    Q. Could you tell me the first agreement
22  that comes to mind that you've entered into with
23  the company.
24    A. The first agreement that comes to mind had
25  to do with my laptop computer that I used while I

Page 51

1  was at KLA.
2     Q. And what was that agreement generally?
3     A. In general my concern about my laptop
4  was that I had confidential information on
5  there relative to other clients with whom I was
6  consulting. KLA wanted to preserve the laptop and
7  the hard drive.
8        And so in general the agreement provided
9  that Skadden would be the custodian of the laptop
10  and that if it were ever subpoenaed or requested,
11  that I would be given notice of that and be given
12  the opportunity to take steps to preserve the
13  confidentiality of any of the information on there
14  that does not relate to KLA.
15    Q. Okay. And that's an agreement in writing?
16    A. Correct.
17    Q. Okay. What's the next agreement that you
18  entered into with the company, if any?
19    A. The next agreement that I entered
20  into with the company was in connection with my
21  resignation from the company.
22    Q. Okay. And that was also a written
23  agreement?
24    A. Correct.
25    Q. Okay. What's the next agreement that you

Page 52

1  entered into with the company?
2     A. Those are the only two that I recall.
3     Q. Okay. Have you entered into a settlement
4  agreement with the company with respect to the
5  pending shareholder derivative litigation?
6     A. No.
7     Q. Do you have a draft of any such agreement?
8     A. No.
9     Q. Do you have an understanding with the
10  company as to what would happen to you in that
11  litigation?
12    A. No.
13    Q. Will you please summarize your educational
14  background, sir.
15    A. Starting with where?
16    Q. Graduation from high school.
17    A. I graduated from high school from
18  San Carlos High School in California. I went to
19  receive my undergraduate degree at the University
20  of California Berkeley. And I received my law
21  degree from the University of San Francisco.
22    Q. What year did you graduate from Berkeley?
23    A. 1983.
24    Q. And what year did you graduate from law
25  school?

Page 53

1     A. 1987.
2     Q. Do you have any formal training in
3  accounting, sir?
4     A. No.
5     Q. Do you have any informal training in
6  accounting?
7     A. It depends on how you define "informal."
8     Q. Did you receive some on-the-job knowledge
9  about accounting in relation to options while you
10  were at KLA?
11    A. I had exposure to issues relating to
12  option -- accounting for options, yes.
13    Q. Do you hold any other degrees other than
14  those that you've mentioned?
15    A. No.
16    Q. Do you hold any licenses other than a
17  driver's license and your California Bar license?
18    A. Well, I'm certified to scuba dive.
19    Q. That counts. Anything else?
20    A. That's all that comes to mind.
21    Q. No real estate or resale licenses or
22  anything like that?
23    A. No.
24    Q. Okay. Following your graduation from law
25  school, could you please take me through the steps

14 (Pages 50 to 53)

Page 54

1  of your employment, your professional employment.
2      A.  My first job after law school was with
3  a small law firm in San Francisco that was at
4  the time -- well, it's currently named Goodin,
5  MacBride, Squeiri, S-q-u-e-r-i, & Schlotz, I think.
6  I then went in late '89 to Varian Associates, Inc.
7  I left Varian Associates, Inc., in '95 --
8      Q.  Okay.  Let me just interrupt you here for
9  just a moment.  The first group, was that a company
10  or a law firm, did you say?
11     A.  Law firm.
12     Q.  That was a law firm.  Okay.  And you said
13  you started with them when?
14     A.  Well, I was a law clerk with them before
15  I graduated law school and then I started as an
16  attorney in 1987 after graduating.  Yeah.
17     Q.  And you stayed until 1989?
18     A.  Yes.
19     Q.  And your general responsibilities at that
20  time were?
21     A.  I was a litigation associate.
22     Q.  Okay.  And then in 1989 you went with
23  Varian Associates.  Was that a law firm or a
24  company?
25     A.  A company.

Page 55

1      Q.  A company.  Okay.  And where were they
2  based?
3      A.  Palo Alto, California.
4      Q.  Okay.  What kind of company were they?
5      A.  A diversified electronics manufacturer.
6      Q.  Were they private or public?
7      A.  Public.
8      Q.  At the time you were with Varian
9  Associates, do you recall whether or not you were
10  awarded any option grants?
11     A.  Yes.
12     Q.  What did your responsibilities entail at
13  Varian?
14     A.  Well, they varied over time.
15     Q.  Can you give me a general statement of how
16  they changed over time?
17     A.  Yeah.  Initially I was hired to manage
18  litigation for the company and as time went on, I
19  took on other substantive responsibilities that
20  included -- I did some M&A work, I managed the
21  company's employment law matters, I consulted on
22  product safety and liability issues, I was a member
23  of two of the company's -- the boards of the two of
24  the company's joint venture partnerships and other
25  duties as assigned.

Page 56

1      Q.  Did you -- generally did you render advice
2  in connection with the company stock option program
3  while you were at Varian?
4      A.  No.
5      Q.  Did you receive options while you were at
6  Varian?
7      A.  Yes.
8      Q.  Can you generally describe how options
9  were granted when you were at Varian?
10     A.  No.
11     Q.  You had nothing to do with the option
12  process?
13     A.  No knowledge of how options were granted
14  at Varian.
15     Q.  And you didn't participate in any way,
16  shape or form in the process itself?
17     A.  No.
18     Q.  Were you in-house general counsel at
19  Varian?
20     A.  No.
21     Q.  What was your title there?
22     A.  Initially it was Associate Corporate
23  Counsel and then shortly thereafter I was promoted
24  to Corporate Counsel.
25     Q.  Who was their outside counsel?

Page 57

1      A.  Well, it was a large company.  We had a
2  lot of outside counsel.  Do you mean outside counsel
3  for corporate matters?
4      Q.  Yes.
5      A.  Orrick Herrington.
6      Q.  While you were at Varian, what department
7  of the company accounted for stock options, to your
8  knowledge?
9      A.  What department?
10     Q.  Yes.  Was there a department of the
11  company that was responsible for the accounting
12  of stock options?
13     A.  For the accounting of stock options.
14  Well, presumably the accounting function.  I don't
15  know.
16     Q.  It's not something that you ever had
17  occasion to inquire as to?
18     A.  No.
19     Q.  Is that right?
20     A.  Correct.
21     Q.  From your perspective, you received stock
22  option awards; is that correct?
23     A.  Yes.  You've asked me that three times.
24  Yes.
25     Q.  And did you have occasion to exercise and

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 58

1  sell the options in Varian?
2      A.  Yes, I did.
3      Q.  When did you leave Varian?
4      A.  1995.
5      Q.  Who did you next join?
6      A.  Samsung Semiconductor, Inc.
7      Q.  And where was the company's office base
8  that you joined?
9      A.  San Jose, California.
10     Q.  What was your title there?
11     A.  General Counsel.
12     Q.  Was that your first general counsel
13  position?
14     A.  Yes.
15     Q.  Generally what was your -- what were your
16  responsibilities?
17     A.  I did a fair amount of commercial
18  transactions; both on the sales and supply side.
19  I did a fair amount of licensing of intellectual
20  property, handled employment law issues. We had
21  some strategic partnership deals that I was involved
22  in and we did some acquisitions that I was involved
23  in.
24     Q.  Did your job functions at all entail
25  counseling with respect to the company's stock

Page 59

1  options?
2      A.  Well, that assumes that the company had
3  stock options.
4      Q.  It does indeed. Let me back up.
5          Did Samsung use stock options as
6  compensation for its employees?
7      A.  No.
8      Q.  You received no stock options when you
9  were at Samsung; is that right?
10     A.  That's correct.
11     Q.  When did you leave Samsung?
12     A.  Now we're up to I think it was early
13  to mid '98. No. no, no. I'm sorry. '97.
14     Q.  Okay. Sometime in 1997?
15     A.  Yes.
16     Q.  And why did you leave Samsung?
17     A.  I'm sorry. Why?
18     Q.  Yes. Generally.
19     A.  Better opportunity.
20     Q.  All right. And who did you join?
21     A.  Phoenix Technologies Limited.
22     Q.  Okay. Where were they based?
23     A.  San Jose, California.
24     Q.  Were they public or private?
25     A.  Public. Or I should say: Yes, they were

Page 60

1  public.
2      Q.  They were public.
3          And what was your title and function
4  there?
5      A.  I was general counsel there as well, and
6  my function was, you know, to handle whatever legal
7  issues arose from the company.
8          At that time Phoenix was a licensor of
9  software to the PC industry as well as we had a
10  division where we licensed intellectual property
11  used in the development and design of semiconductor
12  devices.
13     Q.  Did Phoenix Technologies use options as
14  compensation for its employees?
15     A.  Phoenix had options, yes.
16     Q.  And did part of your responsibilities
17  entail counseling with respect to options?
18     A.  No.
19     Q.  Did you personally receive options --
20     A.  Yes.
21     Q.  -- at Phoenix?
22          And did you receive them on a regular
23  basis while you were there? "Regular" being, you
24  know, at least annually.
25     A.  Yeah. I believe I received a grant after

Page 61

1  my first year. I'm not 100 percent certain of that,
2  but I believe I did.
3      Q.  Did you have an opportunity to generally
4  observe how options were granted at Phoenix
5  Technologies?
6      A.  No.
7      Q.  Did Phoenix Technologies use any sort of
8  pooling system to allocate options?
9      A.  I don't know.
10     Q.  Okay. Were you able to observe what
11  department at the company was responsible for
12  accounting for option grants at Phoenix
13  Technologies?
14     A.  Same answer as at Varian: I don't know
15  from personal knowledge. Again, I would presume
16  it was the accounting department.
17     Q.  Okay. What was your next employment?
18     A.  KLA-Tencor Corporation.
19     Q.  Okay. And how did you become aware of the
20  KLA-Tencor opportunity?
21     A.  I was told of the opportunity by a partner
22  at Wilson Sonsini named Judy O'Brien.
23     Q.  How did you know Miss O'Brien?
24     A.  She was the corporate secretary to another
25  company that I was considering going to so I was

Nichols, Stuart J. Esq.                                                    1/27/2008

**Page 62**

1  interviewing her for one job and she told me about a
2  different job.
3      Q.  Okay.  And did you decide to interview for
4  the KLA-Tencor job?
5      A.  Yes.
6      Q.  By the way, I may refer to KLA-Tencor
7  Corporation as "KLA-Tencor" or simply "KLA" for
8  short.  And when I say "KLA," I mean KLA-Tencor
9  Corporation.  Can we have that understanding?
10  .   A.  Yes, we can.
11     Q.  All right.  So who interviewed you at KLA?
12     A.  Ken Levy, Ken Schroeder, and John Kispert.
13         MR. BELNICK:  Shirli, with apologies.  May
14  we take a break, a personal order break?
15         MS. WEISS:  Absolutely.  And, in fact,
16  please do interrupt me.  I have a tendency not to
17  remember to take breaks.  So by all means.  I see it
18  is 10:56.  Why don't we take a 10-minute break.
19         MR. BELNICK:  Thank you.
20         THE VIDEOGRAPHER:  Off the record.  The
21  time is 10:55 a.m.
22         (Off the record.)
23         THE VIDEOGRAPHER:  We are back on the
24  record.  The time is 11:06 a.m.
25  BY MS. WEISS:

**Page 63**

1      Q.  Mr. Nichols, I believe I asked you who
2  interviewed you before you were hired by KLA and I
3  think that you began to tell me.  And I wrote down
4  Mr. Schroeder, Mr. Kispert and Mr. Levy.  Did I get
5  that right?
6      A.  Yes.  And then one other person, Bob
7  Boehlke, B-o-e-h-l-k-e, I believe is how it's
8  spelled.
9      Q.  Okay.  And who did you understand that you
10  would be reporting to if you took the position?
11     A.  Mr. Boehlke.
12     Q.  And who was Mr. Boehlke?
13     A.  He was then the CFO.
14     Q.  And that's the Chief Financial Officer?
15     A.  That's correct.
16     Q.  And who was Mr. Kispert at that time?
17     A.  Do you mean what was his title?
18     Q.  Yes.
19     A.  Vice President of Finance.
20     Q.  And Mr. Schroeder, what was his title at
21  that time?
22     A.  Chief Executive Officer.
23     Q.  And Mr. Levy, who was he?
24     A.  At that time I believe he was the Chairman
25  of the Board of Directors.

**Page 64**

1      Q.  Okay.  And did the company make you an
2  offer?
3      A.  Yes.
4      Q.  And who did you negotiate the terms of
5  your employment with?
6      A.  Mr. Boehlke.
7      Q.  And did the terms of your offer include an
8  award of options?
9      A.  Yes.
10     Q.  And what did you -- did you negotiate
11  back and forth with Mr. Boehlke in terms of your
12  employment or did you simply take what he offered
13  you?
14     A.  I attempted to negotiate but ultimately
15  took what he offered me.
16     Q.  Okay.  And was it Mr. Boehlke who set your
17  salary compensation --
18     A.  Yes.
19     Q.  -- is that your understanding?
20     A.  Yes.
21     Q.  All right.  And did he also set the number
22  of options you would get when you joined the
23  company?
24     A.  So far as I know.
25     Q.  And do you recall what the terms were, as

**Page 65**

1  you sit there?
2      A.  No.
3          MS. WEISS:  Could you hear me okay?
4          THE VIDEOGRAPHER:  I was hearing you well
5  enough.
6          MS. WEISS:  What number are we up to now?
7          DEPOSITION REPORTER:  50.
8          MS. WEISS:  50, 5-0?
9          DEPOSITION REPORTER:  Correct.
10         MS. WEISS:  We will have marked next in
11  order Exhibit 50.
12         (Whereupon, Exhibit 50 was marked
13          for identification.)
14         MS. WEISS:  This will be 51 (indicating).
15         (Whereupon, Exhibit 51 was marked
16          for identification.)
17         MS. WEISS:  This will be 52 (indicating).
18         (Whereupon, Exhibit 52 was marked
19          for identification.)
20         MS. WEISS:  This will be 53 (indicating).
21         (Whereupon, Exhibit 53 was marked
22          for identification.)
23  BY MS. WEISS:
24     Q.  All right.  Mr. Nichols, turning your
25  attention to Exhibit 52.  Exhibit 52 appears to the

17 (Pages 62 to 65)

Page 66

1 a redlined draft dated October 7, 1999, addressed to
2 yourself, Stuart J. Nichols, and it is unsigned. It
3 has the typewritten signature of Robert J. Boehlke,
4 Executive Vice President, Chief Financial Officer.
5 It's not on company stationery.
6         Can you identify Exhibit 52, sir?
7    A.  How would you like me to identify it?
8    Q.  Can you tell me what it is?
9    A.  It appears to be a markup of an offer
10 letter to me from the company containing the
11 proposed terms of my employment.
12   Q.  Okay. And so did you receive an unsigned
13 offer letter and were invited to mark it up for
14 Mr. Boehlke and send it back? Do you recall?
15   A.  I don't recall. I strongly suspect that
16 I was not invited to mark it up but just did so
17 anyway.
18   Q.  All right. And the black lining and the
19 deletions on Exhibit 52, are those your negotiations
20 or proposed markups of the contract?
21   A.  Yes, they appear to be.
22   Q.  Did anybody else mark this document up?
23   A.  No.
24   Q.  Were you advised by counsel, by the way,
25 when you joined the company?

Page 67

1    A.  No.
2    Q.  And so your effort was to negotiate the
3 terms of your contract in your favor. Was that your
4 effort on Exhibit 52?
5    A.  Yes.
6    Q.  If you take a look at Exhibit 50.
7        Exhibit 50 appears to reflect an email
8 from yourself dated October 12th, 1999, to Bob
9 Boehlke. The subject is "Revised offer letter," and
10 it starts off, "Bob, greetings from Massachusetts.
11 Attached is a marked up version of your offer
12 letter. My changes are noted in revision format.
13 The notable changes are," and then there's a summary
14 of the changes.
15        So did you send this email to Mr. Boehlke
16 as part of the negotiation of the terms of your
17 employment with KLA?
18   A.  Presumably, yeah. I don't have a specific
19 memory of writing this, and I haven't -- this is the
20 first time I've seen it since I presumably sent it.
21 But, yeah, that's what it appears to be.
22   Q.  Okay. What did you understand --
23 what were you communicating in paragraph 3 to
24 Mr. Boehlke?
25   A.  What exactly do you mean?

Page 68

1    Q.  Paragraph 3 states, "Hiring bonus. We
2 had talked about the losses I will incur by not
3 completing the offer period for Phoenix ESPP
4 (conservatively, $2,000.)"
5        Do you see that?
6    A.  Yeah.
7    Q.  Does "Phoenix ESPP" stand for Employee
8 Stock Purchase Plan?
9    A.  Yes.
10   Q.  And were you communicating to Mr. Boehlke
11 that by taking employment at KLA, you would be
12 incurring a loss by not receiving a benefit from
13 the Employee Stock Purchase Plan at Phoenix, your
14 current employment? Is that what you were
15 communicating?
16   A.  Well, I wouldn't put it exactly that way.
17 I would not have received the benefit, that's
18 correct.
19   Q.  Okay. And you go on to state, "In
20 addition, there are some matching 401(k) dollars
21 (also roughly $2,000) and the value of unvested 'in
22 the money' options."
23        What were you referring to when you
24 were referred to "the value of the unvested 'in
25 the money' options" in your discussions with

Page 69

1 Mr. Boehlke?
2    A.  I'm referring to the stock options that I
3 held in Phoenix Technology stock where the exercise
4 price was less than the current market price.
5    Q.  Okay. And were you asking him to do
6 something with respect to the value of the unvested
7 in the money options as part of your employment?
8    A.  Well, yes. I was asking for a hiring
9 bonus in recognition of what I would be forgiving,
10 foregoing.
11   Q.  All right. And do you know if you got
12 that, what you were requesting?
13   A.  Well, you'd have to look at the paper
14 trail here. I truly don't remember.
15   Q.  Okay. Let's look at Exhibit 51.
16        That looks to me like it was the final
17 version of your offer, but you tell me. Exhibit 51
18 is a letter dated October 18th, 1999. It's
19 addressed to yourself. It appears to bear the
20 signature of Mr. Boehlke, and then below that
21 there's the terminology "Acceptance and
22 Acknowledgement," and then there's what appears
23 to be your signature.
24        Would you look at Exhibit 51 and tell me
25 if that's your signature on the second page under

18 (Pages 66 to 69)

Page 70

1  "Acceptance and Acknowledgement."
2      A.  Yes, it is.
3      Q.  All right.  And so his recommendation --
4  well, his statement was that you would be receiving
5  the salary that you requested in your markup; is
6  that correct?
7      A.  The salary, yes.
8      Q.  And in addition, that you would be
9  receiving 20,000 shares of -- an option to purchase
10  20,000 shares of KLA-Tencor stock --
11      A.  That's correct.
12      Q.  -- referenced in that first paragraph
13  under "Salary."
14          Do you see that?
15      A.  Yes.
16      Q.  All right.  And I believe you identified
17  your signature on the second page.  And then the
18  date October 25th, 1999.
19          Is that your handwriting?
20      A.  Yes.
21      Q.  And up above where the arbitration clause
22  is crossed out and there appears to be initials, are
23  those your initials?
24      A.  Yes.
25      Q.  And you crossed out that arbitration

Page 71

1  clause; is that right?
2      A.  Yes.
3      Q.  All right.  And then below where it says
4  "Start date," it says "TBD."  Does that stand for to
5  be decided?
6      A.  Or determined; yeah.
7      Q.  To be determined, okay.
8          And then the "(late November)."  Do you
9  see that?
10      A.  Uh-huh, yes.
11      Q.  All right.  And did you write that in?
12      A.  That appears to be my handwriting, yes.
13      Q.  Okay.  And did you start in approximately
14  late November of 1999?
15      A.  No.  I started -- immediately upon signing
16  the agreement I started doing tasks for KLA.
17      Q.  Okay.  When you say "doing tasks," were
18  you still physically located at Phoenix or did you
19  actually move into an office at KLA?
20      A.  Well, at this point right after I signed
21  the offer letter -- and actually, it may have even
22  been before I signed the offer letter -- there were
23  things that I was getting involved in.  And I had
24  an arrangement with Bob Boehlke that I would
25  essentially split my time for a period of time

Page 72

1  between Phoenix and KLA such that I would show --
2  I went pretty much every day I think to both
3  locations.
4      Q.  Okay.  So you continued at Phoenix and you
5  also started work for KLA.  Would that be correct?
6      A.  Yes.
7      Q.  And you were paid from day 1; is that
8  right?
9      A.  Yes, that's my recollection.
10      Q.  And where were you "housed,"
11  quote-unquote, in the company?
12      A.  Do you mean where was my office?
13      Q.  Where was your office?  I understand it
14  had more than one building.
15      A.  At this stage I was lo-- my office was
16  located in the building referred to as "Building A."
17      Q.  Okay.
18      A.  At 160 Rio Robles.
19      Q.  Okay.  All right.  Building A.  And which
20  floor were you on?
21      A.  The 2nd floor.
22      Q.  Where was Mr. Boehlke's office in relation
23  to your office?
24      A.  In that same suite; 50 feet from mine.
25      Q.  And it was essentially a suite where

Page 73

1  the executives had their offices.  Would that be
2  correct?
3      A.  Yes.
4      Q.  All right.  And you had the title of --
5  when you started you had what title?
6      A.  Vice President, General Counsel.
7      Q.  Were you also a corporate secretary right
8  from the day you started, or do you remember?
9      A.  I never was corporate secretary.
10      Q.  All right.  And then just for purposes
11  of identification, I have a new hire form that's
12  Exhibit 53.  What is a new hire form at the company?
13  What was a new hire form?  What was your
14  understanding of the function of the form?
15      A.  It is the form that people complete when
16  they commence their employment.
17      Q.  Okay.  And is it a form that you receive
18  from the human resources department?
19      A.  Yes.
20      Q.  And down below it appears to have your
21  signature and the date 10/25/99.
22          Do you see that?
23      A.  Yes.
24      Q.  And is that your signature and did you
25  date it that date?

19 (Pages 70 to 73)

Page 74

1    A. Yes.
2    Q. And next to that it's human resources. Do
3 you recognize that signature?
4    A. Yes.
5    Q. Whose is that?
6    A. It's Aparjo Dehal. I don't know if I'm
7 pronouncing that correctly.
8    Q. Was that a person in human resources?
9    A. Yes.
10    Q. And what did you understand -- as you came
11 aboard KLA-Tencor, what did you understand from your
12 discussions with Mr. Boehlke or others what your job
13 responsibilities were going to be?
14    A. Ultimately responsible for the legal
15 affairs of the company.
16    Q. What does that mean?
17    A. That means anything from commercial
18 transactions, employment advice, M&A, management of
19 litigation, some supervision of the incumbent patent
20 lawyer and so forth.
21    Q. What was your function with respect to SEC
22 filings? As you walked in the door, what did you
23 think your function was?
24    A. To review and, you know, provide input
25 from a legal perspective.

Page 75

·1    Q. Was part of your function going to be
2 advising the board?
3    A. Yes.
4    Q. And was part of your function going to be
5 advising the executive officers?
6    A. Yes.
7    Q. And was part of your function going to
8 be advising nonexecutive officers to the extent you
9 were called upon to do so at KLA?
10    A. Yes.
11    Q. Did you have -- as you came in, did you
12 have a staff at all?
13    A. I had an administrative assistant and a
14 patent lawyer, and then I had a non -- a person who
15 was not part of the legal department who was also
16 reporting to me.
17    Q. What was the patent lawyer's name?
18    A. Kevin McAndrews.
19    Q. And what was your administrative
20 assistant's name?
21    A. She left shortly after I arrived and I
22 don't remember her name.
23    Q. Okay. Did someone serve as your secretary
24 or assistant, whatever the terminology was, at KLA
25 while you were there?

Page 76

1    A. Are you asking me whether at all times I
2 had an assistant or a secretary?
3    Q. When you came aboard.
4    A. Oh, yeah.
5    Q. Okay. And that person left?
6    A. Yes.
7    Q. And do you remember the name of the person
8 who followed her in terms of those tasks?
9    A. Yeah. So then I had someone who was my
10 assistant for the first half, approximately, of
11 2000.
12    Q. What was her name or his name?
13    A. Her name was Sylvia Taheri, T-a-h-e-r-i.
14 "Sylvia" spelled with a "y." I believe.
15    Q. And your recollection is she stayed the
16 first half of 2000; is that right?
17    A. Yes.
18    Q. And then did someone follow her?
19    A. Yes.
20    Q. Who was that person?
21    A. Her name is Kery Bird, K-e-r-y, B-i-r-d.
22    Q. How long did Miss Bird stay as your
23 assistant?
24    A. From then until I left the company.
25    Q. And were the duties of Miss Bird and

Page 77

1 Sylvia -- I don't know how to pronounce her last
2 name -- essentially secretarial duties?
3    A. Yes.
4    Q. Did you have anyone that seemed to have
5 the duties of a paralegal there at KLA?
6    A. Not at that time. Eventually there was a
7 patent paralegal that we hired.
8    Q. What was that person's name?
9    A. Well, there were a couple. The first
10 one was named Heidi, H-e-i-d-i, I think, Opstedahl
11 (phonetic), I think is her last name, and I can't
12 even begin to try to spell that. And then she was
13 followed by another patent paralegal named Odette,
14 O-d-e-t-t-e, Devera, D-e-v-e-r-a.
15    Q. Okay. Was there anyone on the corporate
16 side who assisted from a legal standpoint? Any
17 junior attorney or --
18    A. What do you mean when you say "on the
19 corporate side"?
20    Q. In other words, all the other duties that
21 you described; commercial transactions, M&A.
22    A. Shortly after I joined the company I hired
23 a contract lawyer to handle transactional matters.
24 Her name was Corinne Tomeo, C-o-r-i-n-n-e, "Tomeo."
25 is spelled T-o-m-i-e-o -- no, T-o-m- -- I don't

Nichols, Stuart J. Esq.                                          1/27/2008

Page 78

1  know. T-o-m-e-o.
2      Q. How long did she stay?
3      A. A few months is all. Not very long.
4      Q. Okay. Anybody else that served more on
5  the transaction or corporate side, not IP?
6      A. After Corinne left I hired someone to take
7  over her responsibilities as a payrolled employee.
8      Q. Okay. What was that person's name?
9      A. Kim Jackson.
10     Q. Did Miss Jackson have a law degree?
11     A. Yeah. She still does, so far as I know.
12     Q. What did Miss Jackson do for you?
13     A. General -- really in the beginning it was
14 mostly commercial transactions supporting the sales
15 and procurement organizations. And as time went
16 on, she had increasing responsibility over a broad
17 segment of the issues that we dealt with.
18     Q. Did Miss Jackson ever attend Compensation
19 Committee meetings?
20     A. No.
21     Q. Did Miss Jackson ever attend board
22 meetings?
23     A. No.
24     Q. Did Miss Jackson prepare any of the
25 documentation that you interacted with with respect

Page 79

1  to either the Compensation Committee or the board?
2      A. I think that in the latter portion, and by
3  that I mean, you know, the last 12 months or so of
4  my tenure at KLA, she helped me with some matters
5  relating to the Compensation Committee.
6      Q. Is Miss Jackson still employed by KLA?
7      A. No.
8      Q. Where does she live?
9      A. Where does she live? I think in Palo
10 Alto, California.
11     Q. Do you know if "Jackson" is her married
12 name?
13     A. Given that she's not married, I don't
14 think it is.
15     Q. I think that means no.
16        Okay. Anyone else that you can identify
17 that helped you on the corporate or transaction
18 side? I have Miss Jackson and Corinne Tomeo.
19 Anyone else that filled that role at any time
20 while you were there?
21     A. For the last two years or so of my tenure
22 at KLA there was a transactional attorney that
23 worked as a contractor for the company, and her
24 name is Teri Little, L-i-t-t-l-e, T-e-r-i.
25     Q. And she worked as what again, did you say?

Page 80

1      A. She was mostly supporting the company's
2  procurement organization but also working on
3  sales-related transactions as well.
4      Q. Okay. Did she ever attend any
5  Compensation Committee meetings?
6      A. No.
7      Q. Board meetings?
8      A. No.
9      Q. Did she help you compile documentation for
10 either of those two types of meetings?
11     A. No.
12     Q. Okay. Anyone else in the general category
13 that I mentioned?
14     A. If your general category includes
15 transactional work?
16     Q. Yes, transactional work and corporate and
17 M&A.
18     A. There was -- when I joined the company
19 there was a lawyer in the sales organization that
20 was not part of legal and I -- he eventually
21 transferred over into the legal department. His
22 responsibility was to support the sales organization
23 on transactional matters.
24     Q. And his name was?
25     A. Alex, A-l-e-x, Yuan, Y-u-a-n.

Page 81

1      Q. Y-u-a-n. Okay.
2        Was there any assistant that you had
3  during your tenure -- let's put aside Miss Jackson;
4  you identified her -- that assisted you in
5  connection with anything having to do with
6  compensation?
7      A. No.
8      Q. When you needed to prepare materials for
9  any Compensation Committee meeting or board meeting,
10 who did you look to to assist you?
11     A. To the extent that I looked for
12 assistance, it would typically have been outside
13 counsel, Bret DiMarco.
14     Q. Okay. Not Miss Bird or Sylvia?
15     A. No. B-r-e-t, D-i-M-a-r-c-o.
16        MS. WEISS: Okay. Let's mark Exhibit 54.
17        (Whereupon, Exhibit 54 was marked
18        for identification.)
19 BY MS. WEISS:
20     Q. Okay. Exhibit 54 is a document that is
21 Bates stamped MLB/KLA-SEC 00011067 to 11072. It's
22 a document that was received from the SEC in
23 production in this litigation. It's entitled
24 "Minutes of the Meeting of the Board of Directors
25 of KLA-Tencor Corporation," dated November 16th,

21 (Pages 78 to 81)

Page 82

1    1999.
2         Would you make take a moment, sir, and
3    review it.
4         MR. BELNICK: Shirli, may I remark we do
5    have that document, but it doesn't bear the Bates
6    numbers you have.
7         MS. WEISS: Well, that's interesting.
8         MR. FICKES: The copy you gave us has the
9    Bates number of KLS-SEC002735 --
10        MR. BELNICK: 002735 through 002739,
11   prefaced by the initials KLS-SEC.
12        MS. WEISS: Okay. And why don't we use
13   the numbers that you just articulated. I must have
14   a different compilation set.
15   BY MS. WEISS:
16   Q.   Sir, would you take a moment to review
17   Exhibit 54 and tell me when you've done that.
18   A.   Okay. I've done that.
19   Q.   All right. Can you identify Exhibit 54?
20   A.   Yeah. These are minutes of a board
21   meeting of KLA-Tencor Corporation for a meeting
22   held November 16 of 1999.
23   Q.   All right. Thank you.
24        And in the second last page of the
25   compilation there appears to be on the minutes a

Page 84

1    Stu Nichols, who was elected Vice president and
2    General Counsel of the Company at the meeting and
3    Judith M. O'Brien from Wilson Sonsini Goodrich &
4    Rosati, the Company's outside counsel." And then
5    it says, "Mr. Levy acted as Chairman and led the
6    meeting; Mrs. O'Brien acted as Secretary and kept
7    the minutes."
8         Do you see that, sir?
9    A.   Yes.
10   Q.   All right. Does that refresh your memory
11   that Miss O'Brien kept the minutes but then you
12   signed them as present at the meeting and general
13   counsel?
14   A.   No. it doesn't refresh my memory in that
15   regard. I mean, I see what's written here and I
16   don't have any reason to doubt it, but I just don't
17   have a memory of that.
18   Q.   All right. And were minutes generally
19   taken at board of directors meetings that you
20   attended at KLA-Tencor?
21   A.   Yes.
22   Q.   And some of those minutes were taken by
23   you as general counsel. Would that be a correct
24   general statement?
25   A.   Yes.

Page 83

1    signature block for yourself as Vice President,
2    General Counsel. Is that your signature on the
3    minutes?
4    A.   Yes.
5    Q.   Okay. And did you in fact attend the
6    meeting referenced by the document?
7    A.   It appears that I did, yes.
8    Q.   Do you know if you prepared the notes from
9    which the typewritten minutes were prepared?
10   A.   No, I don't recall. I don't know.
11   Q.   Okay. Let's go through the minutes.
12   Okay. Under "Attendance and Quorum" the paragraph
13   states, "Present and at the meeting were chairman
14   Kenneth Levy and Directors James W. Bagley, Leo J.
15   Chamberlain, Richard J. Elkus, Dag Tellefsen, Jon D.
16   Tompkins, Dean O. Morton, Samuel Rubinovitz, Kenneth
17   L. Schroeder and Lida Urbanek, constituting a
18   quorum. Director Edward W. Barnholt was absent."
19        Do you see that?
20   A.   Yes.
21   Q.   And do you recall the names of those
22   people as people who served as members of the
23   board of directors of KLA-Tencor at the time?
24   A.   Yes.
25   Q.   Then it states, "Also present were

Page 85

1    Q.   And when you took the minutes for the
2    company, you did your best to accurately reflect the
3    information that was shown in the minutes; is that
4    correct?
5    A.   Yes.
6    Q.   And it's also correct that the minutes are
7    not a transcript of what occurred at the meetings;
8    correct?
9    A.   Correct.
10   Q.   And there was general discussion among
11   the participants that might not be reflected in the
12   minutes; is that correct?
13   A.   That's correct.
14   Q.   And as far as you know, what is stated in
15   the minutes, however, are statements of occurrences
16   and statements made that are reflected in the
17   minutes that you took. Would that be correct?
18   A.   You lost me on that question. Sorry.
19   Q.   Okay. To the extent that you took the
20   minutes of a corporation of KLA-Tencor and signed
21   the minutes, the statements made in the minutes, to
22   the best of your knowledge, would be the reflection
23   of what actually occurred or what was said that is
24   represented in the minutes as a general rule. Would
25   that be correct?

Page 86

1    A. Yes.
2    Q. And it was your intention to accurately
3  reflect what occurred at the meeting; correct?
4    A. Yes.
5    Q. Do you recall, sir, if the November 16th,
6  1999, meeting of the board is the first meeting of
7  KLA-Tencor that you attended?
8    A. Yes, it would have been the first meeting
9  that I attended.
10    Q. All right. Under "Election of Officers"
11  it shows, "Resolved: That the Board approved the
12  election of officers as attached hereto as Exhibit A
13  to serve at the discretion of the Board until their
14  successors are duly appointed and qualified." And
15  then attached on the last page is a list of
16  officers.
17      Would you review that list and tell me if
18  it comports with your recollection of who served as
19  officers at that time period for KLA-Tencor.
20    A. Yes. Yes.
21    Q. Okay. Anything that you recognize that
22  looks to you to be out of order?
23    A. Well, I hesitated a moment because I don't
24  see here a reference to a VP of HR, but at that time
25  I believe that our VP of HR was not a corporate

Page 87

1  officer. So, yeah, so this comports with my...
2    Q. All right. And so then briefly Ken Levy
3  was the Chairman of the Board at the time and
4  Mr. Schroeder was the Chief Executive Officer
5  and was also President --
6    A. Yes.
7    Q. -- is that your recollection?
8    A. That's my collection.
9    Q. And Mr. Dickerson, he was Chief Operating
10  Officer at the time?
11    A. Yes.
12    Q. And Mr. Boehlke served as the Executive
13  Vice President and Chief Financial Officer?
14    A. Correct.
15    Q. And Mr. Grady served as Executive Vice
16  President of the Wafer Inspection Group?
17    A. Yes.
18    Q. Mr. Neil Richardson, Ph.D., was Executive
19  Vice President of the E-Beam Inspection and
20  Meteorology [sic] Group; is that correct?
21    A. Metrology, not meteorology.
22    Q. Metrology Group; is that correct?
23    A. Yes.
24    Q. All right. And Arthur P. Schnitzer -- I
25  got that right -- was Executive Vice President,

Page 88

1  Strategic Business Development.
2      Do you see that?
3    A. Yes.
4    Q. Did he serve in any other capacity?
5    A. Yeah. You know, I believe at this time
6  Art Schnitzer was the VP of HR, not the VP of
7  Strategic Business Development. So that appears
8  to be an error.
9    Q. All right. And then there's Samuel H.
10  Harrell, Ph.D., Senior Vice President of Strategic
11  Business Development; is that correct?
12    A. Yes, that's correct.
13    Q. All right. Richard P. Wallace was Group
14  Vice President of Lithography and Films.
15      Do you see that?
16    A. Yes.
17    Q. Is that the same Richard Wallace that's
18  president today?
19    A. John Kispert is president; Rick Wallace is
20  the CEO.
21    Q. All right. And Rick Wallace, who's the
22  current CEO, is the same Richard Wallace that's
23  referred to here?
24    A. Yes.
25    Q. All right. And then your title below that

Page 89

1  is described as Vice President, General Counsel and
2  Assistant Secretary.
3      Do you see that?
4    A. Yes.
5    Q. And what was your function as assistant
6  secretary?
7    A. To handle corporate governance matters,
8  review and provide input on SEC filings, do board
9  minutes, prepare the proxy, those sorts of things.
10    Q. All right. And then John H. Kispert,
11  Vice President, Finance and Accounting.
12      Do you see that?
13    A. Yes.
14    Q. What was his role at that time period,
15  fall of 1999?
16    A. He had all -- he had responsibility for
17  all of the finance and accounting-related functions.
18  In other words, they -- those functions reported to
19  him at that time.
20    Q. All right. And so to the extent that
21  the company needed to account for its stock
22  option awards, that would have been Mr. Kispert's
23  responsibility; correct?
24    A. Yes.
25    Q. And under that is J. Dennis Fortino, Group

23 (Pages 86 to 89)