Page 90

1    Vice President, Reticle and Surfscan Group. Did I
2    get that right?
3        A.  Yes, you did.
4        Q.  All right.  And then under that, Larry W.
5    Sonsini.  And Mr. Sonsini was outside counsel; is
6    that correct?
7        A.  That's correct.
8        Q.  And he also served as the secretary of the
9    corporation; is that right?
10       A.  Yes.
11       Q.  And was Wilson Sonsini Goodrich & Rosati
12   the outside corporate counsel company at that time?
13       A.  One of them; yes.
14       Q.  Okay.  So we had marked a little bit
15   earlier your notebooks which I'm now going attempt
16   to identify for the record.  Your notebooks are all
17   in front of you.
18           MR. BELNICK:  If that's all you're going
19   it do, I don't mind if you go and I just hit the
20   bathroom so I don't bother everybody.
21           MS. WEISS:  Everybody will keep an eye on
22   me for you.
23           MR. BELNICK:  Okay.  I trust you.
24           You're in good hands, Stu.
25           MS. WEISS:  I did have a little list here

Page 91

1    at one point.  There was a list of how many were
2    marked.  Just bear with me for a second.
3           Here it is (indicating).  All right.
4    BY MS. WEISS:
5        Q.  Marked as Exhibit 41 is a copy of
6    a comp notebook and it bears Bates stamps
7    KT ACWP-PRIV00002541 through and including 2696.
8    The first page has the name "Stu Nichols" on it.
9           Sir, would you look at Exhibit 41 and
10   tell me if you can identify it.
11       A.  Well, before we do that, the stack I have
12   here goes through 2691, not 2696, so I'm not quite
13   sure.
14           MR. HEMANN:  Mine goes through 2696.
15           MR. FICKES:  Mine does as well.
16           MS. WEISS:  Okay.  Well, that's not good.
17   Yours is not complete.
18           Do we have an extra one of that?
19           MR. HEMANN:  He can borrow my copy.  We'll
20   switch.
21           MS. WEISS:  All right.  At the break we'll
22   supplement, absolutely.
23           So, again, the compilation goes through
24   2696.  I believe the witness has been provided with
25   a complete copy.

Page 92

1    BY MS. WEISS:
2        Q.  Could you identify Exhibit 41.
3        A.  This appears to be a copy of my
4    composition notebook that I maintained both
5    during the latter portion of my tenure at Phoenix
6    Technologies as well as during the first few months
7    of my tenure at KLA-Tencor.
8        Q.  All right.  And the first date that is
9    referenced on the first written page is 8/23/99.
10          Do you see that?
11       A.  Yes.
12       Q.  And is the handwriting in this compilation
13   your handwriting?
14       A.  Yes, it is.
15       Q.  Okay.  Could you tell me what you see as
16   the last date referenced in Exhibit 41.
17       A.  It looks -- it appears that there is an
18   entry on June 22nd.
19       Q.  Of 1999?
20       A.  No.  That would be 2000.
21       Q.  No, that would be 2000, wouldn't it?
22          You said June 22nd, 2000.  And what's the
23   Bates stamp, the last four digits of that entry?
24       A.  The beginning of the entry is 2694.  There
25   are some additional pages that don't appear to bear

Page 93

1    a date.
2        Q.  Okay.  Very good.
3           Turning your attention to what has -- what
4    has been marked as Exhibit 42.  It would be Bates
5    stamped KT ACWP-PRIV00002697 through and including
6    the same prefixes, last four digits 2893.
7           Do your numbers match that?
8        A.  Yes.
9        Q.  Okay.  That would be Exhibit 42.  And
10   could you identify it for the record.
11       A.  This appears to be a copy of a composition
12   notebook which I used while at KLA starting in June
13   of 2000.
14       Q.  Okay.  And the first date that's shown, I
15   think it is on the second page, is what?
16       A.  June 26th of 2000.
17       Q.  And the last date that is shown?
18       A.  The last date that I see here is -- it
19   appears to be May 15, 2001.
20       Q.  What's the Bates stamp, last four digits,
21   you're looking at?
22       A.  2889.
23       Q.  Okay.  4/30/01.  And then under that
24   what's the date that you see?
25       A.  It appears to be 5/15.

24 (Pages 90 to 93)

Nichols, Stuart J. Esq.                                      1/27/2008

---

Page 94

1    Q. And you infer that to be in 2001 --
2    A. Correct.
3    Q. -- right?
4       MS. WEISS: Okay. Do you want to take --
5       THE VIDEOGRAPHER: Yeah, change the tape.
6       MS. WEISS: We need to change the tape
7    here so we'll take a minute.
8       THE VIDEOGRAPHER: Okay. We are going off
9    the record.
10      Here marks the end of videotape No. 1,
11   Volume I, in the deposition of Stuart J. Nichols.
12      (Off the record.)
13      THE VIDEOGRAPHER: We are back on the
14   record.
15      Here marks the beginning of videotape
16   No. 2, Volume I, in the deposition of Stuart J.
17   Nichols. The time is 11:53 a.m.
18   BY MS. WEISS:
19   Q. Mr. Nichols, I'm not sure if I asked you,
20   but on Exhibit 42, is Exhibit 42 a collection of
21   your notations made contemporaneously with the dates
22   shown?
23   A. Generally, yes.
24   Q. Okay. And that's your handwriting that
25   appears in the compilation?

---

Page 95

1    A. Yes.
2    Q. Okay. And then moving to Exhibit 43, the
3    Bates stamp numbers of KT ACWP-PRIV00002894 to the
4    last four digits 3047.
5       Does that comport with your Exhibit 43?
6    A. Yes.
7    Q. Okay. And the front of the page says,
8    "Computation book Stu Nichols," under that "May
9    '01-April '02."
10      Do you see that, sir?
11   A. Yes.
12   Q. Is that your handwriting?
13   A. Yes.
14   Q. All right. And then on the third page,
15   the first entry, could you read that date.
16   A. 5/22/01.
17   Q. And is that in your handwriting?
18   A. Yes.
19   Q. And can you pick up on the last date entry
20   in the compilation, please.
21   A. The last date entry I see is on page 3041,
22   and that is -- that page bears a date of 4/2/02.
23   Q. Okay. And does the compilation contain
24   your handwritten notes made contemporaneously with
25   the events referenced?

---

Page 96

1    A. Again, I'll say generally. And the
2    reason I say that is because I don't know whether
3    in some instances I went back at a later date and
4    supplemented my handwritten notes.
5    Q. All right. We'll get into that in a
6    minute.
7       Moving to Exhibit 44. Exhibit 44 is a
8    computation book Bates stamped KT ACWP-PRIV00003048
9    through the same prefix, last four digits 3201.
10      Is that what you have, sir?
11   A. Yes.
12   Q. Okay. And the first page it says
13   "Stu Nichols." It has a telephone number of
14   408-875-2423. Under that the dates April 12th,
15   2002-November 8th, 2002.
16      Do you see that, sir?
17   A. Yes.
18   Q. Is that your handwriting?
19   A. Yes.
20   Q. Can you identify the first date shown in
21   the compilation?
22   A. April 12, 2002.
23   Q. And that's shown on page No. 3049, the
24   last four digits?
25   A. Yes.

---

Page 97

1    Q. And can you identify the last date in the
2    compilation?
3    A. 11/26/02, and that's on page 3199.
4    Q. All right. And you had the opportunity
5    to review these books briefly before the start of
6    the deposition. Does this compilation consist of
7    your handwritten notes?
8    A. Yes.
9    Q. And generally, were the notes made at or
10   around the event or conversation referenced in the
11   notes?
12   A. Generally, yes.
13   Q. Okay. Exhibit 45 is a computation book
14   Bates stamp No. KT ACWP-PRIV00003202 through and
15   including the last four digits, same prefix, 3357.
16      Do you see that?
17   A. Yes.
18   Q. The cover of the book has your name
19   "Stu Nichols," and below that "11/25/02-8/26/03."
20      Do you see that, sir?
21   A. Yes.
22   Q. Is that in your handwriting?
23   A. Yes.
24   Q. Can you identify the first date in the
25   compilation?

---

25 (Pages 94 to 97)

Page 98

1      A.  The first -- the first part of a date that
2  I see is on 3210, and the copy is such that the
3  first portion of the date does not appear, though
4  it's likely December 02 -- I'm sorry, December 13,
5  '02.  The first full date appears on 3212, and that
6  is -- and that appears 2702 -- oh, I see -- okay.
7          The copy is such that the 1 doesn't
8  appear, but if I look at the next page, two pages
9  later, it appears there is -- the first full date of
10 the whole book, that's 12/17/02, which leads me to
11 believe that the two pages previous on 3212, that
12 the 1 somehow got cut off in the copying and so that
13 would be a date of 12/17/02.
14     Q.  Okay.  Can you pick up a final date on the
15 compilation?
16     A.  8/26/03.
17     Q.  Okay.  Thank you.
18         Exhibit 46 is computation book Bates
19 stamped KT ACWP-PRIV00003358 through and including,
20 same prefix, last four digits 3512.
21         Do you see that?
22     A.  Yes.
23     Q.  The first page states "Stu Nichols
24 extension 2423," under that 8/28/03 to 4/27/04.
25         Is that your handwriting, sir?

Page 99

1      A.  Yes.
2      Q.  Can you tell me what the first date is
3  that you pick up in the compilation?
4      A.  8/28/03.
5      Q.  And the last date in the compilation?
6      A.  6/9/04.
7      Q.  Okay.  You had a brief opportunity to
8  review this book prior to the deposition.  Does it
9  consist of your handwritten notes?
10     A.  Yes.
11     Q.  And were the notes generally made at
12 or around the time of the event or conversation
13 referenced?
14     A.  Yes.
15     Q.  Exhibit 47 is a computation book Bates
16 stamped KT ACWP-PRIV00003513 through 3665.  Is that
17 correct, sir?
18     A.  Yes.
19     Q.  Okay.  The title is "Stu Nichols,
20 408-875" -- is that a 2 or a 1?
21     A.  2.  2423.
22     Q.  --"-2423."  And April 2004-April '05.
23         Is that your handwriting, sir?
24     A.  Yes.
25     Q.  What is the first date you see in the

Page 100

1  compilation?
2      A.  5/5/04.
3      Q.  And the last date?
4      A.  The last date that shows in this document
5  appears on page 36- -- 3655, and the date is
6  4/14/05.
7      Q.  Okay.  Does the compilation consist of
8  your handwritten notes created on or around the
9  event or conversation that you reference?
10     A.  Generally, yes.
11     Q.  Okay.  Two more, sir.
12         Exhibit 48 is a compilation
13 of a computation notebook Bates stamped
14 KT ACWP-PRIV00003666 through and including the
15 same prefix, the last the four numbers 3818.
16         Do you see that?
17     A.  Yes.
18     Q.  The first page states "Stu Nichols
19 408-875-2423," and under that "April '05-April '06."
20         Is that your handwriting, sir?
21     A.  Yes.
22     Q.  Can you tell me the first date referenced
23 in the compilation?
24     A.  The first date written in the compilation
25 is 4/28/05.

Page 101

1      Q.  And the last date?
2      A.  It appears to be May 17.  There's no year,
3  but based on what's written on the cover page, that
4  would be '06.
5      Q.  All right.  Does Exhibit 48 contain your
6  handwritten notations, sir?
7      A.  Yes.
8      Q.  And were they made generally at or around
9  the time of the event or conversation referenced in
10 the notes?
11     A.  Yes.
12     Q.  Exhibit 49.  Exhibit 49 -- excuse
13 me -- is a computation book Bates stamped
14 KT ACWP-PRIV00003819 through and including the
15 same prefix, 3855.
16         Do you see that, sir?
17     A.  Yes.
18     Q.  The title page "Computation Book Stu
19 Nichols 408-875-2423," and under that "April 21,
20 2006-August '06."
21         Do you see that?
22     A.  Yes.
23     Q.  Is that your handwriting?
24     A.  Yes.
25     Q.  What is the first date that is referenced

26 (Pages 98 to 101)

Nichols, Stuart J. Esq.                                                1/27/2008

Page 102

1  in the compilation, sir?
2      A.  4/21/06.
3      Q.  And what is the final date that's
4  referenced in the compilation, sir?
5      A.  5/12/06.
6      Q.  Okay.  Thank you.
7          Mr. Nichols, I'm going to ask you a few
8  questions about your custom and practice in creating
9  these notations and then we'll take a break for
10  lunch.
11         First of all, apart from the notebooks,
12  with respect to your calendars, how did you keep
13  a calendar during the time period that you were
14  employed at KLA?
15     A.  Generally -- well, I believe exclusively
16  I kept my calendar on Outlook.
17     Q.  Did you make your own entries?
18     A.  Occasionally, but not often.
19     Q.  Who made the entries on your behalf, if
20  anybody?
21     A.  Kery Bird.
22     Q.  Okay.  And when she wasn't there, did
23  the person who served in her function make those
24  entries?
25     A.  Yeah.  Or I would -- or I would do it.

Page 103

1      Q.  Okay.  Did you have anywhere else that you
2  made a notation of a meeting that was upcoming?
3      A.  Do you mean a handwritten calendar that I
4  carried around?
5      Q.  Yes.  Did you ever have any handwritten
6  calendars?
7      A.  Not that I recall.  I may have at the
8  very beginning at KLA, but I don't have a specific
9  recollection of that.
10     Q.  Do you know whether or not your Outlook
11  calendar entries for the time period that you were
12  at KLA remained in the possession of KLA?
13     A.  Well, presumably.
14     Q.  Did you ever have occasion to go back and
15  look through them for any reason?
16         MR. BELNICK:  When?  Excuse me.  Since he
17  left KLA?
18         MS. WEISS:  Yes, thank you.
19         THE WITNESS:  No.
20  BY MS. WEISS:
21     Q.  No?
22     A.  I did not go back -- after I left KLA, I
23  never went back and looked at my calendar.
24     Q.  So you were never asked to print out all
25  your calendar entries, for example, in connection

Page 104

1  with the KLA options investigation or anything like
2  that?
3      A.  No.
4      Q.  If that was done, someone else did it?
5      A.  Correct.
6      Q.  Okay.  Could you first of all describe
7  generally what was your custom and practice in terms
8  of making entries in the computation books which are
9  exhibits 41 through 49.
10     A.  Well, it varied a little bit over time so
11  how would you like me to slice that up?
12     Q.  Start with the beginning and move forward.
13     A.  Yeah.  So at the beginning I didn't always
14  enter all of my notes in a composition book, and
15  then over time I eventually -- when I would go to a
16  meeting I would take my spiral notebook with me and
17  would try to reflect all of my notes in those books.
18     Q.  So in the beginning were your notes taken
19  in more than one place, for example?
20     A.  Yes.
21     Q.  All right.  And with respect to the notes
22  that were taken outside of the spiral notebooks, how
23  did you keep those notes?
24     A.  I don't know that I did.  I have no idea
25  where those are.

Page 105

1      Q.  So you might have left those in a variety
2  of places and didn't necessarily retain them;
3  correct?
4      A.  Correct.
5      Q.  There was no litigation pending at that
6  time; correct?
7      A.  Correct.
8      Q.  All right.  And so it would be a true
9  statement to say that the notes reflected in
10  exhibits 41 through 49 are not necessarily all of
11  the notes that you took during the time period that
12  you were at KLA; correct?
13     A.  That's correct.
14     Q.  And I've noticed in going through the
15  notes that there are sometimes several week gaps
16  between the calendar entries.  So could you address
17  that.  What was the usual way that that occurred?
18     A.  Well, that would occur because I had gone
19  to meetings with a notepad separate from my spiral
20  notebook.  It could have also been the case that I
21  attended a series of meetings where the discussion
22  wasn't something that I needed to make -- I felt I
23  didn't need to make a written note of it for myself.
24     Q.  And I suppose it's true that you had
25  conversations with people that are not necessarily

Nichols, Stuart J. Esq.                                    1/27/2008

Page 106

1  reflected in any notes; is that true?
2      A.  Yes.
3      Q.  And you attended meetings that you didn't
4  make any notes of.  Would that be correct?
5      A.  Correct.
6      Q.  When you left KLA, do you know what became
7  of any of the notes that you had at KLA at the time
8  that you left their employ?
9      A.  I'm not exactly sure what you're going
10 after here.  Can you repeat the question?
11     Q.  For example, sometimes when people exit,
12 they do exit interviews and they say, "All my notes
13 that I ever took at the company are," you know, "in
14 the bottom left-hand drawer here," and they point
15 them out.  Did you have any debriefing session where
16 you pointed out where the notes were that you took
17 during the time that you were general counsel?
18     A.  No.  When I went to the company to clean
19 out my office, these notebooks were on my shelf and
20 I delivered them to KLA's outside firm.
21     Q.  Okay.  And the computer that had the
22 Outlook calendar entries, is that the same computer
23 that Skadden took custody of?
24     A.  Well, yes.  However, you have to recognize
25 that all that data is in Outlook and it's therefore

Page 107

1  on the company's server.  There's nothing in terms
2  of calendar entries that would have resided solely
3  on my computer.  It would have been on the
4  network -- on the servers for the network.
5      Q.  I've noticed in going through your notes
6  that there are occasions when statements are quoted.
7  Did you have a custom and practice of taking notes
8  where you used quotation marks?
9      A.  A custom and practice?  I don't know that
10 I would put it that way.  There could be a variety
11 of reasons why I would want to remember specifically
12 what was said, but I can't resolve that into a rule
13 of when I did it and when I didn't do it.
14     Q.  Okay.  But I guess what I'm asking is:
15 When I see a quotation, is it generally true that
16 you are writing down what someone who is speaking
17 to you is saying rather than what you are saying to
18 that person?
19     A.  I think -- yes, I think generally that's
20 true.
21     MS. WEISS:  Okay.  All right.  So I'm
22 going to go to another subject area.  If you guys
23 want to grab a sandwich, this is a good time to do
24 that.
25     THE VIDEOGRAPHER:  Off the record.  The

Page 108

1  time is 12:14 p.m.
2      (Whereupon, lunch recess was taken
3      from 12:14 p.m. until 12:45 p.m.)
4      THE VIDEOGRAPHER:  We are back on the
5  record.  The time is 12:45 p.m.
6  BY MS. WEISS:
7      Q.  Good afternoon, Mr. Nichols.
8      A.  Good afternoon.
9      Q.  You're familiar with a memorandum dated
10 March 19th, 2001, that you sent to Mr. Kenneth
11 Schroeder with copies to Mr. Kispert, Miss Lamb
12 and Miss Nyberg; is that correct?
13     A.  Yes.
14     Q.  Okay.  Prior to that memorandum, did you
15 have occasion to give advice about KLA's option
16 granting program?
17     A.  Not that I recall.
18     Q.  Can you tell me who Maureen Lamb -- well,
19 first of all, what was her function when you were at
20 KLA?  Did you know her?
21     A.  Yes, I knew her.  And her function at
22 various times was to be the Corporate Controller and
23 later the Vice President of Finance and Treasurer.
24     Q.  And Mr. Kispert?
25     A.  When I joined the company, he was the

Page 109

1  Vice President of Finance, or some similar title,
2  and -- I guess it was Vice President of Finance and
3  Accounting.  And then in I believe it was mid 2000,
4  the middle of the year 2000, he was appointed to
5  Chief Financial Officer.
6      Q.  And Miss Nyberg?
7      A.  She was the -- excuse me -- Senior
8  Director of Compensation or maybe Compensation
9  and Benefits.  I'm not sure.
10     Q.  Okay.  So going back to Mr. Kispert.  From
11 your perspective as general counsel, what did you
12 believe his role was first as Vice President of
13 Finance and Accounting?  Would you generally
14 describe what you thought he was responsible for.
15     A.  Mr. Kispert had ultimate responsibility
16 for matters relating to the finance and accounting
17 organizations.
18     Q.  What does that mean to say he had
19 "ultimate responsibility" for them?
20     A.  Those functions reported to him.
21     Q.  What was his day-to-day responsibility,
22 from your perspective?
23     A.  Now we're talking about --
24     Q.  Still when he was Vice President of
25 Finance and Accounting.

28 (Pages 106 to 109)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 110

1     MR. BELNICK: This. I believe, would
2  require him to disclose privileged information.
3  KLA's counsel agrees and so we will abide by their
4  objection.
5     MS. WEISS: Okay. Which privilege are you
6  asserting?
7     MR. BELNICK: Attorney-client.
8     MS. WEISS: Only?
9     MR. BELNICK: I believe so. If work
10  product is involved here, I'd rather not be the one
11  to have to parse --
12     MS. WEISS: Okay. If work product is
13  involved, you need to state for the record --
14     MS. HEINTZ: We will object on the basis
15  of attorney-client and work product.
16     MS. WEISS: Okay. I'm going to voir dire
17  the witness on work product.
18  BY MS. WEISS:
19     Q. Did you come to an understanding of
20  what Mr. Kispert's responsibilities were as Vice
21  President of Finance and Accounting in anticipation
22  of litigation?
23     MR. BELNICK: Of any litigation?
24     THE WITNESS: No.
25  BY MS. WEISS:

Page 111

1     Q. All right. With respect to Mr. Kispert,
2  when he became Chief Financial Officer, from your
3  perspective as general counsel, what did you believe
4  his responsibilities were?
5     A. His -- I thought -- now, this is
6  different. Now the question --
7     MS. WEISS: You know, I think that you're
8  speaking quietly. If you can bring it up a little
9  higher.
10     THE VIDEOGRAPHER: I only have a room mic.
11     MS. WEISS: I think you might have him
12  switched. You have Mr. Belnick as Mr. Fickes.
13     DEPOSITION REPORTER: Do I have them
14  switched?
15     MR. BELNICK: It's an honor.
16     MS. WEISS: All right. So now the
17  question is the same question except with respect
18  to the CFO. Could you -- are you asserting the
19  privilege with respect to his perception of --
20  Mr. Nichols' perception of Mr. Kispert's
21  responsibilities as Chief Financial Officer?
22     MR. BELNICK: As a general matter, I don't
23  think it's privileged unless KLA thinks otherwise.
24     MS. HEINTZ: It's getting difficult to
25  parse through these as the questions go on.

Page 112

1     MS. WEISS: I'm sorry. What's your last
2  name?
3     MS. HEINTZ: Miss Heintz.
4     MS. WEISS: Miss Heintz, are you asserting
5  the attorney-client privilege with respect to my
6  questions of Mr. Nichols as to what his perception
7  of Mr. Kispert's duties were as Chief Financial
8  Officer on the grounds of the attorney-client
9  privilege?
10     MS. HEINTZ: You said from his perspective
11  as the general counsel?
12     MS. WEISS: Yes.
13     MS. HEINTZ: Yes.
14     MS. WEISS: Are you also asserting work
15  product protection?
16     MS. HEINTZ: Not at this time.
17  BY MS. WEISS:
18     Q. Okay. And to be clear, Mr. Nichols,
19  you did not come to an understanding of what
20  Mr. Kispert's responsibilities were as Chief
21  Financial Officer in anticipation of litigation;
22  correct?
23     A. That's correct.
24     Q. As general counsel, what was your
25  understanding of Miss Lamb's responsibilities as

Page 113

1  Corporate Controller during the time she held that
2  function?
3     MS. HEINTZ: I'm going to object to this
4  on the basis of attorney-client privilege.
5     MS. WEISS: But not attorney work product?
6     MS. HEINTZ: Not at this time.
7     MS. WEISS: Same question with respect
8  to Miss Lamb as Vice President of Finance and as
9  Treasurer. Same answer?
10     MS. HEINTZ: Yes.
11  BY MS. WEISS:
12     Q. And it would be correct, Mr. Nichols,
13  that you did not come to an understanding of the
14  roles of Miss Lamb as Corporate Controller or
15  as Vice President of Finance and Treasurer in
16  anticipation of litigation; correct?
17     A. That's correct.
18     Q. Moving to Miss Nyberg. What was your
19  perception of her responsibilities from your
20  perspective as general counsel?
21     MS. HEINTZ: Same objection.
22  BY MS. WEISS:
23     Q. And you did not come to your understanding
24  of her responsibilities as Director of Compensation
25  and Benefits in anticipation of litigation; correct.

29 (Pages 110 to 113)

**Page 114**

1   sir?
2       A.  That's correct.
3           MS. WEISS:  Okay.  So I'll mark next in
4   order which we're at 55.
5           (Whereupon, Exhibit 55 was marked
6           for identification.)
7           MS. WEISS:  Okay.  Exhibit 55, for the
8   record, is a compilation of several pages, Bates
9   Nos. KT ACWP-PRIV00004298 through and including the
10  same prefix, last four digits 4304.  The first page
11  of the compilation is an email from Stuart Nichols
12  dated January 5th, 2000.  Okay.  It shows Greenwich
13  Mean Time, which I'm not exactly sure how to
14  translate that, but we will at some point translate
15  it.
16          The email is apparently sent to Ken Levy
17  and Bob Boehlke.  The subject is "Option program
18  milestones."
19          First, the email states, "Here is my first
20  stab at a series of milestones.  Ken, I suspect that
21  you may be interested in more granularity than I've
22  outlined here.  If so, let me know what you would
23  like to see added.  Stu."
24  BY MS. WEISS:
25      Q.  Mr. Nichols, did you send Exhibit 55 to

**Page 115**

1   Mr. Levy and Mr. Boehlke on January 5th as shown?
2           MR. BELNICK:  You can answer it.
3           THE WITNESS:  I don't have a specific
4   memory of this email as I sit here.  I don't doubt
5   that I did.
6   BY MS. WEISS:
7       Q.  Okay.  This email was produced from the
8   corporate records of KLA-Tencor.  You have no reason
9   to believe that you did not send the email as shown
10  here.  Would that be correct?
11      A.  Correct.
12      Q.  There are going to be some things that you
13  don't remember because of the passage of time.  We
14  understand that so you just need to say that and
15  we'll move on.
16          There are several attached pages to the
17  email.  Did you prepare the attached pages to the
18  email, Mr. Nichols?
19      A.  I don't know.
20      Q.  Does that mean you don't recall?
21      A.  That means I don't recall.
22      Q.  Generally would it have been your practice
23  to review the attached pages of any email that you
24  sent?
25      A.  Yes.

**Page 116**

1       Q.  So if the attached pages which refer to
2   an option transfer program were prepared by someone
3   else at your request, you would still have reviewed
4   them before sending them out to Mr. Levy and
5   Mr. Boehlke.  Can we assume that's true?
6       A.  Well, except that you're suggesting that I
7   had this prepared at my request.  I don't know that
8   to be true.  It could have been prepared completely
9   independently of my request.
10      Q.  Okay.  The first comment says, "Here is my
11  first stab at a series of milestones."
12          Does that comment refresh your
13  recollection that you had something to do with
14  the preparation of the attached?
15      A.  It certainly would indicate from the words
16  written here that I would have.  I don't have a
17  memory of preparing this schedule.  It could well
18  have been prepared —
19          MR. BELNICK:  Well, the question is:  Do
20  you have an independent recollection?
21          THE WITNESS:  No, I don't.
22  BY MS. WEISS:
23      Q.  You don't recall preparing the schedule.
24  But if you sent the schedule out to Mr. Levy and
25  Mr. Boehlke, it would have been a schedule that you

**Page 117**

1   reviewed before sending it; correct?
2       A.  Yes.
3       Q.  And if you characterized it as your "first
4   stab at a series of milestones," it would have been
5   something, would it not, Mr. Nichols, that you had
6   something to do with; correct?
7           MR. BELNICK:  Object to the form.  But I
8   think he's answered.
9           THE WITNESS:  No, that's that not correct.
10  Something to do with, I suppose.  But I don't have
11  any idea whether this schedule was prepared by
12  someone else.  And the "stab" that I'm alluding to
13  is a minor revision of something on here.
14          So I don't know that I prepared it.  I
15  certainly would have reviewed it before I sent it
16  out.  That would have been my practice.
17  BY MS. WEISS:
18      Q.  Does anything about the attachment refresh
19  your recollection about what the option program
20  milestones were?  What the general subject matter
21  was?
22      A.  Well, I have a general memory of the
23  option program.  Your question assumed that I needed
24  to have my memory refreshed on the program itself.
25      Q.  Thank you.  So let me back up.

30 (Pages 114 to 117)

Page 118

```
 1        What was the option program that was being
 2   discussed in this email?
 3        MS. HEINTZ: We're going to object to that
 4   question.
 5        MS. WEISS: And what's your basis?
 6        MS. HEINTZ: On the basis of
 7   attorney-client privilege.
 8        MS. WEISS: And you're instructing him not
 9   to answer?
10        MS. HEINTZ: We are.
11        MS. WEISS: Are you objecting on the basis
12   of the work product protection?
13        MS. HEINTZ: No; yes.
14   BY MS. WEISS:
15        Q.  Mr. Nichols, did you send Exhibit 55
16   to Mr. Levy and Mr. Boehlke in anticipation of
17   litigation?
18        A.  I believed that there was a potential for
19   litigation relative to this program.
20        Q.  So is the answer yes?
21        A.  Yes.
22        Q.  Let me read from a definition of the
23   terminology "anticipated litigation" from the
24   Ninth Circuit case because I know the terminology
25   is not self-explanatory.
```

Page 119

```
 1        Quote, "A document was created because of
 2   the anticipated litigation and would not have been
 3   created in substantially similar form but for the
 4   prospect of that litigation."
 5        A.  Okay.  Then --
 6        MR. BELNICK: Whoa, whoa, whoa, whoa.
 7   There's no question.
 8   BY MS. WEISS:
 9        Q.  Applying that definition -- which, by the
10   way, this is from in re Grand Jury Subpoena 357
11   Fed.3rd, 900, at pages 907 to 910.  Applying that
12   definition, was this document, Exhibit 55, created
13   in anticipation of litigation?
14        MS. HEINTZ: We're going to object.  The
15   witness has testified that this document was created
16   in anticipation of litigation or communication made
17   in anticipation of litigation.  So we will request
18   that the witness not answer the question.
19        MR. FICKES: I have an objection, too.  We
20   are objecting on the grounds that it asks for a
21   legal conclusion.
22        THE VIDEOGRAPHER: Excuse me.  One moment.
23   I only have that room mic, you guys.  You need to
24   bring your voice up or we won't have it.
25        MR. FICKES: Sorry.  I'll do it louder.
```

Page 120

```
 1   We're objecting on the grounds that it asked the
 2   witness to make a legal conclusion.
 3   BY MS. WEISS:
 4        Q.  Okay.  Mr. Nichols, I'm asking you to
 5   testify as to facts.  Did you create this document,
 6   Exhibit 55, in anticipation of litigation under the
 7   definition that I just read to you?
 8        MR. BELNICK: I believe KLA has objected
 9   to that, Miss Weiss, unless I'm wrong.
10        MS. HEINTZ: We have objected to that.  We
11   can argue over the definition of "work product
12   privilege" over papers.  We have objected to it.
13   The witness has testified that he created the
14   document in anticipation of litigation.  We request
15   that he does not answer the question,
16        MS. WEISS: Counsel, after I read the
17   definition, according to the Ninth Circuit, I
18   believe that the witness was about to change his
19   testimony.  Now --
20        MR. BELNICK: But I don't think there's a
21   basis for that, Miss Weiss --
22        MS. WEISS: Well, why don't you let him
23   answer the question?  He can say yes or no.
24        MR. BELNICK: I'm not objecting.  I'm
25   following -- as I told you, the witness and I are
```

Page 121

```
 1   following the direction of his former client.  But
 2   I just want you to know I'm just saying don't assume
 3   when he started to talk before a question was
 4   answered that he was about to disagree or agree
 5   with something he said before.  I haven't the
 6   slightest --
 7        MS. WEISS: Then he can tell me that.  I
 8   just need him to answer the question.  The work
 9   product protection is only triggered by specific
10   facts.  I need to get his answer as to whether or
11   not those facts existed.  If he says that they did,
12   we'll move on.
13        MR. BELNICK: Well, he did testify that
14   he -- I may not be doing this word for word, Shirli.
15   But he did testify that he thought litigation
16   might well result from the program discussed in
17   Exhibit 55.  That's the answer.
18        Now, asking him to apply the definition
19   from a Ninth Circuit case, whether or not that sets
20   a prevailing rule, I don't have the slightest idea
21   in the Ninth Circuit.  That question KLA has taken
22   exception and asked him not to answer so he's not
23   answering.
24        MS. WEISS: So I'm going to repeat the
25   question for the record and then if you instruct him
```

Page 122

1  not to answer, then I'll have a clear record. When
2  I say "you," I mean either of you.
3          MR. BELNICK: I understand. Well, all
4  right. Then I'll have to tell you again: If I
5  object, it's not me objecting as his counsel. It's
6  me objecting so that my client does not in any way
7  violate the instructions of his former client, which
8  he is obliged to follow as a matter of law and
9  ethics, as we all know.
10 BY MS. WEISS:
11     Q. Mr. Nichols, was Exhibit 55 created
12 because of anticipated litigation and would not have
13 been created in substantially similar form but for
14 the prospect of that litigation?
15         MS. HEINTZ: We're instructing Mr. Nichols
16 not to answer that question. It's calling for a
17 legal conclusion and there is too much legal parsing
18 to that question. He has already testified he
19 created the document in anticipation of litigation.
20 On that basis, we're requesting that he does not
21 answer the question.
22         MS. WEISS: Counsel, I am entitled to get
23 the factual basis of a conclusory statement that he
24 created it in anticipation of litigation. I've read
25 to you from the Ninth Circuit; I've quoted to you

Page 123

1  from the Ninth Circuit. Are you instructing him
2  not to tell me whether or not this Exhibit 55 is
3  created in such a way to meet the standard that I
4  just explained? You're telling him he cannot even
5  answer that question?
6          MS. HEINTZ: You're asking him to answer
7  a question that invoked -- the right to invoke the
8  attorney work product.
9          MS. WEISS: Well, Counsel, KLA has the
10 burden of proof on the work product. And as best as
11 I can tell, you're not only not carrying your burden
12 of proof, but you're preventing me from asking
13 foundational questions that would establish one
14 way or the other whether or not the privilege is
15 asserted in good faith.
16         And so I'm going to assume that it's being
17 asserted in bad faith at this point. We're going to
18 make our record and I am going to explain that to
19 the court.
20         MS. HEINTZ: There's also the
21 attorney-client privilege that has been invoked
22 here. And your question also requests information
23 that is protected by the attorney-client privilege.
24         MS. WEISS: Yes. And you've made your
25 record on that.

Page 124

1          All right. I think you've been instructed
2  not to answer so I will move on to the next exhibit,
3  Mr. Nichols.
4          (Whereupon, Exhibit 56 was marked
5          for identification.)
6          MR. BELNICK: Okay. The witness has looked
7  at it.
8          MS. WEISS: All right. Let me just get my
9  date here.
10         All right. Exhibit 56 is a compilation of
11 emails Bates stamped KT ACWP-PRIV00004938 through
12 and including the same prefix, 4940.
13         It's an email chain. The first email in
14 the exhibit begins on 4939. It's dated January 5th,
15 2000, 1:01 p.m., from Leslie Wilson to Stu Nichols
16 Mark Nordstrom, Tracy Laboy, Mike Kahn and Joy
17 Nyberg, and also to raman.chitkara@u.pwcglobal.com.
18 The subject is "Stock Options for Outside
19 Consultants" and the importance is identified
20 as high.
21 BY MS. WEISS:
22     Q. Mr. Nichols, do you see that you are
23 shown as one of the recipients of this email from
24 Ms. Wilson on Exhibit 56?
25     A. Yes.

Page 125

1      Q. Could you tell me who Leslie Wilson is?
2      A. Do you mean what her title was at KLA?
3      Q. Yes.
4      A. Well, it appears from the email that she
5  was the Director of Global Compensation Benefits and
6  HRIS.
7      Q. And you say that because she probably
8  signed it somewhere.
9          MR. FICKES: On page 49 --
10 BY MS. WEISS:
11     Q. Yes, there it is (indicating).
12         And do you remember her at the company?
13     A. Very vaguely.
14     Q. Generally speaking, what was the Director
15 of Global Compensation Benefits and HRIS responsible
16 for at the company at that time?
17     A. Well, I have no idea what the HRIS part
18 of it has to do with -- I mean, what the HRIS
19 responsibilities were. Compensation benefits, of
20 course, would be designing compensation and benefits
21 programs for employees.
22     Q. Okay. But did you know -- did you observe
23 at the time what she appeared to be responsible for
24 functionally at the company? She was the lady who
25 did what? Can you answer that?

Nichols, Stuart J. Esq.                                                1/27/2008

Page 126

1    MR. BELNICK: If you can't, you can't.
2    THE WITNESS: Well, I hardly interacted
3  with her. I think she left shortly after this. I
4  don't know what she was responsible for. All I'm
5  telling you is --
6    MR. BELNICK: He's reading her title from
7  the email.
8    THE WITNESS: Below her name is the title
9  of "Director of Global Compensation Benefits and
10  HRIS."
11  BY MS. WEISS:
12    Q. Okay. Who was Mark Nordstrom at that
13  time? What was his function?
14    A. He was the company's treasurer.
15    Q. Did he have any accounting functions, to
16  your perception?
17    A. Not so far as I know.
18    Q. Who did he report to?
19    A. John Kispert. Well, either John Kispert
20  or Bob Boehlke. I'm not completely sure.
21    Q. Who was Tracy Laboy at that time in terms
22  of function?
23    A. At that time Tracy Laboy was responsible
24  for stock administration.
25    Q. And what was stock administration

Page 127

1  responsible for?
2    A. The recordkeeping and other actions
3  required in connection with the granting of stock
4  options.
5    Q. Did she enter dates into the company
6  software system regarding options, if you know?
7    MS. HEINTZ: We're going to object to that
8  and instruct the witness not to answer on the basis
9  of attorney-client privilege.
10    MS. WEISS: Okay. Is that the only
11  privilege you're asserting?
12    MS. HEINTZ: You can ask whether or not
13  he found out this information in anticipation of
14  litigation.
15  BY MS. WEISS:
16    Q. Did you learn Miss Laboy's role in
17  anticipation of litigation?
18    A. No.
19    MS. WEISS: So you're instructing him
20  not to answer with respect to all of my questions
21  concerning Miss Laboy's functions, roles and actions
22  within the company; is that right?
23    MS. HEINTZ: Yes.
24  BY MS. WEISS:
25    Q. Okay. Who is Mike Kahn, if you know, sir,

Page 128

1  in terms of function?
2    A. I believe at that time Mike Kahn was
3  acting as the VP of HR.
4    Q. Okay. And what was your perception as
5  general counsel of his role as VP of HR in terms of
6  function at that time?
7    MS. HEINTZ: We're going to object to that
8  on the basis of attorney-client privilege.
9  BY MS. WEISS:
10    Q. Did you learn about Mr. Kahn's role in
11  anticipation of litigation?
12    A. No.
13    Q. Moving to Joy Nyberg. What was
14  Miss Nyberg's role at the time of this email?
15    MS. HEINTZ: We're going to object to that
16  on the basis of attorney-client privilege.
17  BY MS. WEISS:
18    Q. Did you learn about Miss Nyberg's role and
19  functions in anticipation of litigation?
20    A. No.
21    Q. There's a reference to what appears to be
22  a person from PWC Global.
23    Do you see that, sir?
24    A. Yes.
25    Q. Were the outside auditors for KLA in the

Page 129

1  2000 time period PriceWaterhouseCoopers?
2    A. Yes.
3    Q. And do you believe that the
4  gentleman referred to was an accountant at
5  PriceWaterhouseCoopers?
6    MR. FICKES: Well, maybe we could --
7  BY MS. WEISS:
8    Q. Do you know who he was? Let's start
9  there. Do you know who this person is that's
10  referred to?
11    A. Mr. Chitkara was the engagement partner
12  for PWC for the KLA-Tencor account.
13    Q. Okay. And during what time period did he
14  serve in that role, do you recall?
15    A. Not specifically. I believe he was
16  the engagement partner when I joined the company;
17  however, he was not the engagement partner when I
18  left the company.
19    Q. Who was when you left?
20    A. I believe his name was Rob Gittings, and I
21  think it's spelled G-i-t-t-i-n-g-s.
22    Q. What was the reason for the change, do you
23  know?
24    A. I don't know.
25    Q. All right. The email states in the

33 (Pages 126 to 129)

Nichols, Stuart J. Esq.    1/27/2008

Page 130

1  first paragraph, "This email is a follow up to our
2  12/23/99 meeting concerning the financial impact
3  of granting stock options to outside consultants."
4      Do you see that, sir?
5      A. Yes.
6      Q. Do you recall discussions with company
7  personnel at the time of this email regarding
8  granting of stock options to outside consultants?
9      MR. BELNICK: You can answer whether you
10  recall or not.
11      THE WITNESS: No.
12  BY MS. WEISS:
13      Q. The email appears to be forwarding a
14  draft of Ms. Wilson's communication -- proposed
15  communication with Ken concerning the financial
16  impact of granting stock options to outside
17  consultants.
18      In reviewing the email, do you believe
19  that she is drafting an email to Ken Schroeder or
20  Ken Levy?
21      MR. BELNICK: Just from looking at the
22  email?
23      MS. WEISS: Yes.
24      MR. BELNICK: Well, I think you can --
25  Shirli, we'll stipulate that it says that the goal

Page 131

1  is to provide Ken Schroeder.
2      MS. WEISS: Well, I don't see that. Where
3  do you see that?
4      MR. BELNICK: Look above the word "Draft."
5      MS. WEISS: Yes, it sure does.
6  BY MS. WEISS:
7      Q. Okay. The first page of the exhibit
8  appears to be an email from you to Leslie Wilson
9  regarding the email that she sent to you and others.
10  And the subject matter line is the same. And the
11  first paragraph states, "Leslie, forgive me. I
12  couldn't help but exercise a little editorial
13  discretion here," and then it goes on to say,
14  "Please bear in mind I'm not an accountant." And
15  then, "In any case, my suggested rewrite follows."
16      Do you see that, sir?
17      A. Yes.
18      Q. And what was your purpose in communicating
19  with Miss Wilson on this subject matter?
20      MS. HEINTZ: We're going to object on the
21  basis of attorney-client privilege.
22  BY MS. WEISS:
23      Q. Okay. And was this email sent back by you
24  to Miss Wilson in anticipation of litigation?
25      A. Not that I recall.

Page 132

1      MS. WEISS: Exhibit 57 (indicating).
2      (Whereupon, Exhibit 57 was marked
3      for identification.)
4      MS. WEISS: Okay. Exhibit 57 is entitled
5  "Minutes of the Meeting of the Board of Directors
6  of KLA-Tencor Corporation January 25, 2000." It's
7  Bates stamped MLB/KLA-SEC00021958 to 21961.
8  BY MS. WEISS:
9      Q. Would you review it, sir, and tell me if
10  that's your signature as Vice President, General
11  Counsel, Secretary of the meeting?
12      A. Yeah, it appears to be a photocopy of my
13  signature.
14      Q. Okay. All right. And it was your custom
15  in acting as the secretary of board of directors
16  meetings to record the attendees, as is shown in
17  this exhibit; is that correct?
18      A. You're asking me whether this exhibit
19  shows the attendees at the meeting that I had in
20  my notes recalled or what have you? What's the
21  question?
22      Q. The question is: When you acted as
23  secretary for the meeting, did you record accurately
24  the attendees in the minutes?
25      A. Well, the minutes contain a list of the

Page 133

1  people who attended; and, yes, it would have been
2  my effort to record that accurately.
3      MS. WEISS: Okay. Exhibit 89.
4      DEPOSITION REPORTER: 58.
5      MS. WEISS: Oops. Sorry. 58. Cross
6  reference 89.
7      (Whereupon, Exhibit 58 was marked
8      for identification.)
9      MS. WEISS: Okay. Exhibit 58 is an email
10  chain Bates stamped MLB/KLA-SEC00051399 to 51400.
11  The email chain starts with an email from Leslie
12  Wilson dated February 11, 2000, 3:31 p.m. to Ken
13  Schroeder, cc: Mike Kahn, Stuart Nichols, Mark
14  Nordstrom, Tracy Laboy, Raman Chitkara; "Subject:
15  Stock options to outside consultants," "Sensitivity:
16  Confidential." And then there's a message to Ken
17  Schroeder.
18      And there's a response from Mr. Schroeder
19  to Ms. Wilson which then appears to be forwarded
20  by Ms. Wilson to Mr. Nordstrom, Ms. Lamb and
21  Mr. Kispert with a message from Miss Wilson.
22  BY MS. WEISS:
23      Q. Mr. Nichols, do you recall receiving the
24  email that shows you as a cc on February 11, 2000?
25      A. No.

34 (Pages 130 to 133)

Page 134

1    Q.  Do you recall any discussions concerning
2  the topic of outside consultants and accounting for
3  outside consultants?
4        MR. BELNICK:  You can answer either yes or
5  no.
6        THE WITNESS:  I don't recall specific
7  discussions as they relate to this email.  I do --
8  yeah, so I'll leave it at that.
9  BY MS. WEISS:
10   Q.  Do you recall any discussions concerning
11 accounting for accounting to outside consultants?
12       MR. BELNICK:  While he was at the company?
13       MS. WEISS:  Yes.
14       MR. BELNICK:  You can answer that yes or
15 no.
16       THE WITNESS:  And when you say
17 "discussions," do you mean oral conversations?
18 BY MS. WEISS:
19   Q.  No.  I'm including email discussion as
20 well.
21       MR. BELNICK:  Whether writing or oral
22 allowed.
23       THE WITNESS:  Yes, I remember discussions.
24 BY MS. WEISS:
25   Q.  So you have in mind specific discussions

Page 135

1  that you had with personnel at KLA-Tencor that
2  involved accounting for stock options to outside
3  consultants?
4    A.  Yes.
5    Q.  And who were the personnel that you recall
6  having the discussions with?
7        MR. BELNICK:  Go ahead, you can answer
8  that.
9        THE WITNESS:  John Kispert.
10 BY MS. WEISS:
11   Q.  And approximately what time period?  Can
12 you identify it?
13   A.  No.  I believe it was later than this,
14 though.
15       MR. BELNICK:  "This" being February 2000?
16       THE WITNESS:  Correct.
17 BY MS. WEISS:
18   Q.  Was it within 2000, do you think?
19   A.  No, I don't believe it was.
20   Q.  What year do you think it occurred?
21   A.  Later in my tenure.  I can't identify the
22 year, but 2003 or perhaps later than that.
23   Q.  So you had a discussion with Mr. Kispert
24 involving accounting for stock options to outside
25 consultants.  What was the purpose of the

Page 136

1  discussion?  Can you say that?
2        MS. HEINTZ:  We're going to object to that
3  on the basis of attorney-client privilege.
4  BY MS. WEISS:
5    Q.  Did you have more than one discussion,
6  Mr. Nichols?
7    A.  I don't recall.
8    Q.  As to the discussions that you do recall,
9  from your standpoint, were they conducted in an
10 anticipation of litigation?
11   A.  No.
12       MS. WEISS:  Okay.  Exhibit 97 -- not 97,
13 59.
14       (Whereupon, Exhibit 59 was marked
15        for identification.)
16       MS. WEISS:  Exhibit 59 are "Minutes of
17 the Meeting of the Board of Directors of KLA-Tencor
18 Corporation" dated April 25th, 2000.  It's Bates
19 stamped MLB/KLA-SEC00021983 and to 21984.
20 BY MS. WEISS:
21   Q.  Mr. Nichols, would you review Exhibit 59
22 and tell me if that's your signature on the second
23 page above your name and title Vice President and
24 General Counsel.
25   A.  This appears to be a photocopy of my

Page 137

1  signature.
2    Q.  Okay.  On the second page -- well, first
3  of all, it would have been your practice, correct,
4  to record on the minutes the attendees at the
5  meeting; is that correct?
6    A.  Yes.
7    Q.  And then --
8        MR. BELNICK:  Shirli, just to save time.
9  If this is acceptable to you and the witness, can we
10 stipulate to the extent Mr. Nichols prepared minutes
11 for board meetings it was always his practice to
12 attend and to accurately reflect who was in
13 attendance?
14       MS. WEISS:  Yes, we can.
15       Is everybody acceptable with that
16 stipulation?
17       MS. HEINTZ:  Yes.
18       MR. FICKES:  Yes.
19 BY MS. WEISS:
20   Q.  All right.  Turning to the second page
21 below "Closed Session," these minutes appear to
22 record that Mr. Levy proposed that Mr. Morton and
23 Ms. Urbanek be appointed to the Audit Committee
24 on an interim basis, and then also that
25 Mr. Levy then appointed Mr. Barnholdt to serve

35 (Pages 134 to 137)

Nichols, Stuart J. Esq.                                                    1/27/2008

1  with Ms. Urbanek on the Compensation Committee.
2        Do you see that, sir?
3     A.  Yes.
4     Q.  Do you believe those events were
5  accurately recorded?
6     A.  Yes.
7     Q.  Okay.  So I'm going to ask you to take a
8  look at one of your notebooks.  Just give me a
9  second and I'll let you know which one.  So it would
10 be Exhibit 42, which is your notebook for the time
11 period June 26th, 2000, commencement date.
12       MR. BELNICK:  Page?
13       MS. WEISS:  Page 2740.
14       MR. FICKES:  I'm sorry.  I couldn't hear.
15       MS. WEISS:  Page 2740.
16       MR. FICKES:  Thank you.
17 BY MS. WEISS:
18    Q.  Mr. Nichols, can you tell from reviewing
19 page 2740 in context what date the notes on that
20 page were likely recorded or the time interval?
21    A.  Excuse me.  There's an entry in -- on a
22 prior set of notes Bates stamped 2737 that bears the
23 date August 9, 2000.  So presumably it was sometime
24 after August 9, 2000.  And there's a subsequent note
25 on page 2743 bearing the date 8/21/2000.  So based

1  on that, presumably sometime between those two
2  dates.
3     Q.  All right.  Take a look at the notes on
4  2739, the page before.
5        About midway down on the page it says
6  "Bruce" and then it says "Option Program."
7        Do you see that?
8     A.  Yes.
9     Q.  Do you know who Bruce was or is?
10    A.  No.  No.
11    Q.  It doesn't spark a recollection?
12    A.  (Witness nods.)
13    Q.  All right.  And below that it says "162m."
14 Is that a reference to a code section?
15    A.  Probably.
16    Q.  Do you know what code section?
17    A.  Tax code section.
18    Q.  Okay.  And would you read the notation to
19 the right of that.
20    A.  "If one of top five cancelled and regrant
21 blew through max in plan then wouldn't be able to
22 deduct some of expense."
23    Q.  Can you tell from that note, sir, whether
24 or not you were making notes during a conversation
25 with someone?

1     A.  Well, I can deduce.  I don't have a memory
2  of this conversation.
3     Q.  Well, what can you tell me about those
4  notes?  What do they mean?
5        MS. HEINTZ:  We're going to object that it
6  reveals attorney-client communications.
7  BY MS. WEISS:
8     Q.  Okay.  Do you think that notation was made
9  in anticipation of litigation?
10    A.  No.
11    Q.  Below that, what's the word below that?
12 Can you read that to me?
13    A.  "Vesting."
14    Q.  Vesting.  Okay.
15       And then the next page starts off -- it
16 appears to say "Roger."  Is that what it says?
17    A.  Yes.
18    Q.  Okay.  Could you read the notes on this
19 page.
20    A.  Yeah.  "FASB 44, new opinion.  Question
21 45 -- an option cancellation.
22       "If six months prior to or after
23 cancellation.
24       "If more than six months, no variable
25 accounting.

1        "Can be no direct or indirect promise
2  that price will be better.
3        "Six plus one day -- one client discussed
4  it.
5        "No other client has done it -- not
6  exciting for employees.  Also, negative for the
7  street.
8        "Do we want any sort of give-back or
9  consideration -- three months vesting -- blackout"
10    Q.  And then can you tell me if the next page
11 is connected with the prior page in terms of notes?
12       MR. BELNICK:  "The next page" being 2741?
13       MS. WEISS:  Right.
14       THE WITNESS:  Probably.
15 BY MS. WEISS:
16    Q.  And what do those notes say?
17    A.  "Can surrender a portion of the option
18 but would be an admin," short for administrative,
19 "nightmare."
20    Q.  Do you whether or not these notes that
21 you've just read on 2740 and 2741 were taken during
22 a conversation with someone?
23    A.  Presumably, yes.
24    Q.  Do you think it was Roger Stern?
25    A.  I don't have a specific memory of the

36 (Pages 138 to 141)

Page 142

1    conversation. but that's likely who that was with.
2        Q. Who was Roger Stern at that time?
3        A. Roger Stern at all times during my
4    employment at KLA was a partner at Wilson Sonsini
5    Goodrich & Rosati.
6        Q. Okay. And can you tell me what the notes
7    mean?
8        MS. HEINTZ: We're going to object on the
9    basis of attorney-client privilege.
10   BY MS. WEISS:
11       Q. Okay. And were the notes created in
12   anticipation of litigation?
13       A. No.
14       MS. WEISS: Okay. Can we take a couple
15   minutes? I need to find a couple of items.
16       THE VIDEOGRAPHER: Going off the record.
17   The time is 1:35 p.m.
18       (Off the record.)
19       THE VIDEOGRAPHER: We are back on the
20   record. The time is 1:48 p.m.
21   BY MS. WEISS:
22       Q. Mr. Nichols, directing your attention
23   momentarily back to Exhibit 55. I believe when we
24   started the dialogue, we were talking about option
25   program milestones. And I think at that time

Page 143

1    I asked you whether or not you anticipated
2    litigation when you sent the email and the
3    attachment that is Exhibit 55, and I think at that
4    point you answered yes. So I'd like to return to
5    that for a moment.
6        First of all, was there a pending
7    litigation involving the subject matter of this
8    email at the time?
9        A. No.
10       Q. And could you tell me what litigation you
11   were anticipating at the time?
12       DEPOSITION REPORTER: I'm sorry. Was that
13   for the record?
14       MR. BELNICK: What I said, no.
15       THE WITNESS: I'm not sure how I can do
16   that without talking about privileged opinions.
17       MR. BELNICK: Give me a second and see if
18   I can help you.
19       (Off the record discussion between
20   Deponent and Counsel.)
21       THE VIDEOGRAPHER: Microphone.
22       THE WITNESS: I'm just keeping it off in
23   case I have to go back. I won't forget about you.
24   I promise.
25       MR. BELNICK: I'll let him -- let me tell

Page 144

1    you what we'll let him answer. Then you can answer
2    if this is right. The subject matter of the
3    litigation that Mr. Nichols was anticipating at the
4    time of Exhibit 55 was tax-related.
5    BY MS. WEISS:
6        Q. Okay. And was it litigation that you were
7    anticipating that would involve KLA Tencor?
8        A. Potentially, yes.
9        Q. Okay. Had there been any threat of
10   litigation that had actually been communicated to
11   you?
12       A. No.
13       Q. Okay. Putting aside the tax-related
14   litigation and focusing your attention from the time
15   period on the year 2000, can you tell me with
16   respect to any of the communications that you might
17   have had involving KLA's option program -- and I
18   think we've seen a few in the 2000 time period that
19   you may not have recalled -- can you think of any
20   instance where your communication during that time
21   period was in anticipation of litigation?
22       MR. BELNICK: Except to the extent that
23   he's testified.
24       MS. WEISS: Exhibit 55 I think is the only
25   one that he's testified to. I could be wrong. The

Page 145

1    record will show.
2        MR. BELNICK: Right. Apart from whatever
3    you've testified to, if it was more than 55, you
4    have the rest of Miss Weiss's question. Can you
5    think of any other instances?
6        THE WITNESS: No.
7    BY MS. WEISS:
8        Q. Okay. So moving into the 2001 time
9    period, including the time period when you had the
10   email communications that had become the subject of
11   this litigation --
12       A. Which occurred in March --
13       Q. -- which occurred in March of 2001, can
14   you tell me whether or not the communications that
15   you made were in anticipation of litigation?
16       MR. BELNICK: Including the March ones?
17   BY MS. WEISS:
18       Q. Yes.
19       A. No.
20       Q. Okay. Moving into the 2002 time period,
21   same question.
22       A. So just to make sure I have the question
23   clear, you're asking me whether in calendar 2002 I
24   had communications that related to stock options
25   where I was concerned about litigation?

Page 146

1    Q.  Where you anticipated litigation.
2    A.  No.
3    Q.  All right.  Same question with respect to
4  2003.
5    A.  No.
6    Q.  You can't think of an instance where you
7  were preparing a communication in anticipation of
8  litigation?
9        MR. BELNICK:  With respect to anything
10  having to do with stock options only?
11        MS. WEISS:  Only.  Stock options, stock
12  option programs, stock option accounting, stock
13  option personnel.
14        MR. BELNICK:  Anything.
15        MS. WEISS:  You know, the subject matter
16  of what we're talking about here.
17        THE WITNESS:  No.
18  BY MS. WEISS:
19    Q.  Okay.
20    A.  And bear in mind when I say that, whether
21  it's, you know, 2002, 2003 or any other time frame,
22  these are events that occurred a long time ago.  And
23  you could well show me a piece of paper that would
24  refresh my recollection.  But as I sit here right
25  now, no, I have no memory of such a perception.

Page 147

1    Q.  Okay.  So, for example, in particular when
2  we get to the March 2001 communications, when you
3  were drafting the communications back and forth, you
4  were not doing those in anticipation of litigation?
5    A.  Correct.
6    Q.  Okay.  That might save us a little time.
7        MR. BELNICK:  I hope so.
8  BY MS. WEISS:
9    Q.  Just briefly turning your attention to
10  Exhibit 42, Bates stamp page 2744, there is an entry
11  beside 8/22.  I believe the year we're referring to
12  is 2000, and there is a reference to Ken Levy.  And
13  my request is that you read the page of notes,
14  please.
15    A.  The page of notes beginning with "Ken
16  Levy" and below that?
17    Q.  Please.
18    A.  "Ken Levy," and then it says "new EEs" --
19  that's my abbreviation for employees --
20  "cancellation of some." and then below that, "new
21  option grant in KT, restarted with four-year
22  vesting, five-year term, 50 percent of unvested,
23  could structure as a call, alternative by calls.
24  Can we" -- and then it says, "Can we buy and sell
25  calls to ourselves?  Call amounts and figure out

Page 148

1  charges and how to do this.  Consider that this
2  would be precedent.  If they return to KT, then they
3  can keep" -- oh, "board of Newco must approve."
4    Q.  Okay.  And then the next page is a new and
5  different communication?
6    A.  Yes.
7    Q.  Okay.  And, again, does the fact that you
8  have "Ken Levy," does that indicate to you that the
9  conversation or excerpts of the conversation that
10  are recorded in these notes of a conversation that
11  you had with Mr. Levy?
12    A.  Yes.
13    Q.  Do you recall the conversation?
14        MR. BELNICK:  Yes or no.
15        THE WITNESS:  No.
16  BY MS. WEISS:
17    Q.  Okay.  Taking a look at the next page, it
18  says "8/23," and then there is a reference about a
19  third of the way down to Ken Schroeder.  Do you see
20  that?
21    A.  Yes.
22    Q.  Could you read the notes below Ken
23  Schroeder.
24    A.  "Acquire smaller company in same area.
25  Due diligence on IP."  Then it says, "Attorney.

Page 149

1  Everything so disorganized that it's hard to tell
2  whether IP is of value and whether it's infringing
3  anyone else's IP."  And then it says, "Board
4  choices: One, not good enough; two, doesn't
5  matter."
6    Q.  Okay.  Do you recall -- first of all, does
7  that -- do those notes indicate that you had a
8  conversation with Mr. Schroeder?
9        MR. BELNICK:  As you recall.
10        THE WITNESS:  I don't recall this
11  conversation with Ken Schroeder, but his -- the fact
12  that his name is here would suggest --
13        MR. BELNICK:  The question is do you
14  recall it?
15        THE WITNESS:  I don't recall it.
16  BY MS. WEISS:
17    Q.  Okay.  So nothing about reviewing these
18  notes calls to mind the content or purpose of this
19  particular conversation that I just referred to?
20    A.  No, nothing.
21    Q.  Okay.  And if you would back up to page
22  2743.  And the top of the page, the date is 8/21/00,
23  and then it appears to be "T/C with Joy Nyberg."  Do
24  I have that right?
25    A.  Yes.

38 (Pages 146 to 149)

Nichols, Stuart J. Esq.                                          1/27/2008

Page 150

1    Q.  Does that indicate to you that you had a
2  conversation with Joy Nyberg?
3    A.  Yes.
4    Q.  Would you read the notes.
5    A.  "Wants nonshareholder-approved plan. Full
6  program put in place. Wants to be able to issue
7  double peak grant immediately. (24-hour notice).
8        "*Question: How many years do we have on
9  evergreen? Nonqual. What board approval required?
10  What share limits? Can we issue based on July
11  price? Can we set aside stock ala BRCM? Can you
12  issue officer shares with only board approval? Is
13  the evergreen tied specifically to the plan?"
14        And then it says, "Options: 1.
15  nonshareholder plan: 2. increase buyback; 3." no
16  entry; "4, preauthorization."
17    Q.  Okay. First of all, down below where it
18  says "options," is the term "options" there used as
19  a synonym for choices?
20    A.  Or alternatives, yes.
21    Q.  Okay. And do you recall this conversation
22  with Joy Nyberg?
23    A.  No.
24    Q.  You don't recall anything about this
25  conversation?

Page 151

1    A.  No.
2    Q.  The first reference is to a
3  nonshareholder-approved plan. Do you recall that
4  KLA did in fact adopt a nonshareholder-approved plan
5  sometime in the 2000 time period?
6    A.  Yes.
7    Q.  Do you recall that the
8  nonshareholder-approved plan is a plan that was
9  designed to benefit nonofficers?
10    A.  Yes.
11    Q.  And Ms. Nyberg was a nonofficer for
12  purposes of the plan: correct?
13    A.  Yes.
14    Q.  And when you recorded this question, "Can
15  we issue based on July price?" It was being
16  recorded in a conversation that occurred after July:
17  correct?
18        MR. BELNICK: I think he said he didn't
19  recall the conversation.
20        THE WITNESS: Yeah. I don't recall the
21  conversation. I see the entry bearing the date.
22  BY MS. WEISS:
23    Q.  And the date -- it would have been your
24  custom and practice at the time to date the
25  conversation on the date that it occurred: correct?

Page 152

1    A.  Correct.
2    Q.  Do you know whether or not you rendered
3  advice to Miss Nyberg about her question?
4    A.  I don't know.
5    Q.  Okay. The next page, it says "8/21."
6  Above "Ken Levy" it says, "Telephone call with Brent
7  DiMarco." Do you see that?
8    A.  Yes.
9    Q.  And Mr. DiMarco was whom at the time?
10    A.  He was an attorney with Wilson Sonsini,
11  our outside counsel.
12    Q.  Do you recall anything about that
13  conversation?
14    A.  No.
15    Q.  Generally, do you remember in the 2000
16  time frame that the stock -- the price of the stock
17  of KLA Tencor started out very high and then over
18  the year generally trended downward?
19        MR. FICKES: Objection. Vague and
20  ambiguous as to "very high."
21        THE WITNESS: No.
22  BY MS. WEISS:
23    Q.  Do you have a recollection one way or the
24  other, sir?
25    A.  No.

Page 153

1    Q.  Okay. I want to show you an exhibit which
2  was taken from a public source that holds itself out
3  as recording stock option -- stock price dates for
4  public companies. And accept my -- or assume for
5  purposes of my questions that the stock price of KLA
6  Tencor is properly recorded. I have to find it
7  first.
8        (Whereupon, Exhibit 60 was marked
9        for identification.)
10        MS. WEISS: 60. 6-0.
11  BY MS. WEISS:
12    Q.  Okay. We'll mark as Exhibit 60 a printout
13  from Yahoo finance website which undertakes to show
14  the stock prices of KLA Tencor Corporation beginning
15  January 3rd, 2000 on the last page, 20, and ending
16  on December 31st, 2003 on the first page.
17        And so if you assume for purposes of my
18  question, Mr. Nichols, that this chart accurately
19  displays the prices of KLA Tencor stock, the opening
20  price, the closing price, the high of the day and
21  the low of the day for the dates shown, if you take
22  a look at January 3rd, 2000, the chart shows that
23  KLA Tencor stock opened at $112.25, closed at
24  $108.50, had a high of $112.25 and a low of $103.38.
25  Do you see that?

Nichols, Stuart J. Esq.                                                      1/27/2008

Page 154

1    A. Yes.
2    Q. And then if you take a look at the months
3  that follow, focusing on the August, September,
4  October and November time period, you'll see that
5  generally, the price goes up and down and is
6  volatile. It's generally trending down. Do you see
7  that?
8    A. Yes.
9    Q. So that, for example, if you just pick a
10 date, October 10th, 2000, the price on that date is
11 $35.06 at the open, and the close of the price is
12 $34.25.
13   A. Okay.
14   Q. Okay. So does reviewing that chart at all
15 refresh your recollection that during the time
16 period of 2000, the general price of KLA Tencor
17 stock was declining in the marketplace?
18   A. No. I mean, I see this document. It
19 speaks for itself. If you're asking me whether I
20 ever had a memory about what KLA's stock price was
21 doing in the year 2000, the answer is no, I don't
22 have a memory of that.
23   Q. All right. And so generally, do you have
24 a memory that in 2000, technology companies' stock
25 in general declined in value, that that was the

Page 155

1  subject of much discussion?
2    A. Yes.
3    Q. And do you think that KLA Tencor was
4  different from the general decline of technology
5  companies in the marketplace in 2000?
6    A. No.
7    Q. And in connection with the decline of
8  prices in the marketplace, was there concern
9  expressed at KLA by senior management that it was
10 important to think about option grants to employees?
11      MS. HEINTZ: Objection on the basis of
12 attorney-client privilege.
13      MR. FICKES: I'll also object that the
14 question is vague and ambiguous as far as "concern"
15 and "senior management."
16      MS. WEISS: You're not going to respond to
17 that question on the basis of the privilege
18 asserted; is that right?
19      MR. BELNICK: That's right. He won't.
20      MS. WEISS: Okay. So much for that.
21      Okay. Exhibit 61.
22      (Whereupon, Exhibit 61 was marked
23      for identification.)
24 BY MS. WEISS:
25   Q. Okay. Exhibit 61 is Bates stamped -- it

Page 156

1  is an email chain, Bates stamped MLB/KLA-SEC00022981
2  through MLB/KLA-SEC00022982. And the email chain
3  starts at the 22982 page, the email from Joy Nyberg
4  to Maureen Lamb, John Kispert and Stuart Nichols, cc
5  to Frank Brienzo, and it says, "Draft of Board
6  Presentation for Ken." "Importance: High."
7  "Sensitivity: Confidential." And it refers to a
8  draft of slides for Ken Schroeder to present at the
9  October board, a nonshareholder plan.
10     Then there is a response from Maureen Lamb
11 on the next email, and it is sent October 5th, 2000.
12 And then a response by yourself to Maureen Lamb
13 dated October 9th, 2000.
14     Do you see that email chain, sir?
15   A. Yes.
16   Q. Do you recall dialogue with Maureen Lamb
17 and Joy Nyberg concerning the
18 nonshareholder-approved plan in or about this time
19 period?
20      MR. BELNICK: Yes or no.
21      THE WITNESS: No.
22 BY MS. WEISS:
23   Q. Do you recall a discussion whereby these
24 personnel were talking about different ways that
25 option shares could be awarded to employees using

Page 157

1  different strategies such as splitting them up,
2  trying to project the time? Do you remember this
3  time -- this type of conversation during this time
4  period at all?
5      MS. HEINTZ: We're going to object on the
6  basis of attorney-client privilege.
7      MS. WEISS: This is a yes or no answer,
8  though.
9      MS. HEINTZ: You're asking for the text of
10 or the content of communications.
11      DEPOSITION REPORTER: I'm sorry. I didn't
12 get the last part.
13      MS. HEINTZ: It's asking for the content
14 of communications. It's not a general subject
15 matter.
16 BY MS. WEISS:
17   Q. Okay. Well, do you recall the general
18 subject matter being discussed in the fall of 2000
19 at KLA Tencor about how to make stock option awards
20 in the future to employees?
21      MR. BELNICK: Yes or no whether you
22 recall.
23      THE WITNESS: No.
24 BY MS. WEISS:
25   Q. Do you see at the top of the page your

40 (Pages 154 to 157)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 158

1    email to Miss Lamb? You say by the way -- or "BTW.
2    on your algorithm point, at my last job we did the
3    same thing. The formula was quite simple. We
4    distributed the pool of new grants based on each
5    employee's allocated share of underwater options.
6    Next time you're passing by, I'll explain."
7         Do you see that?
8    A. Yes.
9    Q. Did you send that email to Miss Lamb about
10   the date shown?
11   A. I sure don't remember.
12   Q. Does reviewing that message refresh your
13   memory about how option grants were awarded at
14   Phoenix Technologies?
15   A. No.
16   Q. The reference to "pool of new grants" does
17   not refresh your memory that you had a prior
18   experience whereby options were pooled in some way
19   and then awarded?
20   A. Quite the contrary.
21   Q. Well, what do you remember?
22   A. I have no such memory.
23   Q. You have no memory one way or another?
24   A. Correct.
25        MS. WEISS: Exhibit 62.

Page 159

1         (Whereupon, Exhibit 62 was marked
2         for identification.)
3    BY MS. WEISS:
4    Q. Exhibit 62 are the Minutes of the Meeting
5    of the Board of Directors of KLA Tencor Corporation
6    dated October 15th, 2000, Bates number
7    MLB/KLA-SEC00022086 through and including 22088.
8         Mr. Nichols, would you look at Exhibit 62
9    and can you identify your --
10        MR. BELNICK: Actually, excuse me, Shirli.
11   Just so your record is complete, our copy goes
12   through 22089.
13        MS. WEISS: Okay. You're right. I missed
14   a page. 22089.
15   BY MS. WEISS:
16   Q. Would you tell me if you recognize your
17   signature as Vice President, General Counsel and
18   Secretary of the meeting on 22088?
19   A. Yeah, that appears to be a copy -- a
20   photocopy of my signature.
21   Q. All right. And same question with 22089.
22   Is that a photocopy of your signature?
23   A. It's actually a photocopy of two of my
24   signatures.
25   Q. Yes. I see that. Thank you.

Page 160

1         All right. In the minutes under
2    "Strategic Initiatives," there is a reference to a
3    presentation by Mr. Schroeder of an overview of the
4    company's strategic initiatives. And it is also
5    recorded that Mr. Schroeder then addressed the
6    company's stock option programs and the impact of
7    the recent stock price decline on employee unvested
8    gain. And then a further reference that
9    Mr. Schroeder would present something at the
10   November 10th board meeting.
11        Do you have a recollection of the
12   presentations referred to in 22088?
13        MR. BELNICK: Yes or no?
14        THE WITNESS: No.
15        MS. WEISS: Exhibit 63.
16        (Whereupon, Exhibit 63 was marked
17        for identification.)
18   BY MS. WEISS:
19   Q. Exhibit 63 does not bear a Bates stamp.
20   It is a document -- oh, I'm sorry. It does.
21   KT ACWP-PRIV00002401 through 2415.
22        Would you review Exhibit 63, Mr. Nichols.
23   A. Okay.
24   Q. Mr. Nichols, the document -- the first
25   page of the document says, "Draft KLA Tencor

Page 161

1    Employee Retention Stock Option Issue." And then it
2    says, "Discussion Document October 30, 2000." Below
3    that there is the logo of a company called iQuantic,
4    i-Q-u-a-n-t-i-c, Inc.
5         Do you recognize the name iQuantic?
6    A. Yes.
7    Q. Could you tell me who iQuantic is or was
8    at that time?
9    A. iQuantic was a consulting firm that
10   specialized in advising companies on compensation
11   matters. And I think, though I'm not sure -- well,
12   I'll leave it at that on compensation matters.
13   Q. Did iQuantic provide consulting services
14   to KLA Tencor?
15   A. I don't know if we engaged them as a
16   consultant, but I know that a representative of
17   iQuantic made a presentation.
18   Q. Did that representative make a
19   presentation at a board meeting, do you recall, or
20   Compensation Committee meeting or some other type of
21   meeting?
22   A. I don't know which type of meeting it was.
23   I don't believe it was a board meeting.
24   Q. Okay.
25   A. It could have either been a comp committee

41 (Pages 158 to 161)

Page 162

1  meeting or a -- just a general informational
2  meeting.
3      Q.  There was an earlier reference to the
4  nonshareholder-approved plan adopted by KLA Tencor.
5  Do you know, Mr. Nichols, whether or not the idea
6  for a nonshareholder-approved plan originated with
7  iQuantic?
8      MR. BELNICK:  Yes or no?
9      THE WITNESS:  No, I don't know.
10 BY MS. WEISS:
11     Q.  Did you have any discussion with iQuantic
12 regarding anything about the contents of Exhibit 63,
13 do you recall?
14     A.  Do you mean me personally?
15     Q.  Sure.
16     A.  Not that I recall.
17     Q.  Who would have been the person at KLA
18 Tencor who would have investigated with iQuantic the
19 parameters of a nonshareholder-approved stock option
20 plan?
21     MR. BELNICK:  If you know.
22     THE WITNESS:  I don't know.
23 BY MS. WEISS:
24     Q.  You don't know whose bailiwick, if you
25 will, that was in?

Page 163

1      A.  Well, I --
2      MR. BELNICK:  Are you asking him if he
3  knows specifically who he spoke to within iQuantic
4  about this subject matter?
5      MS. WEISS:  No.  I'm asking him whether or
6  not there was a group of people in KLA Tencor who
7  was tasked with interacting with outside consultants
8  on this topic.
9      MR. BELNICK:  Okay.  Then --
10     MS. WEISS:  Within their purview.
11     THE WITNESS:  So your question was
12 there a group within KLA Tencor that was tasked with
13 interacting with this type of consultant?
14 BY MS. WEISS:
15     Q.  Yes.
16     A.  No, I'm not aware of any specific group
17 that was so tasked.
18     MS. WEISS:  Okay.  64.
19     (Whereupon, Exhibit 64 was marked
20     for identification.)
21     MR. BELNICK:  Okay.  He's looked at it.
22 BY MS. WEISS:
23     Q.  Exhibit 64, Bates stamped
24 MLB/KLA-SEC00004878 through 4898, is what appears to
25 be a PowerPoint presentation with charts entitled,

Page 164

1  "Employee Retention Stock Option Program Proposal
2  for Compensation Committee 11/8/08 [sic]" -- I'm
3  sorry -- '00.
4      Mr. Nichols, do you recall seeing Exhibit
5  64 before?
6      A.  No, I don't have a specific recollection
7  of seeing that exhibit before.
8      Q.  Do you recall the discussion of a strategy
9  at KLA Tencor to make supplemental grants to
10 shareholder -- to employees and officers in two
11 segments?
12     MS. HEINTZ:  Objection on the basis of
13 attorney-client privilege.
14     MS. WEISS:  Okay.  I think we already have
15 your testimony on work product.
16     Exhibit 65.
17     (Whereupon, Exhibit 65 was marked
18     for identification.)
19     MS. WEISS:  And Exhibit 66.
20     (Whereupon, Exhibit 66 was marked
21     for identification.)
22 BY MS. WEISS:
23     Q.  Mr. Nichols, Exhibit 66 is what appears to
24 be a draft of minutes of the Compensation Committee
25 of KLA-Tencor Corporation, Bates stamped

Page 165

1  MLB/KLA-SEC00004872 through 4876.
2      And then Exhibit 65 are the Minutes of the
3  Meeting of the Board of Directors of KLA-Tencor
4  Corporation dated November 10th, 2000, Bates stamped
5  MLB/KLA-SEC00004903 through 4907.
6      Now, Exhibit 66 -- we had requested from
7  KLA Tencor copies of all of their Compensation
8  Committee minutes as well as all of their board of
9  directors minutes.  And they refused to produce
10 anything, so we don't have any corporate records
11 from KLA.  These were produced from the files of the
12 SEC, presumably produced by KLA.  But we do not have
13 a final copy of the Compensation Committee minutes,
14 I believe, that were signed by you.
15     These draft minutes appear to indicate
16 that you attended a Compensation Committee meeting
17 held on November 8th, 2000.  That appears in the
18 first paragraph of the draft minutes.
19     Mr. Nichols, could you tell me what
20 generally during this time period was your custom
21 and practice in terms of preparation of minutes and
22 signing of them?
23     MR. BELNICK:  For Compensation Committee?
24     MS. WEISS:  Yeah.  Let's start with
25 Compensation Committee.

Page 166

1    THE WITNESS: So -- and what's the time
2  period you're referring to now?
3  BY MS. WEISS:
4    Q. This time period, November of 2000.
5    A. In those -- in that time period, the
6  Compensation Committee meetings typically included a
7  written report that was prepared in advance of the
8  meeting which the members of the comp committee
9  signed. So my practice was to have that be the
10  written record of the meeting.
11    Q. So let's back up a minute. In order to --
12  you attended the Compensation Committee meetings as
13  a general rule?
14    A. Yes.
15    Q. And in order to prepare for the
16  Compensation Committee meetings, did you meet with
17  Joy Nyberg?
18    A. No.
19    Q. You never met with her?
20    A. To prepare for the meetings for the
21  comp --
22    Q. Yes.
23    A. No, never.
24    Q. Okay. And --
25    A. Well, I shouldn't say "never." I

Page 167

1  certainly don't recall any instance where I did
2  that.
3    Q. Okay. How did you compile the information
4  or how was the information compiled for submission
5  to the Compensation Committee members?
6    MR. BELNICK: If you know.
7    THE WITNESS: I don't know.
8  BY MS. WEISS:
9    Q. Who was responsible for compiling the
10  information for review by the Compensation Committee
11  members?
12    A. All I know about that is that Ken
13  Schroeder and Joy Nyberg would work together to
14  prepare the information.
15    Q. All right. And how do you know that?
16    MS. HEINTZ: We object to the extent that
17  it reveals attorney-client communications.
18    MR. BELNICK: If you know that as a result
19  of something that would involve a client
20  communication -- and I don't know how you could
21  otherwise, but --
22    THE WITNESS: Yeah. I don't know how I
23  can answer that without revealing a conversation
24  with a client.
25    MR. BELNICK: And I assume KLA is

Page 168

1  asserting privilege.
2    MS. HEINTZ: We assert the privilege and
3  request that the witness not answer.
4  BY MS. WEISS:
5    Q. Did you prepare an agenda for the
6  Compensation Committee meeting or did someone else?
7    A. I did not.
8    Q. How did you obtain an agenda before the
9  meeting or did you?
10    A. I didn't.
11    Q. Okay. So what was your role at the
12  meeting? Simply minute taker?
13    A. At best because, again, my view was that
14  the written report of the actions that were to be
15  taken was a satisfactory memorialization of those
16  actions.
17    Q. Okay.
18    A. So in the -- in the early time period, I
19  generally didn't even prepare minutes afterwards.
20    Q. Okay. And when you say "written report,"
21  is the executive summary of stock retention
22  recommendation, which is part of the exhibit at 4874
23  and 4875, is that an example of a written report?
24    A. Of -- yes, of a portion of the written
25  report. Yes, that's correct.

Page 169

1    MS. WEISS: Okay. Let's stop. We have to
2  change the tape.
3    THE VIDEOGRAPHER: We are going off the
4  record. The time is 2:32 p.m. Here marks the end
5  of videotape No. 2, volume 1, in the deposition of
6  Stuart Nichols.
7    (Off the record.)
8    THE VIDEOGRAPHER: We are back on the
9  record. The time is 2:34 p.m. Here marks the
10  beginning of videotape No. 3, volume 2, in the
11  deposition of Stuart Nichols.
12  BY MS. WEISS:
13    Q. I believe you said that you recognize the
14  executive summary of stock retention recommendations
15  as part of a report, and I was asking you what you
16  meant by that.
17    A. Occasionally there was additional
18  attachments or information that was part of the
19  report. And there was also a cover page that the
20  committee members signed at the time of the meeting.
21    Q. And would the first page of Exhibit 66
22  generally be the form of the page that the
23  Compensation Committee members would sign?
24    A. No.
25    Q. Okay. Do you know whether or not minutes

Page 170

1  of the November 8th, 2000 Compensation Committee
2  meeting were ever signed?
3      A.  I don't know.
4      Q.  Who was responsible for getting signatures
5  of Compensation Committee members after the meeting?
6      A.  Well, I suppose I ultimately had
7  responsibility.
8      Q.  Can you offer any reason as to why these
9  committee minutes -- well, I'm assuming they weren't
10  signed.  I don't have a signed copy.
11          Do you know whether or not a signed copy
12  exists of these committee minutes?
13      A.  Is that different from your earlier
14  question?
15      MR. BELNICK:  Do you know whether there
16  was ever a signed copy of this?
17      THE WITNESS:  I thought I already answered
18  that.
19      MR. BELNICK:  Answer it again.
20      THE WITNESS:  I don't know.
21  BY MS. WEISS:
22      Q.  These draft minutes appear to record that
23  the Compensation Committee was to propose that the
24  board approve a nonshareholder-approved plan with
25  certain terms.  It's referenced at the middle of the

Page 171

1  page.
2          Do you know whether or not the
3  Compensation Committee -- well, strike that.
4          Do you recall discussion of the
5  nonshareholder-approved plan at the Compensation
6  Committee meeting?
7      A.  No.
8      Q.  Turning back to the first page of the
9  draft, there are a number of clauses which start out
10  as "Whereas."  The second whereas says, "Whereas the
11  purpose of this grant is to retain and reward
12  Officers of the Company in the manner that is
13  consistent with the Company's compensation
14  practices."  And then it says "Resolved."  "The
15  Compensation Committee hereby approves the
16  supplemental grant, the amounts of which
17  supplemental grants will be based on the schedule
18  attached hereto."
19          And then it says, "Resolved further."  "The
20  grants will be made under the company's 1982 Stock
21  Option Plan at an exercise price equal to the price
22  listed for the Company's Common Stock on NASDAQ at
23  the close of trading on the date appearing below."
24  And then there is an attachment that shows a
25  schedule of grants.

Page 172

1          Do you recall that approval being made in
2  November of 2000?
3      A.  No.
4      Q.  Who would have drafted these draft
5  minutes?
6      A.  I believe I would have.
7      Q.  All right.  And so if you created drafts,
8  your intention in creating the draft would have been
9  to reflect what occurred at the meeting; is that
10  right?
11      A.  Correct.
12      Q.  Okay.  In your mind at the time, what
13  further action, if any, was required for the
14  Compensation Committee to make an award to officers
15  of the company other than approving the grants?
16      MR. BELNICK:  If you can answer that.
17      MR. FICKES:  I'm going to object.  That is
18  vague and ambiguous.
19          Do you mean for accounting purposes or
20  just as a matter of internal policy or what?
21      MS. WEISS:  Yes.  Thank you.
22  BY MS. WEISS:
23      Q.  Authorization with grants duly authorized
24  if the Compensation Committee approved them, or did
25  some further action have to be taken in your mind at

Page 173

1  that time?
2      MR. BELNICK:  Shirli, if we can amend that
3  to -- your question originally was what was in his
4  mind, which poses all kinds of problems.  If it was
5  amended to whether he was aware of a procedure that
6  existed at the company that had to -- what was the
7  next step that had to be taken?  And that I think
8  will eliminate what may be a potential objection.
9      MS. WEISS:  Well, I guess I'd first like
10  to know what his understanding was at that time as
11  general counsel and minute taker.  Once the -- once
12  the Compensation Committee approved grants to
13  officers, was there further action necessary for the
14  grants to be awarded?
15      MS. HEINTZ:  We're going to object to the
16  extent it requires revelation of any attorney-client
17  communication.
18      THE WITNESS:  And on that basis, I don't
19  know how to respond to your question without
20  revealing privileged communications.
21  BY MS. WEISS:
22      Q.  Well, let me ask you this, Mr. Nichols.
23  Did you undertake -- when you became the minute
24  taker for the Compensation Committee, did you
25  undertake to educate yourself as to what the charter

Page 174

1  of the Compensation Committee was?
2      A.  I do have a memory of reviewing the
3  charter of the Compensation Committee, yes.
4      Q.  And did you undertake to educate yourself
5  as to the extent of their authority to make grants?
6      A.  In connection with or prior to this, or
7  are you asking in general?
8      Q.  Well, let me back up.  Before you acted as
9  secretary for this meeting, had you undertaken to
10 become acquainted with the extent of the authority
11 of the Compensation Committee?
12     A.  Yes.
13     Q.  So did you have an understanding at the
14 time that you took the minutes for the November 8th
15 meeting as to whether or not all that was required
16 for there to be grants to officers was that the
17 Compensation Committee could approve them?
18     MS. HEINTZ:  We're going to object to the
19 extent it requires revelation of attorney-client
20 communications.
21     THE WITNESS:  The problem with your
22 question is we're sitting here in 2008, and you're
23 asking me to tell you what I remember about what my
24 state of mind was in November of 2000.
25 BY MS. WEISS:

Page 175

1      Q.  Yes, I am.
2      A.  And I just don't remember.  I don't know
3  what I -- what I knew at that time relative to your
4  question, which is about the authority of the
5  Compensation Committee to make stock option grants.
6      Q.  So do you know if someone had asked you in
7  November of 2000 whether it was sufficient for
8  purposes of authorizing officer grants if the
9  Compensation Committee approved them, as you sit
10 here today, you can't tell me whether or not you
11 would have been able to answer that question in
12 November of 2000?
13     MR. FICKES:  I will object that that calls
14 for speculation.
15     MS. WEISS:  Well, he knows what he knew at
16 that time; right?
17 BY MS. WEISS:
18     Q.  I mean, you knew what your custom and
19 practice was at that time?
20     A.  No.  I'm afraid I --
21     MR. BELNICK:  He knew then what it was,
22 but he's talking about what he knows now, eight
23 years later.
24     THE WITNESS:  I don't know what I knew
25 then.  I know what I know now, but I don't know

Page 176

1  whether what I know now is what I knew then.  I
2  suspect they are different things.
3  BY MS. WEISS:
4      Q.  Well, would you have -- you were also the
5  minute taker for the board; right?
6      A.  Correct.
7      Q.  And the company was granting options on a
8  regular basis; correct?
9      MR. FICKES:  Objection.  Vague as to
10 "regular basis."
11     DEPOSITION REPORTER:  I'm sorry.
12 Objection --
13     MR. FICKES:  Objection.  Vague as to
14 "regular basis."
15 BY MS. WEISS:
16     Q.  More than once a year; correct?
17     A.  In the 2000 time frame, I just don't
18 remember when we started -- when KLA started the
19 practice of making options -- oh, you mean for new
20 hires?
21     Q.  No.  I'm talking about officers.
22     A.  Yeah.  See, I just don't remember when KLA
23 adopted this practice of making grants more than
24 just annually.
25     Q.  Okay.  Well, why don't we get the board

Page 177

1  minutes in front of us, too.  We've identified the
2  Compensation Committee minutes.  The board minutes
3  are Exhibit 65.
4      MS. WEISS:  Have I identified those for
5  the record?  I can't remember.
6      MR. BELNICK:  Yes, you have.
7  BY MS. WEISS:
8      Q.  All right.  So if you take a look at
9  Exhibit 65, there is minutes of the board on
10 November 10th and the Compensation Committee minutes
11 on November 8th that are presented in draft that I
12 think you testified you prepared.  Do you see that?
13     A.  Yes.
14     Q.  All right.  So as to the draft
15 Compensation Committee minutes, it provides that,
16 "The Compensation Committee hereby approves the
17 supplement grant, the amount of which supplemental
18 grants will be based on the schedule attached
19 hereto."  And then there's a schedule showing grants
20 to a number of officers.
21     And then let's look at the board minutes
22 of November 10th, 2000.  And on page 2, there's the
23 report of the Compensation Committee.  Below that it
24 states, "Ed Barnholt reported on the results of the
25 meeting of the Compensation Committee by summarizing

45 (Pages 174 to 177)

Page 178

1  the Executive Summary of the Stock Retention
2  Recommendation attached as Exhibit B." And it says,
3  "The Board discussed, and on motion duly made and
4  seconded, unanimously ratified the actions taken in
5  Exhibit B."
6      Do you see that, sir?
7   A. Yes.
8   Q. All right. And you were the minute taker
9  of the board of directors meeting on November 10th,
10 2000, and that's your signature that appears below;
11 correct?
12  A. Yes.
13  Q. All right. So were the options to the
14 officers granted on November 8th or November 10th?
15     MR. BELNICK: As you recall.
16     THE WITNESS: Yeah. So, again, is your
17 question what I remember at the time, or are you
18 asking me to look at these and give you a legal
19 conclusion?
20     MR. BELNICK: Right.
21 BY MS. WEISS:
22  Q. At the time, did you believe that the
23 options were granted on November 8th or November
24 10th?
25     MR. BELNICK: I think he said -- I think

Page 179

1  he's answered that, but go ahead.
2      THE WITNESS: Whether -- I don't know that
3  I've answered that.
4      MR. BELNICK: Okay.
5      THE WITNESS: But I can tell you I don't
6  have a distinct memory about whether I thought that
7  grants occurred on the 10th, the 8th or would occur
8  at some future date. I truly don't know what my
9  state of mind was back in that time frame.
10 BY MS. WEISS:
11  Q. In 2001 did you undertake to try to
12 ascertain whether or not officer grants that are
13 approved by the Compensation Committee and ratified
14 by the board are made as of the date of the
15 Compensation Committee approval or the board
16 ratification? Would you undertake to look at that
17 issue?
18  A. Not that issue, no.
19  Q. Did you come to an understanding in 2001
20 as to -- in the scenario I described whether or not
21 the grants were made at the date of the Compensation
22 Committee meeting or the board meeting?
23     MR. BELNICK: I know what his problem is
24 going to be in answering that. You limited it to
25 two entities. There may have been another entity.

Page 180

1  BY MS. WEISS:
2   Q. Can you answer my question?
3   A. Well, yeah, I can, but the problem is it
4  contains a premise that by virtue of the way you're
5  asking the question, the answer is no. I didn't
6  look at the question that you're now posing. Does
7  the Compensation Committee -- if it makes a grant
8  that is ratified by the board, is that a valid
9  grant? No, I don't remember ever looking at that
10 question.
11  Q. Okay. So you had no understanding at that
12 time as to whether, at the end of a board meeting
13 that had granted options, whether or not those
14 grants were finally made or you did have an
15 understanding?
16  A. No. I think what I've testified to
17 already is that I don't remember what my state of
18 mind was about the authority of these entities that
19 you're now describing, the Compensation Committee
20 and the board, what are -- what were the
21 prerequisites for a valid grant. In terms of my
22 perception back in November of 2000, I don't know my
23 state of mind back then.
24  Q. Do you have an understanding now as you
25 look at these documents with hindsight? Do you have

Page 181

1  an understanding as to when, if at all, the grant to
2  the officers was made in terms of date?
3      MR. BELNICK: Objection. I think that's
4  now asking for a legal conclusion --
5      MS. WEISS: No. I'm asking him for his
6  understanding. He could be right or wrong, and we
7  can argue about that for ten days. I want his
8  understanding now.
9      MS. HEINTZ: We're also objecting on the
10 basis to the extent it reveals attorney-client
11 communications.
12     THE WITNESS: And if I may, I think the
13 other problem with your question is are you asking
14 from the standpoint of Delaware corporate law, from
15 the standpoint of accounting standards? I mean,
16 I --
17 BY MS. WEISS:
18  Q. I'm asking from the standpoint of the
19 authority to grant options as applied to K.I.A.
20 What's your understanding?
21     MR. BELNICK: I object. I think -- okay.
22 It's an improper question. The witness has told
23 you, Shirli, one of the problems with it.
24     MS. WEISS: I think you need to speak up
25 or I think the record is going to be kind of messy.

Case 5:07-cv-03798-JW   Document 40-10   Filed 02/01/2008   Page 48 of 60
Case 5:07-cv-03798-JW   Document 51-6   Filed 02/11/2008   Page 24 of 41

Nichols, Stuart J. Esq.                                              1/27/2008

**Page 182**

1    MR. BELNICK: What I'm saying is that the
2  witness himself has told you there are different
3  problems -- there are different areas that one can
4  look to answer that question depending on the
5  purpose of the question, whether it was accounting
6  standards or Delaware law for corporate governance
7  or tax standards if it was for the purpose of tax, I
8  suppose. So this is a very broad question.
9        Secondly, I think whatever understanding
10  he has now of any of those -- well, let me just stop
11  there. It's up to KLA if they have any further
12  problem. But I think that's one of the
13  difficulties, leaving privilege aside, with the
14  breadth of the question.
15        MS. WEISS: Okay. I think I'm entitled to
16  know what his understanding is now. If his under --
17        MR. BELNICK: I'm not stopping you.
18        MS. WEISS: If we establish that his
19  understanding is based on some communication, he can
20  say that and not reveal the communication.
21        MR. BELNICK: Okay.
22        MS. WEISS: But I think I'm entitled to
23  understand what his current understanding is as to
24  when the grant would have been made.
25  BY MS. WEISS:

**Page 183**

1    Q. Can you answer that?
2        MS. HEINTZ: To the extent it doesn't
3  reveal attorney-client communication.
4  BY MS. WEISS:
5    Q. I'm not asking for communication. What's
6  your understanding right now as you look at these
7  documents?
8    A. Okay. So --
9    Q. If somebody asked you right now, these
10  grants were approved by the Compensation Committee.
11  They were ratified by the board two days later.
12  Mr. Nichols, what's your current understanding as to
13  the date of grant? What would you say?
14        MR. FICKES: I would object on relevance
15  grounds, and that calls for a legal conclusion.
16        MR. BELNICK: I would object on more than
17  that. That definitely -- that understanding would
18  be based on, among other things, communications that
19  Mr. Nichols had with me and other of his lawyers.
20        MS. WEISS: I don't care what it's based
21  on. I'm not asking for the communication. I want
22  to know what his current understanding is, and then
23  I'm going to ask him how he came to that
24  understanding. If that understanding then has to do
25  with communication, I don't want to know about the

**Page 184**

1  communication.
2        MR. BELNICK: If you want to ask him, does
3  he have an understanding, then he can answer yes or
4  no. Then if you want to ask him how did he come to
5  that understanding, fine. He can tell you that.
6  But you're starting by asking, unless I'm mishearing
7  the question, what is his understanding. If someone
8  came to him today and said, What's the answer, tell
9  us what's the answer. When you start from there,
10  it's objectionable because there have been
11  privileged communications that would have, I
12  believe, led in part or in whole to that
13  understanding.
14        MS. WEISS: I disagree with you entirely.
15  I'm entitled to his understanding. You're
16  obstructing the record.
17        MR. BELNICK: No, I'm not.
18        MS. WEISS: I've asked the -- I've asked
19  the witness --
20        MR. BELNICK: I'm trying to facilitate
21  this.
22        MS. WEISS: If you're going -- if you're
23  going to instruct him not to answer based on
24  attorney-client privilege, then we'll have that as
25  the record. But I've asked him a simple question

**Page 185**

1  that I think is highly relevant.
2        MR. BELNICK: Can I voir -- can I just
3  voir dire him?
4        MS. WEISS: You can go and have a meeting
5  with him if you would like.
6        MR. BELNICK: No. I'm just -- I'm trying
7  to facilitate it, Shirli. Ask him -- can't we start
8  by asking him, A, do you have an understanding? B.
9  how did you come to the understand? Then we will
10  know, all of us, whether there is a foundation to
11  object to C, which is, what is the understanding?
12  I'm not obstructing; I'm trying to get it done so
13  that we don't sit here and argue. I don't want to
14  argue. He's a percipient witness. He has no stake
15  other than to answer the questions to the extent
16  they don't involve a privilege.
17  BY MS. WEISS:
18    Q. Can you answer the question that I posed,
19  Mr. Nichols?
20        MR. BELNICK: Could you repeat it to him.
21  please.
22  BY MS. WEISS:
23    Q. As you look at these documents today, do
24  you have an understanding as to whether or not the
25  grant that we've been referring to was made under

47 (Pages 182 to 185)

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 186

1   these facts on November 8th or November 10th?
2       MR. BELNICK:  You can answer that.
3       MS. HEINTZ:  Well, we're going to also
4   instruct not to answer if it is based on an
5   attorney-client communication.
6       MR. BELNICK:  Then you follow KLA's
7   direction.
8       THE WITNESS:  Without relying on
9   privileged communications, my opinion would be
10  that --
11      MR. BELNICK:  No.  The question was do you
12  have an understanding, not what is it.
13      THE WITNESS:  Okay.  I think it was do I
14  have an opinion.  Do I have an understanding?  Yes.
15  I have an understanding.
16  BY MS. WEISS:
17      Q.  Okay.  And what is it?
18      MS. HEINTZ:  We're going to object again,
19  to the extent it's based on an attorney-client
20  communication, not to answer that question.
21      MR. FICKES:  And I'll object again on
22  relevance grounds.
23      THE WITNESS:  Okay.  So without relying on
24  attorney-client information, my understanding
25  looking at these documents is that at a validly

Page 187

1   composed meeting of the Compensation Committee which
2   has authority to make grants, there were minutes
3   that were executed that indicated all of the
4   elements that would be necessary from an accounting
5   standpoint to make a grant to officers, namely, the
6   individuals, the number of the grant -- of the
7   options to each individual, the date upon which it
8   was to be priced and all the terms.
9       So I would say that on the 8th, there was
10  a valid grant.
11  BY MS. WEISS:
12      Q.  All right.  And is it your belief that KLA
13  Tencor's Compensation Committee charter delegated to
14  the Compensation Committee the authority to make
15  grants, or are you relying on some other source for
16  that understanding?
17      A.  Can you read back the question.
18      (Record read as follows:
19      "Question:  And is it your belief that
20      KLA Tencor's committee charter delegated
21      to the Compensation Committee the
22      authority to make grants, or are you
23      relying on some other source for that
24      understanding?")
25      THE WITNESS:  So if I understand your

Page 188

1   question, you said does the committee charter
2   delegate to the Compensation Committee?  I don't
3   think you meant that.
4   BY MS. WEISS:
5       Q.  Does the committee charter empower the
6   Compensation Committee?
7       A.  Which committee?  Which committee charter?
8       Q.  Does the Compensation Committee charter
9   empower the Compensation Committee to make officer
10  grants?
11      A.  Yes.
12      Q.  All right.  Now, at KLA Tencor in November
13  of 2000, who was responsible for properly accounting
14  for stock options to officers?
15      A.  Which individual or which department?
16      Q.  Let's start with the individual, and then
17  we'll go to the department.
18      A.  Well, ultimately, at that time John
19  Kispert was the -- was the CFO, so he would be
20  ultimately responsible for the proper accounting of
21  the stock -- of any accounting matter.
22      Q.  Including accounting for stock options
23  granted to officers; is that correct?
24      A.  Correct.
25      Q.  And Mr. Kispert had access to the

Page 189

1   Compensation Committee minutes of the company
2   whenever he wanted them; correct?
3       A.  Correct.
4       Q.  He also had access to the board of
5   directors minutes whenever he wanted them; correct?
6       A.  Correct.
7       Q.  Take a look at the second page of the
8   report where -- first, the supplemental stock award
9   for officers.
10      Okay.  The first paragraph states,
11  "Background:  A supplemental grant equal to half the
12  recent 'Peak' grant with a 5 year vest was recently
13  approved for all eligible employees in order to
14  increase retention.  Additionally, certain employees
15  with options at $55 a share or greater were given a
16  surrender option for those grants.  Prior to this
17  supplemental grant 50% of optionees were underwater
18  at the market price of $30 a share and turnover of
19  the company was increasing as the stock price was
20  declining."
21      Do you see that?
22      A.  Yes.
23      Q.  And then it says, "Officers are to be
24  awarded grants from the Shareholder Approved plan
25  under the same program used for the employees.  See

48 (Pages 186 to 189)

Nichols, Stuart J. Esq.                                        1/27/2008

Page 190

1  attached for full detail."
2      Can you tell me what it meant in the
3  minutes when you said, "Officers are to be awarded
4  grants from the Shareholder Approved plan under the
5  same program used for employees"?  What employee --
6  what program was being referred to?
7      A.  I'm sorry.  Can you refer me to the
8  language that --
9      Q.  Beside "Recommendation," it says,
10  "Officers are to be awarded grants from the
11  Shareholder Approved plan under the same program
12  used for employees."
13      A.  You said when I said this.
14      Q.  Well, you created -- are these not --
15      MR. BELNICK:  This is the report.
16      THE WITNESS:  I did not create this
17  document.
18      MS. WEISS:  Oh, okay.  That's right.
19  Thank you for the correction.
20  BY MS. WEISS:
21      Q.  Do you have -- can you tell me what "the
22  same program used for employees" is a reference to
23  in those minutes?
24      A.  I can't interpret those words any better
25  than you can.

Page 191

1      Q.  All right.  Thank you.
2      All right.  On the first page of the
3  minutes, at the bottom it says, "The Compensation
4  Committee also reviewed and approved actions
5  recommended by management of the company regarding
6  the issuance of a supplemental option grant to
7  nonofficer employees."
8      Do you see that?  That's right above the
9  word "Draft."
10      MR. BELNICK:  The first sentence after the
11  last "resolved further" clause.
12      THE WITNESS:  Yeah.  Yeah.  I see that.
13  Okay.  I'm sorry.  The question is?
14  BY MS. WEISS:
15      Q.  Do you see that phrase?
16      A.  I see that, yeah.
17      Q.  Okay.  So -- and you recorded that as --
18  in the draft of the Compensation Committee minutes
19  of November 8th, 2000; correct?
20      A.  Yes.  Correct.
21      Q.  All right.  So the action taken by the
22  Compensation Committee in that paragraph related not
23  to officers, but to nonofficer employees; correct?
24      A.  Well, assuming that in fact these are the
25  actions of the committee.  You've pointed out that

Page 192

1  you don't have a signed draft, and apparently
2  there's a question about whether a signed draft even
3  occurred.  I don't know as I sit here today whether
4  I prepared this in advance, whether the meeting was
5  consistent with that.
6      Having said that, I think the words speak
7  relatively clearly for themselves.
8      Q.  All right.  So if this draft properly
9  reflects what actually occurred at the Compensation
10  Committee meeting, the Compensation Committee
11  approved grants made to officers under the 1982
12  stock option plan; correct?
13      A.  Correct.
14      Q.  And also approved a recommendation of
15  management for a supplemental option grant to
16  nonofficer employees; correct?
17      A.  That appears to be the case, yes.
18      Q.  Okay.  And then the board on -- two days
19  later ratified the actions of the Compensation
20  Committee; correct?
21      A.  Correct.
22      MS. WEISS:  Let's take a look at the
23  Compensation Committee charter.  Do you know what
24  that is?
25      MR. FICKES:  Shirli, would this be a good

Page 193

1  time for a break?
2      MS. WEISS:  Sure.
3      THE VIDEOGRAPHER:  Off the record.  The
4  time is 3:04 p.m.
5      (Off the record.)
6      (Whereupon, Exhibit 67 was marked
7      for identification off the record.)
8      THE VIDEOGRAPHER:  Back on the record.
9  The time is 3:25 p.m.
10  BY MS. WEISS:
11      Q.  Okay.  Mr. Nichols, so before the break we
12  were talking about Exhibit 66, which was the minutes
13  of the November 8th, 2000 Compensation Committee
14  meeting, the draft minutes.  Those -- the draft
15  minutes, if correct, reflect that the Compensation
16  Committee approved supplemental grants to KLA
17  Tencor's officers and also reviewed and approved
18  actions recommended by management of the company
19  regarding the issuance of supplemental option grants
20  to nonofficers.
21      Then if we look at Exhibit 65, which is
22  the minutes of the board of directors -- and these I
23  believe are signed by you -- they reflect a
24  presentation by Mr. Barnholt, a member of the
25  Compensation Committee, of the results of the

49 (Pages 190 to 193)

Page 194

1    meeting of the Compensation Committee and the
2    approval of those actions by the board of directors.
3         And I believe you said -- your
4    understanding is that the Compensation Committee
5    could make the grants I just described to the
6    officers without ratification or approval by the
7    board. Did I get that right?
8       A. Yes.
9       Q. Was it -- is it your understanding that
10   the Compensation Committee could approve the
11   recommendations of management with respect to the
12   nonofficers without ratification of the board?
13      A. You know, I don't have a specific
14   understanding about that, about the comp committee
15   approving actions of management. I -- yeah. I
16   don't have an understanding about that.
17      Q. Okay. But you do agree that that's
18   reflected in the Compensation Committee minutes?
19      A. Yes.
20      Q. Okay. As to your understanding about the
21   need or lack of need for ratification by the board,
22   if you would just take a look at the charter of the
23   Compensation Committee. That is attached as Exhibit
24   B-2 to Exhibit 67. Exhibit 67 is Bates stamped
25   MLB/KLA-SEC00050391 through 50458.

Page 195

1       MR. BELNICK: Where will we find B-2? I
2    only have Exhibit D.
3       MS. WEISS: Yeah. I'll tell you in a
4    minute. The compilation is the minutes of the
5    meeting of the board of directors of KLA Instruments
6    Corporation April 28th, 1997.
7       MR. BELNICK: Oh, B-2. I see.
8       MS. WEISS: And the charter commences on
9    Bates stamp 50408 --
10      MR. BELNICK: Through 10.
11      MS. WEISS: Excuse me just a minute.
12      All right. These minutes appear to
13   reflect actions taken in anticipation of the merger
14   of KLA Instruments with Tencor Corporation. And one
15   of those actions is the appointment of new members,
16   amendment of charters for the Audit, Compensation
17   and Nominating Committee. That reference is on page
18   3 toward the bottom.
19      MR. BELNICK: Just so the record is clear,
20   Shirli, this is a meeting that took place before
21   Mr. Nichols joined the company.
22      MS. WEISS: Yes. I'm just laying a
23   foundation --
24      MR. BELNICK: I understand.
25      MS. WEISS: -- for the charter, so bear

Page 196

1    with me here.
2       MR. BELNICK: No. I understand.
3    BY MS. WEISS:
4       Q. So as I understand it, the company,
5    conditioned on the merger, adopted amended charters
6    for the Compensation, Audit and Nominating
7    Committee. That's reflected on page 3 of these
8    minutes. The charter for the Compensation Committee
9    is attached as B-2.
10      First of all, during your tenure at KLA
11   Tencor, sir, did you have occasion to review the
12   Compensation Committee charter?
13      A. Yes.
14      Q. All right. And I think earlier you
15   testified that your current understanding is that
16   the Compensation Committee was empowered to make
17   officer grants without ratification by the board.
18   We referred to the Compensation Committee charter.
19   This is I believe the charter of KLA Tencor's
20   Compensation Committee. It's not that long.
21      Could you please review it and tell me
22   what section you're relying on in your understanding
23   of what you testified to that the Compensation
24   Committee could make a grant to officers without
25   approval of the board?

Page 197

1       A. Is this the charter that was in effect
2    in -- this is a meeting dated April '97. Is this
3    the charter that was in effect in 2000, the time
4    frame about which you're asking me?
5       Q. That's my understanding. And your
6    testimony is subject to that representation.
7       A. Okay.
8       Q. That's my understanding.
9       A. It would appear to me that paragraph 6
10   contains that authority.
11      Q. All right. And so paragraph 6
12   cross-references the 1982 stock option plan?
13      A. Yes.
14      Q. And it also refers to authority delegated
15   by the board of directors to grant stock options or
16   stock purchase rights to individuals eligible for
17   such grants, including grants to individuals subject
18   to section 16 of the Securities Exchange Act of
19   1934. That would be officers; correct?
20      A. Correct.
21      Q. All right. Is it your belief that that
22   authority is delegated by virtue of this paragraph
23   and requires no additional delegation? That
24   would -- would that be your interpretation of this
25   provision?

Page 198

1    A.  Yes.
2        MS. WEISS:  Now I'm going to jump ahead in
3    time to the time period just before the March 2001
4    memorandum that we referred to earlier.
5        (Off the record.)
6        MS. WEISS:  Okay.  I'm going to mark a
7    number of exhibits in connection with what we'll
8    call the March 2001 memo.  So if you'll just bear
9    with me.  I'll handle -- I'll hand them to you one
10   after another, and then I'll ask you a few
11   questions.
12       And we're now at Exhibit --
13       DEPOSITION REPORTER:  68.
14       MS. WEISS:  Okay.  68.
15       (Whereupon, Exhibit 68 was marked
16       for identification.)
17       MS. WEISS:  69; 70; 71; 72; 73; 74; 75;
18   76; 77; 78; 79; 80; 81.
19       (Whereupon, Exhibits 69, 70, 71, 72, 73,
20       74, 75, 76, 77, 78, 79, 80 and 81 were
21       marked for identification.)
22       MS. WEISS:  I think Exhibit 76 is the only
23   one I need for this group.  Did you already give me
24   that?  Thanks.
25       What's next, 82?  82.

Page 199

1        (Whereupon, Exhibit 82 was marked
2        for identification.)
3    BY MS. WEISS:
4    Q.  Okay.  So, Mr. Nichols, the court reporter
5    had handed you what's been marked as Exhibits 68
6    through 82.  Take a look at Exhibit 77.  Can you
7    identify that exhibit?
8    A.  Yes.
9    Q.  What is it?
10   A.  This is a memo that I prepared directed --
11   that I gave to Ken Schroeder.
12   Q.  The date on it is March 19th, 2001.  The
13   Bates stamp is KT ACWP-PRIV00002391 to 2394 -- I'm
14   sorry -- 95.  It's a memorandum marked "Privileged
15   and Confidential," addressed to Ken Schroeder from
16   Stu Nichols with copies to Maureen Lamb, John
17   Kispert and Joy Nyberg, "Re:  Stock Option Pricing."
18       Do you see that, sir?
19   A.  Yes.
20   Q.  You sent that to Mr. Schroeder on March
21   19th, 2001?
22   A.  Yes.
23   Q.  And you sent copies to Maureen Lamb, John
24   Kispert and Joy Nyberg as shown?
25   A.  Yes.

Page 200

1    Q.  And you sent a copy to Maureen Lamb with
2    the expectation that she would read it?
3    A.  Well, to all of them with that
4    expectation.
5    Q.  Okay.  And you sent it to Mr. Kispert with
6    the expectation that he would read it?
7    A.  Yes.
8    Q.  And you sent it to Joy Nyberg with the
9    expectation that she would read it?
10   A.  Yes.  Well, actually, let me clarify.  I
11   sent it to Ken Schroeder with the expectation that
12   he would read it.  I copied Maureen, John and Joy
13   because I wanted to -- them to know that I had
14   written it.  So I don't know that I can say that I
15   expected them to read it.  I mean, any time you're
16   copied on something, you know, you should.  But I
17   think my primary motivation was to just make them
18   aware of what I was communicating to Ken.
19   Q.  And the way that they would be aware of it
20   would be that they would read it; correct?
21   A.  Right.
22   Q.  All right.  Now, as I understand your
23   instruction from counsel, you're going to refuse to
24   testify with respect to this memorandum on the
25   grounds of attorney-client privilege.  Is that

Page 201

1    correct?
2        MS. HEINTZ:  That's correct.
3    BY MS. WEISS:
4    Q.  Okay.  And I think you've already
5    testified that you did not prepare the memorandum in
6    anticipation of litigation; correct?
7    A.  Correct.
8    Q.  And is it the company's position that it
9    will instruct Ms. Lamb, Mr. Kispert, Joy Nyberg and
10   Mr. Schroeder not to testify with respect to this
11   communication from the general counsel Stu Nichols?
12       MS. HEINTZ:  We're prepared to instruct
13   with respect to Mr. Nichols at this time.  We can
14   discuss other applications of the privilege after
15   the deposition.
16       MS. WEISS:  And so is it your statement
17   that you will not commit on the record at this time
18   as to whether or not you will instruct the people
19   that I mentioned that are addressees of this
20   memorandum not to testify?
21       MS. HEINTZ:  With respect to this
22   memorandum, we would instruct them not to testify.
23       MS. WEISS:  Okay.  So it is the company's
24   position that none of these people will be permitted
25   to testify with respect to Exhibit 77 should they be

Page 202

1  called as witnesses, including Mr. Schroeder?
2      MS. HEINTZ: Yes.
3      MS. WEISS: What number -- what was the
4  next number?
5      DEPOSITION REPORTER: 83.
6      (Whereupon, Exhibit 83 was marked
7      for identification.)
8  BY MS. WEISS:
9      Q. Mr. Nichols, Exhibit 83 is a copy of the
10  complaint filed in the United States District Court
11  for the Northern District of California, San Jose
12  Division, by the Securities and Exchange Commission
13  as plaintiff against my client, Kenneth L.
14  Schroeder, on July -- I think it's 25th, 2007.
15      Please review as much of the complaint as
16  you need to to respond to my questions. But I'm
17  going to direct your attention to paragraph 29 under
18  the heading "C., in a March 2001 memorandum
19  Schroeder receives legal advice that he cannot
20  retroactively set stock prices," paragraphs 29, 30,
21  31, 32 and 33.
22      MR. BELNICK: This is not for the record.
23  But, Shirli, where was the paragraph that you read
24  that line from?
25      MS. WEISS: It's the heading on page 7 in

Page 203

1  the middle of the page.
2      MR. BELNICK: I see. Okay. Thanks.
3      (Discussion off the record between
4      Deponent and Counsel.)
5      MR. BELNICK: Shirli, I'll ask if you want
6  or you may ask, but I think it would be helpful to
7  establish whether the witness has ever read this
8  complaint before today.
9      MS. WEISS: Sure, I can ask that question.
10      MR. BELNICK: You can ask it.
11  BY MS. WEISS:
12      Q. Have you ever read this complaint before
13  today?
14      A. No.
15      Q. All right. Have you had a chance to read
16  the paragraphs that I referenced?
17      A. Yes.
18      Q. All right. Can you tell me, Mr. Nichols,
19  if you believe that the reference to paragraph 31
20  and 32 in this complaint is a reference to Exhibit
21  77?
22      A. It appears to be a reference to that
23  exhibit, yes.
24      Q. All right. Thank you.
25      Take a look at Exhibit 78. The lower part

Page 204

1  of Exhibit 78 is an email from Mr. Schroeder to you
2  dated March 22nd, 2001, which appears to be
3  responding to Exhibit 77. Do you see that, sir?
4      A. Uh-huh. Yes.
5      Q. Take a moment and tell me, if you can, if
6  you believe that the allegations in paragraph 33 are
7  a reference to Exhibit 78.
8      A. Yes, it would appear so.
9      MS. WEISS: Miss Heintz, is it the
10  company's position that it will instruct Mr. Nichols
11  not to testify with respect to Exhibit 78 on the
12  grounds of the attorney-client privilege?
13      MS. HEINTZ: Yes.
14      MS. WEISS: Is that the company's position
15  with respect to the individuals identified on
16  Exhibit 77?
17      MS. HEINTZ: Well, they are not identified
18  as recipients of No. 78.
19      MS. WEISS: Yes. But to the extent that I
20  ask them questions about Mr. Schroeder's response,
21  would the company's position be the same? That is
22  to say --
23      MS. HEINTZ: To the extent they would
24  reveal attorney-client communications, yes.
25      MS. WEISS: Would you permit them to

Page 205

1  respond to questions that did not involve reference
2  to Mr. Nichols' memo?
3      MS. HEINTZ: We would have to determine
4  that on a case-by-case basis.
5      MS. WEISS: But as to communications that
6  in any way touched upon Mr. Nichols' communication,
7  you would instruct them not to answer. Is that your
8  position?
9      MS. HEINTZ: If they are communications
10  with Mr. Nichols, yes.
11      MS. WEISS: Only if they are
12  communications with Mr. Nichols?
13      MS. HEINTZ: Or to the extent they are
14  about communications of Mr. Nichols.
15      MS. WEISS: So if Mr. Kispert and
16  Mr. Schroeder had a conversation about Mr. Nichols'
17  memorandum, would you instruct both of those
18  individuals not to respond -- not to answer my
19  questions based on the attorney-client privilege?
20      MS. HEINTZ: We'd have to determine that
21  based on the question and the context.
22      MS. WEISS: So it depends on how the
23  question is asked whether or not they could respond
24  to the question about Mr. Nichols --
25      MS. HEINTZ: Or what the subject matter of

Nichols, Stuart J. Esq.

1/27/2008

Page 206

1  the question is.
2       MS. WEISS: I'm assuming that the subject
3  matter of the question is Mr. Nichols' memo. Take
4  that as the assumption. I'm just trying to shortcut
5  a bunch of depositions here.
6       MS. HEINTZ: I understand.
7       MS. WEISS: Would you instruct
8  Mr. Schroeder and Mr. Kispert not to respond if the
9  questions were posed about Mr. Nichols'
10 communications to Mr. Schroeder?
11      MS. HEINTZ: Yes.
12      MS. WEISS: And would that be your
13 position with respect to questions posed by the SEC
14 as well as Mr. Schroeder's counsel or only
15 Mr. Schroeder's counsel?
16      MS. HEINTZ: No with respect to both.
17      MS. WEISS: Okay. So if the SEC asks
18 questions of Mr. Nichols about Exhibit 77 and 78,
19 you would instruct him not to answer. Same thing
20 with all these other people that are cc'd on the
21 memorandum that is Exhibit 77; correct?
22      MS. HEINTZ: Yes.
23      MS. WEISS: Okay. So I propose that we
24 leave a blank in the record here for the listing of
25 each of these exhibits, and then I ask some group

Page 207

1  questions of Mr. Nichols to establish the assertion
2  of the privilege. Shall we do that?
3       MR. BELNICK: That sounds good to me.
4       MS. WEISS: I'll be happy to recite all
5  this stuff, but you might be asleep at the end of
6  it.
7       MR. BELNICK: Heaven forbid. I mean,
8  unless the SEC objects --
9       MR. FICKES: We don't.
10      MR. BELNICK: -- it sounds like --
11      MS. WEISS: You're okay with that? All
12 right. So we'll ask -- we'll identify them for the
13 court reporter.
14 BY MS. WEISS:
15      Q. But I'm going to ask you, Mr. Nichols, as
16 to each of the exhibits that I have identified,
17 numbers --
18      MR. BELNICK: 68 through --
19      MS. WEISS: -- 68 through 83 --
20      MR. FICKES: Do you mean the complaint?
21      MS. WEISS: 82. 68 through 82.
22      MR. BELNICK: Everything but the
23 complaint.
24      MS. WEISS: And, Miss Heintz, this is
25 probably more of a question for you. As to any

Page 208

1  question that I might pose to Mr. Nichols with
2  respect to these communications, other than
3  identifying himself as either a sender, a recipient
4  of these communications, would your instruction to
5  him be not to respond to my questions based on
6  the attorney-client privilege?
7       MS. HEINTZ: Well, 68 -- Mr. Nichols is
8  not a recipient of the emails in Exhibit 68.
9       MS. WEISS: Okay. Let me just get that in
10 front of me here.
11      You are correct.
12      Would you -- well, that's a good point.
13 Let's look at Exhibit 68.
14 BY MS. WEISS:
15      Q. Exhibit 68 is an email from Mr. Coffey to
16 Joy Nyberg asking in the first sentence, "Joy, Ken
17 Schroeder sent me an email asking if the comp
18 committee meeting had been scheduled," and then it
19 goes on.
20      During the time period referred to in this
21 email, March of 2001, who normally set comp
22 committee meetings? Who normally arranged for a
23 comp committee meeting that had not been
24 prescheduled?
25      A. I believe that my assistant would do that.

Page 209

1       Q. All right. Do you recall during this time
2  period Mr. Schroeder asking that a comp committee
3  meeting be scheduled?
4       A. No.
5       Q. Okay. Ms. Nyberg responds, "I have not
6  tried to schedule a date as we were to get
7  confirmation from Stu regarding the pricing of the
8  extra supplemental grant for section 16 officers."
9  And she goes on.
10      Is there anything about her email back
11 that refreshes your recollection that in early March
12 of 2001, Mr. Schroeder requested that a comp
13 committee meeting be scheduled?
14      A. No.
15      Q. Okay. Exhibit 69. Did you send the email
16 dated March 13th, 2001 to Roger Stern with a copy to
17 Mr. DiMarco as represented by that exhibit?
18      A. It appears I did, yes.
19      Q. You have no reason to believe that you did
20 not?
21      A. That's correct.
22      Q. All right.
23      MS. HEINTZ: Wait a second. I don't have
24 a copy of 69.
25      MS. WEISS: We'll supply you with a copy.

53 (Pages 206 to 209)

Page 210

1      MR. BELNICK: It's not a big point,
2  Shirli, but I just will point out that 69 is
3  addressed to both Stern and DiMarco as opposed to
4  just Stern with a copy to DiMarco.
5      MS. WEISS: Yes. Thank you. You're
6  right.
7  BY MS. WEISS:
8      Q.  Okay. Exhibit 70 is an email chain,
9  beginning with an email dated March 13th, 2001 from
10  Joy Nyberg to Stuart Nichols and Maureen Lamb --
11      MR. BELNICK: You said it's from all three
12  of them. I think you just wanted --
13      MS. WEISS: I'm sorry. From Joy Nyberg to
14  Stuart Nichols and Maureen Lamb.
15  BY MS. WEISS:
16      Q.  Is that right?
17      A.  Yes.
18      MR. FICKES: Are you looking at the
19  original message?
20      MS. WEISS: Let's start over. The
21  original message is --
22      MR. BELNICK: That's the one at the
23  bottom. You go from the bottom up.
24      MR. FICKES: Right.
25  BY MS. WEISS:

Page 211

1      Q.  The original message appears to be an
2  email from Stuart Nichols sent March 12th, 2001, to
3  Joy Nyberg and Maureen Lamb, with a response from
4  Joy Nyberg dated March 13th, 2001 to Stuart Nichols
5  and Maureen Lamb, and a further email from Stuart
6  Nichols to Maureen Lamb and Joy Nyberg dated March
7  13th, 2001.
8      MR. BELNICK: In between is the one from
9  Lamb.
10      MS. WEISS: You're right. In between
11  there is one from Lamb dated March 13th, 2001
12  addressed to Joy Nyberg and Stuart Nichols.
13      MR. BELNICK: Right.
14  BY MS. WEISS:
15      Q.  This email chain represented by Exhibit
16  70, do you have any reason to believe that you were
17  not the sender and recipient as shown on this email
18  string?
19      A.  No. I don't have any reason to believe
20  that I was not.
21      MR. BELNICK: And for the clarity of your
22  record, Shirli, going up the message from
23  Miss Nyberg to Nichols and Lamb it says. "See my
24  comments below in red." I think we can agree that
25  this exhibit as marked doesn't indicate any comments

Page 212

1  in red or any other color.
2      MS. WEISS: Thank you for that
3  clarification.
4  BY MS. WEISS:
5      Q.  If you take a look at the second page of
6  Exhibit 70, there appears to be a notation under
7  "Stock Option Committee" which starts in
8  parentheses "(Stu)" and then a comment. And then in
9  the next paragraph there is another notation in
10  parentheses that says "(Stu)" and then a sentence.
11      Do you have an understanding as you look
12  at this as to whose comments -- as to whether or not
13  those are comments by a person other than yourself?
14  Wait a minute.
15      Do you believe that those are comments by
16  a person on your message other than yourself?
17      A.  I wouldn't use my own name to make
18  comments to myself.
19      Q.  Yes, one would hope. It would be strange.
20  Do you think those are Miss Nyberg's comments?
21      A.  Yes, I do.
22      Q.  All right. Okay. Exhibit 71 is an email
23  from Bret DiMarco dated March 13th, 2001 to Stuart
24  J. Nichols and Roger Stern with an attachment.
25      Do you have any reason to believe that you

Page 213

1  did not receive Exhibit 71?
2      A.  No.
3      Q.  Exhibit 72 is an email from you to Joy
4  Nyberg dated March 14th, 2001, and there's an
5  attachment that is a draft -- what appears to be a
6  draft of Exhibit 77 dated March 14th, 2001.
7      Do you believe that you sent Exhibit 72?
8      A.  Yes.
9      Q.  Exhibit 73 is an email dated March 14th,
10  2001, from Roger Stern to Stuart Nichols with copies
11  to Bret DiMarco and Celina Lopez.
12      Do you have any reason to believe that you
13  did not receive Exhibit 73 from Mr. Stern?
14      A.  No.
15      Q.  Who is Celina Lopez?
16      A.  I haven't the foggiest idea.
17      Q.  Okay. Exhibit 74. The original message
18  on Exhibit 74 is an email from Bret DiMarco sent
19  Tuesday, March 13th, 2001, to Stuart Nichols and
20  Roger Stern, a response by you dated March 14th,
21  2001, to Bret DiMarco and Roger Stern, and a
22  response to that memo by Bret DiMarco dated March
23  14th, 2001, to you with an attached draft apparently
24  of Exhibit 77.
25      Do you have any reason to doubt that you

Nichols, Stuart J. Esq.                                    1/27/2008

Page 214

1  were a sender and recipient as shown on the various
2  emails in Exhibit 74?
3      A.  I have no reason to doubt that.
4      Q.  Exhibit 75 is an email chain -- by the
5  way, who is Monica Torres?  Is she just the person
6  who printed out these emails, do you think, or you
7  have no idea?
8      A.  I have no idea.
9      Q.  Okay.  Exhibit 75 is an email chain from
10  Roger Stern to Stuart Nichols.  It copies Bret
11  DiMarco and Celina Lopez, and a response dated March
12  14th, 2001, from Roger Stern to Stuart Nichols,
13  copied to DiMarco and Celina Lopez, and then a
14  response to that message dated March 14th, 2001,
15  from Bret DiMarco to Roger Stern and Stuart Nichols.
16      Do you have any reason to believe -- and
17  it has an attachment of a draft of Exhibit 77.
18      Do you have any reason to believe that you
19  were not a sender and recipient as shown on this
20  Exhibit 75?
21      A.  No, I have no reason to believe that.
22      Q.  Okay.  Exhibit 76 is an email chain from
23  Roger Stern dated March 14th, 2001, to Stuart
24  Nichols, copies to Bret DiMarco and Celina Lopez.
25  And there is a response from Celina Lopez dated

Page 215

1  March 14th, 2001, to Roger Stern and Stuart Nichols,
2  with a copy to Bret DiMarco.  And attached is an
3  edited version of Exhibit 77.
4      Do you have any reason to doubt that you
5  were a recipient as shown in this string of emails?
6      A.  No.
7      MR. BELNICK:  By the way, I think the top
8  of 76, Shirli, answers the mystery of who Celina
9  Lopez is.  She was the evening secretary apparently
10  at Wilson Sonsini.
11      MS. WEISS:  You are correct.
12  BY MS. WEISS:
13      Q.  Okay.  Exhibit 78 is an email from Stuart
14  Nichols dated March 22nd, 2001, to John Kispert, and
15  it forwards an email from Ken Schroeder dated March
16  22nd, 2001, to Stuart Nichols.  Do you see that,
17  sir?
18      A.  Yes.
19      Q.  And did you forward Mr. Schroeder's
20  response to Mr. Kispert to -- I'm sorry --
21  Schroeder's response to you to Mr. Kispert?
22      A.  It appears I did.
23      Q.  Okay.  And it also says "per my voice
24  mail."  And did you leave a voice mail with John
25  Kispert about the same subject matter?

Page 216

1      A.  Yeah.  Presumably I did.
2      Q.  You don't recall the -- you don't recall
3  doing that?
4      A.  No.
5      Q.  And can we conclude that if you sent
6  Mr. Kispert this message from Mr. Schroeder, you
7  expected him to read it?
8      A.  Yes.
9      Q.  Okay.  Exhibit 79 is an email chain.  It
10  starts with Mr. Schroeder's message to you dated
11  March 22nd, 2001, and it appears to be forwarded by
12  you to Roger Stern and Bret DiMarco.  Is that
13  correct, sir?  You forwarded Mr. Schroeder's message
14  to outside counsel Roger Stern and Bret DiMarco?
15      A.  Yes.
16      Q.  Exhibit 80 begins with Mr. Schroeder's
17  email to you of March 22nd, 2001, which is
18  apparently forwarded by you on March 22nd, 2001, to
19  Roger Stern and Bret DiMarco with a message, to
20  which Mr. Roger Stern responds on March 22nd, 2001,
21  to yourself and Mr. DiMarco.  Is that correct?
22      A.  Correct.
23      Q.  Exhibit 81 is -- starts with the email
24  from Mr. Schroeder that we've identified dated March
25  22nd, 2001.  It appears to have been forwarded by

Page 217

1  yourself to Maureen Lamb on March 22nd, 2001, with
2  the attached message, "Let me know if you have any
3  thoughts on this."  Is that correct?
4      A.  That's correct.
5      Q.  And you would have expected Miss Lamb to
6  read Mr. Schroeder's message; correct?
7      A.  Yes.
8      Q.  And then Exhibit 82 is an email chain that
9  starts with Mr. Schroeder's response to your email.
10  Mr. Schroeder's response os dated March 22nd, 2001.
11  You're forwarding Mr. Schroeder's email to Linda
12  Spitsen dated March 22nd, 2001.  That's your wife,
13  is it?
14      A.  That's correct.
15      Q.  And her response of the same day to you,
16  and then your response to her message later on that
17  day.
18      Do you have any reason to believe that --
19  to doubt that you were the sender and recipient as
20  shown on Exhibit 82?
21      A.  No.  If I may, there is another document
22  attached to mine that you haven't authenticated
23  separately.
24      MR. BELNICK:  2399.
25      THE WITNESS:  Yeah.

55 (Pages 214 to 217)

LiveNote World Service                    800.548.3668 Ext. 1

Nichols, Stuart J. Esq.                                              1/27/2008

Page 218

1    MS. WEISS: Thank you.
2    MR. BELNICK: DiMarco to Stern on top of
3  one -- on top of Stu's.
4  BY MS. WEISS:
5    Q.  Okay.  And so the attachment to Exhibit 82
6  looks like the message of Mr. Schroeder dated March
7  22nd, 2001, which was forwarded to Mr. Stern and
8  Mr. DiMarco.  There was a response by Bret DiMarco
9  dated March 22nd, 2001.
10   A.  To Roger Stern.  It didn't come to me.
11   Q.  To Roger Stern that did not come to you.
12 All right.  Very good.
13   MS. WEISS: Okay.  Now, with respect to
14 all of those communications, Miss Heintz, is it the
15 company's position that it is instructing
16 Mr. Nichols not to respond to questions with respect
17 to all of these communications, Exhibits 68
18 through -- whatever that was -- 82 on the grounds of
19 the attorney-client privilege?
20   MS. HEINTZ: 69 through 82.
21   MS. WEISS: Yes.
22   MS. HEINTZ: 69 through 82.  Yes.  Not 68.
23 That's the one he was not copied on.
24   MR. BELNICK: That's Nyberg to Coffey.
25   MS. WEISS: Okay.  And will it be the

Page 219

1  company's position that it will instruct all of the
2  senders and recipients that are shown on this
3  compilation of documents not to respond to my
4  questions about the contents?
5    MS. HEINTZ: Yes.
6    MS. WEISS: Okay.
7    While we're looking for another exhibit,
8  I'd like the company's and Mr. Nichols' stipulation
9  that all of the minutes -- that they will stipulate
10 to identifying all of the minutes that Mr. Nichols
11 appears to have signed rather than have him go
12 through each one.
13   MR. BELNICK: Sure.
14   MS. WEISS: Would that be acceptable to
15 the SEC and to the company and to --
16   MR. FICKES: I'm not sure I understand.
17   MR. BELNICK: I'm not sure what you mean.
18 I think it's probably acceptable, but I agree with
19 Mark.  I don't know what you want us to stipulate
20 to.  Is it an authentication stipulation?
21   MS. WEISS: Yes.  That he prepared the
22 minutes and that he signed them and that he was
23 present at the meetings.
24   MR. BELNICK: From my point of view, yes,
25 with confidence that if you saw a minute where the

Page 220

1  signature didn't look like all the others of Stu
2  Nichols that you would bring it to our attention.
3    MS. WEISS: Well, I'm going to send them
4  to you.
5    MR. BELNICK: Oh, fine.  Oh, sure.
6    MS. WEISS: I mean, I just don't want to
7  waste time doing it here.
8    MR. BELNICK: Oh, yeah, absolutely.
9  That's fine with me.
10   MS. WEISS: Then you can tell me if for
11 some reason they don't look like his signature.
12   MR. BELNICK: That's perfectly acceptable.
13 I appreciate that.
14   MS. WEISS: Is that okay with you as well?
15   MR. FICKES: That's agreeable with the
16 commission as well, yes.
17   MS. WEISS: 80?
18   DEPOSITION REPORTER: 84.
19   (Whereupon, Exhibit 84 was marked
20   for identification.)
21   MR. FICKES: Actually, Shirli, before you
22 move on, Elena brought up something that I think is
23 worthwhile.  In regards to that stipulation, do we
24 want to do the same stipulation with the comp
25 committee meeting?

Page 221

1    MS. WEISS: Yes.  Good point.  Good point.
2  Is that acceptable to you?
3    MR. FICKES: That's acceptable to us.
4    MS. WEISS: All right.  We'll do a
5  compilation and send them to you.
6    MR. BELNICK: Acceptable to us as well.
7    MS. WEISS: Send them off to everybody,
8  and hopefully we'll just stipulate that they were
9  signed by Mr. Nichols.
10 BY MS. WEISS:
11   Q.  Mr. Nichols, have you had an opportunity
12 to take a look at Exhibit 84?
13   A.  Yes, I have.
14   Q.  Can you identify Exhibit 84?
15   A.  Yes.  How would you like me to do that?
16   Q.  Let me ask you.  When is the first time
17 that you saw it?
18   A.  Sometime in the period between June and
19 August of '06.
20   MR. BELNICK: Subsequent to the Wall
21 Street Journal article making allegations about
22 improper stock option activities at KLA; right?
23   THE WITNESS: Yeah.  The Wall Street
24 Journal article was May 23rd of '06.
25 BY MS. WEISS:

Page 222

1    Q. Were you conducting a search of the
2  company's records for documents related to the
3  company's internal investigation of its stock option
4  granting practices when you found this document?
5    A. When someone at my direction found the
6  document. Yes, that's correct.
7    Q. And that person brought it to you; is that
8  right?
9    A. That's right.
10    Q. And you turned the document over to
11  attorneys for the company?
12    A. Yes.
13    Q. And what is your --
14    A. Well, and the special committee.
15    Q. And what is your understanding as to where
16  the document is located?
17    A. My understanding of where the document was
18  located was on a server, a network server that
19  contained files left behind by my predecessor, Lisa
20  Berry.
21    Q. Okay. And who was the person who found
22  the document?
23    A. He is a contract attorney that I hired for
24  the purposes of assisting in the investigation
25  efforts whose name I'm blanking on at the moment.

Page 223

1  But if you give me a minute, it will probably come
2  to me.
3    Q. Okay. Do you remember the name of the
4  contract organization?
5    A. Yes. Hudson Legal.
6    Q. Hudson Legal?
7    A. Yes.
8    Q. Okay.
9    MS. WEISS: Are we going to be able to
10  enter into a stipulation as to the location of this
11  document in the company's records? Is that
12  something you want to --
13    MR. FICKES: Give us a second.
14    MS. WEISS: Why don't you think about
15  that? And that will be nice to save some time
16  there, too.
17    THE WITNESS: Predictably, the name of the
18  attorney has come to me. Andrew Middleton is his
19  name.
20  BY MS. WEISS:
21    Q. Andrew Middleton?
22    A. Andrew Middleton, M-i-d-d-l-e-t-o-n.
23    Q. Okay. Thank you.
24    Other than with the company's attorneys
25  with the SEC as we've established and with your

Page 224

1  wife, have you discussed the matters that we've
2  generally addressed here today, stock option,
3  granting practices of KLA, the investigation, the
4  SEC lawsuit, with anyone else?
5    A. No.
6    Q. There's no family -- there are no family
7  members that you've had discussions with other than
8  your wife?
9    A. Grant practices? No.
10    Q. Lawsuit?
11    A. The existence of this lawsuit?
12    Q. Yes.
13    A. Yes.
14    Q. Who have you discussed it with?
15    A. At a very high level I mentioned, for
16  example, to my team that I would be absent from work
17  preparing for it on Friday afternoon. I didn't
18  discuss the detail of it, just that I would be away
19  in connection with this.
20    Q. Okay. And when you were hired by MIPS,
21  did the subject of KLA Tencor's investigation and
22  possible fallout from that investigation in terms of
23  investigations and what have you, was that discussed
24  with MIPS?
25    A. Yes.

Page 225

1    Q. And, in general, what was discussed with
2  them?
3    A. Actually, most of the discussion was
4  really not with me directly. I was -- had a working
5  relationship with a lawyer from Davis Polk named
6  Bill Kelly, who is a member of the board of
7  directors of MIPS. And it is my understanding that
8  my boss, MIPS's CEO, had discussions with Mr. Kelly
9  regarding my situation.
10    Q. Okay. But you did not have discussions at
11  MIPS about the situation?
12    A. I don't -- no, I don't believe so.
13    MS. WEISS: Okay. All right. Why don't
14  we take a few minutes. I'll look through my exhibit
15  list and see --
16    MR. FICKES: Can you tell me again what
17  the stipulation was that you wanted on Exhibit 84?
18  Because I might be able to get an answer to you.
19    MS. WEISS: Okay. So what I had in mind
20  is that we would stipulate that the document was
21  located on Lisa Berry's -- or on a server that
22  captured Lisa Berry's communications or work
23  product.
24    MR. BELNICK: A company server as opposed,
25  for example, to a laptop of Lisa --

57 (Pages 222 to 225)

Page 226

1　　　MS. WEISS: Well, that it's identified to
2　Lisa Berry, if you can --
3　　　MR. BELNICK: You have her initials in the
4　lower left.
5　　　MR. FICKES: That's fine with us. We can
6　stipulate to that.
7　　　MS. WEISS: Okay. So if you give me a few
8　minutes, I'll take a look at my exhibit list and see
9　what else we need to mark.
10　　　MR. BELNICK: I think you don't need to
11　mark anything else.
12　　　THE VIDEOGRAPHER: Off the record. The
13　time is 4:24 p.m.
14　　　(Off the record.)
15　　　THE VIDEOGRAPHER: We are back on the
16　record. The time is 4:38 p.m.
17　BY MS. WEISS:
18　　Q.　Mr. Nichols, I've asked you a number of
19　questions that I believe are germane to
20　Mr. Schroeder's defense in this lawsuit. And you
21　have been instructed not to respond to those
22　questions on the basis of privilege by counsel for
23　KLA Tencor, who holds the privilege. And,
24　therefore, I'm not going to proceed further at this
25　time. However, I'm going to leave the record open

Page 227

1　in order to assess our options with respect to the
2　instruction -- your instruction not to respond.
3　　　And so we are going to be requesting
4　another day of your deposition. Also the
5　commission, I'm sure, will be asking you questions,
6　however that turns out. And I will coordinate with
7　your counsel --
8　　　MR. BELNICK: That's fine.
9　　　MS. WEISS: -- for another day of
10　deposition. I'll also send your counsel copies of
11　the minutes that I believe you signed so that we can
12　have a stipulation as to those issues.
13　　　MR. BELNICK: Also acceptable.
14　　　MS. WEISS: And I thank you very much for
15　coming today. I know you have other things to do,
16　and we appreciate it.
17　　　THE WITNESS: That you all for doing this
18　on a Sunday to accommodate my schedule.
19　　　MS. WEISS: Certainly.
20　　　MR. FICKES: And -- I'm sorry. Just while
21　we're still on the record, you probably said this.
22　I just want to make sure we're all on the same page,
23　because of the timing and because the record will
24　remain open. that no one here is going to assert an
25　objection that the commission has waived its right

Page 228

1　to question the witness or to present the witness --
2　　　MR. BELNICK: That's correct. And I think
3　in fact Shirli mentioned that you may have questions
4　as well.
5　　　MR. FICKES: Okay.
6　　　MR. BELNICK: Certainly we're not going to
7　assert that objection on behalf of Mr. Nichols.
8　　　MS. WEISS: All right. We will adjourn
9　for today.
10　　　THE VIDEOGRAPHER: Okay. One moment,
11　please. This is the end of videotape No. 3, volume
12　1, in the deposition of Stuart Nichols. The
13　original videotapes will be retained by LiveNote
14　World Service. Going off the record. The time is
15　4:40 p.m.
16　　　(Whereupon, the deposition adjourned.)
17　　　--oOo--
18
19
20
21
22
23
24
25

Page 229

1　　　DECLARATION
2
3　　　I hereby declare under penalty of perjury that the
4　foregoing is my deposition under oath; that these are
5　the questions asked of me and my answers thereto; and
6　that I have read my deposition and have made the
7　corrections, additions, or changes to my answers that I
8　deem necessary.
9　　　In witness whereof, I hereby subscribe my name
10　this　day of　　　, 2007.
11
12
13
14
　　　STUART NICHOLS
15
16
17
18
19
20
21
22
23
24
25

58 (Pages 226 to 229)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 230

```
 1              CERTIFICATE OF REPORTER
 2
 3        I, JANIS L. JENNINGS, a Certified Shorthand
 4   Reporter of the State of California, do hereby certify:
 5        That the foregoing proceedings were taken
 6   before me at the time and place herein set forth; that
 7   any witnesses in the foregoing proceedings, prior to
 8   testifying, were placed under oath; that a verbatim
 9   record of the proceedings was made by me using machine
10   shorthand which was thereafter transcribed under my
11   direction; further, that the foregoing is an accurate
12   transcription thereof.
13        I further certify that I am neither
14   financially interested in the action nor a relative or
15   employee of any attorney of any of the parties.
16        IN WITNESS WHEREOF, I have this date
17   subscribed my name.
18
19   Dated:  January 29, 2008.
20
21
                JANIS JENNINGS
22              CSR NO. 3942
23
24
25
```

# Exhibit 11



SHIRLI F. WEISS, Bar No. 79225
shirli.weiss@dlapiper.com
DAVID A. PRIEBE, Bar No. 148679
david.priebe@dlapiper.com
JEFFREY B. COOPERSMITH
(Admitted *pro hac vice*)
jeff.coopersmith@dlapiper.com
DLA PIPER US LLP
400 Capitol Mall, Suite 2400
Sacramento, CA  95814-4428
Tel:  916.930.3200
Fax:  916.930.3201

Attorneys for Defendant
Kenneth L. Schroeder

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH L. SCHROEDER,<br><br>Defendant. | Case No. C-07-3798-JW<br><br>**NOTICE OF SUBPOENA FOR RECORDS TO SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP** |

1

1    **TO ALL PARTIES AND TO THEIR ATTORNEY OF RECORD:**

2    PLEASE TAKE NOTICE that pursuant to Rule 45 of the Federal Rules of Civil

3  Procedure, Defendant Kenneth L. Schroeder ("Defendant"), by his attorneys, demands that

4  Skadden, Arps, Slate, Meagher & Flom LLP respond to the demands for production of documents

5  and things identified in Attachment A to the attached subpoena by producing the requested

6  documents on or before November 27, 2007, at 9:00 a.m. at the offices of DLA Piper US LLP,

7  located at 2000 University Avenue, East Palo Alto, CA 94303-2214; Telephone: (650) 833-2000.

8

9  Dated: November 12, 2007            DLA PIPER US LLP

10

11                   By
                        SHIRLI F. WEISS

12                     DAVID A. PRIEBE
                     JEFFREY B. COOPERSMITH

13                     Attorneys for Defendant

14                     Kenneth L. Schroeder

15  SD\1774345.1

16

17

18

19

20

21

22

23

24

25

26

27

28

2

NOTICE OF SUBPOENA FOR RECORDS TO SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
CASE NO. C-07-3798-JW

AO88 (Rev. 12/06) Subpoena in a Civil Case

**Issued by the**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION<br>V. | **SUBPOENA IN A CIVIL CASE** |
| KENNETH L. SCHROEDER | Case Number:[1] C-07-3798-JW |

TO:  Custodian of Records: Skadden, Arps, Slate, Meagher & Flom, LLP, Four Embarcadero Center, Suite 3800, San Francisco, CA 94111; (415) 984-6400

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE ATTACHMENT A

| PLACE<br>DLA Piper US LLP, 2000 University Avenue, East Palo Alto, CA 94303-2214; (650) 833-2000 | DATE AND TIME<br>November 27, 2007; 9:00 a.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>_Shirli F. Weiss_    Attorney for Kenneth Schroeder | DATE<br>November 12, 2007 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Shirli F. Weiss, DLA Piper US LLP, 401 B Street, Suite 1700, San Diego, CA 92101; (619) 699-3650

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.FormsWorkflow.com

**ATTACHMENT A TO SUBPOENA TO SKADDEN, ARPS,**
**SLATE, MEAGHER & FLOM LLP**

*SEC v. Schroeder*

**DEFINITIONS**

1.     "YOU" or "YOUR" or "SKADDEN" shall mean and refer to the law firm of Skadden, Arps, Slate, Meagher & Flom LLP.

2.     "SCHROEDER" shall mean and refer to Defendant Kenneth L. Schroeder.

3.     "KLA-TENCOR" or "THE COMPANY" shall mean and refer to KLA-Tencor Corporation and its predecessor corporations (including KLA Instruments and Tencor Instruments), including its agents, trustees, custodians, affiliates, attorneys, accountants, representatives, consultants, or other persons acting under its direction or control.

4.     "COMMUNICATION(S)" shall mean the exchange of information by any means, including without limitation telephone, telecopy, facsimile, electronic mail, text message, or other electronic medium, letter, memorandum, notes or other writing method, meeting, discussion, conversation or other form of verbal expression.

5.     "CONCERN" or "CONCERNING" shall mean relating to, referring to, describing, discussing, memorializing, reflecting, containing, evidencing or constituting.

6.     "DOCUMENT(S)" shall mean and include all "writings" as "writings" is defined in the Federal Rules of Evidence, Rule 1001(1), as well as all writings of any nature whatsoever within YOUR possession, custody or control, including but not limited to, contracts, agreements, COMMUNICATIONS, correspondence, telegrams, electronic mail, memoranda, records, reports, books, summaries, power point presentations, records of telephone conversations, summaries or records of personal conversations or interviews, diaries, calendars, forecasts, statistical statements, billing records, work papers, drafts, copies, graphs, accounts, analytical records, minutes and other records of meetings, conferences, consultant reports, appraisals, reports or summaries of negotiations, brochures, pamphlets, circulars, trade letters, press releases, notes, personal notes, handwritten notes, marginal notations, bills, invoices, checks, photographs, brochures, lists, journals, advertising, computer tapes, disks, or other computer storage media,

-1-