# Exhibit 6

Morgan, Lewis & Bockius LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Tel: 415.442.1000
Fax: 415.442.1001
www.morganlewis.com

# Morgan Lewis
COUNSELORS AT LAW

John H. Hemann
Partner
415.442.1355
jhemann@morganlewis.com

October 12, 2006

**PRIVILEGED & CONFIDENTIAL**

**VIA HAND DELIVERY**

Marc J. Fagel, Esq.
United States Securities and Exchange Commission
Division of Enforcement
44 Montgomery Street, Suite 2600
San Francisco, CA  94104

Re:    In the Matter of KLA-Tencor Corporation

Dear Mr. Fagel:

KLA-Tencor Corporation (the "Company"), through a Special Committee authorized by the Board of Directors, commenced a review of the company's stock options granting practices on or about May 24, 2006. In the course of its investigation, the Special Committee collected confidential corporate records and communications, including records and communications that may be protected by the attorney-client privilege and work product doctrine. In light of the interest of the Staff of the U.S. Securities and Exchange Commission (the "Staff") in determining whether there have been any violations of the federal securities laws, and the Company's common interest in investigating and analyzing the circumstances and people involved in the events at issue, KLA-Tencor and the Special Committee will voluntarily provide to the Staff copies of documents that may be protected by the attorney-client privilege and work product doctrine ("Confidential Materials").

Please be advised that by producing the Confidential Materials pursuant to this agreement, KLA-Tencor and the Special Committee do not intend to waive the protection of the attorney work product doctrine, attorney-client privilege, or any other privilege applicable as to third parties. The Company believes that the Confidential Materials warrant protection from disclosure.

1-SF/7423219.1

Mark J. Fagel, Esq.
October 12, 2006
Page 2

**Morgan Lewis**
COUNSELORS AT LAW

The Staff will maintain the confidentiality of the Confidential Materials pursuant to this agreement and will not disclose them to any third party, except to the extent that the Staff determines that disclosure is otherwise required by law or would be in furtherance of the Commission's discharge of its duties and responsibilities.

The Staff will not assert that the production of the Confidential Materials to the Commission constitutes a waiver of the protection of the attorney work product doctrine, the attorney-client privilege, or any other privilege applicable as to any third party. The Staff agrees that production of the Confidential Materials provides the Staff with no additional grounds to subpoena testimony, documents or other privileged materials from the Company or the Special Committee, although any such grounds that may exist apart from such production shall remain unaffected by this agreement.

The Staff's agreement to the terms of this letter is signified by your signature on the line provided below.

Sincerely,

John Hemann

AGREED AND ACCEPTED:
United States Securities and Exchange Commission

By: _____
        Division of Enforcement
        MARC J. FAGEL

# Exhibit 7

Page 1

1                  UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4    SECURITIES AND EXCHANGE
     COMMISSION,
5
              Plaintiff,
6
     vs.                              No. C 07-3798-JW
7
     KENNETH L. SCHROEDER,
8
              Defendant.
9

10

11

12

13

14

15           DEPOSITION OF STUART J. NICHOLS, Esq.

16              Sunday, January 27, 2008

17                VOLUME I (Pages 1-230)

18

19

20           SHEILA CHASE & ASSOCIATES
                 REPORTING FOR:
21           LiveNote World Service
             221 Main Street, Suite 1250
22           San Francisco, California  94105
                 Phone:  (415) 321-2300
23               Fax:  (415) 618-0743

24
     Reported by:
25   JANIS JENNINGS, CSR, CRP

Nichols, Stuart J. Esq.                                                   1/27/2008

Page 2

```
 1
 2
 3
 4
 5
 6          Deposition of STUART NICHOLS, taken on
 7    behalf of the Defendant, at DLA PIPER, 2000
 8    University Avenue, East Palo Alto, California,
 9    beginning at 9:48 A.M. on Sunday, January 27,
10    2008, before JANIS L. JENNINGS, Certified
11    Shorthand Reporter No. 3942, CRP
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          A P P E A R A N C E S
 2
 3    For the United States Securities and Exchange
      Commission:
 4
      MARK P. FICKES, ESQ.
 5    ELENA RO, ESQ.
      UNITED STATES SECURITIES
 6    AND EXCHANGE COMMISSION
      44 Montgomery Street, Suite 2600
 7    San Francisco, California  94104
      Phone: 415.705.2338
 8    fickesm@sec.gov
      roe@sec.gov
 9
10
      For the Defendant Kenneth L. Schroeder:
11
      SHIRLI FABBRI WEISS, ESQ.
12    DLA PIPER US LLP
      401 B Street, Suite 1700
13    San Diego, California  92101-4297
      Phone: 619.699.2700
14    Fax: 619.699.2701
15    shirli.weiss@dlapiper.com
16    JEFFREY B. COOPERSMITH, ESQ.
      DLA PIPER US LLP
17    701 Fifth Avenue, Suite 7000
      Seattle, Washington  98104-7044
18    Phone: 206.839.4800
19    Fax: 206.839.4801
      jeff.coopersmith@dlapiper.com
20
21
22
23
24
25
```

Page 4

```
 1          A P P E A R A N C E S (Continued)
 2
 3    For KLA-Tencor Corporation:
 4
          JOHN H. HEMANN, ESQ.
 5        TERA M. HEINTZ, ESQ.
          MORGAN, LEWIS & BOCKIUS LLP
 6        One Market, Spear Street Tower
          San Francisco, California  94105
 7        Phone: 415.442.1000
 8        Fax: 415.442.1001
          jhemann@morganlewis.com
 9        theintz@morganlewis.com
10
11    For the Deponent:
12
13        MARK A. BELNICK, ESQ.
14        LAW OFFICES OF MARK A. BELNICK, LLC
15        120 West 45th Street, Suite 1700B
16        New York, New York  10036
17        Phone: 646.453.2900
18        Fax: 646.453.2908
19        mbelnick@belnicklaw.com
20
21
22    Also Present:
23        Margaret Austin, Paralegal
24        Gary Brewer, Videographer
25
```

Page 5

```
 1          I N D E X
 2    DEPOSITION OF
      STUART NICHOLS
 3
                          Page
 4    Examination by Ms. Weiss          12
 5
 6
 7
 8          EXHIBITS
 9    No.      Description          Page
10    Exhibit 41  Comp Book; Nos. KT ACWP-PRIV00002541-
                  2696                  10
11
      Exhibit 42  Comp Book; Nos. KT ACWP-PRIV00002697-
12                2893                  10
13    Exhibit 43  Computation Book; Nos.
                  KT ACWP-PRIV00002894-3047         10
14
      Exhibit 44  Computation Book; Nos.
15                KT ACWP-PRIV00003048-3201         10
16    Exhibit 45  Computation Book; Nos.
                  KT ACWP-PRIV00003202-3357         10
17
      Exhibit 46  Computation Book; Nos.
18                KT ACWP-PRIV00003358-3512         10
19    Exhibit 47  Computation Book; Nos.
                  KT ACWP-PRIV00003513-3665         10
20
      Exhibit 48  Computation Book; Nos.
21                KT ACWP-PRIV00003666-3818         10
22    Exhibit 49  Computation Book; Nos.
                  KT ACWP-PRIV00003819-3855         10
23
      Exhibit 50  Email thread dated 10/12/99; Nos.
24                MK-PRIV000046 through 47          65
25
```

LiveNote World Service                    800.548.3668 Ext. 1

Nichols, Stuart J. Esq.                                                          1/27/2008

Page 6

```
1        I N D E X (Continued)
2
         EXHIBITS
3
     No.          Description          Page
4
   Exhibit 51  Letter dated 10/18/99 to Stuart
5              Nichols; Nos. MLB/KLA-SEC00016923
               through 16924                    65
6
   Exhibit 52  Letter dated 10/7/99 to Stuart
7              Nichols; Nos. MK0003340-341       65
8  Exhibit 53  New Hire Form; No. MLB/KLA-SEC00016905  65
9  Exhibit 54  Minutes of the Meeting of the Board of
               Directors of KLA-Tencor Corporation
10             November 16, 1999; Nos. KLS-SEC002735
               through 2739                      81
11
   Exhibit 55  Memo dated 1/5/00 from Stuart Nichols;
12             Nos. KT ACWP-PRIV00004298 through 4304  114
13 Exhibit 56  Email thread from Stuart Nichols dated
               1/6/2000; Nos. KTACWP-PRIV00004938
14             through 4940                     124
15 Exhibit 57  Minutes of the Meeting of the Board of
               Directors KLA-Tencor Corporation January
16             25, 2000; Nos. MLB/KLA-SEC00021958
               through 21961                    132
17
   Exhibit 58  Email thread from Leslie Wilson dated
18             1/22/00; Nos. MLB/KLA-SEC00051399
               through 51400                    133
19
   Exhibit 59  Minutes of the Meeting of the Board of
20             Directors of KLA-Tencor Corporation
               April 25, 2000; Nos. MLB/KLA-SEC00021983
21             through 21984                    136
22 Exhibit 60  KLA-Tencor Historical Stock Prices;
               20 pages                         153
23
   Exhibit 61  Email thread of Stuart Nichols dated
24             10/9/00; Nos. MLB/KLA-SEC00022981
               through 22582                    155
25
```

Page 7

```
1        I N D E X (Continued)
2
3        EXHIBITS
4    No.          Description          Page
5  Exhibit 62  Minutes of the Meeting of the Board of
               Directors of KLA-Tencor Corporation Oct.
6              15, 2000; Nos. MLB/KLA-SEC00022086
               through 22089                    159
7
   Exhibit 63  Employee Retention Stock Option Issue
8              Oct. 30, 2000; Nos. KT ACWP-PRIV00002401
               through 2415                     160
9
   Exhibit 64  Employee Retention Stock Option Program
10             Proposal for the Compensation Committee;
               Nos. MLB/KLA-SEC00004879 through 4898  163
11
   Exhibit 65  Minutes of the Meeting of the Board of
12             Directors of KLA-Tencor Corporation
               Nov. 10, 2000; Nos. MLB/KLA-SEC00004903
13             through 4907                     164
14 Exhibit 66  Minutes of the Meeting of the
               Compensation Committee of KLA-Tencor
15             Corp.; Nos. MLB/KLA-SEC00004872 through
               4876                             164
16
   Exhibit 67  Minutes of the Meeting of the Board of
17             Directors of KLA Instruments Corp. Apr.
               28, 1997; Nos. MLB/KLA-SEC00050391
18             through 50458                    193
19 Exhibit 68  Email thread from Joy Nyberg dated
               3/12/01; No. MLB/KLA-SEC00052175   198
20
   Exhibit 69  Email thread from Stuart Nichols dated
21             3/13/01; No. KT ACWP-PRIV00001924
               through 1925                     198
22
   Exhibit 70  Email thread from Stuart Nichols dated
23             3/13/01; No. KT ACWP-PRIV00001903
               through 1904                     198
24
   Exhibit 71  Email thread from Bret DiMarco dated
25             3/13/01; Nos. KLA-SEC000042 through 45  198
```

Page 8

```
1        I N D E X (Continued)
2
         EXHIBITS
3
     No.          Description          Page
4
   Exhibit 72  Email with attachment from Stuart
5              Nichols dated 3/14/01; Nos.
               KT ACWP-PRIV00001905 through 1909   198
6
   Exhibit 73  Email with attachment from Roger
7              Stern dated 3/14/01; Nos.
               KT ACWP-PRIV00002365 through 2370   198
8
   Exhibit 74  Email with attachment from
9              Bret DiMarco dated 3/14/01; Nos.
               KT ACWP-PRIV00001328 through 1332   198
10
   Exhibit 75  Email thread from Bret DiMarco dated
11             3/14/01; Nos. KT ACWP-PRIV00001327
               through 2370                     198
12
   Exhibit 76  Email thread with attachment from
13             Selina Lopez dated 3/14/01; Nos.
               KT ACWP-PRIV00002371 through 2377   198
14
   Exhibit 77  Memo from Stu Nichols dated 3/19/01;
15             Nos. KT ACWP-PRIV00002391 through 2395  198
16 Exhibit 78  Email thread from Stuart Nichols dated
               3/22/01; No. MLB/KLA-SEC00050838   198
17
   Exhibit 79  Email thread from Stuart Nichols dated
18             3/22/01; No. KT ACWP-PRIV00001817   198
19 Exhibit 80  Email thread from Roger Stern dated
               3/22/01; No. KLA-SEC00000007      198
20
   Exhibit 81  Email thread from Stuart Nichols dated
21             3/22/01; No. KT ACWP-PRIV00002389   198
22 Exhibit 82  Email thread from Stuart Nichols dated
               3/22/01; Nos. KT ACWP-PRIV00002397
23             through 2399                     199
24 Exhibit 83  Complaint                        202
25
```

Page 9

```
1        I N D E X (Continued)
2
3        EXHIBITS
4    No.          Description          Page
5  Exhibit 84  Stock Option Committee Procedures;
               No. MLB/KLA-SEC00022989          220
6
7
8        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER
9
         Page        Line
10
          43          11
11       109          21
         112          24
12       118           1
         119           9
13       120           4
         122          11
14       127           5
         128           4
15       128          13
         131          18
16       135          23
         140           3
17       142           6
         155           7
18       164           8
         167          15
19
20
21
22
23
24
25
```

                                                                    3 (Pages 6 to 9)

Nichols, Stuart J. Esq.                                      1/27/2008

Page 10

1          EAST PALO ALTO, CALIFORNIA;
2     SUNDAY, JANUARY 27, 2008; 9:48 A.M.
3          --oOo--
4          (Whereupon, Exhibits 41 through 49
5          were marked for identification off
6          the record)
7          THE VIDEOGRAPHER: Good morning. We're
8     going on the record.
9          Here marks the beginning of videotape
10    No. 1, Volume I, in the deposition of Stuart J.
11    Nichols in the matter of Securities and Exchange
12    Commission versus Kenneth L. Schroeder, in the
13    United States District Court, Northern District
14    of California, case No. C 07-3798-JW.
15         Today's date is January 27th, 2008, and
16    the time is 9:48 a.m.
17         The video operator today is Gary Brewer
18    representing LiveNote World Service, located at
19    221 Main Street, Suite 1250, San Francisco,
20    California, 94105. The phone number is
21    415-321-2300.
22         The court reporter is Janis Jennings of
23    LiveNote.
24         Would counsel please identify themselves
25    and state whom they represent.

Page 11

1          MS. WEISS: Good morning. My name is
2     Shirli Weiss. I'm from DLA Piper and I represent
3     the Defendant Kenneth L. Schroeder
4          MR. COOPERSMITH: I'm Jeff Coopersmith
5     also with DLA Piper and I also represent Kenneth
6     Schroeder.
7          MR. BELNICK: I'm Mark Belnick and I
8     represent the witness Stuart Nichols.
9          MR. HEMANN: John Hemann of Morgan Lewis
10    on behalf of KLA-Tencor.
11         MS. HEINTZ: Tera Heintz from Morgan Lewis
12    on behalf of KLA-Tencor.
13         MR. FICKES: Mark Fickes on behalf of the
14    Securities and Exchange Commission.
15         MS. RO: Elena Ro on behalf of the
16    Securities and Exchange Commission.
17         THE VIDEOGRAPHER: Okay. If there are no
18    stipulations, the reporter may administer the oath.
19
20         STUART NICHOLS,
21    The deponent herein, was sworn and
22         testified as follows:
23    ///
24    ///
25    ///

Page 12

1               EXAMINATION
2     BY MS. WEISS:
3          Q. Good morning, sir. Would you please state
4     your full name and spell your last name for the
5     record.
6          A. Stuart John Nichols. My last name is
7     spelled N-i-c-h-o-l-s.
8          Q. Mr. Nichols, my name is Shirli Weiss. I
9     represent Kenneth Schroeder who is the defendant in
10    this action. You are here pursuant to a subpoena
11    served on your counsel with agreements from him to
12    accept it on your behalf.
13         I'm going to be asking you some questions
14    about the action and my questions and your answers
15    will be taken down by the court reporter.
16         So that we have a clear record, I'll ask
17    that you wait until I finish my question before you
18    commence your answer, and I'll wait until you finish
19    your answer before I commence my next question.
20         Can we have that agreement?
21         A. Yes.
22         Q. You are a member of the California Bar,
23    are you, sir?
24         A. Yes.
25         Q. Can you tell me if you are a member of any

Page 13

1     other bar in the United States?
2          A. Yes.
3          Q. Which bar?
4          A. No, I can tell you. The answer is no, but
5     you asked me whether I can tell you. And the answer
6     is: No, I'm not a member of another bar.
7          Q. Okay. When did you become a member of the
8     California Bar?
9          A. 1987.
10         Q. Were there any interruptions to that
11    membership?
12         A. No.
13         Q. You remain a member today; is that
14    correct?
15         A. Yes.
16         Q. And that means that you're a lawyer;
17    correct?
18         A. Correct.
19         Q. And you understand that you're under oath
20    to tell the truth?
21         A. Yes.
22         Q. And do you understand that if you lie, you
23    could be subject to penalty of perjury?
24         A. Yes.
25         Q. And you understand that if you respond "I

4 (Pages 10 to 13)

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 14

1  do not remember" when in fact you do remember, that
2  that is a lie?
3      A.  Yes.
4      Q.  And you understand that if you respond
5  that you do not know the answer to the question when
6  in fact you do know the answer to the question, that
7  that also is a lie?
8      A.  Yes.
9      Q.  Sir, you can take a break at any time.
10 Just indicate to your counsel and we'll go off the
11 record by agreement.  However, we will not go off
12 the record until all of the parties to the
13 deposition agree that we can go off the record.
14         Could you tell me what your current
15 address is, please.
16     A.  704 Vera Cruz Avenue, Los Altos,
17 California.
18     Q.  Are you currently employed?
19     A.  Yes.
20     Q.  What is the name and address of your
21 employer?
22     A.  MIPS Technologies, Inc.  The address --
23 the headquarters address is 1225 Charleston Avenue,
24 Mountain View, California.
25     Q.  Is "MIPS" short for anything?

Page 15

1      A.  No.
2      Q.  When did you become employed by MIPS?
3      A.  November of 2007.
4      Q.  What is the nature of your employment at
5  MIPS?
6      A.  I'm the general counsel of the company.
7      Q.  I forgot to ask you, Mr. Nichols:  Have
8  you taken any medication that you believe might
9  impair your ability to testify truthfully today?
10     A.  No.
11     Q.  Have you been deposed before?
12     A.  Yes.
13     Q.  When was the last time you were deposed?
14     A.  It has been at least a year and a half.  I
15 don't know exactly.
16     Q.  Was the deposition in the context of --
17 was it related to KLA's option dating practices?
18     A.  No.
19     Q.  What was the context of that deposition?
20     A.  I don't specifically remember, but it was
21 not an uncommon thing for me to be deposed in the
22 context of subpoenas of records.  They would need
23 someone to testify regarding the effort that was
24 made; in the context of litigation, of course.
25 There were requests for production and I would give

Page 16

1  custodian of records-type depositions.  I've done
2  that several times.
3      Q.  And were you testifying as a custodian of
4  records at that deposition?
5      A.  Yes.
6      Q.  And was that for MIPS?
7      A.  No.  As I said, I haven't had my
8  deposition taken for a year and a half.
9      Q.  I see.  Was that for KLA-Tencor?
10     A.  Yes.
11     Q.  Who brought that litigation?
12     A.  Well, your question assumes that there
13 was only one instance, but I think I said there
14 were several, and there were.  I don't remember
15 specifically whether it was -- these were cases that
16 we brought or whether they were cases that were
17 brought by -- against us where we were a defendant,
18 or where we were simply a third party that was
19 producing documents in a litigation matter to which
20 we were not a party.
21     Q.  Did you testify at all in the litigation
22 that you most recently testified in as a percipient
23 witness at all?
24     A.  I do not believe so.
25     Q.  All right.  Prior to that deposition, had

Page 17

1  you been deposed before?
2      A.  Yes.
3      Q.  And what was the context of the most
4  recent deposition prior to that one?
5      A.  Well, again, there were several instances
6  where I was deposed as in the capacity of a
7  custodian of record -- of records.  But I can't
8  distinguish, you know, when they happened or --
9  they were fairly trivial types of depositions.
10     Q.  All right.  Let's put those aside.
11         Can you call to mind any depositions
12 that you gave where you testified as a percipient
13 witness?
14         And do you know what I mean when I say
15 "percipient"?
16     A.  Yes.  I can remember one instance where I
17 testified as a 30(b)(6) witness.
18     Q.  Was that also on behalf of KLA-Tencor?
19     A.  No.
20     Q.  What company was that on behalf of?
21     A.  This was when I was employed by Varian
22 Associates, Inc.
23     Q.  All right.  Putting that aside, can you
24 think of any circumstances where you've testified as
25 a percipient witness?

5 (Pages 14 to 17)

Nichols, Stuart J. Esq.                                                                1/27/2008

Page 18

1    A.   There may have been an instance where I
2  testified while at KLA as a 30(b)(6) witness on some
3  sort of issue about our subsidiary structure.  I
4  don't distinctly remember it, but I have a vague
5  memory that I did do that at one point.
6    Q.   Any other circumstances that you can
7  recall where you testified as a percipient witness?
8    A.   Yes.
9    Q.   Okay.  Please identify the first that
10 comes to mind.
11   A.   The first that comes to mind was a
12 deposition in connection with a wrongful termination
13 and trade secret matter.
14   Q.   Were you a party in that matter or a
15 witness; a nonparty witness?
16   A.   I was a nonparty witness.
17   Q.   Just identify who the litigants were in
18 that matter.
19   A.   I no longer remember the name of the
20 plaintiff.  The defendant was Varian Associates,
21 Inc.
22   Q.   I'm sorry.  Did you say "Varian"?
23   A.   Varian.
24   Q.   Okay.  And you said that was a wrongful
25 termination?

Page 19

1    A.   Yes.
2    Q.   Were you general counsel when you were at
3  Varian?
4    A.   No.
5    Q.   How long ago was that deposition given?
6    A.   At least six years ago.
7    Q.   All right.  Putting aside that instance,
8  can you recall any other circumstances where you
9  testified as a percipient witness?
10   A.   No.
11   Q.   And have you ever been a party to a
12 litigation?
13   A.   Yes.
14   Q.   Let's put aside for the moment litigations
15 arising out of KLA-Tencor's option practices.  Other
16 than litigation arising out of that subject matter,
17 have you been a party to a litigation?
18   A.   No.
19   Q.   Did you review documents in preparation
20 for your deposition today?
21   A.   No.
22   Q.   Have you had an opportunity to speak with
23 your counsel?
24   A.   Yes.
25   Q.   And would you identify is that Mr. Belnick

Page 20

1  who sits to your right?
2    A.   Yes.
3    Q.   All right.  Mr. John Hemann has asked to
4  attend today's deposition.  Mr. Hemann is outside
5  counsel, as I understand it, for KLA-Tencor.
6         Have you met with Mr. Hemann in connection
7  with your deposition today?
8    A.   No.
9    Q.   If I refer to "KLA option practices," I'm
10 referring to the broad spectrum of KLA's option
11 practices during the entire time period of your
12 tenure with the company and thereafter just as a
13 broad shorthand.
14        Have you met with the agents of the SEC
15 prior to today in connection with KLA's option
16 practices?
17   A.   Yes.
18   Q.   How many times can you recall meeting with
19 agents of the SEC?
20   A.   Once.
21   Q.   The approximate time period, do you
22 recall?
23   A.   I believe it was late 2006.
24   Q.   Do you keep a calendar that would tell you
25 the day that you met with the SEC?

Page 21

1    A.   No.
2    Q.   If you needed to remember the date, how
3  would you track down that date?
4    A.   How would I?  I would probably go back to
5  some old email.
6    Q.   What is your email address?
7    A.   Stu, S-t-u, .nichols@gmail.com.
8    Q.   I believe you said you met with the SEC
9  one time; is that correct?
10   A.   Correct.
11   Q.   And who do you recall was present at that
12 meeting?
13   A.   Let's see, my counsel, Mark Belnick.
14 There was at least one representative of the Office
15 of the U.S. Attorney; his name was I believe Michael
16 Wong.  There were two representatives of the FBI
17 whose names I don't recall.  And there was at least
18 one representative of the SEC, and her name is
19 Elena Ro.
20   Q.   And that's Miss Ro who is in attendance
21 today?
22   A.   That's correct.
23   Q.   Do you know who called for that meeting?
24   A.   No, I don't.
25   Q.   When you attended that meeting, were you

Nichols, Stuart J. Esq.                                    1/27/2008

Page 22

1  questioned with respect to KLA's option practices?
2      A.  Yes.
3      Q.  Were you questioned concerning
4  communications that you had while you were general
5  counsel at KLA-Tencor?
6      A.  Yes.
7      Q.  Were you general counsel at KLA-Tencor?
8      A.  I believe at that point I was no longer,
9  though I don't have the date fixed in my head.
10     Q.  What was the approximate time period that
11  you were general counsel at KLA-Tencor?
12     A.  My start date was I believe October 25th
13  of 1999, and my resignation date was October 16th
14  of 2006.
15     Q.  I believe you stated that you made
16  statements during the meeting concerning your
17  communications with -- well, let me ask you.
18         You were asked at the meeting about
19  communications that you had as general counsel with
20  KLA-Tencor with personnel at KLA-Tencor; is that
21  correct?
22     A.  That's correct.
23     Q.  And you were also asked questions with
24  respect to communications that you had as general
25  counsel of KLA-Tencor with KLA-Tencor's outside

Page 23

1  counsel; is that correct?
2      A.  Yes, that's correct.
3      Q.  Can you recall any other general
4  categories of communications that you were
5  questioned about by either the SEC or the
6  representatives of the U.S. Attorneys Office?
7      A.  I'm not sure what you mean by "general
8  categories of communication." Can you be more
9  specific?
10     Q.  Yes.  I think we identified communications
11  that you had with KLA personnel.  We also identified
12  communications that you had with outside counsel for
13  KLA.  Were you questioned about any other categories
14  of communications, such as communications with
15  persons outside of KLA who were not outside counsel
16  and who were not KLA personnel?
17     A.  So I guess it depends.  I may have
18  been asked about communications with KLA's board
19  members.  And I don't know whether when you use
20  the phrase "KLA personnel" you're including board
21  members.
22     Q.  Thank you for that clarification.  For
23  purposes of my questions I will include KLA's board
24  of directors or former members of the board in the
25  category of "KLA personnel."

Page 24

1         Shall we have that understanding?
2      A.  Yup.
3      Q.  You may have been asked questions about
4  your communications with board members; is that
5  correct?
6      A.  I may have, yes.
7      Q.  While you answered questions, did you make
8  a record of your interview?
9      A.  No.
10     Q.  And did you observe anyone else in the
11  room making a record of your interview?
12     A.  The other attorneys who were observing the
13  deposition may well have taken notes.  I don't have
14  a specific memory about whether they did or didn't.
15     Q.  While you were questioned about your
16  communications with KLA personnel, did you assert
17  the attorney-client privilege on behalf of the
18  company in response to those questions or did your
19  attorney assert them on your behalf?
20     MR. BELNICK:  Maybe I can help with this.
21  Before Mr. Nichols answered any questions I obtained
22  a representation from Mr. Wong and I believe SEC
23  counsel that KLA was cooperating with their
24  inquiries.  This was prior, as you know, to this
25  lawsuit.  And that Mr. Nichols was therefore free to

Page 25

1  answer questions that otherwise would be privileged.
2         I left the room and I called KLA's then
3  general counsel, Mr. Gross I believe his name was,
4  and either he or someone from his office confirmed
5  to me over the telephone that the government's
6  representation to me was accurate and that with
7  respect to the Justice Department and the SEC,
8  Mr. Nichols was free to answer any inquiry even
9  though it might otherwise be considered subject
10  to the attorney-client privilege or work product
11  immunity.  And on that basis, thereafter I made no
12  objections on privilege grounds.
13     MS. WEISS:  And so your understanding as a
14  result of your conversation with Mr. Gross was that
15  you were not obliged or even requested to assert the
16  attorney-client privilege in response to questions
17  about Mr. Nichols' communications with KLA
18  personnel; is that correct?
19     MR. BELNICK:  That's correct.  Not only
20  that I was not obliged to and that I should not.
21     MS. WEISS:  And the same question with
22  respect to the work product doctrine, that you were
23  not either requested or required to assert that
24  privilege, and that indeed you were being requested
25  by the company to respond -- to have Mr. Nichols

7 (Pages 22 to 25)

Page 26

1  respond to the questions of both the SEC and the
2  U.S. Attorneys Office; is that correct?
3      MR. BELNICK:  Essentially, yes.
4  BY MS. WEISS:
5      Q.  Mr. Nichols, are you aware of any
6  confidentiality agreements between KLA-Tencor
7  and the U.S. Attorneys Office?
8      A.  No.
9      Q.  Are you aware of any confidentiality
10 agreements between KLA-Tencor and the Securities
11 and Exchange Commission?
12     A.  No.
13     Q.  Was anyone else present other than the
14 people that you identified that you can think of?
15     A.  No.
16     Q.  Were you there pursuant to subpoena or
17 voluntarily?
18     A.  I believe I was there voluntarily.
19     Q.  During the time that you answered
20 questions posed to you, were you shown documents?
21     A.  Yes.
22     Q.  Were any of the documents -- did any of
23 the documents reflect what you would have believed
24 were attorney-client privileged communications
25 between yourself and other people?

Page 27

1      A.  Yes.
2      Q.  Generally what other categories of
3  documents were you shown at that meeting?
4      A.  Meaning documents that would not be
5  privileged, that I did not think were subject to
6  the privilege?
7      Q.  Or not subject to the attorney-client
8  privilege.  In other words, research, PowerPoint,
9  memoranda, anything like that.
10     A.  I don't remember any PowerPoints.  I don't
11 know what you mean by "research."  But I don't --
12 if you mean legal research, or for that matter
13 technical research, I don't remember anything along
14 those lines.  I do remember SEC filings.  And there
15 may have been, for instance, email that was not --
16 that I would not have deemed to be subject to the
17 privilege that I talked about.
18     Q.  How long did the interview last?
19     A.  I believe we started at 9:00 or 10:00 and
20 we concluded at 4:00 or 4:30, something like that.
21 Maybe it was 5:00.  I don't remember exactly.
22     Q.  I take it that the interview was not
23 transcribed?
24     A.  Correct.
25     Q.  And it was not recorded, to your

Page 28

1  knowledge?
2      A.  Not that I know of.
3      Q.  Following that interview, were you
4  contacted by any representatives of the SEC to give
5  any follow-up statements, either through a meeting
6  or in writing or by telephone?
7      A.  Was I personally contacted?
8      Q.  Were you contacted either directly or
9  through your counsel.
10     A.  Yeah.  I believe that my counsel was
11 contacted.
12     Q.  Did you turn over additional statements
13 following that interview which you understood would
14 be turned over to the government?
15     A.  When you say "turn over," what do you
16 mean?
17     Q.  Did you write anything down that you
18 understood would be turned over to the government?
19     A.  Did I personally write anything down?
20     Q.  Yes.  Or participate in a writing that was
21 turned over to the government.
22     A.  Well, a written submission was made after
23 the interview on my behalf.
24     Q.  Okay.  This is a Wells submission?
25     MR. BELNICK:  Let me answer it was not.

Page 29

1      MS. WEISS:  You did not make a Wells
2  submission?
3      MR. BELNICK:  Correct.  It was a
4  submission made by counsel; mainly me and my
5  co-counsel, Akin Gump.  And it was confidential
6  and subject to FOIA, and still is as far as I'm
7  concerned.  And we made the appropriate requests at
8  the time for FOIA treatment and confidentiality, and
9  those are still in effect, those requests.
10     MS. WEISS:  Was the submission that was
11 made solely to the SEC?
12     MR. BELNICK:  Yes.
13 BY MS. WEISS:
14     Q.  Mr. Nichols, do you know if a submission
15 was made to the U.S. Attorneys Office?
16     A.  I'm not aware of any submission made to
17 the U.S. Attorneys Office.
18     MR. BELNICK:  The answer is no.
19 BY MS. WEISS:
20     Q.  Other than the submission that your
21 counsel identified, did you make any other
22 submissions to either the SEC or the U.S. Attorneys
23 Office?
24     A.  No, not that I'm aware of.
25     Q.  Were you contacted for any follow-up

8 (Pages 26 to 29)

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 30

1  questioning up until today by either of those
2  agencies?
3       A.   No.
4       Q.   Since -- do you recall generally press
5  about potential option dates being retrospectively
6  selected in about May of 2006?  Do you recall
7  generally that time period?  Wall Street Journal
8  articles or other articles?
9       A.   Yes.
10      Q.   Since that time period, Mr. Nichols, have
11 you had any communications with the press?
12      A.   Regarding stock option matters?
13      Q.   Yes.
14      A.   No.
15      Q.   Communications involving yourself appeared
16 in the press before the complaint was filed against
17 my client, Mr. Schroeder, which was filed in July of
18 2007.  Do you know who gave those communications to
19 the press?
20      A.   You'll have to be clearer on what
21 communications you're talking about.  I'm not
22 sure what you're referring to.
23      Q.   Do you recall any -- reading any press
24 about KLA-Tencor and your communications with
25 Mr. Schroeder that were discussed in the press?

Page 31

1       A.   There were a number of different articles,
2  different press items; so, yeah, I remember a number
3  of different things in the press.
4       Q.   Do you know of anyone who delivered or
5  gave information about your communications with
6  Mr. Schroeder to any member of the press or media?
7       A.   No.
8       Q.   Do you have any facts on which you can
9  base a suspicion that any particular person gave
10 copies of your communications to the press that
11 involved your communications with Mr. Schroeder?
12      MR. BELNICK:  Just for the record, I
13 object to him being asked for suspicions.
14      But you may answer.
15      THE WITNESS:  No.
16      MR. FICKES:  I also object the question
17 calls for speculation.
18 BY MS. WEISS:
19      Q.   Sir, you were aware that the board of
20 directors of KLA-Tencor at some point after May 1st,
21 2006, formed what they called the Special Committee
22 of the board to investigate KLA-Tencor's option
23 practices?
24      A.   Yes, I'm aware of that.
25      Q.   All right.  So I'll refer to that maybe as

Page 32

1  the "Special Committee" in my questioning.
2       I understand that you met with the Special
3  Committee after May of 2006; is that correct?
4       MR. BELNICK:  Could you clarify if you
5  mean the board members on the committee itself or
6  their counsel?
7  BY MS. WEISS:
8       Q.   I was going to ask you about the
9  attendees, but --
10      MR. BELNICK:  I think it will be faster if
11 you divide it.
12      MS. WEISS:  All right.
13      MR. HEMANN:  Shirli, I think this is
14 probably a good time for me to interject that as a
15 general matter, we have advised Mr. Nichols through
16 his attorney that KLA-Tencor, which would include
17 any committees or members of the board of
18 director -- the directors of KLA-Tencor or their
19 counsel, do not waive any privilege that might be
20 applicable, including the attorney-client or the
21 attorney work product privilege.
22      And we have requested Mr. Nichols through
23 his counsel, Mr. Belnick, that he adhere to his
24 ethical statutory and fiduciary duties, such as they
25 are, and take all necessary steps to protect both

Page 33

1  the attorney-client privilege and the attorney work
2  product privilege doctrine as he answers questions
3  today.
4       And I don't know where exactly this
5  particular set of questions is going, but I wanted
6  to make it clear that the company has made that
7  request.  To the extent that a question that you ask
8  would reveal in Mr. Nichols' answer privileged
9  information; privileged under either the work
10 product doctrine, the attorney-client privilege,
11 we've asked Mr. Nichols to decline to answer the
12 question.
13      And Mr. Belnick will make an observation
14 if he feels that Mr. Nichols' answer will
15 reveal such information, and on that basis of
16 Mr. Belnick's observation, we would ask Mr. Nichols
17 not to answer the question.
18      MS. WEISS:  All right.  As I understand
19 your comments, Mr. Hemann, on behalf of KLA-Tencor
20 you would instruct Mr. Nichols not to respond to
21 questions concerning the content of communications
22 between Mr. Nichols and KLA-Tencor's Special
23 Committee --
24      MR. HEMANN:  Correct.
25      MS. WEISS:  -- including the members of

9 (Pages 30 to 33)

Nichols, Stuart J. Esq.                                                        1/27/2008

Page 34

1  the Special Committee or the counsel acting for
2  their members; is that correct?
3       MR. HEMANN:  That's correct.
4       MS. WEISS:  Is that the same instruction
5  that you would make with respect to all of
6  KLA-Tencor's current and former personnel?
7       MR. HEMANN:  Yes.
8       MS. WEISS:  Would that also be true
9  with respect to the assertion of the work product
10 doctrine with respect to all current and former
11 inside attorneys of KLA-Tencor?
12      MR. HEMANN:  Yes.
13      MS. WEISS:  That is to say that to the
14 extent that they met with the Special Committee,
15 you would instruct them not to respond to my
16 questions --
17      MR. HEMANN:  Oh, I'm sorry.  I'm sorry.
18 I thought you were talking about Mr. Nichols'
19 communications with attorneys for KLA-Tencor.
20      I would instruct Mr. Nichols not to -- I
21 would advise Mr. Nichols that the company is taking
22 the position that his communications with attorneys
23 for KLA-Tencor, whether inside attorneys or outside
24 attorneys, are protected by some combination of
25 the attorney-client privilege and the attorney work

Page 35

1  product doctrine.
2       MS. WEISS:  Okay.  Right now I'm just on
3  the Special Committee.
4       THE VIDEOGRAPHER:  I'm sorry.  Is your
5  BlackBerry on?
6       MR. HEMANN:  Yes.  I can turn it off.
7       THE VIDEOGRAPHER:  Somebody is starting to
8  interfere with the audio.
9       MS. WEISS:  You may actually have to put
10 it remotely.  I've had trouble with Blackberrys that
11 are even off.
12      THE VIDEOGRAPHER:  Thank you.
13      MS. WEISS:  Okay.  Mr. Hemann, what I'd
14 like to do is, first of all, segregate the Special
15 Committee.  And I think you were clear about your
16 instruction with respect to the attorney-client
17 privilege.
18      I'm moving now to the work product
19 protection.  As to Mr. Nichols' communications with
20 the Special Committee or the Special Committee's
21 counsel, is it your instruction to him not to
22 respond to questions on the grounds that asks for
23 his communications to those personnel; the Special
24 Committee or their counsel, on the grounds of the
25 work product doctrine?

Page 36

1       MR. HEMANN:  Yes.
2       MS. WEISS:  And would it be your
3  instruction to each of KLA-Tencor's current and
4  former in-house counsel that they are not to respond
5  to questions that I pose to them as witnesses
6  regarding their communications with the Special
7  Committee or its counsel on the basis of the work
8  product doctrine?
9       MR. HEMANN:  I think my comments and
10 positions today are directed solely to Mr. Nichols.
11 I'd be happy to talk to you after the deposition
12 about other potential witnesses.
13      MS. WEISS:  Well, Counsel, we'd like to
14 make a clear record today of KLA's intentions with
15 respect to instructions to witnesses so that we
16 don't have to take more witness' depositions before
17 we approach the court with these issues.
18      So these issues have been vetted over many
19 weeks now.  Are you not prepared to tell me what
20 the company's position is with respect to other
21 attorneys that I call as witnesses as far as the
22 assertion of the attorney-client privilege and
23 the work product doctrine is concerned?
24      MR. HEMANN:  I'm prepared to meet and
25 confer with you about other witnesses outside

Page 37

1  the context of Mr. Nichols' deposition.
2       MS. WEISS:  Mr. Nichols --
3       MR. BELNICK:  Can I just make a brief
4  statement?
5       MS. WEISS:  Please.
6       MR. BELNICK:  Just to make clear, as
7  I indicated both to you and Mr. Hemann and our
8  communication before deposition when Mr. Hemann gave
9  the instructions he described, Mr. Nichols, as a
10 lawyer, former general counsel for KLA, obviously
11 has fiduciary ethical and legal obligations and so
12 he has no choice.
13      And I'm neither criticizing or applauding,
14 but he obviously has no choice but to follow the
15 instructions of KLA and its counsel, and therefore
16 he will follow the instruction that Mr. Hemann just
17 put on the record.
18      And if all or part -- or the substantial
19 part of an answer would involve privileged or work
20 product, I have no choice but to say "privilege";
21 meaning he can't answer it.  Not because he doesn't
22 want to answer or I don't want him to answer, but
23 because he has no choice as a lawyer other than to
24 follow his former clients' request and direction.
25      MS. WEISS:  I understand, Mr. Belnick.

10 (Pages 34 to 37)

Nichols, Stuart J. Esq.                                                      1/27/2008

Page 38

1   And to the extent that I continue to ask questions
2   that call for communications which you deem
3   privileged, my purpose is going to be to elicit your
4   objection and make a record from which a court can
5   infer your intentions specifically and generally.
6   And Mr. Hemann's intentions.
7        So that will be my purpose in pursuing
8   lines of questioning as to which you've already made
9   your position.
10       MR. BELNICK: I understand. And just
11  two quick points on that so we can get back to
12  the record. First, just so it's clear, when you
13  say "your"; meaning looking at me, they're not my
14  objections. They're KLA's objections and we are
15  adhering to them.
16       Second, I would hope, but it's entirely
17  up to you, that given the statement Mr. Hemann has
18  made, it's fairly clear that there's not going to be
19  very much that Mr. Nichols can answer so I would
20  request that you -- we try to limit the record
21  building for the sake of saving everyone's time.
22  But I'm certainly not going to stop you or try to
23  stop you.
24       MS. WEISS: Okay. Thank you, sir.
25  BY MS. WEISS:

Page 39

1        Q. Mr. Nichols, the notes, the final
2   memoranda that the Special Committee counsel
3   prepared of your interviews with the Special
4   Committee, were turned over, as I understand
5   it, to Mr. Schroeder by the SEC in compliance with
6   Rule 26 in this litigation.
7        I am going to read to you the dates of the
8   interviews that I have and ask you whether or not
9   you generally recall that those were the dates that
10  you met with the committee. So the dates that I
11  have are July 28th, 2006; August 4th, 2006; and
12  September 18th, 2006.
13       Is that generally your recollection as to
14  when you met with the Special Committee?
15       A. That sounds generally right.
16       MR. BELNICK: On all three of those
17  occasions?
18       Because I think the witness' recollection
19  was -- and I think he was correct -- that he met
20  only once with them.
21       THE WITNESS: No, no.
22       MR. BELNICK: I'm misunderstanding then.
23       THE WITNESS: She's referring to the
24  Special Committee, not to the SEC.
25       MR. BELNICK: Oh, I apologize. I

Page 40

1   apologize.
2   BY MS. WEISS:
3        Q. Mr. Nichols, if you met on more than three
4   occasions, do you think you would remember that?
5        A. Yes.
6        Q. Did you make calendar entries as to when
7   you met with the Special Committee?
8        A. I may have.
9        Q. Did you meet with the SEC before or after
10  you met with the Special Committee? And if it was
11  in between, you can tell me that, too.
12       A. I really don't remember the timing.
13       Q. Okay. The memoranda turned over to us
14  with respect to July 28th, 2006, states that the
15  people who were in attendance at your interview
16  were the following: Richard Marmaro, Jack Dicanio,
17  Elizabeth Harlan, all from the Skadden Arps Law
18  Firm; Steven Daughters from LECG, which I understand
19  was their forensic consultant; Mr. Belnick by
20  telephone; yourself.
21       Do you recall anyone else being present at
22  that interview?
23       A. I have a memory that there was a second
24  representative of LECG. Other than that -- and I
25  wouldn't have been able to come up with a name of

Page 41

1   Mr. Daughters, but I just remember that there were
2   two -- I thought I remember there being two LECG
3   people there.
4        Q. All right. Other than that person, do
5   you recall anyone else being in attendance at that
6   meeting?
7        A. No.
8        Q. Who, as you understood it at that time,
9   were the members of the Special Committee itself?
10       A. The members of the Special Committee
11  itself were Ray Bingham and -- I'm blanking on his
12  name.
13       Q. Steven Kaufman?
14       A. Thank you. Steven Kaufman.
15       Q. Did you meet with either Mr. Bingham or
16  Mr. Kaufman, or both, at any time in connection
17  with KLA-Tencor's investigation of its stock option
18  practices?
19       A. Yes.
20       Q. How many times did you meet with
21  Mr. Bingham?
22       A. You're referring now to in-person meetings
23  as opposed to telephone meetings?
24       Q. Let's start with the in-person meetings.
25       A. I recall only one in-person meeting with

11 (Pages 38 to 41)

Nichols, Stuart J. Esq.                                             1/27/2008

Page 42

1  Ray Bingham in connection with his responsibilities
2  relative to the Special Committee.
3      Q.  And at the time that you met with
4  Mr. Bingham, was he questioning you with respect
5  to your past communications at KLA-Tencor?
6      A.  No.
7      Q.  Was it a meeting in connection with
8  his responsibilities as a member of the Special
9  Committee?
10     A.  Yes.
11     Q.  Was there a second meeting with
12 Mr. Bingham?
13     A.  Not that I recall.
14     Q.  Was there any time that Mr. Bingham
15 participated personally in an interview of you
16 with respect to the investigation?
17     A.  No.
18     Q.  Okay.  Moving to Mr. Kaufman.  How many
19 times did you meet with him either in person or by
20 telephone?
21     A.  I don't believe I ever met with him in
22 person in connection with his responsibilities on
23 the Special Committee.
24     Q.  Okay.  Or by telephone?
25     A.  I remember at least one meeting that he --

Page 43

1  in which he participated by phone.
2      Q.  Was the purpose of that meeting, as you
3  understood it, to provide your advice to him as to
4  his responsibilities as a member of that committee?
5      A.  No.
6      Q.  What was the purpose of the meeting with
7  Mr. Kaufman?
8      A.  Well, it was a phone meeting that he
9  participated in by phone that included a number
10 of other people, including Ray Bingham in person.
11     Q.  And what was the purpose of that meeting,
12 as you understood it?
13     MR. BELNICK:  One second, please.  I'm
14 trying to ascertain if we have a privilege issue
15 here.
16     MS. WEISS:  Sure.
17     (Discussion off the record between
18     Deponent and Counsel.)
19     MR. BELNICK:  I believe that the answer
20 will implicate the privilege, at least work product
21 and perhaps attorney-client as well, so we'll have
22 to follow KLA's instruction and respectfully
23 decline.
24     MS. WEISS:  Okay.  And your instruction is
25 to the witness not to answer the question; correct?

Page 44

1      MR. BELNICK:  It is my instruction to
2  the witness -- just so it's clear, Shirli, I'm not
3  trying to mince words -- is he needs to follow KLA's
4  direction.  And the direction, as I understand it
5  and as you understand it, is that KLA has directed
6  him not to answer questions that we believe would
7  implicate attorney-client privilege or work product,
8  and we're following that direction.
9      MS. WEISS:  Okay.  And just so that
10 we don't have to keep repeating that every time,
11 let's have an agreement that when I say, "Are you
12 instructing him not to answer" and you say "Yes,"
13 that will mean that you are instructing him not to
14 answer based on the instruction of KLA which in turn
15 is based on the attorney-client privilege and the
16 work product doctrine.
17     MR. BELNICK:  Correct.  Just so long as
18 it's clear that it's not Mr. Nichols or his counsel
19 who made decisions on whether the privilege exists
20 or doesn't exist.  We have no position on that.
21     MS. WEISS:  Very good.
22     MR. BELNICK:  I mean, the privilege
23 exists and we don't take any position.  I understand
24 there's a waiver issue pending.  We're not taking
25 any positions on whether anything has been waived

Page 45

1  or not.
2      MS. WEISS:  I understand.
3      MR. BELNICK:  We're following KLA's
4  direction.
5      MS. WEISS:  I understand.
6      THE WITNESS:  And just to be clear, if you
7  instruct me not to answer relative to a privilege
8  issue that exists within -- between you and me, you
9  need to make that clear; right?
10     MR. BELNICK:  Thanks.
11     THE WITNESS:  I mean, I don't want every
12 instruction to be construed as an instruction
13 based --
14     MR. BELNICK:  I know.  Don't worry.  If
15 Shirli goes after our top secret confidential
16 discussions, I'll make it clear.
17 BY MS. WEISS:
18     Q.  Okay.  So I think we were questioning you
19 about Mr. Kaufman and I think you declined to answer
20 a question.
21     A.  Well, your question was what was the
22 purpose of this meeting.
23     Q.  And you're instructed not to answer --
24     A.  Correct.
25     Q.  -- based on the attorney-client privilege

12 (Pages 42 to 45)

Page 46

1  and the work product doctrine.
2       All right.  So I have notes from an
3  interview of you that occurred August 4th, 2006.
4  The notes record that Mr. Marmaro, Mr. Dicanio,
5  Miss Harlan, Mr. Daughters, and Mr. Belnick were at
6  that interview, as well as yourself.  Mr. Belnick I
7  don't think made it clear whether he was there by
8  phone or in person.
9       MR. BELNICK:  I was in person.
10  BY MS. WEISS:
11      Q.  In person.
12      And in addition, on August 4th a gentleman
13  named Joe Anastosi also joined.
14      A.  Okay.  So it may have been in the second
15  meeting that there were two LECG people present.
16  Because Mr. Anastosi is LECG?
17      Q.  Yes.
18      A.  Yeah.
19      Q.  And does that comport with your
20  recollection?
21      A.  Yes.
22      Q.  All right.  And then there was a third
23  interview that occurred on September 18th, 2006, and
24  at that interview only Mr. Dicanio and Miss Harlan
25  attended as well as your counsel and yourself and no

Page 47

1  one else.
2       Does that comport with your recollection?
3       A.  Correct.  Although I believe Mr. Belnick
4  participated by phone.
5       Q.  All right.  Now, of those meetings, is
6  there any person that you have a recollection that
7  attended that I didn't mention?
8       A.  No.
9       Q.  And at those meetings would it be correct
10  to say that the attorney who questioned you said
11  that KLA was the holder of the attorney-client
12  privilege and the work product privilege with
13  respect to that -- the Special Committee's interview
14  of you and could turn the results of that interview
15  as they chose over to third parties?
16      Do you recall that instruction?
17      MR. BELNICK:  I'll object to the extent
18  that it calls for him to make legal conclusions --
19  oh, was it an instruction?
20  BY MS. WEISS:
21      Q.  Do you recall that instruction?
22      MR. BELNICK:  I strike the objection.
23  BY MS. WEISS:
24      Q.  Do you have in mind the question?
25      A.  I have in mind the question.

Page 48

1       MR. BELNICK:  I'm sorry.
2       THE WITNESS:  I do generally recall the
3  instruction.
4  BY MS. WEISS:
5       Q.  All right.  Now, in addition to the
6  Special Committee, were you also interviewed in
7  connection with your service as general counsel
8  at KLA by something called the Special Litigation
9  Committee of KLA-Tencor at any time?
10      A.  Yes.
11      Q.  And can you identify approximately when
12  that interview occurred.
13      A.  Well, it would have been after the third
14  of the Special Litigation Committee meetings which
15  you have --
16      MR. BELNICK:  The third of the Special
17  Committee?
18      THE WITNESS:  Yeah, I'm sorry.  The third
19  of the Special Committee meetings which you have
20  reminded me occurred in September of '06.
21  BY MS. WEISS:
22      Q.  How many meetings did you attend with the
23  Special Litigation Committee?
24      A.  I believe there were two.
25      Q.  And whom did you understand the Special

Page 49

1  Litigation Committee to be comprised of?
2       A.  Do you mean in terms of the board
3  committee itself who was on that committee?
4       Q.  Yes.
5       A.  I have a memory that it was Mr. Kaufman
6  and Mr. Wong, but I'm not certain about that.
7       Q.  This would be a different Mr. Wong than
8  the Mr. Wong that you identified earlier?
9       A.  Correct.
10      Q.  And you said you believed that there were
11  two meetings.  Can you tell me who attended those
12  meetings to the best of your recollection.
13      A.  I believe that Tim Miller from the Skadden
14  firm attended both of them and Jim Lyons attended
15  the first one, and perhaps both.
16      Q.  Anyone else?
17      A.  I don't believe so.
18      Q.  Who took notes?
19      A.  Oh, and Mr. Belnick.  Pardon me.
20      Mr. Miller and Mr. Lyons may have taken
21  notes.
22      Q.  You did not?
23      A.  I did not.
24      Q.  Backing up to the Special Committee
25  interviews.  Would it be correct to say that one of

Nichols, Stuart J. Esq.                                                                                     1/27/2008

Page 50

1 the attorneys took notes during that interview?
2     A.  Yes.
3     Q.  And was that a Skadden attorney that took
4 notes?
5     A.  I don't have a specific memory.  I have a
6 general memory that Miss Harlan was taking notes.
7 Mr. Dicanio may have taken notes.  I don't remember
8 one way or another.
9     Q.  Those notes were not submitted to you at
10 any time --
11     A.  No.
12     Q.  -- would that be correct?
13         Would it be correct that they were not
14 submitted?
15     A.  That would be correct.
16     Q.  Okay.  All right.  Following your
17 meeting with the Special Committee and the Special
18 Litigation Committee, have you entered into any
19 agreements with the company?
20     A.  Yes.
21     Q.  Could you tell me the first agreement
22 that comes to mind that you've entered into with
23 the company.
24     A.  The first agreement that comes to mind had
25 to do with my laptop computer that I used while I

Page 51

1 was at KLA.
2     Q.  And what was that agreement generally?
3     A.  In general my concern about my laptop
4 was that I had confidential information on
5 there relative to other clients with whom I was
6 consulting.  KLA wanted to preserve the laptop and
7 the hard drive.
8         And so in general the agreement provided
9 that Skadden would be the custodian of the laptop
10 and that if it were ever subpoenaed or requested,
11 that I would be given notice of that and be given
12 the opportunity to take steps to preserve the
13 confidentiality of any of the information on there
14 that does not relate to KLA.
15     Q.  Okay.  And that's an agreement in writing?
16     A.  Correct.
17     Q.  Okay.  What's the next agreement that you
18 entered into with the company, if any?
19     A.  The next agreement that I entered
20 into with the company was in connection with my
21 resignation from the company.
22     Q.  Okay.  And that was also a written
23 agreement?
24     A.  Correct.
25     Q.  Okay.  What's the next agreement that you

Page 52

1 entered into with the company?
2     A.  Those are the only two that I recall.
3     Q.  Okay.  Have you entered into a settlement
4 agreement with the company with respect to the
5 pending shareholder derivative litigation?
6     A.  No.
7     Q.  Do you have a draft of any such agreement?
8     A.  No.
9     Q.  Do you have an understanding with the
10 company as to what would happen to you in that
11 litigation?
12     A.  No.
13     Q.  Will you please summarize your educational
14 background, sir.
15     A.  Starting with where?
16     Q.  Graduation from high school.
17     A.  I graduated from high school from
18 San Carlos High School in California.  I went to
19 receive my undergraduate degree at the University
20 of California Berkeley.  And I received my law
21 degree from the University of San Francisco.
22     Q.  What year did you graduate from Berkeley?
23     A.  1983.
24     Q.  And what year did you graduate from law
25 school?

Page 53

1     A.  1987.
2     Q.  Do you have any formal training in
3 accounting, sir?
4     A.  No.
5     Q.  Do you have any informal training in
6 accounting?
7     A.  It depends on how you define "informal."
8     Q.  Did you receive some on-the-job knowledge
9 about accounting in relation to options while you
10 were at KLA?
11     A.  I had exposure to issues relating to
12 option -- accounting for options, yes.
13     Q.  Do you hold any other degrees other than
14 those that you've mentioned?
15     A.  No.
16     Q.  Do you hold any licenses other than a
17 driver's license and your California Bar license?
18     A.  Well, I'm certified to scuba dive.
19     Q.  That counts.  Anything else?
20     A.  That's all that comes to mind.
21     Q.  No real estate or resale licenses or
22 anything like that?
23     A.  No.
24     Q.  Okay.  Following your graduation from law
25 school, could you please take me through the steps

14 (Pages 50 to 53)

Page 54

1  of your employment, your professional employment.
2      A.   My first job after law school was with
3  a small law firm in San Francisco that was at
4  the time -- well, it's currently named Goodin,
5  MacBride, Squeiri, S-q-u-e-r-i, & Schlotz, I think.
6  I then went in late '89 to Varian Associates, Inc.
7  I left Varian Associates, Inc., in '95 --
8      Q.   Okay.  Let me just interrupt you here for
9  just a moment.  The first group, was that a company
10 or a law firm, did you say?
11     A.   Law firm.
12     Q.   That was a law firm.  Okay.  And you said
13 you started with them when?
14     A.   Well, I was a law clerk with them before
15 I graduated law school and then I started as an
16 attorney in 1987 after graduating.  Yeah.
17     Q.   And you stayed until 1989?
18     A.   Yes.
19     Q.   And your general responsibilities at that
20 time were?
21     A.   I was a litigation associate.
22     Q.   Okay.  And then in 1989 you went with
23 Varian Associates.  Was that a law firm or a
24 company?
25     A.   A company.

Page 55

1      Q.   A company.  Okay.  And where were they
2  based?
3      A.   Palo Alto, California.
4      Q.   Okay.  What kind of company were they?
5      A.   A diversified electronics manufacturer.
6      Q.   Were they private or public?
7      A.   Public.
8      Q.   At the time you were with Varian
9  Associates, do you recall whether or not you were
10 awarded any option grants?
11     A.   Yes.
12     Q.   What did your responsibilities entail at
13 Varian?
14     A.   Well, they varied over time.
15     Q.   Can you give me a general statement of how
16 they changed over time?
17     A.   Yeah.  Initially I was hired to manage
18 litigation for the company and as time went on, I
19 took on other substantive responsibilities that
20 included -- I did some M&A work, I managed the
21 company's employment law matters, I consulted on
22 product safety and liability issues, I was a member
23 of two of the company's -- the boards of the two of
24 the company's joint venture partnerships and other
25 duties as assigned.

Page 56

1      Q.   Did you -- generally did you render advice
2  in connection with the company stock option program
3  while you were at Varian?
4      A.   No.
5      Q.   Did you receive options while you were at
6  Varian?
7      A.   Yes.
8      Q.   Can you generally describe how options
9  were granted when you were at Varian?
10     A.   No.
11     Q.   You had nothing to do with the option
12 process?
13     A.   No knowledge of how options were granted
14 at Varian.
15     Q.   And you didn't participate in any way,
16 shape or form in the process itself?
17     A.   No.
18     Q.   Were you in-house general counsel at
19 Varian?
20     A.   No.
21     Q.   What was your title there?
22     A.   Initially it was Associate Corporate
23 Counsel and then shortly thereafter I was promoted
24 to Corporate Counsel.
25     Q.   Who was their outside counsel?

Page 57

1      A.   Well, it was a large company.  We had a
2  lot of outside counsel.  Do you mean outside counsel
3  for corporate matters?
4      Q.   Yes.
5      A.   Orrick Herrington.
6      Q.   While you were at Varian, what department
7  of the company accounted for stock options, to your
8  knowledge?
9      A.   What department?
10     Q.   Yes.  Was there a department of the
11 company that was responsible for the accounting
12 of stock options?
13     A.   For the accounting of stock options.
14 Well, presumably the accounting function.  I don't
15 know.
16     Q.   It's not something that you ever had
17 occasion to inquire as to?
18     A.   No.
19     Q.   Is that right?
20     A.   Correct.
21     Q.   From your perspective, you received stock
22 option awards; is that correct?
23     A.   Yes.  You've asked me that three times.
24 Yes.
25     Q.   And did you have occasion to exercise and

Nichols, Stuart J. Esq.                                                                1/27/2008

Page 58

1  sell the options in Varian?
2      A.  Yes, I did.
3      Q.  When did you leave Varian?
4      A.  1995.
5      Q.  Who did you next join?
6      A.  Samsung Semiconductor, Inc.
7      Q.  And where was the company's office base
8  that you joined?
9      A.  San Jose, California.
10     Q.  What was your title there?
11     A.  General Counsel.
12     Q.  Was that your first general counsel
13  position?
14     A.  Yes.
15     Q.  Generally what was your -- what were your
16  responsibilities?
17     A.  I did a fair amount of commercial
18  transactions; both on the sales and supply side.
19  I did a fair amount of licensing of intellectual
20  property, handled employment law issues. We had
21  some strategic partnership deals that I was involved
22  in and we did some acquisitions that I was involved
23  in.
24     Q.  Did your job functions at all entail
25  counseling with respect to the company's stock

Page 59

1  options?
2      A.  Well, that assumes that the company had
3  stock options.
4      Q.  It does indeed. Let me back up.
5          Did Samsung use stock options as
6  compensation for its employees?
7      A.  No.
8      Q.  You received no stock options when you
9  were at Samsung; is that right?
10     A.  That's correct.
11     Q.  When did you leave Samsung?
12     A.  Now we're up to I think it was early
13  to mid '98. No, no, no. I'm sorry. '97.
14     Q.  Okay. Sometime in 1997?
15     A.  Yes.
16     Q.  And why did you leave Samsung?
17     A.  I'm sorry. Why?
18     Q.  Yes. Generally.
19     A.  Better opportunity.
20     Q.  All right. And who did you join?
21     A.  Phoenix Technologies Limited.
22     Q.  Okay. Where were they based?
23     A.  San Jose, California.
24     Q.  Were they public or private?
25     A.  Public. Or I should say: Yes, they were

Page 60

1  public.
2      Q.  They were public.
3          And what was your title and function
4  there?
5      A.  I was general counsel there as well, and
6  my function was, you know, to handle whatever legal
7  issues arose from the company.
8          At that time Phoenix was a licensor of
9  software to the PC industry as well as we had a
10  division where we licensed intellectual property
11  used in the development and design of semiconductor
12  devices.
13     Q.  Did Phoenix Technologies use options as
14  compensation for its employees?
15     A.  Phoenix had options, yes.
16     Q.  And did part of your responsibilities
17  entail counseling with respect to options?
18     A.  No.
19     Q.  Did you personally receive options --
20     A.  Yes.
21     Q.  -- at Phoenix?
22         And did you receive them on a regular
23  basis while you were there? "Regular" being, you
24  know, at least annually.
25     A.  Yeah. I believe I received a grant after

Page 61

1  my first year. I'm not 100 percent certain of that,
2  but I believe I did.
3      Q.  Did you have an opportunity to generally
4  observe how options were granted at Phoenix
5  Technologies?
6      A.  No.
7      Q.  Did Phoenix Technologies use any sort of
8  pooling system to allocate options?
9      A.  I don't know.
10     Q.  Okay. Were you able to observe what
11  department at the company was responsible for
12  accounting for option grants at Phoenix
13  Technologies?
14     A.  Same answer as at Varian: I don't know
15  from personal knowledge. Again, I would presume
16  it was the accounting department.
17     Q.  Okay. What was your next employment?
18     A.  KLA-Tencor Corporation.
19     Q.  Okay. And how did you become aware of the
20  KLA-Tencor opportunity?
21     A.  I was told of the opportunity by a partner
22  at Wilson Sonsini named Judy O'Brien.
23     Q.  How did you know Miss O'Brien?
24     A.  She was the corporate secretary to another
25  company that I was considering going to so I was

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 62

1  interviewing her for one job and she told me about a
2  different job.
3      Q.   Okay.  And did you decide to interview for
4  the KLA-Tencor job?
5      A.   Yes.
6      Q.   By the way, I may refer to KLA-Tencor
7  Corporation as "KLA-Tencor" or simply "KLA" for
8  short.  And when I say "KLA," I mean KLA-Tencor
9  Corporation.  Can we have that understanding?
10     A.   Yes, we can.
11     Q.   All right.  So who interviewed you at KLA?
12     A.   Ken Levy, Ken Schroeder, and John Kispert.
13          MR. BELNICK:  Shirli, with apologies.  May
14  we take a break, a personal order break?
15          MS. WEISS:  Absolutely.  And, in fact,
16  please do interrupt me.  I have a tendency not to
17  remember to take breaks.  So by all means.  I see it
18  is 10:56.  Why don't we take a 10-minute break.
19          MR. BELNICK:  Thank you.
20          THE VIDEOGRAPHER:  Off the record.  The
21  time is 10:55 a.m.
22          (Off the record.)
23          THE VIDEOGRAPHER:  We are back on the
24  record.  The time is 11:06 a.m.
25  BY MS. WEISS:

Page 63

1      Q.   Mr. Nichols, I believe I asked you who
2  interviewed you before you were hired by KLA and I
3  think that you began to tell me.  And I wrote down
4  Mr. Schroeder, Mr. Kispert and Mr. Levy.  Did I get
5  that right?
6      A.   Yes.  And then one other person, Bob
7  Boehlke, B-o-e-h-l-k-e, I believe is how it's
8  spelled.
9      Q.   Okay.  And who did you understand that you
10  would be reporting to if you took the position?
11     A.   Mr. Boehlke.
12     Q.   And who was Mr. Boehlke?
13     A.   He was then the CFO.
14     Q.   And that's the Chief Financial Officer?
15     A.   That's correct.
16     Q.   And who was Mr. Kispert at that time?
17     A.   Do you mean what was his title?
18     Q.   Yes.
19     A.   Vice President of Finance.
20     Q.   And Mr. Schroeder, what was his title at
21  that time?
22     A.   Chief Executive Officer.
23     Q.   And Mr. Levy, who was he?
24     A.   At that time I believe he was the Chairman
25  of the Board of Directors.

Page 64

1      Q.   Okay.  And did the company make you an
2  offer?
3      A.   Yes.
4      Q.   And who did you negotiate the terms of
5  your employment with?
6      A.   Mr. Boehlke.
7      Q.   And did the terms of your offer include an
8  award of options?
9      A.   Yes.
10     Q.   And what did you -- did you negotiate
11  back and forth with Mr. Boehlke in terms of your
12  employment or did you simply take what he offered
13  you?
14     A.   I attempted to negotiate but ultimately
15  took what he offered me.
16     Q.   Okay.  And was it Mr. Boehlke who set your
17  salary compensation --
18     A.   Yes.
19     Q.   -- is that your understanding?
20     A.   Yes.
21     Q.   All right.  And did he also set the number
22  of options you would get when you joined the
23  company?
24     A.   So far as I know.
25     Q.   And do you recall what the terms were, as

Page 65

1  you sit there?
2      A.   No.
3          MS. WEISS:  Could you hear me okay?
4          THE VIDEOGRAPHER:  I was hearing you well
5  enough.
6          MS. WEISS:  What number are we up to now?
7          DEPOSITION REPORTER:  50.
8          MS. WEISS:  50, 5-0?
9          DEPOSITION REPORTER:  Correct.
10         MS. WEISS:  We will have marked next in
11  order Exhibit 50.
12         (Whereupon, Exhibit 50 was marked
13         for identification.)
14         MS. WEISS:  This will be 51 (indicating).
15         (Whereupon, Exhibit 51 was marked
16         for identification.)
17         MS. WEISS:  This will be 52 (indicating).
18         (Whereupon, Exhibit 52 was marked
19         for identification.)
20         MS. WEISS:  This will be 53 (indicating).
21         (Whereupon, Exhibit 53 was marked
22         for identification.)
23  BY MS. WEISS:
24     Q.   All right.  Mr. Nichols, turning your
25  attention to Exhibit 52.  Exhibit 52 appears to the

17 (Pages 62 to 65)

Nichols, Stuart J. Esq.                                                1/27/2008

Page 66

1   a redlined draft dated October 7, 1999, addressed to
2   yourself, Stuart J. Nichols, and it is unsigned. It
3   has the typewritten signature of Robert J. Boehlke,
4   Executive Vice President, Chief Financial Officer.
5   It's not on company stationery.
6        Can you identify Exhibit 52, sir?
7        A.   How would you like me to identify it?
8        Q.   Can you tell me what it is?
9        A.   It appears to be a markup of an offer
10  letter to me from the company containing the
11  proposed terms of my employment.
12       Q.   Okay. And so did you receive an unsigned
13  offer letter and were invited to mark it up for
14  Mr. Boehlke and send it back? Do you recall?
15       A.   I don't recall. I strongly suspect that
16  I was not invited to mark it up but just did so
17  anyway.
18       Q.   All right. And the black lining and the
19  deletions on Exhibit 52, are those your negotiations
20  or proposed markups of the contract?
21       A.   Yes, they appear to be.
22       Q.   Did anybody else mark this document up?
23       A.   No.
24       Q.   Were you advised by counsel, by the way,
25  when you joined the company?

Page 67

1        A.   No.
2        Q.   And so your effort was to negotiate the
3   terms of your contract in your favor. Was that your
4   effort on Exhibit 52?
5        A.   Yes.
6        Q.   If you take a look at Exhibit 50.
7             Exhibit 50 appears to reflect an email
8   from yourself dated October 12th, 1999, to Bob
9   Boehlke. The subject is "Revised offer letter," and
10  it starts off, "Bob, greetings from Massachusetts.
11  Attached is a marked up version of your offer
12  letter. My changes are noted in revision format.
13  The notable changes are," and then there's a summary
14  of the changes.
15            So did you send this email to Mr. Boehlke
16  as part of the negotiation of the terms of your
17  employment with KLA?
18       A.   Presumably, yeah. I don't have a specific
19  memory of writing this, and I haven't -- this is the
20  first time I've seen it since I presumably sent it.
21  But, yeah, that's what it appears to be.
22       Q.   Okay. What did you understand --
23  what were you communicating in paragraph 3 to
24  Mr. Boehlke?
25       A.   What exactly do you mean?

Page 68

1        Q.   Paragraph 3 states, "Hiring bonus. We
2   had talked about the losses I will incur by not
3   completing the offer period for Phoenix ESPP
4   (conservatively, $2,000.)"
5             Do you see that?
6        A.   Yeah.
7        Q.   Does "Phoenix ESPP" stand for Employee
8   Stock Purchase Plan?
9        A.   Yes.
10       Q.   And were you communicating to Mr. Boehlke
11  that by taking employment at KLA, you would be
12  incurring a loss by not receiving a benefit from
13  the Employee Stock Purchase Plan at Phoenix, your
14  current employment? Is that what you were
15  communicating?
16       A.   Well, I wouldn't put it exactly that way.
17  I would not have received the benefit, that's
18  correct.
19       Q.   Okay. And you go on to state, "In
20  addition, there are some matching 401(k) dollars
21  (also roughly $2,000) and the value of unvested 'in
22  the money' options."
23            What were you referring to when you
24  were referred to "the value of the unvested 'in
25  the money' options" in your discussions with

Page 69

1   Mr. Boehlke?
2        A.   I'm referring to the stock options that I
3   held in Phoenix Technology stock where the exercise
4   price was less than the current market price.
5        Q.   Okay. And were you asking him to do
6   something with respect to the value of the unvested
7   in the money options as part of your employment?
8        A.   Well, yes. I was asking for a hiring
9   bonus in recognition of what I would be forgiving,
10  foregoing.
11       Q.   All right. And do you know if you got
12  that, what you were requesting?
13       A.   Well, you'd have to look at the paper
14  trail here. I truly don't remember.
15       Q.   Okay. Let's look at Exhibit 51.
16            That looks to me like it was the final
17  version of your offer, but you tell me. Exhibit 51
18  is a letter dated October 18th, 1999. It's
19  addressed to yourself. It appears to bear the
20  signature of Mr. Boehlke, and then below that
21  there's the terminology "Acceptance and
22  Acknowledgment," and then there's what appears
23  to be your signature.
24            Would you look at Exhibit 51 and tell me
25  if that's your signature on the second page under

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 70

1   "Acceptance and Acknowledgement."
2       A.   Yes, it is.
3       Q.   All right.  And so his recommendation --
4   well, his statement was that you would be receiving
5   the salary that you requested in your markup; is
6   that correct?
7       A.   The salary, yes.
8       Q.   And in addition, that you would be
9   receiving 20,000 shares of -- an option to purchase
10  20,000 shares of KLA-Tencor stock --
11      A.   That's correct.
12      Q.   -- referenced in that first paragraph
13  under "Salary."
14           Do you see that?
15      A.   Yes.
16      Q.   All right.  And I believe you identified
17  your signature on the second page.  And then the
18  date October 25th, 1999.
19           Is that your handwriting?
20      A.   Yes.
21      Q.   And up above where the arbitration clause
22  is crossed out and there appears to be initials, are
23  those your initials?
24      A.   Yes.
25      Q.   And you crossed out that arbitration

Page 71

1   clause; is that right?
2       A.   Yes.
3       Q.   All right.  And then below where it says
4   "Start date," it says "TBD."  Does that stand for to
5   be decided?
6       A.   Or determined; yeah.
7       Q.   To be determined, okay.
8            And then the "(late November)."  Do you
9   see that?
10      A.   Uh-huh, yes.
11      Q.   All right.  And did you write that in?
12      A.   That appears to be my handwriting, yes.
13      Q.   Okay.  And did you start in approximately
14  late November of 1999?
15      A.   No.  I started -- immediately upon signing
16  the agreement I started doing tasks for KLA.
17      Q.   Okay.  When you say "doing tasks," were
18  you still physically located at Phoenix or did you
19  actually move into an office at KLA?
20      A.   Well, at this point right after I signed
21  the offer letter -- and actually, it may have even
22  been before I signed the offer letter -- there were
23  things that I was getting involved in.  And I had
24  an arrangement with Bob Boehlke that I would
25  essentially split my time for a period of time

Page 72

1   between Phoenix and KLA such that I would show --
2   I went pretty much every day I think to both
3   locations.
4       Q.   Okay.  So you continued at Phoenix and you
5   also started work for KLA.  Would that be correct?
6       A.   Yes.
7       Q.   And you were paid from day 1; is that
8   right?
9       A.   Yes, that's my recollection.
10      Q.   And where were you "housed,"
11  quote-unquote, in the company?
12      A.   Do you mean where was my office?
13      Q.   Where was your office?  I understand it
14  had more than one building.
15      A.   At this stage I was lo- -- my office was
16  located in the building referred to as "Building A."
17      Q.   Okay.
18      A.   At 160 Rio Robles.
19      Q.   Okay.  All right.  Building A.  And which
20  floor were you on?
21      A.   The 2nd floor.
22      Q.   Where was Mr. Boehlke's office in relation
23  to your office?
24      A.   In that same suite; 50 feet from mine.
25      Q.   And it was essentially a suite where

Page 73

1   the executives had their offices.  Would that be
2   correct?
3       A.   Yes.
4       Q.   All right.  And you had the title of --
5   when you started you had what title?
6       A.   Vice President, General Counsel.
7       Q.   Were you also a corporate secretary right
8   from the day you started, or do you remember?
9       A.   I never was corporate secretary.
10      Q.   All right.  And then just for purposes
11  of identification, I have a new hire form that's
12  Exhibit 53.  What is a new hire form at the company?
13  What was a new hire form?  What was your
14  understanding of the function of the form?
15      A.   It is the form that people complete when
16  they commence their employment.
17      Q.   Okay.  And is it a form that you receive
18  from the human resources department?
19      A.   Yes.
20      Q.   And down below it appears to have your
21  signature and the date 10/25/99.
22           Do you see that?
23      A.   Yes.
24      Q.   And is that your signature and did you
25  date it that date?

19 (Pages 70 to 73)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 74

1    A.  Yes.
2    Q.  And next to that it's human resources.  Do
3  you recognize that signature?
4    A.  Yes.
5    Q.  Whose is that?
6    A.  It's Aparjo Dehal.  I don't know if I'm
7  pronouncing that correctly.
8    Q.  Was that a person in human resources?
9    A.  Yes.
10   Q.  And what did you understand -- as you came
11 aboard KLA-Tencor, what did you understand from your
12 discussions with Mr. Boehlke or others what your job
13 responsibilities were going to be?
14   A.  Ultimately responsible for the legal
15 affairs of the company.
16   Q.  What does that mean?
17   A.  That means anything from commercial
18 transactions, employment advice, M&A, management of
19 litigation, some supervision of the incumbent patent
20 lawyer and so forth.
21   Q.  What was your function with respect to SEC
22 filings?  As you walked in the door, what did you
23 think your function was?
24   A.  To review and, you know, provide input
25 from a legal perspective.

Page 75

1    Q.  Was part of your function going to be
2  advising the board?
3    A.  Yes.
4    Q.  And was part of your function going to be
5  advising the executive officers?
6    A.  Yes.
7    Q.  And was part of your function going to
8  be advising nonexecutive officers to the extent you
9  were called upon to do so at KLA?
10   A.  Yes.
11   Q.  Did you have -- as you came in, did you
12 have a staff at all?
13   A.  I had an administrative assistant and a
14 patent lawyer, and then I had a non -- a person who
15 was not part of the legal department who was also
16 reporting to me.
17   Q.  What was the patent lawyer's name?
18   A.  Kevin McAndrews.
19   Q.  And what was your administrative
20 assistant's name?
21   A.  She left shortly after I arrived and I
22 don't remember her name.
23   Q.  Okay.  Did someone serve as your secretary
24 or assistant, whatever the terminology was, at KLA
25 while you were there?

Page 76

1    A.  Are you asking me whether at all times I
2  had an assistant or a secretary?
3    Q.  When you came aboard.
4    A.  Oh, yeah.
5    Q.  Okay.  And that person left?
6    A.  Yes.
7    Q.  And do you remember the name of the person
8  who followed her in terms of those tasks?
9    A.  Yeah.  So then I had someone who was my
10 assistant for the first half, approximately, of
11 2000.
12   Q.  What was her name or his name?
13   A.  Her name was Sylvia Taheri, T-a-h-e-r-i.
14 "Sylvia" spelled with a "y," I believe.
15   Q.  And your recollection is she stayed the
16 first half of 2000; is that right?
17   A.  Yes.
18   Q.  And then did someone follow her?
19   A.  Yes.
20   Q.  Who was that person?
21   A.  Her name is Kery Bird, K-e-r-y, B-i-r-d.
22   Q.  How long did Miss Bird stay as your
23 assistant?
24   A.  From then until I left the company.
25   Q.  And were the duties of Miss Bird and

Page 77

1  Sylvia -- I don't know how to pronounce her last
2  name -- essentially secretarial duties?
3    A.  Yes.
4    Q.  Did you have anyone that seemed to have
5  the duties of a paralegal there at KLA?
6    A.  Not at that time.  Eventually there was a
7  patent paralegal that we hired.
8    Q.  What was that person's name?
9    A.  Well, there were a couple.  The first
10 one was named Heidi, H-e-i-d-i, I think, Opstedahl
11 (phonetic), I think is her last name, and I can't
12 even begin to try to spell that.  And then she was
13 followed by another patent paralegal named Odette,
14 O-d-e-t-t-e, Devera, D-e-v-e-r-a.
15   Q.  Okay.  Was there anyone on the corporate
16 side who assisted from a legal standpoint?  Any
17 junior attorney or --
18   A.  What do you mean when you say "on the
19 corporate side"?
20   Q.  In other words, all the other duties that
21 you described; commercial transactions, M&A.
22   A.  Shortly after I joined the company I hired
23 a contract lawyer to handle transactional matters.
24 Her name was Corinne Tomeo, C-o-r-i-n-n-e, "Tomeo,"
25 is spelled T-o-m-i-e-o -- no, T-o-m- -- I don't

20 (Pages 74 to 77)

Nichols, Stuart J. Esq.                                                1/27/2008

Page 78

1  know, T-o-m-e-o.
2      Q.  How long did she stay?
3      A.  A few months is all.  Not very long.
4      Q.  Okay.  Anybody else that served more on
5  the transaction or corporate side, not IP?
6      A.  After Corinne left I hired someone to take
7  over her responsibilities as a payrolled employee.
8      Q.  Okay.  What was that person's name?
9      A.  Kim Jackson.
10     Q.  Did Miss Jackson have a law degree?
11     A.  Yeah.  She still does, so far as I know.
12     Q.  What did Miss Jackson do for you?
13     A.  General -- really in the beginning it was
14 mostly commercial transactions supporting the sales
15 and procurement organizations.  And as time went
16 on, she had increasing responsibility over a broad
17 segment of the issues that we dealt with.
18     Q.  Did Miss Jackson ever attend Compensation
19 Committee meetings?
20     A.  No.
21     Q.  Did Miss Jackson ever attend board
22 meetings?
23     A.  No.
24     Q.  Did Miss Jackson prepare any of the
25 documentation that you interacted with with respect

Page 79

1  to either the Compensation Committee or the board?
2      A.  I think that in the latter portion, and by
3  that I mean, you know, the last 12 months or so of
4  my tenure at KLA, she helped me with some matters
5  relating to the Compensation Committee.
6      Q.  Is Miss Jackson still employed by KLA?
7      A.  No.
8      Q.  Where does she live?
9      A.  Where does she live?  I think in Palo
10 Alto, California.
11     Q.  Do you know if "Jackson" is her married
12 name?
13     A.  Given that she's not married, I don't
14 think it is.
15     Q.  I think that means no.
16         Okay.  Anyone else that you can identify
17 that helped you on the corporate or transaction
18 side?  I have Miss Jackson and Corinne Tomeo.
19 Anyone else that filled that role at any time
20 while you were there?
21     A.  For the last two years or so of my tenure
22 at KLA there was a transactional attorney that
23 worked as a contractor for the company, and her
24 name is Teri Little, L-i-t-t-l-e, T-e-r-i.
25     Q.  And she worked as what again, did you say?

Page 80

1      A.  She was mostly supporting the company's
2  procurement organization but also working on
3  sales-related transactions as well.
4      Q.  Okay.  Did she ever attend any
5  Compensation Committee meetings?
6      A.  No.
7      Q.  Board meetings?
8      A.  No.
9      Q.  Did she help you compile documentation for
10 either of those two types of meetings?
11     A.  No.
12     Q.  Okay.  Anyone else in the general category
13 that I mentioned?
14     A.  If your general category includes
15 transactional work?
16     Q.  Yes, transactional work and corporate and
17 M&A.
18     A.  There was -- when I joined the company
19 there was a lawyer in the sales organization that
20 was not part of legal and I -- he eventually
21 transferred over into the legal department.  His
22 responsibility was to support the sales organization
23 on transactional matters.
24     Q.  And his name was?
25     A.  Alex, A-l-e-x, Yuan, Y-u-a-n.

Page 81

1      Q.  Y-u-a-n.  Okay.
2          Was there any assistant that you had
3  during your tenure -- let's put aside Miss Jackson;
4  you identified her -- that assisted you in
5  connection with anything having to do with
6  compensation?
7      A.  No.
8      Q.  When you needed to prepare materials for
9  any Compensation Committee meeting or board meeting,
10 who did you look to to assist you?
11     A.  To the extent that I looked for
12 assistance, it would typically have been outside
13 counsel, Bret DiMarco.
14     Q.  Okay.  Not Miss Bird or Sylvia?
15     A.  No.  B-r-e-t, D-i-M-a-r-c-o.
16         MS. WEISS:  Okay.  Let's mark Exhibit 54.
17         (Whereupon, Exhibit 54 was marked
18         for identification.)
19 BY MS. WEISS:
20     Q.  Okay.  Exhibit 54 is a document that is
21 Bates stamped MLB/KLA-SEC 00011067 to 11072.  It's
22 a document that was received from the SEC in
23 production in this litigation.  It's entitled
24 "Minutes of the Meeting of the Board of Directors
25 of KLA-Tencor Corporation," dated November 16th,

21 (Pages 78 to 81)

Nichols, Stuart J. Esq.                                                          1/27/2008

Page 82

1 1999.
2        Would you make take a moment, sir, and
3 review it.
4        MR. BELNICK:  Shirli, may I remark we do
5 have that document, but it doesn't bear the Bates
6 numbers you have.
7        MS. WEISS:  Well, that's interesting.
8        MR. FICKES:  The copy you gave us has the
9 Bates number of KLS-SEC002735 --
10       MR. BELNICK:  002735 through 002739,
11 prefaced by the initials KLS-SEC.
12       MS. WEISS:  Okay.  And why don't we use
13 the numbers that you just articulated.  I must have
14 a different compilation set.
15 BY MS. WEISS:
16       Q.   Sir, would you take a moment to review
17 Exhibit 54 and tell me when you've done that.
18       A.   Okay.  I've done that.
19       Q.   All right.  Can you identify Exhibit 54?
20       A.   Yeah.  These are minutes of a board
21 meeting of KLA-Tencor Corporation for a meeting
22 held November 16 of 1999.
23       Q.   All right.  Thank you.
24            And in the second last page of the
25 compilation there appears to be on the minutes a

Page 83

1 signature block for yourself as Vice President,
2 General Counsel.  Is that your signature on the
3 minutes?
4       A.   Yes.
5       Q.   Okay.  And did you in fact attend the
6 meeting referenced by the document?
7       A.   It appears that I did, yes.
8       Q.   Do you know if you prepared the notes from
9 which the typewritten minutes were prepared?
10      A.   No, I don't recall.  I don't know.
11      Q.   Okay.  Let's go through the minutes.
12 Okay.  Under "Attendance and Quorum" the paragraph
13 states, "Present and at the meeting were chairman
14 Kenneth Levy and Directors James W. Bagley, Leo J.
15 Chamberlain, Richard J. Elkus, Dag Tellefsen, Jon D.
16 Tompkins, Dean O. Morton, Samuel Rubinovitz, Kenneth
17 L. Schroeder and Lida Urbanek, constituting a
18 quorum.  Director Edward W. Barnholt was absent."
19           Do you see that?
20      A.   Yes.
21      Q.   And do you recall the names of those
22 people as people who served as members of the
23 board of directors of KLA-Tencor at the time?
24      A.   Yes.
25      Q.   Then it states, "Also present were

Page 84

1 Stu Nichols, who was elected Vice president and
2 General Counsel of the Company at the meeting and
3 Judith M. O'Brien from Wilson Sonsini Goodrich &
4 Rosati, the Company's outside counsel."  And then
5 it says,"Mr. Levy acted as Chairman and led the
6 meeting; Mrs. O'Brien acted as Secretary and kept
7 the minutes."
8           Do you see that, sir?
9       A.   Yes.
10      Q.   All right.  Does that refresh your memory
11 that Miss O'Brien kept the minutes but then you
12 signed them as present at the meeting and general
13 counsel?
14      A.   No, it doesn't refresh my memory in that
15 regard.  I mean, I see what's written here and I
16 don't have any reason to doubt it, but I just don't
17 have a memory of that.
18      Q.   All right.  And were minutes generally
19 taken at board of directors meetings that you
20 attended at KLA-Tencor?
21      A.   Yes.
22      Q.   And some of those minutes were taken by
23 you as general counsel.  Would that be a correct
24 general statement?
25      A.   Yes.

Page 85

1       Q.   And when you took the minutes for the
2 company, you did your best to accurately reflect the
3 information that was shown in the minutes; is that
4 correct?
5       A.   Yes.
6       Q.   And it's also correct that the minutes are
7 not a transcript of what occurred at the meetings;
8 correct?
9       A.   Correct.
10      Q.   And there was general discussion among
11 the participants that might not be reflected in the
12 minutes; is that correct?
13      A.   That's correct.
14      Q.   And as far as you know, what is stated in
15 the minutes, however, are statements of occurrences
16 and statements made that are reflected in the
17 minutes that you took.  Would that be correct?
18      A.   You lost me on that question.  Sorry.
19      Q.   Okay.  To the extent that you took the
20 minutes of a corporation of KLA-Tencor and signed
21 the minutes, the statements made in the minutes, to
22 the best of your knowledge, would be the reflection
23 of what actually occurred or what was said that is
24 represented in the minutes as a general rule.  Would
25 that be correct?

Nichols, Stuart J. Esq.                                          1/27/2008

Page 86

1     A.  Yes.
2     Q.  And it was your intention to accurately
3  reflect what occurred at the meeting; correct?
4     A.  Yes.
5     Q.  Do you recall, sir, if the November 16th,
6  1999, meeting of the board is the first meeting of
7  KLA-Tencor that you attended?
8     A.  Yes, it would have been the first meeting
9  that I attended.
10    Q.  All right.  Under "Election of Officers"
11 it shows, "Resolved:  That the Board approved the
12 election of officers as attached hereto as Exhibit A
13 to serve at the discretion of the Board until their
14 successors are duly appointed and qualified."  And
15 then attached on the last page is a list of
16 officers.
17       Would you review that list and tell me if
18 it comports with your recollection of who served as
19 officers at that time period for KLA-Tencor.
20    A.  Yes.  Yes.
21    Q.  Okay.  Anything that you recognize that
22 looks to you to be out of order?
23    A.  Well, I hesitated a moment because I don't
24 see here a reference to a VP of HR, but at that time
25 I believe that our VP of HR was not a corporate

Page 87

1  officer.  So, yeah, so this comports with my...
2     Q.  All right.  And so then briefly Ken Levy
3  was the Chairman of the Board at the time and
4  Mr. Schroeder was the Chief Executive Officer
5  and was also President --
6     A.  Yes.
7     Q.  -- is that your recollection?
8     A.  That's my collection.
9     Q.  And Mr. Dickerson, he was Chief Operating
10 Officer at the time?
11    A.  Yes.
12    Q.  And Mr. Boehlke served as the Executive
13 Vice President and Chief Financial Officer?
14    A.  Correct.
15    Q.  And Mr. Grady served as Executive Vice
16 President of the Wafer Inspection Group?
17    A.  Yes.
18    Q.  Mr. Neil Richardson, Ph.D., was Executive
19 Vice President of the E-Beam Inspection and
20 Meteorology [sic] Group; is that correct?
21    A.  Metrology, not meteorology.
22    Q.  Metrology Group; is that correct?
23    A.  Yes.
24    Q.  All right.  And Arthur P. Schnitzer -- I
25 got that right -- was Executive Vice President,

Page 88

1  Strategic Business Development.
2        Do you see that?
3     A.  Yes.
4     Q.  Did he serve in any other capacity?
5     A.  Yeah.  You know, I believe at this time
6  Art Schnitzer was the VP of HR, not the VP of
7  Strategic Business Development.  So that appears
8  to be an error.
9     Q.  All right.  And then there's Samuel H.
10 Harrell, Ph.D., Senior Vice President of Strategic
11 Business Development; is that correct?
12    A.  Yes, that's correct.
13    Q.  All right.  Richard P. Wallace was Group
14 Vice President of Lithography and Films.
15       Do you see that?
16    A.  Yes.
17    Q.  Is that the same Richard Wallace that's
18 president today?
19    A.  John Kispert is president; Rick Wallace is
20 the CEO.
21    Q.  All right.  And Rick Wallace, who's the
22 current CEO, is the same Richard Wallace that's
23 referred to here?
24    A.  Yes.
25    Q.  All right.  And then your title below that

Page 89

1  is described as Vice President, General Counsel and
2  Assistant Secretary.
3        Do you see that?
4     A.  Yes.
5     Q.  And what was your function as assistant
6  secretary?
7     A.  To handle corporate governance matters,
8  review and provide input on SEC filings, do board
9  minutes, prepare the proxy, those sorts of things.
10    Q.  All right.  And then John H. Kispert,
11 Vice President, Finance and Accounting.
12       Do you see that?
13    A.  Yes.
14    Q.  What was his role at that time period,
15 fall of 1999?
16    A.  He had all -- he had responsibility for
17 all of the finance and accounting-related functions.
18 In other words, they -- those functions reported to
19 him at that time.
20    Q.  All right.  And so to the extent that
21 the company needed to account for its stock
22 option awards, that would have been Mr. Kispert's
23 responsibility; correct?
24    A.  Yes.
25    Q.  And under that is J. Dennis Fortino, Group

23 (Pages 86 to 89)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 90

1  Vice President, Reticle and Surfscan Group. Did I
2  get that right?
3      A.  Yes, you did.
4      Q.  All right. And then under that, Larry W.
5  Sonsini. And Mr. Sonsini was outside counsel; is
6  that correct?
7      A.  That's correct.
8      Q.  And he also served as the secretary of the
9  corporation; is that right?
10     A.  Yes.
11     Q.  And was Wilson Sonsini Goodrich & Rosati
12 the outside corporate counsel company at that time?
13     A.  One of them; yes.
14     Q.  Okay. So we had marked a little bit
15 earlier your notebooks which I'm now going attempt
16 to identify for the record. Your notebooks are all
17 in front of you.
18     MR. BELNICK: If that's all you're going
19 it do, I don't mind if you go and I just hit the
20 bathroom so I don't bother everybody.
21     MS. WEISS: Everybody will keep an eye on
22 me for you.
23     MR. BELNICK: Okay. I trust you.
24     You're in good hands, Stu.
25     MS. WEISS: I did have a little list here

Page 91

1  at one point. There was a list of how many were
2  marked. Just bear with me for a second.
3      Here it is (indicating). All right.
4  BY MS. WEISS:
5      Q.  Marked as Exhibit 41 is a copy of
6  a comp notebook and it bears Bates stamps
7  KT ACWP-PRIV00002541 through and including 2696.
8  The first page has the name "Stu Nichols" on it.
9      Sir, would you look at Exhibit 41 and
10 tell me if you can identify it.
11     A.  Well, before we do that, the stack I have
12 here goes through 2691, not 2696, so I'm not quite
13 sure.
14     MR. HEMANN: Mine goes through 2696.
15     MR. FICKES: Mine does as well.
16     MS. WEISS: Okay. Well, that's not good.
17 Yours is not complete.
18     Do we have an extra one of that?
19     MR. HEMANN: He can borrow my copy. We'll
20 switch.
21     MS. WEISS: All right. At the break we'll
22 supplement, absolutely.
23     So, again, the compilation goes through
24 2696. I believe the witness has been provided with
25 a complete copy.

Page 92

1  BY MS. WEISS:
2      Q.  Could you identify Exhibit 41.
3      A.  This appears to be a copy of my
4  composition notebook that I maintained both
5  during the latter portion of my tenure at Phoenix
6  Technologies as well as during the first few months
7  of my tenure at KLA-Tencor.
8      Q.  All right. And the first date that is
9  referenced on the first written page is 8/23/99.
10     Do you see that?
11     A.  Yes.
12     Q.  And is the handwriting in this compilation
13 your handwriting?
14     A.  Yes, it is.
15     Q.  Okay. Could you tell me what you see as
16 the last date referenced in Exhibit 41.
17     A.  It looks -- it appears that there is an
18 entry on June 22nd.
19     Q.  Of 1999?
20     A.  No. That would be 2000.
21     Q.  No, that would be 2000, wouldn't it?
22     You said June 22nd, 2000. And what's the
23 Bates stamp, the last four digits of that entry?
24     A.  The beginning of the entry is 2694. There
25 are some additional pages that don't appear to bear

Page 93

1  a date.
2      Q.  Okay. Very good.
3      Turning your attention to what has -- what
4  has been marked as Exhibit 42. It would be Bates
5  stamped KT ACWP-PRIV00002697 through and including
6  the same prefixes, last four digits 2893.
7      Do your numbers match that?
8      A.  Yes.
9      Q.  Okay. That would be Exhibit 42. And
10 could you identify it for the record.
11     A.  This appears to be a copy of a composition
12 notebook which I used while at KLA starting in June
13 of 2000.
14     Q.  Okay. And the first date that's shown, I
15 think it is on the second page, is what?
16     A.  June 26th of 2000.
17     Q.  And the last date that is shown?
18     A.  The last date that I see here is -- it
19 appears to be May 15, 2001.
20     Q.  What's the Bates stamp, last four digits,
21 you're looking at?
22     A.  2889.
23     Q.  Okay. 4/30/01. And then under that
24 what's the date that you see?
25     A.  It appears to be 5/15.

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 94

1    Q.   And you infer that to be in 2001 --
2    A.   Correct.
3    Q.   -- right?
4         MS. WEISS:  Okay.  Do you want to take --
5         THE VIDEOGRAPHER:  Yeah, change the tape.
6         MS. WEISS:  We need to change the tape
7    here so we'll take a minute.
8         THE VIDEOGRAPHER:  Okay.  We are going off
9    the record.
10        Here marks the end of videotape No. 1,
11   Volume I, in the deposition of Stuart J. Nichols.
12        (Off the record.)
13        THE VIDEOGRAPHER:  We are back on the
14   record.
15        Here marks the beginning of videotape
16   No. 2, Volume I, in the deposition of Stuart J.
17   Nichols.  The time is 11:53 a.m.
18   BY MS. WEISS:
19        Q.   Mr. Nichols, I'm not sure if I asked you,
20   but on Exhibit 42, is Exhibit 42 a collection of
21   your notations made contemporaneously with the dates
22   shown?
23        A.   Generally, yes.
24        Q.   Okay.  And that's your handwriting that
25   appears in the compilation?

Page 95

1    A.   Yes.
2    Q.   Okay.  And then moving to Exhibit 43, the
3    Bates stamp numbers of KT ACWP-PRIV00002894 to the
4    last four digits 3047.
5         Does that comport with your Exhibit 43?
6    A.   Yes.
7    Q.   Okay.  And the front of the page says,
8    "Computation book Stu Nichols," under that "May
9    '01-April '02."
10        Do you see that, sir?
11   A.   Yes.
12   Q.   Is that your handwriting?
13   A.   Yes.
14   Q.   All right.  And then on the third page,
15   the first entry, could you read that date.
16   A.   5/22/01.
17   Q.   And is that in your handwriting?
18   A.   Yes.
19   Q.   And can you pick up on the last date entry
20   in the compilation, please.
21   A.   The last date entry I see is on page 3041,
22   and that is -- that page bears a date of 4/2/02.
23   Q.   Okay.  And does the compilation contain
24   your handwritten notes made contemporaneously with
25   the events referenced?

Page 96

1    A.   Again, I'll say generally.  And the
2    reason I say that is because I don't know whether
3    in some instances I went back at a later date and
4    supplemented my handwritten notes.
5    Q.   All right.  We'll get into that in a
6    minute.
7         Moving to Exhibit 44.  Exhibit 44 is a
8    computation book Bates stamped KT ACWP-PRIV00003048
9    through the same prefix, last four digits 3201.
10        Is that what you have, sir?
11   A.   Yes.
12   Q.   Okay.  And the first page it says
13   "Stu Nichols."  It has a telephone number of
14   408-875-2423.  Under that the dates April 12th,
15   2002-November 8th, 2002.
16        Do you see that, sir?
17   A.   Yes.
18   Q.   Is that your handwriting?
19   A.   Yes.
20   Q.   Can you identify the first date shown in
21   the compilation?
22   A.   April 12, 2002.
23   Q.   And that's shown on page No. 3049, the
24   last four digits?
25   A.   Yes.

Page 97

1    Q.   And can you identify the last date in the
2    compilation?
3    A.   11/26/02, and that's on page 3199.
4    Q.   All right.  And you had the opportunity
5    to review these books briefly before the start of
6    the deposition.  Does this compilation consist of
7    your handwritten notes?
8    A.   Yes.
9    Q.   And generally, were the notes made at or
10   around the event or conversation referenced in the
11   notes?
12   A.   Generally, yes.
13   Q.   Okay.  Exhibit 45 is a computation book
14   Bates stamp No. KT ACWP-PRIV00003202 through and
15   including the last four digits, same prefix, 3357.
16        Do you see that?
17   A.   Yes.
18   Q.   The cover of the book has your name
19   "Stu Nichols," and below that "11/25/02-8/26/03."
20        Do you see that, sir?
21   A.   Yes.
22   Q.   Is that in your handwriting?
23   A.   Yes.
24   Q.   Can you identify the first date in the
25   compilation?

25 (Pages 94 to 97)

Nichols, Stuart J. Esq.                                                     1/27/2008

Page 98

1    A.   The first -- the first part of a date that
2  I see is on 3210, and the copy is such that the
3  first portion of the date does not appear, though
4  it's likely December 02 -- I'm sorry, December 13,
5  '02.  The first full date appears on 3212, and that
6  is -- and that appears 2702 -- oh, I see -- okay.
7        The copy is such that the 1 doesn't
8  appear, but if I look at the next page, two pages
9  later, it appears there is -- the first full date of
10 the whole book, that's 12/17/02, which leads me to
11 believe that the two pages previous on 3212, that
12 the 1 somehow got cut off in the copying and so that
13 would be a date of 12/17/02.
14    Q.   Okay.  Can you pick up a final date on the
15 compilation?
16    A.   8/26/03.
17    Q.   Okay.  Thank you.
18        Exhibit 46 is computation book Bates
19 stamped KT ACWP-PRIV00003358 through and including,
20 same prefix, last four digits 3512.
21        Do you see that?
22    A.   Yes.
23    Q.   The first page states "Stu Nichols
24 extension 2423," under that 8/28/03 to 4/27/04.
25        Is that your handwriting, sir?

Page 99

1    A.   Yes.
2    Q.   Can you tell me what the first date is
3  that you pick up in the compilation?
4    A.   8/28/03.
5    Q.   And the last date in the compilation?
6    A.   6/9/04.
7    Q.   Okay.  You had a brief opportunity to
8  review this book prior to the deposition.  Does it
9  consist of your handwritten notes?
10    A.   Yes.
11    Q.   And were the notes generally made at
12 or around the time of the event or conversation
13 referenced?
14    A.   Yes.
15    Q.   Exhibit 47 is a computation book Bates
16 stamped KT ACWP-PRIV00003513 through 3665.  Is that
17 correct, sir?
18    A.   Yes.
19    Q.   Okay.  The title is "Stu Nichols,
20 408-875" -- is that a 2 or a 1?
21    A.   2.  2423.
22    Q.   -- "-2423."  And April 2004-April '05.
23        Is that your handwriting, sir?
24    A.   Yes.
25    Q.   What is the first date you see in the

Page 100

1  compilation?
2    A.   5/5/04.
3    Q.   And the last date?
4    A.   The last date that shows in this document
5  appears on page 36- -- 3655, and the date is
6  4/14/05.
7    Q.   Okay.  Does the compilation consist of
8  your handwritten notes created on or around the
9  event or conversation that you reference?
10    A.   Generally, yes.
11    Q.   Okay.  Two more, sir.
12        Exhibit 48 is a compilation
13 of a computation notebook Bates stamped
14 KT ACWP-PRIV00003666 through and including the
15 same prefix, the last the four numbers 3818.
16        Do you see that?
17    A.   Yes.
18    Q.   The first page states "Stu Nichols
19 408-875-2423," and under that "April '05-April '06."
20        Is that your handwriting, sir?
21    A.   Yes.
22    Q.   Can you tell me the first date referenced
23 in the compilation?
24    A.   The first date written in the compilation
25 is 4/28/05.

Page 101

1    Q.   And the last date?
2    A.   It appears to be May 17.  There's no year,
3  but based on what's written on the cover page, that
4  would be '06.
5    Q.   All right.  Does Exhibit 48 contain your
6  handwritten notations, sir?
7    A.   Yes.
8    Q.   And were they made generally at or around
9  the time of the event or conversation referenced in
10 the notes?
11    A.   Yes.
12    Q.   Exhibit 49.  Exhibit 49 -- excuse
13 me -- is a computation book Bates stamped
14 KT ACWP-PRIV00003819 through and including the
15 same prefix, 3855.
16        Do you see that, sir?
17    A.   Yes.
18    Q.   The title page "Computation Book Stu
19 Nichols 408-875-2423," and under that "April 21,
20 2006-August '06."
21        Do you see that?
22    A.   Yes.
23    Q.   Is that your handwriting?
24    A.   Yes.
25    Q.   What is the first date that is referenced

26 (Pages 98 to 101)

Nichols, Stuart J. Esq.                                                1/27/2008

Page 102

1    in the compilation, sir?
2        A.   4/21/06.
3        Q.   And what is the final date that's
4    referenced in the compilation, sir?
5        A.   5/12/06.
6        Q.   Okay.  Thank you.
7            Mr. Nichols, I'm going to ask you a few
8    questions about your custom and practice in creating
9    these notations and then we'll take a break for
10   lunch.
11           First of all, apart from the notebooks,
12   with respect to your calendars, how did you keep
13   a calendar during the time period that you were
14   employed at KLA?
15       A.   Generally -- well, I believe exclusively
16   I kept my calendar on Outlook.
17       Q.   Did you make your own entries?
18       A.   Occasionally, but not often.
19       Q.   Who made the entries on your behalf, if
20   anybody?
21       A.   Kery Bird.
22       Q.   Okay.  And when she wasn't there, did
23   the person who served in her function make those
24   entries?
25       A.   Yeah.  Or I would -- or I would do it.

Page 103

1        Q.   Okay.  Did you have anywhere else that you
2    made a notation of a meeting that was upcoming?
3        A.   Do you mean a handwritten calendar that I
4    carried around?
5        Q.   Yes.  Did you ever have any handwritten
6    calendars?
7        A.   Not that I recall.  I may have at the
8    very beginning at KLA, but I don't have a specific
9    recollection of that.
10       Q.   Do you know whether or not your Outlook
11   calendar entries for the time period that you were
12   at KLA remained in the possession of KLA?
13       A.   Well, presumably.
14       Q.   Did you ever have occasion to go back and
15   look through them for any reason?
16           MR. BELNICK:  When?  Excuse me.  Since he
17   left KLA?
18           MS. WEISS:  Yes, thank you.
19           THE WITNESS:  No.
20   BY MS. WEISS:
21       Q.   No?
22       A.   I did not go back -- after I left KLA, I
23   never went back and looked at my calendar.
24       Q.   So you were never asked to print out all
25   your calendar entries, for example, in connection

Page 104

1    with the KLA options investigation or anything like
2    that?
3        A.   No.
4        Q.   If that was done, someone else did it?
5        A.   Correct.
6        Q.   Okay.  Could you first of all describe
7    generally what was your custom and practice in terms
8    of making entries in the computation books which are
9    exhibits 41 through 49.
10       A.   Well, it varied a little bit over time so
11   how would you like me to slice that up?
12       Q.   Start with the beginning and move forward.
13       A.   Yeah.  So at the beginning I didn't always
14   enter all of my notes in a composition book, and
15   then over time I eventually -- when I would go to a
16   meeting I would take my spiral notebook with me and
17   would try to reflect all of my notes in those books.
18       Q.   So in the beginning were your notes taken
19   in more than one place, for example?
20       A.   Yes.
21       Q.   All right.  And with respect to the notes
22   that were taken outside of the spiral notebooks, how
23   did you keep those notes?
24       A.   I don't know that I did.  I have no idea
25   where those are.

Page 105

1        Q.   So you might have left those in a variety
2    of places and didn't necessarily retain them;
3    correct?
4        A.   Correct.
5        Q.   There was no litigation pending at that
6    time; correct?
7        A.   Correct.
8        Q.   All right.  And so it would be a true
9    statement to say that the notes reflected in
10   exhibits 41 through 49 are not necessarily all of
11   the notes that you took during the time period that
12   you were at KLA; correct?
13       A.   That's correct.
14       Q.   And I've noticed in going through the
15   notes that there are sometimes several week gaps
16   between the calendar entries.  So could you address
17   that.  What was the usual way that that occurred?
18       A.   Well, that would occur because I had gone
19   to meetings with a notepad separate from my spiral
20   notebook.  It could have also been the case that I
21   attended a series of meetings where the discussion
22   wasn't something that I needed to make -- I felt I
23   didn't need to make a written note of it for myself.
24       Q.   And I suppose it's true that you had
25   conversations with people that are not necessarily

27 (Pages 102 to 105)

Nichols, Stuart J. Esq.                                              1/27/2008

Page 106

1   reflected in any notes; is that true?
2       A.   Yes.
3       Q.   And you attended meetings that you didn't
4   make any notes of.  Would that be correct?
5       A.   Correct.
6       Q.   When you left KLA, do you know what became
7   of any of the notes that you had at KLA at the time
8   that you left their employ?
9       A.   I'm not exactly sure what you're going
10  after here.  Can you repeat the question?
11      Q.   For example, sometimes when people exit,
12  they do exit interviews and they say, "All my notes
13  that I ever took at the company are," you know, "in
14  the bottom left-hand drawer here," and they point
15  them out.  Did you have any debriefing session where
16  you pointed out where the notes were that you took
17  during the time that you were general counsel?
18      A.   No.  When I went to the company to clean
19  out my office, these notebooks were on my shelf and
20  I delivered them to KLA's outside firm.
21      Q.   Okay.  And the computer that had the
22  Outlook calendar entries, is that the same computer
23  that Skadden took custody of?
24      A.   Well, yes.  However, you have to recognize
25  that all that data is in Outlook and it's therefore

Page 107

1   on the company's server.  There's nothing in terms
2   of calendar entries that would have resided solely
3   on my computer.  It would have been on the
4   network -- on the servers for the network.
5       Q.   I've noticed in going through your notes
6   that there are occasions when statements are quoted.
7   Did you have a custom and practice of taking notes
8   where you used quotation marks?
9       A.   A custom and practice?  I don't know that
10  I would put it that way.  There could be a variety
11  of reasons why I would want to remember specifically
12  what was said, but I can't resolve that into a rule
13  of when I did it and when I didn't do it.
14      Q.   Okay.  But I guess what I'm asking is:
15  When I see a quotation, is it generally true that
16  you are writing down what someone who is speaking
17  to you is saying rather than what you are saying to
18  that person?
19      A.   I think -- yes, I think generally that's
20  true.
21      MS. WEISS:  Okay.  All right.  So I'm
22  going to go to another subject area.  If you guys
23  want to grab a sandwich, this is a good time to do
24  that.
25      THE VIDEOGRAPHER:  Off the record.  The

Page 108

1   time is 12:14 p.m.
2           (Whereupon, lunch recess was taken
3           from 12:14 p.m. until 12:45 p.m.)
4       THE VIDEOGRAPHER:  We are back on the
5   record.  The time is 12:45 p.m.
6   BY MS. WEISS:
7       Q.   Good afternoon, Mr. Nichols.
8       A.   Good afternoon.
9       Q.   You're familiar with a memorandum dated
10  March 19th, 2001, that you sent to Mr. Kenneth
11  Schroeder with copies to Mr. Kispert, Miss Lamb
12  and Miss Nyberg; is that correct?
13      A.   Yes.
14      Q.   Okay.  Prior to that memorandum, did you
15  have occasion to give advice about KLA's option
16  granting program?
17      A.   Not that I recall.
18      Q.   Can you tell me who Maureen Lamb -- well,
19  first of all, what was her function when you were at
20  KLA?  Did you know her?
21      A.   Yes, I knew her.  And her function at
22  various times was to be the Corporate Controller and
23  later the Vice President of Finance and Treasurer.
24      Q.   And Mr. Kispert?
25      A.   When I joined the company, he was the

Page 109

1   Vice President of Finance, or some similar title,
2   and -- I guess it was Vice President of Finance and
3   Accounting.  And then in I believe it was mid 2000,
4   the middle of the year 2000, he was appointed to
5   Chief Financial Officer.
6       Q.   And Miss Nyberg?
7       A.   She was the -- excuse me -- Senior
8   Director of Compensation or maybe Compensation
9   and Benefits.  I'm not sure.
10      Q.   Okay.  So going back to Mr. Kispert.  From
11  your perspective as general counsel, what did you
12  believe his role was first as Vice President of
13  Finance and Accounting?  Would you generally
14  describe what you thought he was responsible for.
15      A.   Mr. Kispert had ultimate responsibility
16  for matters relating to the finance and accounting
17  organizations.
18      Q.   What does that mean to say he had
19  "ultimate responsibility" for them?
20      A.   Those functions reported to him.
21      Q.   What was his day-to-day responsibility,
22  from your perspective?
23      A.   Now we're talking about --
24      Q.   Still when he was Vice President of
25  Finance and Accounting.

28 (Pages 106 to 109)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 110

1       MR. BELNICK:  This, I believe, would
2   require him to disclose privileged information.
3   KLA's counsel agrees and so we will abide by their
4   objection.
5       MS. WEISS:  Okay.  Which privilege are you
6   asserting?
7       MR. BELNICK:  Attorney-client.
8       MS. WEISS:  Only?
9       MR. BELNICK:  I believe so.  If work
10  product is involved here, I'd rather not be the one
11  to have to parse --
12      MS. WEISS:  Okay.  If work product is
13  involved, you need to state for the record --
14      MS. HEINTZ:  We will object on the basis
15  of attorney-client and work product.
16      MS. WEISS:  Okay.  I'm going to voir dire
17  the witness on work product.
18  BY MS. WEISS:
19      Q.  Did you come to an understanding of
20  what Mr. Kispert's responsibilities were as Vice
21  President of Finance and Accounting in anticipation
22  of litigation?
23      MR. BELNICK:  Of any litigation?
24      THE WITNESS:  No.
25  BY MS. WEISS:

Page 111

1       Q.  All right.  With respect to Mr. Kispert,
2   when he became Chief Financial Officer, from your
3   perspective as general counsel, what did you believe
4   his responsibilities were?
5       A.  His -- I thought -- now, this is
6   different.  Now the question --
7       MS. WEISS:  You know, I think that you're
8   speaking quietly.  If you can bring it up a little
9   higher.
10      THE VIDEOGRAPHER:  I only have a room mic.
11      MS. WEISS:  I think you might have him
12  switched.  You have Mr. Belnick as Mr. Fickes.
13      DEPOSITION REPORTER:  Do I have them
14  switched?
15      MR. BELNICK:  It's an honor.
16      MS. WEISS:  All right.  So now the
17  question is the same question except with respect
18  to the CFO.  Could you -- are you asserting the
19  privilege with respect to his perception of --
20  Mr. Nichols' perception of Mr. Kispert's
21  responsibilities as Chief Financial Officer?
22      MR. BELNICK:  As a general matter, I don't
23  think it's privileged unless KLA thinks otherwise.
24      MS. HEINTZ:  It's getting difficult to
25  parse through these as the questions go on.

Page 112

1       MS. WEISS:  I'm sorry.  What's your last
2   name?
3       MS. HEINTZ:  Miss Heintz.
4       MS. WEISS:  Miss Heintz, are you asserting
5   the attorney-client privilege with respect to my
6   questions of Mr. Nichols as to what his perception
7   of Mr. Kispert's duties were as Chief Financial
8   Officer on the grounds of the attorney-client
9   privilege?
10      MS. HEINTZ:  You said from his perspective
11  as the general counsel?
12      MS. WEISS:  Yes.
13      MS. HEINTZ:  Yes.
14      MS. WEISS:  Are you also asserting work
15  product protection?
16      MS. HEINTZ:  Not at this time.
17  BY MS. WEISS:
18      Q.  Okay.  And to be clear, Mr. Nichols,
19  you did not come to an understanding of what
20  Mr. Kispert's responsibilities were as Chief
21  Financial Officer in anticipation of litigation;
22  correct?
23      A.  That's correct.
24      Q.  As general counsel, what was your
25  understanding of Miss Lamb's responsibilities as

Page 113

1   Corporate Controller during the time she held that
2   function?
3       MS. HEINTZ:  I'm going to object to this
4   on the basis of attorney-client privilege.
5       MS. WEISS:  But not attorney work product?
6       MS. HEINTZ:  Not at this time.
7       MS. WEISS:  Same question with respect
8   to Miss Lamb as Vice President of Finance and as
9   Treasurer.  Same answer?
10      MS. HEINTZ:  Yes.
11  BY MS. WEISS:
12      Q.  And it would be correct, Mr. Nichols,
13  that you did not come to an understanding of the
14  roles of Miss Lamb as Corporate Controller or
15  as Vice President of Finance and Treasurer in
16  anticipation of litigation; correct?
17      A.  That's correct.
18      Q.  Moving to Miss Nyberg.  What was your
19  perception of her responsibilities from your
20  perspective as general counsel?
21      MS. HEINTZ:  Same objection.
22  BY MS. WEISS:
23      Q.  And you did not come to your understanding
24  of her responsibilities as Director of Compensation
25  and Benefits in anticipation of litigation; correct,

29 (Pages 110 to 113)

Nichols, Stuart J. Esq.                                                                      1/27/2008

Page 114

1    sir?
2        A.   That's correct.
3        MS. WEISS:  Okay.  So I'll mark next in
4    order which we're at 55.
5        (Whereupon, Exhibit 55 was marked
6        for identification.)
7        MS. WEISS:  Okay.  Exhibit 55, for the
8    record, is a compilation of several pages, Bates
9    Nos. KT ACWP-PRIV00004298 through and including the
10   same prefix, last four digits 4304.  The first page
11   of the compilation is an email from Stuart Nichols
12   dated January 5th, 2000.  Okay.  It shows Greenwich
13   Mean Time, which I'm not exactly sure how to
14   translate that, but we will at some point translate
15   it.
16       The email is apparently sent to Ken Levy
17   and Bob Boehlke.  The subject is "Option program
18   milestones."
19       First, the email states, "Here is my first
20   stab at a series of milestones.  Ken, I suspect that
21   you may be interested in more granularity than I've
22   outlined here.  If so, let me know what you would
23   like to see added.  Stu."
24   BY MS. WEISS:
25       Q.   Mr. Nichols, did you send Exhibit 55 to

Page 115

1    Mr. Levy and Mr. Boehlke on January 5th as shown?
2        MR. BELNICK:  You can answer it.
3        THE WITNESS:  I don't have a specific
4    memory of this email as I sit here.  I don't doubt
5    that I did.
6    BY MS. WEISS:
7        Q.   Okay.  This email was produced from the
8    corporate records of KLA-Tencor.  You have no reason
9    to believe that you did not send the email as shown
10   here.  Would that be correct?
11       A.   Correct.
12       Q.   There are going to be some things that you
13   don't remember because of the passage of time.  We
14   understand that so you just need to say.that and
15   we'll move on.
16       There are several attached pages to the
17   email.  Did you prepare the attached pages to the
18   email, Mr. Nichols?
19       A.   I don't know.
20       Q.   Does that mean you don't recall?
21       A.   That means I don't recall.
22       Q.   Generally would it have been your practice
23   to review the attached pages of any email that you
24   sent?
25       A.   Yes.

Page 116

1        Q.   So if the attached pages which refer to
2    an option transfer program were prepared by someone
3    else at your request, you would still have reviewed
4    them before sending them out to Mr. Levy and
5    Mr. Boehlke.  Can we assume that's true?
6        A.   Well, except that you're suggesting that I
7    had this prepared at my request.  I don't know that
8    to be true.  It could have been prepared completely
9    independently of my request.
10       Q.   Okay.  The first comment says, "Here is my
11   first stab at a series of milestones."
12       Does that comment refresh your
13   recollection that you had something to do with
14   the preparation of the attached?
15       A.   It certainly would indicate from the words
16   written here that I would have.  I don't have a
17   memory of preparing this schedule.  It could well
18   have been prepared --
19       MR. BELNICK:  Well, the question is:  Do
20   you have an independent recollection?
21       THE WITNESS:  No, I don't.
22   BY MS. WEISS:
23       Q.   You don't recall preparing the schedule.
24   But if you sent the schedule out to Mr. Levy and
25   Mr. Boehlke, it would have been a schedule that you

Page 117

1    reviewed before sending it; correct?
2        A.   Yes.
3        Q.   And if you characterized it as your "first
4    stab at a series of milestones," it would have been
5    something, would it not, Mr. Nichols, that you had
6    something to do with; correct?
7        MR. BELNICK:  Object to the form.  But I
8    think he's answered.
9        THE WITNESS:  No, that's that not correct.
10   Something to do with, I suppose.  But I don't have
11   any idea whether this schedule was prepared by
12   someone else.  And the "stab" that I'm alluding to
13   is a minor revision of something on there.
14       So I don't know that I prepared it.  I
15   certainly would have reviewed it before I sent it
16   out.  That would have been my practice.
17   BY MS. WEISS:
18       Q.   Does anything about the attachment refresh
19   your recollection about what the option program
20   milestones were?  What the general subject matter
21   was?
22       A.   Well, I have a general memory of the
23   option program.  Your question assumed that I needed
24   to have my memory refreshed on the program itself.
25       Q.   Thank you.  So let me back up.

30 (Pages 114 to 117)

Nichols, Stuart J. Esq.                                                                    1/27/2008

Page 118

1    What was the option program that was being
2  discussed in this email?
3         MS. HEINTZ:  We're going to object to that
4  question.
5         MS. WEISS:  And what's your basis?
6         MS. HEINTZ:  On the basis of
7  attorney-client privilege.
8         MS. WEISS:  And you're instructing him not
9  to answer?
10        MS. HEINTZ:  We are.
11        MS. WEISS:  Are you objecting on the basis
12 of the work product protection?
13        MS. HEINTZ:  No; yes.
14 BY MS. WEISS:
15    Q.   Mr. Nichols, did you send Exhibit 55
16 to Mr. Levy and Mr. Boehlke in anticipation of
17 litigation?
18    A.   I believed that there was a potential for
19 litigation relative to this program.
20    Q.   So is the answer yes?
21    A.   Yes.
22    Q.   Let me read from a definition of the
23 terminology "anticipated litigation" from the
24 Ninth Circuit case because I know the terminology
25 is not self-explanatory.

Page 119

1    Quote, "A document was created because of
2  the anticipated litigation and would not have been
3  created in substantially similar form but for the
4  prospect of that litigation."
5     A.   Okay.  Then --
6         MR. BELNICK:  Whoa, whoa, whoa, whoa.
7  There's no question.
8  BY MS. WEISS:
9     Q.   Applying that definition -- which, by the
10 way, this is from in re Grand Jury Subpoena 357
11 Fed.3rd, 900, at pages 907 to 910.  Applying that
12 definition, was this document, Exhibit 55, created
13 in anticipation of litigation?
14        MS. HEINTZ:  We're going to object.  The
15 witness has testified that this document was created
16 in anticipation of litigation or communication made
17 in anticipation of litigation.  So we will request
18 that the witness not answer the question.
19        MR. FICKES:  I have an objection, too.  We
20 are objecting on the grounds that it asks for a
21 legal conclusion.
22        THE VIDEOGRAPHER:  Excuse me.  One moment.
23 I only have that room mic, you guys.  You need to
24 bring your voice up or we won't have it.
25        MR. FICKES:  Sorry.  I'll do it louder.

Page 120

1  We're objecting on the grounds that it asked the
2  witness to make a legal conclusion.
3  BY MS. WEISS:
4     Q.   Okay.  Mr. Nichols, I'm asking you to
5  testify as to facts.  Did you create this document,
6  Exhibit 55, in anticipation of litigation under the
7  definition that I just read to you?
8         MR. BELNICK:  I believe KLA has objected
9  to that, Miss Weiss, unless I'm wrong.
10        MS. HEINTZ:  We have objected to that.  We
11 can argue over the definition of "work product
12 privilege" over papers.  We have objected to it.
13 The witness has testified that he created the
14 document in anticipation of litigation.  We request
15 that he does not answer the question.
16        MS. WEISS:  Counsel, after I read the
17 definition, according to the Ninth Circuit, I
18 believe that the witness was about to change his
19 testimony.  Now --
20        MR. BELNICK:  But I don't think there's a
21 basis for that, Miss Weiss --
22        MS. WEISS:  Well, why don't you let him
23 answer the question?  He can say yes or no.
24        MR. BELNICK:  I'm not objecting.  I'm
25 following -- as I told you, the witness and I are

Page 121

1  following the direction of his former client.  But
2  I just want you to know I'm just saying don't assume
3  when he started to talk before a question was
4  answered that he was about to disagree or agree
5  with something he said before.  I haven't the
6  slightest --
7         MS. WEISS:  Then he can tell me that.  I
8  just need him to answer the question.  The work
9  product protection is only triggered by specific
10 facts.  I need to get his answer as to whether or
11 not those facts existed.  If he says that they did,
12 we'll move on.
13        MR. BELNICK:  Well, he did testify that
14 he -- I may not be doing this word for word, Shirli.
15 But he did testify that he thought litigation
16 might well result from the program discussed in
17 Exhibit 55.  That's the answer.
18        Now, asking him to apply the definition
19 from a Ninth Circuit case, whether or not that sets
20 a prevailing rule, I don't have the slightest idea
21 in the Ninth Circuit.  That question KLA has taken
22 exception and asked him not to answer so he's not
23 answering.
24        MS. WEISS:  So I'm going to repeat the
25 question for the record and then if you instruct him

31 (Pages 118 to 121)

Page 122

1  not to answer, then I'll have a clear record. When
2  I say "you," I mean either of you.
3      MR. BELNICK: I understand. Well, all
4  right. Then I'll have to tell you again: If I
5  object, it's not me objecting as his counsel. It's
6  me objecting so that my client does not in any way
7  violate the instructions of his former client, which
8  he is obliged to follow as a matter of law and
9  ethics, as we all know.
10 BY MS. WEISS:
11     Q. Mr. Nichols, was Exhibit 55 created
12 because of anticipated litigation and would not have
13 been created in substantially similar form but for
14 the prospect of that litigation?
15     MS. HEINTZ: We're instructing Mr. Nichols
16 not to answer that question. It's calling for a
17 legal conclusion and there is too much legal parsing
18 to that question. He has already testified he
19 created the document in anticipation of litigation.
20 On that basis, we're requesting that he does not
21 answer the question.
22     MS. WEISS: Counsel, I am entitled to get
23 the factual basis of a conclusory statement that he
24 created it in anticipation of litigation. I've read
25 to you from the Ninth Circuit; I've quoted to you

Page 123

1  from the Ninth Circuit. Are you instructing him
2  not to tell me whether or not this Exhibit 55 was
3  created in such a way to meet the standard that I
4  just explained? You're telling him he cannot even
5  answer that question?
6      MS. HEINTZ: You're asking him to answer
7  a question that invoked -- the right to invoke the
8  attorney work product.
9      MS. WEISS: Well, Counsel, KLA has the
10 burden of proof on the work product. And as best as
11 I can tell, you're not only not carrying your burden
12 of proof, but you're preventing me from asking
13 foundational questions that would establish one
14 way or the other whether or not the privilege is
15 asserted in good faith.
16     And so I'm going to assume that it's being
17 asserted in bad faith at this point. We're going to
18 make our record and I am going to explain that to
19 the court.
20     MS. HEINTZ: There's also the
21 attorney-client privilege that has been invoked
22 here. And your question also requests information
23 that is protected by the attorney-client privilege.
24     MS. WEISS: Yes. And you've made your
25 record on that.

Page 124

1      All right. I think you've been instructed
2  not to answer so I will move on to the next exhibit,
3  Mr. Nichols.
4      (Whereupon, Exhibit 56 was marked
5      for identification.)
6      MR. BELNICK: Okay. The witness has looked
7  at it.
8      MS. WEISS: All right. Let me just get my
9  date here.
10     All right. Exhibit 56 is a compilation of
11 emails Bates stamped KT ACWP-PRIV00004938 through
12 and including the same prefix, 4940.
13     It's an email chain. The first email in
14 the exhibit begins on 4939. It's dated January 5th,
15 2000, 1:01 p.m., from Leslie Wilson to Stu Nichols
16 Mark Nordstrom, Tracy Laboy, Mike Kahn and Joy
17 Nyberg, and also to raman.chitkara@u.pwcglobal.com.
18 The subject is "Stock Options for Outside
19 Consultants" and the importance is identified
20 as high.
21 BY MS. WEISS:
22     Q. Mr. Nichols, do you see that you are
23 shown as one of the recipients of this email from
24 Ms. Wilson on Exhibit 56?
25     A. Yes.

Page 125

1      Q. Could you tell me who Leslie Wilson is?
2      A. Do you mean what her title was at KLA?
3      Q. Yes.
4      A. Well, it appears from the email that she
5  was the Director of Global Compensation Benefits and
6  HRIS.
7      Q. And you say that because she probably
8  signed it somewhere.
9      MR. FICKES: On page 49 --
10 BY MS. WEISS:
11     Q. Yes, there it is (indicating).
12     And do you remember her at the company?
13     A. Very vaguely.
14     Q. Generally speaking, what was the Director
15 of Global Compensation Benefits and HRIS responsible
16 for at the company at that time?
17     A. Well, I have no idea what the HRIS part
18 of it has to do with -- I mean, what the HRIS
19 responsibilities were. Compensation benefits, of
20 course, would be designing compensation and benefits
21 programs for employees.
22     Q. Okay. But did you know -- did you observe
23 at the time what she appeared to be responsible for
24 functionally at the company? She was the lady who
25 did what? Can you answer that?

Nichols, Stuart J. Esq.                                    1/27/2008

Page 126

1    MR. BELNICK: If you can't, you can't.
2    THE WITNESS: Well, I hardly interacted
3  with her. I think she left shortly after this. I
4  don't know what she was responsible for. All I'm
5  telling you is --
6    MR. BELNICK: He's reading her title from
7  the email.
8    THE WITNESS: Below her name is the title
9  of "Director of Global Compensation Benefits and
10  HRIS."
11  BY MS. WEISS:
12    Q.  Okay. Who was Mark Nordstrom at that
13  time? What was his function?
14    A.  He was the company's treasurer.
15    Q.  Did he have any accounting functions, to
16  your perception?
17    A.  Not so far as I know.
18    Q.  Who did he report to?
19    A.  John Kispert. Well, either John Kispert
20  or Bob Boehlke. I'm not completely sure.
21    Q.  Who was Tracy Laboy at that time in terms
22  of function?
23    A.  At that time Tracy Laboy was responsible
24  for stock administration.
25    Q.  And what was stock administration

Page 127

1  responsible for?
2    A.  The recordkeeping and other actions
3  required in connection with the granting of stock
4  options.
5    Q.  Did she enter dates into the company
6  software system regarding options, if you know?
7    MS. HEINTZ: We're going to object to that
8  and instruct the witness not to answer on the basis
9  of attorney-client privilege.
10    MS. WEISS: Okay. Is that the only
11  privilege you're asserting?
12    MS. HEINTZ: You can ask whether or not
13  he found out this information in anticipation of
14  litigation.
15  BY MS. WEISS:
16    Q.  Did you learn Miss Laboy's role in
17  anticipation of litigation?
18    A.  No.
19    MS. WEISS: So you're instructing him
20  not to answer with respect to all of my questions
21  concerning Miss Laboy's functions, roles and actions
22  within the company; is that right?
23    MS. HEINTZ: Yes.
24  BY MS. WEISS:
25    Q.  Okay. Who is Mike Kahn, if you know, sir,

Page 128

1  in terms of function?
2    A.  I believe at that time Mike Kahn was
3  acting as the VP of HR.
4    Q.  Okay. And what was your perception as
5  general counsel of his role as VP of HR in terms of
6  function at that time?
7    MS. HEINTZ: We're going to object to that
8  on the basis of attorney-client privilege.
9  BY MS. WEISS:
10    Q.  Did you learn about Mr. Kahn's role in
11  anticipation of litigation?
12    A.  No.
13    Q.  Moving to Joy Nyberg. What was
14  Miss Nyberg's role at the time of this email?
15    MS. HEINTZ: We're going to object to that
16  on the basis of attorney-client privilege.
17  BY MS. WEISS:
18    Q.  Did you learn about Miss Nyberg's role and
19  functions in anticipation of litigation?
20    A.  No.
21    Q.  There's a reference to what appears to be
22  a person from PWC Global.
23    Do you see that, sir?
24    A.  Yes.
25    Q.  Were the outside auditors for KLA in the

Page 129

1  2000 time period PriceWaterhouseCoopers?
2    A.  Yes.
3    Q.  And do you believe that the
4  gentleman referred to was an accountant at
5  PriceWaterhouseCoopers?
6    MR. FICKES: Well, maybe we could --
7  BY MS. WEISS:
8    Q.  Do you know who he was? Let's start
9  there. Do you know who this person is that's
10  referred to?
11    A.  Mr. Chitkara was the engagement partner
12  for PWC for the KLA-Tencor account.
13    Q.  Okay. And during what time period did he
14  serve in that role, do you recall?
15    A.  Not specifically. I believe he was
16  the engagement partner when I joined the company;
17  however, he was not the engagement partner when I
18  left the company.
19    Q.  Who was when you left?
20    A.  I believe his name was Rob Gittings, and I
21  think it's spelled G-i-t-t-i-n-g-s.
22    Q.  What was the reason for the change, do you
23  know?
24    A.  I don't know.
25    Q.  All right. The email states in the

33 (Pages 126 to 129)

Nichols, Stuart J. Esq.                                                                    1/27/2008

1  first paragraph, "This email is a follow up to our
2  12/23/99 meeting concerning the financial impact
3  of granting stock options to outside consultants."
4      Q.  Do you see that, sir?
5      A.  Yes.
6      Q.  Do you recall discussions with company
7  personnel at the time of this email regarding
8  granting of stock options to outside consultants?
9      MR. BELNICK:  You can answer whether you
10 recall or not.
11     THE WITNESS:  No.
12 BY MS. WEISS:
13     Q.  The email appears to be forwarding a
14 draft of Ms. Wilson's communication -- proposed
15 communication with Ken concerning the financial
16 impact of granting stock options to outside
17 consultants.
18     In reviewing the email, do you believe
19 that she is drafting an email to Ken Schroeder or
20 Ken Levy?
21     MR. BELNICK:  Just from looking at the
22 email?
23     MS. WEISS:  Yes.
24     MR. BELNICK:  Well, I think you can --
25 Shirli, we'll stipulate that it says that the goal

1  is to provide Ken Schroeder.
2      MS. WEISS:  Well, I don't see that.  Where
3  do you see that?
4      MR. BELNICK:  Look above the word "Draft."
5      MS. WEISS:  Yes, it sure does.
6  BY MS. WEISS:
7      Q.  Okay.  The first page of the exhibit
8  appears to be an email from you to Leslie Wilson
9  regarding the email that she sent to you and others.
10 And the subject matter line is the same.  And the
11 first paragraph states, "Leslie, forgive me, I
12 couldn't help but exercise a little editorial
13 discretion here," and then it goes on to say,
14 "Please bear in mind I'm not an accountant."  And
15 then, "In any case, my suggested rewrite follows."
16     Do you see that, sir?
17     A.  Yes.
18     Q.  And what was your purpose in communicating
19 with Miss Wilson on this subject matter?
20     MS. HEINTZ:  We're going to object on the
21 basis of attorney-client privilege.
22 BY MS. WEISS:
23     Q.  Okay.  And was this email sent back by you
24 to Miss Wilson in anticipation of litigation?
25     A.  Not that I recall.

1      MS. WEISS:  Exhibit 57 (indicating).
2      (Whereupon, Exhibit 57 was marked
3      for identification.)
4      MS. WEISS:  Okay.  Exhibit 57 is entitled
5  "Minutes of the Meeting of the Board of Directors
6  of KLA-Tencor Corporation January 25, 2000."  It's
7  Bates stamped MLB/KLA-SEC00021958 to 21961.
8  BY MS. WEISS:
9      Q.  Would you review it, sir, and tell me if
10 that's your signature as Vice President, General
11 Counsel, Secretary of the meeting?
12     A.  Yeah, it appears to be a photocopy of my
13 signature.
14     Q.  Okay.  All right.  And it was your custom
15 in acting as the secretary of board of directors
16 meetings to record the attendees, as is shown in
17 this exhibit; is that correct?
18     A.  You're asking me whether this exhibit
19 shows the attendees at the meeting that I had in
20 my notes recalled or what have you?  What's the
21 question?
22     Q.  The question is:  When you acted as
23 secretary for the meeting, did you record accurately
24 the attendees in the minutes?
25     A.  Well, the minutes contain a list of the

1  people who attended; and, yes, it would have been
2  my effort to record that accurately.
3      MS. WEISS:  Okay.  Exhibit 89.
4      DEPOSITION REPORTER:  58.
5      MS. WEISS:  Oops.  Sorry.  58.  Cross
6  reference 89.
7      (Whereupon, Exhibit 58 was marked
8      for identification.)
9      MS. WEISS:  Okay.  Exhibit 58 is an email
10 chain Bates stamped MLB/KLA-SEC00051399 to 51400.
11 The email chain starts with an email from Leslie
12 Wilson dated February 11, 2000, 3:31 p.m. to Ken
13 Schroeder, cc:  Mike Kahn, Stuart Nichols, Mark
14 Nordstrom, Tracy Laboy, Raman Chitkara; "Subject:
15 Stock options to outside consultants," "Sensitivity:
16 Confidential."  And then there's a message to Ken
17 Schroeder.
18     And there's a response from Mr. Schroeder
19 to Ms. Wilson which then appears to be forwarded
20 by Ms. Wilson to Mr. Nordstrom, Ms. Lamb and
21 Mr. Kispert with a message from Miss Wilson.
22 BY MS. WEISS:
23     Q.  Mr. Nichols, do you recall receiving the
24 email that shows you as a cc on February 11, 2000?
25     A.  No.

34 (Pages 130 to 133)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 134

1    Q.  Do you recall any discussions concerning
2  the topic of outside consultants and accounting for
3  outside consultants?
4         MR. BELNICK:  You can answer either yes or
5  no.
6         THE WITNESS:  I don't recall specific
7  discussions as they relate to this email.  I do --
8  yeah, so I'll leave it at that.
9  BY MS. WEISS:
10    Q.  Do you recall any discussions concerning
11  accounting for options to outside consultants?
12         MR. BELNICK:  While he was at the company?
13         MS. WEISS:  Yes.
14         MR. BELNICK:  You can answer that yes or
15  no.
16         THE WITNESS:  And when you say
17  "discussions," do you mean oral conversations?
18  BY MS. WEISS:
19    Q.  No.  I'm including email discussion as
20  well.
21         MR. BELNICK:  Whether writing or oral
22  allowed.
23         THE WITNESS:  Yes, I remember discussions.
24  BY MS. WEISS:
25    Q.  So you have in mind specific discussions

Page 135

1  that you had with personnel at KLA-Tencor that
2  involved accounting for stock options to outside
3  consultants?
4    A.  Yes.
5    Q.  And who were the personnel that you recall
6  having the discussions with?
7         MR. BELNICK:  Go ahead, you can answer
8  that.
9         THE WITNESS:  John Kispert.
10  BY MS. WEISS:
11    Q.  And approximately what time period?  Can
12  you identify it?
13    A.  No.  I believe it was later than this,
14  though.
15         MR. BELNICK:  "This" being February 2000?
16         THE WITNESS:  Correct.
17  BY MS. WEISS:
18    Q.  Was it within 2000, do you think?
19    A.  No, I don't believe it was.
20    Q.  What year do you think it occurred?
21    A.  Later in my tenure.  I can't identify the
22  year, but 2003 or perhaps later than that.
23    Q.  So you had a discussion with Mr. Kispert
24  involving accounting for stock options to outside
25  consultants.  What was the purpose of the

Page 136

1  discussion?  Can you say that?
2         MS. HEINTZ:  We're going to object to that
3  on the basis of attorney-client privilege.
4  BY MS. WEISS:
5    Q.  Did you have more than one discussion,
6  Mr. Nichols?
7    A.  I don't recall.
8    Q.  As to the discussions that you do recall,
9  from your standpoint, were they conducted in an
10  anticipation of litigation?
11    A.  No.
12         MS. WEISS:  Okay.  Exhibit 97 -- not 97,
13  59.
14         (Whereupon, Exhibit 59 was marked
15         for identification.)
16         MS. WEISS:  Exhibit 59 are "Minutes of
17  the Meeting of the Board of Directors of KLA-Tencor
18  Corporation" dated April 25th, 2000.  It's Bates
19  stamped MLB/KLA-SEC00021983 and to 21984.
20  BY MS. WEISS:
21    Q.  Mr. Nichols, would you review Exhibit 59
22  and tell me if that's your signature on the second
23  page above your name and title Vice President and
24  General Counsel.
25    A.  This appears to be a photocopy of my

Page 137

1  signature.
2    Q.  Okay.  On the second page -- well, first
3  of all, it would have been your practice, correct,
4  to record on the minutes the attendees at the
5  meeting; is that correct?
6    A.  Yes.
7    Q.  And then --
8         MR. BELNICK:  Shirli, just to save time.
9  If this is acceptable to you and the witness, can we
10  stipulate to the extent Mr. Nichols prepared minutes
11  for board meetings it was always his practice to
12  attend and to accurately reflect who was in
13  attendance?
14         MS. WEISS:  Yes, we can.
15         Is everybody acceptable with that
16  stipulation?
17         MS. HEINTZ:  Yes.
18         MR. FICKES:  Yes.
19  BY MS. WEISS:
20    Q.  All right.  Turning to the second page
21  below "Closed Session," these minutes appear to
22  record that Mr. Levy proposed that Mr. Morton and
23  Ms. Urbanek be appointed to the Audit Committee
24  on an interim basis, and then also that
25  Mr. Levy then appointed Mr. Barnholdt to serve

35 (Pages 134 to 137)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 138
1  with Ms. Urbanek on the Compensation Committee.
2        Do you see that, sir?
3     A.  Yes.
4     Q.  Do you believe those events were
5  accurately recorded?
6     A.  Yes.
7     Q.  Okay.  So I'm going to ask you to take a
8  look at one of your notebooks.  Just give me a
9  second and I'll let you know which one.  So it would
10 be Exhibit 42, which is your notebook for the time
11 period June 26th, 2000, commencement date.
12       MR. BELNICK:  Page?
13       MS. WEISS:  Page 2740.
14       MR. FICKES:  I'm sorry.  I couldn't hear.
15       MS. WEISS:  Page 2740.
16       MR. FICKES:  Thank you.
17 BY MS. WEISS:
18    Q.  Mr. Nichols, can you tell from reviewing
19 page 2740 in context what date the notes on that
20 page were likely recorded or the time interval?
21    A.  Excuse me.  There's an entry in -- on a
22 prior set of notes Bates stamped 2737 that bears the
23 date August 9, 2000.  So presumably it was sometime
24 after August 9, 2000.  And there's a subsequent note
25 on page 2743 bearing the date 8/21/2000.  So based

Page 139
1  on that, presumably sometime between those two
2  dates.
3     Q.  All right.  Take a look at the notes on
4  2739, the page before.
5        About midway down on the page it says
6  "Bruce" and then it says "Option Program."
7        Do you see that?
8     A.  Yes.
9     Q.  Do you know who Bruce was or is?
10    A.  No.  No.
11    Q.  It doesn't spark a recollection?
12    A.  (Witness nods.)
13    Q.  All right.  And below that it says "162m."
14 Is that a reference to a code section?
15    A.  Probably.
16    Q.  Do you know what code section?
17    A.  Tax code section.
18    Q.  Okay.  And would you read the notation to
19 the right of that.
20    A.  "If one of top five cancelled and regrant
21 blew through max in plan then wouldn't be able to
22 deduct some of expense."
23    Q.  Can you tell from that note, sir, whether
24 or not you were making notes during a conversation
25 with someone?

Page 140
1     A.  Well, I can deduce.  I don't have a memory
2  of this conversation.
3     Q.  Well, what can you tell me about those
4  notes?  What do they mean?
5        MS. HEINTZ:  We're going to object that it
6  reveals attorney-client communications.
7  BY MS. WEISS:
8     Q.  Okay.  Do you think that notation was made
9  in anticipation of litigation?
10    A.  No.
11    Q.  Below that, what's the word below that?
12 Can you read that to me?
13    A.  "Vesting."
14    Q.  Vesting.  Okay.
15       And then the next page starts off -- it
16 appears to say "Roger."  Is that what it says?
17    A.  Yes.
18    Q.  Okay.  Could you read the notes on this
19 page.
20    A.  Yeah.  "FASB 44, new opinion.  Question
21 45 -- an option cancellation.
22       "If six months prior to or after
23 cancellation.
24       "If more than six months, no variable
25 accounting.

Page 141
1        "Can be no direct or indirect promise
2  that price will be better.
3        "Six plus one day -- one client discussed
4  it.
5        "No other client has done it -- not
6  exciting for employees.  Also, negative for the
7  street.
8        "Do we want any sort of give-back or
9  consideration -- three months vesting -- blackout"
10    Q.  And then can you tell me if the next page
11 is connected with the prior page in terms of notes?
12       MR. BELNICK:  "The next page" being 2741?
13       MS. WEISS:  Right.
14       THE WITNESS:  Probably.
15 BY MS. WEISS:
16    Q.  And what do those notes say?
17    A.  "Can surrender a portion of the option
18 but would be an admin," short for administrative,
19 "nightmare."
20    Q.  Do you whether or not these notes that
21 you've just read on 2740 and 2741 were taken during
22 a conversation with someone?
23    A.  Presumably, yes.
24    Q.  Do you think it was Roger Stern?
25    A.  I don't have a specific memory of the

36 (Pages 138 to 141)

Page 142

1 conversation, but that's likely who that was with.
2    Q.  Who was Roger Stern at that time?
3    A.  Roger Stern at all times during my
4 employment at KLA was a partner at Wilson Sonsini
5 Goodrich & Rosati.
6    Q.  Okay.  And can you tell me what the notes
7 mean?
8        MS. HEINTZ:  We're going to object on the
9 basis of attorney-client privilege.
10 BY MS. WEISS:
11    Q.  Okay.  And were the notes created in
12 anticipation of litigation?
13    A.  No.
14        MS. WEISS:  Okay.  Can we take a couple
15 minutes?  I need to find a couple of items.
16        THE VIDEOGRAPHER:  Going off the record.
17 The time is 1:35 p.m.
18        (Off the record.)
19        THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 1:48 p.m.
21 BY MS. WEISS:
22    Q.  Mr. Nichols, directing your attention
23 momentarily back to Exhibit 55.  I believe when we
24 started the dialogue, we were talking about option
25 program milestones.  And I think at that time

Page 143

1 I asked you whether or not you anticipated
2 litigation when you sent the email and the
3 attachment that is Exhibit 55, and I think at that
4 point you answered yes.  So I'd like to return to
5 that for a moment.
6        First of all, was there a pending
7 litigation involving the subject matter of this
8 email at the time?
9    A.  No.
10    Q.  And could you tell me what litigation you
11 were anticipating at the time?
12        DEPOSITION REPORTER:  I'm sorry.  Was that
13 for the record?
14    MR. BELNICK:  What I said, no.
15        THE WITNESS:  I'm not sure how I can do
16 that without talking about privileged opinions.
17        MR. BELNICK:  Give me a second and see if
18 I can help you.
19        (Off the record discussion between
20 Deponent and Counsel.)
21        THE VIDEOGRAPHER:  Microphone.
22        THE WITNESS:  I'm just keeping it off in
23 case I have to go back.  I won't forget about you.
24 I promise.
25        MR. BELNICK:  I'll let him -- let me tell

Page 144

1 you what we'll let him answer.  Then you can answer
2 if this is right.  The subject matter of the
3 litigation that Mr. Nichols was anticipating at the
4 time of Exhibit 55 was tax-related.
5 BY MS. WEISS:
6    Q.  Okay.  And was it litigation that you were
7 anticipating that would involve KLA Tencor?
8    A.  Potentially, yes.
9    Q.  Okay.  Had there been any threat of
10 litigation that had actually been communicated to
11 you?
12    A.  No.
13    Q.  Okay.  Putting aside the tax-related
14 litigation and focusing your attention from the time
15 period on the year 2000, can you tell me with
16 respect to any of the communications that you might
17 have had involving KLA's option program -- and I
18 think we've seen a few in the 2000 time period that
19 you may not have recalled -- can you think of any
20 instance where your communication during that time
21 period was in anticipation of litigation?
22        MR. BELNICK:  Except to the extent that
23 he's testified?
24        MS. WEISS:  Exhibit 55 I think is the only
25 one that he's testified to.  I could be wrong.  The

Page 145

1 record will show.
2        MR. BELNICK:  Right.  Apart from whatever
3 you've testified to, if it was more than 55, you
4 have the rest of Miss Weiss's question.  Can you
5 think of any other instances?
6        THE WITNESS:  No.
7 BY MS. WEISS:
8    Q.  Okay.  So moving into the 2001 time
9 period, including the time period when you had the
10 email communications that had become the subject of
11 this litigation --
12    A.  Which occurred in March --
13    Q.  -- which occurred in March of 2001, can
14 you tell me whether or not the communications that
15 you made were in anticipation of litigation?
16        MR. BELNICK:  Including the March ones?
17 BY MS. WEISS:
18    Q.  Yes.
19    A.  No.
20    Q.  Okay.  Moving into the 2002 time period,
21 same question.
22    A.  So just to make sure I have the question
23 clear, you're asking me whether in calendar 2002 I
24 had communications that related to stock options
25 where I was concerned about litigation?

37 (Pages 142 to 145)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 146

1    Q.   Where you anticipated litigation.
2    A.   No.
3    Q.   All right.  Same question with respect to
4  2003.
5    A.   No.
6    Q.   You can't think of an instance where you
7  were preparing a communication in anticipation of
8  litigation?
9        MR. BELNICK:  With respect to anything
10 having to do with stock options only?
11       MS. WEISS:  Only.  Stock options, stock
12 option programs, stock option accounting, stock
13 option personnel.
14       MR. BELNICK:  Anything.
15       MS. WEISS:  You know, the subject matter
16 of what we're talking about here.
17       THE WITNESS:  No.
18 BY MS. WEISS:
19   Q.   Okay.
20   A.   And bear in mind when I say that, whether
21 it's, you know, 2002, 2003 or any other time frame,
22 these are events that occurred a long time ago.  And
23 you could well show me a piece of paper that would
24 refresh my recollection.  But as I sit here right
25 now, no, I have no memory of such a perception.

Page 147

1    Q.   Okay.  So, for example, in particular when
2  we get to the March 2001 communications, when you
3  were drafting the communications back and forth, you
4  were not doing those in anticipation of litigation?
5    A.   Correct.
6    Q.   Okay.  That might save us a little time.
7        MR. BELNICK:  I hope so.
8  BY MS. WEISS:
9    Q.   Just briefly turning your attention to
10 Exhibit 42, Bates stamp page 2744, there is an entry
11 beside 8/22.  I believe the year we're referring to
12 is 2000, and there is a reference to Ken Levy.  And
13 my request is that you read the page of notes,
14 please.
15   A.   The page of notes beginning with "Ken
16 Levy" and below that?
17   Q.   Please.
18   A.   "Ken Levy," and then it says "new EEs" --
19 that's my abbreviation for employees --
20 "cancellation of some," and then below that, "new
21 option grant in KT, restarted with four-year
22 vesting, five-year term, 50 percent of unvested,
23 could structure as a call, alternative by calls.
24 Can we" -- and then it says, "Can we buy and sell
25 calls to ourselves?  Call amounts and figure out

Page 148

1  charges and how to do this.  Consider that this
2  would be precedent.  If they return to KT, then they
3  can keep" -- oh, "board of Newco must approve."
4    Q.   Okay.  And then the next page is a new and
5  different communication?
6    A.   Yes.
7    Q.   Okay.  And, again, does the fact that you
8  have "Ken Levy," does that indicate to you that the
9  conversation or excerpts of the conversation that
10 are recorded in these notes of a conversation that
11 you had with Mr. Levy?
12   A.   Yes.
13   Q.   Do you recall the conversation?
14       MR. BELNICK:  Yes or no.
15       THE WITNESS:  No.
16 BY MS. WEISS:
17   Q.   Okay.  Taking a look at the next page, it
18 says "8/23," and then there is a reference about a
19 third of the way down to Ken Schroeder.  Do you see
20 that?
21   A.   Yes.
22   Q.   Could you read the notes below Ken
23 Schroeder.
24   A.   "Acquire smaller company in same area.
25 Due diligence on IP."  Then it says, "Attorney.

Page 149

1  Everything so disorganized that it's hard to tell
2  whether IP is of value and whether it's infringing
3  anyone else's IP."  And then it says, "Board
4  choices:  One, not good enough; two, doesn't
5  matter."
6    Q.   Okay.  Do you recall -- first of all, does
7  that -- do those notes indicate that you had a
8  conversation with Mr. Schroeder?
9        MR. BELNICK:  As you recall.
10       THE WITNESS:  I don't recall this
11 conversation with Ken Schroeder, but his -- the fact
12 that his name is here would suggest --
13       MR. BELNICK:  The question is do you
14 recall it?
15       THE WITNESS:  I don't recall it.
16 BY MS. WEISS:
17   Q.   Okay.  So nothing about reviewing these
18 notes calls to mind the content or purpose of this
19 particular conversation that I just referred to?
20   A.   No, nothing.
21   Q.   Okay.  And if you would back up to page
22 2743.  And the top of the page, the date is 8/21/00,
23 and then it appears to be "T/C with Joy Nyberg."  Do
24 I have that right?
25   A.   Yes.

38 (Pages 146 to 149)

Page 150

1    Q.  Does that indicate to you that you had a
2 conversation with Joy Nyberg?
3    A.  Yes.
4    Q.  Would you read the notes.
5    A.  "Wants nonshareholder-approved plan. Full
6 program put in place. Wants to be able to issue
7 double peak grant immediately. (24-hour notice).
8       "*Question: How many years do we have on
9 evergreen? Nonqual. What board approval required?
10 What share limits? Can we issue based on July
11 price? Can we set aside stock ala BRCM? Can you
12 issue officer shares with only board approval? Is
13 the evergreen tied specifically to the plan?"
14      And then it says, "Options: 1,
15 nonshareholder plan; 2, increase buyback; 3," no
16 entry; "4, preauthorization."
17   Q.  Okay. First of all, down below where it
18 says "options," is the term "options" there used as
19 a synonym for choices?
20   A.  Or alternatives, yes.
21   Q.  Okay. And do you recall this conversation
22 with Joy Nyberg?
23   A.  No.
24   Q.  You don't recall anything about this
25 conversation?

Page 151

1    A.  No.
2    Q.  The first reference is to a
3 nonshareholder-approved plan. Do you recall that
4 KLA did in fact adopt a nonshareholder-approved plan
5 sometime in the 2000 time period?
6    A.  Yes.
7    Q.  Do you recall that the
8 nonshareholder-approved plan is a plan that was
9 designed to benefit nonofficers?
10   A.  Yes.
11   Q.  And Ms. Nyberg was a nonofficer for
12 purposes of the plan; correct?
13   A.  Yes.
14   Q.  And when you recorded this question, "Can
15 we issue based on July price?" It was being
16 recorded in a conversation that occurred after July;
17 correct?
18      MR. BELNICK: I think he said he didn't
19 recall the conversation.
20      THE WITNESS: Yeah. I don't recall the
21 conversation. I see the entry bearing the date.
22 BY MS. WEISS:
23   Q.  And the date -- it would have been your
24 custom and practice at the time to date the
25 conversation on the date that it occurred; correct?

Page 152

1    A.  Correct.
2    Q.  Do you know whether or not you rendered
3 advice to Miss Nyberg about her question?
4    A.  I don't know.
5    Q.  Okay. The next page, it says "8/21."
6 Above "Ken Levy" it says, "Telephone call with Brent
7 DiMarco." Do you see that?
8    A.  Yes.
9    Q.  And Mr. DiMarco was whom at the time?
10   A.  He was an attorney with Wilson Sonsini,
11 our outside counsel.
12   Q.  Do you recall anything about that
13 conversation?
14   A.  No.
15   Q.  Generally, do you remember in the 2000
16 time frame that the stock -- the price of the stock
17 of KLA Tencor started out very high and then over
18 the year generally trended downward?
19      MR. FICKES: Objection. Vague and
20 ambiguous as to "very high."
21      THE WITNESS: No.
22 BY MS. WEISS:
23   Q.  Do you have a recollection one way or the
24 other, sir?
25   A.  No.

Page 153

1    Q.  Okay. I want to show you an exhibit which
2 was taken from a public source that holds itself out
3 as recording stock option -- stock price dates for
4 public companies. And accept my -- or assume for
5 purposes of my questions that the stock price of KLA
6 Tencor is properly recorded. I have to find it
7 first.
8       (Whereupon, Exhibit 60 was marked
9       for identification.)
10      MS. WEISS: 60. 6-0.
11 BY MS. WEISS:
12   Q.  Okay. We'll mark as Exhibit 60 a printout
13 from Yahoo finance website which undertakes to show
14 the stock prices of KLA Tencor Corporation beginning
15 January 3rd, 2000 on the last page, 20, and ending
16 on December 31st, 2003 on the first page.
17      And so if you assume for purposes of my
18 question, Mr. Nichols, that this chart accurately
19 displays the prices of KLA Tencor stock, the opening
20 price, the closing price, the high of the day and
21 the low of the day for the dates shown, if you take
22 a look at January 3rd, 2000, the chart shows that
23 KLA Tencor stock opened at $112.25, closed at
24 $108.50, had a high of $112.25 and a low of $103.38.
25 Do you see that?

Page 154

1    A.  Yes.
2    Q.  And then if you take a look at the months
3  that follow, focusing on the August, September,
4  October and November time period, you'll see that
5  generally, the price goes up and down and is
6  volatile. It's generally trending down. Do you see
7  that?
8    A.  Yes.
9    Q.  So that, for example, if you just pick a
10  date, October 10th, 2000, the price on that date is
11  $35.06 at the open, and the close of the price is
12  $34.25.
13    A.  Okay.
14    Q.  Okay.  So does reviewing that chart at all
15  refresh your recollection that during the time
16  period of 2000, the general price of KLA Tencor
17  stock was declining in the marketplace?
18    A.  No.  I mean, I see this document.  It
19  speaks for itself.  If you're asking me whether I
20  ever had a memory about what KLA's stock price was
21  doing in the year 2000, the answer is no, I don't
22  have a memory of that.
23    Q.  All right.  And so generally, do you have
24  a memory that in 2000, technology companies' stock
25  in general declined in value, that that was the

Page 155

1  subject of much discussion?
2    A.  Yes.
3    Q.  And do you think that KLA Tencor was
4  different from the general decline of technology
5  companies in the marketplace in 2000?
6    A.  No.
7    Q.  And in connection with the decline of
8  prices in the marketplace, was there concern
9  expressed at KLA by senior management that it was
10  important to think about option grants to employees?
11    MS. HEINTZ:  Objection on the basis of
12  attorney-client privilege.
13    MR. FICKES:  I'll also object that the
14  question is vague and ambiguous as far as "concern"
15  and "senior management."
16    MS. WEISS:  You're not going to respond to
17  that question on the basis of the privilege
18  asserted; is that right?
19    MR. BELNICK:  That's right.  He won't.
20    MS. WEISS:  Okay.  So much for that.
21    Okay.  Exhibit 61.
22    (Whereupon, Exhibit 61 was marked
23    for identification.)
24  BY MS. WEISS:
25    Q.  Okay.  Exhibit 61 is Bates stamped -- it

Page 156

1  is an email chain, Bates stamped MLB/KLA-SEC00022981
2  through MLB/KLA-SEC00022982.  And the email chain
3  starts at the 22982 page, the email from Joy Nyberg
4  to Maureen Lamb, John Kispert and Stuart Nichols, cc
5  to Frank Brienzo, and it says, "Draft of Board
6  Presentation for Ken."  "Importance:  High."
7  "Sensitivity:  Confidential."  And it refers to a
8  draft of slides for Ken Schroeder to present at the
9  October board, a nonshareholder plan.
10    Then there is a response from Maureen Lamb
11  on the next email, and it is sent October 5th, 2000.
12  And then a response by yourself to Maureen Lamb
13  dated October 9th, 2000.
14    Do you see that email chain, sir?
15    A.  Yes.
16    Q.  Do you recall dialogue with Maureen Lamb
17  and Joy Nyberg concerning the
18  nonshareholder-approved plan in or about this time
19  period?
20    MR. BELNICK:  Yes or no.
21    THE WITNESS:  No.
22  BY MS. WEISS:
23    Q.  Do you recall a discussion whereby these
24  personnel were talking about different ways that
25  option shares could be awarded to employees using

Page 157

1  different strategies such as splitting them up,
2  trying to project the time?  Do you remember this
3  time -- this type of conversation during this time
4  period at all?
5    MS. HEINTZ:  We're going to object on the
6  basis of attorney-client privilege.
7    MS. WEISS:  This is a yes or no answer,
8  though.
9    MS. HEINTZ:  You're asking for the text of
10  or the content of communications.
11    DEPOSITION REPORTER:  I'm sorry.  I didn't
12  get the last part.
13    MS. HEINTZ:  It's asking for the content
14  of communications.  It's not a general subject
15  matter.
16  BY MS. WEISS:
17    Q.  Okay.  Well, do you recall the general
18  subject matter being discussed in the fall of 2000
19  at KLA Tencor about how to make stock option awards
20  in the future to employees?
21    MR. BELNICK:  Yes or no whether you
22  recall.
23    THE WITNESS:  No.
24  BY MS. WEISS:
25    Q.  Do you see at the top of the page your

Nichols, Stuart J. Esq.                                           1/27/2008

Page 158

1  email to Miss Lamb?  You say by the way -- or "BTW,
2  on your algorithm point, at my last job we did the
3  same thing.  The formula was quite simple.  We
4  distributed the pool of new grants based on each
5  employee's allocated share of underwater options.
6  Next time you're passing by, I'll explain."
7       Do you see that?
8       A.  Yes.
9       Q.  Did you send that email to Miss Lamb about
10 the date shown?
11      A.  I sure don't remember.
12      Q.  Does reviewing that message refresh your
13 memory about how option grants were awarded at
14 Phoenix Technologies?
15      A.  No.
16      Q.  The reference to "pool of new grants" does
17 not refresh your memory that you had a prior
18 experience whereby options were pooled in some way
19 and then awarded?
20      A.  Quite the contrary.
21      Q.  Well, what do you remember?
22      A.  I have no such memory.
23      Q.  You have no memory one way or another?
24      A.  Correct.
25      MS. WEISS:  Exhibit 62.

Page 159

1       (Whereupon, Exhibit 62 was marked
2        for identification.)
3  BY MS. WEISS:
4       Q.  Exhibit 62 are the Minutes of the Meeting
5  of the Board of Directors of KLA Tencor Corporation
6  dated October 15th, 2000, Bates number
7  MLB/KLA-SEC00022086 through and including 22088.
8       Mr. Nichols, would you look at Exhibit 62
9  and can you identify your --
10      MR. BELNICK:  Actually, excuse me, Shirli.
11 Just so your record is complete, our copy goes
12 through 22089.
13      MS. WEISS:  Okay.  You're right.  I missed
14 a page.  22089.
15 BY MS. WEISS:
16      Q.  Would you tell me if you recognize your
17 signature as Vice President, General Counsel and
18 Secretary of the meeting on 22088?
19      A.  Yeah, that appears to be a copy -- a
20 photocopy of my signature.
21      Q.  All right.  And same question with 22089.
22 Is that a photocopy of your signature?
23      A.  It's actually a photocopy of two of my
24 signatures.
25      Q.  Yes.  I see that.  Thank you.

Page 160

1       All right.  In the minutes under
2  "Strategic Initiatives," there is a reference to a
3  presentation by Mr. Schroeder of an overview of the
4  company's strategic initiatives.  And it is also
5  recorded that Mr. Schroeder then addressed the
6  company's stock option programs and the impact of
7  the recent stock price decline on employee unvested
8  gain.  And then a further reference that
9  Mr. Schroeder would present something at the
10 November 10th board meeting.
11      Do you have a recollection of the
12 presentations referred to on 22088?
13      MR. BELNICK:  Yes or no?
14      THE WITNESS:  No.
15      MS. WEISS:  Exhibit 63.
16      (Whereupon, Exhibit 63 was marked
17       for identification.)
18 BY MS. WEISS:
19      Q.  Exhibit 63 does not bear a Bates stamp.
20 It is a document -- oh, I'm sorry.  It does.
21 KT ACWP-PRIV00002401 through 2415.
22      Would you review Exhibit 63, Mr. Nichols.
23      A.  Okay.
24      Q.  Mr. Nichols, the document -- the first
25 page of the document says, "Draft KLA Tencor

Page 161

1  Employee Retention Stock Option Issue."  And then it
2  says, "Discussion Document October 30, 2000."  Below
3  that there is the logo of a company called iQuantic,
4  i-Q-u-a-n-t-i-c, Inc.
5       Do you recognize the name iQuantic?
6       A.  Yes.
7       Q.  Could you tell me who iQuantic is or was
8  at that time?
9       A.  iQuantic was a consulting firm that
10 specialized in advising companies on compensation
11 matters.  And I think, though I'm not sure -- well,
12 I'll leave it at that on compensation matters.
13      Q.  Did iQuantic provide consulting services
14 to KLA Tencor?
15      A.  I don't know if we engaged them as a
16 consultant, but I know that a representative of
17 iQuantic made a presentation.
18      Q.  Did that representative make a
19 presentation at a board meeting, do you recall, or
20 Compensation Committee meeting or some other type of
21 meeting?
22      A.  I don't know which type of meeting it was.
23 I don't believe it was a board meeting.
24      Q.  Okay.
25      A.  It could have either been a comp committee

41 (Pages 158 to 161)

Nichols, Stuart J. Esq.                                                1/27/2008

Page 162

1  meeting or a -- just a general informational
2  meeting.
3       Q.   There was an earlier reference to the
4  nonshareholder-approved plan adopted by KLA Tencor.
5  Do you know, Mr. Nichols, whether or not the idea
6  for a nonshareholder-approved plan originated with
7  iQuantic?
8       MR. BELNICK:  Yes or no?
9       THE WITNESS:  No, I don't know.
10 BY MS. WEISS:
11      Q.   Did you have any discussion with iQuantic
12 regarding anything about the contents of Exhibit 63,
13 do you recall?
14      A.   Do you mean me personally?
15      Q.   Sure.
16      A.   Not that I recall.
17      Q.   Who would have been the person at KLA
18 Tencor who would have investigated with iQuantic the
19 parameters of a nonshareholder-approved stock option
20 plan?
21      MR. BELNICK:  If you know.
22      THE WITNESS:  I don't know.
23 BY MS. WEISS:
24      Q.   You don't know whose bailiwick, if you
25 will, that was in?

Page 163

1       A.   Well, I --
2       MR. BELNICK:  Are you asking him if he
3  knows specifically who he spoke to within iQuantic
4  about this subject matter?
5       MS. WEISS:  No.  I'm asking him whether or
6  not there was a group of people in KLA Tencor who
7  was tasked with interacting with outside consultants
8  on this topic.
9       MR. BELNICK:  Okay.  Then --
10      MS. WEISS:  Within their purview.
11      THE WITNESS:  So your question is was
12 there a group within KLA Tencor that was tasked with
13 interacting with this type of consultant?
14 BY MS. WEISS:
15      Q.   Yes.
16      A.   No, I'm not aware of any specific group
17 that was so tasked.
18      MS. WEISS:  Okay.  64.
19      (Whereupon, Exhibit 64 was marked
20       for identification.)
21      MR. BELNICK:  Okay.  He's looked at it.
22 BY MS. WEISS:
23      Q.   Exhibit 64, Bates stamped
24 MLB/KLA-SEC00004878 through 4898, is what appears to
25 be a PowerPoint presentation with charts entitled,

Page 164

1  "Employee Retention Stock Option Program Proposal
2  for Compensation Committee 11/8/08 [sic]" -- I'm
3  sorry -- '00.
4       Mr. Nichols, do you recall seeing Exhibit
5  64 before?
6       A.   No, I don't have a specific recollection
7  of seeing that exhibit before.
8       Q.   Do you recall the discussion of a strategy
9  at KLA Tencor to make supplemental grants to
10 shareholder -- to employees and officers in two
11 segments?
12      MS. HEINTZ:  Objection on the basis of
13 attorney-client privilege.
14      MS. WEISS:  Okay.  I think we already have
15 your testimony on work product.
16      Exhibit 65.
17      (Whereupon, Exhibit 65 was marked
18       for identification.)
19      MS. WEISS:  And Exhibit 66.
20      (Whereupon, Exhibit 66 was marked
21       for identification.)
22 BY MS. WEISS:
23      Q.   Mr. Nichols, Exhibit 66 is what appears to
24 be a draft of minutes of the Compensation Committee
25 of KLA-Tencor Corporation, Bates stamped

Page 165

1  MLB/KLA-SEC00004872 through 4876.
2       And then Exhibit 65 are the Minutes of the
3  Meeting of the Board of Directors of KLA-Tencor
4  Corporation dated November 10th, 2000, Bates stamped
5  MLB/KLA-SEC00004903 through 4907.
6       Now, Exhibit 66 -- we had requested from
7  KLA Tencor copies of all of their Compensation
8  Committee minutes as well as all of their board of
9  directors minutes.  And they refused to produce
10 anything, so we don't have any corporate records
11 from KLA.  These were produced from the files of the
12 SEC, presumably produced by KLA.  But we do not have
13 a final copy of the Compensation Committee minutes,
14 I believe, that were signed by you.
15      These draft minutes appear to indicate
16 that you attended a Compensation Committee meeting
17 held on November 8th, 2000.  That appears in the
18 first paragraph of the draft minutes.
19      Mr. Nichols, could you tell me what
20 generally during this time period was your custom
21 and practice in terms of preparation of minutes and
22 signing of them?
23      MR. BELNICK:  For Compensation Committee?
24      MS. WEISS:  Yeah.  Let's start with
25 Compensation Committee.

42 (Pages 162 to 165)

Page 166

1    THE WITNESS:  So -- and what's the time
2  period you're referring to now?
3  BY MS. WEISS:
4    Q.  This time period, November of 2000.
5    A.  In those -- in that time period, the
6  Compensation Committee meetings typically included a
7  written report that was prepared in advance of the
8  meeting which the members of the comp committee
9  signed.  So my practice was to have that be the
10  written record of the meeting.
11    Q.  So let's back up a minute.  In order to --
12  you attended the Compensation Committee meetings as
13  a general rule?
14    A.  Yes.
15    Q.  And in order to prepare for the
16  Compensation Committee meetings, did you meet with
17  Joy Nyberg?
18    A.  No.
19    Q.  You never met with her?
20    A.  To prepare for the meetings for the
21  comp --
22    Q.  Yes.
23    A.  No, never.
24    Q.  Okay.  And --
25    A.  Well, I shouldn't say "never."  I

Page 167

1  certainly don't recall any instance where I did
2  that.
3    Q.  Okay.  How did you compile the information
4  or how was the information compiled for submission
5  to the Compensation Committee members?
6    MR. BELNICK:  If you know.
7    THE WITNESS:  I don't know.
8  BY MS. WEISS:
9    Q.  Who was responsible for compiling the
10  information for review by the Compensation Committee
11  members?
12    A.  All I know about that is that Ken
13  Schroeder and Joy Nyberg would work together to
14  prepare the information.
15    Q.  All right.  And how do you know that?
16    MS. HEINTZ:  We object to the extent that
17  it reveals attorney-client communications.
18    MR. BELNICK:  If you know that as a result
19  of something that would involve a client
20  communication -- and I don't know how you could
21  otherwise, but --
22    THE WITNESS:  Yeah.  I don't know how I
23  can answer that without revealing a conversation
24  with a client.
25    MR. BELNICK:  And I assume KLA is

Page 168

1  asserting privilege.
2    MS. HEINTZ:  We assert the privilege and
3  request that the witness not answer.
4  BY MS. WEISS:
5    Q.  Did you prepare an agenda for the
6  Compensation Committee meeting or did someone else?
7    A.  I did not.
8    Q.  How did you obtain an agenda before the
9  meeting or did you?
10    A.  I didn't.
11    Q.  Okay.  So what was your role at the
12  meeting?  Simply minute taker?
13    A.  At best because, again, my view was that
14  the written report of the actions that were to be
15  taken was a satisfactory memorialization of those
16  actions.
17    Q.  Okay.
18    A.  So in the -- in the early time period, I
19  generally didn't even prepare minutes afterwards.
20    Q.  Okay.  And when you say "written report,"
21  is the executive summary of stock retention
22  recommendation, which is part of the exhibit at 4874
23  and 4875, is that an example of a written report?
24    A.  Of -- yes, of a portion of the written
25  report.  Yes, that's correct.

Page 169

1    MS. WEISS:  Okay.  Let's stop.  We have to
2  change the tape.
3    THE VIDEOGRAPHER:  We are going off the
4  record.  The time is 2:32 p.m.  Here marks the end
5  of videotape No. 2, volume 1, in the deposition of
6  Stuart Nichols.
7    (Off the record.)
8    THE VIDEOGRAPHER:  We are back on the
9  record.  The time is 2:34 p.m.  Here marks the
10  beginning of videotape No. 3, volume 2, in the
11  deposition of Stuart Nichols.
12  BY MS. WEISS:
13    Q.  I believe you said that you recognize the
14  executive summary of stock retention recommendations
15  as part of a report, and I was asking you what you
16  meant by that.
17    A.  Occasionally there was additional
18  attachments or information that was part of the
19  report.  And there was also a cover page that the
20  committee members signed at the time of the meeting.
21    Q.  And would the first page of Exhibit 66
22  generally be the form of the page that the
23  Compensation Committee members would sign?
24    A.  No.
25    Q.  Okay.  Do you know whether or not minutes

Nichols, Stuart J. Esq.                                    1/27/2008

Page 170

1  of the November 8th, 2000 Compensation Committee
2  meeting were ever signed?
3      A.  I don't know.
4      Q.  Who was responsible for getting signatures
5  of Compensation Committee members after the meeting?
6      A.  Well, I suppose I ultimately had
7  responsibility.
8      Q.  Can you offer any reason as to why these
9  committee minutes -- well, I'm assuming they weren't
10 signed.  I don't have a signed copy.
11     Do you know whether or not a signed copy
12 exists of these committee minutes?
13     A.  Is that different from your earlier
14 question?
15     MR. BELNICK:  Do you know whether there
16 was ever a signed copy of this?
17     THE WITNESS:  I thought I already answered
18 that.
19     MR. BELNICK:  Answer it again.
20     THE WITNESS:  I don't know.
21 BY MS. WEISS:
22     Q.  These draft minutes appear to record that
23 the Compensation Committee was to propose that the
24 board approve a nonshareholder-approved plan with
25 certain terms.  It's referenced at the middle of the

Page 171

1  page.
2      Do you know whether or not the
3  Compensation Committee -- well, strike that.
4      Do you recall discussion of the
5  nonshareholder-approved plan at the Compensation
6  Committee meeting?
7      A.  No.
8      Q.  Turning back to the first page of the
9  draft, there are a number of clauses which start out
10 as "Whereas."  The second whereas says, "Whereas the
11 purpose of this grant is to retain and reward
12 Officers of the Company in the manner that is
13 consistent with the Company's compensation
14 practices."  And then it says "Resolved."  "The
15 Compensation Committee hereby approves the
16 supplemental grant, the amounts of which
17 supplemental grants will be based on the schedule
18 attached hereto."
19     And then it says, "Resolved further," "The
20 grants will be made under the company's 1982 Stock
21 Option Plan at an exercise price equal to the price
22 listed for the Company's Common Stock on NASDAQ at
23 the close of trading on the date appearing below."
24 And then there is an attachment that shows a
25 schedule of grants.

Page 172

1      Do you recall that approval being made in
2  November of 2000?
3      A.  No.
4      Q.  Who would have drafted these draft
5  minutes?
6      A.  I believe I would have.
7      Q.  All right.  And so if you created drafts,
8  your intention in creating the draft would have been
9  to reflect what occurred at the meeting; is that
10 right?
11     A.  Correct.
12     Q.  Okay.  In your mind at the time, what
13 further action, if any, was required for the
14 Compensation Committee to make an award to officers
15 of the company other than approving the grants?
16     MR. BELNICK:  If you can answer that.
17     MR. FICKES:  I'm going to object.  That is
18 vague and ambiguous.
19     Do you mean for accounting purposes or
20 just as a matter of internal policy or what?
21     MS. WEISS:  Yes.  Thank you.
22 BY MS. WEISS:
23     Q.  Authorization with grants duly authorized
24 if the Compensation Committee approved them, or did
25 some further action have to be taken in your mind at

Page 173

1  that time?
2      MR. BELNICK:  Shirli, if we can amend that
3  to -- your question originally was what was in his
4  mind, which poses all kinds of problems.  If it was
5  amended to whether he was aware of a procedure that
6  existed at the company that had to -- what was the
7  next step that had to be taken?  And that I think
8  will eliminate what may be a potential objection.
9      MS. WEISS:  Well, I guess I'd first like
10 to know what his understanding was at that time as
11 general counsel and minute taker.  Once the -- once
12 the Compensation Committee approved grants to
13 officers, was there further action necessary for the
14 grants to be awarded?
15     MS. HEINTZ:  We're going to object to the
16 extent it requires revelation of any attorney-client
17 communication.
18     THE WITNESS:  And on that basis, I don't
19 know how to respond to your question without
20 revealing privileged communications.
21 BY MS. WEISS:
22     Q.  Well, let me ask you this, Mr. Nichols.
23 Did you undertake -- when you became the minute
24 taker for the Compensation Committee, did you
25 undertake to educate yourself as to what the charter

44 (Pages 170 to 173)

Nichols, Stuart J. Esq.                                                      1/27/2008

Page 174

1  of the Compensation Committee was?
2      A.  I do have a memory of reviewing the
3  charter of the Compensation Committee, yes.
4      Q.  And did you undertake to educate yourself
5  as to the extent of their authority to make grants?
6      A.  In connection with or prior to this, or
7  are you asking in general?
8      Q.  Well, let me back up.  Before you acted as
9  secretary for this meeting, had you undertaken to
10  become acquainted with the extent of the authority
11  of the Compensation Committee?
12      A.  Yes.
13      Q.  So did you have an understanding at the
14  time that you took the minutes for the November 8th
15  meeting as to whether or not all that was required
16  for there to be grants to officers was that the
17  Compensation Committee could approve them?
18      MS. HEINTZ:  We're going to object to the
19  extent it requires revelation of attorney-client
20  communications.
21      THE WITNESS:  The problem with your
22  question is we're sitting here in 2008, and you're
23  asking me to tell you what I remember about what my
24  state of mind was in November of 2000.
25  BY MS. WEISS:

Page 175

1      Q.  Yes, I am.
2      A.  And I just don't remember.  I don't know
3  what I -- what I knew at that time relative to your
4  question, which is about the authority of the
5  Compensation Committee to make stock option grants.
6      Q.  So do you know if someone had asked you in
7  November of 2000 whether it was sufficient for
8  purposes of authorizing officer grants if the
9  Compensation Committee approved them, as you sit
10  here today, you can't tell me whether or not you
11  would have been able to answer that question in
12  November of 2000?
13      MR. FICKES:  I will object that that calls
14  for speculation.
15      MS. WEISS:  Well, he knows what he knew at
16  that time; right?
17  BY MS. WEISS:
18      Q.  I mean, you knew what your custom and
19  practice was at that time?
20      A.  No.  I'm afraid I --
21      MR. BELNICK:  He knew then what it was,
22  but he's talking about what he knows now, eight
23  years later.
24      THE WITNESS:  I don't know what I knew
25  then.  I know what I know now, but I don't know

Page 176

1  whether what I know now is what I knew then.  I
2  suspect they are different things.
3  BY MS. WEISS:
4      Q.  Well, would you have -- you were also the
5  minute taker for the board; right?
6      A.  Correct.
7      Q.  And the company was granting options on a
8  regular basis; correct?
9      MR. FICKES:  Objection.  Vague as to
10  "regular basis."
11      DEPOSITION REPORTER:  I'm sorry.
12  Objection --
13      MR. FICKES:  Objection.  Vague as to
14  "regular basis."
15  BY MS. WEISS:
16      Q.  More than once a year; correct?
17      A.  In the 2000 time frame, I just don't
18  remember when we started -- when KLA started the
19  practice of making options -- oh, you mean for new
20  hires?
21      Q.  No.  I'm talking about officers.
22      A.  Yeah.  See, I just don't remember when KLA
23  adopted this practice of making grants more than
24  just annually.
25      Q.  Okay.  Well, why don't we get the board

Page 177

1  minutes in front of us, too.  We've identified the
2  Compensation Committee minutes.  The board minutes
3  are Exhibit 65.
4      MS. WEISS:  Have I identified those for
5  the record?  I can't remember.
6      MR. BELNICK:  Yes, you have.
7  BY MS. WEISS:
8      Q.  All right.  So if you take a look at
9  Exhibit 65, there is minutes of the board on
10  November 10th and the Compensation Committee minutes
11  on November 8th that are presented in draft that I
12  think you testified you prepared.  Do you see that?
13      A.  Yes.
14      Q.  All right.  So as to the draft
15  Compensation Committee minutes, it provides that,
16  "The Compensation Committee hereby approves the
17  supplement grant, the amount of which supplemental
18  grants will be based on the schedule attached
19  hereto."  And then there's a schedule showing grants
20  to a number of officers.
21      And then let's look at the board minutes
22  of November 10th, 2000.  And on page 2, there's the
23  report of the Compensation Committee.  Below that it
24  states, "Ed Barnholt reported on the results of the
25  meeting of the Compensation Committee by summarizing

45 (Pages 174 to 177)

Nichols, Stuart J. Esq.                                              1/27/2008

Page 178

1  the Executive Summary of the Stock Retention
2  Recommendation attached as Exhibit B." And it says,
3  "The Board discussed, and on motion duly made and
4  seconded, unanimously ratified the actions taken in
5  Exhibit B."
6      Do you see that, sir?
7  A. Yes.
8  Q. All right. And you were the minute taker
9  of the board of directors meeting on November 10th,
10 2000, and that's your signature that appears below;
11 correct?
12 A. Yes.
13 Q. All right. So were the options to the
14 officers granted on November 8th or November 10th?
15     MR. BELNICK: As you recall.
16     THE WITNESS: Yeah. So, again, is your
17 question what I remember at the time, or are you
18 asking me to look at these and give you a legal
19 conclusion?
20     MR. BELNICK: Right.
21 BY MS. WEISS:
22 Q. At the time, did you believe that the
23 options were granted on November 8th or November
24 10th?
25     MR. BELNICK: I think he said -- I think

Page 179

1  he's answered that, but go ahead.
2      THE WITNESS: Whether -- I don't know that
3  I've answered that.
4      MR. BELNICK: Okay.
5      THE WITNESS: But I can tell you I don't
6  have a distinct memory about whether I thought that
7  grants occurred on the 10th, the 8th or would occur
8  at some future date. I truly don't know what my
9  state of mind was back in that time frame.
10 BY MS. WEISS:
11 Q. In 2001 did you undertake to try to
12 ascertain whether or not officer grants that are
13 approved by the Compensation Committee and ratified
14 by the board are made as of the date of the
15 Compensation Committee approval or the board
16 ratification? Would you undertake to look at that
17 issue?
18 A. Not that issue, no.
19 Q. Did you come to an understanding in 2001
20 as to -- in the scenario I described whether or not
21 the grants were made at the date of the Compensation
22 Committee meeting or the board meeting?
23     MR. BELNICK: I know what his problem is
24 going to be in answering that. You limited it to
25 two entities. There may have been another entity.

Page 180

1  BY MS. WEISS:
2  Q. Can you answer my question?
3  A. Well, yeah, I can, but the problem is it
4  contains a premise that by virtue of the way you're
5  asking the question, the answer is no. I didn't
6  look at the question that you're now posing. Does
7  the Compensation Committee -- if it makes a grant
8  that is ratified by the board, is that a valid
9  grant? No, I don't remember ever looking at that
10 question.
11 Q. Okay. So you had no understanding at that
12 time as to whether, at the end of a board meeting
13 that had granted options, whether or not those
14 grants were finally made or you did have an
15 understanding?
16 A. No. I think what I've testified to
17 already is that I don't remember what my state of
18 mind was about the authority of these entities that
19 you're now describing, the Compensation Committee
20 and the board, what are -- what were the
21 prerequisites for a valid grant. In terms of my
22 perception back in November of 2000, I don't know my
23 state of mind back then.
24 Q. Do you have an understanding now as you
25 look at these documents with hindsight? Do you have

Page 181

1  an understanding as to when, if at all, the grant to
2  the officers was made in terms of date?
3      MR. BELNICK: Objection. I think that's
4  now asking for a legal conclusion --
5      MS. WEISS: No. I'm asking him for his
6  understanding. He could be right or wrong, and we
7  can argue about that for ten days. I want his
8  understanding now.
9      MS. HEINTZ: We're also objecting on the
10 basis to the extent it reveals attorney-client
11 communications.
12     THE WITNESS: And if I may, I think the
13 other problem with your question is are you asking
14 from the standpoint of Delaware corporate law, from
15 the standpoint of accounting standards? I mean,
16 I --
17 BY MS. WEISS:
18 Q. I'm asking from the standpoint of the
19 authority to grant options as applied to KLA.
20 What's your understanding?
21     MR. BELNICK: I object. I think -- okay.
22 It's an improper question. The witness has told
23 you, Shirli, one of the problems with it.
24     MS. WEISS: I think you need to speak up
25 or I think the record is going to be kind of messy.

46 (Pages 178 to 181)

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 182

1    MR. BELNICK: What I'm saying is that the
2  witness himself has told you there are different
3  problems -- there are different areas that one can
4  look to answer that question depending on the
5  purpose of the question, whether it was accounting
6  standards or Delaware law for corporate governance
7  or tax standards if it was for the purpose of tax, I
8  suppose. So this is a very broad question.
9    Secondly, I think whatever understanding
10  he has now of any of those -- well, let me just stop
11  there. It's up to KLA if they have any further
12  problem. But I think that's one of the
13  difficulties, leaving privilege aside, with the
14  breadth of the question.
15    MS. WEISS: Okay. I think I'm entitled to
16  know what his understanding is now. If his under --
17    MR. BELNICK: I'm not stopping you.
18    MS. WEISS: If we establish that his
19  understanding is based on some communication, he can
20  say that and not reveal the communication.
21    MR. BELNICK: Okay.
22    MS. WEISS: But I think I'm entitled to
23  understand what his current understanding is as to
24  when the grant would have been made.
25  BY MS. WEISS:

Page 183

1    Q. Can you answer that?
2    MS. HEINTZ: To the extent it doesn't
3  reveal attorney-client communication.
4  BY MS. WEISS:
5    Q. I'm not asking for communication. What's
6  your understanding right now as you look at these
7  documents?
8    A. Okay. So --
9    Q. If somebody asked you right now, these
10  grants were approved by the Compensation Committee.
11  They were ratified by the board two days later.
12  Mr. Nichols, what's your current understanding as to
13  the date of grant? What would you say?
14    MR. FICKES: I would object on relevance
15  grounds, and that calls for a legal conclusion.
16    MR. BELNICK: I would object on more than
17  that. That definitely -- that understanding would
18  be based on, among other things, communications that
19  Mr. Nichols had with me and other of his lawyers.
20    MS. WEISS: I don't care what it's based
21  on. I'm not asking for the communication. I want
22  to know what his current understanding is, and then
23  I'm going to ask him how he came to that
24  understanding. If that understanding then has to do
25  with communication, I don't want to know about the

Page 184

1  communication.
2    MR. BELNICK: If you want to ask him, does
3  he have an understanding, then he can answer yes or
4  no. Then if you want to ask him how did he come to
5  that understanding, fine. He can tell you that.
6  But you're starting by asking, unless I'm mishearing
7  the question, what is his understanding. If someone
8  came to him today and said, What's the answer, tell
9  us what's the answer. When you start from there,
10  it's objectionable because there have been
11  privileged communications that would have, I
12  believe, led in part or in whole to that
13  understanding.
14    MS. WEISS: I disagree with you entirely.
15  I'm entitled to his understanding. You're
16  obstructing the record.
17    MR. BELNICK: No, I'm not.
18    MS. WEISS: I've asked the -- I've asked
19  the witness --
20    MR. BELNICK: I'm trying to facilitate
21  this.
22    MS. WEISS: If you're going -- if you're
23  going to instruct him not to answer based on
24  attorney-client privilege, then we'll have that as
25  the record. But I've asked him a simple question

Page 185

1  that I think is highly relevant.
2    MR. BELNICK: Can I voir -- can I just
3  voir dire him?
4    MS. WEISS: You can go and have a meeting
5  with him if you would like.
6    MR. BELNICK: No. I'm just -- I'm trying
7  to facilitate it, Shirli. Ask him -- can't we start
8  by asking him, A, do you have an understanding? B,
9  how did you come to the understand? Then we will
10  know, all of us, whether there is a foundation to
11  object to C, which is, what is the understanding?
12  I'm not obstructing; I'm trying to get it done so
13  that we don't sit here and argue. I don't want to
14  argue. He's a percipient witness. He has no stake
15  other than to answer the questions to the extent
16  they don't involve a privilege.
17  BY MS. WEISS:
18    Q. Can you answer the question that I posed,
19  Mr. Nichols?
20    MR. BELNICK: Could you repeat it to him,
21  please.
22  BY MS. WEISS:
23    Q. As you look at these documents today, do
24  you have an understanding as to whether or not the
25  grant that we've been referring to was made under

47 (Pages 182 to 185)

1    these facts on November 8th or November 10th?
2              MR. BELNICK:  You can answer that.
3              MS. HEINTZ:  Well, we're going to also
4    instruct not to answer if it is based on an
5    attorney-client communication.
6              MR. BELNICK:  Then you follow KLA's
7    direction.
8              THE WITNESS:  Without relying on
9    privileged communications, my opinion would be
10   that --
11             MR. BELNICK:  No.  The question was do you
12   have an understanding, not what is it.
13             THE WITNESS:  Okay.  I think it was do I
14   have an opinion.  Do I have an understanding?  Yes,
15   I have an understanding.
16   BY MS. WEISS:
17       Q.   Okay.  And what is it?
18             MS. HEINTZ:  We're going to object again,
19   to the extent it's based on an attorney-client
20   communication, not to answer that question.
21             MR. FICKES:  And I'll object again on
22   relevance grounds.
23             THE WITNESS:  Okay.  So without relying on
24   attorney-client information, my understanding
25   looking at these documents is that at a validly

1    composed meeting of the Compensation Committee which
2    has authority to make grants, there were minutes
3    that were executed that indicated all of the
4    elements that would be necessary from an accounting
5    standpoint to make a grant to officers, namely, the
6    individuals, the number of the grant -- of the
7    options to each individual, the date upon which it
8    was to be priced and all the terms.
9              So I would say that on the 8th, there was
10   a valid grant.
11   BY MS. WEISS:
12       Q.   All right.  And is it your belief that KLA
13   Tencor's Compensation Committee charter delegated to
14   the Compensation Committee the authority to make
15   grants, or are you relying on some other source for
16   that understanding?
17       A.   Can you read back the question.
18             (Record read as follows:
19             "Question:  And is it your belief that
20             KLA Tencor's committee charter delegated
21             to the Compensation Committee the
22             authority to make grants, or are you
23             relying on some other source for that
24             understanding?")
25             THE WITNESS:  So if I understand your

1    question, you said does the committee charter
2    delegate to the Compensation Committee?  I don't
3    think you meant that.
4    BY MS. WEISS:
5        Q.   Does the committee charter empower the
6    Compensation Committee?
7        A.   Which committee?  Which committee charter?
8        Q.   Does the Compensation Committee charter
9    empower the Compensation Committee to make officer
10   grants?
11       A.   Yes.
12       Q.   All right.  Now, at KLA Tencor in November
13   of 2000, who was responsible for properly accounting
14   for stock options to officers?
15       A.   Which individual or which department?
16       Q.   Let's start with the individual, and then
17   we'll go to the department.
18       A.   Well, ultimately, at that time John
19   Kispert was the -- was the CFO, so he would be
20   ultimately responsible for the proper accounting of
21   the stock -- of any accounting matter.
22       Q.   Including accounting for stock options
23   granted to officers; is that correct?
24       A.   Correct.
25       Q.   And Mr. Kispert had access to the

1    Compensation Committee minutes of the company
2    whenever he wanted them; correct?
3        A.   Correct.
4        Q.   He also had access to the board of
5    directors minutes whenever he wanted them; correct?
6        A.   Correct.
7        Q.   Take a look at the second page of the
8    report where -- first, the supplemental stock award
9    for officers.
10            Okay.  The first paragraph states,
11   "Background:  A supplemental grant equal to half the
12   recent 'Peak' grant with a 5 year vest was recently
13   approved for all eligible employees in order to
14   increase retention.  Additionally, certain employees
15   with options at $55 a share or greater were given a
16   surrender option for those grants.  Prior to this
17   supplemental grant 50% of optionees were underwater
18   at the market price of $30 a share and turnover of
19   the company was increasing as the stock price was
20   declining."
21            Do you see that?
22       A.   Yes.
23       Q.   And then it says, "Officers are to be
24   awarded grants from the Shareholder Approved plan
25   under the same program used for the employees.  See

Nichols, Stuart J. Esq.                                                        1/27/2008

Page 190

1 attached for full detail."
2        Can you tell me what it meant in the
3 minutes when you said, "Officers are to be awarded
4 grants from the Shareholder Approved plan under the
5 same program used for employees"?  What employee --
6 what program was being referred to?
7        A.  I'm sorry.  Can you refer me to the
8 language that --
9        Q.  Beside "Recommendation," it says,
10 "Officers are to be awarded grants from the
11 Shareholder Approved plan under the same program
12 used for employees."
13       A.  You said when I said this.
14       Q.  Well, you created -- are these not --
15           MR. BELNICK:  This is the report.
16           THE WITNESS:  I did not create this
17 document.
18           MS. WEISS:  Oh, okay.  That's right.
19 Thank you for the correction.
20 BY MS. WEISS:
21       Q.  Do you have -- can you tell me what "the
22 same program used for employees" is a reference to
23 in those minutes?
24       A.  I can't interpret those words any better
25 than you can.

Page 191

1        Q.  All right.  Thank you.
2            All right.  On the first page of the
3 minutes, at the bottom it says, "The Compensation
4 Committee also reviewed and approved actions
5 recommended by management of the company regarding
6 the issuance of a supplemental option grant to
7 nonofficer employees."
8            Do you see that?  That's right above the
9 word "Draft."
10           MR. BELNICK:  The first sentence after the
11 last "resolved further" clause.
12           THE WITNESS:  Yeah.  Yeah.  I see that.
13 Okay.  I'm sorry.  The question is?
14 BY MS. WEISS:
15       Q.  Do you see that phrase?
16       A.  I see that, yeah.
17       Q.  Okay.  So -- and you recorded that as --
18 in the draft of the Compensation Committee minutes
19 of November 8th, 2000; correct?
20       A.  Yes.  Correct.
21       Q.  All right.  So the action taken by the
22 Compensation Committee in that paragraph related not
23 to officers, but to nonofficer employees; correct?
24       A.  Well, assuming that in fact these are the
25 actions of the committee.  You've pointed out that

Page 192

1 you don't have a signed draft, and apparently
2 there's a question about whether a signed draft even
3 occurred.  I don't know as I sit here today whether
4 I prepared this in advance, whether the meeting was
5 consistent with that.
6            Having said that, I think the words speak
7 relatively clearly for themselves.
8        Q.  All right.  So if this draft properly
9 reflects what actually occurred at the Compensation
10 Committee meeting, the Compensation Committee
11 approved grants made to officers under the 1982
12 stock option plan; correct?
13       A.  Correct.
14       Q.  And also approved a recommendation of
15 management for a supplemental option grant to
16 nonofficer employees; correct?
17       A.  That appears to be the case, yes.
18       Q.  Okay.  And then the board on -- two days
19 later ratified the actions of the Compensation
20 Committee; correct?
21       A.  Correct.
22           MS. WEISS:  Let's take a look at the
23 Compensation Committee charter.  Do you know what
24 that is?
25           MR. FICKES:  Shirli, would this be a good

Page 193

1 time for a break?
2            MS. WEISS:  Sure.
3            THE VIDEOGRAPHER:  Off the record.  The
4 time is 3:04 p.m.
5            (Off the record.)
6            (Whereupon, Exhibit 67 was marked
7             for identification off the record.)
8            THE VIDEOGRAPHER:  Back on the record.
9 The time is 3:25 p.m.
10 BY MS. WEISS:
11       Q.  Okay.  Mr. Nichols, so before the break we
12 were talking about Exhibit 66, which was the minutes
13 of the November 8th, 2000 Compensation Committee
14 meeting, the draft minutes.  Those -- the draft
15 minutes, if correct, reflect that the Compensation
16 Committee approved supplemental grants to KLA
17 Tencor's officers and also reviewed and approved
18 actions recommended by management of the company
19 regarding the issuance of supplemental option grants
20 to nonofficers.
21           Then if we look at Exhibit 65, which is
22 the minutes of the board of directors -- and these I
23 believe are signed by you -- they reflect a
24 presentation by Mr. Barnholt, a member of the
25 Compensation Committee, of the results of the

49 (Pages 190 to 193)

Nichols, Stuart J. Esq.                                                1/27/2008

Page 194

1  meeting of the Compensation Committee and the
2  approval of those actions by the board of directors.
3        And I believe you said -- your
4  understanding is that the Compensation Committee
5  could make the grants I just described to the
6  officers without ratification or approval by the
7  board. Did I get that right?
8     A. Yes.
9     Q. Was it -- is it your understanding that
10  the Compensation Committee could approve the
11  recommendations of management with respect to the
12  nonofficers without ratification of the board?
13     A. You know, I don't have a specific
14  understanding about that, about the comp committee
15  approving actions of management. I -- yeah. I
16  don't have an understanding about that.
17     Q. Okay. But you do agree that that's
18  reflected in the Compensation Committee minutes?
19     A. Yes.
20     Q. Okay. As to your understanding about the
21  need or lack of need for ratification by the board,
22  if you would just take a look at the charter of the
23  Compensation Committee. That is attached as Exhibit
24  B-2 to Exhibit 67. Exhibit 67 is Bates stamped
25  MLB/KLA-SEC00050391 through 50458.

Page 195

1        MR. BELNICK: Where will we find B-2? I
2  only have Exhibit D.
3        MS. WEISS: Yeah. I'll tell you in a
4  minute. The compilation is the minutes of the
5  meeting of the board of directors of KLA Instruments
6  Corporation April 28th, 1997.
7        MR. BELNICK: Oh, B-2. I see.
8        MS. WEISS: And the charter commences on
9  Bates stamp 50408 --
10        MR. BELNICK: Through 10.
11        MS. WEISS: Excuse me just a minute.
12        All right. These minutes appear to
13  reflect actions taken in anticipation of the merger
14  of KLA Instruments with Tencor Corporation. And one
15  of those actions is the appointment of new members,
16  amendment of charters for the Audit, Compensation
17  and Nominating Committee. That reference is on page
18  3 toward the bottom.
19        MR. BELNICK: Just so the record is clear,
20  Shirli, this is a meeting that took place before
21  Mr. Nichols joined the company.
22        MS. WEISS: Yes. I'm just laying a
23  foundation --
24        MR. BELNICK: I understand.
25        MS. WEISS: -- for the charter, so bear

Page 196

1  with me here.
2        MR. BELNICK: No. I understand.
3  BY MS. WEISS:
4     Q. So as I understand it, the company,
5  conditioned on the merger, adopted amended charters
6  for the Compensation, Audit and Nominating
7  Committee. That's reflected on page 3 of these
8  minutes. The charter for the Compensation Committee
9  is attached as B-2.
10        First of all, during your tenure at KLA
11  Tencor, sir, did you have occasion to review the
12  Compensation Committee charter?
13     A. Yes.
14     Q. All right. And I think earlier you
15  testified that your current understanding is that
16  the Compensation Committee was empowered to make
17  officer grants without ratification by the board.
18  We referred to the Compensation Committee charter.
19  This is I believe the charter of KLA Tencor's
20  Compensation Committee. It's not that long.
21        Could you please review it and tell me
22  what section you're relying on in your understanding
23  of what you testified to that the Compensation
24  Committee could make a grant to officers without
25  approval of the board?

Page 197

1     A. Is this the charter that was in effect
2  in -- this is a meeting dated April '97. Is this
3  the charter that was in effect in 2000, the time
4  frame about which you're asking me?
5     Q. That's my understanding. And your
6  testimony is subject to that representation.
7     A. Okay.
8     Q. That's my understanding.
9     A. It would appear to me that paragraph 6
10  contains that authority.
11     Q. All right. And so paragraph 6
12  cross-references the 1982 stock option plan?
13     A. Yes.
14     Q. And it also refers to authority delegated
15  by the board of directors to grant stock options or
16  stock purchase rights to individuals eligible for
17  such grants, including grants to individuals subject
18  to section 16 of the Securities Exchange Act of
19  1934. That would be officers; correct?
20     A. Correct.
21     Q. All right. Is it your belief that that
22  authority is delegated by virtue of this paragraph
23  and requires no additional delegation? That
24  would -- would that be your interpretation of this
25  provision?

50 (Pages 194 to 197)

Nichols, Stuart J. Esq.                                                    1/27/2008

Page 198

1    A.  Yes.
2         MS. WEISS:  Now I'm going to jump ahead in
3    time to the time period just before the March 2001
4    memorandum that we referred to earlier.
5         (Off the record.)
6         MS. WEISS:  Okay.  I'm going to mark a
7    number of exhibits in connection with what we'll
8    call the March 2001 memo.  So if you'll just bear
9    with me.  I'll handle -- I'll hand them to you one
10   after another, and then I'll ask you a few
11   questions.
12        And we're now at Exhibit --
13        DEPOSITION REPORTER:  68.
14        MS. WEISS:  Okay.  68.
15        (Whereupon, Exhibit 68 was marked
16         for identification.)
17        MS. WEISS:  69; 70; 71; 72; 73; 74; 75;
18   76; 77; 78; 79; 80; 81.
19        (Whereupon, Exhibits 69, 70, 71, 72, 73,
20         74, 75, 76, 77, 78, 79, 80 and 81 were
21         marked for identification.)
22        MS. WEISS:  I think Exhibit 76 is the only
23   one I need for this group.  Did you already give me
24   that?  Thanks.
25        What's next, 82?  82.

Page 199

1         (Whereupon, Exhibit 82 was marked
2          for identification.)
3    BY MS. WEISS:
4         Q.  Okay.  So, Mr. Nichols, the court reporter
5    had handed you what's been marked as Exhibits 68
6    through 82.  Take a look at Exhibit 77.  Can you
7    identify that exhibit?
8         A.  Yes.
9         Q.  What is it?
10        A.  This is a memo that I prepared directed --
11   that I gave to Ken Schroeder.
12        Q.  The date on it is March 19th, 2001.  The
13   Bates stamp is KT ACWP-PRIV00002391 to 2394 -- I'm
14   sorry -- 95.  It's a memorandum marked "Privileged
15   and Confidential," addressed to Ken Schroeder from
16   Stu Nichols with copies to Maureen Lamb, John
17   Kispert and Joy Nyberg, "Re:  Stock Option Pricing."
18        Do you see that, sir?
19        A.  Yes.
20        Q.  You sent that to Mr. Schroeder on March
21   19th, 2001?
22        A.  Yes.
23        Q.  And you sent copies to Maureen Lamb, John
24   Kispert and Joy Nyberg as shown?
25        A.  Yes.

Page 200

1         Q.  And you sent a copy to Maureen Lamb with
2    the expectation that she would read it?
3         A.  Well, to all of them with that
4    expectation.
5         Q.  Okay.  And you sent it to Mr. Kispert with
6    the expectation that he would read it?
7         A.  Yes.
8         Q.  And you sent it to Joy Nyberg with the
9    expectation that she would read it?
10        A.  Yes.  Well, actually, let me clarify.  I
11   sent it to Ken Schroeder with the expectation that
12   he would read it.  I copied Maureen, John and Joy
13   because I wanted to -- them to know that I had
14   written it.  So I don't know that I can say that I
15   expected them to read it.  I mean, any time you're
16   copied on something, you know, you should.  But I
17   think my primary motivation was to just make them
18   aware of what I was communicating to Ken.
19        Q.  And the way that they would be aware of it
20   would be that they would read it; correct?
21        A.  Right.
22        Q.  All right.  Now, as I understand your
23   instruction from counsel, you're going to refuse to
24   testify with respect to this memorandum on the
25   grounds of attorney-client privilege.  Is that

Page 201

1    correct?
2         MS. HEINTZ:  That's correct.
3    BY MS. WEISS:
4         Q.  Okay.  And I think you've already
5    testified that you did not prepare the memorandum in
6    anticipation of litigation; correct?
7         A.  Correct.
8         Q.  And is it the company's position that it
9    will instruct Ms. Lamb, Mr. Kispert, Joy Nyberg and
10   Mr. Schroeder not to testify with respect to this
11   communication from the general counsel Stu Nichols?
12        MS. HEINTZ:  We're prepared to instruct
13   with respect to Mr. Nichols at this time.  We can
14   discuss other applications of the privilege after
15   the deposition.
16        MS. WEISS:  And so is it your statement
17   that you will not commit on the record at this time
18   as to whether or not you will instruct the people
19   that I mentioned that are addressees of this
20   memorandum not to testify?
21        MS. HEINTZ:  With respect to this
22   memorandum, we would instruct them not to testify.
23        MS. WEISS:  Okay.  So it is the company's
24   position that none of these people will be permitted
25   to testify with respect to Exhibit 77 should they be

Page 202

1    called as witnesses, including Mr. Schroeder?
2         MS. HEINTZ:  Yes.
3         MS. WEISS:  What number -- what was the
4    next number?
5         DEPOSITION REPORTER:  83.
6         (Whereupon, Exhibit 83 was marked
7         for identification.)
8    BY MS. WEISS:
9         Q.   Mr. Nichols, Exhibit 83 is a copy of the
10   complaint filed in the United States District Court
11   for the Northern District of California, San Jose
12   Division, by the Securities and Exchange Commission
13   as plaintiff against my client, Kenneth L.
14   Schroeder, on July -- I think it's 25th, 2007.
15        Please review as much of the complaint as
16   you need to to respond to my questions.  But I'm
17   going to direct your attention to paragraph 29 under
18   the heading "C., in a March 2001 memorandum
19   Schroeder receives legal advice that he cannot
20   retroactively set stock prices," paragraphs 29, 30,
21   31, 32 and 33.
22        MR. BELNICK:  This is not for the record.
23   But, Shirli, where was the paragraph that you read
24   that line from?
25        MS. WEISS:  It's the heading on page 7 in

Page 203

1    the middle of the page.
2         MR. BELNICK:  I see.  Okay.  Thanks.
3         (Discussion off the record between
4         Deponent and Counsel.)
5         MR. BELNICK:  Shirli, I'll ask if you want
6    or you may ask, but I think it would be helpful to
7    establish whether the witness has ever read this
8    complaint before today.
9         MS. WEISS:  Sure, I can ask that question.
10        MR. BELNICK:  You can ask it.
11   BY MS. WEISS:
12        Q.   Have you ever read this complaint before
13   today?
14        A.   No.
15        Q.   All right.  Have you had a chance to read
16   the paragraphs that I referenced?
17        A.   Yes.
18        Q.   All right.  Can you tell me, Mr. Nichols,
19   if you believe that the reference to paragraph 31
20   and 32 in this complaint is a reference to Exhibit
21   77?
22        A.   It appears to be a reference to that
23   exhibit, yes.
24        Q.   All right.  Thank you.
25        Take a look at Exhibit 78.  The lower part

Page 204

1    of Exhibit 78 is an email from Mr. Schroeder to you
2    dated March 22nd, 2001, which appears to be
3    responding to Exhibit 77.  Do you see that, sir?
4         A.   Uh-huh.  Yes.
5         Q.   Take a moment and tell me, if you can, if
6    you believe that the allegations in paragraph 33 are
7    a reference to Exhibit 78.
8         A.   Yes, it would appear so.
9         MS. WEISS:  Miss Heintz, is it the
10   company's position that it will instruct Mr. Nichols
11   not to testify with respect to Exhibit 78 on the
12   grounds of the attorney-client privilege?
13        MS. HEINTZ:  Yes.
14        MS. WEISS:  Is that the company's position
15   with respect to the individuals identified on
16   Exhibit 77?
17        MS. HEINTZ:  Well, they are not identified
18   as recipients of No. 78.
19        MS. WEISS:  Yes.  But to the extent that I
20   ask them questions about Mr. Schroeder's response,
21   would the company's position be the same?  That is
22   to say --
23        MS. HEINTZ:  To the extent they would
24   reveal attorney-client communications, yes.
25        MS. WEISS:  Would you permit them to

Page 205

1    respond to questions that did not involve reference
2    to Mr. Nichols' memo?
3         MS. HEINTZ:  We would have to determine
4    that on a case-by-case basis.
5         MS. WEISS:  But as to communications that
6    in any way touched upon Mr. Nichols' communication,
7    you would instruct them not to answer.  Is that your
8    position?
9         MS. HEINTZ:  If they are communications
10   with Mr. Nichols, yes.
11        MS. WEISS:  Only if they are
12   communications with Mr. Nichols?
13        MS. HEINTZ:  Or to the extent they are
14   about communications of Mr. Nichols.
15        MS. WEISS:  So if Mr. Kispert and
16   Mr. Schroeder had a conversation about Mr. Nichols'
17   memorandum, would you instruct those two
18   individuals not to respond -- not to answer my
19   questions based on the attorney-client privilege?
20        MS. HEINTZ:  We'd have to determine that
21   based on the question and the context.
22        MS. WEISS:  So it depends on how the
23   question is asked whether or not they could respond
24   to the question about Mr. Nichols --
25        MS. HEINTZ:  Or what the subject matter of

Nichols, Stuart J. Esq.                                          1/27/2008

Page 206

1  the question is.
2        MS. WEISS: I'm assuming that the subject
3  matter of the question is Mr. Nichols' memo. Take
4  that as the assumption. I'm just trying to shortcut
5  a bunch of depositions here.
6        MS. HEINTZ: I understand.
7        MS. WEISS: Would you instruct
8  Mr. Schroeder and Mr. Kispert not to respond if the
9  questions were posed about Mr. Nichols'
10  communications to Mr. Schroeder?
11        MS. HEINTZ: Yes.
12        MS. WEISS: And would that be your
13  position with respect to questions posed by the SEC
14  as well as Mr. Schroeder's counsel or only
15  Mr. Schroeder's counsel?
16        MS. HEINTZ: No with respect to both.
17        MS. WEISS: Okay. So if the SEC asks
18  questions of Mr. Nichols about Exhibit 77 and 78,
19  you would instruct him not to answer. Same thing
20  with all these other people that are cc'd on the
21  memorandum that is Exhibit 77; correct?
22        MS. HEINTZ: Yes.
23        MS. WEISS: Okay. So I propose that we
24  leave a blank in the record here for the listing of
25  each of these exhibits, and then I ask some group

Page 207

1  questions of Mr. Nichols to establish the assertion
2  of the privilege. Shall we do that?
3        MR. BELNICK: That sounds good to me.
4        MS. WEISS: I'll be happy to recite all
5  this stuff, but you might be asleep at the end of
6  it.
7        MR. BELNICK: Heaven forbid. I mean,
8  unless the SEC objects --
9        MR. FICKES: We don't.
10        MR. BELNICK: -- it sounds like --
11        MS. WEISS: You're okay with that? All
12  right. So we'll ask -- we'll identify them for the
13  court reporter.
14  BY MS. WEISS:
15        Q. But I'm going to ask you, Mr. Nichols, as
16  to each of the exhibits that I have identified,
17  numbers --
18        MR. BELNICK: 68 through --
19        MS. WEISS: -- 68 through 83 --
20        MR. FICKES: Do you mean the complaint?
21        MS. WEISS: 82. 68 through 82.
22        MR. BELNICK: Everything but the
23  complaint.
24        MS. WEISS: And, Miss Heintz, this is
25  probably more of a question for you. As to any

Page 208

1  question that I might pose to Mr. Nichols with
2  respect to these communications, other than
3  identifying himself as either a sender, a recipient
4  of these communications, would your instruction to
5  him be to not to respond to my questions based on
6  the attorney-client privilege?
7        MS. HEINTZ: Well, 68 -- Mr. Nichols is
8  not a recipient of the emails in Exhibit 68.
9        MS. WEISS: Okay. Let me just get that in
10  front of me here.
11        You are correct.
12        Would you -- well, that's a good point.
13  Let's look at Exhibit 68.
14  BY MS. WEISS:
15        Q. Exhibit 68 is an email from Mr. Coffey to
16  Joy Nyberg asking in the first sentence, "Joy, Ken
17  Schroeder sent me an email asking if the comp
18  committee meeting had been scheduled," and then it
19  goes on.
20        During the time period referred to in this
21  email, March of 2001, who normally set comp
22  committee meetings? Who normally arranged for a
23  comp committee meeting that had not been
24  prescheduled?
25        A. I believe that my assistant would do that.

Page 209

1        Q. All right. Do you recall during this time
2  period Mr. Schroeder asking that a comp committee
3  meeting be scheduled?
4        A. No.
5        Q. Okay. Ms. Nyberg responds, "I have not
6  tried to schedule a date as we were to get
7  confirmation from Stu regarding the pricing of the
8  extra supplemental grant for section 16 officers."
9  And she goes on.
10        Is there anything about her email back
11  that refreshes your recollection that in early March
12  of 2001, Mr. Schroeder requested that a comp
13  committee meeting be scheduled?
14        A. No.
15        Q. Okay. Exhibit 69. Did you send the email
16  dated March 13th, 2001 to Roger Stern with a copy to
17  Mr. DiMarco as represented by that exhibit?
18        A. It appears I did, yes.
19        Q. You have no reason to believe that you did
20  not?
21        A. That's correct.
22        Q. All right.
23        MS. HEINTZ: Wait a second. I don't have
24  a copy of 69.
25        MS. WEISS: We'll supply you with a copy.

53 (Pages 206 to 209)

Page 210

1          MR. BELNICK:  It's not a big point,
2  Shirli, but I just will point out that 69 is
3  addressed to both Stern and DiMarco as opposed to
4  just Stern with a copy to DiMarco.
5          MS. WEISS:  Yes.  Thank you.  You're
6  right.
7  BY MS. WEISS:
8      Q.  Okay.  Exhibit 70 is an email chain,
9  beginning with an email dated March 13th, 2001 from
10  Joy Nyberg to Stuart Nichols and Maureen Lamb --
11          MR. BELNICK:  You said it's from all three
12  of them.  I think you just wanted --
13          MS. WEISS:  I'm sorry.  From Joy Nyberg to
14  Stuart Nichols and Maureen Lamb.
15  BY MS. WEISS:
16      Q.  Is that right?
17      A.  Yes.
18          MR. FICKES:  Are you looking at the
19  original message?
20          MS. WEISS:  Let's start over.  The
21  original message is --
22          MR. BELNICK:  That's the one at the
23  bottom.  You go from the bottom up.
24          MR. FICKES:  Right.
25  BY MS. WEISS:

Page 211

1      Q.  The original message appears to be an
2  email from Stuart Nichols sent March 12th, 2001, to
3  Joy Nyberg and Maureen Lamb, with a response from
4  Joy Nyberg dated March 13th, 2001 to Stuart Nichols
5  and Maureen Lamb, and a further email from Stuart
6  Nichols to Maureen Lamb and Joy Nyberg dated March
7  13th, 2001.
8          MR. BELNICK:  In between is the one from
9  Lamb.
10          MS. WEISS:  You're right.  In between
11  there is one from Lamb dated March 13th, 2001
12  addressed to Joy Nyberg and Stuart Nichols.
13          MR. BELNICK:  Right.
14  BY MS. WEISS:
15      Q.  This email chain represented by Exhibit
16  70, do you have any reason to believe that you were
17  not the sender and recipient as shown on this email
18  string?
19      A.  No, I don't have any reason to believe
20  that I was not.
21          MR. BELNICK:  And for the clarity of your
22  record, Shirli, going up the message from
23  Miss Nyberg to Nichols and Lamb it says, "See my
24  comments below in red."  I think we can agree that
25  this exhibit as marked doesn't indicate any comments

Page 212

1  in red or any other color.
2          MS. WEISS:  Thank you for that
3  clarification.
4  BY MS. WEISS:
5      Q.  If you take a look at the second page of
6  Exhibit 70, there appears to be a notation under
7  "Stock Option Committee" which starts in
8  parentheses "(Stu)" and then a comment.  And then in
9  the next paragraph there is another notation in
10  parentheses that says "(Stu)" and then a sentence.
11          Do you have an understanding as you look
12  at this as to whose comments -- as to whether or not
13  those are comments by a person other than yourself?
14  Wait a minute.
15          Do you believe that those are comments by
16  a person on your message other than yourself?
17      A.  Yes.  I wouldn't use my own name to make
18  comments to myself.
19      Q.  Yes, one would hope.  It would be strange.
20  Do you think those are Miss Nyberg's comments?
21      A.  Yes, I do.
22      Q.  All right.  Okay.  Exhibit 71 is an email
23  from Bret DiMarco dated March 13th, 2001 to Stuart
24  J. Nichols and Roger Stern with an attachment.
25          Do you have any reason to believe that you

Page 213

1  did not receive Exhibit 71?
2      A.  No.
3      Q.  Exhibit 72 is an email from you to Joy
4  Nyberg dated March 14th, 2001, and there's an
5  attachment that is a draft -- what appears to be a
6  draft of Exhibit 77 dated March 14th, 2001.
7          Do you believe that you sent Exhibit 72?
8      A.  Yes.
9      Q.  Exhibit 73 is an email dated March 14th,
10  2001, from Roger Stern to Stuart Nichols with copies
11  to Bret DiMarco and Celina Lopez.
12          Do you have any reason to believe that you
13  did not receive Exhibit 73 from Mr. Stern?
14      A.  No.
15      Q.  Who is Celina Lopez?
16      A.  I haven't the foggiest idea.
17      Q.  Okay.  Exhibit 74.  The original message
18  on Exhibit 74 is an email from Bret DiMarco sent
19  Tuesday, March 13th, 2001, to Stuart Nichols and
20  Roger Stern, a response by you dated March 14th,
21  2001, to Bret DiMarco and Roger Stern, and a
22  response to that memo by Bret DiMarco dated March
23  14th, 2001, to you with an attached draft apparently
24  of Exhibit 77.
25          Do you have any reason to doubt that you

54 (Pages 210 to 213)

Nichols, Stuart J. Esq.                                               1/27/2008

Page 214

1   were a sender and recipient as shown on the various
2   emails in Exhibit 74?
3       A.  I have no reason to doubt that.
4       Q.  Exhibit 75 is an email chain -- by the
5   way, who is Monica Torres?  Is she just the person
6   who printed out these emails, do you think, or you
7   have no idea?
8       A.  I have no idea.
9       Q.  Okay.  Exhibit 75 is an email chain from
10  Roger Stern to Stuart Nichols.  It copies Bret
11  DiMarco and Celina Lopez, and a response dated March
12  14th, 2001, from Roger Stern to Stuart Nichols,
13  copied to DiMarco and Celina Lopez, and then a
14  response to that message dated March 14th, 2001,
15  from Bret DiMarco to Roger Stern and Stuart Nichols.
16      Do you have any reason to believe -- and
17  it has an attachment of a draft of Exhibit 77.
18      Do you have any reason to believe that you
19  were not a sender and recipient as shown on this
20  Exhibit 75?
21      A.  No, I have no reason to believe that.
22      Q.  Okay.  Exhibit 76 is an email chain from
23  Roger Stern dated March 14th, 2001, to Stuart
24  Nichols, copies to Bret DiMarco and Celina Lopez.
25  And there is a response from Celina Lopez dated

Page 215

1   March 14th, 2001, to Roger Stern and Stuart Nichols,
2   with a copy to Bret DiMarco.  And attached is an
3   edited version of Exhibit 77.
4       Do you have any reason to doubt that you
5   were a recipient as shown in this string of emails?
6       A.  No.
7       MR. BELNICK:  By the way, I think the top
8   of 76, Shirli, answers the mystery of who Celina
9   Lopez is.  She was the evening secretary apparently
10  at Wilson Sonsini.
11      MS. WEISS:  You are correct.
12  BY MS. WEISS:
13      Q.  Okay.  Exhibit 78 is an email from Stuart
14  Nichols dated March 22nd, 2001, to John Kispert, and
15  it forwards an email from Ken Schroeder dated March
16  22nd, 2001, to Stuart Nichols.  Do you see that,
17  sir?
18      A.  Yes.
19      Q.  And did you forward Mr. Schroeder's
20  response to Mr. Kispert to -- I'm sorry --
21  Schroeder's response to you to Mr. Kispert?
22      A.  It appears I did.
23      Q.  Okay.  And it also says "per my voice
24  mail."  And did you leave a voice mail with John
25  Kispert about the same subject matter?

Page 216

1       A.  Yeah.  Presumably I did.
2       Q.  You don't recall the -- you don't recall
3   doing that?
4       A.  No.
5       Q.  And can we conclude that if you sent
6   Mr. Kispert this message from Mr. Schroeder, you
7   expected him to read it?
8       A.  Yes.
9       Q.  Okay.  Exhibit 79 is an email chain.  It
10  starts with Mr. Schroeder's message to you dated
11  March 22nd, 2001, and it appears to be forwarded by
12  you to Roger Stern and Bret DiMarco.  Is that
13  correct, sir?  You forwarded Mr. Schroeder's message
14  to outside counsel Roger Stern and Bret DiMarco?
15      A.  Yes.
16      Q.  Exhibit 80 begins with Mr. Schroeder's
17  email to you of March 22nd, 2001, which is
18  apparently forwarded by you on March 22nd, 2001, to
19  Roger Stern and Bret DiMarco with a message, to
20  which Mr. Roger Stern responds on March 22nd, 2001,
21  to yourself and Mr. DiMarco.  Is that correct?
22      A.  Correct.
23      Q.  Exhibit 81 is -- starts with the email
24  from Mr. Schroeder that we've identified dated March
25  22nd, 2001.  It appears to have been forwarded by

Page 217

1   yourself to Maureen Lamb on March 22nd, 2001, with
2   the attached message, "Let me know if you have any
3   thoughts on this."  Is that correct?
4       A.  That's correct.
5       Q.  And you would have expected Miss Lamb to
6   read Mr. Schroeder's message; correct?
7       A.  Yes.
8       Q.  And then Exhibit 82 is an email chain that
9   starts with Mr. Schroeder's response to your email.
10  Mr. Schroeder's response os dated March 22nd, 2001.
11  You're forwarding Mr. Schroeder's email to Linda
12  Spitsen dated March 22nd, 2001.  That's your wife,
13  is it?
14      A.  That's correct.
15      Q.  And her response of the same day to you,
16  and then your response to her message later on that
17  day.
18      Do you have any reason to believe that --
19  to doubt that you were the sender and recipient as
20  shown on Exhibit 82?
21      A.  No.  If I may, there is another document
22  attached to mine that you haven't authenticated
23  separately.
24      MR. BELNICK:  2399.
25      THE WITNESS:  Yeah.

55 (Pages 214 to 217)

Nichols, Stuart J. Esq.                                    1/27/2008

Page 218

1      MS. WEISS:  Thank you.
2      MR. BELNICK:  DiMarco to Stern on top of
3   one -- on top of Stu's.
4   BY MS. WEISS:
5      Q.   Okay.  And so the attachment to Exhibit 82
6   looks like the message of Mr. Schroeder dated March
7   22nd, 2001, which was forwarded to Mr. Stern and
8   Mr. DiMarco.  There was a response by Bret DiMarco
9   dated March 22nd, 2001.
10     A.   To Roger Stern.  It didn't come to me.
11     Q.   To Roger Stern that did not come to you.
12  All right.  Very good.
13     MS. WEISS:  Okay.  Now, with respect to
14  all of those communications, Miss Heintz, is it the
15  company's position that it is instructing
16  Mr. Nichols not to respond to questions with respect
17  to all of these communications, Exhibits 68
18  through -- whatever that was -- 82 on the grounds of
19  the attorney-client privilege?
20     MS. HEINTZ:  69 through 82.
21     MS. WEISS:  Yes.
22     MS. HEINTZ:  69 through 82.  Yes.  Not 68.
23  That's the one he was not copied on.
24     MR. BELNICK:  That's Nyberg to Coffey.
25     MS. WEISS:  Okay.  And will it be the

Page 219

1   company's position that it will instruct all of the
2   senders and recipients that are shown on this
3   compilation of documents not to respond to my
4   questions about the contents?
5      MS. HEINTZ:  Yes.
6      MS. WEISS:  Okay.
7      While we're looking for another exhibit,
8   I'd like the company's and Mr. Nichols' stipulation
9   that all of the minutes -- that they will stipulate
10  to identifying all of the minutes that Mr. Nichols
11  appears to have signed rather than have him go
12  through each one.
13     MR. BELNICK:  Sure.
14     MS. WEISS:  Would that be acceptable to
15  the SEC and to the company and to --
16     MR. FICKES:  I'm not sure I understand.
17     MR. BELNICK:  I'm not sure what you mean.
18  I think it's probably acceptable, but I agree with
19  Mark.  I don't know what you want us to stipulate
20  to.  Is it an authentication stipulation?
21     MS. WEISS:  Yes.  That he prepared the
22  minutes and that he signed them and that he was
23  present at the meetings.
24     MR. BELNICK:  From my point of view, yes,
25  with confidence that if you saw a minute where the

Page 220

1   signature didn't look like all the others of Stu
2   Nichols that you would bring it to our attention.
3      MS. WEISS:  Well, I'm going to send them
4   to you.
5      MR. BELNICK:  Oh, fine.  Oh, sure.
6      MS. WEISS:  I mean, I just don't want to
7   waste time doing it here.
8      MR. BELNICK:  Oh, yeah, absolutely.
9   That's fine with me.
10     MS. WEISS:  Then you can tell me if for
11  some reason they don't look like his signature.
12     MR. BELNICK:  That's perfectly acceptable.
13  I appreciate that.
14     MS. WEISS:  Is that okay with you as well?
15     MR. FICKES:  That's agreeable with the
16  commission as well, yes.
17     MS. WEISS:  80?
18     DEPOSITION REPORTER:  84.
19     (Whereupon, Exhibit 84 was marked
20     for identification.)
21     MR. FICKES:  Actually, Shirli, before you
22  move on, Elena brought up something that I think is
23  worthwhile.  In regards to that stipulation, do we
24  want to do the same stipulation with the comp
25  committee meeting?

Page 221

1      MS. WEISS:  Yes.  Good point.  Good point.
2   Is that acceptable to you?
3      MR. FICKES:  That's acceptable to us.
4      MS. WEISS:  All right.  We'll do a
5   compilation and send them to you.
6      MR. BELNICK:  Acceptable to us as well.
7      MS. WEISS:  Send them off to everybody,
8   and hopefully we'll just stipulate that they were
9   signed by Mr. Nichols.
10  BY MS. WEISS:
11     Q.   Mr. Nichols, have you had an opportunity
12  to take a look at Exhibit 84?
13     A.   Yes, I have.
14     Q.   Can you identify Exhibit 84?
15     A.   Yes.  How would you like me to do that?
16     Q.   Let me ask you.  When is the first time
17  that you saw it?
18     A.   Sometime in the period between June and
19  August of '06.
20     MR. BELNICK:  Subsequent to the Wall
21  Street Journal article making allegations about
22  improper stock option activities at KLA; right?
23     THE WITNESS:  Yeah.  The Wall Street
24  Journal article was May 23rd of '06.
25  BY MS. WEISS:

Page 222

1   Q.   Were you conducting a search of the
2 company's records for documents related to the
3 company's internal investigation of its stock option
4 granting practices when you found this document?
5   A.   When someone at my direction found the
6 document. Yes, that's correct.
7   Q.   And that person brought it to you; is that
8 right?
9   A.   That's right.
10   Q.   And you turned the document over to
11 attorneys for the company?
12   A.   Yes.
13   Q.   And what is your --
14   A.   Well, and the special committee.
15   Q.   And what is your understanding as to where
16 the document is located?
17   A.   My understanding of where the document was
18 located was on a server, a network server that
19 contained files left behind by my predecessor, Lisa
20 Berry.
21   Q.   Okay. And who was the person who found
22 the document?
23   A.   He is a contract attorney that I hired for
24 the purposes of assisting in the investigation
25 efforts whose name I'm blanking on at the moment.

Page 223

1 But if you give me a minute, it will probably come
2 to me.
3   Q.   Okay. Do you remember the name of the
4 contract organization?
5   A.   Yes. Hudson Legal.
6   Q.   Hudson Legal?
7   A.   Yes.
8   Q.   Okay.
9       MS. WEISS: Are we going to be able to
10 enter into a stipulation as to the location of this
11 document in the company's records? Is that
12 something you want to --
13      MR. FICKES: Give us a second.
14      MS. WEISS: Why don't you think about
15 that? And that will be nice to save some time
16 there, too.
17      THE WITNESS: Predictably, the name of the
18 attorney has come to me. Andrew Middleton is his
19 name.
20 BY MS. WEISS:
21   Q.   Andrew Middleton?
22   A.   Andrew Middleton, M-i-d-d-l-e-t-o-n.
23   Q.   Okay. Thank you.
24      Other than with the company's attorneys
25 with the SEC as we've established and with your

Page 224

1 wife, have you discussed the matters that we've
2 generally addressed here today, stock option,
3 granting practices of KLA, the investigation, the
4 SEC lawsuit, with anyone else?
5   A.   No.
6   Q.   There's no family -- there are no family
7 members that you've had discussions with other than
8 your wife?
9   A.   Grant practices? No.
10   Q.   Lawsuit?
11   A.   The existence of this lawsuit?
12   Q.   Yes.
13   A.   Yes.
14   Q.   Who have you discussed it with?
15   A.   At a very high level I mentioned, for
16 example, to my team that I would be absent from work
17 preparing for it on Friday afternoon. I didn't
18 discuss the detail of it, just that I would be away
19 in connection with this.
20   Q.   Okay. And when you were hired by MIPS,
21 did the subject of KLA Tencor's investigation and
22 possible fallout from that investigation in terms of
23 investigations and what have you, was that discussed
24 with MIPS?
25   A.   Yes.

Page 225

1   Q.   And, in general, what was discussed with
2 them?
3   A.   Actually, most of the discussion was
4 really not with me directly. I was -- had a working
5 relationship with a lawyer from Davis Polk named
6 Bill Kelly, who is a member of the board of
7 directors of MIPS. And it is my understanding that
8 my boss, MIPS's CEO, had discussions with Mr. Kelly
9 regarding my situation.
10   Q.   Okay. But you did not have discussions at
11 MIPS about the situation?
12   A.   I don't -- no, I don't believe so.
13      MS. WEISS: Okay. All right. Why don't
14 we take a few minutes. I'll look through my exhibit
15 list and see --
16      MR. FICKES: Can you tell me again what
17 the stipulation was that you wanted on Exhibit 84?
18 Because I might be able to get an answer to you.
19      MS. WEISS: Okay. So what I had in mind
20 is that we would stipulate that the document was
21 located on Lisa Berry's -- or on a server that
22 captured Lisa Berry's communications or work
23 product.
24      MR. BELNICK: A company server as opposed,
25 for example, to a laptop of Lisa --

Page 226

1     MS. WEISS:  Well, that it's identified to
2  Lisa Berry, if you can --
3     MR. BELNICK:  You have her initials in the
4  lower left.
5     MR. FICKES:  That's fine with us.  We can
6  stipulate to that.
7     MS. WEISS:  Okay.  So if you give me a few
8  minutes, I'll take a look at my exhibit list and see
9  what else we need to mark.
10    MR. BELNICK:  I think you don't need to
11 mark anything else.
12    THE VIDEOGRAPHER:  Off the record.  The
13 time is 4:24 p.m.
14    (Off the record.)
15    THE VIDEOGRAPHER:  We are back on the
16 record.  The time is 4:38 p.m.
17 BY MS. WEISS:
18    Q.  Mr. Nichols, I've asked you a number of
19 questions that I believe are germane to
20 Mr. Schroeder's defense in this lawsuit.  And you
21 have been instructed not to respond to those
22 questions on the basis of privilege by counsel for
23 KLA Tencor, who holds the privilege.  And,
24 therefore, I'm not going to proceed further at this
25 time.  However, I'm going to leave the record open

Page 227

1  in order to assess our options with respect to the
2  instruction -- your instruction not to respond.
3     And so we are going to be requesting
4  another day of your deposition.  Also the
5  commission, I'm sure, will be asking you questions,
6  however that turns out.  And I will coordinate with
7  your counsel --
8     MR. BELNICK:  That's fine.
9     MS. WEISS:  -- for another day of
10 deposition.  I'll also send your counsel copies of
11 the minutes that I believe you signed so that we can
12 have a stipulation as to those issues.
13    MR. BELNICK:  Also acceptable.
14    MS. WEISS:  And I thank you very much for
15 coming today.  I know you have other things to do,
16 and we appreciate it.
17    THE WITNESS:  That you all for doing this
18 on a Sunday to accommodate my schedule.
19    MS. WEISS:  Certainly.
20    MR. FICKES:  And -- I'm sorry.  Just while
21 we're still on the record, you probably said this.
22 I just want to make sure we're all on the same page,
23 because of the timing and because the record will
24 remain open, that no one here is going to assert an
25 objection that the commission has waived its right

Page 228

1  to question the witness or to present the witness --
2     MR. BELNICK:  That's correct.  And I think
3  in fact Shirli mentioned that you may have questions
4  as well.
5     MR. FICKES:  Okay.
6     MR. BELNICK:  Certainly we're not going to
7  assert that objection on behalf of Mr. Nichols.
8     MS. WEISS:  All right.  We will adjourn
9  for today.
10    THE VIDEOGRAPHER:  Okay.  One moment,
11 please.  This is the end of videotape No. 3, volume
12 1, in the deposition of Stuart Nichols.  The
13 original videotapes will be retained by LiveNote
14 World Service.  Going off the record.  The time is
15 4:40 p.m.
16    (Whereupon, the deposition adjourned.)
17            --oOo--
18
19
20
21
22
23
24
25

Page 229

1            DECLARATION
2
3     I hereby declare under penalty of perjury that the
4  foregoing is my deposition under oath; that these are
5  the questions asked of me and my answers thereto; and
6  that I have read my deposition and have made the
7  corrections, additions, or changes to my answers that I
8  deem necessary.
9     In witness whereof, I hereby subscribe my name
10 this     day of              , 2007.
11
12
13
14
                    _____
15                   STUART NICHOLS
16
17
18
19
20
21
22
23
24
25

Nichols, Stuart J. Esq.                                                        1/27/2008

Page 230

```
 1          CERTIFICATE OF REPORTER
 2
 3       I, JANIS L. JENNINGS, a Certified Shorthand
 4  Reporter of the State of California, do hereby certify:
 5       That the foregoing proceedings were taken
 6  before me at the time and place herein set forth; that
 7  any witnesses in the foregoing proceedings, prior to
 8  testifying, were placed under oath; that a verbatim
 9  record of the proceedings was made by me using machine
10  shorthand which was thereafter transcribed under my
11  direction; further, that the foregoing is an accurate
12  transcription thereof.
13       I further certify that I am neither
14  financially interested in the action nor a relative or
15  employee of any attorney of any of the parties.
16       IN WITNESS WHEREOF, I have this date
17  subscribed my name.
18
19  Dated:  January 29, 2008.
20
21
                 JANIS JENNINGS
22               CSR NO. 3942
23
24
25
```

59 (Page 230)