# TAB 3

# TAB 3

# Legal Memorandum

Published by The Heritage Foundation

No. 19
November 6, 2006

## What We Have Here Is Failure to Cooperate: The Thompson Memorandum and Federal Prosecution of White-Collar Crime

*Brian W. Walsh*

In a criminal prosecution that America's legal and business communities have been watching closely, a federal court in Manhattan issued two rulings[1] this summer that shed light on questionable and apparently unconstitutional tactics that the U.S. Department of Justice has been using in its post-Enron, post-WorldCom offensive against "white-collar" financial crime. *United States v. Stein* involves the Justice Department's prosecution of former employees of the international accounting firm KPMG for their alleged wrongdoing in the firm's tax-shelter practice. The case's ramifications reach far beyond KPMG.

Coupled with hearings the House of Representatives held in March and the Senate held in September on closely related issues, the rulings by Judge Lewis Kaplan of the U.S. District Court for the Southern District of New York promise to spur much-needed reform of Justice Department policies and practices for investigating and prosecuting white-collar crime. Judge Kaplan concluded that the federal prosecutors violated the KPMG defendants' Fifth and Sixth Amendment rights. The prosecutors did this indirectly—i.e., by pressuring KPMG to exert professional and financial pressure on its employees to forgo their rights.

Neither these rulings nor the government conduct they exposed came as a shock to the many attorneys, business leaders, and professional and business associations that have been voicing their concerns and objections regarding what are widely considered to be abusive tactics by the Justice Department in its investigation and prosecution of white-collar crime.

### Talking Points

- A federal court in Manhattan ruled that Justice Department policies and practices for investigating alleged white-collar crime are unconstitutional. These policies and practices are undermining the traditional protections afforded to Americans by the attorney-client relationship.

- The Justice Department should restrict federal prosecutors' requests for waivers of attorney-client privilege to situations where the established crime-fraud exception exists and should maintain and report statistics on waivers of the privilege.

- When deciding whether to indict a business organization, federal prosecutors should not take into consideration whether the business has waived privileges or is paying employees' legal fees.

This paper, in its entirety, can be found at:
www.heritage.org/research/legalissues/lm19.cfm

Produced by the Center for Legal and Judicial Studies

Published by The Heritage Foundation
214 Massachusetts Avenue, NE
Washington, DC 20002-4999
(202) 546-4400 • heritage.org

Nothing written here is to be construed as necessarily reflecting the views of The Heritage Foundation or as an attempt to aid or hinder the passage of any bill before Congress.



No. 19 ———— Legal Memorandum ———— November 6, 2006

These concerns and objections have, however, received relatively little attention in the mainstream media, which generally reports nothing about white-collar crime other than news of federal prosecutors' regular successes in investigating, prosecuting, and convicting well-known businesses and their employees. The average American thus may be surprised to learn the details of the prosecutorial conduct, as described in Judge Kaplan's opinions, that apparently is authorized by Justice Department policies.

The *Stein* case provides compelling evidence that our federal justice system needs reform. Five specific reforms to the Department of Justice's prosecutorial policies and practices stand out. The Justice Department should:

1. Eliminate consideration of whether a business organization waived its rights to maintain the confidentiality of privileged attorney-client communications and attorney work product when determining whether the business should be indicted;

2. Accept, but never request, materials or information that is covered by the attorney-client privilege or attorney work-product protections;

3. Not seek production of materials and information for which a business has asserted a privilege or work-product objection in response to a valid subpoena or other request by the government unless the materials and information are not in fact entitled to protection because they are being used to perpetrate a crime or fraud;

4. Collect and regularly publish, at least until the above recommendations are implemented, statistics showing how often federal prosecutors request waivers, how often individuals and businesses agree to such requests, and how they waive privilege apart from any overt request; and

5. Eliminate any consideration of whether a business is paying employees' legal fees when determining whether the organization will be indicted.

## *STEIN* REVEALS PROSECUTORS' COERCIVE TACTICS

### KPMG at the Mercy of the Government

In *U.S. v. Stein*, twelve former KPMG employees are being prosecuted for their alleged wrongdoing in KPMG's provision of tax-shelter products and services. In order to avoid the potentially catastrophic effects that a federal indictment alone can have on a business, in August 2005 KPMG entered into a deferred prosecution agreement with the Justice Department that required KPMG to admit that tax fraud had been committed by the accounting firm itself.

Earlier this year, the defendants in the *Stein* prosecution made pre-trial motions asserting that their Fifth Amendment due-process rights and Sixth Amendment rights to counsel were violated by the Justice Department's written policies and federal prosecutors' conduct when investigating KPMG. Judge Kaplan agreed. The written opinions accompanying Judge Kaplan's two rulings provide an eye-opening account of the Justice Department's current practices in investigating and prosecuting white-collar crime.

The story begins well after the defendants' alleged misconduct. Once the IRS concluded its investigation of KPMG's tax-shelter practice and referred the case to the Justice Department for possible prosecution, federal prosecutors convened an initial meeting with attorneys from Skadden, Arps, Slate, Meagher & Flom, the law firm serving as KPMG's outside defense counsel. When KPMG learned of the IRS's criminal referral, it promptly concluded that a federal criminal indictment probably would destroy the firm, much as federal indictment alone had destroyed its former competitor Arthur Andersen.

Before indictment by the Justice Department for its alleged wrongdoing in the Enron scandal, Arthur Andersen was an 89-year-old accounting powerhouse with annual worldwide revenues of $9.3 billion and 28,000 employees. By the time the U.S. Supreme Court reversed Andersen's con-

---

1. *United States v. Stein*, No. S1 05 Crim. 0888, 2006 WL 2060430 (S.D.N.Y. July 25, 2006) [hereinafter Stein II]; *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. June 26, 2006) [hereinafter Stein I].



No. 19 — Legal Memorandum — November 6, 2006

viction, the firm had long since imploded and its partners and employees had dispersed. All that remained were relatively paltry assets upon which numerous litigants were making claims, most piggy-backing on Justice Department allegations of Enron-related wrongdoing. If they had any doubt before, every business leader and business attorney now knows that the mere decision to prosecute can destroy their company.

Federal prosecutors decide whether to prosecute a business such as KPMG or Arthur Andersen based in part on whether the organization cooperates fully with the government's investigation. Arthur Andersen thus stands as a powerful lesson to businesses on what can happen to them if they fail to persuade prosecutors that they have fully cooperated. This lesson has not been lost on firms being investigated by federal regulators and prosecutors.[2]

As Judge Kaplan noted, there can be little doubt that KPMG had taken to heart the fate of Arthur Andersen. At its first meeting with prosecutors, KPMG's outside counsel disclosed that the firm had decided to cooperate fully with the government in order to avoid indictment. The firm's counsel explained that KPMG had concluded that indictment would probably destroy it. KPMG's goal, he said, was to save itself, not to protect any of its employees.

KPMG had essentially thrown itself on the mercy of the prosecutors and would do anything necessary to avoid indictment. This should have been apparent to anyone in the meeting and should have caused the prosecution team to tread lightly to ensure that KPMG did not overstep the bounds of fairness or use its economic leverage over its employees in an improper manner.

Soon after the opening comments by KPMG's counsel, the lead prosecutor "asked" whether KPMG had any legal or contractual obligations to pay its employees' legal fees and what the firm's plans were in this regard. KPMG's counsel requested the prosecution team's perspective on whether the firm could pay legal fees. The supervising prosecutor's response was that the Justice Department's so-called Thompson Memorandum must be considered.

### The Justice Department's Thompson Memorandum

When deciding whether to prosecute a business organization, every federal prosecutor is required to assess the nine factors set forth in *Principles of Federal Prosecution of Business Organizations*,[3] a memorandum issued in January 2003 by then-Deputy Attorney General Larry Thompson. The Thompson Memorandum revised its predecessor, the Holder Memorandum,[4] primarily by making a federal prosecutor's assessment of the Holder Memorandum's factors mandatory rather than advisory. Prominent among the Thompson Memorandum's nine factors is number four, "*the corporation's* timely and voluntary disclosure and its *willingness to cooperate in the investigation of its agents*."[5] Most of what the Thompson Memorandum and Justice Department prosecutors deem to be cooperation is non-controversial. What has caused widespread concern, however, is the Thompson Memorandum's direction to prosecutors to consider (1) whether a business organization has declined to pay or advance attorney fees for its "culpable employees and agents"[6] and (2) whether the organization has waived its attorney-client privilege.[7]

---

2. See, e.g., Irwin M. Stelzer, *Protecting the Innocent: Even White-Collar Defendants Have Rights*, THE WEEKLY STANDARD, Aug. 21, 2006 ("[W]hen the mere threat of prosecution, combined with public castigation, can cause as much damage as conviction, innocent-until-proven-guilty becomes rather meaningless."), *available at* http://www.findarticles.com/p/articles/mi_m0RMQ/is_46_11/ai_n16690082.

3. *Principles of Federal Prosecution of Business Organizations*, Memorandum from Deputy Attorney General Larry D. Thompson to Heads of Department Components and U.S. Attorneys (Jan. 20, 2003), *available at* http://www.usdoj.gov/dag/cftf/corporate_guidelines.htm [hereinafter *Thompson Memorandum*].

4. *Federal Prosecution of Corporations*, Memorandum from Deputy Attorney General Eric Holder to the U.S. Attorneys' Offices (June 16, 1999) (on file with the Department of Justice).

5. *Thompson Memorandum*, *supra* note 3, § II.A.4 (emphasis added).


The Heritage Foundation

Even if no member of a prosecution team ever mentions either factor to a company, the mandatory nature of the Thompson Memorandum places great pressure on the company to take these two steps.[8] As the Thompson Memorandum itself emphasizes, a "prosecutor generally has wide latitude in determining when, whom, how, and even whether to prosecute."[9] A company and its counsel know that the prosecution team will go through each of the Memorandum's nine factors point by point. If a company has chosen not to comply with any one of the specific examples the Memorandum provides of proper cooperation, it will be glaringly apparent.[10] As KPMG's chief in-house counsel testified at a deposition, the firm's goal was "to be able to say at the right time with the right audience, we're in full compliance with the Thompson [Memorandum]."[11] Anything less may well have constituted legal malpractice.

Corporate counsel are well apprised of the Justice Department's attitude toward legal representation of executives and other employees whom prosecutors believe may be guilty. The language of the Thompson Memorandum assumes, before their trial or even their indictment, that those employees the government suspects of wrongdoing are in fact guilty of wrongdoing.

Another factor to be weighed by the prosecutor is *whether the corporation appears to be protecting its culpable employees and agents.* Thus, while cases will differ depending on the circumstances, *a corporation's promise of support to culpable employees and agents . . . through the advancing of attorneys fees . . . may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.*[12]

How a company is supposed to determine, before any trial or indictment, whether its employees are in fact culpable—i.e., guilty of wrongdoing—is a question Justice Department policies fail to answer.

Justice Department officials echoed this language in their statements for the House and Senate hearings.[13] As Judge Kaplan noted, Justice Department officials have in the past also been quoted by the media expressing skepticism that employees who know they have not acted with criminal intent need excellent legal representation.[14] No

---

6. *Id.* § VI.B ("[W]hile cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents . . . through the advancing of attorneys fees . . . may be considered by the prosecutor in weighing and evaluating the extent and value of a corporation's cooperation.")

7. *Id.* §§ II.A.4, VI.A, VI.B.

8. As one commentator recently noted: "The mandatory nature of the Thompson Memo is not lost on defense counsel, and the evidence in *Stein* illustrated this point." Stephanie A. Martz, *Report from the Front Lines: The Thompson Memo and the KPMG Tax Shelter Case*, WALL ST. LAW., Aug. 2006, at 5–6.

9. *Thompson Memorandum*, supra note 3, § II.B.

10. *See* Martz, *supra* note 8, at 6 ("In general, it cannot be gainsaid that if a company decides to ignore any individual factor set forth in the Thompson Memo, or any subset of factors, it does so at its own peril.").

11. Stein I, 435 F. Supp. 2d at 348 & n.78 (internal quotation marks omitted) (quoting deposition testimony of KPMG's chief legal officer, former U.S. District Judge Sven Erik Holmes).

12. *Thompson Memorandum*, supra note 3, § VI.B (emphasis added).

13. E.g., *The Thompson Memorandum's Effect on the Right to Counsel in Corporate Investigations: Hearing Before the Senate Comm. on the Judiciary*, 109th Cong. (forthcoming) [hereinafter *Senate Hearing*] (statement of Dep. Att'y Gen. Paul J. McNulty, U.S. Dep't of Justice, Sep. 12, 2006, at 10), *available at* http://judiciary.senate.gov/testimony.cfm?id=2054&wit_id=3986; *White Collar Enforcement (Part I): Attorney-Client Privilege and Corporate Waivers: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Sec. of the House Comm. on the Judiciary*, 109th Cong. 109-112 (2006) [hereinafter *House Hearing*] (statement of Assoc. Att'y Gen. Robert McCallum, U.S. Department of Justice) at 8, 9.

14. E.g., Stein I, 435 F. Supp. 2d at 338 n.13 (quoting Laurie P. Cohen, *In the Crossfire: Prosecutors' Tough New Tactics Turn Firms Against Employees*, WALL. ST. J., June 4, 2004, at A1).



responsible corporate counsel could fail to take such statements into account when contemplating whether the prosecution team might deem a company's payment of even a single employee's legal fees to be a "failure to cooperate."

**Prosecutors Increase the Pressure to Cooperate**

Set against this background, the supervising prosecutor's reference to the Thompson Memorandum at the parties' first meeting carried with it dire implications for KPMG's survival. Judge Kaplan's opinions indicate that none of the parties disputes that both KPMG counsel and the federal prosecutors attending the first meeting were well aware of the relevant Thompson Memorandum factors. KPMG's counsel could not have missed the import of the supervising prosecutor's comment regarding the Memorandum.

KPMG's counsel explained to the prosecutors that the firm normally paid its employees' legal fees but that it was still investigating whether it had a legal or contractual obligation to do so. Like most professional services organizations, KPMG had a long-standing practice of paying its employees' legal fees in full for actions taken as a part of their official duties. Neither KPMG's counsel nor the court could identify any exceptions to this practice. To the contrary, Judge Kaplan found that, prior to the current investigation, KPMG had always paid fees without limit. In one instance, KPMG had paid approximately $20 million to defend four of its partners during the course of a criminal investigation and civil charges by the Securities and Exchange Commission (SEC).[15]

Despite this policy, in the face of the pressure exerted by the Thompson Memorandum, KPMG's counsel promised the prosecutors at this first meeting that the firm would cut off payments for any employees who declined to cooperate, such as by invoking their constitutional right against self-incrimination.[16] KPMG's counsel then moved on to discuss the firm's internal investigation and efforts to dismiss those partners the firm felt were not being cooperative.

The moment KPMG's counsel made another comment about legal representation for KPMG's partners, the lead prosecutor shifted the discussion back to KPMG's payment of attorney fees. He requested that KPMG take steps to determine whether it had any legal or contractual obligation to pay legal fees for those employees who cooperated.

The supervising prosecutor followed up on the lead prosecutor's request with an ambiguous comment to the effect that misconduct should not or could not be rewarded and referred to "federal guidelines."[17] At the hearing before Judge Kaplan, this prosecutor testified that she intended the comment to allude to the possibility that KPMG might provide generous severance agreements to employees under suspicion or investigation. Judge Kaplan ultimately found that, whatever the supervising prosecutor's subjective intent might have been, everyone else in the room—KPMG representatives and prosecutors alike—interpreted her comment as suggesting that if the firm paid its employees' attorney fees, federal prosecutors might determine that the firm was not in compliance with the Thompson Memorandum's cooperation factor. As KPMG's counsel knew, the result of that determination would probably be indictment.

Whatever doubt could have existed about the meaning of the supervising prosecutor's comment was eliminated by the lead prosecutor's next statement. If KPMG determined that it was under no obligation to pay fees but did so anyway, he said, "[W]e'll look at that under a microscope."[18]

The prosecutors' comments and questions were not an off-hand inquiry into KPMG's plans to pay attorney fees but part of the prosecution team's overall strategy. Before this initial meeting, the

---

15. Id. at 340.
16. The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.
17. Stein I, 435 F. Supp. 2d at 342.
18. Id. at 344 & n.52.



prosecution team gathered to prepare, and it produced a document listing the issues the government intended to address with KPMG. Titled "Skadden Meeting Points," the document listed on its first page six questions that the prosecution team planned to ask KPMG's counsel regarding whether the firm intended to pay attorney fees.[19]

KPMG got the message. Despite the firm's unbroken practice of paying the full amount of its employees' attorney fees, KPMG's counsel unsurprisingly reported to the lead prosecutor soon after the first meeting that, in the firm's opinion, it had no legal obligation to do so. Counsel stated its concern, however, that not paying fees at all would cause the firm significant problems because of its long-standing practice to the contrary. For this reason, the firm had decided to cap the amount of fees it would pay for each employee and make payment conditional on the employee's full cooperation with the government's investigation.

Further, KPMG's counsel asked the federal prosecutors to inform KPMG immediately if any employee did not cooperate.[20] KPMG promised that the firm would notify any uncooperative employees that their attorney fees would be cut off completely and that they might face other employment consequences unless they cooperated fully.

Apparently, even this was not enough cooperation to satisfy the prosecution team. Displeased with the language and tone of KPMG's form letter encouraging employees to cooperate with the government investigation, prosecutors went so far as to draft their preferred language for the firm to use. The government's draft emphasized that employees were free to meet with government investigators "without the assistance of counsel."[21] KPMG used a version of this language in a follow-up document to its employees. The lead prosecutor also urged KPMG to encourage its employees to be "totally open"[22] with the prosecution team, even to the point of admitting criminal wrongdoing.

By contrast, the government apparently did not encourage KPMG to inform its employees that the firm's goals did not include protecting its employees or that KPMG and the government were, in effect, working as a team. In light of the prosecutors' expressions of displeasure over KPMG's initial form letter, the firm itself could not risk informing its employees of these important facts affecting their constitutional rights and other legal interests.

Thus was instituted a system whereby prosecutors would inform KPMG whenever an employee was not sufficiently cooperative, and KPMG would promptly inform that employee that the firm would cut off attorney fees and possibly fire him unless he immediately began to cooperate fully. Judge Kaplan found several instances in which KPMG employees altered their course after the firm stated that it would cut off their attorney fees, strongly implied that it would fire them, or both. When recalcitrant witnesses whom the government reported to KPMG suddenly began to cooperate, prosecutors could not have failed to notice that the system was working.

The court concluded that through this system the government violated the defendants' Fifth and Sixth Amendment rights.[23] After a second hearing on these issues, the court suppressed statements two defendants had provided to the government[24] only after KPMG had threatened to cut off their legal fees and terminate their employment for their failure to cooperate.

**A Telling Admission**

The Justice Department's actions after the rulings by Judge Kaplan strongly suggest that the Department is not disturbed by the conduct of its prosecutors and that this conduct was not an iso-

---

19. *Id.* at 341.
20. *Id.* at 347.
21. *Id.* at 346.
22. *Id.* at 345 (internal quotation marks omitted).
23. *Id.* at 382.
24. Stein II, No. S1 05 Crim. 0888, 2006 WL 2060430, at *17.



lated occurrence. A few days after the first *Stein* ruling, the Justice Department sent Judge Kaplan a brief letter that speaks volumes. The media focused on the letter's request that, in order to protect the individual prosecutors' professional reputations, Judge Kaplan remove their names from his opinion.[25] But the first sentence of the letter's second paragraph is more telling. It states:

> The Government appreciates the Court's acknowledgement that *the prosecutors' conduct in this case was in accordance with established Department of Justice policy* that had never before been addressed by a court.[26]

The Justice Department's policies and practices for investigating white-collar crime have run off course. Given the immense pressure placed upon the Department by the media, Capitol Hill, and the White House to come up with more white-collar prosecutions and convictions of corporate executives, its decision to streamline its policies and practices in order to obtain deferred prosecution agreements, guilty pleas, and convictions may be understandable. But that does not justify its conduct.

## A WIDESPREAD PROBLEM

The violation of the former KPMG employees' constitutional rights is part of a larger problem and not an isolated incident. The extensive efforts of a broad array of organizations to redress the coercive effects of the Thompson Memorandum's policies and procedures illustrate this. This loose coalition spans the political spectrum and includes the American Bar Association (ABA), American Civil Liberties Union (ACLU), Association of Corporate Counsel, Business Roundtable, National Association of Criminal Defense Lawyers, and U.S. Chamber of Commerce. The ABA, for example, formed a task force on the attorney-client privilege in response to its members' concern over the Department of Justice's increasing use of privilege waivers and denials of attorney fee payments as tools in its white-collar law enforcement efforts. As a result of the task force's efforts, the ABA adopted a resolution stating that waiver of attorney-client privilege should not be taken into account when determining whether to prosecute a company. In May 2006, the ABA submitted a reworked version of the Thompson Memorandum to Attorney General Alberto Gonzales.[27] The ABA's recommended revisions would eliminate consideration of whether a company waived its attorney-client privilege and whether it paid its employees' attorney fees when Justice Department prosecutors are determining whether the company should be indicted.

Members of the coalition have recommended to the U.S. Sentencing Commission that the U.S. Sentencing Guidelines not take waiver of attorney-client privilege into consideration when determining for sentencing purposes whether a business organization cooperated with the government. In August 2005, several former high-ranking Justice Department officials joined in a letter supporting this position, including former U.S. Attorneys General who served under Presidents Jimmy Carter, Ronald Reagan, George H.W. Bush, and Bill Clinton.[28] The Sentencing Commission voted unanimously in May 2006 to recommend that all language regarding the waiver of the attorney-client privilege and work-product protections be dropped from the relevant section of the U.S. Sentencing Guidelines,[29] which apply to all federal criminal cases. Because Congress has not rejected

---

25. *See, e.g.*, Laurie P. Cohen, *U.S. Asks Judge to Strike Statements in KPMG Case*, WALL ST. J., July 6, 2006, at C3.

26. Letter from U.S. Attorney Michael J. Garcia to U.S. District Judge Lewis A. Kaplan 1 (June 30, 2006) (emphasis added), *available at* http://online.wsj.com/public/resources/documents/kpmg-20060630-letter.pdf.

27. Letter from Am. Bar Ass'n President Michael S. Greco to Attorney General Alberto Gonzales (May 2, 2006), *available at* http://www.abanet.org/poladv/acprivgonz5206.pdf.

28. Letter from Former Justice Department Officials to Hon. Richard J. Hinojosa, Chairman, U.S. Sentencing Commission (Aug. 15, 2005), *available at* http://www.acca.com/public/policy/attyclient/doj.pdf.

29. Notice of Submission to Congress of Amendments to the Sentencing Guidelines Effective Nov. 1, 2006, U.S. Sentencing Comm'n, 71 Fed. Reg. 28063-01, 28073 (proposed May 15, 2006).



or modified the Commission's recommendation, it took effect as of November 1, 2006.

Despite this achievement, companies and their employees continue to face federal criminal investigations and prosecutions in the midst of a "culture of waiver." This culture has been identified and partially quantified by surveys of attorneys conducted by the coalition and headed by the Association of Corporate Counsel (ACC) and National Association of Criminal Defense Lawyers (NACDL). Approximately 75 percent of respondents agreed that a culture of waiver exists "in which governmental agencies believe it is reasonable and appropriate for them to expect a company under investigation to broadly waive [its] attorney-client privilege."[30]

The Justice Department has criticized such surveys. Deputy Attorney General Paul McNulty, for example, asserted before the Senate Judiciary Committee last month that "no critic has produced any empirical data demonstrating that prosecutors are routinely requesting, let alone coercing[,] waivers."[31]

This criticism is misplaced. The burden of proving the frequency or infrequency of waivers should be on the government. The Justice Department is the only entity that can produce definitive empirical data. Only the Department has access to the actual numbers that can demonstrate how frequently federal prosecutors request privilege waivers and how frequently companies waive privileges, either upon government request or "voluntarily." Yet the Justice Department has been unwilling to collect and publish these statistics.

## WHY SHOULD AMERICANS CARE?

### Payment of Attorney Fees

Not long after Judge Kaplan's first ruling in *Stein* in June, an attorney posted a comment in response to a discussion of *Stein* on the *Wall Street Journal's* weblog on legal issues. The attorney expressed doubt whether the rights of the *Stein* defendants were really worth protecting:

> These defendants not only had counsel, but very good [counsel]. . . . [Judge] Kaplan is biased in favor of the rich defendants and "their lawyers." If we are to give corporate wrongdoers such special treatment, I think it should come from the legislature.[32]

Such doubt about whether Americans should care about the constitutional rights of white-collar criminal defendants is not uncommon.

Judge Kaplan addresses this doubt by showing that what happened in the KPMG investigation has troubling, widespread implications for more Americans than just "rich defendants." It has become an important principle of American working life that "an employer often must reimburse an employee for legal expenses when the employee is sued, or even charged with a crime, as a result of doing his or her job."[33] While acknowledging that this principle is "not of constitutional dimension," Judge Kaplan points out that employees in the highest and lowest positions in companies of all sizes depend on their employers to provide for their legal defense if they inadvertently run afoul of the law in the course of their duties. Both the overnight delivery service driver who hits a bicyclist who swerved in front of his truck and the high school guidance counselor who provided regular counsel and advice to a teenager who ends up committing suicide expect their employers to pay for a good lawyer to defend them when these bad things happen at work.[34]

Second, the cost of defending against most white-collar criminal charges is far greater than the cost of defending against the typical traffic accident or even medical malpractice case. White-collar criminal cases usually involve tens of thousands,

---

30. *House Hearing, supra* note 13, app. (*The Decline of the Attorney-Client Privilege in the Corporate Context: Survey Results*) at 69, 71–72.
31. *Senate Hearing, supra* note 13 (statement of Dep. Att'y Gen. Paul J. McNulty, at 10).
32. Law Blog, *Wachtell Lipton on the KPMG Decision* (June 30, 2006), *at* http://blogs.wsj.com/law/2006/06/30/wachtell-lipton-on-the-kpmg-decision/#comment-5323.
33. Stein I, 435 F. Supp. 2d at 335.



hundreds of thousands, or even millions of documents, all of which must be sorted and sifted, then reviewed and reviewed again, to determine whether the suspects actually committed a crime. By June 2006, the government's case against the twelve KPMG defendants involved 335 witness deposition transcripts, 195 income tax returns, and approximately 5 to 6 *million* pages of documents.[35] This is the equivalent of approximately 3,000 boxes of documents that defense attorneys, paralegals, and other legal assistants must categorize, index, and review in fine detail. Only a select few of these documents will be presented at trial (which, after his two rulings this summer, Judge Kaplan postponed until January 2007), but the defense must be intimately familiar with all of them in order to anticipate which the prosecution might use to persuade the jury that the accused is guilty.

Although the most prominent white-collar criminal prosecutions involve the top executives of major corporations, for every prosecution of a high-ranking executive, several lower-level employees are typically alleged to have been involved in related criminal conduct.[36] CEOs and other top executives of the Fortune 500 may be wealthy, but annual salaries plummet dramatically a step or two down the corporate ladder. A director or mid-level manager in New York or San Francisco may earn $100,000 to $150,000 per year, but that is not nearly enough to fund a competent defense in a complex white-collar prosecution.

An innocent employee who cannot pay for his own defense has almost no viable options. Few if any public defenders are expert at defending against complex white-collar criminal charges. An employee cannot capably represent himself against a team of federal prosecutors and FBI or SEC investigators whose job it is to present the most compelling case possible that the defendant is guilty. Without a capable defense, there cannot be a fair trial. Regardless of guilt or innocence, the employee would be vulnerable to receiving the harshest sentence available under the law. Rather than exercise his Sixth Amendment right to a trial and face this risk, an employee will almost certainly plead guilty in an attempt to negotiate a less onerous sentence.

Finally, the Justice Department's assumption—as expressed in the Thompson Memorandum's cooperation factor—that a company's decision to pay for its employees' legal defense implies that the company is uncooperative is inconsistent with the position the Department itself has taken when one of its own has been the subject of criminal investigation and prosecution. As one commentator pointed out almost a decade ago, the Justice Department began paying attorney fees for FBI Agent Lon Horiuchi when he faced congressional hearings in 1995 and started defending against a wrongful death and civil rights suit in connection with the shooting death of the wife of suspected white supremacist Randy Weaver at Ruby Ridge.[37] Soon after the State of Idaho indicted Horiuchi for the shooting, the Jus-

---

34. Judge Kaplan framed it well:

   This . . . principle is not the stuff of television and movie drama. It does not remotely approach *Miranda* warnings in popular culture. But it is very much a part of American life. Persons in jobs big and small, private and public, rely on it every day. Bus drivers sued for accidents, cops sued for allegedly wrongful arrests, nurses named in malpractice cases, news reporters sued in libel cases, and corporate chieftains embroiled in securities litigation generally have similar rights to have their employers pay their legal expenses if they are sued as a result of their doing their jobs. *This right is as much a part of the bargain between employer and employee as salary or wages.*

   *Id.* (emphasis added).

35. Stein I, 425 F. Supp. 2d at 371 n.205.

36. *See, e.g.*, *House Hearing*, *supra* note 13 (statement of Assoc. Att'y Gen. Robert McCallum, U.S. Department of Justice), at 9. The Justice Department conviction statistics cited by McCallum show that of the over 900 corporate fraud convictions the Department secured from July 2002 through December 2005, less than 35 percent involved CEOs, presidents, vice presidents, and similar executives.



tice Department announced that it would "continue to pay for his legal representation."[38] As the commentator argued, the Department should not be faulted for this decision.

> This decision by the Department of Justice is absolutely appropriate. Agent Horiuchi apparently was acting in the course of his official duties, as part of a hostage rescue team. No reason exists why he should be forced into bankruptcy, or a reluctant guilty plea, as a result of the Idaho state prosecution of his actions as part of that team. He, like all defendants, is entitled to a fair trial and to competent legal representation at that trial.[39]

Similarly, federal prosecutors should realize that a business organization can cooperate with law enforcement efforts while fulfilling all of its legal and ethical obligations to pay attorney fees for employees who are under investigation or indicted but not yet convicted. As Judge Kaplan observed, "There is no necessary inconsistency between an entity cooperating with the government and, at the same time, paying defense costs of individual employees and former employees."[40] When considering the fairness of the Thompson Memorandum's policies, the Justice Department should take to heart its own policy decision to pay for the legal defense of Agent Horiuchi.

### Attorney-Client Privilege

In order for our criminal justice system to function properly, those who have important information that is relevant to criminal investigations or prosecutions must be required to disclose it to law enforcement officials.[41] Privileges, on the other hand, operate to protect some relevant information from disclosure. Why, then, should the average American be concerned if the Justice Department routinely subjects companies suspected of white-collar crimes to great pressure to waive their attorney-client privilege? This is no arcane legal question but one that cuts to the heart of America's legal system.

Privileges such as the attorney-client privilege play a vital role by protecting and promoting important societal values. Anglo-American society has for at least four centuries[42] concluded that the attorney-client privilege encourages and facilitates law-abiding conduct by granting individuals a safe-haven for any discussions they may want to have with their attorneys about whether a current or proposed course of conduct is indeed legal. Further, much beneficial and law-abiding conduct will needlessly be avoided if such discussions cannot be held without individuals fearing that the information they disclose could be used against them by law enforcement. This is termed the "instrumentalist" justification for privileges.

No one denies how *useful* it is to prosecutors to have access to all of a criminal suspect's confidential communications with his attorney. It is far less difficult and far more efficient to secure a conviction if all of the most damaging facts have been located, organized, and even summarized by the defendant's attorney or his company's attorney.[43] Justice Department officials themselves often assert this usefulness as a justification for requesting or expecting waiver.[44]

---

37. John T. Boese, *Attorney's Fees: DOJ Announces Intent to Pay Attorney's Fees of FBI Agent Indicted by State in Ruby Ridge Slaying*, FRAUDMAIL ALERT (Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C.), Sep. 12, 1997, *available at* http://www.ffhsj.com/wcc/frdarch/fm970912.htm.

38. Press Release No. 97-342, "Regarding Charges Filed Against Lon Horiuchi," U.S. Department of Justice (Aug. 21, 1997), *available at* http://www.usdoj.gov/opa/pr/1997/August97/342crm.htm.

39. Boese, *supra* note 37.

40. Stein I, 435 F. Supp. 2d at 364.

41. *See* Branzburg v. Hayes, 408 U.S. 665, 688 (1972) (recognizing the "longstanding principle that the public . . . has a right to every man's evidence except for those persons protected by a constitutional, common-law, or statutory privilege" (internal quotation marks omitted)).

42. *See* Berd v. Lovelace, 21 Eng. Rep. 33 (Ch. 1577); *Dennis v. Codrington*, 21 Eng. Rep. 53 (Ch. 1580).


The Heritage Foundation

Nevertheless, uncovering every last fact in the search for the truth and obtaining criminal convictions quickly and efficiently are not the only objectives of America's justice system, and they do not necessarily embody its preeminent values.[45] The American justice system places a premium on protecting the rights of the accused and providing justice and fairness at all stages of criminal proceedings, from initial investigation to indictment and from trial and sentencing to parole decisions. Accordingly, the balance in the American justice system is weighted in favor of ensuring that the innocent are not wrongly condemned rather than ensuring that the guilty do not go free.

Such values are firmly established in the Constitution. For example, the Bill of Rights' inclusion of the right against self-incrimination demonstrates that America's legal system is willing to forgo large swaths of important evidence, thereby jeopardizing convictions, to protect defendants against unjust conviction. The Fifth Amendment right against self-incrimination is an absolute privilege. It protects a criminal suspect or defendant from having to speak to anyone at all about the circumstances surrounding a crime, his whereabouts at the time it was committed, or anything else that a law enforcement official may want to learn. The Fifth Amendment thus stands as a substantial impediment to obtaining the truth regardless of how likely or obvious it may seem that a suspect is guilty. This is one of the choices the American people have made to protect the innocent from unjust conviction.

The attorney-client privilege is far less of a hindrance to criminal investigation and prosecution. Unlike the Fifth Amendment right against self-incrimination, the attorney-client privilege does not shield criminal suspects or defendants from being required to disclose whatever relevant *facts* they may know,[46] even if those facts were learned during confidential attorney-client communications. Further, the Fifth Amendment protects suspects' rights against self-incrimination even if they are engaged in an ongoing criminal enterprise. By contrast, the well-established crime-fraud exception to the attorney-client privilege allows government investigators and prosecutors access to confidential attorney-client communications when attorneys or their clients are using the attorney-client relationship to carry on a criminal enterprise, plan future criminal conduct, or perpetrate a fraud upon the court or others.

Of vital importance, when an American finds himself subject to a criminal investigation or prosecution, his attorney may be the only person in whom he can fully confide. Even if innocent, anything he says to his co-workers, lifelong friends, or

---

43. *Cf.* John Gibeaut, *A Matter of Opinion: Speakers Debate Whether Deferred Prosecution Agreements Help Corporations*, A.B.A. J., Oct. 2006, at 58, 58 ("Defense lawyers say privilege waivers enable the government to gather evidence against individual employees—including their statements to internal company investigators—without worrying about things like Fifth Amendment rights against self-incrimination.").

44. *See, e.g.*, Thompson Memorandum, *supra* note 3, § VI.B ("[W]aivers permit the government to obtain statements of possible witnesses, subjects, and targets, without having to negotiate individual cooperation or immunity agreements. In addition, they are often critical in enabling the government to evaluate the completeness of a corporation's voluntary disclosure and cooperation. Prosecutors may, therefore, request a waiver in appropriate circumstances."); Senate Hearing, *supra* note 13 (statement of Dep. Att'y Gen. Paul J. McNulty, at 6) (explaining that a company's privilege waiver can provide prosecutors "access to the results of an internal investigation [which] would obviously assist the government in conducting a more streamlined inquiry").

45. "By protecting relationships and values outside the courtroom, privileges demonstrate that even though the search for truth is of critical importance in the litigation process, it is not necessarily paramount to all other interests of society." Christopher B. Mueller & Laird C. Kirkpatrick, EVIDENCE § 5.1, at 330 (1995).

46. *Upjohn Co. v. U.S.*, 449 U.S. 383, 395 (1981) ("The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney . . . ."); *U.S. v. Cunningham*, 672 F.2d 1064, 1073 n.8 (2d Cir. 1982) ("The privilege attaches not to the information but to the communication of the information. Thus, [the client] may be examined as to any fact but may not, absent a waiver, be compelled to say whether or not he communicated that fact to his counsel.").



parents can and often will be used against him. When presented to a jury by a skillful prosecutor, an innocent man's statement to his friend that he *is afraid he might be found guilty* becomes damning evidence that he *is in fact guilty*. The attorney-client privilege thus permits an employee under investigation or indictment to bare his soul and provide his attorney evidence that might help him fight the criminal charges as well as evidence that makes him appear guilty and must therefore be countered.

## DUTY TO DO JUSTICE, NOT MERELY TO CONVICT

The Justice Department should be careful to choose the proper yardstick to measure its success, but does not appear to do so. Justice Department officials led off their statements for both the House hearing in March and the Senate hearing in September by listing the disconcertingly large number of corporate presidents and executive officers the Department has convicted since 2002—as well as the much larger number of corporate fraud convictions the Department has obtained of employees at all levels. The Department recently released its annual statistical report,[47] which purportedly illustrates its effectiveness at investigating and prosecuting white-collar crimes. The Department's conviction rate in white-collar criminal cases is astronomical. Even as the number of cases opened shrinks, the number of convictions grows. Nevertheless, the Department may be relying too heavily on conviction rates to define its success. The Department's ultimate aim—justice itself—cannot of course be gauged by statistics alone.

Before serving as a justice of the U.S. Supreme Court and chief prosecutor in the Nuremberg Nazi war-crimes trials, Robert Jackson served as the Attorney General of the United States. In April 1940, Attorney General Jackson addressed a gathering of all U.S. Attorneys, the chief federal prosecutors. His topic was the proper role and professional philosophy of a federal prosecutor, and he began by considering the awesome power a prosecutor holds: "The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous."[48] Jackson went on to address the ethical choices a prosecutor must make in order to be a great prosecutor rather than merely a "successful" prosecutor:

> Your positions are of such independence and importance that while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just. Although the government technically loses its case, it has really won if justice has been done. The lawyer in public office is justified in seeking to leave behind him a good record. But he must remember that his most alert and severe, but just, judges will be the members of his own profession, and that lawyers rest their good opinion of each other not merely on results accomplished but on the quality of the performance.[49]

No one should doubt the dedication to professional excellence and integrity of Justice Department prosecutors. Contrary to some mischaracterizations, they are almost uniformly concerned about the constitutional rights of the persons whom they investigate or prosecute. Nevertheless, it takes more than dedication to resist the siren song of focusing on securing convictions in the criminal cases that are receiving the most attention from the media, the Congress, and the public. Prosecutors must withstand the temptation to eliminate or bypass impediments to successful prosecutions, including the

---

47. U.S. Department of Justice, *United States Attorneys' Annual Statistical Report, Fiscal Year 2005*, available at http://www.usdoj.gov/usao/reading_room/reports/asr2005/05statrpt.pdf.

48. Robert H. Jackson, The Federal Prosecutor, Address Before the United States Attorneys (Apr. 1, 1940), in 31 J. CRIM. L. & CRIMINOLOGY 3 (1940), available at http://www.robertjackson.org/Man/theman2-7-6-1/.

49. *Id.*; see also *Berger v. U.S.*, 295 U.S. 78, 88 (1935) (Sutherland, J.) ("The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.").



attorney-client privilege and employer-funded legal defenses, where those impediments implicate important constitutional values or the American people's fundamental notions of fairness. To take the easier course is to exalt efficiency over justice—to the ultimate detriment of all those whom the Department seeks to serve.

## RECOMMENDATIONS FOR REFORM

A subcommittee of the House Judiciary Committee held a hearing on the policies and tactics of the Thompson Memorandum in March, and the Senate Judiciary Committee held its own hearing in September. These are good first steps toward accomplishing what should be Congress's initial goals in redressing the Thompson Memorandum's improper effects: publicly exploring the Justice Department's tactics, highlighting possible abuses, and calling the Department—including specific officials, if necessary—to account for using tactics that take unfair advantage of employees and violate their constitutional rights by leveraging business organizations' extreme fear of indictment. Despite how politically popular white-collar investigations and convictions may be, the public needs to be apprised of the great potential for abuse and error. Millions of Americans who work for firms involved in interstate commerce are vulnerable to these threats, and Members of Congress have a role to play in changing the law if the Justice Department will not change its own policies and practices, particularly those expressed by the Thompson Memorandum.

The Justice Department's current policies and practices for investigating and prosecuting white-collar crime fail to take into adequate account the principle that the government cannot, and should not, do indirectly what it is forbidden to do directly.[50] The Thompson Memorandum should be amended to eliminate any reference to the waiver of attorney-client privilege or work-product protections in the context of determining whether to indict a business organization. Similarly, all of the Memorandum's references to a company's payment of its employees' legal fees should be eliminated. Justice traditionally has been best served when all parties to criminal litigation are well represented by experienced, diligent counsel. Any policy that undermines such representation should be considered with suspicion. If government action is involved, as the *Stein* case illustrates, such conduct may well violate fundamental Fifth and Sixth Amendment rights.

In the meantime, the Justice Department should create and publish specific and uniform national policies and procedures governing waiver requests. All requests for waiver by federal prosecutors and regulators should require approval by Justice Department officials at the national level. Only published national procedures and national oversight can ensure that the waiver request process is uniform, predictable, and transparent.

To promote the responsible use of waiver requests, as well as to counter the "culture of waiver," the Justice Department should collect and publish statistics on how often waiver is requested, how often business organizations agree to such requests, and how often organizations waive even apart from any request from prosecutors.

If the Department's policies and practices do not change, employers should be required to provide all employees a written *Miranda*-like warning explaining that anything they say to an attorney for the company can and generally will be used against them if they ever are indicted as part of company wrongdoing. Employees must be fully informed that their employers are highly likely to waive any attorney-client privilege if the company becomes the subject of a government investigation. As Judge Kaplan's opinions make clear, employees' Fifth and Sixth Amendment rights cannot be adequately protected without such warnings.

---

50. *Cf. Rutan v. Republican Party of Ill.*, 497 U.S. 62, 77–78 (1990) ("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government 'to produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." (internal citation omitted)).



Finally, some amount of reform may be imposed by the justice system itself. Individual defendants should be emboldened by Judge Kaplan's decisions.[51] Judge Kaplan suggested that the former KPMG employees could have moved to suppress on the basis of KPMG's coercive actions and the language of the Thompson Memorandum alone. Defendants should rely on Judge Kaplan's thorough and well-reasoned opinions to persuade other courts to engage in discovery and hold evidentiary hearings on the Justice Department's coercive tactics. Similar constitutional violations may turn up.

—*Brian W. Walsh is Senior Legal Research Fellow in the Center for Legal and Judicial Studies at The Heritage Foundation.*

---

51. Members of the white-collar defense bar should also keep in mind the standard recommended by the court in *Stein* for proving a violation of employees' Fifth Amendment rights. The court concluded "that an individual claiming that a statement was compelled in violation of the Fifth Amendment must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt the same way." Stein II, No. S1 05 Crim. 0888, 2006 WL 2060430, at *9.

