# TAB 9

# TAB 9

0091-4169/06/9602-0621
THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY
Copyright © 2006 by Northwestern University School of Law

Vol. 96, No. 2
Printed in U.S.A.

# THE DECLINE OF THE ATTORNEY-CLIENT PRIVILEGE IN THE CORPORATE SETTING

## WILLIAM R. MCLUCAS, HOWARD M. SHAPIRO
## & JULIE J. SONG[*]

Beginning in 2001, the American corporate landscape experienced the first of numerous scandals involving accounting irregularities, financial fraud, and other instances of misconduct. In response, law enforcement officials began an intensive effort to root out corporate fraud and to restore public confidence in our capital markets.[1]    That effort—and the accompanying demands by law enforcement agencies that the corporations involved waive their attorney-client privilege—is itself beginning to raise profound issues for how corporations conduct business.

There are several issues to be considered as we evaluate the government's recent heightened level of aggression in seeking privilege waivers. First, over the last several years, cooperation with government investigations—more often than not measured by whether the corporation has waived its attorney-client privilege—has become increasingly critical as law enforcement agencies have sought to restore public confidence in our capital markets.[2]    Second, internal investigations conducted by corporate

---

[*] Mr. McLucas and Mr. Shapiro are partners at Wilmer Cutler Pickering Hale and Dorr LLP. Mr. McLucas co-chairs WilmerHale's securities department and is former Director of Enforcement of the U.S. Securities and Exchange Commission. Mr. Shapiro co-chairs the firm's litigation department and is former General Counsel of the Federal Bureau of Investigation and a former Assistant United States Attorney for the Southern District of New York. Ms. Song is an associate in the firm's securities department.

[1] *See generally* William R. McLucas & Paul R. Eckert, *Sarbanes Oxley and the SEC's Enforcement Program, in* THE PRACTITIONER'S GUIDE TO THE SARBANES-OXLEY ACT VII-2-1–3 (John J. Huber et al. eds., 2004) (providing background on the enactment of the Sarbanes-Oxley Act).

[2] *See infra* notes 37–56 and accompanying text; Marc B. Dorfman, *Top 10 Securities and Exchange Commission Enforcement Developments of 2004,* 37 SECURITIES REGULATIONS & L. DAILY (BNA) 469 (2005) ("The SEC's punishment of companies for failing to cooperate is the Number One SEC enforcement development in 2004."); George Terwilliger III, *GCs and Business Managers Play Crucial Role in Responding to Business Crimes Investigations,*

counsel—the results of which are often demanded by the government in exchange for "credit" for cooperation—now have particular significance.[3] In the context of governmental demands for waiver of the attorney-client privilege, these internal investigations often turn companies against the very executives and employees who are paid to act in the company's best interests. As such, the process itself demands more careful evaluation than has, to date, been brought to bear.

The current trend has, at a minimum, eroded our traditional adversarial process and skewed the balance of power between government investigators and their corporate targets. Over time, this process may well drive a wedge between the corporate entity and the executives and employees the company relies upon for the shareholders' benefit, even when these individuals have done nothing wrong. It forces corporate managers to think first of their own liability and not the broader good of the enterprise that should be—and once was—at the core of their professional lives.

As we discuss below, the use of internal investigations by companies and their boards of directors and cooperation by corporations with the government are not new concepts. Beginning with the U.S. Securities and Exchange Commission's ("SEC" or the "Commission") "voluntary disclosure program" in the 1970s and continuing through the 1990s with several high-profile criminal inquiries, internal investigations and cooperation—often without demands for waiver of the attorney-client privilege—have played an important role in resolving securities enforcement and criminal inquiries. Recent corporate scandals, however, have led to an upset of this historical pattern, and instead, demands for privilege waiver are now commonplace.

To be sure, in looking at the investor carnage from the collection of recent accounting scandals, there are likely benefits from the government's aggressive enforcement approach that we, as yet, cannot fully appreciate. Improvements in corporate governance and aggressive activism by board members in ensuring better accounting, better disclosure, and overall good corporate citizenship, are already observable, at least anecdotally. However, far broader questions about the impact of this new order remain very much open to debate. What is the long term impact on the behavior of executives and employees who believe that in their daily service for the company, their personal behavior and interests are, in most instances, aligned with that of the company? What will be the effect on Board

---

NAT'L L.J., Aug. 15, 2005, at 13 (observing on the three-year anniversary of the Sarbanes-Oxley Act that "[f]ailure to cooperate can harden prosecutors' attitudes significantly and render a bad situation even worse").

[3] *See infra* notes 57–58 and accompanying text.

members who, after the settlements of the private actions in Enron and WorldCom, are now of necessity focused on their personal liability as well as on their fiduciary duties? And what, if anything, can be done about the enormous leverage of the government in requiring such inquiries and waivers as the price of avoiding criminal indictment and/or demands in governmental civil proceedings that are franchise threatening? How reasoned and consistent is the government's approach? At what level in the government are these decisions being evaluated? Have the broader implications of this dramatic change in our adversarial system been examined? We do not believe that we have yet seen the long-term consequences for a corporation when, at the suggestion of any unlawfulness, the government says, "Investigate yourself and report to us, no privilege, no tactics, no reservations, and trust us, we will do the right thing."

The issues raised by the broader use of internal investigations by public companies and the current policy of the Department of Justice ("DOJ" or the "Department") and the SEC regarding waiver of attorney-client privilege may well have profound consequences for the every day functioning of a corporation. Indeed, there is some risk that management of the corporate enterprise may well suffer as a consequence. We normally expect that company executives act in the company's and shareholders' best interests. Now we have to be concerned that those whom shareholders have entrusted with management are, at the first hint of wrongdoing and inquiry, sufficiently focused on and distracted by their own personal risk or liability rather than the broader interests of the company, that these broad-based waiver demands may well adversely affect the way companies behave.

As background, we briefly review the historical context of cooperation by corporations, the current enforcement and regulatory landscape, the attorney-client privilege and its applicability to corporations, and the government's position on cooperation. We then assess internal investigations and the implications for the relationship between corporations and their executives and employees. We will discuss how the current culture, in which the attorney-client privilege is waived in the context of internal investigations, may create particularly acute problems within a public company. Finally, we articulate our concerns over whether this process and its impact on the loyalties of executives and employees will soon change the way those executives and employees behave as fiduciaries of the corporate enterprise.

## I.  EVOLUTION OF INTERNAL INVESTIGATIONS AND POLICIES REGARDING COOPERATION WITH THE GOVERNMENT

### A.  HISTORICAL CONTEXT

We should begin with some perspective.   The use of internal investigations by public companies and their boards of directors, and cooperation by corporations with government regulators, are not new concepts.   In the 1970s, the SEC announced its "voluntary disclosure program"[4] concerning the suspected widespread practice of public companies maintaining "off the books" slush funds, which were used to make payments both abroad and domestically for political purposes and to influence counter-parties, intermediaries, and government officials in business transactions.   The results were stunning: Hundreds of U.S corporations came forward with disclosures about the existence of such funds and the use of these "off the books" accounts to facilitate all manner of questionable payments.[5]   The consequence was passage of the Foreign Corrupt Practices Act in December 1977.[6]   The statute remains an integral part of the federal securities laws.  It outlawed foreign bribery, required that greater accountability and internal controls be maintained by public companies over their assets, and, in theory, became a critical tool of the accounting profession and the SEC in ensuring that public companies maintain sound internal controls and accurate books and records.   The voluntary disclosure program's approach to self-policing, remediation, and cooperation became a part of the SEC's enforcement arsenal over the years and, in numerous cases, was an effective tool for addressing a variety of problems in corporate America.[7]

---

[4] *See* U.S. SECURITIES & EXCHANGE COMM'N, 94TH CONG., REPORT ON QUESTIONABLE AND ILLEGAL CORPORATE PAYMENTS AND PRACTICES 10–13 (Comm. Print 1976) [hereinafter REPORT OF THE SECURITIES AND EXCHANGE COMMISSION]; *Hearing Before the Subcomm. on Int'l Economic Policy of the S. Comm. on Int'l Relations*, 94th Cong. (1975) (Statement of Philip A. Loomis, SEC Commissioner).

[5] *See* REPORT OF THE SECURITIES AND EXCHANGE COMMISSION, *supra* note 4, at 1.

[6] Foreign Corrupt Practices Act of 1977, Pub. L. No. 95-213, 91 Stat. 1494, *amended by* Title V of the Omnibus Trade & Competitiveness Act of 1988; Pub. L. No. 100-418, §§ 5001–03, 102 Stat. 1415, *codified as amended at* 15 U.S.C. §§ 78m(b)(2), 78m(b)(3), 78dd-1, 78dd-2, 78ff (2000 & Supp. 2005), *amended by* the Int'l Antibribery and Fair Competition Act of 1998, Pub. L. No. 105-366m 112 Stat. 3302.

[7] *See* William R. McLucas et al., *Common Sense, Flexibility, and Enforcement of the Federal Securities Laws*, 51 BUS. LAW. 1221, 1225 (1996) ("While the Commission promised no immunity from follow-up scrutiny or prosecution, those companies participating in the program were promised fair consideration by the agency as to whether further action would be taken.  The clear implication was that cooperation would be rewarded."); DANIEL M. HAWKE, ROUNDTABLE ON ENFORCEMENT: A BRIEF HISTORY OF THE

Even prior to the corporate scandals of the past five years or so, a similar approach to cooperation was employed by the DOJ in a number of high profile corporate criminal inquiries.[8] These precedents, along with the Thompson Memorandum,[9] established the broad outlines under which such inquiries and the process of seeking credit from the Department for cooperation would be measured.

At the SEC, even before the Enron debacle and the passage of the Sarbanes-Oxley Act,[10] then-Chairman Harvey Pitt (who, as an attorney in private practice, had previously been quite effective in advocating the use of such internal inquiries as an alternative to the standard SEC investigation) pushed to formalize the critical considerations surrounding this process by way of a formal SEC pronouncement. In 2001 the SEC formalized the key elements of cooperation in its *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions* in the

---

SEC'S ENFORCEMENT PROGRAM 1934–1981, at 26 (SEC Historical Society Oral Histories Committee 2002) (stating that the voluntary disclosure program "shifted the burden of law enforcement from government to industry . . . [w]rongdoers of every stripe, but especially those at the country's largest corporations, were invited to admit their sins voluntarily in the SEC's public filing room—or else face the commission's wrath").

[8] *See, e.g.*, United States v. Salomon Bros. Inc., 57 Fed. Reg. 29,743 (July 6, 1992). In the Salomon Brothers case, the company allegedly submitted false and unauthorized bids in violation of federal law and entered into unlawful agreements in violation of the Sherman Act. *See id.* at 29,744–45. Although the company paid $290 million to settle civil charges, the DOJ did not pursue criminal prosecution because the company, among other things, conducted an internal investigation, replaced top management, and cooperated with government investigators. *See* Press Release, U.S. Dep't of Justice, *Department of Justice and SEC Enter $290 Million Settlement with Salomon Brothers in Treasury Securities Case* (May 20, 1992), *available at* http://www.usdoj.gov/atr/public/press_releases/1992/211182.htm. Similarly, in a case against Bankers Trust Corporation involving alleged inappropriate diversions of unclaimed customer funds and related false banking entries, the Department declined to pursue the most serious criminal charges (although the company did plead guilty and was required to pay over $60 million) when the bank self-reported the misconduct, undertook an internal investigation, and cooperated with government investigators. *See Did Bankers Trust Alter the Rules?*, N.Y. L.J., CORP. COUNS., Nov. 20, 2000, at S4 (citing Press Release, U.S. Attorney's Office, S. Dist. of N.Y. (Mar. 11, 1999); Bankers Trust Statement on Settlement with U.S. Attorney (Mar. 12, 1999)); *see also generally* Lawrence J. Zweifach, *Internal Corporate Investigations*, 905 PRACTICING L. INST. 531, 543 (1995) ("Some companies have been able to avoid being the target of a criminal prosecution by fully disclosing all wrongdoing to the government."); Paula J. Desio, *The Regulatory Environment and the Organizational Sentencing Guidelines*, 1120 PRACTICING L. INST. 301, 308 (1999) (reviewing the Antitrust Division of the Department of Justice's corporate leniency policy).

[9] *See infra* notes 43–51 and accompanying text.

[10] Sarbanes-Oxley Act, Pub. L. No. 107-204, § 116 Stat. 745 (2002).

Seaboard matter (the "Seaboard Report").[11] Since the Seaboard Report, Enron, WorldCom, Adelphia, Tyco, HealthSouth, and a litany of other such headline-grabbing corporate scandals have dramatically escalated the frequency and stakes associated with such inquiries at corporations. These scandals have taken the once-episodic notions of an internal inquiry, cooperation, and privilege waiver, to an everyday feature of the law enforcement process.[12]

## B. CURRENT ENFORCEMENT LANDSCAPE

In the aftermath of Enron and WorldCom, securities enforcement and white collar criminal investigations have taken on renewed life.[13] The President himself helped articulate the government's corporate crime policy when he announced, in March 2002, a "Ten Point Plan to Improve Corporate Responsibility and Protect America's Shareholders."[14] Shortly thereafter, in July 2002, Congress passed the Sarbanes-Oxley Act and thus introduced the most dramatic changes to the law enforcement and regulatory landscape since the Securities Exchange Act of 1934.

Among other things, Sarbanes-Oxley provided new regulatory and remedial powers to the SEC. For example, the statute authorizes the SEC to seek forfeiture of certain bonuses and profits,[15] officer and director bars and penalties,[16] temporary asset freezes,[17] and the barring of individuals from the securities industry based on state regulatory proceedings.[18] Sarbanes-Oxley also granted the SEC, in administrative proceedings and civil actions seeking the payment of disgorgement and civil penalties, the authority to establish victim restitution funds so that those payments can be directed

---

[11] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 and Commission Statement on the Relationship of Cooperation to Agency Enforcement Decisions, Exchange Act Release No. 34-44969 [2001–2003 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 74,985 (Oct. 23, 2001), *available at* http://www.sec.gov/litigation/investreport/34-44969.htm; *see also infra* notes 38–42 and accompanying text.

[12] *See infra* notes 57–58 and accompanying text.

[13] *See* Joseph Nocera, *For All Its Cost, Sarbanes Law is Working*, N.Y. TIMES, Dec. 3, 2005, at C1 ("[A]fter WorldCom, in an instant everything changed. Everyone in Washington wanted to do something—anything—to show they were cracking down on corporate fraud").

[14] *See* President's Ten-Point Plan to Improve Corporate Responsibility and Protect America's Shareholders, *available at* http://www.whitehouse.gov/infocus/corporateresponsibility/index2.html (last visited April 5, 2006).

[15] *See* 15 U.S.C. § 7243 (2000 & Supp. 2005).

[16] *See* 15 U.S.C. §§ 78u(d)(2), 77t(e).

[17] 15 U.S.C. § 78u-3(c).

[18] *See id.* § 78o.

back to injured shareholders.[19]  Finally, Sarbanes-Oxley created several new criminal offenses and increased the maximum penalties for already existing securities-related crimes.[20]

Equipped with new authority under Sarbanes-Oxley, as well as record-high budgetary appropriations levels, the SEC's Enforcement Division has reached historic levels of activity in the years since Enron.[21]  Between FY 2001 and FY 2004, the SEC increased its enforcement activity by 32%.[22]  Not only have the numbers of enforcement actions increased, but so, too, have the penalties accompanying those actions.[23]  In FY 2002, the SEC imposed its first $10 million penalty against a public corporation; over the next two years, the SEC imposed sixty penalties of that amount or more.[24]

---

[19] *See id.* § 7246.

[20] *See, e.g.,* 18 U.S.C. § 1341 (2000 & Supp. 2 2003) (increasing imprisonment for mail and wire fraud from five to twenty years); 29 U.S.C. § 1131 (2000 & Supp. 2 2003) (increasing imprisonment for ERISA violations from one to ten years and increasing fines from $100,000 to $500,000); 15 U.S.C. § 78ff(a) (for violations of the Securities Exchange Act, increasing imprisonment for individuals from ten years to twenty years, and increasing fines from $1 million to $5 million for individuals and from $2.5 million to $25 million for corporations).

[21] In FY 2002, the SEC was appropriated $438 million for its annual budget.  *See* Harvey L. Pitt, SEC Chairman, Testimony Before the Subcomm. on Commerce, Justice, State, and the Judiciary, of the Committee on Appropriations, U.S. House of Representatives (Apr. 17, 2002), *available at* http://www.sec.gov/news/testimony/041702tshlp.htm.  In FY 2003, 2004, and 2005, the SEC's budget jumped to $716 million, $811 million, and $913 million, respectively.  *See* William H. Donaldson, SEC Chairman, Testimony Before the Subcomm. on Commerce, Justice, State, and the Judiciary, of the Committee on Appropriations, U.S. Senate (Apr. 8, 2003), *available at* http://www.sec.gov/news/testimony/040803tswhd.htm; William H. Donaldson, SEC Chairman, Testimony Before the Subcommittee on Science, State, Justice and Commerce and Related Agencies, of the Committee on Appropriations (Mar. 11, 2005), *available at* http://www.sec.gov/news/testimony/ts031105whd.htm.  Since 2002, the SEC has hired more than 840 new positions.  *See* Donaldson, *supra* (Mar. 11, 2005).

[22] The SEC initiated 484, 598, 678, and 639 enforcement actions in FY 2001, 2002, 2003, and 2004, respectively.    *See* SEC ANN. REP. 2 (2002), *available at* http://www.sec.gov/pdf/annrep02/ar02full.pdf; SEC ANN. REP. 17 (2003), *available at* http://www.sec.gov/pdf/annrep03/ar03enforce.pdf; SEC ANN. REP. 2 (2004), *available at* http://www.sec.gov/about/secpar/secpar04stats.pdf.

[23] *See* William H. Donaldson, SEC Chairman, Testimony Concerning the Impact of the Sarbanes-Oxley Act Before the House Committee on Financial Services (Apr. 21, 2005), *available at* http://www.sec.gov/news/testimony/ts042105whd.htm.  Since enactment of Sarbanes-Oxley, the SEC has authorized recovery in over 100 cases with a total value of $5.2 billion in disgorgement and penalties under the FAIR Funds provision of the Act.  *See id.*  The FAIR Funds provision authorizes the SEC to establish funds for the benefit of victims.  *See* 15 U.S.C. § 7246.

[24] *See* Rachel McTague, *Goldschmid Defends SEC's Approach to Enforcement, Level of Money Penalties,* 37 SEC. REG. L. REP. (BNA) 451 (2005).  The SEC has imposed enormous penalties in the years since Enron, including a $750 million penalty against WorldCom, $250

It is unclear whether the use of penalties against corporations by the SEC will subside. In January 2006, the Commission announced a long-awaited policy regarding the imposition of penalties against corporations in SEC actions.[25] Specifically, the Commission stated that determining the appropriateness of penalties on corporations turns on two primary considerations: (1) "[t]he presence or absence of a direct benefit to the corporation as a result of the violation . . . [and (2) the] degree to which the penalty will recompense or further harm the injured shareholders."[26] The Commission also will consider a host of other factors, including the extent of the corporation's cooperation with law enforcement agencies.[27]

As noted above, federal criminal authorities also have dramatically increased their attention to financial fraud.[28] In July 2002, the President established the Corporate Fraud Task Force (the "Task Force") comprised of a DOJ group focused on corporate fraud efforts within the Department, as well as an interagency working group focused on maximizing cooperation across the law enforcement agencies.[29] The Task Force's second annual report noted that since its inception, it had obtained over 500 corporate fraud convictions or guilty pleas, an increase of 250 over the previous year, and had charged over 900 defendants and 60 corporate CEOs

---

million penalty against Qwest, $100 million penalty against Bristol-Myers Squibb Company, and $100 million penalty against Alliance Capital. *See* Stephen M. Cutler, Director, SEC Division of Enforcement, *Remarks to the Second Annual General Counsel Roundtable: Tone at the Top: Getting it Right* (Dec. 3, 2004), *available at* http://www.sec.gov/news/speech/spch120304smc.htm.

[25] *See* Statement of the U.S. Securities and Exchange Comm'n Concerning Financial Penalties (Jan. 4, 2006), *available at* http://www.sec.gov/news/press/2006-4.htm [hereinafter SEC Financial Penalties Statement]; *see also* SEC Sues McAfee, Inc. for Accounting Fraud, Litig. Rel. No. 19520 (Jan. 4, 2006), *available at* http://www.sec.gov/litigation/litreleases/lr19520.htm; *In re* Applix. Inc., Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Securities Act Release No. 8651, Exchange Act Release No. 53049 (Jan. 4, 2006), *available at* http://www.sec.gov/litigation/admin/33-8651.pdf.

[26] *See* SEC Financial Penalties Statement, *supra* note 25.

[27] *Id.* Other factors to be taken under consideration include the deterrent effect of the penalty, the injury suffered by innocent parties, the pervasiveness of participation in the offense by individuals throughout the corporation, the level of the wrongdoers' intent, the difficulty of detection of the wrongdoing, and remedial steps taken by the corporation. *See id.*

[28] In addition, other federal and state authorities have begun focusing on corporate fraud. *See* William R. McLucas et al., *An Overview of SEC Enforcement, Remedial, and Settlement Powers Before and After the Sarbanes-Oxley Act*, 1396 PLI/CORP. 1111, 1113 (2003).

[29] *See* Exec. Order No. 13271 (July 9, 2002), *available at* http://www.usdoj.gov/dag/cftf/execorder.htm.

and presidents with some type of crime involving corporate fraud.[30]  Much
of this increase in prosecution of criminal activity was attributed to a
corresponding increase in SEC investigations.[31]

## C. ATTORNEY-CLIENT PRIVILEGE

Against this backdrop, the attorney-client privilege—one of the oldest
common law testimonial privileges—has come under increasing
challenge.[32]  The underlying purpose of the privilege, of course, is to allow
clients to receive the most competent legal advice from fully informed
counsel.[33]  It is a privilege held by the client, and only the client may waive

---

[30] *See* U.S. DEP'T OF JUSTICE, SECOND YEAR REPORT TO THE PRESIDENT – CORPORATE
FRAUD TASK FORCE, at iii (2004), *available at* http://www.usdoj.gov/dag/cftf/
2nd_yr_fraud_report.pdf.

[31] In 2002, SEC investigations resulted in nearly 260 criminal filings by thirty U.S.
Attorneys' Offices. *See* Greg Farrell, *New York No Longer Has Dibs on Securities Fraud*,
USA TODAY, July 2, 2003, at 1B.

[32] *See* Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998); *see also, e.g.*, Lance
Cole, *Revoking Our Privileges: Federal Law Enforcement's Multi-Front Assault on the
Attorney-Client Privilege (and Why It Is Misguided)*, 48 VILL. L. REV. 469 (2003)
(summarizing recent attacks on the privilege by federal law enforcement officers); GEORGE J.
TERWILLIGER III & DARRYL S. LEW, FEDERALIST SOC., PRIVILEGE IN PERIL: CORPORATE
COOPERATION IN THE NEW ERA OF GOVERNMENT INVESTIGATIONS (forthcoming 2006) (on
file with authors) (reviewing federal court treatment of limited waiver agreements and
consequences of uncertain judicial treatment of such agreements).

In September 2004, the American Bar Association ("ABA") established an ABA Task
Force on the Attorney-Client Privilege to examine current developments in the areas of
attorney-client privilege and the work product doctrine.  On August 9, 2005, the ABA Task
Force adopted a resolution stating that, "the American Bar Association opposes policies,
practices and procedures of governmental bodies that have the effect of eroding the attorney-
client privilege and work product doctrine . . . [and] the routine practice by government
officials of seeking to obtain a waiver of the attorney-client privilege or work product
doctrine through the granting or denial of any benefit or advantage."  Resolution Adopted by
the House of Delegates of the Am. Bar Ass'n (Aug. 9, 2005), *available at*
http://www.abanet.org/buslaw/attorneyclient/materials/hod/recommendation_adopted.pdf.

[33] *See In re* Colton, 201 F. Supp. 13, 15 (S.D.N.Y. 1961), *aff'd*, 306 F.2d 633 (2d Cir.
1962), *cert. denied*, 371 U.S. 951 (1963) (basis of the privilege is "to encourage clients to
make the fullest disclosures to their attorneys, to enable the latter properly to advise the
clients"); United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358 (D. Mass. 1950)
("To induce *clients* to make [free and honest] communications, the privilege to prevent their
later disclosure is said by courts and commentators to be a necessity.") (emphasis added).

it.[34] Courts have long held that the attorney-client privilege applies to corporations.[35]

## D. SEC AND DOJ POLICIES REGARDING COOPERATION

Despite the strong historical foundations of the attorney-client privilege, its application has recently come under attack in the securities and white collar criminal enforcement context.[36] Specifically, the SEC and DOJ alike have announced policies for evaluating a company's cooperation in determining whether to bring civil enforcement and criminal actions against companies, as well as what sanctions to seek—and often that cooperation is measured by whether the corporation has waived its attorney-client privilege.[37]

---

[34] *See In re* Grand Jury Proceedings, 73 F.R.D. 647, 652 (M.D. Fla. 1977) ("The privilege . . . belongs to the client, not the attorney; and an attorney can neither invoke nor waive the privilege if his client desires the contrary.").

[35] *See* Upjohn Co. v. United States, 449 U.S. 383, 390 (1981) (citing United States v. Louisville & Nashville R.R. Co., 236 U.S. 318, 336 (1915)). In *Upjohn Co.*, the Supreme Court rejected the government's argument that the corporation's privilege protected only communications with the company's "control group," i.e., those who had the power to control the corporation's response to the legal advice it received. *See id.* at 390. Instead, the Court held that the attorney-client privilege extends to protect communications between all corporate employees and corporate counsel when the communications are made for the purposes of assisting with an internal investigation. *Id.* at 394. The Court stressed that this rule served the purposes of the privilege by allowing corporate counsel to have all the relevant information "to enable him to give sound and informed advice." *Id.* at 390.

[36] The defense bar has reacted mightily to the perceived erosion of the attorney-client privilege. For example, a broad and diverse coalition of private associations—including the U.S. Chamber of Commerce, the National Chamber Foundation, ABA, the American Civil Liberties Union, Association of Corporate Counsel ("ACC"), and National Association of Criminal Defense Lawyers ("NACDL")—have joined forces to campaign against the recent erosions of the privilege due to federal government demands for waiver. *See Speakers Mull Fixes for Perceived Erosion of Corporations' Attorney-Client Privilege*, 74 U.S.L.W. (BNA) 2294 (2005).

The NACDL and the ACC recently conducted studies of outside and in-house counsel to determine the credibility of the claim that the attorney-client privilege is under attack. Responses from outside counsel showed that 48% believed there had been an erosion of the attorney-client privilege and work product doctrine since Enron; 87% believed the privilege recently has been challenged (25% of the time by federal prosecutors); 96% agreed that the attorney-client privilege and work product doctrine serve important purposes in facilitating their work as company counsel; and 95% agreed that the weakening of the privilege "chills a client's frank discussion of legal issues." *See* NAT'L ASS'N OF CRIMINAL DEF. LAWYERS, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS SURVEY: THE ATTORNEY-CLIENT PRIVILEGE IS UNDER ATTACK 2-3 (Apr. 2005), *available at* http://www.nacdl.org/public.nsf/Legislation/Overcriminalization002/$FILE/AC_Survey.pdf.

[37] In addition, state regulators, such as the New York Attorney General, and self-regulatory organizations like the New York Stock Exchange, have followed the federal regulators' lead in demanding corporate cooperation in exchange for leniency in sanctions.

As mentioned above, in October 2001, the SEC set forth its policy on crediting cooperation in the resolution of enforcement actions.[38]  This policy, set forth in what is known as the "Seaboard Report," listed four broad factors the SEC considers in determining whether, and how much, to credit a corporation's cooperation, including (1) self-policing prior to discovering the misconduct, (2) self-reporting the misconduct upon discovery, (3) remediation, and (4) cooperation with law enforcement agencies.  The Seaboard Report asks, "Did the Company promptly make available to our staff the results of its [internal] review and provide sufficient documentation reflecting its response to the situation?"[39]  It also acknowledges that waiver of the attorney-client privilege may be necessary to demonstrate cooperation: "In some cases, the desire to provide information to the Commission staff may cause companies to consider choosing not to assert the attorney-client privilege, the work product protection and other privileges, protections, and exemptions with respect to the Commission."[40]

In the Seaboard matter, the SEC lauded the corporation's decision to turn over documents related to the internal investigation, including notes and transcripts from employee interviews, and not to invoke the attorney-client privilege or work product doctrine with regard to facts uncovered in the investigation.[41]  Since the Seaboard Report, corporations have operated under the assumption that waiver of the attorney-client privilege is one of the key factors in assessing cooperation with the SEC.[42]

On January 20, 2003, then Deputy Attorney General Larry Thompson issued a policy memorandum regarding "Principles of Federal Prosecution of Business Organizations" (the "Thompson Memo").  The Thompson Memo is current DOJ policy and sets forth nine factors to guide DOJ prosecutors in deciding whether to seek criminal charges against a business

---

*See* Bruce A. Green & David C. Clifton, *Feeling a Chill*, 91 A.B.A. J. 61, 64 (2005).  New York Attorney General Eliot Spitzer recently stated that because the Sentencing Guidelines Commentary validates federal prosecutors' waiver practices, "he would be in effect foolish not to ask for waiver in any major corporate case his office prosecutes" and that he ought to take advantage of such an approach if the DOJ did.  *See* STATEMENT OF THE AMERICAN CHEMISTRY COUNCIL, THE ASSOCIATION OF CORPORATE COUNSEL, AND THE NATIONAL ASSOCIATION OF MANUFACTURERS BEFORE THE U.S. SENTENCING COMMISSION 5 (2005), *available at* http://www.ussc.gov/corp/11_15_05/VanDam-ACC-NAM.pdf.

[38] *See supra* note 11.

[39] *Id.*

[40] *See id.* at n.3.

[41] *See id.*

[42] *See supra* note 2.

organization.[43] The memo directs "increased emphasis on and scrutiny of the authenticity of a corporation's cooperation" in making charging decisions.[44] It provides that one of the factors prosecutors should consider in deciding whether to bring charges is "the corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of corporate attorney-client and work product protection."[45]

The Thompson Memo directs prosecutors to consider "whether the corporation appears to be protecting its culpable employees and agents."[46] In the eyes of the Justice Department, this can include "advancing of attorneys' fees, . . . retaining the employees without sanction for their misconduct, . . . providing information to the employees about the government's investigation pursuant to a joint defense agreement, . . . [or] attempts to shield corporate officers and employees from liability by a willingness of the corporation to plead guilty."[47] The Thompson Memo also includes a new factor for consideration: "the adequacy of the

---

[43] *See* Memorandum from Larry D. Thompson, Deputy Attorney General, to Heads of Department Components and United States Attorneys 1 (Jan. 20, 2003), *available at* http://www.usdoj.gov/dag/cftf/corporate_guidelines.htm [hereinafter Thompson Memo]. The Thompson Memo revises a substantially similar memorandum authored in 1999 by former Deputy Attorney General Eric Holder. *See* Memorandum from Deputy Attorney General to All Component Heads and United States Attorneys 1 (June 16, 1999), *available at* http://www.usdoj.gov/criminal/fraud/policy/chargingcorps.html [hereinafter the Holder Memo]. Unlike the Holder Memo, which allowed prosecutors discretion in deciding whether to apply the factors for determining whether to charge a company in a particular case, *see* Holder Memo, *supra*, at 1, the Thompson Memo requires that "*in every matter involving business crimes,*" a prosecutor must apply the factors. *See* Thompson Memo, *supra*, at 1 (emphasis added).

[44] *See* Thompson Memo, *supra* note 43, at 1.

[45] *Id.* at 3. Other factors include the corporation's history of similar misconduct; the corporation's remedial actions; and the adequacy of prosecuting individuals responsible for the corporation's malfeasance. *Id.* In the Comment section regarding Cooperation and Voluntary Disclosure, the Thompson Memo adds a new explanatory paragraph:

> Another factor to be weighed . . . is whether the corporation, while purporting to cooperate, has engaged in conduct that impedes the investigation (whether or not rising to the level of criminal obstruction).    Examples of such conduct include: overly broad assertions of corporate representation of employees or former employees; inappropriate directions to employees or their counsel, such as directions not to cooperate openly and fully with the investigation including, for example, the direction to decline to be interviewed; making presentations or submissions that contain misleading assertions or omissions; incomplete or delayed production of records; and failure to promptly disclose illegal conduct known to the corporation.

*Id.* at 6.

[46] *Id.* at 5.

[47] *See id.* These same considerations were also engrained in the predecessor Holder Memo. *See* Holder Memo, *supra* note 43, at 7.

prosecution of individuals responsible for the corporation's malfeasance."[48] Thus, not only does the Thompson Memo strongly suggest that the corporation surrender certain basic assumptions traditionally associated with defending itself and its employees in the name of cooperating with the government, but it also emphasizes the liability and potential punishment of individuals in lieu of the corporation.[49]

This emphasis on individual liability, distinct from that of the company, is embodied in the Thompson Memo's reasoning that, "imposition of individual criminal liability may provide the strongest deterrent against future corporate wrongdoing. Only rarely should provable individual culpability not be pursued, even in the face of offers of corporate guilty pleas."[50] This last point has led to somewhat of a reversal of order in criminal cases. Before the Thompson Memo, corporations often accepted pleas to spare their employees the same fate. Now, however, the DOJ is more likely to "listen to arguments that individual prosecutions obviate the need for corporate prosecutions."[51]

More recently, the DOJ reiterated its policy on seeking waivers of attorney-client privilege for corporations. On October 21, 2005, Acting Deputy Attorney General Robert McCallum issued a memorandum directing prosecutors to "establish a written waiver review process for [their] district or component" (the "McCallum Memo").[52] The McCallum Memo ensures that each U.S. Attorney across the country will be ready to strike with a demand for a privilege waiver. Significantly, it does not require consistency or predictability across offices in making these demands—an issue that is particularly troublesome for corporations doing business in a global marketplace.

The U.S. Sentencing Commission has validated the DOJ view of waiver of the attorney-client privilege by recent amendments to the Organizational Sentencing Guidelines. In particular, recently amended

---

[48] *Id.* at 3.

[49] *See* Theodore V. Wells, Jr., *Current Developments in the Government's Corporate Prosecution Policy*, 1517 PLI/CORP. 829, 833 (2005).

[50] *See* Thompson Memo, *supra* note 43, at 2.

[51] *See* Howard W. Goldstein, *Corporate Crime: The Thompson Memorandum*, N.Y. L.J. ONLINE, Mar. 6, 2003, at 5, *available at* http://www.nylj.com; *see also* Mary Jo White, *Corporate Criminal Liability: What Has Gone Wrong?* 1517 PLI/CORP. 815, 819 (2005) (emphasizing that the Thompson Memo's new requirement that prosecutors analyze every corporate crime by an employee(s) in determining whether to charge a corporate employer and requiring prosecutors to apply the Thompson factors in every case makes every corporate crime a candidate for a corporate charge).

[52] *See* Memorandum from Robert D. McCallum, Jr., Acting Deputy Attorney General, to Heads of Department Components and United States Attorneys 1 (Oct. 21, 2005), *available at* http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/crm00163.htm.

Commentary to § 8C2.5 states that for purposes of reducing a corporation's culpability score, waiver of the attorney-client privilege "is not a prerequisite . . . *unless such waiver is necessary in order to provide timely and thorough disclosure of all pertinent information known to the organization*."[53]   In light of this endorsement by the Sentencing Commission of the DOJ's approach to waiver,[54] public corporations are often left with little choice but to waive the attorney-client privilege if they hope to negotiate lenient pleas, or non-prosecution or deferred prosecution agreements.[55]  As noted by the ABA, "the exception is likely to swallow the

[53] *See* U.S. SENT'G COMM'N, EFFECTIVE COMPLIANCE AND ETHICS PROGRAMS IN CHAPTER EIGHT 112, 124 (2004) (emphasis added), *available at* http://www.ussc.gov/2004guid/RFMay04_Corp.pdf.  Not surprisingly, the amended commentary has received much criticism.  As a result, the U.S. Sentencing Commission recently began efforts to reexamine the issue, and, as of the time of the writing of this article, no resolution of those efforts has been announced.  *See* U.S. SENT'G COMM'N, PUBLIC MEETING PANEL DISCUSSION ON THE ATTORNEY-CLIENT WAIVER AND THE FEDERAL SENTENCING GUIDELINES (2005), *available at* http://www.ussc.gov/AGENDAS/agd11_05.htm.

[54] *See* Mary Beth Buchanan, *Organizational Sentencing: Federal Guidelines and the Benefits of Programs to Prevent and Detect Violations of Law*, 39 WAKE FOREST L. REV. 587, 589 (2004) (stating that the Thompson Memo's waiver approach is "entirely consistent" and "based squarely on" the newly amended commentary to § 8C2.5); Elkan Abramowitz & Barry A. Bohrer, N.Y. L.J ONLINE, Nov. 1, 2005, *available at* http://www.nylj.com ("In addition to the [Thompson Memo and the McCallum Memo], the policy underscoring the importance of corporate cooperation–often in the form of acceding to government requests to produce privileged information–in criminal and regulatory investigations is also found in the federal sentencing guidelines relating to organizations.").

[55] Since the 2003 Thompson Memo, we have seen a growth in number of non-prosecution and deferred prosecution agreements against corporations as alternative means to resolving criminal government investigations when corporations cooperate.  *See* Thompson Memo, *supra* note 43, at 6 ("granting a corporation immunity or amnesty or pre-trial diversion (i.e., a deferred prosecution agreement) may be considered in the course of the government's investigation"); David Pitofsky, *Monitor/Examiner's Role Under Deferred Prosecution Agreements*, 234 N.Y. L.J. 3, 3 n.2 (Sept. 14, 2005) (noting that deferred prosecution agreements and non-prosecution agreements "were originally created for cases involving individual defendants, not organizational defendants" and that the "authorization for federal prosecutors to enter into [such agreements] with companies comes from the so-called 'Thompson Memo'"); Timothy Coleman & Peter H. Bresnan, *What Does Law Enforcement Regard as an Effective Compliance Program?* 1478 PLI/CORP. 543, 549 (2005) ("[T]he Chapter 8 guidelines play an important role in informing the Government's evaluation of whether to grant a deferred prosecution, and under what terms.").

Indeed, a recent report found that "prosecutors have entered into twice as many non-prosecution and deferred prosecution agreements with major American corporations in the last four years (twenty-three agreements between 2002 and 2005) than they have in the previous ten years (eleven agreements between 1992 and 2001)."  *Crime Without Conviction: The Rise of Deferred and Non-Prosecution Agreements*, CORP. CRIME REP., Dec. 28, 2005, at 1, *available at* http://www.corporatecrimereporter.com/deferredreport.htm; *see also, e.g.*, Letter from David Kelly, U.S. Attorney for the Southern District of New York, to Robert S. Bennett, Counsel to KPMG LLP (Aug. 26, 2005) (deferred prosecution

rule; prosecutors will make routine requests for waivers and organizations will be forced to routinely grant them."[56]

## II.    UNINTENDED COSTS OF THE NEW REGIME

Internal investigations have taken on a new prominence in the wake of the Thompson Memo, the Seaboard Report, and the government's reaction to the succession of corporate scandals. These investigations have long been a feature of corporate America's efforts to address allegations of management or employee misconduct and to ensure compliance with various federal and state regulatory requirements.[57]  But with passage of Sarbanes-Oxley and the current SEC and DOJ emphasis on cooperation and privilege waiver in reaction to the wave of recent corporate scandals, the frequency and importance of internal investigations cannot be overstated.[58]

### A.  INTERNAL INVESTIGATIONS: DIVIDING THE EMPLOYER-EMPLOYEE RELATIONSHIP

More and more, the very prospect of an internal investigation drives a wedge between corporations and their employees.  In light of the sensitive information often uncovered during internal investigations, they have traditionally been conducted by attorneys and with an eye toward

---

agreement), *available at* http://www.usdoj.gov/usao/nys/Press%20Releases/August%2005/ KPMG%20dp%20AGMT.pdf; Letter from U.S. DOJ to Alan Vinegrad and Philip C. Korologos, Counsel to Adelphia Communications Corp. (Apr. 25, 2005) (non-prosecution agreement) (on file with authors); Deferred Prosecution Agreement, United States v. Bristol-Myers Squibb Co., Cr. No. 2:05-mj-06076 (D.N.J. 2005), *available at* http://www.usdoj.gov/ usao/nj/publicaffairs/NJ_Press/files/pdffiles/deferredpros.pdf [hereinafter BMS Deferred Prosecution Agreement]; Deferred Prosecution Agreement, United States v. America Online, Inc., Cr. No. 1:04 m 1133 (E.D.N.Y. 2004), *available at* http://www.usdoj.gov/dag/cftf/ chargingdocs/aolagreement.pdf; Deferred Prosecution Agreement, United States v. Computer Assocs. Int'l, Cr. No. 04-837 (E.D.N.Y. 2004), *available at* http://www.usdoj.gov/ dag/cftf/chargingdocs/compassocagreement.pdf [hereinafter Computer Associates Deferred Prosecution Agreement].

[56] *See* Letter from Robert D. Evans, American Bar Ass'n, to U.S. Sentencing Commission re Comments on Notice of Proposed Priorities—Chapter 8 Organizational Guidelines, Section 8C2.5, Waiver of Attorney-Client Privilege, at 3 (Aug. 15, 2005).

[57] *See supra* notes 4–12 and accompanying text; *see generally* STEPHEN F. BLACK & ANDREW N. VOLLMER, INTERNAL CORP. INVESTIGATIONS §§ 1.01–1.02 (2004) (tracing the history of internal investigations since the 1960s).

[58] *See* BLACK & VOLLMER, *supra* note 57, §§ 1.01–1.02; MARC I. STEINBERG, ATTORNEY LIABILITY AFTER SARBANES-OXLEY § 7.01 (2005).  Sarbanes-Oxley encourages the use of internal investigations by requiring audit committees to establish procedures for handling complaints about financial reporting matters and requiring companies to respond to reports by its lawyers of legal violations.  *See* BLACK & VOLLMER, *supra* note 57; 15 U.S.C. §§ 78(f)(m)(4), 7245 (2000 & Supp. 2005).

maintaining the attorney-client privilege.[59] Notwithstanding this practice, the government's escalating demands for waiver of the privilege increasingly extend to materials related to internal investigations.[60] This becomes particularly problematic for a company's executives and employees—some of whom may be involved in or responsible for the putative misconduct. Even where they have acted in the good faith belief that their actions were appropriate and in the company's best interests, the process itself often creates a conflict between the corporation and the individuals managing it or serving it.[61]

Currently, the process of an internal investigation may well force executives and employees into a series of Hobson's choices. As a practical matter, executives and employees must participate in the investigation interviews or else lose their jobs.[62] Then, having participated—or having

---

[59] *See* BLACK & VOLLMER, *supra* note 57, § 6.02[1].

[60] *See* STEINBERG, *supra* note 58, § 7.03 ("[T]he Government frequently seeks internal investigation reports authored by legal counsel, witness interviews conducted by counsel in connection with internal investigations, notes made by counsel, and documents that evidence the legal advice provided by counsel during the internal investigation.").

In several recent SEC settlements that have recognized corporations' cooperation, the corporations disclosed the results of their internal investigations and declined to assert the attorney-client privilege with respect to communications during that time period. *See, e.g.*, *In re* Monsanto Co., Order Instituting Cease-and-Desist, Making Findings, and Imposing a Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934, Exchange Act Release No. 50978 (Jan. 6, 2005), *available at* http://www.sec.gov/litigation/admin/34-50978.htm (imposing cease and desist order and remedial undertakings, but no monetary sanctions); Press Release, Securities and Exchange Commission, SEC Charges Royal Ahold and Three Former Top Executives With Fraud (Oct. 13, 2004), *available at* http://www.sec.gov/news/press/2004-144.htm (consenting to permanent injunction, but no monetary sanctions).

[61] *See* N. Richard Janis, *Deputizing Company Counsel as Agents of the Federal Government*, WASHINGTON LAWYER, Mar. 2005, at 32; Michael Farber, *Interviewing Company Employees in the Internal Investigation: Navigating the Minefield*, 19 INSIGHTS 10 (2005); John Gibeaut, *Junior G-Men: Corporate Lawyers Worry that They're Doing the Government's Bidding While Doing Internal Investigations*, 89 ABA J. 46, 51 (2005) ("[C]orporate lawyers are particularly worried that Justice is trying to drive a wedge between companies and employees."); Michael Burr, et al., *The CLT Tap 20: The Events, People & Stories of 2005*, 15 CORP. LEGAL TIMES 36, 42 (2005) (citing the August 2005 KPMG deferred prosecution agreement as the fifth most significant legal development in 2005 because it represents the larger problem of attacks on attorney-client privilege due to government demands for waiver of the privilege).

[62] *See* Testimony of Henry W. Asbill, National Association of Criminal Defense Lawyers, to the U.S. Sentencing Commission, at 4 (Nov. 15, 2005) ("Increasingly, companies do not hesitate to fire individual employees who refuse to 'cooperate.'"); Sarah Helene Duggin, *Internal Corporate Investigations: Legal Ethics, Professionalism, and the Employee Interview*, 2003 COLUM. BUS. L. REV. 859, 907 (2003) ("[I]n most states, [an employee's] refusal to cooperate with an internal investigation 'constitutes a breach of the employee's duty of loyalty to the corporation and is good grounds' [for dismissal.]")

considered participating—in the interviews, an executive or employee may decide he wants outside counsel to guide him through the process.[63]  While the employee might reasonably expect his company to help pay the legal bills associated with an inquiry into the work he did for the company—and most companies do so—the DOJ or the SEC policies often disfavor such support, depending upon how the government views the individual's conduct.[64]  These individuals may be left in the difficult position of paying their own legal fees or else forfeiting legal representation.[65]

---

(quoting STEPHEN F. BLACK, INTERNAL CORPORATE INVESTIGATIONS §1.01, §4.03[2] (1998)); Lisa A. Mathewson & Catherine M. Recker, *Joint Defense Agreements in the Corporate Context: No Guarantees*, THE CHAMPION, Sept./Oct. 2005, at 20, *available at* http://www.nacdl.org/public.nsf/698c98dd101a846085256eb400500c01/1c707e2c1df831628 52570b3006f1ba7?OpenDocument&Highlight=0,lecroy     ("[C]orporations     commonly condition continued employment on cooperation with an internal investigation.").

[63] For example, in the Computer Associates case, the company's executives pleaded guilty to obstruction of justice charges on the theory that, in lying to the company's outside counsel, they had misled federal prosecutors because the results of the investigation were passed on the government during the company's efforts to cooperate with the government investigation. *See* Alex Berenson, *Case Expands Type of Lies Prosecutors Will Pursue*, N.Y. TIMES, May 17, 2004, at C1. In that case, the government learned of the misstatements because the company waived its attorney-client privilege as to the internal investigation. *See* Richard P. Swanson, *Corporate Investigations and Common Law*, 231 N.Y. L.J. 4 (2004).

[64] *See* Thompson Memo, *supra* note 43; Laurie P. Cohen, *U.S. Prosecutors' Tough New Tactics Turn Firms Against Staff*, WALL ST. J., June 7, 2004, at A5. In the government's recent investigation of KPMG's marketing of illegal tax shelters, KPMG broke ranks with one of its leading partners in the name of cooperation. *See id.* KPMG asked the partner to resign and then refused to pay his legal fees unless he cooperated with the prosecutors. *See id.*

When asked whether the "government [is] being unfair to company employees if it pressures their employers not to pick up the tab," former Deputy Attorney General Thompson responded that, "if employees really don't believe they acted with criminal intent, 'they don't need fancy legal representation,' to defend themselves. There are lots of reasonably priced lawyers." *See id.*

[65] *See* Asbill, *supra* note 62, at 4 ("[U]n-insured officers and employees are unlikely to have their defense costs paid if there is even a hint that they are potential targets of the investigation; at the same time many companies will categorically refuse to pay defense costs of employees who are seen as non-cooperating."). *But see* Homestore, Inc. v. Tafeen, 888 A.2d 204 (Del. Supr. 2005) (holding that company executive was entitled to advancement of legal fees under company bylaws and state corporate statute).

The recent KPMG case involving allegedly fraudulent tax shelters provides an effective example. There, KPMG agreed to advance up to $400,000 in legal fees to each of its thirty current and former partners and employees who were the subject of a grand jury investigation on the condition that they agree to cooperate with the government. *See* Cohen, *supra* note 64. This amount of money and this condition are unremarkable at first glance. But $400,000 would be seriously inadequate to mount a vigorous defense to prosecution in a complicated case with significant liability at risk, as this one undoubtedly is for many of the individuals involved. Also, the deal presents the partners and employees with a Hobson's choice: go it alone and virtually ensure personal financial ruin, or accept the partial subsidy

Joint defense agreements, which provide a safe harbor to preserve privilege while protecting the company's interests, offer no solace. Joint defense agreements allow parties with different attorney-client relationships and privileges, but with a common interest, to agree to share information with each other for purposes of formulating their defenses without waiver.[66] Such agreements also serve the public interest by helping companies uncover facts expeditiously and move quickly toward a resolution of issues. A joint defense agreement may be the only way a corporation can access the facts underlying the allegation(s) of misconduct where the employees are separately represented. At a minimum, a joint defense agreement may encourage employees to participate in a company's internal investigation rather than to refuse and/or delay the investigation. But, DOJ and SEC policies reject such agreements as well.[67]

The days when joint defense agreements gave both corporation and employees the ability to participate in internal investigations without the risk of disclosure by the other party are rapidly passing. To former Deputy Attorney General Comey, the very possibility of such an agreement was baffling: "It is hard for me to understand why a corporation would ever enter into a joint defense agreement because doing so may prevent it from making disclosures it either must make if it is a regulated industry, or may wish to make to a prosecutor."[68] This approach oversimplifies a complicated analysis: the obligations of a company under investigation run not only to the government. It also has other, arguably prior, obligations to manage itself appropriately and efficiently, and to maximize shareholder value. When allegations of misconduct impede a corporation's ability to effectively serve its shareholders, it might well make sense for the corporation to enter a joint defense agreement to uncover the facts expeditiously and to move forward with appropriate remedial steps. Instead, the corporation and its employees are effectively consigned to their

---

of their legal defense while agreeing to give up their own rights in the name of "cooperation."

[66] *See* Mathewson & Recker, *supra* note 62, at 20.

[67] *See, e.g.*, Thompson Memo, *supra* note 43; *In re* Grand Jury Subpoena, 274 F.3d 563, 568 (1st Cir. 2001) (permitting corporation that entered into a joint defense agreement with its officers to unilaterally waive privilege both for itself and the officers); United States v. LeCroy, 348 F. Supp. 2d 375 (E.D. Pa. 2004) (holding that employees waived the attorney-client privilege despite a joint defense agreement with their corporation when they submitted to interviews after the corporation indicated it might waive the privilege if pushed by the government to do so).

[68] *Interview with United States Attorney James B. Comey Regarding Department of Justice's Policy on Requesting Corporations under Criminal Investigation to Waive the Attorney Client Privilege and Work Product Protection*, U.S. ATTORNEYS' BULLETIN, Nov. 2003, at 4.

respective corners while the threat of privilege waiver chills meaningful discussion among those most knowledgeable of a crucial issue facing the company.

The imbalance of power created by the demand for "cooperation" and waiver of privilege is exacerbated by government investigations that now effectively have no time or budgetary limits. At one time in the not-so-distant past, the government was compelled to make triage decisions in order to best allocate its resources for a particular investigation. DOJ and SEC attorneys were forced to make careful calculations about the value of a particular case and whether governmental resources were best devoted to this or that thread of any given investigation.    The costliness of investigations, combined with real budgetary limits, operated as a natural check on prosecutorial inquiries that could otherwise have no bounds.

Now, private lawyers are effectively "deputized" in many internal investigations, and the government obtains the facts of their inquiry through waiver of attorney-client privilege.[69]    The new approach leverages governmental resources and takes away the historical checks and balances that existed in the process when the government investigated and company counsel defended in such an investigation.  When private attorneys can effectively be commissioned into government service through a process that will unearth every scrap of relevant information at the company's cost, governmental budget constraints matter much less.  There is no incentive to hold back on some investigations that would otherwise be unproductive, and the government has nearly unlimited opportunity—with a very low threshold for cost effectiveness—to find misconduct at a public corporation. Because the publicity and risks of a civil or criminal trial can be so devastating to public corporations, and especially to highly regulated corporations—both in economic and reputational terms—they are often compelled to settle, even if it means taking positions contrary to their officers and employees.[70]

The recent increase in the use of deferred prosecution agreements exacerbates the waiver policy vis-à-vis corporations.[71]  These agreements, many of which require waiver of the privilege,[72] give prosecutors enormous

---

[69] *See* Swanson, *supra* note 63.  Because the SEC and DOJ now franchise out investigations to companies' counsel, the government agencies can demand evaluation into whatever issues they choose at whatever cost to the company.

[70] *See id.* (citing statistics demonstrating a decrease in federal trials: 11,000 cases in 1962; 12,500 cases in 1985; and 8000 cases in 2002, despite a five-fold increase in filings over corresponding forty-year time period).

[71] *See supra* note 55 (discussing deferred prosecution agreements).

[72] *See, e.g.*, Computer Associates Deferred Prosecution Agreement, *supra* note 55.

discretion to impose hefty penalties and remedial undertakings on companies so that they may avoid being indicted.[73]  They have effectively lowered the floor for criminal prosecution.  What's more, there is limited judicial oversight over deferred prosecution agreements.  An investigation is launched and the case largely settled before a court has weighed the first bit of evidence or tested a single legal theory.  As a result, problematic legal issues may well simmer just below the surface with no resolution, and the opportunity to test the issues will not arise.[74]

## B.  PUBLIC VERSUS PRIVATE CORPORATIONS: A DIFFERENT CALCULUS IN WAIVING PRIVILEGE

In this new era, publicly traded companies are especially susceptible to government demands for waiver in a way that private companies are not. Unlike a publicly held corporation that has regular disclosure and reporting requirements to the SEC and its shareholders, a private company may well stand on firmer ground in facing a governmental investigation.  Private companies can actually resist demands for waiver.  Alleged facts can be refuted.  Spotty legal theories can be researched and challenged.  In short, the case can be developed and defended much more completely before the company is forced to choose to settle or fight.  A private company simply does not face the punishment that publicity and controversy can inflict at the first sign of market concern.

A public company, on the other hand, is far more at risk of substantial harm from negative publicity.  Indeed, loss of investor confidence and reputational damage may well be overwhelming before it is even clear that someone violated the law.  Even small swings in a company's stock price

---

[73] If we learned anything from Arthur Andersen, it was the power of an indictment to crumble a company.  The company's conviction led to dissolution and left more than 80,000 employees without jobs.  *See* Howard W. Goldstein, *Corporate Crime*, N.Y. L.J. ONLINE (Sept. 1, 2006), *available at* http://www.nylj.com.  That the Supreme Court ultimately reversed Arthur Andersen's conviction will not restore the thousands of lives that were disrupted when the company dissolved.  *See* Arthur Andersen LLP v. United States, 125 S. Ct. 2129, 2137 (2005).

[74] DOJ's extremely strong hand at times puts its prosecutors in the position of managing their corporate targets.  For example, as part of its deferred prosecution agreement, Bristol-Myers Squibb Company agreed to appoint one of its board members as a non-executive chairman and to appoint an additional non-executive director acceptable to the U.S. Attorney.  *See* BMS Deferred Prosecution Agreement, *supra* note 55; Stephen Taub, *Bristol's Former CFO Indicted,* CFO.com (June 16, 2005), http://www.cfo.com/article/cfm/4096065?f=search.  This sort of decision making by government attorneys is troubling to the extent that the judgment that goes into performing effectively as a director of a large public corporation is borne of many years of experience in the business world, not (possibly a few) years as a prosecutor or staff attorney.

today are relentlessly scrutinized by the financial press, and a combination of a regulatory or criminal inquiry with negative press can be lethal for a public corporation. Taking the long-term view of shareholders' interests can thus become impossible when a short-term crisis—facing off against a tough federal prosecutor with an indictment in hand—overwhelms the board's ability to reason through to a sound decision.

A related casualty of this new trend of waiver demands peculiar to public corporations is its effect on the willingness of business leaders to assume board positions. Facing increased administrative responsibilities and costs as well as decreased nimbleness in managing companies that results from this imbalance of prosecutorial power, the most qualified candidates now often refuse board positions—a trend that hurts our markets by draining the most qualified human capital and thereby decreasing the efficiency of public corporations.[75]

Moreover, when the DOJ and the SEC bring a case in tandem against a public corporation, the company must comply or else run the risk of being denied access to the capital markets. Unlike private companies that are not subject to filing requirements for new issue securities registration statements, proxy materials, and annual reports,[76] a public corporation must do so with the approval of the very agency (i.e., the SEC) that is investigating it. In addition, unlike a private company, a public corporation is subject to the pressure of possible shareholder litigation at even a hint of governmental inquiry.

### III. CONCLUSION

Internal investigations and privilege waivers are neither new nor presumptively bad for the capital markets, as a general proposition. Indeed, one can make the case—and prosecutors and regulators no doubt will—that the frequency and reliance on such tools have been necessary in the wake of the recent accounting and disclosure meltdowns by presumably once well run, well respected public companies. It is difficult to refute governmental assertions that these extraordinary events have demanded an extraordinary response. Our concern is that the long-term implications of this short-term prosecutorial response to the problem have yet to be assessed.

The traditional shared commitment by a corporation's fiduciaries to meet its obligations to the shareholders breaks down in the face of the government's waiver practices. At almost every turn—particularly in the

---

[75] *See* Eric Dash, *Executive Pay: A Special Report; For Directors, Great Expectations (and More Pay)*, N.Y. TIMES, Apr. 4, 2004, § 3, at 10.

[76] *See* SEC. INDUS. ASS'N, 2003 CAPITAL MARKETS HANDBOOK 4 (John C. Burch, Jr. & Bruce S. Foerster eds., 4th ed. 2003).

context of internal investigations—issues of personal liability and risk threaten to prevail over the sense of duty to the shared enterprise. Today, an employee's first instinct is often to wonder how he can protect himself, not about how the company can right itself or, indeed, defend itself.

To approach the issues intelligently, it is not sufficient simply to equate the waiver of the attorney-client privilege with "doing the right thing." Gradations of both individual and corporate wrongdoing will always exist, and company counsel, senior management, and the board of directors should retain some role *in the first instance* in assessing such issues. Indeed, the system should allow reasonable and reasoned room for a determination to advocate zealously for the company and its employees, including reliance on the attorney-client privilege. Different and competing concerns will have to be carefully weighed in each instance, and the analyses are much more complicated than the current approach presumes. Even when people engage in misconduct, the now nearly-automatic demand for broad-based waivers carries with it larger risks and consequences that have yet to be fully understood, let alone properly weighed by the government.