PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

M E M O R A N D U M

September 16, 2006

TO: KLA-Tencor File

FROM: Elizabeth Harlan

Re: September 15, 2006, Interview of Cynthia Mangan

On September 15, 2006, Galen Bellamy ("GB") and Elizabeth Harlan of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") interviewed Cynthia Mangan ("Mangan"), the former administrative assistant to Gary Dickerson at KLA-Tencor Corporation ("KLA"). The interview took place via telephone. This memorandum is not a verbatim accounting of the above interview, but instead contains my words, mental impressions, personal recollection, creative thought process, opinions and discussion of the events described below. This memorandum also serves to communicate certain facts and mental impressions to the client in connection with the provision of legal advice. I have prepared this memorandum in anticipation of potential civil, administrative, and/or criminal litigation and proceedings. Accord-

Exhibit 1

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

ingly, this memorandum constitutes confidential attorney work product and is also protected by the attorney-client privilege. It has not been reviewed by Ms. Mangan.

### Introduction

GB explained at the outset that Skadden has been retained by a Special Committee of KLA's Board of Directors to conduct an independent investigation of the recent allegations of stock option backdating. GB explained that Skadden represents the Special Committee, not KLA or Mangan. GB explained that the conversation was confidential and privileged, and that the privilege belonged to KLA, not Mangan. Accordingly, the Board or the Special Committee could choose to disclose anything Mangan said during the conversation to third parties, such as the SEC, without advance notice to Mangan. Mangan said that she understood these instructions.

### Mangan's Role at KLA

Mangan began working at KLA Instruments in 1983. She served as the administrative assistant to Robert Boehlke from 1983 until 1994. From 1994 until 1997 she did graphic design for the company. In 1997, she left KLA. She returned to KLA in October 2000 as an assistant to Gary Dickerson ("Dickerson").

KT ACWP-PRIV00000666
F.O.I.A. Confidential
Treatment Requests

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

She worked for Dickerson until he retired in May 2004. Mangan now serves as the administrative assistant to Rick Wallace.

### Dickerson's Calendars and Files

Mangan explained that Dickerson did not keep a lot of paper in his files, but he would keep customer presentations for approximately one year after the presentation was made. Mangan said that most of Dickerson's files were on his computer, which was backed up by the IT Department on a regular basis. The IT Department created zip disks of the files and gave them to Mangan, who kept them at her desk. Mangan said that Dickerson may have taken the zip disks with him when he left KLA, or they could be in storage. She said she would think about how to locate them. She said that the usual practice when someone left the company was to pack their materials and then have the Facilities Department send them to storage. Mangan explained that Dickerson packed his own office when he left.

Mangan remembered that when Dickerson left, his physical files were either packed and put in storage or, if the documents were several years old they were thrown away. Mangan remembered going through his files and shredding some of them, including the customer presentations.

3

KT ACWP-PRIV00000667
F.O.I.A. Confidential
Treatment Requests

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

Mangan explained that Dickerson did not use Outlook to keep his calendar. He kept paper calendars from the time he came to KLA and he took them with him when he left. Mangan had a practice of giving Dickerson a 3x5 notecard each morning with his schedule for the day on it. She did not retain any of those notecards and did not keep a copy set or an electronic version of Dickerson's calendars.

Mangan maintained Dickerson's travel calendar and files while she worked for him. She said those calendars and files had either been disposed of or sent to storage. GB asked what the standard policy was for dealing with materials left behind by an executive. Mangan explained that if the executive did not destroy or take the materials with him, then his assistant had discretion to do what she wanted with the materials. Mangan said that her preference was to shred materials so that they would not be in her space when she started assisting the next executive.

Mangan said she had no memory of Dickerson asking for some of his files after he had left KLA and her telling him that they had been destroyed.

### The Stock Option Approval Process

GB asked Mangan what her procedure was for presenting documents to Dickerson for signature. Mangan said that she would present the document to

4

KT ACWP-PRIV00000668
F.O.I.A. Confidential
Treatment Requests

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

Dickerson and wait for him to sign it if it was convenient to do so, and if not, she put the documents in a folder for his signature. Mangan said that she remembered receiving many documents related to stock option grants from Joy Nyberg and Lars Samson that required Dickerson's signature. She said she received such documents periodically and that Dickerson signed them after the Stock Option Committee had met. She recalled that the stock option approval sheets came to her from Nyberg or Samson with the prices filled in. The documents came to Dickerson for signature first and then moved from Committee member to Committee member by level of seniority from lowest to highest. After Dickerson, the sheet went to Ken Schroeder and then on to Ken Levy. However, Mangan was not sure the approval sheets went to Levy.

Mangan did not remember how often the stock option approval sheets arrived for signature. She said the number of times varied each year. Mangan said that Samson typically gave the approval documents to her, but that sometimes he obtained the signatures himself while he was in the executive suite. Mangan did not remember Leslie Wilson bringing the approval sheets, and while she recognized Michael Kahn's name, she did not think he was at KLA while she was. She only remembered Nyberg and Samson bringing the approval documents.

5

KT ACWP-PRIV00000669
F.O.I.A. Confidential
Treatment Requests

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
<u>AND THE ATTORNEY WORK PRODUCT DOCTRINE</u>

GB showed Mangan an April 3, 2001, memorandum from Nyberg to Schroeder, Dickerson and Levy requesting approval of the recommended stock option grants for the 2nd fiscal year 2001 Supplemental Focal Grant Program for non-officers. (Ex. 1)[1] The memorandum was signed by Ken Schroeder and Dickerson, the grant date was April 4, 2001, and the price was $32.75. Mangan said that this type of document was familiar to her. She said that the date and price were always written in on these documents when she received them for Dickerson's signature. She knew that because she was a stock option recipient and was always interested in seeing what the price was going to be.

GB asked how much time typically passed between receipt of the unsigned approval documents from Samson or Nyberg and the return of the signed approval documents to the compensation department. Mangan explained that the executives signed the approval sheet and the document was returned to compensation in one or two days, unless one of the executives was traveling.

Mangan was familiar with the Stock Option Committee. GB asked whether the Committee had meetings between 2000 and 2002. Mangan said they had

---

[1] During the interview, GB emailed Mangan an electronic image of this document that Mangan was able to view on her computer screen. GB followed the same procedure for Exhibits 2 and 3.

6

KT ACWP-PRIV00000670
F.O.I.A. Confidential
Treatment Requests

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

short meetings periodically, either in person or by telephone. She said she remembered this because she, Tina Galindo and Judith Christiansen would schedule the meetings. Mangan said that the approvals were always signed after the meeting, when Nyberg or Samson would bring the approval documents. She said the approval documents would arrive for signature two or three days after the Stock Option Committee had met. Mangan assumed that the Committee discussed prices and communicated the price to Nyberg. After that communication, Nyberg would create the paperwork and Mangan and Galindo would arrange to get the paperwork signed. Mangan said that Nyberg and Samson never called to ask when the Stock Option Committee meeting was going to be held. Mangan also said that she was never personally involved in communicating the price to the compensation department.

Mangan said she was never present for Stock Option Committee meetings and that none of the administrative assistants took notes or minutes during the meetings. Mangan never noticed that the dates on the approval sheets were before the date the documents were arriving for signature. She said that the only portion of the sheets she focused on was the price of the options.

GB showed Mangan the November 2001 new hire and promotion stock option grant spreadsheet. (Ex. 2) The spreadsheet was signed by Schroeder

7

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

and Dickerson. The issue date was November 20, 2001, and the issue price was $45.54. Mangan said that this type of document was familiar to her. She understood that is was also part of the stock option granting process, just like the approval memorandum that GB had shown her earlier.

GB asked Mangan if she ever saw Schroeder, Levy and Dickerson meet. Mangan said that she saw them go into Schroeder's office and that she and Galindo knew that they were having the Stock Option Committee meeting. Mangan said she never heard the three men discussing whether it was a good time to grant options or discussing strike prices, but noted that they would not have had such discussions in front of her.

GB showed Mangan an October 23, 2003, email from Schroeder to her copying Dickerson and Levy. (Ex. 3) The email instructed Mangan to organize a meeting of the Stock Option Committee for the following Monday after the market closed. Mangan did not remember the email, but said that she would act as Schroeder's assistant when Galindo was out, so perhaps this email was sent to her because she was working for Schroeder at the time.

GB asked Mangan if she was sure the Stock Option Committee was meeting between 2000 and 2002, when she first started supporting Dickerson. He

8

KT ACWP-PRIV00000672
F.O.I.A. Confidential
Treatment Requests

PRIVILEGED AND CONFIDENTIAL
SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE
AND THE ATTORNEY WORK PRODUCT DOCTRINE

noted that Skadden has found emails beginning in late 2002 scheduling Stock Option Committee meetings, but none before that. Mangan said that she could not swear that they were meeting, but she assumed they were. She said she remembered discussing possible dates for the meetings with Judith Christiansen, often by telephone.

Mangan explained that she thought all three executives signed the stock option approvals, but that she probably would not have seen Levy's signature. She said that either she or Galindo, but usually Galindo, typically called Nyberg or Samson to pick up the signed approval documents.

Mangan said that she never noticed a delay between the point in time when the approvals were signed and when she received notification of her option grant. She said she would not have paid attention to any such delay.

Mangan has had no contact with Dickerson for at least two years. GB asked if she remembered Dickerson meeting with KLA's auditors. Mangan said that she thinks he did because she feels as if she was familiar with them.

### May 22, 2006, Wall Street Journal Article

Mangan knew that KLA had been named in the May 22, 2006, WSJ article. She had several conversations at work about whether the allegations were

9

PRIVILEGED AND CONFIDENTIAL<br>SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE<br><u>AND THE ATTORNEY WORK PRODUCT DOCTRINE</u>

true. She remembered discussing the issue with Sherli Ryan, a former administrative assistant for Paul Sandlan, an engineer. Mangan had not discussed the allegations with anyone in the compensation department. She remembered people saying that the allegations were shocking and that people in general did not think backdating had occurred at KLA.

190142-San Francisco S1A

KT ACWP-PRIV00000674
F.O.I.A. Confidential
Treatment Requests